## IN THE UNITED STATES COURT DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| URBAN SUSTAINABILITY DIRECTORS NETWORK,<br>500 Westover Drive, #14973<br>Sanford, NC 27330, | Case No.   1:25-cv-1775 |
| OAKVILLE BLUEGRASS COOPERATIVE,<br>1314 S. Grand Blvd<br>Spokane, WA 99205-1174, and | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| AGROECOLOGY COMMONS,<br>836 Marin Rd<br>El Sobrante, CA 94803-1322 | |
| *Plaintiffs*, | |
| v. | |
| UNITED STATES DEPARTMENT OF AGRICULTURE,<br>1400 Independence Ave., S.W.<br>Washington, DC 20250, | |
| BROOKE ROLLINS, in her official capacity as Secretary of the United States Department of Agriculture,<br>1400 Independence Ave., S.W.<br>Washington, DC 20250, | |
| UNITED STATES FOREST SERVICE,<br>1400 Independence Ave., S.W.<br>Washington, DC 20250, | |
| TOM SCHULTZ, in his official capacity as Forest Service Chief,<br>1400 Independence Ave., S.W.<br>Washington, DC 20250, | |
| *Continued on second page* | |

1

NATURAL RESOURCES
CONSERVATION SERVICE,
1400 Independence Ave., S.W.
Washington, DC 20250,

AUBREY J.D. BETTENCOURT, in her
official capacity as Chief of the Natural
Resources Conservation Service,
1400 Independence Ave., S.W.
Washington, DC 20250,

NATIONAL INSTITUTE OF FOOD AND
AGRICULTURE,
1400 Independence Ave., S.W.
Washington, DC 20250, and

JAYE L. HAMBY, in his official capacity as
Director of National Institute of Food and
Agriculture

     *Defendants*.

## INTRODUCTION

1.      This action seeks to stop the U.S. Department of Agriculture's ("USDA") policy, pattern, and practice of unlawfully terminating hundreds of grants issued to nonprofit organizations, farmers, ranchers, universities, cities, and states. Defendants' policy, pattern and practice has undercut efforts to strengthen rural and agricultural communities, address food security in low-income communities, support beginning farmers, empower urban communities to address climate and heat risks, and support the production and marketing of climate-smart commodities. Defendants' sole basis for these mass terminations is that the grant awards allegedly no longer effectuate new USDA priorities—namely the Trump Administration's priority to attack anything it can portray as related to diversity, equity, inclusion ("DEI") or climate change, regardless of the purpose of the awards or limits on agency authority.

2.      Plaintiffs are nonprofit organizations that received USDA grant awards under a variety of programs, including, for example, the U.S. Forest Service's ("USFS") Urban and Community Forestry Assistance ("UCFA") program, the National Resources Conservation Service's ("NRCS") Partnerships for Climate-Smart Commodities ("PCSC") program, and the National Institute of Food and Agriculture's ("NIFA") Community Food Projects Competitive Grants Program ("CFPCGP"). Plaintiffs devoted extensive time and resources to develop their grant proposals, and then, once awarded, acted in reliance on these grants by hiring employees, providing and promising new or expanded programs to community members and sub-awardees, entering into contracts with local small business, expending their own resources to invest in the projects' long-term success, and foregoing other funding opportunities that they reasonably believed they would no longer need.

3.      Following the Trump Administration's Executive Orders requiring that federal agencies eliminate grant awards related to DEI, climate change, and/or environmental justice, in February 2025, Defendants began engaging in a policy, pattern, and practice of unlawfully terminating federal grant awards.

4.      Defendants justified these widespread award terminations—which Plaintiffs and others received through minimally edited form letters with no discussion of individual grants or individualized determinations—by alleging that the awards "no longer effectuate" USDA's new "agency priorities."

5.      Defendants' policy, pattern, and practice of terminating Plaintiffs' and hundreds of other USDA awards in this manner violates Plaintiffs' constitutionally protected right to due process, as well as USDA's own regulations. It also runs afoul of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.  And, for certain awards, USDA's policy, pattern, and practice violates the U.S. Constitution's Separation of Powers provision and is *ultra vires* because these terminations exceed executive authority and usurp legislative authority.

6.      Plaintiffs and many other nonprofit organizations, farmers, ranchers, universities, cities, states, and the communities they serve have been and continue to be harmed by USDA's unlawful policy, pattern, and practice of terminating grant awards. USDA's actions threaten Plaintiffs' and others' livelihoods, jobs, and communities. Plaintiffs are faced with layoffs, abandoning projects and investments, reputational harm in the community for failing to deliver promised programs, and drastic reductions in their organization's operations, or in some cases, having to shutter their organizations entirely.

7.      Plaintiffs seek declaratory and injunctive relief to vacate and set aside Defendants' unlawful policy, pattern, and practice of terminating awards without the requisite

authority to do so, without a reasoned explanation, and, for select award programs, contrary to congressional mandates, to undo the terminations that Defendants have already issued, and to prevent any future terminations resulting from these unlawful actions.

## JURISDICTION AND VENUE

8.      This action arises under the APA, 5 U.S.C. § 701, *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.* This Court has both subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 28 U.S.C. § 1331.

9.      The Court has authority to enter a declaratory judgment and to provide temporary, preliminary, and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure; the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202; the All Writs Act, 28 U.S.C. § 1651; and the Court's inherent equitable powers. The APA further authorizes the Court to grant temporary and permanent relief from agency action. 5 U.S.C. §§ 705–706.

10.      Venue properly vests in this Court pursuant to 28 U.S.C. § 1391(e).

## PARTIES

11.      Plaintiff Urban Sustainability Directors Network ("USDN") is a nonprofit that supports local government sustainability directors in the United States and Canada to accelerate adoption of sustainability practices, with over 330 member municipalities across the region. In 2023, USDN applied for and was awarded a five-year, $28 million award from USFS under the UCFA program. USDN expended significant time and effort on its grant application, which was overseen and guided by USFS. USDN's project funded by the award aims to strengthen the field of urban forestry, increase equitable access to urban tree canopy in disadvantaged communities, broaden community engagement in urban forest planning, and expand best management and maintenance practices to improve resilience to climate change and extreme heat. The first stage

of the project involves pass-through grants that fund tree planting and sustainability director positions in 25 cities that were selected by USFS during the application process. The second stage involves pass-through funding to additional recipients to develop workforce-development programs that train youth on how to plant and maintain trees in their neighborhoods. USDN's project also provides technical assistance through training and assessment. The grant further contributes to USDN's administrative costs.

12.     Starting in late January 2025, USDA and USFS froze USDN's award. Then on April 2, 2025, USDN received a letter from USDA and USFS terminating its award. Ex. A, attached hereto ("USDN Termination").

13.     The USDN Termination has caused widespread disruption of USDN's internal operations and its ability to continue this project. USDN had to stop its project altogether, including ceasing payment to its sub-awardees and contractors. Its sub-awardees in turn have had to lay off staff and stop their urban forestry programs. USDN had to significantly scale up their operations and expertise to take on this project, and now is anticipating a two-thirds reduction in operations if the funding is not restored. While USDN has not yet had to lay off any employees, without this funding, layoffs are likely because at least seven staff members were paid primarily through the award funding. The termination has also caused tremendous emotional distress for USDN staff and required them to divert time and resources away from other critical projects. It has inhibited USDN's ability to plan for the future and has deterred the organization from applying for federal funding in the future.

14.     Plaintiff Oakville Bluegrass Cooperative ("OBC") collaboratively promotes solutions to increasing droughts, floods, and soil degradation that are causing declining margins for farmers. OBC identifies best practices in sustainable agriculture tailored to the needs of

specialty crop growers and shares its learnings to its members to help promote the long-term health of their farms.

15.    On March 26, 2024, OBC received an award of $4.9 million through USDA's Partnership for Climate Smart Commodities ("PCSC") program to work through a unique cooperative-led partnership system to incentivize the early adoption of no-till farming and a new method of conservation crop cover in specialty crop systems. OBC's application to the program took several hundreds of hours of work, equivalent to at least one full-time person's work for six months.

16.    In January 2025, the Trump Administration froze all funding for PCSC grantees with no indication of whether or when the funds would be released. USDA and NRCS then cancelled the PCSC program on April 14, 2025, and terminated OBC's grant on April 22, 2025. Ex. B, attached hereto ("OBC Termination").

17.    As a result of the funding freeze and subsequent grant termination, OBC's project work has come to a halt. OBC has already been forced to lay off five employees, to return a truck leased as part of the program, and to break a lease for a facility used to store equipment and grass seed. Since the termination, OBC had to stop all soil sampling and testing, which was a critical part of its program. OBC also has not been able to pay a university lab that was processing soil samples for it and some interns who had been doing soil sampling. The termination has caused a loss of momentum and confidence on the part of growers who were planning to implement this new cover crop on their fields. If OBC does not receive its grant funding or replace it with sufficient private funds, it will likely shut down the collaborative.

18.    Plaintiff Agroecology Commons ("AC") is a California-based nonprofit organization that cultivates knowledge sharing, community action, and global solidarity for

agroecological land stewardship, collective healing, and justice within the food movement. In 2023, AC applied for and was awarded a three-year, $397,914 grant award from NIFA through the CFPCGP. AC expended substantial time and resources on its grant application. AC's funded project involves a collaborative model to advance nutrient-dense food sovereignty and community self-reliance through urban agroecological land stewardship, expanding market channels, and increasing the distribution of fresh local food in low-access communities in the San Francisco Bay Area. The project includes a network of values-aligned cooperative markets, a tool lending library accessible to farmers, on-farm apprenticeships for first-generation beginning farmers, the AC Cooperative Incubator Farm that provides land access to beginning farmers, and on-farm urban soil assessments.

19.    On March 7, 2025, AC received a letter from USDA and NIFA terminating its award. Ex. C, attached hereto ("AC Termination").

20.    AC's programming and operations have been significantly impacted by the termination of its grant funding. The remaining grant funds were intended to be used towards its Cooperative Incubator Farm, which AC was about to roll out but now has had to put on hold and will not happen absent this funding. AC had to cancel contracts with six participants who had planned to steward that land as part of the project. AC staff has had to divert time away from other projects to manage the land or let it go fallow. During this time, AC and project participants are losing out on valuable learning and crop-growing time. AC has also had to redirect time and resources towards finding other financial support, causing other projects to be scaled back or put on hold. The termination has made future planning more difficult and will require AC to shift their strategic planning if the funding is not restored soon or if alternative funding sources cannot be secured.

21.    Defendant U.S. Department of Agriculture is an agency within the meaning of the APA, 5 U.S.C. § 701. USDA operates under the supervision and direction of the Secretary of USDA.

22.    Defendant Brooke Rollins is the Secretary of USDA and is sued in her official capacity only.[1]

23.    Defendant U.S. Forest Service is a subagency of USDA and an agency within the meaning of the APA, 5 U.S.C. § 701. USFS operates under the supervision and direction of the Forest Service Chief.

24.    Defendant Tom Schultz is the Forest Service Chief and is sued in his official capacity only.

25.    Defendant Natural Resources Conservation Service is a subagency of USDA and an agency within the meaning of the APA, 5 U.S.C. § 701. NRCS operates under the Supervision and direction of the Chief of NRCS.

26.    Defendant Aubrey J.D. Bettencourt is the Chief of the Natural Resources Conservation Service and is sued in her official capacity only.

27.    Defendant National Institute of Food and Agriculture is a subagency of USDA and an agency within the meaning of the APA, 5 U.S.C. § 701. NIFA operates under the supervision and direction of its Director.

28.    Defendants Jaye L. Hamby is Director of NIFA and is sued in his official capacity only.

---

[1] References herein to "USDA" include both the U.S. Department of Agriculture and Secretary Rollins. The same is true for each subagency: mention of the subagency acronym refers both to the subagency itself and the subagency official.

## FACTUAL BACKGROUND

**I.    USDA Awards**

29.    USDA is responsible for overseeing congressionally funded programs related to agriculture, and for distributing funds Congress has appropriated through federal awards, including grants and cooperative agreements.

30.    As described below, these programs and the federal awards supporting them cover a broad range of issues that create jobs and support community, agricultural, and rural development, often pursuant to mandates from Congress. The programs range from supporting local urban forestry, to addressing food insecurity, to incentivizing the adoption of more environmentally friendly agricultural practices.

31.    Before awarding funding, federal agencies, including USDA, are required to give public notice of the funding opportunity that includes the goals and priorities of the program; publicly solicit applications; conduct a "merit review process"; and only select "recipients most likely to be successful in delivering results based on the program objectives." 2 C. F. R. §§ 200.204–200.205.

32.    To ensure that taxpayer money is well spent, federal awards involve lengthy and complex application procedures and reporting and auditing requirements. *See*, *e.g.*, 2 C. F. R. §§ 200.205–200.213 (application process), 200.328–200.330 (performance, financial monitoring, and reporting requirements for federal award recipients), 200.500–200.521 (financial auditing requirements for federal award recipients).

33.    Recipients of these awards are selected by USDA through this competitive process and once selected, enter into binding terms with USDA in the form of a grant or cooperative agreement.

34.     By these awards, USDA agrees to provide funding up to a specified dollar amount over a specified period of time for work that advances U.S. policy interests as detailed in the agency's notices of funding opportunity or equivalent award-related documentation.

35.     In exchange, awardees agree to use the federal funds to complete their agency-approved projects on an agency-approved timeline, in a manner that advances objectives for the programs defined by Congress and/or the awarding agency at the time of the award. Awardees also agree to comply with lengthy terms and conditions incorporated into their award agreements. The terms are dictated by pre-existing USDA rules and regulations and are virtually identical across funding recipients within a given program.

36.     USDA does not receive consideration in the form of direct tangible benefits from the awardees' performance of these awards.

37.     The following are just some examples of USDA grant programs.

**A.  Urban and Community Forestry Assistance Program**

38.     In 2022, Congress passed and President Biden signed into law the Inflation Reduction Act, Pub. L. No. 117-169, 136 Stat. 1818 (2022) ("IRA").

39.     In Subtitle D, Section 23003(a)(2) of the IRA, Congress appropriated $1.5 billion to USDA, to remain available until September 30, 2031, "to provide multiyear, programmatic, competitive grants to a State agency, a local governmental entity, an agency or governmental entity of the District of Columbia, an agency or governmental entity of an insular area . . . an Indian Tribe, or a nonprofit organization through the Urban and Community Forestry Assistance program established under section 9(c) of the Cooperative Forestry Assistance Act of 1978 (16 U.S.C. 2105(c)) for tree planting and related activities."

40.     These funds are administered through the USFS, an agency within USDA.

11

41.     In creating the UCFA program, Congress found, among other things, that "tree plantings and ground covers such as low growing dense perennial turfgrass sod in urban areas and communities can aid in reducing carbon dioxide emissions, mitigating the heat island effect, and reducing energy consumption, thus contributing to efforts to reduce global warming trends." 16 U.S.C. § 2105(a)(5).

42.     Thus, the statutory purposes of the UCFA program include "implement[ing] [] tree planting program[s] to complement urban and community tree maintenance and open space programs and to reduce carbon dioxide emissions, conserve energy, and improve air quality in addition to providing other environmental benefits." *Id.* § 2105(b)(5).

43.     On April 12, 2023, USFS issued a Notice of Funding Opportunity to initiate the process of distributing these IRA funds to qualified applicants through a competitive process. The notice's section on "Legislative Authority and Funding Priorities" reiterates that the funds must be used for projects in furtherance of the priorities listed in IRA Section 23003(a)(2). It further provides that the program prioritizes projects "working to support disadvantaged communities experiencing low tree canopy and environmental justice," as well as "locally led conservation and park projects in communities that disproportionately lack access to nature and its benefits."[2]

44.     Following the application process, USFS announced more than $1 billion in awards to 385 community-based organizations, local and state governments, and other entities in all 50 states. The agency also allocated $250 million in funding directly to state and territory

---

[2] U.S. Dep't of Ag. Forest Serv., USDA-FS-2023-UCF-IRA-01, *USDA Forest Service Urban & Community Forestry Inflation Reduction Act Notice of Funding Opportunity* (Apr. 12, 2023), https://www.fs.usda.gov/sites/default/files/UCF-IRA-NOFO-04122023.pdf [https://perma.cc/F48W-783Z].

forestry agencies to administer awards.[3] The projects awarded under the program were all dedicated to tree planting and maintenance, workforce development, wood utilization, extreme heat mitigation, restoration and resilience strategies, and community planning.

45.    USDN received one such award, Award of Cooperative Agreement 24-CA-11132544-016, in the amount of $28 million for its project titled, "Accelerating Urban Forestry as Equity Centered Climate Action and Sustainable Community Development." The award agreement was fully executed on December 11, 2023, and the performance period began that same day and continues until November 30, 2028.

46.    Consistent with the Notice of Funding Opportunity and USDA's stated objectives for the UCFA program, as well as Congress's statutory mandates, USDN's project is a five-year program designed to strengthen the field of urban forestry, increase equitable access to urban tree canopy in disadvantaged communities, broaden community engagement in urban forest planning, and expand best management practices to improve resilience to climate change and extreme heat. Through this program, USDN supports communities with pass-through funding to municipalities and community organizations, and by providing technical assistance. The award also provides funding for USDN's administrative operations.

### B.  Partnerships for Climate-Smart Commodities

47.    In 2022, USDA established the Partnerships for Climate-Smart Commodities ("PCSC") program through the Commodity Credit Corporation, created by the Commodity Credit Corporation Charter Act to support farming. *See* 15 U.S.C. § 714.

---

[3] USDA, *Urban and Community Forestry Grants Factsheet* (2023), https://www.fs.usda.gov/sites/default/files/urban-communit-forestry-2023-factsheet.pdf [https://perma.cc/2VG4-QBUL]; *Urban Forests*, USDA, https://www.fs.usda.gov/managing-land/urban-forests [https://perma.cc/E8H6-9QYS] (last visited May 7, 2025).

48.    Administered through NRCS, the PCSC program was designed to "build markets and invest in America's climate-smart farmers, ranchers, and forest owners to strengthen U.S. rural and agricultural communities."[4] Through the program, USDA aimed to "support the production and marketing of climate-smart commodities through a set of pilot projects that provide voluntary incentives through partners to producers and land owners, including early adopters, to: (a) implement climate-smart production practices, activities, and systems on working lands, (b) measure/quantify, monitor and verify the carbon and greenhouse gas (GHG) benefits associated with those practices, and (c) develop markets and promote the resulting climate-smart commodities."[5]

49.    The Notice of Funding Opportunity for the PCSC program specifically stated, "[p]roposals must provide a plan to pilot implementation of climate-smart agriculture and/or forestry practices on a large-scale, including meaningful involvement of small or historically underserved producers."[6]

50.    Pursuant to the "Review and Selection Process," under the "merit/technical criteria," for the first pool of funding, the most heavily-weighted factor was the "[p]rojected benefits from GHG mitigation and carbon sequestration from ongoing or new on-farm practices associated with the production of climate-smart commodities," and for the second pool of funding, the most heavily weighted factor was "Equity/Environmental Justice (EJ)/Minority Serving Institutions (MSI) Reach."[7]

---

[4] USDA, *Partnership for Climate-Smart Commodities Notice of Funding Opportunity* 2 (2002), https://www.usda.gov/sites/default/files/documents/climate-smart-nfo-usda-nrcs-comm-22-nofo0001139-02062022-web-final.pdf [https://perma.cc/3FDJ-XG27].
[5] *Id.*
[6] *Id.*
[7] *Id.* at 27–28.

51.    USDA invested nearly $3.1 billion of Commodity Credit Corporation funding in the PCSC program across 135 projects.[8]

52.    Oakville Bluegrass Cooperative received one such award on March 26, 2024, in the amount of $4.9 million, for a pilot project to "galvanize early adoption of a promising climate-smart conservation cover, Oakville Bluegrass, in specialty crop systems," utilizing "a unique, cooperative-led partnership system for managing on-farm implementation of Oakville Bluegrass."

53.    With this grant, OBC intended to incentivize the "[a]doption of no-till and a climate-smart conservation cover on nearly 50,000 specialty crop production acres," "reduc[e] farms' greenhouse gas (GHG) footprint, including through soil carbon sequestration, with an expected annual impact of over 1 ton of CO2-equivalent removed or avoided per acre," produce "[c]o-benefits to soil health, water use, and agronomic resiliency worth an estimated $1,500,000 to producers annually," and serve approximately 533 producers, "with at least half being small or underserved producers."

54.    OBC also intended to introduce and utilize a new way to measure changes in soil carbon sequestration, using remote sensing and deep learning models that would reduce the costs of measurement and monitoring.

55.    The ultimate goal of OBC's project was for producers of processed almonds to achieve and document lower carbon intensity in their products so that they could receive premium payments based on the increased carbon sequestration in their soil.

---

[8] USDA, *Partnerships for Climate Smart Commodities Progress as of September 2024* (2024), https://www.usda.gov/sites/default/files/documents/partnerships-climate-smart-commodities-report-summary-september-2024-data.pdf [https://perma.cc/JKR9-4BC6].

### C.  Community Food Projects Competitive Grants Program

56.     In 2022, USDA subagency NIFA announced a funding opportunity for the

CFPCGP, authorized by Public Law 104-107, which amended the Food Stamp Act of 1977 (7

U.S.C. § 2011) and added a section, "Assistance for Community Food Projects" (7 U.S.C.

§ 2034). Awards issued through this program are intended to help eligible nonprofits, tribal

organizations, and food-program service providers in need of a one-time grant for projects that

promote self-sufficiency and food security in low-income communities.

57.     In the Request for Applications, the purpose and priorities of the program are

based on Congress's mandate for the program, set out in 7 U.S.C. § 2034, to assist private

nonprofit entities establish and carry out community food projects, defined as community based

projects that are designed "to meet the food needs of low-income individuals through food

distribution, community outreach to assist in participation in Federally assisted nutrition

programs, or improving access to food as part of a comprehensive service"; "to increase the self-

reliance of communities in providing for the food needs of the communities"; and "to promote

comprehensive responses to local food access, farm, and nutrition issues"; or "to meet specific

State, local, or neighborhood food and agricultural needs, including needs relating to"

equipment, long-term planning, and "the creation of innovative marketing activities that

mutually benefit agricultural producers and low-income consumers."[9]

58.     The Request for Applications encourages applications for communities in

Opportunity Zones, low-income communities defined by population census tracts,[10] because

---

[9] USDA, *Request for Applications Community Food Projects Competitive Grant Program* 39
(2022), available at https://perma.cc/TM36-QWH8 (on file with Plaintiffs' counsel).
[10] *Opportunity Zones*, U.S. Dep't of Hous. & Urb. Dev., https://www.hud.gov/opportunity-zones
(last visited June 2, 2025) [https://perma.cc/F3XS-5R5W].

"[t]he CFPCGP is intended to bring together stakeholders from distinct parts of the food system and to foster understanding of national food security trends and how they might improve local food systems."[11]

59.    The Request for Applications states that these priorities directly align with USDA's 2022–2026 Strategic Plan's[12] Goal 4: Make Safe, Nutritious Food Available to All Americans, and Objective 4.1; Increase Food Security Through Assistance and Access to Nutritious and Affordable Food.

60.    AC received an award through the CFPCGP for its project, "Growing Cooperative Networks for Community Food Sovereignty, Nutrition, and Agroecological Land Stewardship." The total amount of the award was $397,914, with a period of performance of July 15, 2023, to July 14, 2026. The award agreement was fully executed on January 29, 2024.

61.    AC's project involves a collaborative model to advance nutrient-dense food sovereignty and community self-reliance through urban agroecological land stewardship, expanding market channels, and increasing the distribution of fresh local food in low-access communities in the San Francisco Bay Area, specifically in Alameda, Contra Costa, and Fresno counties. Much of their work takes place within designated Opportunity Zones.

62.    The project centers relationship-building and cooperation through values-aligned market collaboration, farm apprenticeships, land access, soil assessments, and a food sovereignty tool lending library. The apprenticeships support new local farmers and build mentoring capacity

---

[11] USDA, *Request for Applications Community Food Projects Competitive Grant Program* 6 (2022), available at https://perma.cc/TM36-QWH8 (on file with Plaintiffs' counsel).
[12] USDA, *Strategic Plan Fiscal Years 2022-2026* (2022), https://www.usda.gov/sites/default/files/documents/usda-fy-2022-2026-strategic-plan.pdf [https://perma.cc/5DZG-YV65].

for experienced farmers to pass on their knowledge to the next generation. The project also supports two cooperative markets and a network of urban farm partners.

63.     AC's project proposal documents are incorporated into the award agreement and identify the project goals and intended outcomes. This includes supporting low-income women, queer, and Black, Indigenous, and people of color urban farmers and consumers, who due to systemic barriers are often underrepresented and overburdened within agriculture and often lack access to nutritious food. The intended outcomes of the project are identified as developing a network of values-aligned cooperative markets, providing access to cooperative farm tools and value-added processing equipment, providing agroecological education through on-farm partnerships, providing land access to beginning farmers through AC's Cooperative Incubator Farm, and training for farmers on urban soil assessments.

## II.    Regulations Applicable to Termination of Awards

64.     The Office of Management and Budget's ("OMB") Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards ("Uniform Guidance"), 2 C.F.R. Part 200, provides rules and requirements for federal agencies' management of grant awards.

65.     USDA has formally adopted the Uniform Guidance as its "policies and procedures for uniform administrative requirements, cost principles, and audit requirements for Federal awards." 2 CFR § 400.1.

66.     Certain USDA subagencies have also independently adopted the Uniform Guidance. *See*, *e.g.*, 7 C.F.R. § 3400.8 (NIFA).

67.     Accordingly, the Uniform Guidance applies to USDA's management of Plaintiffs' awards, as well as all other awards issued by USDA.

18

68.     The Uniform Guidance provides several procedural safeguards that protect the interests of grant recipients from ambiguous, vague, or shifting requirements, including limiting the bases for termination. *See* 2 C.F.R. §§ 200.211, 200.340–343, 200.472.

69.     Two versions of the Uniform Guidance are relevant to Plaintiffs' claims: the 2020 version, which became effective November 12, 2020, except for amendments to §§ 200.216 and 200.340, which became effective on August 13, 2020, 85 Fed. Reg. 49,506 (Aug. 13, 2020) ("2020 Uniform Guidance"); and the 2024 version of the Uniform Guidance, which became effective on October 1, 2024, 89 Fed. Reg. 30,046 (Apr. 22, 2024) ("2024 Uniform Guidance"); *see* 89 Fed. Reg. 68,321 (Aug. 26, 2024) (USDA adopting October 1, 2024 effective date for 2024 Uniform Guidance).

70.     Both versions of the Uniform Guidance include a provision laying out the circumstances in which an award may be terminated. *See* 2 C.F.R. § 200.340. While the structure of 2 C.F.R. § 200.340 differs between the two, both require that agencies "clearly and unambiguously" identify termination provisions in an award's terms and conditions, and limit termination based on an award no longer serving agency priorities to circumstances in which the agency has specific evidence that the particular award no longer serves the priorities it was originally intended to further.

71.     Section 200.340(a)(2) of the 2020 Uniform Guidance provides that a federal award may be terminated "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

72.     The 2020 Uniform Guidance § 200.211(c)(v) relatedly requires that "Federal awarding agencies must make recipients aware, in a clear and unambiguous manner, of the

termination provisions in § 200.340, including the applicable termination provisions in the Federal awarding agency's regulations or in each Federal award."

73.    The preamble to the final rule for the 2020 Uniform Guidance restates this requirement: "Federal awarding agencies must clearly and unambiguously articulate the conditions under which a Federal award may be terminated in their applicable regulations and in the terms and conditions of Federal awards." 85 Fed. Reg. at 49,507; *see* 2 C.F.R. § 200.340(b) (2021).

74.    The stated intent of the 2020 Uniform Guidance is for "Federal awarding agencies" to "prioritize ongoing support to Federal awards that meet program goals." 85 Fed. Reg. at 49,507. OMB provided examples of circumstances in which an agency's termination pursuant to 2 C.F.R. § 200.340(a)(2) (2021) would be appropriate: "if additional evidence reveals that a specific award objective is ineffective at achieving program goals" or if "additional evidence . . . cause[s] the Federal awarding agency to significantly question the feasibility of the intended objective of the award." *Id.* at 49,508–09.

75.    The preamble to the final rule also emphasized that the provision allowing for unilateral termination by the agency in § 200.340(a)(2) (2021) is "linked to performance goals of the program (§ 200.301)." 85 Fed. Reg. at 49507. The referenced provision states that "program goals and objectives should be derived from program planning and design (see § 200.202)," and "[t]he Federal agency should clearly communicate the specific program goals and objectives in the Federal award." 2 C.F.R. § 200.301 (2021).

76.    In 2024, OMB updated the Uniform Guidance, adjusting the language in § 200.340, while maintaining the essential requirements of the prior version.

77.     The 2024 Uniform Guidance modified the language that was in the 2020 Uniform Guidance § 200.340(a)(2), and moved it to § 200.340(a)(4). It now provides that a federal award may be terminated "[b]y the Federal agency or pass-through entity pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4) (2025).

78.     The 2024 Uniform Guidance also revised section 200.340 to reiterate the requirement that agencies "must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award." 2 C.F.R. § 200.340(b) (2025); see 2 C.F.R. § 200.211(c)(v) (2025) ("Federal agencies must inform recipients of the termination provisions in § 200.340, including the applicable termination provisions in the Federal agency's regulations or terms and conditions of the Federal award.").

79.     In the preamble to the 2024 Uniform Guidance, OMB explained that the federal award "may include a term and condition allowing termination by the Federal agency . . . if an award no longer effectuates the program goals or agency priorities," but makes clear that termination is authorized only "[p]rovided that the language is included in the terms and condition of the award." 89 Fed. Reg. at 30,089.

80.     Thus, under either version of the Uniform Guidance, for an agency to terminate an award on the basis that it no longer effectuates the program goals or agency priorities, the agency must "clearly and unambiguously" specify in the award that this ground—no longer effectuating program goals or agency priorities—is a basis for termination.

81.     Moreover, an agency may only terminate an award on the basis that it no longer effectuates the program goals or agency priorities if those program goals and agency priorities are determined and "clearly and unambiguously" identified in the terms and conditions at the

time of the award. USDA had to identify what those policies and priorities were at the time of the award and only the award's failure to effectuate those identified policies and priorities can be a basis for termination—assuming USDA reserved its right to terminate because the award failed to effectuate the policies and priorities.

82.    Additionally, the Uniform Guidance allows for termination of an award that no longer effectuates program goals or agency priorities only if specific evidence shows the particular award no longer serves the intended program goals and agency priorities as determined at the time of the award and reflected in the award documents. *See also* 2 C.F.R. §§ 200.202–204 (2025); 2 C.F.R. §§ 200.202–204 (2021) (requiring goals to be identified at the outset of the award). To terminate on this basis, USDA needs evidence not of its changed position, but that the awardee's project was failing to achieve the objectives the award originally set out to achieve.

83.    Further still, an agency may suspend or terminate a grant award in part or in its entirety *only after* the agency "determines that noncompliance cannot be remedied by imposing specific conditions," such as "[r]equiring additional project monitoring," requiring the recipient to obtain technical or management assistance, or "[e]stablishing additional prior approvals." 2 C.F.R. §§ 200.339, 200.208(c) (2025); 2 C.F.R. §§ 200.339, 200.208(c) (2021). Termination is therefore limited to circumstances in which USDA took additional steps in an effort to achieve compliance and failed.

84.    Certain subagencies also have additional processes that must precede grant termination. For instance, NIFA's regulations provide that "NIFA generally will suspend (rather than immediately terminate) an award to allow the awardee an opportunity to take appropriate corrective action before NIFA makes a termination decision." 7 C.F.R. § 3430.60.

### III.   Defendants' Termination of Federal Awards

### A.  Executive Orders

85.     In the first days of the new federal administration, President Trump issued a series of executive orders broadly seeking to end all efforts, including federal awards, related to "equity"—such as any initiatives relating to DEI or Diversity, Equity, Inclusion, and Accessibility ("DEIA").

86.     On January 20, 2025, President Trump issued Executive Order No. 14151 "Ending Radical and Wasteful Government DEI Programs and Preferencing." 90 Fed. Reg. 8,339 (Jan. 29, 2025) ("First DEI EO").

87.     The First DEI EO instructs the Director of OMB, Director of Office of Personnel Management, and Attorney General to "coordinate the termination of all discriminatory programs, including illegal DEI and 'diversity, equity, inclusion, and accessibility' (DEIA) mandates, policies, programs, preferences, and activities in the Federal Government, under whatever name they appear." *Id.* at 8,339. It also requires each federal agency head to "terminate, to the maximum extent allowed by law, all . . . 'equity-related' grants or contracts" within 60 days. *Id.*

88.     On January 21, 2025, President Trump issued Executive Order No. 14173 "Ending Illegal Discrimination and Restoring Merit-Based Opportunity," 90 Fed. Reg. 8,633 (Jan. 31, 2025) ("Second DEI EO," together with the First DEI EO, "the DEI EOs").

89.     The Second DEI EO requires the Director of OMB, with the assistance of the Attorney General, to "[e]xcise references to DEI and DEIA principles, under whatever name they may appear, from Federal acquisition, contracting, grants, and financial assistance procedures" and to "[t]erminate all 'diversity,' 'equity,' 'equitable decision-making,' 'equitable

23

deployment of financial and technical assistance,' 'advancing equity,' and like mandates, requirements, programs, or activities, as appropriate." *Id.* at 8,634. It also instructs federal agencies to include in every contract or grant award terms requiring contractual counterparties or grant recipients "to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." *Id.*

90.     The DEI EOs do not define key terms, including "equity-related," "programs promoting DEI," "illegal DEI," and "DEIA principles." In fact, in a hearing before the District Court for the Northern District of Illinois on March 25, 2025, the U.S. Department of Justice refused to provide the court with the Trump Administration's definition of "illegal and immoral discrimination" in the context of the Executive Orders.[13]

91.     On January 20, 2025, President Trump issued an Executive Order No. 14154 "Unleashing American Energy." 90 Fed. Reg. 8353 (Jan. 29, 2025) ("Energy EO").

92.     Section 2 of the Energy EO detailed several purported "polic[ies] of the United States," including "to ensure that no Federal funding be employed in a manner contrary to the principles outlined in this section, unless required by law." Id. at 8,353–54.

93.     Section 7 of the Energy EO, titled "Terminating the Green New Deal," directed all agencies to "immediately pause the disbursement of funds appropriated through the Inflation Reduction Act of 2022 (Public Law 117-169) or the Infrastructure Investment and Jobs Act (Public Law 117-58)" and to "review their processes, policies, and programs for issuing grants, loans, contracts, or any other financial disbursements of such appropriated funds for consistency with the law and the policy outlined in section 2 of this order." 90 Fed. Reg. at 8,357.

---

[13] Chris Strohm, *Judge Presses DOJ Attorney to Define "Illegal" DEI Programming*, Bloomberg Law (May 15, 2025), https://news.bloomberglaw.com/litigation/judge-presses-doj-attorney-to-define-illegal-dei-programming.

94.     The Energy EO required that within 90 days of its issuance, all agency heads submit a report detailing their review and recommendations to "enhance their alignment with the policy set forth in section 2." *Id.* The Energy EO directed that "[n]o funds" blocked under the Order "shall be disbursed" unless the Director of OMB and Assistant to the President for Economic Policy determine that such payments "are consistent with any review recommendations they have chosen to adopt." *Id.*

**B.  Defendants' Termination of Awards**

95.     In an apparent effort to effectuate the President's sweeping Executive Orders in as quick a manner as possible regardless of the legality of their conduct, Defendants adopted the policy, pattern, and practice at issue here, terminating awarded grants without individualized review but rather based on vague allegations that the projects were not aligned the President's newly stated goals of eliminating funding for DEI and climate initiatives—without any effort to determine whether the projects could be brought into line.

96.     As justification for all these terminations, Defendants cited 2 C.F.R. § 200.340(a)(4).

97.     None of the terminations Defendants issued under this policy, pattern, and practice complied with the requirements of the Uniform Guidance.

98.     Under this policy, pattern, and practice, Defendants' award terminations:

a.  Are based on termination grounds that were not clearly and unambiguously allowed for under the awards;

b.  Are based on a claimed failure to effectuate agency priorities, when those agency priorities were not specified in the awards;

c.  Are based on the Trump Administration's new priorities that did not exist at the time of the awards;

d.  Lack any evidence that the awards failed to effectuate the priorities determined at the time of the awards;

e.  Lack any reasoned explanation for the terminations;

f.  Do not allege any noncompliance by the recipients with the terms or conditions of their awards;

g.  Do not describe any specific aspect of the awards that was found to be objectionable, let alone unlawful;

h.  Do not provide any advance notice to awardees; and

i.  Do not offer technical assistance or even an opportunity to address any alleged problems prior to termination.

99.     For example, on April 2, 2025, USDN received a letter from USDA and USFS terminating its award for its project, "Accelerating Urban Forestry as Equity Centered Climate Action and Sustainable Community Development." Ex. A.

100.    The USDN Termination states USDA's new policy is to "establish a return to American principles and realign its focus towards its original objectives of maximizing and promoting American agriculture; ensuring a safe, nutritious, and secure food supply; enhancing rural prosperity; and managing our National Forests." Ex. A. USDA, it continues, must "conserve[]" resources and "focus[] upon its original objectives, as well as its obligations under the Constitution and laws of the United States." *Id.* Thus, according to the termination letter, USDA's new priorities include "ensuring that its grants, cooperative agreements, and other

similar arrangements do not support programs that promote or take part in climate change or environmental justice initiatives." *Id.*

101.    The USDN Termination went on to state that the award "provides funding for programs that promote or take part in climate change or environmental justice initiatives; that conflict with the Department's policies and priorities; that are not free from fraud, abuse, or duplication; or that otherwise fail to serve the best interests of the United States." Ex. A.

102.    The USDN Termination ultimately asserts that USDA and USFS terminated USDN's award because the award is "inconsistent with, and no longer effectuates, Department priorities." *Id.* The letter cites 2 C.F.R. § 200.340(a)(4) in support of this assertion. *Id.*

103.    The USDN Termination also broadly claims that the termination is made pursuant to 2 C.F.R. §§ 200.339–343, which are the Uniform Guidance rules governing remedies for noncompliance; termination; notification of termination requirements, opportunities to object, hearings, and appeals; and effect of suspension and termination. *Id.*

104.    Pursuant to the policy, pattern, and practice of unlawfully terminating grants, the USDN Termination:

> a.  Was based on termination grounds that were not clearly and unambiguously allowed for under USDN's award;
>
> b.  Was based on a claimed failure to effectuate agency priorities, when those agency priorities were not specified in USDN's award;
>
> c.  Was based on the Trump Administration's new priorities that did not exist at the time of USDN's award;
>
> d.  Lacked any evidence that the award failed to effectuate the priorities determined at the time of the award;

e.   Lacked any reasoned explanation for the termination;

f.   Did not allege any noncompliance by USDN with the terms or conditions
     of its award;

g.   Did not describe any specific aspect of the award that was found to be
     objectionable, let alone unlawful;

h.   Did not provide any advance notice to USDN; and

i.   Did not offer technical assistance or even an opportunity to address any
     alleged problems prior to termination.

105.   On May 1, 2025, USDN submitted an appeal letter to USFS pursuant to the

optional process included in the DISPUTES provision of its award. To date, USDN has not yet

heard back from the agency. It would be futile for USDN to wait for USFS's response because

the termination was made as part of an agency-wide policy, pattern and practice pursuant to the

Executive Orders to eliminate funding with any connection to climate and environmental justice

initiatives.

106.   Similarly, on April 14, 2025, OBC received a notice from USDA terminating its

PCSC grant. Ex. B.

107.   The OBC Termination states USDA has "reformed and overhauled PCSC as the

Advancing Markets for Producers (AMP) initiative and identified changes to better align the

initiative with USDA priorities." *Id.* It then lists three newly developed and never-before

articulated "Farmer First" priorities and alleges that OBC's grant did not meet the first priority

because it failed to have a "minimum of 65% of federal funds [] go[ing] to producers." Id.

108.   The OBC Termination ultimately asserts that USDA terminated OBC's award

"pursuant to 2 C.F.R. § 200.340(a)(4)" with no further discussion. *Id.*

109.    Pursuant to the policy, pattern, and practice of unlawfully terminating grants, the OBC Termination:

a.  Was based on termination grounds that were not clearly and unambiguous allowed for under OBC's award;

b.  Was based on a claimed failure to effectuate agency priorities, when those agency priorities were not specified in OBC's award;

c.  Was based on the Trump Administration's new priorities that did not exist at the time of OBC's award;

d.  Lacked any evidence that the award failed to effectuate the priorities determined at the time of the award;

e.  Lacked any reasoned explanation for the termination;

f.  Did not allege any noncompliance by OBC with the terms or conditions of its award;

g.  Did not describe any specific aspect of the award that was found to be objectionable, let alone unlawful;

h.  Did not provide any advance notice to OBC; and

i.  Did not offer technical assistance or even an opportunity to address any alleged problems prior to termination.

110.    On May 16, 2025, OBC filed its request for an appeal with USDA's National Appeals Division ("NAD"). To date, it has not heard back from the NAD. It would be futile for OBC to wait for the appeal process to play out because USDA cancelled the PCSC program and thus, the outcome of the appeal is predetermined.

111.    On March 7, 2025, NIFA sent a letter to AC, terminating the award for its project,

"Growing Cooperative Networks for Community Food Sovereignty, Nutrition, and

Agroecological Land Stewardship." Ex. C.

112.    The AC Termination states the award is terminated "as of the date of this notice,

in accordance with 2 CFR § 200.340(a)(4) and the terms and conditions of the award." Ex. C.

The only stated justification is that the award "no longer effectuates USDA priorities, which are

to maximize and promote American agriculture; ensure a safe, nutritious, and secure food

supply; enhance rural prosperity; and protect our National Forests." *Id.*

113.    Around the same time of the AC Termination, Secretary Rollins took to her

official Instagram to provide what she called a "DOGE update," explaining, "@usdagov was

funding a $397K grant in the San Francisco Bay to educate queer, trans, and BIPOC urban

farmers and consumers about food justice and values-aligned markets… 🙍 This grant has been

CANCELLED."[14] She continued, "By stopping this wasteful spending here at USDA, we are

ending identity policy and we are refocusing our agency on American farming, ranching, and

forestry."

114.    USDA and NIFA never provided AC any formal notice that its grant was

terminated for any of the reasons implicated by Secretary Rollins in her post.

115.    Pursuant to the policy, pattern, and practice of unlawfully terminating grants, the

AC Termination:

        a.    Was based on termination grounds that were not clearly and

            unambiguously allowed for under AC's award;

---

[14] Video posted by Secretary Rollins (@secrollins), Instagram (Mar. 12, 2025),
https://www.instagram.com/reel/DHGsKH2xXFY/?utm_source=ig_web_copy_link&igsh=MzRl
ODBiNWFlZA%3D%3D.

b.  Was based on a claimed failure to effectuate agency priorities, when those agency priorities were not specified in AC's award;

c.  Was based on the Trump Administration's new priorities, which did not exist at the time of AC's award;

d.  Lacked any evidence that the award failed to effectuate the priorities determined at the time of the award;

e.  Lacked any reasoned explanation for the termination;

f.  Did not allege any noncompliance by AC with the terms or conditions of its award;

g.  Did not describe any specific aspect of the award that was found to be objectionable, let alone unlawful;

h.  Did not provide any advance notice to AC; and

i.  Did not offer technical assistance or even an opportunity to address any alleged problems prior to termination.

116.    On May 6, 2025, AC submitted an appeal letter to NIFA pursuant to 7 C.F.R. § 3430.62. The appeal was submitted out of an abundance of caution, but was not a necessary step for AC because it applies only where NIFA has terminated based on "failure of the awardee to carry out its approved project in accordance with the applicable law and the terms and conditions of award or for failure of the awardee otherwise to comply with any law," which NIFA has not stated as its basis for termination. 7 C.F.R. § 3430.62(a). AC has not yet received a response from NIFA. It would be futile for AC to wait for NIFA's response because the termination was made as part of an agency-wide policy, pattern, and practice pursuant to the

Executive Orders to eliminate funding with any connection to DEI, climate, or environmental justice initiatives.

117.    On information and belief, Defendants issued numerous other letters similar or virtually identical to each of Plaintiffs' award terminations.

118.    On information and belief, these terminations were made and continue to be made as the result of a policy, pattern, and practice by Defendants to unilaterally terminate grants with boilerplate language and citation to 2 C.F.R. § 200.340(a)(4).[15]

119.    The USDN Termination includes highlighted fill-ins for the name of the subagency that issued its award to be filled in. *See* Ex. A.

120.    Defendants sent most or all the termination letters via email as attached pdf files. On information and belief, the file names for the pdfs sent to some recipients included the phrase "Full Termination Letter Template."

121.    The newly formed Department of Government Efficiency ("DOGE") maintains a website that lists terminations of federal awards and claims to have "sav[ed]" this money.[16] The website represents that it is "[a]n official website of the United States government" and uses the official .gov domain name.

122.    The website's listing of terminated grants includes information about each grant's issuing agency, the recipient's name, the amount of the grant, and the description of the grant.

123.    As of May 16, 2025, the DOGE website lists nearly 600 awards terminated by USDA.

---

[15] Carolyn Y. Johnson & Joel Achenbach, *These 5 Words Have Killed Millions in Grants and Advanced Trump's Agenda*, Wash. Post (Mar. 27, 2025), https://www.washingtonpost.com/science/2025/03/27/trump-federal-grants-research-cuts/ [https://perma.cc/FIEG-2WCP].
[16] Dep't of Gov't Efficiency, https://doge.gov (last visited June 2, 2025).

124.     Defendants' terminations of Plaintiffs' awards are included on the DOGE website list of terminated grants.

125.     On information and belief, Defendants continue to terminate awards pursuant to this policy, pattern, and practice. Plaintiffs, as well as others with awards similarly terminated by USDA, have been and continue to be injured by Defendants' abrupt unlawful termination of their awards. Plaintiffs are no longer able to execute their important projects, carry out their missions, plan for the future, pay their employees, contractors, or sub-awardees, and serve communities in need. The harms to Plaintiffs' work only grow as time continues, with more potential layoffs and reductions in operations on the horizon absent this grant funding.

**FIRST CAUSE OF ACTION**
**Violation of Due Process Clause**
**By All Plaintiffs Against All Defendants**

126.     The allegations made in all preceding paragraphs are realleged and incorporated by reference herein.

127.     The Fifth Amendment to the United States Constitution guarantees that no person shall be deprived of life, liberty, or property without due process of law.

128.     Plaintiffs have a constitutionally protected interest in the USDA funding they applied for, were awarded, and relied on. Plaintiffs have expended significant resources to set up their programs and projects in reliance on their grant awards. Plaintiffs' interests in their awards are established and governed by the acceptance of their application by USDA. *See*, *e.g.*, *Cnty. of Santa Clara v. Trump*, 275 F. Supp. 3d 1196, 1218 (N.D. Cal. 2017), *aff'd in part*, *vacated in part*, *remanded sub nom*, *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018).

129.    Because Defendants have adopted procedural protections for awardees through their own regulations, Plaintiffs also have a constitutionally protected right to scrupulous compliance with the regulations.

130.    Thus, Plaintiffs were entitled to reasonable notice and due process before Defendants summarily terminated their grant funding.

131.    Plaintiffs did not receive prior notice before Defendants summarily terminated their awards and ceased disbursing funds owed. Nor were Plaintiffs provided a hearing or other opportunity to challenge the termination of their grants before the terminations.

132.    The terminations deprived Plaintiffs of their interests in their funding without the procedural due process rights to which they are constitutionally entitled. Plaintiffs have had their operations disrupted as a result, including reduction in services provided, staff layoffs, and damage to relationships with community beneficiaries, with ongoing risks to their very existence.

133.    Thus, Defendants' termination of awards in the manner described herein violates the Fifth Amendment Due Process Clause.

134.    Plaintiffs are entitled to have these unlawful actions set aside.

## SECOND CAUSE OF ACTION
**Violation of Due Process Clause – Void for Vagueness
By All Plaintiffs Against All Defendants**

135.    The allegations made in all preceding paragraphs are realleged and incorporated by reference herein.

136.    The Fifth Amendment to the United States Constitution guarantees that no person shall be deprived of life, liberty, or property without due process of law. A fundamental aspect of due process is that government-imposed obligations must be stated with sufficient clarity to provide fair notice and prevent arbitrary enforcement. Government regulatory enforcement is

void for vagueness if it (1) does not provide a person of ordinary intelligence fair notice of what is prohibited or (2) risks arbitrary application. *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972); *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012); *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674 (D.C. Cir. 2016); *Timpinaro v. SEC*, 2 F.3d 453, 460 (D.C. Cir. 1993). Open-ended regulatory terminology that allows for "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings" violates due process. *United States v. Williams*, 553 U.S. 285, 306 (2008); *Coates v. City of Cincinnati*, 402 U.S. 611, 611–14 (1971); *Smith v. Goguen*, 415 U.S. 566, 573–77 (1974).

137.    Plaintiffs have a constitutionally protected interest in the award funding they applied for, were awarded, and relied on. Plaintiffs also have a constitutionally protected interest in Defendants' scrupulous compliance with their own regulations.

138.    Defendants' application of 2 C.F.R. § 200.340(a)(4) to Plaintiffs is unconstitutionally vague and constitutes an arbitrary exercise of authority. Defendants' form termination letters summarily assert that the relevant grant "no longer effectuates agency priorities." The words "effectuate" and "priorities," at minimum, are not defined in the letters, awards, law, or regulations, and are unconstitutionally vague.

139.    Moreover, the form termination letters are also unconstitutionally vague because they are based on priorities that were never previously identified for awardees.

140.    To the extent the terminations mention new priorities, these new priorities are not contained in any guidance, law, or regulation and were not defined within award documents.

141.    As a result, Defendants' termination of awards in the manner described herein is unconstitutionally vague, thereby violating the Fifth Amendment Due Process Clause.

142.    Plaintiffs are entitled to have these unlawful actions set aside.

**THIRD CAUSE OF ACTION**
**Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**Agency Action Not in Accordance with Law (Uniform Guidance, 2 C.F.R. § 400.1)**
**By All Plaintiffs Against All Defendants**

143.    The allegations made in all preceding paragraphs are realleged and incorporated by reference herein.

144.    Defendants are "agencies" under the APA, 5 U.S.C. § 551(1).

145.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law." 5 U.S.C. § 706(2)(A).

146.    The APA's reference to "law" in the phrase "not in accordance with law," "means, of course, any law, and not merely those laws that the agency itself is charged with administering." *FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003) (emphasis in original).

147.    When a federal agency has promulgated "[r]egulations with the force and effect of law," those regulations "supplement the bare bones" of federal statutes. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 265, 268 (1954). "[A]n agency is bound by its own regulations," and therefore "if an agency action fails to comply with its regulations, that action may be set aside as arbitrary and capricious." *Erie Boulevard Hydropower, LP v. FERC*, 878 F.3d 258, 269 (D.C. Cir. 2017) (citation modified). In particular, "agencies may not violate their own rules and regulations to the prejudice of others." *Battle v. F.A.A.*, 393 F.3d 1330, 1336 (D.C. Cir. 2005).

148.    Defendants' policy, pattern, and practice of terminating of Plaintiffs' and others' awards pursuant to 2 C.F.R. § 200.340(a)(4) in the manner described above is a final agency action. The mass termination of awards has resulted in the immediate cessation of project support and funding, including that to which Plaintiffs are entitled, and marks the culmination of

USDA's decision making. The termination letters contain the totality of USDA's stated explanation for each of the terminated awards.

149.    Defendants' policy, pattern, and practice of issuing form letters terminating awards pursuant to 2 C.F.R. § 200.340(a)(4) is not in accordance with law for several reasons, including:

      a.  Reliance on a provision, 2 C.F.R. § 200.340(a)(4), that does not apply to USDA awards issued before October 1, 2024;

      b.  Failure to clearly and unambiguously list the grounds for termination in the conditions of the award, as opposed to merely cross-referencing the relevant Code of Federal Regulations provision;

      c.  Terminating based on new USDA priorities, rather than any program goals or agency priorities as determined at the time of the award that are included in the award itself (if any);

      d.  Failure to identify or rely on any specific new evidence about the particular award that demonstrates the award no longer effectuates the priorities it was initially intended to serve; and

      e.  Failure to inform awardees prior to termination of any noncompliance with the award's requirements and offer technical assistance or an opportunity to address any issue, as contemplated by 2 C.F.R. §§ 200.339, 200.208(c).

150.    Additionally, those subagencies that have adopted more specific procedural protections have likewise failed to comply with those requirements. For instance, NIFA's regulations provide that the agency will "allow the awardee an opportunity to take appropriate

corrective action before NIFA makes a termination decision." 7 C.F.R. § 3430.60. NIFA failed to do so as part of the AC Termination. On information and belief, this is also the case for other award terminations by NIFA.

151.    For each of these reasons, USDA's policy, pattern, and practice of terminating awards based on its new priorities without procedural safeguards substantively and procedurally violate its own governing regulations. *See* 2 C.F.R. §§ 200.340, 400.1.

152.    Plaintiffs and additional awardees terminated pursuant to USDA's policy, pattern, and practice have suffered and will continue to suffer irreparable harm if these actions are not declared unlawful, and Plaintiffs have no adequate remedy in law.

153.    Plaintiffs are entitled to have Defendants' actions set aside because they are in violation of law.

<u>**FOURTH CAUSE OF ACTION**</u>
**Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**Agency Action that is Arbitrary and Capricious and an Abuse of Discretion**
**By All Plaintiffs Against All Defendants**

154.    The allegations made in all preceding paragraphs are realleged and incorporated by reference herein.

155.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

156.    An agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*

463 U.S. 29, 43 (1983). Moreover, when an agency changes its policy, if the "new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests," the agency's failure to consider such factors "would be arbitrary and capricious." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). The "reasoned explanation requirement . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).

157.    Defendants' policy, pattern, and practice of issuing the termination letters to hundreds of federal awardees—including Plaintiffs—is arbitrary and capricious for each of the following reasons:

a.  In the form termination letters, Defendants did not provide a reasonable explanation for the award terminations, but instead broadly asserted that the award "no longer effectuates agency priorities," without explaining why that is the case, and did not explain how the awards are allegedly inconsistent with its new priorities;

b.  Where funding has been issued to recipients pursuant to statutory mandates, Defendants did not explain how its new priorities can be reconciled with those statutory mandates;

c.  Defendants did not explain how Plaintiffs' awards no longer effectuate USDA's priorities as determined at the time of the award, which is the proper standard by which to judge the awards;

d.  Where applicable, Defendants failed to consider how the award terminations would impact the statutory purposes for the awards;

e.  Defendants did not explain in any of its termination letters what additional specific evidence shows that terminated awards are ineffective at achieving or no longer serve USDA's priorities as determined at the time of the award;

f.  Defendants failed to consider the Plaintiffs' and other awardees' reliance interests;

g.  Defendants failed to consider that many of the terminated awards are, in fact, consistent with USDA's new priorities of "maximizing and promoting American agriculture" and "ensuring a safe, nutritious, and secure food supply; enhancing rural prosperity" or putting "Farmers First"; and

h.  Defendants' termination letters failed to provide a reasoned explanation for its change in policy from its previous priorities.

158.    Further, USDA and NRCS's policy, pattern, and practice of terminating PCSC grants, including OBC's award and at least one hundred others, is arbitrary and capricious because the "Farmer First" requirements were not part of the original criteria for PCSC, and the termination letters do not explain how OBC and other terminated awardees have failed to meet the new criteria.

159.    Defendants' unlawful action has caused and will continue to cause irreparable harm absent a declaration that this conduct is unlawful and injunctive relief setting Defendants' actions aside, and Plaintiffs have no adequate remedy in law.

160.    Plaintiffs are entitled to have Defendants' actions set aside because they are in violation of law.

**FIFTH CAUSE OF ACTION**
**Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**Agency Action Not in Accordance with Law (Cooperative Forestry Assistance Act of 1978**
**and Inflation Reduction Act of 2022)**
**By USDN Against USDA and USFS**

161.    The allegations made in all preceding paragraphs are realleged and incorporated by reference herein.

162.    USDA and USFS's policy, pattern, and practice of terminating UCFA program awards are also not in accordance with law and thus violate the APA because the stated basis for termination directly contravenes Congress's statutory mandate for funding the program.

163.    Congress intended awards under the UCFA program to implement tree planting programs that contribute to reducing global warming trends by reducing carbon dioxide emissions, mitigating the heat island effect, and reducing energy consumption. 16 U.S.C. § 2105.

164.    USDA and USFS are required to carry out this program as statutorily mandated and to distribute the funds that Congress appropriated for the program.

165.    Consistent with its statutory duties, USDA and USFS obligated these funds to specific entities following a rigorous, regulated, and competitive grantmaking process.

166.    USDA and USFS's stated justification for the termination of UCFA program awards—including USDN's—was that the awards "no longer effectuate agency priorities" because they relate to climate or environmental justice.

167.    USDA and USFS's new priority of defunding awards based on climate and environmental justice, however, is at odds with Congress's mandates that USDA fund the UCFA program, and that those funds go towards programs that address climate and other environmental harms.

168.    Accordingly, USDA and USFS's policy, pattern, and practice of terminating UCFA program awards on the basis that the funds relate to climate or environmental justice is not in accordance with the statutory requirements for the program and thus violate the APA.

169.    USDA and USFS's unlawful actions have caused and will continue to cause irreparable harm absent a declaration that this conduct is unlawful and injunctive relief setting these actions aside, and USDN has no adequate remedy in law.

170.    USDN is entitled to have USDA and USFS's actions set aside because they are a violation of law.

## SIXTH CAUSE OF ACTION
**Violation of Separation of Powers**
**By USDN Against USDA and USFS**

171.    The allegations made in all preceding paragraphs are realleged and incorporated by reference herein.

172.    Article I, Section 1 of the United States Constitution states that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." U.S. Const. Art. I, § 1. "The Framers viewed the legislative power as a special threat to individual liberty, so they divided that power to ensure that 'differences of opinion' and the 'jarrings of parties' would 'promote deliberation and circumspection' and 'check excesses in the majority.'" *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 223 (2020) (quoting Federalist No. 70, at 475 (A. Hamilton)). Attempts by the Executive Branch to exercise legislative power are an affront to the carefully constructed balance created by the Framers.

173.    The Constitution vests the right to appropriate funds exclusively with Congress. The Executive Branch has no discretion to withhold funds validly appropriated by Congress. U.S. Const. Art. I, § 9, cl. 7; *see also Train v. City of New York*, 420 U.S. 35, 45–47 (1975).

174.    "[W]henever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge." *Collins v. Yellen*, 594 U.S. 220, 245 (2021).

175.    Congress enacted the UCFA program and appropriated $1.5 billion in funding for that program to serve the enumerated purposes described above.

176.    USDA and USFS's policy, pattern, and practice of terminating awards issued pursuant to IRA funding for the UCFA program—including USDN's—violate the separation of powers because the basis for terminating such awards directly contravenes their statutory mandates.

177.    USDN is entitled to have these actions set aside because they are a violation of law.

**SEVENTH CAUSE OF ACTION**
***Ultra Vires* Action**
**By USDN Against USDA and USFS**

178.    The allegations made in all preceding paragraphs are realleged and incorporated by reference herein.

179.    USDA and USFS are acting *ultra vires* in seeking to terminate UCFA program awards. *See Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689–91 (1949); *Dugan v. Rank*, 372 U.S. 609, 621–22 (1963).

180.    USDA and USFS have no statutory authority to terminate awards for reasons wholly inconsistent with the IRA and Cooperative Forestry Assistance Act of 1978.

181.    Accordingly, USDA and USFS's termination of UCFA program awards, including USDN's award, are unlawful *ultra vires* actions, and USDN is entitled to have these unlawful actions set aside.

## REQUESTS FOR RELIEF

Wherefore, Plaintiffs respectfully request that this Court:

1.    Issue a declaration that Defendants' terminations of Plaintiffs' awards and all others pursuant to the policy, pattern, and practice described herein are unlawful;

2.    Vacate and set aside the terminations of Plaintiffs' awards and all other awards terminated pursuant to Defendants' policy, pattern, and practice as described herein;

3.    Order Defendants to return to the status quo in relation to Plaintiffs' awards and all other awards terminated pursuant to Defendants' policy, pattern, and practice described herein;

4.    Preliminarily and permanently enjoin Defendants from giving effect to or maintaining award terminations of Plaintiffs' awards and all others enacted pursuant to Defendants' policy, pattern, and practice described herein;

5.    Preliminarily and permanently enjoin Defendants from unlawfully re-terminating the awards reinstated pursuant to the Court's order;

6.    Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

7.    Grant any and all other such relief as the Court may deem appropriate.

Dated this 5th day of June 2025.

     Respectfully submitted,

/s/ David S. Muraskin
David S. Muraskin
DC Bar No. 1012451
FarmSTAND
712 H Street NE
Suite 2534
Washington, DC 20002
202-595-8816
Email: david@farmstand.org


Carrie Apfel
DC Bar No. 974342
Earthjustice
1001 G Street, NW, Suite 1000
Washington, DC  20001
(202) 667-4500
capfel@earthjustice.org


Benjamin E. Apple
DC Bar No. 1014680 (*Pro Hac Vice admission
pending*)
Farmers Justice Center
6 Fifth Street West
Suite 650
St. Paul, MN 55102
(651) 204-7203
ben.apple@farmersjustice.org

*Counsel for Plaintiff*

Holly Bainbridge
DC Bar No. 90021466 (*Pro Hac Vice
admission pending*)
FarmSTAND
712 H Street NE
Suite 2534
Washington, DC 20002
202-595-8816
Email: holly@farmstand.org


Scott W. Carlson
DC Bar No. 986041 (*Pro Hac Vice
admission pending*)
Farmers Justice Center
6 Fifth Street West
Suite 650
St. Paul, MN 55102
(651) 204-1664
scott.carlson@farmersjustice.org

# Exhibit A

**USDA** United States    Forest    Washington Office    1400 Independence Avenue, SW
Department of    Service    Washington, D.C.  20250
Agriculture

---

**File Code:**    1580
**Date:**    **April 2, 2025**

Jamal Brown
Director of Finance, People, & Culture
Center for Regenerative Solutions/Urban Sustainability Network
500 Westover Drive, #14973
Sanford, NC 27330

Re: Termination Notice for Agreement No. **24-CA-11132544-016 for the project titled,
Accelerating Urban Forestry as Equity Centered Climate Action and Sustainable
Community Development**

Dear Mr. Brown:

This letter provides notice that the United States Department of Agriculture is terminating your
federal award, (**24-CA-11132544-016, Accelerating Urban Forestry as Equity Centered
Climate Action and Sustainable Community Development**), in accordance with the terms and
conditions of your award, which include applicable regulations relating to termination. *See* 2
C.F.R. §§ 200.340-343 and 472.

It is the policy of the Department to establish a return to American principles and realign its
focus towards its original objectives of maximizing and promoting American agriculture;
ensuring a safe, nutritious, and secure food supply; enhancing rural prosperity; and managing our
National Forests. This policy prioritizes multiple use management; conservation of our Nation's
natural resources; and a focus on serving the American people in furtherance of those policies.
The Department's resources must be conserved and focused upon its original objectives, as well
as its obligations under the Constitution and laws of the United States. The Department's
priorities include ensuring that its grants, cooperative agreements, and other similar
arrangements do not support programs that promote or take part in climate change or
environmental justice initiatives. It is vital that the Department assess both whether all award
payments are free from fraud, abuse, and duplication and whether they are in the best interests of
the United States.

Termination The award specified above provides funding for programs that promote or take part
in climate change or environmental justice initiatives; that conflict with the Department's
policies and priorities; that are not free from fraud, abuse, or duplication; or that otherwise fail to
serve the best interests of the United States. The award is therefore inconsistent with, and no
longer effectuates, Department priorities. *See* 2 C.F.R. § 200.340(a)(4). Pursuant to, among other
authorities, 2 C.F.R. §§ 200.339-343, which are applicable to your award, the Department hereby
terminates award No. **24-CA-11132544-016** in its entirety effective April 2, 2025.

Closure You must submit all final reports and a final payment request no later than 120 calendar
days after the date of this notice. You will be reimbursed for costs incurred up to the date of this
notice that are determined to be consistent with 2 C.F.R. § 200.343, *Effects of suspension or*



Caring for the Land and Serving People



Printed on Recycled Paper

Center for Regenerative Solutions/Urban Sustainability Network

2

*termination*. Any open balance remaining 120 days after the date of this notice will be unavailable for payment.

If you do not submit all reports in accordance with the terms and conditions of the Federal award within one (1) year of the effective termination date, the Forest Service must proceed to close out the award with the information available. In these circumstances, in accordance with 2 C.F.R. § 200.344, the Forest Service must report your material failure to comply with the terms and conditions of the award in SAM.gov using the Contractor Performance Assessment Reporting System (CPARS). In this way, failure to submit timely and accurate final reports may affect your future funding.

Recipients are required by Federal regulation to retain all Federal award records consistent with 2 C.F.R. § 200.334.  Termination of the agreement does not affect a Federal agency's or a pass-through entity's right to disallow costs and recover funds based on a later audit or other review. In addition, termination does not affect a recipient's obligation to return any funds due as a result of later refunds, corrections, or other transactions, including final indirect cost rate adjustments (refer to 2 C.F.R. § 200.345).

Appeal Process. See the DISPUTES provision in the award document.

If you have questions, contact your Forest Service Program Contact, Nausheen Iqbal at Nausheen.iqbal@usda.gov.

Sincerely,

LISA NORTHROP
Digitally signed by LISA NORTHROP
Date: 2025.04.02 17:04:27 -04'00'

LISA NORTHROP
Associate Deputy Chief
State, Private, and Tribal Forestry

Cc:
Jaelith Hall-Rivera, Chief of Staff, Office of the Chief
John Crockett, Deputy Chief of State, Private, and Tribal Forestry
Lisa Northrop, Associate Deputy Chief of State, Private, and Tribal Forestry
Andria Weeks, Associate Deputy Chief of Business Operations
Nausheen Iqbal, Assistant Director (Acting) Urban and Community Forestry
Lynne Sholty, Supervisory Grants & Agreements Specialist

# Exhibit B

**USDA  Natural Resources Conservation Service**
U.S. DEPARTMENT OF AGRICULTURE

April 14, 2025

Oakville Bluegrass Cooperative
1314 S Grand Blvd
Spokane WA 99205-1174

Dear Recipient:

USDA has undertaken a review of Partnerships for Climate Smart Commodities (PCSC) grants.  As a result of that review, we have reformed and overhauled PCSC as the Advancing Markets for Producers (AMP) initiative and identified changes to better align the initiative with USDA priorities. USDA is reviewing existing grant agreements based on three Farmer First policy priorities:

- A minimum of 65% of federal funds must go to producers
- Grant recipients must have enrolled at least one producer as of 12/31/2024
- Grant recipients must have made a payment to at least one producer as of 12/31/2024

Our review of your grant NR243A750004G031 shows that you have failed to meet the first priority, and therefore, your grant will be terminated pursuant to 2 CFR 200.340(a)(4). You will be afforded the opportunity to resubmit a proposal that will be evaluated using the Farmer First policy priorities of AMP. You have until June 20, 2025, to submit your new proposal.

If you have questions, please contact Colton Buckley, Chief of Staff of the Natural Resources Conservation Service at colton.buckley@usda.gov.

Sincerely,

AUBREY BETTENCOURT
*Chief*

---

Natural Resources Conservation Service
*USDA is an equal opportunity provider, employer, and lender.*

# Exhibit C

 **National Institute of Food and Agriculture**
U.S. DEPARTMENT OF AGRICULTURE

March 7, 2025

Leah Atwood
Partnerships and Resources
Agroecology Commons
836 Marin Rd
El Sobrante, CA 94803-1322

**Re:    Termination Notice for Agreement No. 2023-33800-40420 for the project titled, Growing Cooperative Networks for Community Food Sovereignty, Nutrition, and Agroecological Land Stewardship**

Dear Recipient:

Pursuant to 2 CFR § 200.341 this letter serves as written notification that the subject agreement between the National Institute of Food and Agriculture (NIFA) and Agroecology Commons (Recipient) is terminated as of the date of this notice, in accordance with 2 CFR § 200.340(a)(4) and the terms and conditions of the award. NIFA has determined that award 2023-33800-40420 no longer effectuates USDA priorities, which are to maximize and promote American agriculture; ensure a safe, nutritious, and secure food supply; enhance rural prosperity; and protect our National Forests.

You must submit all final reports and a final payment request no later than 120 calendar days after the date of this notice. You will be reimbursed for costs incurred up to the effective date of termination that are determined to be consistent with 2 C.F.R. § 200.343, *Effects of suspension or termination*. Any open balance remaining 120 days after the date of this notice will be unavailable for payment to the Recipient.

If you do not submit all reports in accordance with the terms and conditions of the Federal award within one (1) year of the effective termination date, NIFA must proceed to close out the award with the information available. In these circumstances, in accordance with 2 CFR § 200.344, NIFA must report the Recipient's material failure to comply with the terms and conditions of the award in SAM.gov using the Contractor Performance Assessment Reporting System (CPARS). In this way, failure to submit timely and accurate final reports may affect future funding to the Recipient.

Recipients are required by Federal regulation to retain all Federal award records consistent with 2 CFR § 200.334. Termination of the agreement does not affect a Federal agency's or a pass-through entity's right to disallow costs and recover funds based on a later audit or other review. In addition, termination does not affect the recipient's obligation to return

USDA IS AN EQUAL OPPORTUNITY PROVIDER, EMPLOYER, AND LENDER



National Institute of Food and Agriculture
U.S. DEPARTMENT OF AGRICULTURE

any funds due as a result of later refunds, corrections, or other transactions, including final indirect cost rate adjustments (refer to 2 CFR § 200.345).

If you have questions, contact the NIFA Program Contact, Kimberly Whittet at kimberly.whittet@usda.gov.

Sincerely,

MATTHEW FAULKNER    Digitally signed by MATTHEW FAULKNER
Date: 2025.03.07 13:40:37 -06'00'

Matthew Faulkner
Deputy Director, Office of Grants and Financial Management

CC:
Kimberly Whittet, Senior Policy Advisor, Office of Grants and Financial Management
Edward Nwaba, Division Director, Awards Management Division
Lydia Kaume, National Program Leader, Institute of Food Safety and Nutrition