## IN THE UNITED STATES COURT DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| URBAN SUSTAINABILITY DIRECTORS NETWORK, OAKVILLE BLUEGRASS COOPERATIVE, AGROECOLOGY COMMONS, PROVIDENCE FARM COLLECTIVE CORP. and INSTITUTE FOR AGRICULTURE AND TRADE POLICY, | Case No. 1:25-cv-01775-BAH |
| *Plaintiffs*, | |
| v. | |
| UNITED STATES DEPARTMENT OF AGRICULTURE, BROOKE ROLLINS, in her official capacity as Secretary of the United States Department of Agriculture, DEPARTMENT OF GOVERNMENT EFFICIENCY, AMY GLEASON, in her official capacity as Acting Administrator of the Department of Government Efficiency, UNITED STATES FOREST SERVICE, TOM SCHULTZ, in his official capacity as Forest Service Chief, NATURAL RESOURCES CONSERVATION SERVICE, AUBREY J.D. BETTENCOURT, in her official capacity as Chief of the Natural Resources Conservation Service, NATIONAL INSTITUTE OF FOOD AND AGRICULTURE, JAYE L. HAMBY, in his official capacity as Director of National Institute of Food and Agriculture, FARM SERVICE AGENCY, WILLIAM BEAM, in his official capacity as Administrator of the Farm Service Agency, AGRICULTURAL MARKETING SERVICE, and ERIN MORRIS, in her official capacity as Administrator of Agricultural Marketing Service, | |
| *Defendants*. | |

## PLAINTIFFS' STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 3

   I.   Background on USDA Grantmaking ......................................................................... 3

      A.   USDA Grants Are Governed by the U.S. Office of Management and Budget's
      Regulations on Grant Oversight............................................................................... 4

      B.   Plaintiffs Were Each Awarded USDA Grants ......................................................... 6

   II.   The Administration Issues Executive Orders Targeting Federal Grants ......................... 13

   III.   Defendants Begin a Policy and Practice of Terminating Grants.................................... 14

STANDARD OF REVIEW .................................................................................................. 19

ARGUMENT ...................................................................................................................... 19

   I.   The Court Has Jurisdiction Over Plaintiffs' Claims ........................................................ 19

   II.   Plaintiffs Are Likely to Succeed on the Merits ............................................................... 23

      A.   Defendants' policy and practice of terminating awards is not in accordance with federal
      regulations.................................................................................................................. 23

         i.   Regulatory history of 2 C.F.R. § 200.340 .......................................................... 24

         ii.   Defendants' policy and practice is inconsistent with 2 C.F.R § 200.340................. 26

      B.   Defendants' policy and practice is arbitrary and capricious. ........................................ 29

      C.   Defendants' policy and practice violates Plaintiffs' due process rights....................... 33

         i.   Defendants' policy and practice violates procedural due process. ........................... 33

         ii.   Defendants' policy and practice is unconstitutionally vague.................................... 35

      D.   Terminations of USDN and Agroecology Commons' grants violate separation of
      powers, are contrary to statutory authority, and are *ultra vires*. ........................................... 36

         i.   USDA and USFS's termination of USDN's Urban Forestry Award......................... 37

         ii.   USDA and FSA's termination of Agroecology Commons' Land Access Award...... 38

   III.   Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief ................................ 40

   IV.   The Balance of Equities and Public Interest Weigh Heavily in Plaintiffs' Favor. ............ 43

   V.   The Court Should Not Require a Bond........................................................................... 44

CONCLUSION.................................................................................................................... 45

# TABLE OF AUTHORITIES

**Cases**

*Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, No. 1:25-cv-00702, 2025 WL 833917 (D. Md. Mar. 17, 2025) .................................................................................................................... 31, 40

*Am. Bar Ass'n v. U.S. Dep't of Just.*, No. 25-CV-1263 (CRC), 2025 WL 1388891 (D.D.C. May 14, 2025) ........................................................................................................................... 20

*Archdiocese of Washington v. Washington Metro. Area Transit Auth.*, 897 F.3d 314 (D.C. Cir. 2018) ........................................................................................................................... 42

*Battle v. FAA*, 393 F.3d 1330 (D.C. Cir. 2005) ........................................................................ 24

*Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564 (1972) ..................................................... 33

*Bennett v. Spear*, 520 U.S. 154 (1997) ...................................................................................... 23

*\*Bowen v. Massachusetts*, 487 U.S. 879 (1988) .................................................................. 21, 22

*C.G.B. v. Wolf*, 464 F. Supp. 3d 174 (D.D.C. 2020) ................................................................. 43

*Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996) ..................................... 22, 37

*Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142 (2012) .............................................. 32

*City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018) ....................... 33, 37, 38

*City of Houston v. Dep't of Hous. & Urb. Dev*, 24 F.3d 1421 (D.C. Cir. 1994) ........................ 42

*\*Climate United Fund v. Citibank, N.A.*, No. 25-CV-698 (TSC), 2025 WL 1131412 (D.D.C. Apr. 16, 2025) ...................................................................................................................... 40, 42

*Cmty. Legal Servs. in East Palo Alto v. HHS*, No. 3:25-cv-02847, 2025 WL 973318 (N.D. Cal. Apr. 1, 2025) .................................................................................................................... 44

*Cnty. of Santa Clara v. Trump*, 275 F. Supp. 3d 1196 (N.D. Cal. 2017) ................................... 33

*Coates v. City of Cincinnati*, 402 U.S. 611 (1971) .................................................................... 35

*Colorado v. HHS*, No. 1:25-cv-00121, 2025 WL 1017775 (D.R.I. Apr. 5, 2025) ..................... 44

*\*Crowley Gov't Servs., Inc v. Gen. Servs. Admin.*, 38 F.4th 1099 (D.C. Cir. 2022) .................... 20

*Dep't of Com. v. New York*, 588 U.S. 752 (2019) ...................................................................... 30

*\*Dep't of Educ. v. California*, 145 S. Ct. 966 (2025) ................................................................. 22

*Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339 (D.C. Cir. 2012) ...................................... 37

*Drs. For Am. v. Off. Of Pers. Mgmt.*, 766 F. Supp. 3d 39 (D.D.C. 2025) .................................... 31

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016) ............................................................ 32

*Erie Boulevard Hydropower, LP v. FERC*, 878 F.3d 258 (D.C. Cir. 2017) ................................ 24

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ............................................................ 30

*FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012) ............................................................ 35

*FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293 (2003) .................................................... 24

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ........................................................................ 35

*\*Green & Healthy Homes Initiatives v. Env't Prot. Agency*, No. 25-CV-1096-ABA, 2025 WL 1697463, (D. Md. June 17, 2025) ................................................................................... 19, 21

*Harris County, Tx. v. Kennedy*, No. 25-CV-1275 (CRC), 2025 WL 1707665 (D.D.C. June 17, 2025) ...................................................................................................................................... 19

*In re Aiken County*, 725 F.3d 255 (D.C. Cir. 2013) ...................................................................... 37

*Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682 (1949) ................................................ 23

*\*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) .................................... 40

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990) ...................................................................... 24

*Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122 (2023) ...................................................................... 22

*Massachusetts v. Nat'l Insts. of Health*, 770 F. Supp. 3d 277 (D. Mass. 2025) ........................ 22

*Mazaleski v. Treusdell*, 562 F.2d 701 (D.C. Cir. 1977) ................................................................ 34

*\*Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982) ............................................................ 20

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ...................................................................................................................................... 29

*Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167 (D.D.C. 1971) .................................... 44

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 25-239 (LLA), 2025 WL 597959 (D.D.C. Feb. 25, 2025) ...................................................................................... 23, 40, 44

*NB ex rel. Peacock v. District of Columbia*, 794 F.3d 31 (D.C. Cir. 2015) .......................... 33, 34

*New York v. Trump*, No. 25-1236, 2025 WL 914788 (1st Cir. Mar. 26, 2025) ............................ 24

*Nken v. Holder*, 556 U.S. 418 (2009) ........................................................................... 43

*Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148 (D.D.C. 2017) ................................. 43

*P.J.E.S. by & through Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492 (D.D.C. 2020) ............. 44

*\*RFE/RL, Inc. v. Lake*, No. 1:25-cv-00799-RCL, 2025 WL 900481(D.D.C. Mar. 25, 2025)23, 30, 40

*RFE/RL, Inc. v. Lake*, No. 1:25-CV-799-RCL, 2025 WL 1232863 (D.D.C. Apr. 29, 2025) ........ 19

*Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180 (D.C. Cir. 1992) ........................................... 37

*S. Educ. Found. v. U.S. Dep't of Educ.*, No. CV 25-1079 (PLF), 2025 WL 1453047 (D.D.C. May 21, 2025) ................................................................................................... 40

*Sierra Club v. Salazar*, 177 F. Supp. 3d 512 (D.D.C. 2016) ........................................... 32

*Simms v. District of Columbia*, 872 F. Supp. 2d 90 (D.D.C. 2012) ................................. 44

*Smith v. Goguen*, 415 U.S. 566 (1974) ........................................................................... 35

*\*Thakur v. Trump*, No. 25-CV-04737-RFL, 2025 WL 1734471 (N.D. Cal. June 23, 2025) . 17, 19

*Turner v. U.S. Agency for Global Media*, 502 F. Supp. 3d 333 (D.D.C. 2020) .......................... 43

*U.S. Dep't of the Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339 (D.C. Cir. 2012) ........................ 3

*United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954) ........................................... 24

*United States v. Williams*, 553 U.S. 285 (2008) ........................................................... 35

*Verizon v. FCC*, 740 F.3d 623 (D.C. Cir. 2014) ........................................................... 32

*Widakuswara v. Lake*, No. 1:25-CV-1015-RCL, 2025 WL 1166400 (D.D.C. Apr. 22, 2025) ...... 20

*Widakuswara v. Lake*, No. 25-5144, 2025 WL 1521355 (D.C. Cir. May 28, 2025) .................... 20

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ........................................... 19

*\*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, No. 1:25-CV-00097-MSM-PAS, 2025 WL 1116157 (D.R.I. Apr. 15, 2025) ....................................................... 21, 22, 44

*Zinermon v. Burch*, 494 U.S. 113 (1990) ................................................................. 34, 35

**Statutes**

16 U.S.C. § 2105(a)(5) ................................................................................................ 37, 38

16 U.S.C. § 2105(b)(5) ................................................................................................ 37

28 U.S.C. § 1331 ........................................................................................................ 19

28 U.S.C. § 1491(a)(1) .......................................................................................... 19, 20

5 U.S.C. § 704 ............................................................................................................ 23

5 U.S.C. § 706(2)(A) ............................................................................................ 23, 29

5 U.S.C. § 706(2)(A), (B) .......................................................................................... 37

7 U.S.C. § 6991, *et seq.*............................................................................................. 17

Agriculture Improvement Act of 2018, Pub. L. No. 115-334, 132 Stat. 4490 (2018) ...................11

*American Rescue Plan Act of 2021, Pub. L. No. 117-2, 135 Stat. 4, 13–14 (2021) ............ 10, 39

Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, 122 Stat. 1651 (2008) ........11

*Inflation Reduction Act, Pub. L. No. 117-169, § 22007, 136 Stat. 2022 (2022).................. 10, 39

*Inflation Reduction Act, Pub. L. No. 117-169, § 23003(a)(2), 136 Stat. 2026 (2022)........... 7, 37

Inflation Reduction Act, Pub. L. No. 117-169, 136 Stat. 1818 (2022)........................................ 7

**Regulations**

2 C.F.R. § 200.1 ..................................................................................................... 4, 5

2 C.F.R. § 200.208(c) ............................................................................................ 6, 29

2 C.F.R. § 200.211(c)(v) ............................................................................................ 26

2 C.F.R. § 200.339 ................................................................................................ 6, 29

*2 C.F.R. § 200.340 ............................................................................................... 5, 25

2 C.F.R. § 200.340(a)(4) ............................................................................................ 26

2 C.F.R. § 200.340(b) ................................................................................................ 26

2 C.F.R. §§ 200.204–200.205 ...................................................................................... 5

2 C.F.R. §§ 200.205–200.213 ...................................................................................... 5

2 C.F.R. §§ 200.328–200.330 ...................................................................................... 5

2 C.F.R. §§ 200.500–200.521 ...................................................................................... 5

2 CFR § 400.1 ............................................................................................................ 4

7 C.F.R. § 3400.8 ....................................................................................................... 4

7 C.F.R. § 3430.60 .................................................................................................. 6, 29

7 U.S.C. § 2034 ........................................................................................................... 9

*2020 Uniform Guidance, 85 Fed. Reg. 49,506 (Aug. 13, 2020) ..................... 24, 25, 26

*2024 Uniform Guidance, 89 Fed. Reg. 30,046 (Apr. 22, 2024) ........................... 24, 27

48 C.F.R. § 1.101 ......................................................................................................... 4

48 C.F.R. § 2.101 ......................................................................................................... 5

USDA Uniform Administrative Requirements, Cost Principles, and Audit Requirements for
    Federal Awards, 89 Fed. Reg. 68,321 (Aug. 26, 2024) ..................................... 25, 27

**Other Authorities**

The Federalist No. 51, at 320 (James Madison) (Clinton Rossiter ed. 1961)................................ 4

**Constitutional Provisions**

U.S. Const. amend. V................................................................................................. 33

U.S. Const. art. 1, § 1 ................................................................................................ 36

U.S. Const. art. II, § 3 ............................................................................................... 36

**Executive Orders**

Executive Order 14151, "Ending Radical and Wasteful Government DEI Programs and
    Preferencing," 90 Fed. Reg. 8,339 (Jan. 29, 2025)................................................... 13

Executive Order 14154, "Unleashing American Energy," 90 Fed. Reg. 8,353 (Jan. 29, 2025).. 13,
    14

Executive Order 14222, "Implementing the President's 'Department of Government Efficiency'
    Cost Efficiency Initiative," 90 Fed. Reg. 11,095 (Mar. 3, 2025)........................... 13, 14

Executive Order No. 14173, "Ending Illegal Discrimination and Restoring Merit-Based
    Opportunity," 90 Fed. Reg. 8,633 (Jan. 31, 2025)................................................. 13, 14

**Briefs**

Complaint, *New Jersey v. U.S. Office of Mgmt. and Budget*, 1:25-cv-11816 (N.D. Mass. June 24,
    2025), ECF No. 1 ..................................................................................................... 17

Complaint, *Shapiro v. U.S. Dep't of Agric.*, 1:25-cv-00998-JFS (M.D. Penn. June 5, 2025), ECF
    No. 1........................................................................................................................ 17

Complaint, *Thakur v. Trump*, 3:25-cv-004737-RFL (N.D. Cal. June 4, 2025), ECF No. 1 ......... 17

Letter from Director Frank M. Wood, NAD, re: NAD Case No. 2025S000294 (June 2, 2025) (on file with Plaintiffs' counsel).................................................................................. 18

Letter from Director Frank M. Wood, NAD, re: NAD Case No. 2025W000415 (June 9, 2025) (on file with Plaintiffs' counsel) ................................................................................ 18

## **INTRODUCTION**

Beginning in February 2025, the U.S. Department of Agriculture ("USDA") instituted a widespread policy and practice of unlawfully terminating hundreds of grants issued to nonprofit organizations, farmers, ranchers, universities, cities, and states. This policy and practice has significantly undercut efforts to, among other things, strengthen rural and agricultural communities, address food insecurity in low-income communities, support beginning farmers, empower urban communities to address climate and heat risks, and support the production and marketing of climate-smart commodities. Defendants' basis for terminating awards *en masse* is that they "no longer effectuate" new USDA "priorities"—namely, the Trump Administration's priorities to eliminate any government spending it can portray as related to diversity, equity, and inclusion ("DEI") or climate change. But Defendants' policy and practice of terminating grants in this manner wholly disregards the awardees' rights under the U.S. Constitution, federal regulatory requirements for USDA's grant oversight, and in many instances, Congress's mandates for the grant programs.

Plaintiffs are nonprofit organizations that receive USDA[1] grant awards under a variety of programs across the agency, including through the U.S. Forest Service's ("USFS") Urban and Community Forestry Assistance program ("Urban Forestry Program"), the Natural Resources Conservation Service's ("NRCS") Partnerships for Climate-Smart Commodities ("PCSC") program, the National Institute of Food and Agriculture's ("NIFA") Community Food Projects Competitive Grants Program ("Community Food Program"), the Farm Service Agency's ("FSA") Increasing Land, Capital, and Market Access Program ("Land Access Program"), NIFA's Beginning Farmer and Rancher Development Program ("Beginning Farmer Program"), and the

---

[1] Each agency and sub-agency acronym used herein refers to both the agency or sub-agency and its official.

Agricultural Marketing Service's ("AMS") Regional Food System Partnerships ("RFSP") program. Plaintiffs devoted extensive time and resources to develop their grant proposals, and then, once awarded, acted in reliance on these grants by hiring employees, providing and promising new or expanded programs to community members and sub-awardees, entering into contracts with local small businesses, expending their own resources to invest in the projects' long-term success, and foregoing other funding opportunities that they reasonably believed they would no longer need.

Following the Trump Administration's Executive Orders requiring federal agencies—at the direction of the Department of Government Efficiency ("DOGE")—to eliminate grant awards related to DEI or climate change, Defendants began their policy and practice of terminating awards through minimally edited, boilerplate form letters. Plaintiffs in this case are among the hundreds to receive such letters from USDA. The form letters lack any discussion specific to the awards at issue and provide no reasoned explanation for the terminations, relying on conclusory assertions that each award "no longer effectuates" the agencies new "priorities," and therefore is terminated subject to 2 C.F.R. § 200.340(a)(4). This policy and practice continues to this day, with USDA recently announcing that it will terminate another 145 awards—including an additional award of a Plaintiff in this suit—based on its new priorities against DEI. Defendants' policy and practice of terminating grants in this manner violates the Constitution and federal regulations and statutes.

Plaintiffs now ask the Court for preliminary relief enjoining Defendants' policy and practice of unlawfully terminating Plaintiffs' and others' grants and restoring the status quo. Such relief is appropriate in this case for several reasons. *First*, this Court has jurisdiction over Plaintiffs' claims, as many courts have held in analogous cases, because (i) Plaintiffs' claims are based on the Constitution, federal regulations, and for some, federal statutes, and (ii) Plaintiffs seek

equitable relief, including reversal of the termination decisions. *Second*, Plaintiffs are likely to prevail on the merits of each of their claims. The policy and practice violates the Administrative Procedure Act ("APA") because it is inconsistent with applicable regulations and is arbitrary and capricious. It also violates Plaintiffs' constitutional right to due process because Defendants afforded them no process prior to termination, and because the terminations are impermissibly vague. And for certain Plaintiffs, Defendants' policy and practice of terminating these awards violated the Constitution's separation of powers and are *ultra vires* because they are wholly incompatible with the congressional mandates for the funds. *Third*, Plaintiffs will suffer irreparable harm absent immediate relief. Without this funding, Plaintiffs are faced with layoffs, abandoning projects and investments, reputational harm in the community for failing to deliver promised programs, and drastic reductions in their organizations' operations. For some, they may have to shutter their organizations entirely. And *fourth*, the equities and the public interest tip heavily in favor of a preliminary injunction to stop those harms while Defendants themselves face no recognizable harm from following the law.

For these reasons, and as discussed more fully below, Plaintiffs respectfully request that the Court issue a preliminary injunction and, in the event that Defendants do not timely oppose, *ex parte* relief.

## **BACKGROUND**

### I.    **Background on USDA Grantmaking**

Pursuant to Article I of the Constitution, the power to appropriate funds to federal agencies for specific public purposes and objectives rests with Congress. This delegation "was one of the most important authorities allocated to Congress in the Constitution's 'necessary partition of power among the several departments.'" *U.S. Dep't of the Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1346 (D.C. Cir. 2012) (quoting The Federalist No. 51, at 320 (James Madison) (Clinton

Rossiter ed. 1961)). Therefore, it is under Congress's authority that federal agencies issue grants with funds appropriated by Congress to carry out their missions, consistent with statutory requirements.

USDA is one such federal agency. As part of its execution of its responsibilities, USDA, through its sub-agencies, distributes funds to various stakeholders through federal awards, including grants, cooperative agreements, and other funding mechanisms.[2] These grant programs dedicate billions of dollars to support communities, create jobs, protect natural resources, and promote agricultural and rural development, often pursuant to specific mandates from Congress.

### A. USDA Grants Are Governed by the U.S. Office of Management and Budget's Regulations on Grant Oversight

Defendants' oversight of grant awards is subject to regulatory requirements. The Office of Management and Budget's ("OMB") Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards ("Uniform Guidance"), 2 C.F.R. Part 200, provides rules and requirements for federal agencies' management of grant awards.[3] USDA has formally adopted the Uniform Guidance as its "policies and procedures for uniform administrative requirements, cost principles, and audit requirements for Federal awards." 2 CFR § 400.1. Certain USDA sub-agencies have also independently adopted the Uniform Guidance. *See*, *e.g.*, 7 C.F.R. § 3400.8 (NIFA).

The Uniform Guidance provides rules governing the lifecycle of grants. It requires that before awarding funding, federal agencies, including Defendants, give public notice of the funding

---

[2] Federally awarded grants and cooperative agreements are referred to herein as "grants" or "awards" for simplicity and because distinctions between the two do not matter unless indicated. *See* 2 C.F.R. § 200.1 (Uniform Guidance applies equally to grants, cooperative agreements, and other federal financial assistance).

[3] This is distinct from the Federal Acquisition Regulations, which is the "codification and publication of uniform policies and procedures for acquisition by all executive agencies," and thus regulates federal agencies' management of contracts. *See* 48 C.F.R. § 1.101.

opportunity that includes the goals and priorities of the program; publicly solicit applications; conduct a "merit review process"; and only select "recipients most likely to be successful in delivering results based on the program objectives." 2 C.F.R. §§ 200.204–200.205. To ensure that taxpayer money is well spent, federal awards involve lengthy and complex application procedures and reporting and auditing requirements. *See*, *e.g.*, 2 C.F.R. §§ 200.205–200.213 (application process), 200.328–200.330 (performance, financial monitoring, and reporting requirements for federal award recipients), 200.500–200.521 (financial auditing requirements for federal award recipients).

Once recipients are selected, they "enter into a relationship" with USDA, "the principal purpose of which is to transfer anything of value to carry out a public purpose authorized by a law of the United States []; and not to acquire property or services for the Federal agency or pass-through entity's direct benefit or use." 2 C.F.R. § 200.1 (definitions of "grant agreement or grant," "cooperative agreement").[4] The public purpose to be served by each binding relationship is detailed in the agency's notices of funding opportunity or other award-related documentation. In carrying out their grant-funded projects, awardees agree to comply with lengthy terms and conditions dictated by pre-existing USDA rules and incorporated into their award agreements.

Central to this matter, the Uniform Guidance describes the limited circumstances in which an award may be terminated by the government. *See* 2 C.F.R. § 200.340. First, USDA must "clearly and unambiguously" identify in an award's terms and conditions which subsections of § 200.340 or other bases for termination can be invoked. Second, if failure to effectuate agency

---

[4] By contrast, a "contract" is defined as "a mutually binding legal relationship obligating the seller to furnish the supplies or services (including construction) and the buyer to pay for them." 48 C.F.R. § 2.101. By definition, "[c]ontracts do not include grants and cooperative agreements covered by 31 U.S.C. 6301." *Id*.

priorities is a ground for termination listed in the award, the agency must also "clearly and unambiguously" identify those agency priorities that could subject the award to termination. Third, USDA must limit any termination based on failure to effectuate agency priorities to circumstances in which the agency has specific evidence that the particular award no longer effectuates the priorities it was originally intended to further. *Id.* Fourth, before terminating for noncompliance, USDA must first "determine[] that noncompliance cannot be remedied by imposing specific conditions," such as "[r]equiring additional project monitoring," requiring the recipient to obtain technical or management assistance, or "[e]stablishing additional prior approvals." 2 C.F.R. §§ 200.339, 200.208(c).

Certain USDA sub-agencies also have additional processes that must precede grant termination. For instance, NIFA's regulations provide that "NIFA generally will suspend (rather than immediately terminate) an award to allow the awardee an opportunity to take appropriate corrective action before NIFA makes a termination decision." 7 C.F.R. § 3430.60. AMS's General Terms and Conditions for Grants provide the same.[5]

### B. Plaintiffs Were Each Awarded USDA Grants

Plaintiffs are nonprofit organizations that received grants terminated under the policy and practice at issue in this case.

**Urban Sustainability Directors Network ("USDN").** In 2022, Congress passed and President Biden signed into law the Inflation Reduction Act, Pub. L. No. 117-169, 136 Stat. 1818 (2022) ("IRA"). As part of the IRA, Congress appropriated $1.5 billion to USDA "to provide multiyear, programmatic, competitive grants to a State agency, a local governmental entity, an

---

[5] *AMS General Terms and Conditions* at § 16.5, AMS (Jan. 2024), https://www.ams.usda.gov/sites/default/files/media/FY2024_AMSGeneralTermsandConditions.pdf.

agency or governmental entity of the District of Columbia, an agency or governmental entity of an insular area . . . an Indian Tribe, or a nonprofit organization through the Urban and Community Forestry Assistance program established under section 9(c) of the Cooperative Forestry Assistance Act of 1978 (16 U.S.C. 2105(c)) for tree planting and related activities." IRA § 23003(a)(2).

On April 12, 2023, USDA sub-agency USFS issued a Notice of Funding Opportunity to initiate the process of distributing these IRA funds to qualified applicants through a competitive process.[6] The notice's section on "Legislative Authority and Funding Priorities" reiterates that the funds must be used for projects in furtherance of the priorities listed in IRA § 23003(a)(2). *Id.* at 2. It further provides that the program prioritizes projects "working to support disadvantaged communities experiencing low tree canopy and environmental justice," as well as "locally led conservation and park projects in communities that disproportionately lack access to nature and its benefits." *Id.* at 2–3.

USDN received a $28 million Urban Forestry Program grant following a lengthy application process in which USFS itself identified priorities for USDN's project. Decl. of Jamal Brown ("Brown Decl.") ¶¶ 7–11. USDN's grant funds a five-year program designed to strengthen the field of urban forestry, increase equitable access to urban tree canopy in disadvantaged communities, broaden community engagement in urban forest planning, and expand best management practices to improve resilience to climate change and extreme heat. Brown Decl., Ex. B. Through this program, USDN supports communities with pass-through funding to municipalities and community organizations, and by providing technical assistance. *Id.* The award also provides funding for USDN's administrative operations. *Id.*

---

[6] USDA Forest Service Urban & Community Forestry, *Inflation Reduction Act Notice of Funding Opportunity (NOFO)* (Apr. 12, 2023), https://www.fs.usda.gov/sites/default/files/UCF-IRA-NOFO-04122023.pdf.

**Oakville Bluegrass Cooperative ("OBC").** USDA established the PCSC program in 2022 through the Commodity Credit Corporation to support the production and marketing of climate-smart commodities and farming practices.[7] NRCS administers the PCSC program. In selecting initial proposals to fund, NRCS stated in the Notice of Funding Opportunity that for the first set of awards, it would most heavily weigh the "[p]rojected benefits from GHG mitigation and carbon sequestration from ongoing or new on-farm practices associated with the production of climate-smart commodities," and for the second group of projects, it would most heavily weigh "Equity/Environmental Justice (EJ)/Minority Serving Institutions (MSI) Reach." *Id.*

After spending significant time on its application, OBC received a PCSC award of $4.9 million from the second set of award funding for a pilot project to "galvanize early adoption of a promising climate-smart conservation cover, Oakville Bluegrass, in specialty crop systems," utilizing "a unique, cooperative-led partnership system for managing on-farm implementation of Oakville Bluegrass." Decl. of Jeff Thiel ("Thiel Decl."), Ex. A. The ultimate goal of OBC's project was for producers of processed almonds to achieve and document lower carbon intensity in their products so that they could receive premium payments based on the increased carbon sequestration in their soil. *Id.*

**Agroecology Commons.** USDA, through its sub-agency NIFA, announced in 2022 a funding opportunity for the Community Food Program, authorized by Public Law 104-107, which amended the Food Stamp Act of 1977 (7 U.S.C. § 2011) and added a section, "Assistance for Community Food Projects" (7 U.S.C. § 2034). According to NIFA's Request for Applications, these awards were intended to serve the purposes set out for the program in 7 U.S.C. § 2034—in

---

[7] USDA, *Partnership for Climate-Smart Commodities Fiscal Year (FY) 2022 National Funding Opportunity (NFO)* (2022), https://www.usda.gov/sites/default/files/documents/climate-smart-nfo-usda-nrcs-comm-22-nofo0001139-02062022-web-final.pdf.

short, to help eligible nonprofits, tribal organizations, and food-program service providers in need of a one-time grant for projects that promote self-sufficiency and food security in low-income communities.[8] The Request for Applications encouraged application from communities in Opportunity Zones, low-income communities defined by population census tracts,[9] because the Community Food Program "is intended to bring together stakeholders from distinct parts of the food system and to foster understanding of national food security trends and how they might improve local food systems." *Id.* It further stated that these priorities directly align with USDA's 2022–2026 Strategic Plan's Goal 4: Make Safe, Nutritious Food Available to All Americans, and Objective 4.1; Increase Food Security Through Assistance and Access to Nutritious and Affordable Food. *Id.*

After a competitive application process, Agroecology Commons received one of these awards for $397,914 for its collaborative model to advance nutrient-dense food sovereignty and community self-reliance through urban agroecological land stewardship, expanding market channels, and increasing the distribution of fresh local food in low-access communities in the San Francisco Bay Area. Decl. of Leah Atwood ("Atwood Decl.") ¶¶ 7–11. Agroecology Commons' project proposal documents are incorporated into the award agreement and identify the project goals and intended outcomes. Atwood Decl., Exs. B, C. This includes supporting low-income women, queer, and Black, Indigenous, and people of color urban farmers and consumers, who due to systemic barriers are often underrepresented and overburdened within agriculture and often lack access to nutritious food. Atwood Decl., Ex. B.

---

[8] USDA NIFA, *Request For Applications Community Food Projects Competitive Grant Program* (2022), https://www.highergov.com/document/fy23-cfp-rfa-508-pdf-320433/.

[9] *Opportunity Zones*, U.S. Dep't of Hous. & Urb. Dev., https://www.hud.gov/opportunity-zones (last visited June 2, 2025) [https://perma.cc/F3XS-5R5W].

Agroecology Commons also has a separate grant at issue in this suit through USDA and FSA's Land Access Program. The American Rescue Plan Act of 2021 directed the Secretary of Agriculture to use $1 billion in 2021 on agricultural programs that benefit "socially disadvantaged farmers, ranchers, or forest landowners, or other members of socially disadvantaged groups." Pub. L. No. 117-2, 135 Stat. 4, 13–14 (2021). Congress amended this through the IRA to add an additional $2.9 billion to benefit "underserved farmers" and "farmers . . . determined to have experienced discrimination prior to January 1, 2021, in Department of Agriculture farm lending programs . . . ." IRA § 22007. USDA used these funds to create the Land Access Program and issued a Notice of Funding Opportunity for grant funding through the program.[10]

In 2024, Agroecology Commons was awarded a Land Access Program grant for $2,500,000 after a resource-intensive application process. Atwood Decl. ¶¶ 15–17. Their project aims to develop and implement innovative solutions that catalyze equitable access to land, capital, and market opportunities for queer, trans, Black, Indigenous, and multi-racial farmers in the Bay Area, where land access is particularly challenging. Atwood Decl., Ex. E. The project involves purchasing land for beginning farmers to cooperatively use, developing partnerships with restaurants, farmers markets, and grocery cooperatives, providing technical assistance to farmers, developing a data management and sharing plan, expanding their online learning platform for farmers, and expanding farmer participation in land equity policy education. *Id.* Agroecology Commons' project proposal documents are incorporated into the award agreement and identify the project goals and intended outcomes. Atwood Decl., Exs. D, E.

---

[10] USDA, *Increasing Land, Capital, and Market Access Program National Funding Opportunity (NFO)* (2022), https://apply07.grants.gov/apply/opportunities/instructions/PKG00276548-instructions.pdf.

**Providence Farm Collective ("PFC").** In 2023, NIFA issued a Request for Applications under the Beginning Farmer Program, authorized by the 2008 Farm Bill[11] and reauthorized and funded again by the 2018 Farm Bill.[12] Per the Request for Applications, the "primary goal" of the program "is to help beginning farmers and ranchers . . . enter and/or improve their successes in farming, ranching, and management of nonindustrial private forest lands."[13] One of the listed "priorities" was "economic revitalization, particularly in socially disadvantaged communities." *Id.* The Request for Applications also included a "targeted set aside for projects that address the needs of two subsets of beginning farmers and ranchers," under which "[a]t least five percent of the program funds available for standard [Beginning Farmer Program] projects will be allocated to address the needs of limited resource beginning farmers and ranchers [and] socially disadvantaged beginning farmers or ranchers." *Id.* The Request states that the program "is aligned with . . . USDA Strategic Plan FY 2022-2026" and the Plan's Strategic Goals 1 to 5. *Id.*

PFC received an award through the Beginning Farmer Program for its project, "Empowering Refugee, Immigrant, and Black Beginning Farmers through Personalized, Culturally Adapted Training and Education at PFC." Decl. of Kristin Heltman-Weiss ("Heltman-Weiss Decl."), Ex. C. The award was for $749,998 over three years. *Id.* The funded project comprises an Incubator Farm Program and related educational programming, together designed to empower refugee, immigrant, and Black beginning farmers with needed resources, knowledge, skills, and opportunities to enter and continuously improve their successes in farming. Heltman-Weiss Decl., Ex. B. The resources provided to such farmers include access to land, personalized

---

[11] Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, 122 Stat. 1651 (2008).
[12] Agriculture Improvement Act of 2018, Pub. L. No. 115-334, 132 Stat. 4490 (2018).
[13] USDA NIFA, *Request for Applications Beginning Farmer and Rancher Development Program* (2023), https://www.highergov.com/document/fy23-bfrdp-rfa-508-pdf-323993/.

education and technical assistance, farming equipment and supplies, and marketing opportunities. *Id.*

**Institute for Agriculture and Trade Policy ("IATP").** In February 2023, USDA's AMS published a Request for Applications for its RFSP program, which was established by the 2018 Farm Bill to provide funding for public-private partnerships that support regional food economies. The Request for Applications noted that AMS "support[s] partnerships in the early stages of convening, envisioning, goal setting and identifying strategies for developing local or regional food systems. Specifically, these projects support food system's efforts to build community connections (public and private) that allow a region to drive the discovery and promotion of collaboration opportunities within the food system."[14] It also emphasized that "AMS encourages applications from partnerships that engage with smaller farms and ranches, new and beginning farmers and ranchers, underserved producers, veteran producers, and/or underserved communities." *Id.*

On May 2, 2023, IATP applied for an RFSP grant. Decl. of Erin McKee VanSlooten ("McKee Decl.) ¶ 7. On October 30, 2023, IATP's application was approved for $111,694 in federal funds for a period of two years. McKee Decl., Ex. A. The awarded project aimed to support the MinnieAg Network, a network of Minnesota farm and food systems organizations that prioritize practices to nourish people and the planet. McKee Decl., Ex. B. The project included the creation of a visual directory for the network, as well as the development of educational resources on Minnesota agricultural policy that IATP intended to publish and make available in multiple languages. *Id.*

---

[14] USDA AMS, *Regional Food System Partnerships Fiscal Year 2023 Request for Applications* (2023), https://www.ams.usda.gov/sites/default/files/media/2023_RFSP_RFA.pdf.

II.    **The Administration Issues Executive Orders Targeting Federal Grants**

In the first days of the new federal administration, President Trump issued at least four executive orders targeting all federal government efforts, including grants, related to equity, DEI, Diversity, Equity, Inclusion, and Accessibility ("DEIA"), or climate change: (1) Executive Order 14151, "Ending Radical and Wasteful Government DEI Programs and Preferencing," 90 Fed. Reg. 8,339 (Jan. 29, 2025) ("First DEI EO"); Executive Order No. 14173, "Ending Illegal Discrimination and Restoring Merit-Based Opportunity," 90 Fed. Reg. 8,633 (Jan. 31, 2025) ("Second DEI EO"); Executive Order 14154, "Unleashing American Energy," 90 Fed. Reg. 8,353 (Jan. 29, 2025) ("Energy EO"); and Executive Order 14222, "Implementing the President's 'Department of Government Efficiency' Cost Efficiency Initiative," 90 Fed. Reg. 11,095 (Mar. 3, 2025) ("DOGE EO").

The First DEI EO instructs the Director of OMB, Director of the Office of Personnel Management, and Attorney General to "coordinate the termination of all discriminatory programs, including illegal DEI and 'diversity, equity, inclusion, and accessibility' (DEIA) mandates, policies, programs, preferences, and activities in the Federal Government, under whatever name they appear." 90 Fed. Reg. at 8,339. It also requires each federal agency head to "terminate, to the maximum extent allowed by law, all . . . 'equity-related' grants or contracts" within 60 days. *Id.* Relatedly, the Second DEI EO requires the Director of OMB to "[e]xcise references to DEI and DEIA principles, under whatever name they may appear, from Federal acquisition, contracting, grants, and financial assistance procedures" and to "[t]erminate all 'diversity,' 'equity,' 'equitable decision-making,' 'equitable deployment of financial and technical assistance,' 'advancing equity,' and like mandates, requirements, programs, or activities, as appropriate." 90 Fed. Reg. at 8,634.

13

The Energy EO identifies new "poli[cies] of the United States" focused on production and use of "oil, natural gas, coal, hydropower, biofuels, critical mineral, and nuclear energy resources," and revoked numerous Executive Orders that reference climate change or the climate crisis. 90 Fed. Reg. 8,353–54. It requires that "no Federal funding be employed in a manner contrary to" these new policies. *Id.* at 8,354. Further, it directed all agencies to "immediately pause the disbursement of funds appropriated through the Inflation Reduction Act of 2022 (Public Law 117-169) or the Infrastructure Investment and Jobs Act (Public Law 117-58)" and to "review their processes, policies, and programs for issuing grants, loans, contracts, or any other financial disbursements of such appropriated funds for consistency with" the new policies. *Id.* at 8,357.

Finally, the DOGE EO instructs agencies, "in consultation with the agency's DOGE Team Lead," to "review all existing covered contracts and grants" and to "terminate or modify" those contracts and grants to "advance the policies of [the Trump] Administration." 90 Fed. Reg. at 11,095–96.

## III.    Defendants Begin a Policy and Practice of Terminating Grants

Shortly after the Executive Orders were issued, on February 14, 2025, Secretary of Agriculture Brooke Rollins announced she "welcome[d]" DOGE's spending cuts, and that DOGE would have "full access" to USDA as she reviewed "thousands of . . . grants" over the first weeks of her tenure to ensure compliance with the Executive Orders, "per the President's directives."[15]

---

[15] USDA, *Secretary Rollins Takes Bold Action to Stop Wasteful Spending and Optimize USDA to Better Serve American Agriculture* (Feb. 14, 2025), https://www.usda.gov/about-usda/news/press-releases/2025/02/14/secretary-rollins-takes-bold-action-stop-wasteful-spending-and-optimize-usda-better-serve-american.

On March 13, 2025, USDA announced that Rollins had "worked with [DOGE] to streamline USDA operations by cutting wasteful spending and saving American taxpayers millions."[16]

That initial effort to cut grants, which continues today, is based on vague allegations that certain projects were not aligned with the President's newly stated goals of eliminating funding for DEI and climate initiatives, without individualized review and without any effort to determine whether the projects could be brought into line. More specifically Defendants' unlawful policy and practice involves the following:

- Terminating awards via minimally edited form letters that provide the award at issue is terminated pursuant to 2 C.F.R. § 200.340(a)(4) because it "no longer effectuates agency priorities" based on the new Trump Administration priorities against DEI, climate action, or environmental justice;

- Terminating grants based on grounds that are not clearly and unambiguously allowed for under the awards;

- Terminating grants based on a claimed failure to effectuate priorities that were not specified in the awards;

- Terminating grants based on priorities that did not exist at the time of the awards;

- Terminating grants without any reasoned explanation;

- Terminating grants without any evidence of how the awards fail to effectuate either the agency's priorities as determined at the time of the award or the new priorities;

- Terminating grants without alleging any noncompliance with the terms of the award;

- Terminating awards without describing any specific aspect of the awards found to be objectionable;

- Terminating awards effective immediately without any advance notice; and

---

[16] USDA, *Secretary Brooke Rollins Takes Bold Action in First 30 Days at USDA* (Mar. 13, 2025), https://www.usda.gov/about-usda/news/press-releases/2025/03/13/secretary-brooke-rollins-takes-bold-action-first-30-days-usda.

- Terminating awards without first offering technical assistance or opportunity to modify to address any alleged problems.

Each Plaintiff received one such termination letter. Brown Decl., Ex. A; Thiel Decl., Ex. D; Atwood Decl., Ex. A.; Heltman-Weiss Decl., Ex. A; McKee Decl., Ex. C. Agroecology Commons has not yet received a second formal termination letter for its Land Access Program grant, but based on USDA's apparently including that award as one that "will be terminated" based on "DEI" in a recent announcement, that termination too will likely be made pursuant to this same policy and practice. Atwood Decl. ¶ 19.[17]

The DOGE website as of May 16, 2025, lists approximately 600 terminated awards, all of which were very likely terminated by form letters issued pursuant to this policy and practice because they were terminated at around the same time as Plaintiffs' awards in association with DOGE's effectuation of the Executive Orders within USDA.[18] This widespread policy and practice affected awardees in many USDA grant programs, including ones other than those represented by Plaintiffs.

For instance, the Pennsylvania Department of Agriculture received one of the formulaic letters terminating its $13 million award—issued pursuant to the Local Food Purchase Assistance program to "[p]urchase local, unprocessed or minimally processed domestic foods from local producers, targeting historically underserved farmers/producers/fishers and small businesses including processors, aggregators, and distributors" and then to "[d]istribute the food purchased to underserved communities"—because it allegedly no longer effectuated agency priorities.

---

[17] USDA, *Secretary Rollins Takes Bold Action to Put American Farmers First, Cuts Millions in Woke DEI Funding* (June 17, 2025), https://www.usda.gov/about-usda/news/press-releases/2025/06/17/secretary-rollins-takes-bold-action-put-american-farmers-first-cuts-millions-woke-dei-funding.

[18] *Savings*, Dep't of Gov't Efficiency, https://doge.gov/savings (last visited June 25, 2025).

Complaint at ¶¶ 2–7, *Shapiro v. U.S. Dep't of Agric.*, 1:25-cv-00998-JFS (M.D. Penn. June 5, 2025), ECF No. 1.

Likewise, USDA issued similar termination letters to academic researchers across the University of California system, terminating their grants through this same pattern and practice based on 2 C.F.R. § 200.340(a)(4) because they allegedly "no longer effectuate" the Administration's new priorities. Complaint at ¶¶ 360–65, *Thakur v. Trump*, 3:25-cv-004737-RFL (N.D. Cal. June 4, 2025), ECF No. 1. In a class action challenging those terminations, the district court recently granted a preliminary injunction and provisional class certification. *Thakur v. Trump*, No. 25-CV-04737-RFL, 2025 WL 1734471 (N.D. Cal. June 23, 2025).

And on June 24, 2025, a coalition of states sued USDA and other agencies for their unlawful use of 2 C.F.R. § 200.340(a)(4) to terminate federal funding. Complaint at ¶¶ 1–12, *New Jersey v. U.S. Office of Mgmt. and Budget*, 1:25-cv-11816 (N.D. Mass. June 24, 2025), ECF No. 1.

Since the initial filing of this case, Defendants have continued to terminate grants pursuant to this policy and practice. For instance, on June 11, 2025, USDA and NRCS issued similar formulaic letters terminating awards issued under another IRA-funded program, citing these very same grounds for termination and following the very same unlawful pattern.[19] And on June 17, 2025, Secretary Rollins announced that the agency "will terminate" another of 145 allegedly "DEI focused" awards, likely pursuant to this same policy and pattern. *See supra* n.17.

Further, adverse decisions related to certain USDA grant awards, including terminations, are generally subject to administrative exhaustion in USDA's National Appeals Division ("NAD") before they are permitted to proceed in district court. 7 U.S.C. § 6991, *et seq.* Thus, many

---

[19] Grace Yarrow, *USDA Cancels IRA-Funded Grants for Conservation Program*, PoliticoPro (June 11, 2025), https://subscriber.politicopro.com/article/2025/06/usda-cancels-ira-funded-grants-for-conservation-program-00401724.

terminated awardees have turned to NAD before proceeding in court, including those that may have otherwise joined this action. Recently, NAD issued decisions that the claims raised in this case are ones of "general applicability" that it is not permitted to review. *E.g.*, Letter from Director Frank M. Wood, NAD, re: NAD Case No. 2025W000415 (June 9, 2025) (on file with Plaintiffs' counsel); Letter from Director Frank M. Wood, NAD, re: NAD Case No. 2025S000294 (June 2, 2025) (on file with Plaintiffs' counsel). Put simply, the scale and impact of the unlawful policy and practice is massive and growing.[20]

Plaintiffs, like the hundreds of other terminated awardees, have felt and will continue to feel the devastating effects of Defendants' policy and practice of unlawfully terminating their grants. Plaintiffs put significant resources into applying for their grants and building multi-year programs to provide services critical to the communities they serve. Brown Decl. ¶¶ 8–9; Thiel Decl. ¶¶ 6–7; Atwood Decl. ¶¶ 8–10, 16; Heltman-Weiss Decl. ¶¶ 7–8; McKee Decl. ¶¶ 7–9. With the abrupt termination of the grant awards, Plaintiffs can no longer accomplish their core missions. Brown Decl. ¶ 16; Thiel Decl. ¶ 17; Atwood Decl. ¶¶ 20, 22, 24, 16; Heltman-Weiss Decl. ¶ 18; McKee Decl. ¶¶ 4–7. Plaintiffs have had to stop the projects funded by their terminated grants and divert significant resources away from other projects to find alternative funding sources. Brown Decl. ¶¶ 16, 18; Thiel Decl. ¶¶ 17, 19; Atwood Decl. ¶¶ 22, 24–25; Heltman-Weiss Decl. ¶¶ 18–22; McKee Decl. ¶ 20. Some Plaintiffs have already had to lay off staff, while some will face imminent layoffs and additional reductions in operations if funding cannot be secured. *E.g.*, Brown Decl. ¶ 19; Thiel Decl. ¶ 12. Others have had to end relationships with sub-awardees and

---

[20] Accordingly, to the extent this Court is only inclined to issue preliminary relief as to named Plaintiffs rather than all awardees impacted by Defendants' terminations made pursuant to its unlawful policy and practice, Plaintiffs ask for the opportunity to amend to add additional parties to be covered by any preliminary relief.

contractors. *E.g.*, Brown Decl. ¶ 15; Atwood Decl. ¶ 22. The end beneficiaries of Plaintiffs' grant funding, including beginning farmers, communities experiencing food insecurity, and municipalities with inadequate urban forestry, are losing access to the important programs and services that Plaintiffs provide. Brown Decl. ¶ 17; Thiel Decl. ¶ 23; Atwood Decl. ¶ 22; Heltman-Weiss Decl. ¶ 21; McKee Decl. ¶ 22.

## STANDARD OF REVIEW

For preliminary injunctive relief, a plaintiff must show: (1) a likelihood of success on the merits; (2) the plaintiff is likely to suffer irreparable harm absent preliminary relief; (3) the balance of equities weighs in the plaintiff's favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## ARGUMENT

## I.    The Court Has Jurisdiction Over Plaintiffs' Claims

Federal district courts have jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Plaintiffs' claims constitute such an action and thus belong in this court. To avoid this inexorable outcome, Defendants will likely argue, as they have done in other cases, that Plaintiffs' claims sound in contract and therefore, under the Tucker Act, 28 U.S.C. § 1491(a)(1), this case may only proceed in the Court of Federal Claims. Defendants would be wrong, as courts have found in most other cases where the government has raised this defense in response to motions for preliminary relief on similar claims.[21]

---

[21] *See*, *e.g.*, *Thakur*, 2025 WL 1734471, at *18; *Green & Healthy Homes Initiatives v. Env't Prot. Agency*, No. 25-CV-1096-ABA, 2025 WL 1697463, at *12 (D. Md. June 17, 2025) (collecting cases); *Harris County, Tx. v. Kennedy*, No. 25-CV-1275 (CRC), 2025 WL 1707665, at *4 (D.D.C. June 17, 2025); *RFE/RL, Inc. v. Lake*, No. 1:25-CV-799-RCL, 2025 WL 1232863, at *4 (D.D.C. Apr. 29, 2025); *Widakuswara v. Lake*, No. 1:25-CV-1015-RCL, 2025 WL 1166400, at *9 (D.D.C.

The Tucker Act vests the Court of Federal Claims with jurisdiction over "express or implied contract[s] with the United States." 28 U.S.C. § 1491(a)(1). The Tucker Act deprives district courts of jurisdiction when a claim is "at its essence contractual." *Am. Bar Ass'n v. U.S. Dep't of Just.*, No. 25-CV-1263 (CRC), 2025 WL 1388891, at *5 (D.D.C. May 14, 2025) (quoting *Crowley Gov't Servs., Inc v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106 (D.C. Cir. 2022)). In determining whether an action is "at its essence" one of contract, courts look to both "the source of the rights upon which the plaintiff bases its claims, and [] the type of relief sought." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982). Both factors support this Court's exercise of jurisdiction here.

First, Plaintiffs' claims must proceed in this court because they are based on the Constitution, federal regulations, and for some, federal statutes. In assessing the source of the rights of a claim, the D.C. Circuit has "explicitly rejected the 'broad' notion 'that any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act' because to do so would 'deny a court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship with the government.'" *Crowley*, 38 F.4th at 1106–07 (quoting *Megapulse*, 672 F.2d at 967–68).

Plaintiffs allege Defendants have engaged in a policy and practice of terminating grants *en masse* in a manner contrary to the Uniform Guidance, due process, and for certain Plaintiffs, separation of powers. These claims do not turn on the terms of a contract between the parties, but on constitutional law, and federal regulations and statutes. *See Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, No. 1:25-CV-00097-MSM-PAS, 2025 WL 1116157, at *13

---

Apr. 22, 2025); *see also Widakuswara v. Lake*, No. 25-5144, 2025 WL 1521355, at *1 (D.C. Cir. May 28, 2025) (en banc decision lifting stay of preliminary injunction issued by district court).

(D.R.I. Apr. 15, 2025). While Plaintiffs seek to reinstate their grants (not contracts),[22] the source of their right to that relief does not come from the text of those agreements, but from the Constitution, regulatory obligations Defendants have imposed on themselves, and Congress's mandates for certain grants. *See Green & Healthy Homes*, 2025 WL 1697463, at *12 ("[A]lthough Plaintiffs' grant agreements gave them certain contractual rights, those are not the rights that Plaintiffs have brought this case to enforce. Rather, their claim is that EPA has violated the APA, the Constitution, and OMB regulations; those are the sources of rights that are pertinent to this case."). Indeed, the nature of Defendants' action at issue in this case punctuates that this is not about any contract term—instead, it is about a widespread policy and practice by Defendants to terminate grants without consideration of their constitutional, regulatory, and statutory obligations.

Second, Plaintiffs here do not seek money damages—the relief typically available from the Court of Federal Claims for contract breaches. Instead, Plaintiffs seek declaratory judgment that Plaintiffs' policy and pattern runs afoul of the Constitution, federal regulations, and Congress's mandates for certain grants, and injunctive relief requiring reinstatement of their grants and the status quo. In *Bowen v. Massachusetts*, 487 U.S. 879, 909 (1988), the Supreme Court held that a district court had jurisdiction over a case in which the plaintiff sought reversal of an agency decision to withhold grant funds, characterizing that relief as not one for "money judgment" or "damages." The Court reasoned that money damages "are given to the plaintiff to substitute for a suffered loss, whereas specific remedies are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled." *Id*. at 895 (citation modified). Therefore, even though the relief sought by the plaintiffs involved the payment of money, because the plaintiff sought reversal of the unlawful agency action, its claims were at home in district court. *Id.* at 893.

---

[22] As noted *supra* n.4, by definition, a grant is not a contract.

As one court has explained, "[a] hallmark of such equitable actions is the existence of prospective relief in ongoing relationships." *Woonasquatucket*, 2025 WL 1116157, at *13; *Massachusetts v. Nat'l Insts. of Health*, 770 F. Supp. 3d 277, 295 (D. Mass. 2025) (finding district court jurisdiction where the plaintiffs' "claims are to preserve their ongoing and prospective agreements with" the government). Like in *Bowen*, Plaintiffs here seek reversal of unlawful agency action and equitable relief to continue the ongoing relationships that are their grants.

Accordingly, both factors demonstrate that Plaintiffs claims must proceed in this Court.

This result is not disturbed by the Supreme Court's order granting a stay of a temporary restraining order "enjoining the Government from terminating various education-related grants." *Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (per curium). Notably, the Court did not have the benefit of merits briefing on this complex issue. It also did not overrule *Bowen*, but instead acknowledged the case by stating that "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." *Id.* (quoting *Bowen*, 487 U.S. at 910). This Court should "follow the case which directly controls." *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023).

Nonetheless, *Department of Education* can also be differentiated. First, that case involves only APA claims. Nothing in the Supreme Court's decision implied that nonstatutory claims, including those brought under the Constitution, cannot proceed in district court. In fact, while the Supreme Court's order revolved around lack of sovereign immunity waiver for the APA claims, constitutional and other nonstatutory claims need not rely on any waiver of sovereign immunity because where an "'officer is not doing the business which the sovereign has empowered him to do,'" "there is no sovereign immunity to waive—it never attached in the first place." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996) (quoting *Larson v. Domestic & Foreign*

*Com. Corp.*, 337 U.S. 682, 689 (1949)). Second, the source of the plaintiff's claims was in their particular grant agreements, whereas in this case Plaintiffs allege a systemic failure to comply with the applicable regulations.

Thus, this case falls squarely within this Court's jurisdiction because Plaintiffs' claims arise from the Constitution, and federal regulations and statutes, and Plaintiffs seek equitable relief and reversal of the agency policy and practice.

## II.    Plaintiffs Are Likely to Succeed on the Merits

Plaintiffs are likely to prevail on their claims because Defendants' policy and practice is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law in violation of the APA in several ways, violates Plaintiffs' constitutional rights, and contravenes statutory mandates for certain Plaintiffs.

### A.    Defendants' policy and practice of terminating awards is not in accordance with federal regulations.

Defendants' policy and practice of relying on 2 C.F.R. § 200.340(a)(4) is unlawful under the APA because it violates federal regulations and is thus "not in accordance with law." 5 U.S.C. § 706(2)(A).[23] The APA's reference to "law" in the phrase "not in accordance with law," "means,

---

[23] As a preliminary matter, Defendants' actions taken pursuant to its policy and practice of terminating already-awarded grants constitute final agency action for APA purposes. 5 U.S.C. § 704; *Bennett v. Spear*, 520 U.S. 154, 156, 177-78 (1997) (final agency action marks "consummation of the agency's decisionmaking process" and is one by which "rights or obligations have been determined," or from which "legal consequences will flow") (citation omitted). The implementation of the policy and practice through termination of awards marks the consummation of Defendants' decisionmaking and imposes legal consequences because it resulted in the immediate loss of promised funding to Plaintiffs and other awardees, and required awardees to cease performance of projects well underway and to undertake closeout obligations with the threat of enforcement. *See, e.g., Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 25-239 (LLA), 2025 WL 597959, at *13 (D.D.C. Feb. 25, 2025) (holding that pause on funding constituted final agency action); *see also RFE/RL, Inc. v. Lake*, No. 1:25-cv-00799-RCL, 2025 WL 900481, at *3 (D.D.C. Mar. 25, 2025). Defendants' decision to implement a policy and practice "across the board" to Plaintiffs and numerous other awardees in a wide range of programs can "of course be challenged under the APA." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890

of course, any law, and not merely those laws that the agency itself is charged with administering." *FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003). When a federal agency has adopted "[r]egulations with the force and effect of law," those regulations "supplement the bare bones" of federal statutes. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 265, 268 (1954). "[A]n agency is bound by its own regulations," and therefore "if an agency action fails to comply with its regulations, that action may be set aside as arbitrary and capricious." *Erie Boulevard Hydropower, LP v. FERC*, 878 F.3d 258, 269 (D.C. Cir. 2017) (citation modified). In particular, "agencies may not violate their own rules and regulations to the prejudice of others." *Battle v. FAA*, 393 F.3d 1330, 1336 (D.C. Cir. 2005).

Defendants' policy and practice of terminating awards pursuant to 2 C.F.R. § 200.340(a)(4) because they allegedly no longer effectuate agency priorities—newly adopted to comply with the Trump Administration's Executive Orders—is contrary to the Uniform Guidance in two fundamental ways. *First*, 2 C.F.R. § 200.340 does not allow for termination in these circumstances. *Second*, Defendants failed to comply with pre-termination requirements imposed by its own regulations.

      *i. Regulatory history of 2 C.F.R. § 200.340*

Two versions of the termination provision from the Uniform Guidance are relevant to Plaintiffs' claims: the 2020 version, which became effective November 12, 2020, except for amendments to §§ 200.216 and 200.340, which became effective on August 13, 2020, 85 Fed. Reg. 49,506 (Aug. 13, 2020) ("2020 Uniform Guidance"); and the 2024 version of the Uniform Guidance, which became effective on October 1, 2024, 89 Fed. Reg. 30,046 (Apr. 22, 2024) ("2024

---

n.2 (1990); *see New York v. Trump*, No. 25-1236, 2025 WL 914788, at *12 (1st Cir. Mar. 26, 2025); *see also New York*, 2025 WL 914788, at *12 (1st Cir. Mar. 26, 2025) (finding actionable "the decisions by the Agency Defendants to implement broad, categorical freezes on obligated funds").

Uniform Guidance"); *see* 89 Fed. Reg. 68,321 (Aug. 26, 2024) (USDA adopting October 1, 2024 effective date for 2024 Uniform Guidance).

Both versions of the Uniform Guidance include a provision laying out the circumstances in which an award may be terminated. *See* 2 C.F.R. § 200.340. While the structure of 2 C.F.R. § 200.340 differs between the two, both (i) require that agencies "clearly and unambiguously" identify termination provisions in an award's terms and conditions, and (ii) limit termination based on an award's no longer serving agency priorities to circumstances in which the agency has specific evidence that the particular award no longer effectuates the priorities it was originally stated to further.

Section 200.340(a)(2) of the 2020 Uniform Guidance provides that a federal award may be terminated "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities." For an agency to terminate an award pursuant to this provision, the 2020 version of § 200.211(c)(v) requires that agencies "make recipients aware, in a clear and unambiguous manner, of the termination provisions in § 200.340, including the applicable termination provisions in the Federal awarding agency's regulations or in each Federal award." *See* 85 Fed. Reg. at 49,542.

The stated intent of the 2020 Uniform Guidance is for "Federal awarding agencies" to "prioritize ongoing support to Federal awards that meet program goals." 85 Fed. Reg. at 49,507. OMB provided examples of circumstances in which an agency's termination pursuant to 2 C.F.R. § 200.340(a)(2) (2021) would be appropriate: "if additional evidence reveals that a specific award objective is ineffective at achieving program goals" or if "additional evidence . . . cause[s] the Federal awarding agency to significantly question the feasibility of the intended objective of the award." *Id.* at 49,507–08. The preamble to the final rule also emphasized that the provision

25

allowing for termination by the agency in § 200.340(a)(2) (2021) is "linked to *performance goals of the program* (§ 200.301)." 85 Fed. Reg. at 49,507 (emphasis added).

In 2024, OMB updated the Uniform Guidance, adjusting the language in § 200.340, while maintaining the essential requirements of the prior version. The 2024 Uniform Guidance modified the language that was in the 2020 Uniform Guidance § 200.340(a)(2), and moved it to § 200.340(a)(4). It modified the language of the provision to state that a federal award may be terminated "[b]y the Federal agency or pass-through entity pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4) (2025). It also stated that agencies "must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award." 2 C.F.R. § 200.340(b) (2025); *see* 2 C.F.R. § 200.211(c)(v) (2025).

Thus, under either the 2020 or 2024 rules, agencies can only terminate under § 200.340(a)(2) (2021) or (a)(4) (2025) if: (i) that subsection was "clearly and unambiguously" specified as a basis for potential termination; (ii) the agency concludes that the award is no longer furthering the program goals and agency priorities established at the time of the award that were communicated "clearly and unambiguously" in the award itself; and (iii) that conclusion is based on new "additional evidence" of how the award "no longer" serves these program goals and agency priorities as determined at the time of the award.

### ii.  *Defendants' policy and practice is inconsistent with 2 C.F.R § 200.340*

Defendants' policy and practice of terminating awards pursuant to 2 C.F.R. § 200.340(a)(4) because the awards "no longer effectuate agency priorities" is not in accordance with the Uniform Guidance for several reasons. *First*, this provision does not apply to awards issued before it was added to the Uniform Guidance in October 2024. *Second*, the provision requires that this ground for termination be "clearly and unambiguously" included in the award. *Third*, the priorities

26

allegedly no longer being served by the grant must also be "clearly and unambiguously" listed in the awards. *Fourth*, the provision is meant to apply when evidence shows the award no longer serves the purposes it was meant to serve at the time of award, not new agency priorities established after award solicitation, proposal development, application, selection, and execution of the award. And *fifth*, the policy and practice provided no advance notice of the termination or any opportunity to modify performance.

*First*, the policy and practice of termination relies on a regulatory basis that was not (and could not be) clearly and unambiguously specified at the time of the award. Subsection (a)(4) was added in the October 2024 revision to the Uniform Guidance. Plaintiffs' awards and many other awards terminated pursuant to Defendants' policy and practice were executed *before* this provision was added: USDN on December 11, 2023; OBC on March 26, 2024; Agroecology Commons on January 29, 2024; PFC on September 7, 2023; IATP on October 30, 2023. Brown Decl., Ex. C; Thiel Decl., Ex. A; Atwood Decl., Ex. C; Heltman-Weiss Decl., Ex. C; McKee Decl. A. The preamble to the 2024 Uniform Guidance expressly states that it does not apply to "Federal awards issued prior to October 1, 2024" unless the agency adopted an earlier date. 89 Fed. Reg. at 30,046. Defendants did not do so. 89 Fed. Reg. at 68,321. Thus, the subsection that Defendants policy and practice relies on does not apply to Plaintiffs' awards and any other terminated awards issued before October 1, 2024. By Defendants' own rules, they cannot rely on a regulatory provision not specified at the time of the award.

*Second*, albeit related, the ground for termination—that the award "no longer effectuates agency priorities"—is not "clearly and unambiguously" included in Plaintiffs and others' awards. Were the Court to treat Defendants' reference to 2 C.F.R. § 200.340(a)(4) as merely a massive typographical error, Defendants' policy and practice to terminate based on "agency priorities" still

relies on a regulatory basis insufficiently identified in the awards. For instance, Plaintiffs' awards only cross-reference the Uniform Guidance in general or 2 C.F.R. § 200.340 broadly, or just the USDA's adoption of the Uniform Guidance, rather than spelling out the circumstances in which the award is subject to termination. No reasonable awardee would read a reference to 2 C.F.R. Part 200 or 2 C.F.R. § 200.340 and understand that it means that the award may be terminated if it no longer effectuates agency priorities. Thus, this basis for termination was not "clearly and unambiguously" communicated to Plaintiffs and cannot support Defendants' termination.

*Third and fourth*, the policy and practice terminates grants based on unlawfully changed priorities *and* without evidence. The Uniform Guidance allows an agency to terminate an award on the basis that it no longer effectuates the program goals or agency priorities only if two conditions are met: (1) the failure to meet specific program goals and agency priorities are determined and "clearly and unambiguously" identified in the award at the time it is issued; and (2) new evidence shows the award no longer meets those original goals and priorities. Defendants do not and cannot claim that either of these preconditions were met before terminating awards *en masse* based on form letters. Defendants are expressly relying on the Trump Administration's new agency priorities that did not exist at the time these awards were issued. Thus, the terminations are unrelated to—and Defendants have no evidence to support misalignment with—the goals and priorities the awards were intended to serve.

*Fifth*, Defendants' policy and practice also fails to comply with separate requirements in the Uniform Guidance that awardees have an opportunity to address any issues before termination. All potentially relevant versions of the Uniform Guidance provide that an agency may suspend or terminate a grant award in part or in its entirety only after the agency "determines that noncompliance cannot be remedied by imposing specific conditions," such as "[r]equiring

additional project monitoring," requiring the recipient to obtain technical or management assistance, or "[e]stablishing additional prior approvals." 2 C.F.R. §§ 200.339, 200.208(c) (2025); 2 C.F.R. §§ 200.339, 200.208(c) (2021). USDA therefore can only terminate an award after it first evaluates how it could achieve compliance and failed. Both NIFA and AMS have additional, stricter processes that must precede termination, for instance, each must "allow the awardee an opportunity to take appropriate corrective action before [the agency] makes a termination decision." 7 C.F.R. § 3430.60; *see supra* n.14.

There is no question that Defendants' policy and practice did not comply with these regulatory requirements. The terminations were effective the same day the letters were issued, and funding immediately ceased. Plaintiffs and other terminated awardees were given no opportunity to address any alleged noncompliance before termination.

Thus, for any one of the five reasons above, Defendants' policy and practice is contrary to the Uniform Guidance, and NIFA and AMS regulations, and thus violates the APA. Plaintiffs are thus entitled to injunctive relief to set aside Defendants' unlawful actions.

## B. Defendants' policy and practice is arbitrary and capricious.

Defendants' policy and practice separately violates the APA because it is arbitrary and capricious. The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). An agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). For this reason, when an agency changes its policy, if the "new policy rests upon

factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests," the agency's failure to consider such factors "would be arbitrary and capricious." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). The "reasoned explanation requirement . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019). Similarly, if an agency departs from prior policy but fails to "display awareness that it *is* changing position" or fails to "show that there are good reasons for the new policy," that too renders the action arbitrary and capricious. *Fox*, 556 U.S. 502, 515.

Defendants' policy and practice of terminating hundreds of awards—including Plaintiffs'—via form letters and in reliance on 2 C.F.R. § 200.340(a)(4) is arbitrary and capricious for numerous reasons, including, but not limited to, that the terminations are not explained, let alone reasonably explained; that Defendants' failed to consider Plaintiffs', other awardees', and the broader communities' reliance interests; and that it represents a change in policy without adequate justification.

Defendants' policy and practice consists of issuing termination letters that are not reasonably explained, which is arbitrary and capricious in violation of the APA. Defendants' letters all assert in near-identical language that the award "no longer effectuates agency priorities" without explaining why that is the case. The similarity amongst termination letters itself raises a red flag that the terminations were not the result of reasoned decisionmaking.

Further, Defendants' conclusory statements "can scarcely be characterized as an explanation." *RFE/RL*, 2025 WL 900481, at *3. When terminating a grant, Defendants are required to provide recipients with a "workable, sensible, or meaningful reason or basis for the termination

of their awards." *Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, No. 1:25-cv-00702, 2025 WL 833917, at *21 (D. Md. Mar. 17, 2025). Defendants' policy and practice fails to do so. Instead, it consists of issuing terminations that are "'completely unreasoned' and thus were not the product of reasoned decisionmaking." *Drs. For Am. v. Off. Of Pers. Mgmt.*, 766 F. Supp. 3d 39, 53 (D.D.C. 2025).

Indeed, gaps abound in the sparse explanation Defendants provide in their formulaic termination letters. For instance, USDN's letter says the award was being terminated because it "provides funding for programs that promote or take part in climate change or environmental justice initiatives; that conflict with the Department's policies and priorities; that are not free from fraud, abuse, or duplication; **_or_** that otherwise fail to serve the best interests of the United States." Brown Decl., Ex. A (emphasis added). This communicates at least four distinct potential bases for the termination without identifying or explaining which applies to USDN. The pattern is reflected in PFC and IATP's terminations. Heltman-Weiss Decl., Ex. A; McKee Decl., Ex. C. Unsurprisingly, therefore, these letters offer no explanation for how the grants fail to effectuate the unspecified agency priority.

Similarly, as to OBC and other PCSC awardees, the termination letters made up new criteria, omitting any explanation or evidence for how those new criteria were determined and not met. Thiel Decl., Ex. D. The terminations fail to include any explanation as to how the awards no longer effectuate the program goals as originally designed. *Id.*

Agroecology Commons' letter only says it "no longer effectuates USDA priorities, which are to maximize and promote American agriculture; ensure a safe, nutritious, and secure food supply; enhance rural prosperity; and protect our National Forests." Atwood Decl., Ex. A. Defendants made no effort to explain why the grant no longer effectuates these priorities. Indeed,

Defendants could not, as the new priorities are actually furthered by the programs the grant funds—a beginning-farmer training and food security program. Atwood Decl., Ex. B.

This pervasive lack of reasoned explanation for the terminations is evident across the Defendants' policy and practice and renders it and the resulting terminations arbitrary and capricious.

Defendants' policy and practice is also arbitrary and capricious because it did not account for Plaintiffs' reliance interest. Plaintiffs and other awardees relied on their understanding that so long as they complied with the requirements from their awards, they would have this funding until the award end date. They started programs, hired employees, entered contracts, and developed relationships, only to have their funding abruptly terminated by Defendants. Where there has been good-faith reliance on Defendants' prior position, the government must account for that reliance when explaining a shift in policy. *See Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156–57 (2012); *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 224 (2016). Defendants in no way did so here.

Further, Defendants' policy and practice is also arbitrary and capricious because it rests on new priorities that constitute an unexplained and unreasonable change in longstanding principles. Even if it were permissible for Defendants to "chang[e] its course" and to base its terminations on these new priorities—which it is not under Defendant's own regulations—they are "obligated to supply a reasoned analysis for the change." *Sierra Club v. Salazar*, 177 F. Supp. 3d 512, 532-33 (D.D.C. 2016); *see also Verizon v. FCC*, 740 F.3d 623, 636 (D.C. Cir. 2014) ("[R]easoned decision-making ordinarily demands that an agency acknowledge and explain the reasons for a changed interpretation."). In terminating these awards, Defendants failed articulate "good reasons"

for the shift, *Encino Motorcars*, 579 U.S. at 221 (quotation marks omitted), thus rendering the decision arbitrary and capricious.

At bottom, Defendants failed to justify their policy and practice of terminating Plaintiffs' and others' grants *en masse*, failed to consider important aspects of the problem, relied on factors that Congress did not intend for them to consider and that they themselves previously did not consider, and failed to articulate a reasoned explanation for their change in position. This is the very epitome of arbitrary and capricious decisionmaking, and Defendants' actions must be set aside.

### C. Defendants' policy and practice violates Plaintiffs' due process rights.

#### i. *Defendants' policy and practice violates procedural due process.*

The Fifth Amendment to the Constitution guarantees that "no person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. This protects "property" interests where a person or entity has a "legitimate claim of entitlement." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). Federal grantees "have a legitimate property interest in federal funds that Congress has already appropriated and that the [grantees] have accepted." *Cnty. of Santa Clara v. Trump*, 275 F. Supp. 3d 1196, 1218 (N.D. Cal. 2017), *aff'd in part, vacated in part, remanded sub nom. City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018); *see NB ex rel. Peacock v. District of Columbia*, 794 F.3d 31, 41 (D.C. Cir. 2015) (A person has a protected property interest if that "person would be entitled to receive the government benefit assuming she satisfied the preconditions to obtaining it" and "award of the benefit would follow from satisfaction of applicable eligibility criteria."). "[I]f the statute or implementing regulations place substantive limitations on official discretion to withhold award of the benefit upon satisfaction of the eligibility criteria, there is a legitimate claim of entitlement, as

to which the Due Process Clause affords protection." *NB ex rel. Peacock*, 794 F.3d at 41–42 (citation modified).

Plaintiffs have a constitutionally protected property interest in the grant funding they applied for, were awarded, and relied and continue to rely on. Thus, Plaintiffs were entitled to due process before Defendants summarily terminated their awards without prior notice or opportunity to be heard. *Zinermon v. Burch*, 494 U.S. 113, 127 (1990) (Barring extraordinary circumstances, "the Constitution requires some kind of a hearing *before* the State deprives a person of liberty or property." (emphasis added)).

Notably, due process' requirements parallel the requirements imposed by the Uniform Guidance, which, as discussed above, mandate that awardees have an opportunity to address remediable issues before termination. *See supra* Section II.A.ii. In fact, the failure to follow those rules is not only evidence of a due process violation, but itself amounts to a due process violation, as due process requires Defendants' "scrupulous compliance with those regulations" it has adopted "to avoid any injustice." *Mazaleski v. Treusdell*, 562 F.2d 701, 719 (D.C. Cir. 1977).

Thus, Plaintiffs' procedural due process rights were violated by each of the following:

- Plaintiffs were afforded no process before their awards were terminated, and thus denied the process required by USDA's regulations. The terminations became effective the same day the letters were issued.

- The termination letters provided no explanation beyond that the awards do not meet the agency's new priorities.

- Awardees were given no chance to fix any alleged problem with their grant.

- Defendants have not and cannot produce any evidence that they reasonably concluded the awards could not be remedied before terminating.

While some termination letters provided for post-deprivation appeal opportunities, that is insufficient to satisfy due process rights, which require fair notice and a reasonable opportunity to

be heard *before* deprivation of a property interest, not after, when Plaintiffs already have lost access to funding and continue to suffer irreparable harm. *See Zinermon*, 494 U.S. at 127.

    *ii. Defendants' policy and practice is unconstitutionally vague.*

Defendants' policy and practice also violates the Due Process Clause by terminating grants in an unconstitutionally vague manner. Federal regulatory enforcement is void for vagueness if it does not provide a person of ordinary intelligence fair notice of what is prohibited or if it risks arbitrary application. *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972); *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Terminology that allows for "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings" violates due process in this way. *United States v. Williams*, 553 U.S. 285, 306 (2008); *Coates v. City of Cincinnati*, 402 U.S. 611, 611–14 (1971) (holding a regulation against "annoying" conduct unconstitutionally vague); *Smith v. Goguen*, 415 U.S. 566, 573–77 (1974) (holding a prohibition on treating the American flag "contemptuously" unconstitutionally vague).

Defendants' policy and practice of using 2 C.F.R. § 200.340(a)(4) to terminate grants because the awards allegedly "no longer effectuate agency priorities" is unconstitutionally vague because the new priorities were not and could not have been included in the terms of the awards that Plaintiffs agreed to, meaning they can be arbitrarily imposed.

Moreover, the form letters themselves are replete with broad phrasing that lacks the "[p]recision and guidance" that is "necessary so that those enforcing the law do not act in an arbitrary or discriminatory way," as Defendants' conduct evidences. *Fox*, 567 U.S. at 253. For instance, many termination letters reference numerous potential reasons for termination without identifying which applies to the particular award. *E.g.*, Brown Decl., Ex. A; Heltman-Weiss Decl., Ex. A; McKee Decl., Ex. C. For Agroecology Commons' Community Food Project grant, the termination says it does not effectuate the new policies to "maximize and promote American

agriculture; ensure a safe, nutritious, and secure food supply; enhance rural prosperity; and protect our National Forests." Atwood Decl., Ex. A. But any objective understanding of Agroecology Commons' work training farmers and addressing food insecurity matches these new priorities. *See* Atwood Decl., Ex. B. And those letters relying on "DEI" and "equity" as termination bases do not define those terms. The First and Second DEI EOs likewise do not define these terms or others, including "equity-related," "programs promoting DEI," "illegal DEI," and "DEIA principles." Further, in a hearing before the District Court for the Northern District of Illinois on March 25, 2025, the U.S. Department of Justice refused to provide the court with the Trump Administration's definition of "illegal and immoral discrimination" in the context of the Executive Orders.[24]

Defendants' approach allows them to end billions of dollars of funding based purely on the subjective whims of the Executive Branch officials. This is the exact instability and arbitrary application of government power that the Due Process Clause seeks to prevent.

### D. Terminations of USDN and Agroecology Commons' grants violate separation of powers, are contrary to statutory authority, and are *ultra vires*.

USDN and Agroecology Commons are likely to succeed on their additional claims against USDA, USFS, and FSA because the termination of their awards is contrary to the authorizing statute for the relevant programs, violates the Constitution's mandate on separation of powers, and is *ultra vires*.

The Constitution empowers Congress to make laws (U.S. Const. art. 1, § 1) and requires the President to faithfully execute those laws (*id.* art. II, § 3). Congress, not the Executive, has "exclusive power" of the purse. *Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1346 (D.C.

---

[24] Chris Strohm, *Judge Presses DOJ Attorney to Define "Illegal" DEI Programming*, Bloomberg Law (May 15, 2025), https://news.bloomberglaw.com/litigation/judge-presses-doj-attorney-todefine-illegal-dei-programming.

Cir. 2012) (quoting *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 185 (D.C. Cir. 1992)). The Executive cannot unilaterally refuse to spend money that Congress has appropriated. *In re Aiken County*, 725 F.3d 255, 261 n. 1 (D.C. Cir. 2013). "Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals." *City & Cnty. of San Francisco*, 897 F.3d at 1235. A federal agency action outside of any constitutional or statutory authority must be struck down as *ultra vires. Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996). Further supporting this is the APA's mandate that a court "hold unlawful and set aside agency action" that is "not in accordance with law" or "contrary to constitutional right". 5 U.S.C. § 706(2)(A), (B).

       *i.   USDA and USFS's termination of USDN's Urban Forestry Award*

In the Cooperative Forestry Assistance Act of 1978, Congress authorized the Urban Forestry Program based on the finding that "tree plantings and ground covers such as low growing dense perennial turfgrass sod in urban areas and communities can aid in reducing carbon dioxide emissions, mitigating the heat island effect, and reducing energy consumption, thus contributing to efforts to reduce global warming trends." 16 U.S.C. § 2105(a)(5). Thus, the statutory purposes of the Urban Forestry Program include "implement[ing] [] tree planting program[s] to complement urban and community tree maintenance and open space programs and to reduce carbon dioxide emissions, conserve energy, and improve air quality in addition to providing other environmental benefits." *Id.* § 2105(b)(5). In the IRA, Congress appropriated funds for the program grants to serve these purposes. IRA § 23003(a)(2). USDN received an award to carry out its program in furtherance of these statutory purposes, including by expanding best management practices to improve resilience to climate change and extreme heat. Brown Decl., Ex. B.

Shortly after President Trump took office, USDA and USFS terminated USDN's award because it "provides funding for programs that promote or take part in climate change or

environmental justice initiatives; that conflict with the Department's policies and priorities; that are not free from fraud, abuse, or duplication; or that otherwise fail to serve the best interests of the United States." Brown Decl., Ex. A. The termination letter also states that the agency seeks to "conserve[]" resources to focus on the Administration's new objectives. *Id.* The letter never identified which of these many rationales led to USDN's termination.

USDA and USFS' termination of USDN under its policy and practice contravene Congress's mandates and thus is contrary to law, violates separation of powers, and is *ultra vires*. Congress expressly required funding for climate change initiatives through the IRA money allocated for the Urban Forestry Program. Congress stated the point of the funds was to "aid in reducing carbon dioxide emissions," "heat island effect" and "energy consumption" that contribute to "global warming trends." 16 U.S.C. § 2105(a)(5) And it is Congress, not the Executive, that determines how this funding should be spent.

USDA and USFS also violate constitutional separation of powers by refusing to spend amounts appropriated by Congress. USDN's termination letter expressly states that this funding will be "conserve[d]," Brown Decl., Ex. A, and on the DOGE website, the termination of USDN's awards is shown as "savings" by the federal government. *See supra* n.18. USDA and USFS thus do not intend to redistribute this money within the program—rather they seek to withhold it altogether. This plainly contravenes Congress's sole power of the purse. *City & County of San Francisco*, 897 F.3d at 1235.

>    ii.   *USDA and FSA's termination of Agroecology Commons' Land Access Award*

Section 1006 of the American Rescue Plan Act of 2021 appropriated over $1 billion to the Secretary of Agriculture for fiscal year 2021 and directed that the Secretary "shall" use those funds on various agricultural programs that benefit "socially disadvantaged farmers, ranchers, or forest landowners, or other members of socially disadvantaged groups." Pub. L. No. 117-2, 135 Stat. 4,

13–14. In Section 22007 of the IRA, Congress amended Section 1006 of the American Rescue Plan Act and appropriated an additional $2.9 billion to fund agricultural programs to benefit "underserved farmers, ranchers, or forest landowners," certain educational institutions that serve underserved communities, and "farmers, ranchers, or forest landowners determined to have experienced discrimination prior to January 1, 2021, in Department of Agriculture farm lending programs." USDA and FSA used these IRA funds to create the Land Access Program. *See supra* n.10.

Thus, per Congress's mandate, the funds for the Land Access Program must benefit socially disadvantaged and underserved farmers. Agroecology Commons received an award through this program to do just that. Its project proposal explains how the queer, trans, Black, Indigenous, and multi-racial farmers it serves have been socially disadvantaged and underserved due to corporate consolidation of agriculture, legacies of unjust land distribution, systemic racism, and limited access to resources. Atwood Decl., Ex. B.

USDA's recent announcement that it "will terminate more than 145 Diversity, Equity, and Inclusion (DEI) focused awards" references an award to be terminated that appears to be Agroecology Commons' award: a $2.5 million grant for "[e]xpanding equitable access to land, capital, and market opportunities for underserved producers in the Bay Area." *See supra* n.17. USDA and FSA's decision to terminate the award based on "DEI" is fundamentally at odds with Congress's direction that this funding support socially disadvantaged and underserved farmers.

Accordingly, because USDA, USFS, and FSA's terminations of USDN and Agroecology Commons' awards violates the APA and separation of powers, and is *ultra vires*, these actions should be enjoined.

### III.    Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief

To be entitled to a preliminary injunction, a plaintiff must show that it has suffered harm that is "certain and great," "actual and not theoretical," and so "imminent that there is a clear and present need for equitable relief to prevent irreparable harm." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (citation modified). "Obstacles [that] unquestionably make it more difficult for [an organization] to accomplish their primary mission . . . provide injury for purposes both of standing and irreparable harm." *Id.* at 9. In the context of the government's withholding of an organization's funding, irreparable harm is established where the cessation of funding affects the existence of programs, the organizations' reputation, or the livelihoods of organization's staff and the communities they serve. *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 763 F. Supp. 3d 36, 57 (D.D.C. 2025); *RFE/RL*, 2025 WL 900481, at *4; *S. Educ. Found. v. U.S. Dep't of Educ.*, No. CV 25-1079 (PLF), 2025 WL 1453047, at *15 (D.D.C. May 21, 2025); *Am. Ass'n of Colls. for Tchr. Educ.*, 2025 WL 833917, at *23.

Plaintiffs readily meet this standard. "The very purpose of Plaintiffs' existence and their business operations, including the financing for their projects, depends on their grant money." *Climate United Fund v. Citibank, N.A.*, No. 25-CV-698 (TSC), 2025 WL 1131412, at *17 (D.D.C. Apr. 16, 2025). Plaintiffs all rely on funding from their terminated grants to accomplish their missions. Brown Decl. ¶ 5; Thiel Decl. ¶¶ 4–6; Atwood Decl. ¶ 5; Heltman-Weiss Decl. ¶ 5; McKee Decl. ¶¶ 4–7. If Defendants' unlawful policy and practice remains in effect and Plaintiffs' grants are not reinstated, Plaintiffs will be irreparably and irreversibly harmed in several ways, including being unable to finance their important programs, having to lay off staff, experiencing erosion of their reputation in the communities they serve, and being forced to scale back or cease operations.

For instance, USDN has stopped its urban forestry program altogether, ceasing payment to its sub-awardee municipalities, which in turn have had to end their tree growing programs and lay off staff. Brown Decl. ¶¶ 16–17. USDN may have to lay off staff and greatly reduce its operations if funding is not promptly restored. *Id.* ¶¶ 18–19.

Agroecology Commons, absent immediate restoration of its grant, will not be able to continue its incubator farm where beginning farmers get to test their ideas. Atwood Decl. ¶ 22. Agroecology Commons has already had to cancel contracts with six beginning farmers who were meant to steward the farm; thus, until funding is restored, Agroecology Commons staff must take time away from other projects to maintain the farm themselves or let it go fallow, missing out on valuable growing time. *Id.* ¶¶ 22–23. Agroecology Commons has also had to stop its acquisition of land for its Land Commons project, in which it planned to lease land to new farmers to address land access challenges in their region. *Id.* ¶ 24.

OBC had to stop its project work on its cooperative-led partnership system to promote use of a new conservation cover crop, and has already had to lay off four employees.[25] Thiel Decl. ¶¶ 17, 19. Growers who planned to use OBC's crop cover have lost confidence in the program and momentum towards joining. *Id.* ¶ 18.

PFC is currently relying on extremely limited general operating funds to keep its Incubator Farm Program running. Heltman-Weiss Decl. ¶ 21. The operating funds will be exhausted in a matter of months, so lay-off of a staff member and discontinuation of critical parts of the project are imminent. *Id.* ¶¶ 21–22. The imminent closure or drastic reduction of this project represents a massive blow to participating farmers and their ability to build sustainable, profitable farms in the

---

[25] The First Amended Complaint inadvertently states that OBC has had to lay off five employees, but it has had to lay off four of five employees to date.

region, as well as to the regional communities that the project and its farmers nourish with local foods and economic activity. *Id.* ¶¶ 13, 21, 27–29. It is also eroding the trust that participating farmers had in PFC while severely impacting the emotional wellbeing of PFC staff and its farmers. *Id.* ¶¶ 23, 28.

IATP has had to significantly delay its work under the grant program, which hurts the network of farm and food systems organizations that work to nourish people in Minneapolis. McKee Decl. ¶ 19. It may also have to meaningfully narrow its work under the grant. *Id.* ¶ 21.

Absent a preliminary injunction, Plaintiffs will continue to suffer these irreparable harms. Moreover, without immediate intervention, the funding to which Plaintiffs are entitled may be rendered unrecoverable. "[I]n cases involving government expenditures, 'once the relevant funds have been obligated, a court cannot reach them in order to award relief.'" *Climate United Fund*, 2025 WL 1131412, at *17 (quoting *City of Houston v. Dep't of Hous. & Urb. Dev*, 24 F.3d 1421, 1426–27 (D.C. Cir. 1994)). Thus, "[a]ny transfer, re-allocation, or re-obligation of these funds would be an irreparable loss—one that threatens the very existence of Plaintiffs' businesses." *Id*. For instance, USDA has already publicly stated that it intends to re-obligate PCSC grant funding that OBC was awarded.[26] Thus, a preliminary injunction is required to prevent the irreparable loss of Defendants' reallocating funds promised to Plaintiffs.

Finally, as to Plaintiffs' constitutional claims "the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury,'" *Archdiocese of Washington v. Washington Metro. Area Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018). Thus,

---

[26] USDA, *USDA Cancels Biden Era Climate Slush Fund, Reprioritizes Existing Funding to Farmers* (Apr. 14, 2025), https://www.usda.gov/about-usda/news/press-releases/2025/04/14/usda-cancels-biden-era-climate-slush-fund-reprioritizes-existing-funding-farmers.

to the extent this Court concludes the policy and practice violates due process or the separation of powers, no more is required to establish an injury warranting immediate relief.

## IV.    The Balance of Equities and Public Interest Weigh Heavily in Plaintiffs' Favor.

The balance of equities and public interest factors merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "It is well established that the Government cannot suffer harm from an injunction that merely ends an unlawful practice." *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (quotation marks and citations omitted). Similarly, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017) (quotation marks and citation omitted). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws—such as the APA, as well as regulations . . . that govern their existence and operations." *Id.* (internal quotation marks and citations omitted). Moreover, because the Constitution "is the ultimate expression of the public interest," "government actions in contravention of the Constitution are always contrary to the public interest." *Turner v. U.S. Agency for Global Media*, 502 F. Supp. 3d 333, 386 (D.D.C. 2020) (cleaned up).

Thus, the equities and public interest tip drastically in favor of Plaintiffs. The harm inflicted on Plaintiffs and the communities they serve with their grant-funded programming far outweighs Defendants' interest in immediately enforcing these grant terminations. Further, preserving Plaintiffs' rights under the Constitution and APA is essential to the public interest. Defendants, on the other hand, will suffer no harm from ceasing to terminate already authorized grants for which Congress has already appropriated funds. Nor will Defendants be harmed by returning to the orderly and legally compliant grant oversight process required by the Constitution and Defendants' own regulations.

43

The balance of equities and public interest strongly support a preliminary injunction to preserve the status quo until this Court can rule on the merits of Plaintiffs' claims.

## V.    The Court Should Not Require a Bond.

Federal Rule of Civil Procedure 65(c) "'vest[s] broad discretion in the district court to determine the appropriate amount of an injunction bond,' including the discretion to require no bond at all." *P.J.E.S. by & through Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020) (quoting *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 107 (D.D.C. 2012)). A bond "is not necessary" where it "would have the effect of denying the plaintiffs their right to judicial review of administrative action." *Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971) (collecting cases).

When enjoining unlawful funding terminations, courts have declined to require plaintiffs to post bond. *See, e.g.*; *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 25-239 (LLA), 2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025); *Colorado v. HHS*, No. 1:25-cv-00121, 2025 WL 1017775, at *6 (D.R.I. Apr. 5, 2025); *Cmty. Legal Servs. in East Palo Alto v. HHS*, No. 3:25-cv-02847, 2025 WL 973318, at *4 (N.D. Cal. Apr. 1, 2025). As one court explained, "[i]n a case where the Government is alleged to have unlawfully withheld [large sums] of previously committed funds to countless recipients, it would defy logic—and contravene the very basis of this opinion—to hold Plaintiffs hostage for the resulting harm." *Nat'l Council of Nonprofits*, 2025 WL 597959, at *19; *see also Woonasquatucket*, 2025 WL 1116157, at *24. Plaintiffs request that result here too.

44

## CONCLUSION

For the reasons stated above, the Court should grant Plaintiffs' motion and preliminarily enjoin Defendants' policy and practice of unlawfully terminating grants and return Plaintiffs and other terminated awardees to the condition they were in before commencement of this unlawful conduct.

Dated this 26th day of June 2025.

Respectfully submitted,

/s/ Holly Bainbridge
Holly Bainbridge
DC Bar No. 90021466 (*Pro Hac Vice*)
FarmSTAND
712 H Street NE
Suite 2534
Washington, DC 20002
202-595-8816
Email: holly@farmstand.org

David S. Muraskin
DC Bar No. 1012451
FarmSTAND
712 H Street NE
Suite 2534
Washington, DC 20002
202-595-8816
Email: david@farmstand.org

Carrie Apfel
DC Bar No. 974342
Earthjustice
1001 G Street, NW, Suite 1000
Washington, DC  20001
(202) 667-4500
capfel@earthjustice.org

Scott W. Carlson
MN Bar No. 0338400 (*Pro Hac Vice*)
Farmers Justice Center
6 Fifth Street West
Suite 650
St. Paul, MN 55102
(651) 204-1664
scott.carlson@farmersjustice.org

Benjamin E. Apple
NC Bar No. 52009 (*Pro Hac Vice*)
Farmers Justice Center
6 Fifth Street West
Suite 650
St. Paul, MN 55102
(651) 204-7203
ben.apple@farmersjustice.org

*Counsel for Plaintiffs*