# IN THE UNITED STATES COURT DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| URBAN SUSTAINABILITY DIRECTORS NETWORK, OAKVILLE BLUEGRASS COOPERATIVE, AGROECOLOGY COMMONS, PROVIDENCE FARM COLLECTIVE CORP. and INSTITUTE FOR AGRICULTURE AND TRADE POLICY, | Case No. 1:25-cv-01775-BAH |
| *Plaintiffs*, |  |
| v. |  |
| UNITED STATES DEPARTMENT OF AGRICULTURE, BROOKE ROLLINS, in her official capacity as Secretary of the United States Department of Agriculture, DEPARTMENT OF GOVERNMENT EFFICIENCY, AMY GLEASON, in her official capacity as Acting Administrator of the Department of Government Efficiency, UNITED STATES FOREST SERVICE, TOM SCHULTZ, in his official capacity as Forest Service Chief, NATURAL RESOURCES CONSERVATION SERVICE, AUBREY J.D. BETTENCOURT, in her official capacity as Chief of the Natural Resources Conservation Service, NATIONAL INSTITUTE OF FOOD AND AGRICULTURE, JAYE L. HAMBY, in his official capacity as Director of National Institute of Food and Agriculture, FARM SERVICE AGENCY, WILLIAM BEAM, in his official capacity as Administrator of the Farm Service Agency, AGRICULTURAL MARKETING SERVICE, and ERIN MORRIS, in her official capacity as Administrator of Agricultural Marketing Service, |  |
| *Defendants*. |  |

## DECLARATION OF LEAH ATWOOD

I, Leah Atwood, declare as follows:

 1. My name is Leah Atwood, and I live in El Sobrante, California. This declaration is based on my personal knowledge and professional education and experience. I am over the age of eighteen and suffer from no legal incapacity. I submit this declaration in support of Agroecology Commons, a nonprofit organization which was affected by the U.S. Department of Agriculture's ("USDA") termination of federal grant funding. If called to testify, I could and would state the facts herein.

 2. Agroecology Commons is a 501(c)(3) nonprofit organization headquartered in El Sobrante, California.

 3. I am the Director of Partnerships for Agroecology Commons. I have been involved in a leadership capacity with Agroecology Commons since its founding in 2020. My current role primarily involves supporting our organization's development, fundraising, and partnership efforts and often includes additional responsibilities due to our organization's small size, making me extensively knowledgeable about Agroecology Commons' mission, policies, and programs.

 4. Established in 2020, Agroecology Commons' mission is to cultivate community and global solidarity for decolonized land stewardship, collective healing, and food justice. Our collective comprises farmers, educators, artists, and cooperative business owners across the San Francisco Bay Area in California, all of whom share a commitment to building cooperative relationships and resource-sharing networks.

 5. Agroecology Commons relies on federal grant funding to accomplish its mission by, among other things, supporting our Cooperative Incubator Farm and farmer-to-farmer educational programming, training new farmers and supporting them with land access and

cooperative infrastructure, providing seed grants to graduates from our training program, AND facilitating paid apprenticeships with our farm partner network,

6.    On March 7, 2025, Agroecology Commons received a letter from USDA and NIFA terminating our Community Food Projects Competitive Grants Program ("Community Food Program") grant. A true and correct copy of the letter is attached hereto as Exhibit A. This letter is the full extent of USDA and NIFA's termination that has been communicated to us.

7.    In 2022, Agroecology Commons applied for this Community Food Program grant for our project, "Growing Cooperative Networks for Community Food Sovereignty, Nutrition, and Agroecological Land Stewardship."

8.    To receive this and another grant award discussed below, our organization invested significant time and effort into our application as part of a two-year planning process. After developing comprehensive project and budget narratives—complete with detailed timelines, logic models, partnership agreements, and outcomes for each of our programs—we initially received a rejection from NIFA. In response, we underwent many planning sessions to review, analyze, and improve our application while coordinating with our project partners about their roles and specific deliverables. After we applied for the grant for the second time, we received a recommendation to approve our participation six months after our submission. We spent another ten weeks updating our application and adjusting our budget and timeline to ensure we continued to meet the grant requirements. Throughout this two-year process, two of our full-time staff members spent approximately 10% of their time on this grant, and one full-time staff member dedicated 60% of their time for four months.

9.    Agroecology Commons spent significant time forming several partnerships in anticipation of the grant funding. These partnerships included a host farm leader to coordinate

with local farms about educational programming and communication, a contractor for cooperative organizing, and a contracted scientist and soil health specialist from the Agroecology Lab at University of California, Berkeley.

10. Agroecology Commons planned to allocate this funding toward five major activities: (1) helping beginning farmers form connections with local markets; (2) developing a tool-lending library for urban farmers; (3) creating a local farmer mentorship network to support beginning and urban farmers through apprenticeships and advisory mentorship; (4) developing our three-acre Cooperative Incubator Farm to provide underserved farmers with affordable land tenure and facilitate cooperative farming; and (5) conducting urban soil assessments and holistic soil stewardship education. A true and correct copy of our project narrative is attached hereto as Exhibit B.

11. Agroecology Commons was approved for a $397,914 NIFA grant through the Community Food Program. The award agreement for this grant was executed on January 29, 2024. A true and correct copy of the executed award is attached hereto as Exhibit C. This funding was authorized from July 15, 2023, until July 14, 2026.

12. On March 7, 2025, USDA and NIFA terminated our Community Food Program award effective immediately on the basis that it no longer effectuates USDA's new priorities. The letter provides no explanation for the termination.

13. The termination letter issued to us did not notify us of any appeal rights. Nonetheless, Agroecology Commons sent a letter electronically to USDA and NIFA disputing the validity and basis of the termination on May 5, 2025. We have not received any response from USDA and NIFA.

14. USDA and its subagency Farm Service Agency ("FSA") have also apparently terminated another Agroecology Commons grant issued pursuant to the Increasing Land, Capital, and Market Access Program ("Land Access Program"), though Agroecology Commons has not yet received an official termination letter.

15. In 2024, Agroecology Commons applied for and was awarded a grant through the Land Access Program for our project, "Catalyzing Equitable Access to Land, Capital, and Market Opportunities through an Agroecologically Stewarded Land Commons, Diversified Technical Support Program, and Resource Sharing Cooperative in the Bay Area."

16. This grant application required three months of planning for three staff spending approximately 25% of their time on it, and a year for revisions during the process, using 5% of two full-time staff members' time during that time.

17. Our Land Access Program grant was for $2,500,000 and was authorized from March 21, 2024 to November 30, 2028. A true and correct copy of relevant excerpts from the award agreement is attached hereto as Exhibit D.

18. Our project funded by this grant aims to develop and implement innovative solutions that catalyze equitable access to land, capital, and market opportunities for Queer, Trans, Black, Indigenous, and Multi-Racial producers that serve marginalized communities in the Bay Area. The project involves planning and purchasing land for our Agroecological Cooperative Land Commons to be used cooperatively by beginning farmers; developing partnerships with restaurants, farmers' markets, and grocery cooperatives to provide small-scale farmers reliable market and wholesale outlets; providing wrap-around assistance to underserved farmers; expanding our Farmer Campus Online Learning Platform; and expanding farmer participation in land equity policy education. Our project proposal is attached hereto at Exhibit E.

19. Our Land Access Program grant has been frozen since February 2025. Then, on June 17, 2025, USDA posted a press release titled, "Secretary Rollins Takes Bold Action to Put American Farmers First, Cuts Millions in Woke DEI Funding." The press release states that USDA "will terminate" a $2,500,000 grant for "[e]xpanding equitable access to land, capital, and market opportunities for underserved producers in the Bay Area." We believe this must be in reference to our grant because most closely match this description of all the awards we are aware of. However, have to date note received a termination notice.

20. Unless Agroecology Commons is immediately restored access to our remaining funding, we will continue to be irreparably harmed by USDA's terminations of our awards.

21. As of the date of the Community Food Project grant termination, Agroecology Commons has yet to use the portion of the funding intended for the culmination of the grant and years of hard work: our Cooperative Incubator Farm project. Before our award was terminated, we were planning to imminently use the remaining funds for our Cooperative Incubator Farm. This portion of the project involves us providing land access at our farm and diverse resources to beginning farmers who have gone through our training processes so that they can incubate their own farming business ideas.

22. Because of the termination of our funds, we will not be able to finish the current round of our Cooperative Incubator Farm as planned and have put it on hold. We have had to terminate contracts with six of these beginning farmers. These farmers are thusly missing out on the benefits they have waited for and on valuable growing time and land access. We have also had to terminate contracts with a grant writer and host farm mentor.

23. Because we are unable to have these farmers steward this land, we have had to redirect staff time from other projects so that our staff can manage the land. Alternatively, we have to let

the land go fallow, in which case we are experiencing decreased food production, which

perpetuates the very conditions our grant is meant to solve

24. Likewise, once we received USDA's announcement about our Land Access Program

grant, we stopped all of our project work under that award. We had already connected with a

realtor and done four site visits, but had not yet purchased the land for the Land Commons

project. We have had to put our land purchase on hold because of the termination. We also have

already expended significant time doing strategic planning for the Land Commons project, but

will not be able to carry it out absent this funding. We have also had to stop all other aspects of

this project.

25. Additionally, because of both grant terminations, Agroecology Commons had to

fundamentally alter our strategic plan. We have had to and continue to have to divert substantial

staff time toward shifting our organization's priorities and searching for alternative funding

sources. Specifically, we have had to redirect approximately 30-60% of four staff members' time

towards addressing the termination, meeting the close-out procedures, and finding alternative

funding.

26. Our staff have been adversely impacted by the termination of these grants. Everyone in

our organization is experiencing emotional distress and fatigue from lack of information, higher

volumes of meetings, and the abrupt ending of plans and programming that were already in

motion. Our staff also experienced indirect harassment on social media after the Administration

posted about our grant termination.[1] To avoid further harm to our staff, we have been forced to

---

[1] Video posted by Secretary Rollins (@secrollins), Instagram (Mar. 12, 2025),
https://www.instagram.com/reel/DHGsKH2xXFY/?utm_source=ig_web_copy_link&igsh=MzRl
ODBiNWFlZA%3D%3D.

withdraw from reserves and unrestricted funding sources to prevent layoffs. However, if our funding is not restored or we cannot find alternative sources of funding, layoffs are likely.

27. While we hoped to double our team size by next year, we rescinded an offer letter that was issued after a four-month interview process and had to delay the hiring of four new staff members indefinitely.

28. Agroecology Commons has suffered reputational harm because of our grant termination. In particular, our beginning farmers hold our organization responsible for providing them with the resources and education necessary to begin a career in farming.

29. The injury to Agroecology Commons and its interests would be redressed by an order from the Court granting Plaintiffs' their requested relief.

I declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed this _25_ day of June 2025 in El Sobrante, California.

Leah Atwood
Director of Partnerships
Agroecology Commons

# Exhibit A

 National Institute of Food and Agriculture
U.S. DEPARTMENT OF AGRICULTURE

March 7, 2025

Leah Atwood
Partnerships and Resources
Agroecology Commons
836 Marin Rd
El Sobrante, CA 94803-1322

**Re:    Termination Notice for Agreement No. 2023-33800-40420 for the project titled, Growing Cooperative Networks for Community Food Sovereignty, Nutrition, and Agroecological Land Stewardship**

Dear Recipient:

Pursuant to 2 CFR § 200.341 this letter serves as written notification that the subject agreement between the National Institute of Food and Agriculture (NIFA) and Agroecology Commons (Recipient) is terminated as of the date of this notice, in accordance with 2 CFR § 200.340(a)(4) and the terms and conditions of the award. NIFA has determined that award 2023-33800-40420 no longer effectuates USDA priorities, which are to maximize and promote American agriculture; ensure a safe, nutritious, and secure food supply; enhance rural prosperity; and protect our National Forests.

You must submit all final reports and a final payment request no later than 120 calendar days after the date of this notice. You will be reimbursed for costs incurred up to the effective date of termination that are determined to be consistent with 2 C.F.R. § 200.343, *Effects of suspension or termination*. Any open balance remaining 120 days after the date of this notice will be unavailable for payment to the Recipient.

If you do not submit all reports in accordance with the terms and conditions of the Federal award within one (1) year of the effective termination date, NIFA must proceed to close out the award with the information available. In these circumstances, in accordance with 2 CFR § 200.344, NIFA must report the Recipient's material failure to comply with the terms and conditions of the award in SAM.gov using the Contractor Performance Assessment Reporting System (CPARS). In this way, failure to submit timely and accurate final reports may affect future funding to the Recipient.

Recipients are required by Federal regulation to retain all Federal award records consistent with 2 CFR § 200.334. Termination of the agreement does not affect a Federal agency's or a pass-through entity's right to disallow costs and recover funds based on a later audit or other review. In addition, termination does not affect the recipient's obligation to return

USDA IS AN EQUAL OPPORTUNITY PROVIDER, EMPLOYER, AND LENDER



National Institute of Food and Agriculture
U.S. DEPARTMENT OF AGRICULTURE

any funds due as a result of later refunds, corrections, or other transactions, including final indirect cost rate adjustments (refer to 2 CFR § 200.345).

If you have questions, contact the NIFA Program Contact, Kimberly Whittet at kimberly.whittet@usda.gov.

Sincerely,

MATTHEW FAULKNER    Digitally signed by MATTHEW FAULKNER
Date: 2025.03.07 13:40:37 -06'00'

Matthew Faulkner
Deputy Director, Office of Grants and Financial Management

CC:
Kimberly Whittet, Senior Policy Advisor, Office of Grants and Financial Management
Edward Nwaba, Division Director, Awards Management Division
Lydia Kaume, National Program Leader, Institute of Food Safety and Nutrition

USDA IS AN EQUAL OPPORTUNITY PROVIDER, EMPLOYER, AND LENDER

# Exhibit B

**Title:** Growing Cooperative Networks for Community Food Sovereignty, Nutrition, and Agroecological Land Stewardship

**The Community to Be Involved in the Project and the Needs to Be Addressed**

Born out of a participatory community design session held in December 2019 in the East Bay with 25 beginning farmers and food justice educators, this project will build values-aligned relationships between local farmers and local markets, facilitate the cooperation for local farmers to sell their produce at local markets, increase farmer and consumer knowledge about nutrient density of fresh and local agroecologically grown food. Just three months after a plan was set to launch an Agroecological Cooperative Incubator Farm, a very small virus changed the course of the big wide world. Of the many lessons learned during the COVID-19 pandemic about the needs for social change, the importance of resilient local food systems that are not dependent on multinational supply chains has resounded across the country. The impact of COVID-19 on local food access and nutrition security in the California Bay Area was compounded by multiple challenges such as climate disasters, climate extremes including smoke and wildfires impacting crops, and increasing land access scarcity for farmers due to development, gentrification, and contamination. In addition to advancing nutrient-dense food and community self-reliance, this project, Growing Cooperative Networks for Community Food Sovereignty, Nutrition, and Agroecological Land Stewardship will contribute to climate and ecosystem resilience through the expansion of agroecological farming practices. Below is a common acronym key for our proposal to support a more easeful review!

| | |
|---|---|
| Agroecology Commons | AC |
| Mandela Grocery Cooperative | MGC |
| Bay Area Farmer-to-Farmer Training | BAFFT |
| Queer, Trans, Black, Indigenous, People of Color | QTBIPOC |
| Feral Heart Farm | FHF |

Organized to serve beginning farmers and low-income community members in Alameda, Contra Costa, and Fresno counties, this project aims to deepen community food system resilience. Project beneficiaries include socially disadvantaged and low-income beginning farmers, consumers, and youth; people of color, women, transgender, and gender non-conforming individuals, formerly incarcerated, and immigrants to the United States. Pre-COVID data shows that one in ten people in the Bay Area are hungry, and 62% do not qualify for food stamps even though they may be struggling financially with high costs of living in the area, but on a federal level they make too much money to qualify for SNAP[1]. Over

---

[1] Duggan, Tara. "Bay Area developing ambitious new tools to reduce hunger." *SF Chronicle*, 18 November 2018

the course of the pandemic these numbers have worsened with food insecurity rates increasing to 20% and then 33%[2]. In February 2022, one of only two existing West Oakland's full service grocery stores closed, leaving thousands of residents with even less access to fresh nutrient-dense produce. By virtue of their proximity to dense populations, farmers in the Bay Area region can play a vital role in sustainable and equitable food systems by providing nourishing and affordable food, as well as by educating beginning farmers, and community residents on how to grow their own fresh food. AC believes the future of community food sovereignty is rooted in resilient social networks for mutual aid, agroecological innovation, community-based education, and values-aligned markets.

**2. The Organizations and Communities Involved in the Project.**

**Lead Organization:** AC is a nonprofit organization based in Oakland and El Sobrante, California, dedicated to cultivating knowledge sharing, community action, and solidarity for agroecological land stewardship, collective healing, and justice within the food movement. Honoring that the foundation of agroecological principles comes from Indigenous and peasant land-based traditions, AC envisions a future in which food and farming systems are based on cooperation, sovereignty, and global solidarity. AC coordinates the Bay Area Farmer-to-Farmer Training (BAFFT), which has served over 100 beginning and aspiring farmers in the last two years, 90% of whom come from socially disadvantaged backgrounds. AC takes a direct and long-term relationship-based approach working with hundreds of aspiring and beginning farmers to assess their unique challenges, needs, and opportunities. AC's staff has diverse skill-sets with degrees and decades of experience in farmer-to-farmer pedagogies, agroecology, sustainable food systems, and project management. AC's educational approach is rooted in collaboration with practicing farmers to advance farmer-led and farmer-to-farmer learning. AC Staff have designed over 23 food systems curriculum modules, led three agroecology certificate programs, and is a founding member of Farmer Campus (farmercampus.com), an interactive, online farmer learning platform, which currently offers four online courses to farmers to over 1000 registered users: Organic Seed Production in collaboration with the Organic Seed Alliance, Farmers Build Fire Resilience, On-farm Climate Resilience, and Introduction to Agroecology.

**Agroecology Commons Key Personnel:**

**PI: Brooke Porter, Agroecology and Education Director:** Brooke is the Agroecology and Education Director at AC. As a seed sower, agroecologist, and visual storyteller she is committed to cultivating relationships of reciprocity with the land and communities. Brooke has co-administered an array of grants from entities such as the CDFA, USDA, and private foundations. Brooke has supported education

---

[2] Pignotti, G., Dougan, M., Tablas-Mejia, I., Telias, A., Gounden, A. "Food Insecurity and Food Access during COVID-19 in the SF Bay Area." College of Health and Human Sciences, San Jose State University, March 2021.

initiatives for socially disadvantaged farmers as a lead facilitator and educator of BAFFT. Brooke has conducted research between BAFFT and farming training programs in Brazil, in order to expand alternative pedagogies for teaching agroecology, rooted in popular education and social justice. Brooke holds a Master of Science in agroecology from the Norwegian University of Life Sciences in conjunction with the Universidad de Córdoba in Spain. Brooke uses her trilingual language skills (English, Spanish, and Portuguese) to strengthen a movement for agroecology throughout the Americas. Brooke has a wide array of farming experience ranging from vegetable/ herbal production, and animal stewardship. **CO-PI: Jeneba Kilgore, Principal Administrator and Cooperative Networks Director:** Jeneba is the Co-Director of AC's Beginning Farmer and Rancher Development Program: The Bay Area Farmer to Farmer Training and Farmer Mobilization program. Jeneba has facilitated workshops to over 100 beginning farmers throughout the Bay Area. She is the online technical lead of the BAFFT's virtual classes, as well as a lead instructor of cooperative organizing, and values-aligned market collaboration. Jeneba is a former worker-owner at Mandela Grocery Cooperative. She spent the last 10 years specializing in cooperative community economics and has three years of experience running a community grocery store serving low-income customers, teaching nutrition classes, and working to support urban farmers, especially Black, Indigenous, and farmers of color. Jeneba is a beginning farmer passionate about growing ancestral varieties of crops and teaching people how to cook them. **Leah Atwood, Farmer-to-Farmer Partnerships Director:** Leah is the Co-Director AC Beginning Farmer and Rancher Development Program: The Bay Area Farmer-to-Farmer Training and Farmer Mobilization program. Leah has experience managing government grants and has served as a PI or key personnel on eleven different USDA and CDFA applications. Over the last 15 years, she has provided technical, educational, facilitation, and interpersonal support to over 700 socially disadvantaged, beginning, and urban farmers, via mentorship, workshops, and direct consultations. She co-designed BAFFT which has now served over 100 beginning and urban farmers in California. Leah has facilitated farmer-to-farmer training, mentorship programs, and mini-grants for 120 urban farmers and administered $105k in mini-grants directly to urban farmers for agroecological innovation, capacity building, and mentorship. In 2014 Leah co-founded and manages an urban goat farm and livestock mentorship program serving beginning farmers and community members. Leah is fluent in Spanish.

**Lead Farm Mentor and Core Farmer Educator BAFFT: Kanoa Dinwoodie, Feral Heart Farm:** Kanoa has over 17 years of experience as a market farmer and is a core facilitator and organizer of BAFFT. He has hosted five apprenticeship programs in collaboration with AC. Feral Heart Farm is a CCOF-certified farm that uses a variety of practices including fertility management, companion planting and biodynamic practices to work in conjunction with the natural systems, increase diversity, and mitigate

risks. Seed stewardship is a passion of his, which he sees as integral to any farm's sustainability. He currently participates in seed stewardship projects for various seed companies and organizations. Kanoa participates in all aspects of the farm from seeding to soil prep, to planting, to weeding and harvesting, to marketing to restaurants, and to CSAs, as well as administrative work.

**Core Market Partners: Mandela Grocery Cooperative (MGC) and 14th Street Market, Oakland, CA:** MGC is a 13-year-old Black-owned community grocery store that services residents in Oakland and especially West Oakland. MGC also leads online nutrition classes for community members and sources from local farmers and food purveyors to support money circulating within their local economy longer, providing more jobs to people who live in Oakland. MGC intentionally supports businesses run by people of color, because they are committed to creating opportunities for interdependence in the food space where POC entrepreneurs generate livable incomes to support their families. Mandela's standards for high-quality food means a continued search for fresh, nutrient-dense, and packaged foods made with clean ingredients. MGC is mentoring budding cooperative markets the 14th Street Market in Downtown Oakland which will launch in 2023 with a focus on

**Urban Farmer Mentors:** This project is rooted in multi-stakeholder collaboration with practicing urban farmers and community markets who are committed to teaching urban farming and increasing food access and sovereignty in their communities. AC and MGC are in current collaboration with these farmers through farmer-to-farmer skillshares, and a collaborative curriculum design process. **Feral Heart Farm (FHF), Sunol, CA:** Located at the historic Sunol Agricultural  Park, just thirty minutes from downtown Oakland, FHF is committed to nurturing relationships with land, food, and people. FHF is a certified organic farm by CCOF and uses composting, companion planting, low to no-till methods, perennial polyculture and biodynamic practices to work in conjunction with the natural systems. Farmer Kanoa Dinwoodie also works as an educator where he is dedicated to teaching the next generation of farmers about agroecology, food sovereignty, and land justice. **Red H Farm, Sebastopol, CA:** Is a cooperatively run farm operated by Caiti Hachmyer and Reyna Yagi. Red H Farm is a 1.2 acre agroecological vegetable farm located on the unceded territory of the Coast Miwok people, outside of the town of Sebastopol, California, where Caiti grew up. Red H Farm is grounded in the agroecological ethics of growing soil, conserving water, fostering biodiversity, cultivating community and building equity. **Scott Family Farm, Fresno, CA:** Scott Family Farms is an 8-acre farm operated by Will Scott Jr. and his

family. Mr. Scott, Jr. is determined to keep the legacy of African American farmers alive and growing in the Golden State. Mr. Scott is the president of The African American Farmers of California (AFFC) is a non-profit organization headquartered in the heart of the Central Valley, Fresno, California. The organization currently operates a 22-acre demonstration farm site in Fresno **Cultural Roots Nursery, Oakland, CA:** Cultural Roots Nursery grows a diverse and culturally relevant selection of vegetables, herbs, and trees for the communities they serve. By increasing the availability and accessibility of these heritage plants Cultural Roots strengthens the local food system and empowers others to grow their own ancestral foods. Cultural Roots Nursery plant production focuses on East, South Asian, and Middle Eastern heritage crops **Soul Flower Farm, El Sobrante, CA:** Soul Flower Farm is committed to aid in the generation of Social Equality through vocational empowerment and regenerative design. Soul Flower Farm makes accessible urban farming workshops and classes to those who are regularly overlooked in the current state of society. With the goal to make freedom the new norm, Soul Flower Farm's approach is holistic, instilling connection with the earth, the wisdom in the seed, nurturing of the sprout, maintenance of the crop, care for the harvest and mindfulness of tomorrow. **Raised Roots, Sunol and Livermore, CA**: Jamil Burns is a farmer from the Bay Area who first discovered his love for farming while studying environmental science in college in the Central Valley. Raised Roots is currently farming at two urban farm sites in Sunol, and Livermore. Raised Roots is committed to farming as a livelihood, supporting a localized food movement, and feeding the people of this local region.

**Consultants: Adrionna Fike** has been a worker-owner for 10-years at Mandela Grocery Cooperative and the Cooperative Transition Lead for 14th Street Market. Adrionna specializes in cooperative business development and program evaluation and has a Masters degree in Public Administration. She will support cooperative marketing education and program evaluation through her roles at Mandela Grocery Coop and 14th Street Market. **Cole Rainey,** is a seed keeper, soil scientist, farmer, and educator. Cole is currently pursuing a PhD in the Berkeley Agroecology Lab, where they focus on holistic soil stewardship methods and community food sovereignty. Cole will be supporting in teaching the soil stewardship workshops and processing soil test results.

Each of the communities, individuals, and organizations listed above are a part of designing the programming we offer. Beyond the list above, former BAFFT graduates, organizers, and educators, members of the food movement in the Bay Area, and neighbors of AC's Farm support in identifying what Bay Area communities need. Our programming is curated to be beneficial to this place, land, culture, and the people of it. To AC, relationships shape the ways we navigate, are the center of our efforts, and key decision-makers for our programs. Through phone calls, farm visits, walks with neighbors, feedback

forms, shared meals, and on-farm workdays, we invite participatory design, asking questions, listening to needs, and co-designing our program offerings based on our discoveries.

**3. Project Goals and Intended Outcomes.**

Due to high real estate and land costs in urban areas, especially in the Bay Area, socially-disadvantaged farmers face enormous barriers in starting and maintaining successful farm operations, as well as finding and maintaining reliable direct marketing opportunities. These barriers include a lack of land tenure, infrastructure, training, and financial and social capital. In an annual statewide policy survey led by the Community Alliance with Family Farmers (CAFF) in 2019, climate change, affordable and nearby housing, and land tenure emerged as the three greatest priorities for all small and mid-scale farmers. In a more recent set of listening sessions with 16 urban farmers, land access emerged as the primary challenge facing urban farmers in the East Bay and beyond. Land access in the surrounding Bay Area is astronomically expensive. Based on a recent study by the USDA, the average acre of cropland in California costs $13,800, which is roughly ten times more than the national average [3]. In Alameda County cropland currently ranges from $7,200/acre up to $374,000/acre [4]

This project will serve predominantly low-income women, queer, and Black, Indigenous, and people of color (BIPOC) urban farmers and consumers, who due to systemic barriers are often underrepresented and overburdened within agriculture and often lack access to nutritious food. Due to structural racism, Covid19 continues to impact communities of color more significantly. This project aims to improve urban food production and consumption by supporting aspiring, beginning, and experienced BIPOC urban farmers to grow more food. In our network of over 150 educators and beginning farmers, 90% are BIPOC and reflect the diversity of the Bay Area's residents. We strongly believe that people learn better from people they can relate to, and who have faced similar life experiences and struggles.

AC currently partners with BIPOC-led farms (Feral Heart Farms, Scott Family Farms, Red H Farms, Cultural Roots Nursery, Raised Roots, Soul Flower Farm, and Deep Medicine Circle), to host farmer-to-farmer skillshares and the Bay Area Farmer-to-Farmer Training (BAFFT). To get a visual glimpse of the inspiring and diverse learning experiences offered by BAFFT's on-farm days, check out our photo album from the last 2022 cohort here! Through partnerships with these farm mentors, we are able to provide ongoing workshops that are led by practitioners that have faced similar challenges as the beginning and aspiring farmers themselves. Graduates of BAFFT are invited to participate in the Farmer Mobilization. The Farmer Mobilization provides graduates with opportunities to viscerally experience farming with mentorship, catalyze a farming business, and deepen practices as land stewards. There are

---

[3] United States Department of Agriculture, Farm Census. 2017
[4] Land and Farm, https://www.landandfarm.com/. 2022

6

three pathways to engage with the Farmer Mobilization: Paid on-farm apprenticeship with experienced farmers in the BAFFT network; apply for a seed grant that supports an existing or budding agroecological business with advisory support, and steward a portion of the land at AC cooperative incubator farm. We provide opportunities that support beginning farmers through real-life relationships with place, people, soil, and plants. With the support of this grant, we seek to uplift our Cooperative Incubator Farm, the Tool Lending Library, soil assessments/workshops, direct values-aligned market training, and our Farmer Mobilization program.

**Outcome 1: Values-Aligned Marketing Training-** Through collaboration with MGC and budding cooperative markets, this project will advance collaboration between farmers and markets to better serve farmers and consumers in low-access food areas. Starting with MGC, this project will cultivate a network of values-aligned cooperative markets including the budding cooperative markets the DEEP East Oakland Market and 14th Street Market in downtown Oakland, both of which are in partnership with MGC. This includes relationship building between cooperative markets and farmers with coordinated site visits, organizing pre-season coordination meetings so farmers can shape their crop planting schedules based on what consumers and markets most need, as well as minimizing competition between urban farmers and increasing collaboration so crops can be aggregated to better meet market and consumer needs. **Outcome 2: Access to Cooperative Farm Tools and Value-Added Processing Equipment-** Extractive capitalism prioritizes individual property and inequitable access to resources amongst people. Land, tools, and infrastructure to nurture a farm and the people who steward it are expensive. Barriers include lack of access to land, training, and financial and social capital. Beginning farmers, especially low-income socially-disadvantaged farmers, face enormous barriers in starting and maintaining successful farm operations as well as finding and maintaining reliable direct marketing opportunities. In 2015, farmers under 35 years old had an average debt-to-asset ratio of 28%, compared to 16% for those aged 45 to 54, and only 11.5% for those aged 55 to 64. [5] The barriers to becoming a farmer are massive—the cost of land, certifications, and necessary resources. We are actively addressing this issue through AC's 3-acre Cooperative Incubator Farm and Food Sovereignty Tool Lending Library, where we reduce economic barriers and capital investment for socially disadvantaged farmers, and encourage access to land, infrastructure, and tools through cooperation. Our tool lending library is currently underway with a goal to launch summer 2023, providing resources like seeds, a commercial dehydrator, honey spinner, grain mill, seeder, value-added processing equipment, walk-behind tractor, and much more. With the support of this grant, we will be able to expand our current collection of tools to strengthen a local urban farm network. This model of cooperation is inspired by a long legacy of successful cooperative farming initiatives including Southern Black farmers and Midwestern grain farmers. **Outcome 3: Agroecological Education**

---

[5] Rippon-Butler, Holly. 2020, *Land Policy Towards a More Equitable Farming Future*. National Young Farmers Coalition.

**through On Farm Apprenticeships:** We recognize the important legacy farm apprenticeships have had in passing along agrarian traditions and seek to circumvent the problematic model of unpaid internships which exploit labor and exclude farming opportunities to a select few with socio-economic privilege. A large portion of the farmers we serve are first-generation beginning farmers who did not grow up on farms. Having support from experienced farmers when it comes to crop planning, marketing, and land management is a critical resource. According to a study by the National Young Farmers Coalition, multigenerational farmers typically inherit family and community connections that are critical to their success and may give them more of an opportunity to understand how the USDA works and what programs are available, have a relationship with the local bank and suppliers, and learn about market opportunities and equipment for sale. AC fosters these connections and opportunities for first-generation beginning farmers through creating networks of cooperation and mentorship through our farm apprenticeships. The apprenticeship program is organized in collaboration with farm partners and co-led by Kanoa Dinwoodie of Feral Heart Farms. 6-9 beginning farmers will be paired with experienced farmers to participate in a farm apprenticeship. These 120-hour apprenticeships will be supported through an individualized learning plan created in collaboration between farmers and apprentices with the support of AC. AC has successfully carried out on-farm apprenticeships between local farmers and graduates of BAFFT and there is a great need and desire to continue to offer these apprenticeships. This grant would assist in expanding the AC apprenticeship program. Through our program, we erode these entry barriers by building a learning network between aspiring farmers and active land stewards where each person is paid and honored for their time and commitments. Graduates of BAFFT will be paired with farmers at the start of the new year and will have the opportunity to carry out their apprenticeships through the course of a year, allowing beginning farmers to experience various seasons of farming and their respective responsibilities. As part of farm apprentices learning plans, they are responsible for hosting farmer-to-farmer skillshares to help strengthen horizontal learning networks for agroecological producers. Past farmer-to-farmer skillshares have included irrigation design and repair, Black agrarian legacies, goat stewardship, and seed production. This provides an opportunity for farm mentors to demonstrate their unique farming practices and for the farm apprentices to uplift their learning. **Outcome 4: Land Access through Agroecology Commons Cooperative Incubator Farm-** AC Incubator Cooperative Farm provides beginning farmers with explicit access to land in the Bay Area, a rare opportunity, to grow food and medicine, while learning, deepening, and returning to the skills of our ancestors from around the world. The AC farm is collectively held in a land trust. AC tends to three acres —an acre for farming crops, as well as over two acres for silvopasture and perennial food systems including a riparian zone with a creek. In the past months, we have sown and integrated cover crops for the initial health of the soil, designed and implemented rows for food and medicine growth shaping the earth for intentional crops as

well as water retention. Now that the creation of over 40 terraced rows on the one-acre plot is implemented, we are building out infrastructure for the farms' operation, and excitedly planning our invitation for graduates of the Bay Area Farmer-to-Farmer Training (BAFFT) to farm together in 2023. The incubator farm provides access to a portion of the land for beginning farmers to autonomously and cooperatively grow crops, hone skills, and launch their farm dreams with mentorship and cooperative support, as well as have access to infrastructure, tools, materials, and seeds. We want this to all be free to BAFFT graduates. BAFFT participants have lineages from around the world, with ancestors who may have been violently displaced or taken from their lands. The incubator farm not only gives people access to land and resources to experiment, but importantly brings us back into a relationship with land, place, and culturally appropriate food. We say "us" because this history is also true for members of AC who will be tending the land with BAFFT graduates—AC's members represent the communities we serve. This farm will be covered with ancestral crops from around the world like Sierra Leone, Iraq, the Philippines, and Japan to name a few; songs in many languages will be sung, and people will be cooperatively tending and learning together. Ensuring that beginning farmers have what they need, we have many plans for infrastructure. We will install irrigation, pest management protections, and have compost available; we will build a wash station for produce, a greenhouse for propagation and climate-controlled plants, 1,400 ft of fencing, as well as shaded seating to encourage farmer's rest, an educational classroom space, and a tool shed. **Outcome 5: Urban Soil Assessments-** In order to create viable farming initiatives, it is imperative that soil health be evaluated to ensure community health and thriving farms. Urban agriculture often faces high rates of soil degradation due to contaminants, unauthorized industry dumping, construction, and heavy traffic. Through biannual on-farm workshops that provide farmers with the tools to both evaluate, steward, and remediate their soil we create viable agriculture initiatives in the Bay Area. Soil Stewardship workshops taught through this grant will address the following topics: Soil fertility, compost, microbes, benefits of cover cropping and different cover cropping techniques, no-till farming principles, linking soil health to human health, mycoremediation, soil testing, and contamination. Four local  farms will be provided with soil testing a year, to ensure soil health from contaminants, test organic soil matter content, and determine the soil texture profile. These comprehensive soil tests will be carried out by local soil ecologist Cole Rainey, who will process lab results at UC Berekely's Agroecology Lab. Soil stewardship workshops will be facilitated by members of AC team and Cole Rainey on a biannual, basis free of charge to local farmers. Each workshop will serve between 10-20 farmers.


4. Activities to Achieve the Goals.

**Activity 1: Facilitate Values-Aligned Marketing Training and Support Farmers in Building Relationships with Local Markets**

Steps:
- Host four field days (2x/year) and four market days (2x/year) for 10 beginning farmers led by MGC and 14th St Market. Cooperative market worker-owners will visit farms and farmers will visit markets to learn more about the unique needs and challenges of each, and to build relationships and develop pathways for long-term market access. (March & September, 2024 & 2025, responsible party: MGC & AC)
- Conduct four trainings (2x/year) for 10 farmers on marketing to local coop markets including social media training, branding, post-harvest, food safety, and delivery scheduling. (April & October, 2024 & 2025, responsible party: MGC and 14th St Market)

Outcomes and Achievements:
- 10 Beginning farmers will increase their understanding of local marketing strategies and integrate at least one new marketing practice
- 10 Beginning farmers will have direct relationships with a local market for selling crops
- 2-5 farmers will sell crops at a local market
- 3 local market cooperatives will build relationships with local farmers

**Activity 2: Develop an urban farmer tool lending library to facilitate resource sharing and access.**

Steps:
- Identify priority tools and infrastructure needs for farm partners. (February 2023-June 2023, responsible party: AC)
- Locate site for storing tools and value-added food processing materials to be cooperatively owned and shared for 10 farm sites. (April 2023-September 2023, responsible party: AC)
- Source supplies for tool lending library. (April 2023-November 2023, responsible party: AC)
- Develop user manual and provide training on how to safely and appropriately use equipment. (April 2023-November 2023, responsible party: AC & FHF)
- Craft community equipment lending agreements. (April 2023, responsible party: AC)

Outcomes and Achievements:
- Increased farming capacity with labor-saving tools.
- Expanded options of shared infrastructure to offset start-up costs for beginning urban farmers in regional proximity to the Bay Area.
- Increased food security with value added food processing and preserving

**Activity 3: Develop a local farmer mentorship network to serve beginning/aspiring urban farmers through hands-on apprenticeships and advisory mentorship.**

Steps:
- Link current farmer mentor partners with 6-9 new, beginning, and landless farmers for mentorships. (September, 2023-2025, responsible party: AC & FHF)
- Collaborate with and guide farmer mentors to improve their apprenticeship programs with seasonal 120-hour training plans for 6-9 new, beginning, and landless farmers. (July-December, 2023-2025, responsible party: AC & FHF)

- Expand AC's farmer-to-farmer skillshare network and host apprentice led agroecological skillshares for 100 participants. (once per quarter 2023-2025, responsible party: AC & FHF)

Outcomes and Achievements:
- Expand existing mentorship and apprenticeship network where beginning farmers have the opportunity to gain real-world experience in agroecological food production, values-aligned marketing, and how to strengthen food sovereignty for local low-income communities.
- 6-9 beginning farmers will have increased skills in agroecological food production, values-aligned marketing, and how to strengthen food sovereignty for local communities.

**Activity 4: Expand 3-acre Cooperative Incubator Farm to incubate and mentor beginning and underserved farmers in cooperative farming and provide affordable land tenure**

Steps:
- Conduct outreach to a network of 100 BAFFT graduates for the participatory design process of the Cooperative Incubator Farm. (February 2023, responsible party: AC)
- Identify 5-10 graduates who would like to be a part of a participatory design process of the Cooperative Incubator Farm. (February-March 2023, responsible party: AC)
- Work with 5-10 applicants to develop their cooperative business plans in collaboration with a broader urban farmer network and values-aligned markets. (February-August, 2023-2025, responsible party: AC & MGC)
- Initiate contracts with 5-10 beginning farmer applicants and support them in crop planning, production, marketing and education. (March, 2023-2025, responsible party: AC )

Outcomes and Achievements:
- Provide land access to beginning farmers and mentorship and agroecological farm production.
- Develop a new model for a multi-stakeholder cooperative incubator farm with the sharing of governance and decision-making by incubatees, partner organizations, and AC staff.
- Offer 5-10 individuals the opportunity for continued hands-on experiential
- Learning, mentorship, and subsidized land leases at Cooperative Incubator Farm
- Co-design customized training plans and organize mentorship advisors for 5-10 incubatees
- Support the sharing and exchange of seed varieties adapted to local climate to promote seed stewardship practices, increased biodiversity and preservation of heirloom varieties

**Activity 5: Conduct Urban Soil Assessments and Holistic Soil Stewardship Education**

Steps:
- Host a biannual farmer training on holistic soil stewardship including topics: Soil fertility, compost, microbes, benefits of cover cropping and different cover cropping techniques, no-till farming principles, linking soil health to human health, mycoremediation, soil testing, and contamination. (April & November, 2023-2025, responsible party: Cole Rainey)
- Offer soil testing/assessments as well as lab results analysis for 4 urban farm sites through UC Berkeley's Agroecology Lab. (April & November, 2023-2025, responsible party: Cole Rainey)

Outcomes and Achievements:
- 80-120 beginning farmers will gain a deeper understanding of holistic soil stewardship.
- 12  farm sites will have soil testing data to help improve their soil health
- 80-120 farmers will improve understanding of the connection between soil and human health.

| Timeline of Activity Milestones | Year 1 | | | | Year 2 | | | | Year 3 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q 1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q 4 | Q1 | Q 2 | Q3 | Q4 |
| Identify priority tools and infrastructure needs for farm partners. | █ | █ | | | | | | | | | | |
| Build tool lending library storage shed | | █ | █ | | | | | | | | | |
| Source tool lending library supplies | | █ | █ | | | | | | | | | |
| Craft community equipment lending agreements and train farmers in the library check-out process and tool use. | | █ | █ | | | | | | | | | |
| Link current farmer mentor partners with 6-9 apprentice farmers | █ | | █ | █ | █ | █ | | █ | █ | █ | | █ |
| Work with farmer mentors to develop individualized mentorship and training plans for 6-9 beginning farmers. | | █ | █ | █ | | █ | █ | █ | | █ | █ | █ |
| Expand AC farmer-to-farmer skillshare network and host agroecological skillshares for 100 participants | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ |
| Conduct outreach to a network of 100 BAFFT graduates for the participatory design of Cooperative Incubator Farm. | | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ |
| Identify 5-10 graduates to be a part of a participatory design process of the Cooperative Incubator Farm. | | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ |
| Work with 5-10 applicants to develop their cooperative businesses plans | | █ | █ | █ | | █ | █ | █ | | █ | █ | █ |
| Initiate contracts with 5-10 beginning farmer applicants and support them in crop planning, production, marketing | █ | | | | █ | █ | █ | █ | █ | | | |
| Host four field days and four market days for 10 beginning farmers and coop markets led by MGC and 14th Street. | | | | | █ | | █ | | █ | | █ | |
| Conduct four coop marketing trainings including social media training, branding, post-harvest, food safety, and delivery scheduling. | | | | | | █ | █ | | | █ | █ | █ |

| Task | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Host a biannual farmer training on holistic soil stewardship. | | | | | | | | | | |
| Offer soil testing/assessments for 4 urban farm sites. | | | | | | | | | | |
| Conduct evaluations for mentorship participants, host mentors, tool-lending library network, and farmer incubatees. | | | | | | | | | | |

## 5. Relationship to Program Goals

This project will improve agroecological production and innovation by supporting farmers to improve their production practices, expand market channels, and distribute more food for low-access urban food areas in Alameda, Contra Costa, and Fresno counties. To simultaneously support farmers and feed more people with marginalized food access, this project proposes a cooperative approach between farmers, organizations, and values-aligned markets in the low-food access neighborhoods where the farmers, consumers, and residents live. This project is rooted in the ethos of sharing skills and resources to strengthen a food system rooted in agroecology, cooperation, and food security. Through a partnership between values-aligned organizations from different sectors of the food system AC, MGC, 14th Street, and a Bay Area urban farmer network led by experienced farmer Kanoa Dinwoodie of Feral Heart Farms (FHF) at the Sunol AgPark, this project will both expand on and initiate new educational opportunities for local farmers and residents, as well as create expanded market outlets for farmers and low-income residents. MGC and AC have a proven track record of collaboration and have been increasing educational partnerships over the last three years. They work well as collaborating organizations because of their shared goals to serve socially disadvantaged communities through cooperative approaches and their complementary focus areas; AC on producers and MGC on consumers. AC works with practicing farmers and non-traditional students through a popular education pedagogical approach, while MGC centers programming around cooperative organizing, local economies, and creating businesses. AC has also partnered with FHF over the last three years to train socially disadvantaged farmers through BAFFT and organized five on-farm apprenticeship programs. Facilitating values-aligned marketing training and supporting farmers in building relationships with value-aligned markets promotes the development of entrepreneurial projects. The sale of nutrient-dense, agroecologically grown produce directly links farmers and consumers, strengthening local food security and fostering innovative marketing activities that mutually benefit agricultural producers and low-income consumers. The cooperative market outlets serving as partners in this grant are BIPOC-led initiatives that have long-standing community ties with low-income consumers. In order for local cooperatively-owned markets to consistently and significantly

13

support small-scale farmers, there needs to be intimate knowledge of the needs of each party, by each party. Both farmers and market owners/workers need to understand the challenges the other faces, what are their priorities, and how to best communicate and collaborate. By organizing a combination of field days and market days to combine interactive learning with trust building and relationship building, this project will develop pathways for both markets and farms to collaborate on increasing local food security for mutual benefit. The Food Sovereignty Tool Lending Library will be stocked with food processing equipment such as canning supplies, a small grain mill, a honey spinner, a commercial dehydrator and more. These valuable tools will be available to a network of farmers seeking to process and preserve food. Having tools for farmers to create value-added products enhances food-purchasing and food-preparation skills. It also allows for nutrient-dense foods to be offered throughout the seasons. A tool-lending library will reduce economic barriers and capital investment for small urban farmers, encourage access to infrastructure and tools through cooperation as well as program sustainability through proper tool care training and cultivating cooperative values. While we believe a tool-lending library is innovative for the modern times, this project honors that there are long-standing traditions of sharing tools, machinery, and infrastructure that runs deep in agricultural legacies such as planting and harvest cooperation between Black farmers and even with large grain farmers sharing silos while introducing labor-saving technologies. A stronger urban farmer mentorship network will promote farmer-to-farmer learning methodologies that encourage community building and local community-led solutions. Farmer networks encourage bottom-up community extension services in which local farmers are at the forefront of demonstrating best practices and appropriate technologies. Being able to produce food is essential in making sure it reaches low-income communities. The expansion of the 3-acre Cooperative Incubator Farm addresses multiple food system issues including access to land tenure, the need for localized food production, and the reduction of access barriers for socially disadvantaged farmers. Strengthening the farm actively challenges the legacy of laws, policies, and violence that has allowed for land theft and blocked Black, Indigenous, and people of color from accessing land. In the next 10 years, data shows as many as 400 million acres of farmland will be in need of new farmers[6]. Secure land tenure is essential for farming viability and provides an opportunity to shift power in order to create a more equitable and just food system. The farm will also provide the educational support needed by beginning farmers. In order to create viable farming initiatives, it is imperative that soil health is evaluated to ensure community health and thriving farms. Urban agriculture often faces high rates of soil degradation due to contaminants, unauthorized industry dumping, construction, and heavy traffic. By providing farmers with the tools to both evaluate, steward, and remediate their soil we create viable agricultural initiatives in the Bay Area.

---

[6] Rippon-Butler, Holly. 2020, *Land Policy Towards a More Equitable Farming Future*. National Young Farmers Coalition.

Soil health is inextricably linked to human health and can enhance crop nutrient content directly supporting human health. Social determinants of health (SDOH) show how low-income often urban residents are exposed to toxins through the soil at higher rates. It is imperative that we ensure our local food producers are cultivating nutrient-dense crops in healthy soils.

**Evaluation:** This project will use a multipronged evaluation approach including needs assessments, participant evaluations, and outcome-based reporting. Ongoing monitoring and evaluation of stated measurable outcomes will support project completion and success. Project stakeholders will access assessments and evaluations through AC' online Farmer Campus (farmercampus.com) as a free resource for all farmers. AC's and MGC's biannual evaluations will be used to track qualitative and quantitative progress through the assessment of written and verbal evaluations. Following workshops, participants will be asked to complete surveys to assess learning and improve programming. In-depth needs assessments will help to find compatible matches between farm mentors and farm mentees. A steering committee will assess and evaluate curriculum, program design, and implementation, composed of AC board and advisors. Data collected through the evaluation process will be used to assess program strengths and shortcomings and shared with partner organizations and farms to strengthen multistakeholder farmer organizing and collaborative initiatives.

**Self-Sustainability:** This project will be sustained beyond the life of the grant by fostering relationships between farmers and values-aligned markets for both retail and direct-to-consumer sales of fruits, vegetables, herbs, and value-added products grown at urban farm sites. This proposal will support initial logistics and coordination, which is a consistent barrier for grocery stores to onboard smaller urban farmers to create lasting relationships necessary to support direct market outlets for urban farmers. Agroecology Commons has a diversified multi-revenue stream model consisting of donations, crowdfunding, individual donors, foundation, state, and national grants. A diversified funding portfolio ensures our organization's sustainability and allows for projects to take place beyond reliance on one particular source and funding period. We have been committed to offering these resources and programs, even when we had limited funding we mobilized volunteers including ourselves in order to ensure the well-being of farmers in our community and to continue to support aspiring beginning farmers. We currently have six foundations supporting this work and two hundred individual donors. We plan to grow this diversified donor base over time in order to not rely exclusively on government grants.

# Exhibit C

# United States Department of Agriculture
## National Institute of Food and Agriculture
### AWARD FACE SHEET

| 1. Award No.<br>2023-33800-40420 | 2.Amendment No. | 3. Proposal Number<br>2023-00456 | 4. Period of Performance<br>07/15/2023 through 07/14/2026 | 5. Type of Instrument<br>Standard Grant |
|---|---|---|---|---|
| 6. Type of Action<br>New | 7. CFDA Number<br>10.225 | 8.FAIN<br>20233380040420 | 9. Method of Payment<br>ASAP ▇▇▇▇▇▇ | 10. CRIS Number<br>1030681 |

**11.Authority.** 7 U.S.C. 2034, Sec. 25 of the Food Stamp Act of 1977, as amended by PL 107-171 and PL 110-246, Community Food Projects

| 12. Agency (Name and Address)<br><br>Awards Management Division<br>National Institute of Food and Agriculture/USDA<br>805 Pennsylvania Ave Kansas City, MO 64105 | 13. Awardee Organization<br>AGROECOLOGY COMMONS<br>EL SOBRANTE, CA 94803-1322 |
|---|---|

| 14. Program Point of Contact:<br>Lydia Kaume<br>Telephone: 000-000-0000<br>lydia.kaume@usda.gov | Administrative Point of Contact:<br>Jenifer Denison<br>Telephone: 208-512-5069<br>jenifer.denison@usda.gov | 15. Project Director/Performing Organization<br>Brooke Porter<br>Agroecology Commons<br>El Sobrante, CA 94803-1322 |
|---|---|---|

### 16. Funding:

| | **Federal** | **Non-Federal** |
|---|---|---|
| **Previous Total** | $0.00 | $0.00 |
| **+ or -** | $397,914.00 | $397,914.00 |
| **Total** | $397,914.00 | $397,914.00 |
| **Grand Total** | $795,828.00 | |

### 17. Funds Chargeable

| **FY-TAS-FDC** | **Amount** | **FY-TAS-FDC** | **Amount** |
|---|---|---|---|
| 23-1223505-33800 | $397,914.00 | | |

**18. Title of Proposal**

Growing Cooperative Networks for Community Food Sovereignty, Nutrition, and Agroecological Land Stewardship

### PROVISIONS

**This Award incorporates the following:**

1. Funds in the amount of $397,914 are withheld pending receipt of an Authorized Representative's signature on the Award Face Sheet (NIFA Form 2009). Signature certifies that recipient understands the responsibility in maintaining all matching funds documentation and that documents must be available upon request for audit purposes. Signature also acknowledges responsibility in ensuring matching requirements are met per requirements and standards stated in Section 200.306 of 2 CFR 200. Return the signed award document to awards@usda.gov and the Administrative Point of Contact listed in Block 14. above.
2. The referenced proposal and any revision thereto - incorporated by reference
3. Research Terms and Conditions and USDA/NIFA Agency-Specific Terms and Conditions (May 2022) at http://nifa.usda.gov/terms-and-conditions.
4. General Provisions found in Title 2: 2 CFR Part 400; 2 CFR Part 415; 2 CFR Part 416; 2 CFR Part 418; 2 CFR Part 422; and, Title 7: 7 CFR Part 3430 - all incorporated by reference and found at https://www.nsf.gov/bfa/dias/policy/fedrtc/rtcoverlay_nov20.pdf.
5. The Approved Award Budget
6. NIFA Project Initiation Documents - incorporated by reference
7. Failure to submit complete, accurate, and timely reports may result in possible award delays or enforcement actions. Federal Financial SF-425 forms are to be sent to awards@usda.gov. Project progress reports are to be completed in the REEport portal located at https://portal.nifa.usda.gov. Questions regarding access to REEport should be directed to electronic@usda.gov. Additional information regarding grant management and closeout can be found at: https://nifa.usda.gov/manage-grant and https://nifa.usda.gov/close-grant.
8. The obligation of funds may be terminated without further cause unless the recipient commences the timely drawdown of funds; initial drawdown of funds signifies acceptance of award terms and conditions and should commence in a timely manner within the award period. Inquiries regarding ASAP Payment Accounts should be directed to the Financial Management Division at

### FOR THE UNITED STATES DEPARTMENT OF AGRICULTURE

This award, subject to the provisions above, shall constitute an obligation of funds on behalf of the Government. Such obligation may be terminated without further cause unless the recipient commences the timely drawdown of funds; such drawdowns may not exceed one year from issuance date of the award.

| Typed Name<br>Stephanie Smith<br>Authorized Departmental Officer | Signature<br>STEPHANIE.SMITH2 | Date<br>07/14/2023 |
|---|---|---|

### FOR THE PERFORMING ORGANIZATION
**Signature of person authorized by the governing body of the performing organization to incur contractual obligations.**
**Signature indicates acceptance when a cooperative agreement is cited in Type of Instrument (block 5) above.**

| Typed Name and Title<br>Jeneba Kilgore, Co-Director | Signature | Date<br>01/29/2024 |
|---|---|---|

NIFA-2009

# United States Department of Agriculture
## National Institute of Food and Agriculture
## AWARD FACE SHEET

| 1. Award No. 2023-33800-40420 | 2.Amendment No. | 3. Proposal Number 2023-00456 | 4. Period of Performance 07/15/2023 through 07/14/2026 | 5. Type of Instrument Standard Grant |
|---|---|---|---|---|

| 6. Type of Action New | 7. CFDA Number 10.225 | 8.FAIN 20233380040420 | 9. Method of Payment ASAP ▓▓▓▓▓▓ | 10. CRIS Number 1030681 |
|---|---|---|---|---|

**11.Authority.** 7 U.S.C. 2034, Sec. 25 of the Food Stamp Act of 1977, as amended by PL 107-171 and PL 110-246, Community Food Projects

| 12. Agency (Name and Address) | 13. Awardee Organization |
|---|---|
| Awards Management Division National Institute of Food and Agriculture/USDA 805 Pennsylvania Ave Kansas City, MO 64105 | AGROECOLOGY COMMONS EL SOBRANTE, CA 94803-1322 |

| 14. Program Point of Contact: | Administrative Point of Contact: | 15. Project Director/Performing Organization |
|---|---|---|
| Lydia Kaume Telephone: 000-000-0000 lydia.kaume@usda.gov | Jenifer Denison Telephone: 208-512-5069 jenifer.denison@usda.gov | Brooke Porter Agroecology Commons El Sobrante, CA 94803-1322 |

| 16. Funding: | **Federal** | **Non-Federal** | 17. Funds Chargeable | | | |
|---|---|---|---|---|---|---|
| | | | **FY-TAS-FDC** | **Amount** | **FY-TAS-FDC** | **Amount** |
| **Previous Total** | $0.00 | $0.00 | 23-1223505-33800 | $397,914.00 | | |
| **+ or -** | $397,914.00 | $397,914.00 | | | | |
| **Total** | $397,914.00 | $397,914.00 | | | | |
| **Grand Total** | $795,828.00 | | | | | |

**18. Title of Proposal**

Growing Cooperative Networks for Community Food Sovereignty, Nutrition, and Agroecological Land Stewardship

## PROVISIONS

asapcustomerservice@usda.gov.

9. Prohibition against using funds under Grants and Cooperative Agreements with entities that require certain internal confidentiality agreements are referenced at https://nifa.usda.gov/prohibition-confidentiality-agreements

10. The Project Director is required to attend the annual Community Nutrition Project Director's meeting as a condition of this award.

11. Cooperation with the Training and Technical Assistance (T&TA) provider for the following services is a requirement of this award: (i) attendance at Project Directors' meetings, and (ii) submission of project evaluation reports annually for the life of the grant. Additionally, awardees are strongly encouraged to participate in the services provided by the T&TA provider.

12. Proper acknowledgement of funding is required in social media, published articles, manuscripts, dissertations, posters, presentations, invention, patents, and press releases. Proper acknowledgement can be found at: https://www.nifa.usda.gov/grants/regulations-and-guidelines/acknowledgment-usda-support-nifa

13. Form AD-1048 or other NIFA approved format must be completed by the approved consultant(s) and returned to the recipient for retention in the official award file. It is not necessary to send a copy to NIFA. (https://www.ocio.usda.gov/document/ad-1048)

**Co-Project Director(s):**

Jeneba Kilgore (Agroecology Commons)

## FOR THE UNITED STATES DEPARTMENT OF AGRICULTURE

This award, subject to the provisions above, shall constitute an obligation of funds on behalf of the Government. Such obligation may be terminated without further cause unless the recipient commences the timely drawdown of funds; such drawdowns may not exceed one year from issuance date of the award.

# Exhibit D

U.S. Department of Agriculture

ADS-093
7/2012

## NOTICE OF GRANT AND AGREEMENT AWARD

| 1. Award Identifying Number | 2. Amendment No. | 3. Award/Project Period | 4. Type of Award Instrument |
|---|---|---|---|
| FSA24GRA0011610 | 1 | Date of Final signature – 11/30/2028 | Grant |

| 5. Agency: (Name and Address) | 6. Recipient Organization: (Name and Address) |
|---|---|
| USDA, FSA Office of Outreach<br>1400 INDEPENDENCE AVENUE, SW<br>Stop 0511, Room 3086-S<br>WASHINGTON, DC 20250 | Agroecology Commons<br>PO Box 3406<br>Oakland, California 94609 |

| UEI: RB2PLL823E86 | EIN: ██████████ |
|---|---|

| 7. Agency Program Contact: | 8. Agency Administrative Contact: | 9. Recipient Program Contact: | 10. Recipient Administrative Contact: |
|---|---|---|---|
| Michael Mannigan<br>michael.mannigan@usda.gov<br>541-699-3215 x 00000 | Kenneth James<br>kenneth.james@usda.gov<br>301-395-2816 | Jeneba Kilgore<br>jeneba@agroecologycommons.org<br>510-907-1237 | Leah Atwood<br>leah@agroecologycommons.org<br>510-717-8949 |

| 11. CFDA Number | 12. Authority | 13. Type of Action | 14. Project Director |
|---|---|---|---|
| 10.968 | Section 1006 American Rescue Plan Act, as amended by the Inflation Reduction Act | ii. Amendment/Revision | Jeneba Kilgore<br>jeneba@agroecologycommons.org<br>510-907-1237 |

**15. Project Title/Description:**

Complete agreement includes this ADS-093 (NOA) and attachments listed on page 2.

**16. Entity Type:** _____ Profit    _X_ Nonprofit    _____ Higher Education    _____ Federal    _____ State/Local    _____ Indian/Native American    _____ Other

**17. Select Funding Type:** [✓] Federal    [✓] Non-Federal

| | | |
|---|---|---|
| Original Funds Total: | $ 2,500,000.00 | |
| Additional Funds Total: | | $ 12,000.00 |
| Grand Total: | $ 2,500,000.00 | $ 12,000.00 |

**18. Accounting and Appropriation Data**

| Financial Code | Amount | Budget Period | Treasury Symbol |
|---|---|---|---|
| WBS: FA.AD.ORCH.CA | $ 2,500,000.00 | 2231 | 12-1124 2022/2031 |
| BOC: 2559 | | | Fund: FAPMB1124D |
| Fund Center: FA10402000 | | | Functional Area: FA6011IRALLA |

**19. APPROVED BUDGET**

| | | | | |
|---|---|---|---|---|
| Personnel | $    780,000.00 | Fringe Benefits | $    124,800.00 |
| Travel | $    0.00 | Equipment | $    0.00 |
| Supplies | $    0.00 | Contractual | $    35,000.00 |
| Construction | $    0.00 | Other | $    1,467,720.00 |
| Total Direct Cost\ | $    2,407,520.00 | Total Indirect Cost | $    92,480.00 |
| | | Total Non-Federal Funds | $    12,000.00 |
| | | Total Federal Funds Awarded | $    2,500,000.00 |
| | | Total Approved Budget | $    2,512,000.00 |

This agreement is subject to applicable USDA statutory provisions and Financial Assistance Regulations. In accepting this award or amendment and any payments made pursuant thereto, the undersigned represents that he or she is duly authorized to act on behalf of the awardee organization, agrees that the award is subject to the applicable provisions of this agreement (and all attachments), and agrees that acceptance of any payments constitutes an agreement by the payee that the amounts, if any found by USDA to have been overpaid, will be refunded or credited in full to USDA.

U.S. Department of Agriculture

ADS-093
7/2012

(Continuation)

| NOTICE OF GRANT AND AGREEMENT AWARD | | | |
|---|---|---|---|
| **Award Identifying Number** | **Amendment No.** | **Award/Project Period** | **Type of Award Instrument** |
| FSA24GRA0011610 | 1 | Date of Final signature - 11/30/2028 | Grant |

List of Attachments:

| Amendment Narrative, Attachment 1A - Revised Statement of Work; Attachment 2A - Revised Project Narrative; Attachment 3A - Revised Budget Narrative; Attachment 4 - General Terms and Conditions |
|---|

| **Name and Title of Authorized Recipient Representative** | **Signature** | | **Date** |
|---|---|---|---|
| Jeneba Kilgore, Co-Director | *[signature]* | Digitally signed by Jeneba Kilgore Date: 2024.05.21 09:55:13 -07'00' | |
| **Name and Title of Authorized Government Representative** | **Signature** | | **Date** |
| Steven Peterson, Associate Administrator | STEVEN PETERSON | Digitally signed by STEVEN PETERSON Date: 2024.05.21 16:46:07 -04'00' | |

## NONDISCRIMINATION STATEMENT

The U.S. Department of Agriculture (USDA) prohibits discrimination in all its programs and activities on the basis of race, color, national origin, age, disability, and where applicable, sex, marital status, familial status, parental status, religion, sexual orientation, genetic information, political beliefs, reprisal, or because all or a part of an individual's income is derived from any public assistance program.  (Not all prohibited bases apply to all programs.)  Persons with disabilities who require alternative means for communication of program information (Braille, large print, audiotape, etc.) should contact USDA's TARGET Center at (202) 720-2600 (voice and TDD). To file a complaint of discrimination write to USDA, Director, Office of Civil Rights, 1400 Independence Avenue, SW., Washington, DC 20250-9410 or call (800) 795-3272 (voice) or (202) 720-6382 (TDD).  USDA is an equal opportunity provider, employer, and lender.

## PRIVACY ACT STATEMENT

The above statements are made in accordance with the Privacy Act of 1974 (5 U.S.C. Section 522a).

**AMENDMENT NO. 1
TO AGREEMENT NUMBER FSA24GRA0011610**

**PURPOSE**

The purpose of this amendment is to update the Notice of Award, Statement of Work (Attachment 1A), Project Narrative (Attachment 2A), Budget Narrative (Attachment 3A), and General Terms and Conditions (Attachment 4A).

**In the case of any conflict between language in this amendment and the award General Terms and Conditions, the provisions of this amendment will control.**

**REVISIONS TO THE NOTICE OF AWARD (FORM ADS-093):**

1. The addition of a non-federal share to Block 17.

2. The Approved Budget for the agreement is revised as shown in Block 19.

3. The list of Attachments on page 2 of the NOA has been revised to include this amendment narrative and the revised attachments.

**REVISIONS TO AGREEMENT ATTACHMENTS**

1. The Agreement Statement of Work (Attachment 1) is replaced in its entirety with Attachment 1A to this amendment.

2. Agreement Project Narrative (Attachment 2) is replaced in its entirety with Attachment 2A to this amendment.

3. The Agreement Budget Narrative (Attachment 3) is replaced in its entirety with Attachment 3A to this amendment.

4. The General Terms and Conditions (Attachment 4) is replaced in its entirely with Attachment 4A to this amendment.

**U.S. DEPARTMENT OF AGRICULTURE
FARM PRODUCTION AND CONSERVATION**

Revised March 2024

**GENERAL TERMS AND CONDITIONS FOR NON-ezFEDGRANTS
GRANTS AND COOPERATIVE AGREEMENTS**

The Farm Production and Conservation (FPAC) mission area encompasses the following USDA agencies: Natural Resources Conservation Service (NRCS), Farm Service Agency (FSA), Risk Management Agency (RMA), the Commodity Credit Corporation (CCC), and the FPAC Business Center.

## A. APPLICABLE REGULATIONS

1. As a condition of this award, the recipient assures and certifies that it has and/or will comply and require subrecipients to comply with the requirements contained in the following statutes and regulations, as applicable. The full text of Code of Federal Regulations (CFR) references may be found at https://www.gpo.gov/fdsys/browse/collectionCfr.action?collectionCode=CF R and http://www.ecfr.gov/.

   a. 2 CFR Part 25, "Universal Identifier and System of Award Management"

   b. 2 CFR Part 170, "Reporting Subaward and Executive Compensation Information"

   c. 2 CFR Part 175, "Award Term for Trafficking in Persons"

   d. 2 CFR Part 180, "OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement)"

   e. 2 CFR Part 182, "Governmentwide Requirements for Drug- Free Workplace (Financial Assistance)"

   f. 2 CFR Part 183 Never Contract with the Enemy

   g. 2 CFR Part 184, "Buy America Preferences for Infrastructure Projects"

   h. 2 CFR Part 200, "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards"

   i. 2 CFR Part 400, "Uniform Administrative Requirements, Cost Principles, And Audit Requirements for Federal Awards"

   j. 2 CFR Part 417, "Nonprocurement Debarment and Suspension"

   k. 2 CFR Part 418, "New Restrictions on Lobbying"

   l. 2 CFR Part 421, "Requirements for Drug-Free Workplace (Financial Assistance)"

   m. 2 CFR Part 422, "Research Institutions Conducting USDA-Funded Extramural Research; Research Misconduct"

2. Allowable project costs will be determined in accordance with the authorizing statute, the purpose of the award, and, to the extent applicable, to the type of organizations receiving the award, regardless of tier. The following portions of the Code of Federal Regulations are hereby incorporated by reference. The full text of Code of Federal Regulations references may be found at https://www.ecfr.gov/current/title-2/subtitle-A/chapter-II/part-200 , 2 CFR Part 200, "Uniform Administrative Requirements, Cost Principles and Audit Requirements for Federal Awards"

3. For corporate recipients, by accepting this award the recipient acknowledges: (1) that it does not have a Federal tax delinquency, meaning that it is not subject to any unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability, **and** (2) that it has not been convicted of a felony criminal violation under any Federal law within 24 months preceding the award, unless a suspending and debarring official of the USDA has considered suspension or debarment of the recipient corporation based on these convictions and/or tax delinquencies and determined that suspension or debarment is not necessary to protect the interests of the Government. If the recipient fails to comply with these provisions, the agency will annul this agreement and may recover any funds the recipient has expended in violation of the above cited statutory provisions.

## B. UNALLOWABLE COSTS

The following costs are not allowed:

1. Profit and management fees. Recipients may not earn and keep income resulting from an award.

2. Costs above the amount authorized for the project.

3. Costs incurred after the award period of performance end date.

4. Costs not identified in the approved budget or approved budget revisions.

5. Costs of promotional items and memorabilia, including models, gifts, and souvenirs.

6. Compensation for injuries to persons or damage to property arising from project activities.

7. Meals: Meals may be charged to an award only if they are necessary for the performance of the project. For instance, meals (normally only lunch) that are a necessary part of the costs of meetings and conferences (i.e., required attendance and continuity of a meeting), the primary purpose of which is the dissemination of information, are allowable, as are costs of transportation, rental of facilities, speakers' fees, and other items incidental to such meetings or conferences. Note: Meals consumed while in official travel status do not fall in this category. They are considered to be per diem expenses and should be reimbursed in accordance with the organization's established travel policies subject to statutory limitations or in accordance with Federal travel policies.

8. Costs normally charged as indirect costs may not be charged as direct costs without proper justification and agency approval. Proper justification includes documentation that the costs meet the criteria for allowability (see 2 CFR 200.403). Examples of such costs include rent, utilities, depreciation on buildings and equipment, the costs of operating and maintaining facilities, and general administration and general expenses, such as the salaries and expenses of executive officers, personnel administration, and accounting.

9. Salaries that are not commensurate with level of work: All costs must be reasonable to be allowable (2 CFR 200.403), and 2 CFR 200.404 defines a reasonable cost as one if, in its nature and amount, it does not exceed that which would be incurred by a prudent person under the circumstances prevailing at the time the decision was made to incur the cost. Salaries determined not to be reasonable compared to the

level of work will be unallowable.

10. Honoraria. Speaker fees are allowable.

11. Costs which lie outside the scope of the approved project and amendments thereto.

12. Entertainment costs, regardless of their apparent relationship to project objectives.

13. Consulting services performed by a Federal employee during official duty hours when such consulting services result in the payment of additional compensation to the employee; and

14. Unless specifically allowed by the agency or program, renovation or refurbishment of facilities, the purchase or installation of fixed equipment in facilities, and the planning, repair, rehabilitation, acquisition, or construction of buildings or facilities.

This list is not exhaustive. For general information about the allowability of particular items of costs, please see 2 CFR Part 200, "Subpart E - Cost Principles", or direct specific inquiries to the administrative contact identified in the award. The allowability of some items of costs may be difficult to determine. To avoid disallowance or dispute of such costs, the recipient may seek prior approval before incurring them. See 2 CFR 200.407.

## C. PRIOR APPROVAL REQUIREMENTS

Certain items of cost and award revisions require the prior written approval of the awarding agency. The following are the most common situations requiring prior approval. However, this list is not exhaustive, and the recipient is also bound by any other prior approval requirements identified in the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards. Submit all requests for the approvals described below via e-mail to FPAC.BC.GAD@usda.gov. All requests for prior approval must reference the applicable agreement number.

1. Pre-award costs --To receive reimbursement for costs incurred prior to the award date, recipients must request written approval. This restriction also applies to costs intended to meet cost share requirements. Even with approval, recipients incur pre-award costs at their own risk. The Federal awarding agency is under no obligation to reimburse such costs if for any reason the recipient does not receive a Federal award or if the Federal award is less than anticipated and inadequate to cover the costs.

2. Revisions to scope, objective, or deliverables -- When it is necessary to modify the scope, objective, or deliverables of an award, the recipient must submit a written request and justification for the change along with the revised scope, objective, or deliverables of the award.

3. Additions or changes to subawards and contracts -- The subawarding, transferring, or contracting out of any work (i.e., services) under a Federal award not identified in the original award budget or any changes to subaward or contracts requires prior written approval. The recipient must submit a justification for the proposed subaward/contract, and a detailed budget for the subaward/contract. This provision does not apply to the acquisition of supplies, material, equipment, or general support services.

4. Permanent change in a key person specified in the award -- When there is a permanent change in key personnel, the recipient must request prior written approval

for the substitution or change. The request must identify the replacement personnel and provide his or her qualifications.

5. Absence or temporary change in project leadership -- If the approved project director or principal investigator disengages from the project for more than three months or reduces time devoted to the project by 25 percent or more, the recipient must request prior approval in writing, identifying who will be in charge during the project director's absence. The notification must include the qualifications of the replacement.

6. Budget revisions -- Recipients must request prior written approval for deviations from the approved budget in the instances described below. For budget revisions, the recipient may be required to submit a new SF 424A or 424C and budget narrative, even those that do not require prior approval.

    a. The inclusion of costs that require prior approval in accordance with Subpart E—Cost Principles of this part or 45 CFR part 75 Appendix IX, "Principles for Determining Costs Applicable to Research and Development under Awards and Contracts with Hospitals," or 48 CFR part 31, "Contract Cost Principles and Procedures," as applicable.

    b. Where the cumulative amount of transfers of funds among direct cost categories or programs, functions, and activities exceeds or is expected to exceed 10 percent of the total budget as last approved by the Federal awarding agency, and where the Federal share of the project exceeds the simplified acquisition threshold. Recipients must notify the Government of budget changes that do not meet the threshold described above.

    c. The transfer of funds budgeted for participant support costs to other categories of expense requires prior written approval. Participant support costs means direct costs for items such as stipends or subsistence allowances, travel allowances, and registration fees paid to or on behalf of participants or trainees (but not employees) in connection with conferences or training projects.

    d. Changes in the approved cost share provided by the recipient, including to the amount, source, or type.

    e. Additional Federal funds needed to complete the project. This change also requires a formal agreement amendment.

    f. Adjustments to Indirect Cost Rates -- Recipients must have either a current NICRA or elect to use the de minimis in order to charge indirect costs. If an indirect rate indirect cost rate increases during the award's period of performance, the agency is not obligated, but retains discretion to, either add funds to the award or allow a budget realignment. If an indirect rate indirect cost rate decreases during the award's period of performance, indirect costs must be charged in accordance with the current rate.

    g. If the change is due to receipt of a new negotiated indirect costs rate agreement (NICRA), the prior approval request must include a copy of the new agreement.

7. No-Cost Extensions of Time -- When a no-cost extension of time is necessary, the recipient authorized signatory must submit a written request via e-mail to FPAC.BC.GAD@usda.gov. Except in limited circumstances, a no-cost extension of time cannot exceed 12 months. FPAC cannot approve requests for no-cost extensions received after the expiration of the award. In addition, time may not allow extension requests submitted less than 30 calendar days before the period of

performance end date to be processed, so recipients are encouraged to submit requests as soon as possible. FPAC agencies cannot approve no-cost extensions requested merely to expend remaining funds. The request must contain the following:

    a. Amount of additional time requested

    b. Explanation for the need for the extension

    c. A summary of progress to date and revised milestones

## D. PAYMENTS

1. Recipients must request reimbursement or advances using a properly completed and executed SF–270, submitted with a Budget Expense Table or Deliverable Expense Table (or similar summary document), as applicable. Submit requests to FPAC.BC.GAD@usda.gov. Payment request preparation guidance and templates for Budget Expense Tables and Deliverable Expense Tables are available at this link: https://www.fpacbc.usda.gov/about/grants-and-agreements/award-payments/index.html. Documents must be provided as attachments; documents submitted via weblink or other document services will not be accepted.

2. Recipients requesting advances should request payments in amounts necessary to meet their current needs pursuant to procedures contained in the Federal administrative provisions and 31 CFR Part 205. Requests must be submitted no less than 15 days prior to the start of the requested advance period. The recipient must provide a summary document showing the amount of advanced funds spent within 30 days of the end of the advance period. If applicable, the recipient must also submit a summary of the cost share provided.

3. The recipient must maintain records of supporting documentation all costs incurred under this award. Such documentation includes, but is not limited to, canceled checks, paid bills, payroll records, and subaward documents. Labor cost charges to this award must be based upon salaries actually earned and the time actually worked on this award. All project costs must be incurred within the period of performance of this award, including any approved no-cost extension of time. The Government may disallow costs that cannot be supported by supporting documentation or that are incurred outside of the agreement period of performance and budget and may require the return of any funds paid out for those costs. The level of detail and documentation required to be provided to support any individual payment request is at the discretion of the Government. Do not provide supporting documentation unless it is specifically requested.

4. Recipients must pay all costs incurred (i.e., liquidate obligations) under the award and request all final requests for payment no later than 120 calendar days after the period of performance end date. The Government must timely close-out expired agreements, which includes de-obligation of unspent funds. Therefore, funds may not be available for payment requests received more than 120 days after the period of performance end date and the Government is not obligated to make such payments.

5. Payments under fixed-amount awards are made based on deliverables completed, milestones achieved, or as a single payment upon award completion rather than costs incurred. The Government and recipient must utilize 2 CFR 200, Subpart E, Cost principles to support unit prices included in fixed amount awards prior to

agreement execution.

6. The method of payment between the recipient and its contractors will be in accordance with the policies and procedures established by the recipient except that the contractors may not use the USDA Office of Financial Management/National Finance Center method to request payments. If the recipient makes advance payments to contractors, the recipient must ensure that the timing of such payments is designed to minimize elapsed time between the advance payment and the disbursement of funds. Recipients must not submit requests from their contractors for review or approval.

## E.  FINANCIAL REPORTING

1. Recipients must submit a Federal Financial Report (FFR), SF 425 in accordance with the schedule included in the award statement of work. Recipients must submit reports via e-mail to FPAC.BC.GAD@usda.gov (SF425 and instructions are available at https://www.fpacbc.usda.gov/about/grants-and-agreements/required-reports-closing/index.html.) Failure to submit reports as required may result in suspension or termination of award.

2. The recipient must submit a final financial report no later than 120 calendar days after the period of performance end date.  Failure to do so may result in a negative report to the Federal Awardee Performance and Integrity Information System (FAPIIS).

3. The FPAC awarding agency will withhold payments under this award if the recipient is delinquent in submitting required reports.

4. Reports submitted via e-mail must be provided as attachments; documents submitted via weblink or other document services will not be accepted.

## F.  PERFORMANCE MONITORING AND REPORTING

1. The recipient is responsible for monitoring day-to-day performance and for reporting to the FPAC awarding agency. If the project involves subaward/contractual arrangements, the recipient is also responsible for monitoring the performance of project activities under those arrangements to ensure that approved goals and schedules are met.

2. The recipient must submit a written progress report at the frequency specified in the statement of work via e-mail to FPAC.BC.GAD@usda.gov. Reports submitted via e-mail must be provided as attachments; documents submitted via weblink or other document services will not be accepted.  Each report must cover—

   a. A comparison of actual accomplishments with the milestones and deliverables established for the reporting period and, where project output can be quantified, a computation of the costs per unit of output.

   b. The reasons why milestones and deliverables targets were not met, if appropriate.

   c. Additional pertinent information including, where appropriate, analysis and explanation of cost overruns or high unit costs.

3. The recipient must submit a final report no later than 120 calendar days after the period of performance end date. Failure to do so may result in a negative report to

the Federal Awardee Performance and Integrity Information System (FAPIIS).

4. The FPAC awarding agency will withhold payments under this award if the recipient is delinquent in submitting required reports.

## G.  REPORTING SUBAWARDS AND EXECUTIVE COMPENSATION

1. Reporting of first-tier subawards.

    a. Applicability. Unless you are exempt as provided in paragraph 4 of this award term, you must report each action that obligates $30,000 or more in Federal funds that does not include Recovery funds (as defined in section 1512(a)(2) of the American Recovery and Reinvestment Act of 2009, Pub.L. 111-5) for a subaward to an entity (see definitions in paragraph e. of this award term).

    b. Where and when to report.

        i.   You must report each obligating action described in paragraph 1.a. of this award term to *http://www.fsrs.gov*.

        ii.  For subaward information, report no later than the end of the month following the month in which the obligation was made. (For example, if the obligation was made on November 7, 2010, the obligation must be reported by no later than December 31, 2010.)

    c. What to report. You must report the information about each obligating action that the submission instructions posted at *http://www.fsrs.gov*.

2. Reporting Total Compensation of Recipient Executives.

    a. Applicability and what to report. You must report total compensation for each of your five most highly compensated executives for the preceding completed fiscal year, if—

        i.   the total Federal funding authorized to date under this award is $30,000 or more;

        ii.  in the preceding fiscal year, you received—

            (a) 80 percent or more of your annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); and

            (b) $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); and

        iii. The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986. (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at *http://www.sec.gov/answers/execomp.htm*

    b. Where and when to report. You must report executive total compensation

described in paragraph 2.a. of this award term:

    i. As part of your registration profile at https://sam.gov

    ii. By the end of the month following the month in which this award is made, and annually thereafter.

3. Reporting of Total Compensation of Subrecipient Executives.

    a. Applicability and what to report. Unless you are exempt as provided in paragraph d. of this award term, for each first-tier subrecipient under this award, you shall report the names and total compensation of each of the subrecipient's five most highly compensated executives for the subrecipient's preceding completed fiscal year, if—

        i. In the subrecipient's preceding fiscal year, the subrecipient received—

            (a) 80 percent or more of its annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); and

            (b) $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts), and Federal financial assistance subject to the Transparency Act (and subawards); and

        ii. The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986. (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at *http://www.sec.gov/answers/execomp.htm*

    b. Where and when to report. You must report subrecipient executive total compensation described in paragraph 3.a. of this award term:

        i. To the recipient.

        ii. By the end of the month following the month during which you make the subaward. For example, if a subaward is obligated on any date during the month of October of a given year (*i.e.,* between October 1 and 31), you must report any required compensation information of the subrecipient by November 30 of that year.

4. Exemptions - If, in the previous tax year, you had gross income, from all sources, under $300,000, you are exempt from the requirements to report:

    a. Subawards, and

    b. The total compensation of the five most highly compensated executives of any subrecipient.

5. Definitions. For purposes of this award term:

    a. Entity means all of the following, as defined in 2 CFR part 25:

        i. A Governmental organization, which is a State, local government, or Indian Tribe;

     ii.    A foreign public entity;

     iii.    A domestic or foreign nonprofit organization;

     iv.    A domestic or foreign for-profit organization;

     v.    A Federal agency, but only as a subrecipient under an award or subaward to a non- Federal entity.

b.   Executive means officers, managing partners, or any other employees in management positions.

c.   Subaward:

     i.    This term means a legal instrument to provide support for the performance of any portion of the substantive project or program for which you received this award and that you as the recipient award to an eligible subrecipient.

     ii.    The term does not include your procurement of property and services needed to carry out the project or program (for further explanation, see Sec.210 of the attachment to OMB Circular A-133, "Audits of States, Local Governments, and Non-Profit Organizations").

     iii.    A subaward may be provided through any legal agreement, including an agreement that you or a subrecipient considers a contract.

d.   Subrecipient means an entity that:

     i.    Receives a subaward from you (the recipient) under this award; and

     ii.    Is accountable to you for the use of the Federal funds provided by the subaward.

e.   Total compensation means the cash and noncash dollar value earned by the executive during the recipient's or subrecipient's preceding fiscal year and includes the following (for more information see 17 CFR 229.402(c)(2)):

     i.    Salary and bonus.

     ii.    Awards of stock, stock options, and stock appreciation rights. Use the dollar amount recognized for financial statement reporting purposes with respect to the fiscal year in accordance with the Statement of Financial Accounting Standards No. 123 (Revised 2004) (FAS 123R), Shared Based Payments.

     iii.    Earnings for services under non-equity incentive plans. This does not include group life, health, hospitalization or medical reimbursement plans that do not discriminate in favor of executives and are available generally to all salaried employees.

     iv.    Change in pension value. This is the change in present value of defined benefit and actuarial pension plans.

     v.    Above-market earnings on deferred compensation which is not tax-qualified.

     vi.    Other compensation, if the aggregate value of all such other compensation (e.g. severance, termination payments, value of life insurance paid on behalf of the employee, perquisites or property) for the executive exceeds $10,000.

## H. AUDIT REQUIREMENTS

The recipient is responsible for complying with audit requirements in accordance with 2 CFR 200, Subpart F. A recipient entity that expends $750,000 or more during the recipient's fiscal year in Federal awards must have a single or program-specific audit conducted for that year. A single audit is required to be uploaded by the recipient to the Federal Audit Clearinghouse within 30 calendar days after receipt of the auditor's report, or nine (9) months after the end of the audit period, whichever comes first.

## I. AWARDS WITH RESEARCH ACTIVITIES

1. Recipients who engage or assist in scientific related activities on behalf of USDA must uphold the principles of scientific integrity established by Departmental Regulations 1074-001, Scientific Integrity. Covered activities include engaging in, supervising, managing, and reporting scientific work; analyzing and publicly communicating information resulting from scientific work; and utilizing information derived from scientific work in policy and decision making.

2. In accordance with USDA Departmental Regulation (DR) 1020-006, recipients of awards that produce scholarly publications and digitally formatted scientific data assets resulting from unclassified scientific research supported wholly or in part by USDA funds must make the publications and data sets publicly accessible, to the extent feasible with law, agency mission, and resources. Final peer-reviewed, accepted manuscripts must be made freely accessible to the public through the USDA public access archive system (PubAg, hosted by the National Agricultural Library (NAL)). Public access through PubAg must be established within 12 months of the date on which the publisher makes the article available online. The final published article may be submitted to PubAg in lieu of the final peer-reviewed, accepted manuscript, provided the author has the right to submit the published version (e.g., open access articles). Recipients can access NAL at https://www.nal.usda.gov.

   Digital scientific research data assets connected to a scholarly publication must also receive a digital persistent identifier, such as a Digital Object Identifier (DOI), that allows a scholarly publication and its catalog metadata to link to the published digital scientific research data asset from which the publication was developed. Authors of scholarly publications, at their discretion, are also encouraged to obtain digital persistent identifiers for other associated scientific research products, such as software, workflow documentation, curricular materials, and multi-media materials, if these products are not subject to statutory restrictions and would provide information that would help future users of the scholarly publication. Recipients can receive a DOI via NAL.

   Recipients can access DR 1020-006 at https://www.usda.gov/directives/dr-1020-006

## J. SPECIAL PROVISIONS

1. The recipient assures and certifies that it will comply with the minimum-wage and maximum-hour provisions of the Federal Fair Labor Standards Act.

2. Employees of FPAC agencies will participate in efforts under this agreement solely as representatives of the United States. They may not participate as directors, officers, employees, or otherwise serve or hold themselves out as representatives of the recipient. They also may not assist the recipient with efforts to lobby Congress or

to raise money through fundraising efforts. Further, FPAC employees must report to their immediate supervisor any negotiations with the recipient concerning future employment and must refrain from participation in projects or agreements with such recipients.

3. Except for agreements entered under the Agriculture Conservation Experienced Services (ACES) program authorized by the Food, Conservation, and Energy Act of 2008, employees of the recipient will not be considered Federal employees or agents of the United States for any purposes under this agreement. An individual providing services under the ACES program is deemed to be an employee of the United States Government solely for purposes of chapter 171 of title 28, United States Code, provided the individual is acting within the scope of the agreement.

4. Except in very limited circumstances (e.g., construction agreements), no agreement period of performance can exceed a total of five years, including extensions.

5. The recipient and its employees are prohibited from promoting, recommending, or discussing the availability of specific commercial products or services with FPAC agency clients in the course of carrying out activities under this agreement, including any products or services offered by the recipient, except as may be specifically allowed in the agreement.

6. The recipient agrees to comply with USDA's Department-wide enterprise geospatial data management policy implemented in DR 3465-001, which establishes the USDA policy for defining the strategic direction necessary to optimize the management of the USDA geospatial data and geospatial infrastructure, including all geospatial data created for, by, and enhanced by USDA. Recipients can access DR 3465-001 at https://www.usda.gov/directives/dr-3465-001

## K. PATENTS, INVENTIONS, COPYRIGHTS, AND ACKNOWLEDGMENT OF SUPPORT AND DISCLAIMER

1. The following acknowledgment of USDA support must appear in the publication of any material, whether copyrighted or not, and any products in electronic formats (web sites, computer programs, etc.) that is substantially based upon or developed under this award:

   "This material is based upon work supported by the U.S. Department of Agriculture, under agreement number [recipient should enter the applicable award number here]."

   In addition, all publications and other materials, except scientific articles or papers published in scientific journals, must include the following statement:

   "Any opinions, findings, conclusions, or recommendations expressed in this publication are those of the author(s) and do not necessarily reflect the views of the U.S. Department of Agriculture. In addition, any reference to specific brands or types of products or services does not constitute or imply an endorsement by the U.S. Department of Agriculture for those products or services."

   All publications printed with Federal Government funds will include the most current USDA nondiscrimination statement, available from the Public Affairs Division, Civil Rights Division, or on the USDA home page. If the material is too small to include the full nondiscrimination statement, the material must, at a minimum, include the following statement:

"USDA is an equal opportunity provider, employer, and lender."

The recipient is responsible for ensuring that an acknowledgment of USDA is made during news media interviews, including popular media such as radio, television, and news magazines, that discuss work funded by this award in a substantial way.

2. Allocation of rights of patents, inventions, and copyrights must be in accordance with 2 CFR Part 200.315. This regulation provides that small businesses normally may retain the principal worldwide patent rights to any invention developed with USDA support.

3. In accordance with 37 CFR Section 401.14, each subject invention must be disclosed to the Federal agency within 2 months after the inventor discloses it in writing to recipient personnel responsible for patent matters. Invention disclosure statements pursuant to 37 CFR Section 401.14(c) must be made in writing to FPAC.BC.GAD@usda.gov.

4. USDA receives a royalty-free license for Federal Government use, reserves the right to require the patentee to license others in certain circumstances, and requires that anyone exclusively licensed to sell the invention in the United States must manufacture it domestically.

## L.  COST SHARING REQUIREMENTS

1. If the award has specific cost sharing requirements, cost sharing participation in other projects must not be counted toward meeting the specific cost share requirement of this award. Cost share must come from non-Federal sources unless otherwise stated in the applicable program authorizing statute.

2. Cost share costs must be necessary and reasonable for accomplishment of project or program objectives.

3. Cost sharing must be documented on each SF 425 and payment requests as it is provided by the recipient or third party. The required cost sharing ratio must be met by the end of the agreement period of performance; however, it does not have to be maintained for every payment request.

4. Should the recipient become aware that it may be unable to provide the cost share amount identified in this award, it must—

   a. Immediately notify the FPAC Business Center Grants and Agreements Division via e-mail to FPAC.BC.GAD@usda.gov, and

   b. Either specify the steps it plans to take to secure replacement cost share or specify the plans to phase out the project in the absence of cost share.

   Failure by the recipient to notify FPAC in accordance with this section or failure to submit an acceptable remediation plan may result in the disallowance of some or all the costs charged to the award, the subsequent recovery by FPAC of some of the FPAC funds provided under the award, and/or termination of the award. It may constitute a violation of the terms and conditions of the award so serious as to provide grounds for subsequent suspension or debarment.  FPAC reviews and approves or disapproves cost sharing remediation plans on a case-by-case basis.

5. The recipient must maintain records of all project costs that are claimed a s  cost sharing as well as records of costs to be paid by FPAC. If the recipient's cost sharing includes in-kind contributions, the basis for determining the valuation for volunteer

services and donated property must be documented.

6. Recipients must also request prior approval before changing the source or type of cost sharing. See the Prior Approval Section.

## M. PROGRAM INCOME

1. Program income does not include Federal funds received under an award. Program income means gross income earned by the non-Federal entity that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in §200.307(f). Examples include fees charged for conferences or workshops, fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds. Interest earned on advances of Federal funds is not program income. Except as otherwise provided in Federal statutes, regulations, or the terms and conditions of the Federal award, program income does not include rebates, credits, discounts, and interest earned on any of them.

2. Unless recipients specifically request to use the deductive or cost share method, program income must be additive.

3. If program income is earned and not already identified and addressed in the award, the recipient must provide notification to the FPAC BC GAD via e-mail to FPAC.BC.GAD@usda.gov and indicate the preferred treatment method. Use of the deductive or cost share method may require an amendment or prior approval.

4. Program income may be used to meet recipient cost sharing requirements with prior approval of the Government.

5. Recipients must report all program income on the applicable SF 270 and SF 425 as it is earned.

## N. PROCUREMENT STANDARDS

The recipient must have and use documented procurement procedures, consistent with State, local, and tribal laws and regulations, for the acquisition of property or services (including construction) required under a Federal award or subaward. Those procedures must comply with the procurement standards set out in 2 CFR 200.317-327, including the requirements regarding conflicts of interest, competition, and methods of procurement. Procurements must be well-documented, and those records are subject to inspection and audit.

## O. BUILD AMERICA, BUY AMERICA FOR CONSTRUCTION

Buy America Preference -- Recipients of an award of Federal financial assistance from a program for infrastructure are hereby notified that none of the funds provided under this award may be used for an infrastructure project unless:

1. All iron and steel used in the project are produced in the United States—this means all manufacturing processes, from the initial melting stage through the application of coatings, occurred in the United States;

2. All manufactured products used in the project are produced in the United States—

this means the manufactured product was manufactured in the United States; and the cost of the components of the manufactured product that are mined, produced, or manufactured in the United States is greater than 55 percent of the total cost of all components of the manufactured product, unless another standard that meets or exceeds this standard has been established under applicable law or regulation for determining the minimum amount of domestic content of the manufactured product; and

3. All construction materials are manufactured in the United States—this means that all manufacturing processes for the construction material occurred in the United States. The construction material standards are listed below.

*Incorporation into an infrastructure project.* The Buy America Preference only applies to articles, materials, and supplies that are consumed in, incorporated into, or affixed to an infrastructure project. As such, it does not apply to tools, equipment, and supplies, such as temporary scaffolding, brought to the construction site and removed at or before the completion of the infrastructure project. Nor does a Buy America Preference apply to equipment and furnishings, such as movable chairs, desks, and portable computer equipment, that are used at or within the finished infrastructure project, but are not an integral part of the structure or permanently affixed to the infrastructure project.

*Categorization of articles, materials, and supplies.* An article, material, or supply should only be classified into one of the following categories: (i) Iron or steel products; (ii) Manufactured products; (iii) Construction materials; or (iv) Section 70917(c) materials. An article, material, or supply should not be considered to fall into multiple categories. In some cases, an article, material, or supply may not fall under any of the categories listed in this paragraph. The classification of an article, material, or supply as falling into one of the categories listed in this paragraph must be made based on its status at the time it is brought to the work site for incorporation into an infrastructure project. In general, the work site is the location of the infrastructure project at which the iron, steel, manufactured products, and construction materials will be incorporated.

*Application of the Buy America Preference by category.* An article, material, or supply incorporated into an infrastructure project must meet the Buy America Preference for only the single category in which it is classified.

*Determining the cost of components for manufactured products.* In determining whether the cost of components for manufactured products is greater than 55 percent of the total cost of all components, use the following instructions:

1. For components purchased by the manufacturer, the acquisition cost, including transportation costs to the place of incorporation into the manufactured product (whether or not such costs are paid to a domestic firm), and any applicable duty (whether or not a duty-free entry certificate is issued); or

2. For components manufactured by the manufacturer, all costs associated with the manufacture of the component, including transportation costs as described in paragraph (a), plus allocable overhead costs, but excluding profit. Cost of components does not include any costs associated with the manufacture of the manufactured product.

*Construction material standards.* The Buy America Preference applies to the following construction materials incorporated into infrastructure projects. Each construction material is followed by a standard for the material to be considered "produced in the United States." Except as specifically provided, only a single standard should be applied

to a single construction material.

1.  Non-ferrous metals. All manufacturing processes, from initial smelting or melting through final shaping, coating, and assembly, occurred in the United States.

2.  Plastic and polymer-based products. All manufacturing processes, from initial combination of constituent plastic or polymer-based inputs, or, where applicable, constituent composite materials, until the item is in its final form, occurred in the United States.

3.  Glass. All manufacturing processes, from initial batching and melting of raw materials through annealing, cooling, and cutting, occurred in the United States.

4.  Fiber optic cable (including drop cable). All manufacturing processes, from the initial ribboning (if applicable), through buffering, fiber stranding and jacketing, occurred in the United States. All manufacturing processes also include the standards for glass and optical fiber, but not for non-ferrous metals, plastic and polymer-based products, or any others.

5.  Optical fiber. All manufacturing processes, from the initial preform fabrication stage through the completion of the draw, occurred in the United States.

6.  Lumber. All manufacturing processes, from initial debarking through treatment and planing, occurred in the United States.

7.  Drywall. All manufacturing processes, from initial blending of mined or synthetic gypsum plaster and additives through cutting and drying of sandwiched panels, occurred in the United States.

8.  Engineered wood. All manufacturing processes from the initial combination of constituent materials until the wood product is in its final form, occurred in the United States.

*Waivers:*  When necessary, recipients may apply for, and the agency may grant, a waiver from these requirements.  The agency should notify the recipient for information on the process for requesting a waiver from these requirements.

When the Federal agency has made a determination that one of the following exceptions applies, the awarding official may waive the application of the Buy America Preference in any case in which the agency determines that:

1.  applying the Buy America Preference would be inconsistent with the public interest;

2.  the types of iron, steel, manufactured products, or construction materials are not produced in the United States in sufficient and reasonably available quantities or of a satisfactory quality; or

3.  the inclusion of iron, steel, manufactured products, or construction materials produced in the United States will increase the cost of the overall project by more than 25 percent.

A request to waive the application of the Buy America Preference must be in writing.

The agency will provide instructions on the format, contents, and supporting materials required for any waiver request.  Waiver requests are subject to public comment periods of no less than 15 days and must be reviewed by the Made in America Office.

There may be instances where an award qualifies, in whole or in part, for an existing waiver described at https://www.usda.gov/ocfo/federal-financial-assistance-policy/USDABuyAmericaWaiver

*Definitions*

**"Buy America Preference"** means the "domestic content procurement preference" set forth in section 70914 of the Build America, Buy America Act, which requires the head of each Federal agency to ensure that none of the funds made available for a Federal award for an infrastructure project may be obligated unless all of the iron, steel, manufactured products, and construction materials incorporated into the project are produced in the United States.

**"Construction materials"** means articles, materials, or supplies that consist of only one of the items listed in paragraph 1. of this definition, except as provided in paragraph 2 of this definition. To the extent one of the items listed in paragraph 1 contains as inputs other items listed in paragraph 1, it is nonetheless a construction material.

1. The listed items are:

    a. Non-ferrous metals;

    b. Plastic and polymer-based products (including polyvinylchloride, composite building materials, and polymers used in fiber optic cables);

    c. Glass (including optic glass);

    d. Fiber optic cable (including drop cable);

    e. Optical fiber;

    f. Lumber;

    g. Engineered wood; and

    h. Drywall.

2. Minor additions of articles, materials, supplies, or binding agents to a construction material do not change the categorization of the construction material.

**"Infrastructure"** means public infrastructure projects in the United States, which includes, at a minimum, the structures, facilities, and equipment for roads, highways, and bridges; public transportation; dams, ports, harbors, and other maritime facilities; intercity passenger and freight railroads; freight and intermodal facilities; airports; water systems, including drinking water and wastewater systems; electrical transmission facilities and systems; utilities; broadband infrastructure; and buildings and real property; and structures, facilities, and equipment that generate, transport, and distribute energy including electric vehicle (EV) charging.

**"Infrastructure project"** means any activity related to the construction, alteration, maintenance, or repair of infrastructure in the United States regardless of whether infrastructure is the primary purpose of the project. See also paragraphs (c) and (d) of 2 CFR 184.4.

**"Iron or steel products"** means articles, materials, or supplies that consist wholly or predominantly of iron or steel or a combination of both.

"**Manufactured products**" means:

1. Articles, materials, or supplies that have been:

   a.  Processed into a specific form and shape; or

   b.  Combined with other articles, materials, or supplies to create a product with different properties than the individual articles, materials, or supplies.

2. If an item is classified as an iron or steel product, a construction material, or a Section 70917(c) material under 2 CFR 184.4(e) and the definitions set forth in 2 CFR 184.3, then it is not a manufactured product. However, an article, material, or supply classified as a manufactured product under 2 CFR 184.4(e) and paragraph 1 of this definition may include components that are construction materials, iron or steel products, or Section 70917(c) materials.

**"Predominantly of iron or steel or a combination of both"** means that the cost of the iron and steel content exceeds 50 percent of the total cost of all its components. The cost of iron and steel is the cost of the iron or steel mill products (such as bar, billet, slab, wire, plate, or sheet), castings, or forgings utilized in the manufacture of the product and a good faith estimate of the cost of iron or steel components.

**"Section 70917(c) materials"** means cement and cementitious materials; aggregates such as stone, sand, or gravel; or aggregate binding agents or additives. See Section 70917(c) of the Build America, Buy America Act.

## P. NONEXPENDABLE EQUIPMENT

1. Recipients purchasing equipment or products with funds provided under this award are encouraged to purchase only American-made equipment and products. A state must use, manage and dispose of equipment acquired under a Federal award by the state in accordance with state laws and procedures. All other recipients must follow these procedures.

2. Title to equipment acquired under a Federal award will vest conditionally in the recipient upon acquisition. The recipient must not encumber the property without prior approval of the Government.

3. The recipient must use the equipment for the authorized purposes of the project for as long as needed whether or not the project or program continues to be supported by the Federal award. When no longer needed for the original program or project, the equipment may be used in other activities supported by the Federal awarding agency, in the following order of priority:

   a.  Activities under a Federal award from the Federal awarding agency which funded the original program or project, then.

   b.  Activities under Federal awards from other Federal awarding agencies.

4. The recipient must maintain property records that include a description of the property, a serial number or other identification number, the source of funding for the property (including the FAIN), who holds title, the acquisition date, and cost of the property, percentage of Federal participation in the project costs for the Federal award under which the property was acquired, the location, use and condition of the property, and any ultimate disposition data including the date of disposal and sale price of the property.

5. The recipient must take a physical inventory of the property and reconcile the results with the property records at least once every two years until final disposition.

6. When equipment is no longer needed for any of the purposes set out in this provision

and the per-unit fair market value is less than $5,000, the recipient may retain, sell, or dispose of the equipment with no further obligation to FPAC. However, if the per-unit fair market value is $5,000 or more, the recipient must submit a written request for disposition instructions to FPAC.BC.GAD@usda.gov.

## Q.  LIMIT OF FEDERAL LIABILITY

1.  The maximum financial obligation of FPAC to the recipient is the amount of funds indicated in the award as obligated by FPAC. However, if an erroneous amount is stated on the approved budget, or any supporting document relating to the award, FPAC will have the unilateral right to make the correction and to make an appropriate adjustment in the FPAC share of the award to align with the Federal amount authorized.

2.  For awards where it is anticipated that the period of performance will include multiple budget periods, all subsequent budget periods are subject to the availability of funds, program authority, satisfactory performance, and compliance with the terms and conditions of the Federal award.

## R.  AMENDMENTS

The parties may modify this agreement via formal amendment executed by the authorized signatories of each. The FPAC Business Center's Grants and Agreements Division has developed streamlined procedures for certain agreement changes, including no-cost extensions and some changes to agency and recipients contacts that do not require formal amendments. Contact the administrative contact for this award for instructions.

## S.  PRIVACY ACT AND PROHIBITION AGAINST CERTAIN INTERNAL CONFIDENTIALITY AGREEMENTS

1.  Activities performed under this award may involve access to confidential and potentially sensitive information about governmental and landowner issues. The term "confidential information" means proprietary information or data of a personal nature about an individual, or information or data submitted by or pertaining to an organization. This information must not be disclosed without the prior written consent of FPAC.

2.  The recipient's personnel will follow the rules and procedures of disclosure set forth in the Privacy Act of 1974, 5 U.S.C. Section 552a, and implementing regulations and policies with respect to systems of records determined to be subject to the Privacy Act. The recipient's personnel must also comply with privacy of personal information relating to natural resources conservation programs in accordance with section 1244 of Title II of the Farm Security and Rural Investment Act of 2002 (Public Law 107-171).

3.  The recipient agrees to comply with the **"Prohibition Against Certain Internal Confidentiality Agreements:"**

    a.  You may not require your employees, contractors, or subrecipients seeking to report fraud, waste, or abuse to sign or comply with internal confidentiality agreements or statements prohibiting or otherwise restricting them from lawfully reporting that waste, fraud, or abuse to a designated investigative or law

enforcement representative of a Federal department or agency authorized to receive such information.

b.  You must notify your employees, contractors, or subrecipients that the prohibitions and restrictions of any internal confidentiality agreements inconsistent with paragraph a. of this award provision are no longer in effect.

c.  The prohibition in paragraph a. of this award provision does not contravene requirements applicable to any other form issued by a Federal department or agency governing the nondisclosure of classified information.

d.  If FPAC determines that you are not in compliance with this award provision, FPAC:

    i.   Will prohibit your use of funds under this award, in accordance with sections 743 and 744 of Division E of the Consolidated Appropriations Act, 2016, (Pub. L. 114–113) or any successor provision of law;

    ii.  May pursue other remedies available for your material failure to comply with award terms and conditions.

## T.  ACKNOWLEDGMENT OF SECTION 1619 COMPLIANCE

The recipient agrees to comply with FPAC guidelines and requirements regarding the disclosure of information protected under Section 1619 of the Food, Conservation, and Energy Act of 2008 (PL 110- 246), 7 U.S.C. 8791 as described below.

1.  Acceptance of this award indicates acknowledgment and understanding that the recipient is legally bound by Federal statute to comply with the provisions of Section 1619 and that the recipient will not subsequently disclose information protected by section 1619 to any individual or organization that is not directly covered by this award. Any such subsequent disclosure of the protected information (except as permitted under Section 1619) will be considered a violation of Section 1619. The recipient will be held responsible should disclosure of the protected information occur.

2.  Acceptance of this award legally binds every owner, manager, supervisor, employee, contractor, agent, and representative of the recipient to comply with the provisions in Section 1619. The recipient must consult with FPAC prior to providing protected information to an entity or individual outside of the recipient and as necessary to implement the program to ensure that such release is permissible.

3.  The recipient will use the protected information only to perform work that is directly connected to this award. Use of the protected information to perform work that is not directly connected to this award is expressly prohibited.

4.  The recipient must internally restrict access to the protected information to only those individuals who have a demonstrated need to know the protected information to perform work under this award.

5.  The provisions in Section 1619 are continuing obligations. Even when the recipient is no longer a recipient, or when individuals currently affiliated with the recipient become no longer so affiliated, every person having been provided access to the protected information will continue to be legally bound to comply with these provisions.

6.  The recipient must notify all managers, supervisors, employees, contractors, agents,

and representatives about this provision and the requirements of Section 1619. Notifications about the existence of this provision must be made to those individuals who are new to the organization and periodic notifications must be sent throughout the organization (as well as to all contractors and agents) to remind all about the ongoing and continuing requirements.

7. When the recipient is unsure whether particular information is covered or protected by Section 1619, the recipient must consult with FPAC to determine whether the information must be withheld.

8. Use of the protected information for any purpose is expressly prohibited after the period of performance end date of this award. Upon the award end date, any protected information provided under this award must be immediately destroyed or returned to FPAC. The recipient must provide to FPAC written certification that the protected information (paper copy, electronic copy, or both) has been properly destroyed, removed from any electronic storage media, or both.

9. Any State's "sunshine law," "open records act" or other version of the Freedom of Information Act is superseded by section 1619 under the Supremacy Clause of the U.S. Constitution. Accordingly, information protected from disclosure by section 1619 must not be released under such State laws.

10. Protected Information.  Examples of the types of information prohibited by disclosure under Section 1619 include, but are **not limited to**, the following:

    a.  State identification and county number (where reported and where located).

    b.  Producer or landowner name, business full address, phone number, Social Security Number, and similar personal identifying information.

    c.  Farm, tract, field, and contract numbers.

    d.  Production shares and share of acres for each Farm Serial Number (FSN) field.

    e.  Acreage information, including crop codes.

    f.  All attributes for Common Land Units (CLUs) in USDA's Geospatial Information System

    g.  Any photographic, map, or geospatial data that, when combined with other maps, can be used to identify a landowner.

    h.  Location of conservation practices.

11. Section 1619 allows disclosure of "payment information (including payment information and the names and addresses of recipients of payments) under any Department program *that is otherwise authorized by law*" (emphasis added). The names and payment information of producers generally may be provided to the public; however, the recipient shall consult with FPAC if there is any uncertainty as to the provision of such information.

12. Section 1619 also allows disclosure of otherwise protected information if "the information has been transformed into a statistical or aggregate form without naming any (i) individual owner, operator, or producer; or (ii) specific data gathering site." The recipient must consult with FPAC as to whether specific information falls within this exception prior to relying on this exception.

13. Violations. The recipient will be held responsible for violations of this provision and Section 1619. A violation of this provision by the recipient may result in action by

FPAC, including termination of the underlying Federal award.

14. Effective Period. The requirements of this provision are effective on the date of the final signature and will continue until FPAC notifies the recipient that it is no longer required based on changes in applicable Federal law.

## U.  NATIONAL POLICY REQUIREMENTS

The recipient must comply with all relevant public policy requirements, including those in general appropriations provisions, which can be accessed at this link: https://www.usda.gov/sites/default/files/documents/Regulatory_Statutory_National_Policy_Requirements_Overlay.pdf

## V.  TERMINATION

In accordance with 2 CFR 200.340, the recipient understands this agreement may be terminated in whole or in part as follows:

1.  By the Federal awarding agency or pass-through entity, if a recipient fails to comply with the terms and conditions of a Federal award;

2.  By the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities;

3.  By the Federal awarding agency or pass-through entity with the consent of the recipient, in which case the two parties must agree upon the termination conditions, including the effective date and, in the case of partial termination, the portion to be terminated; or

4.  By the recipient upon sending to the Federal awarding agency or pass-through entity written notification setting forth the reasons for such termination, the effective date, and, in the case of partial termination, the portion to be terminated. However, if the Federal awarding agency or pass-through entity determines in the case of partial termination that the reduced or modified portion of the Federal award or subaward will not accomplish the purposes for which the Federal award was made, the Federal awarding agency or pass-through entity may terminate the Federal award in its entirety.

5.  If the Federal award is terminated for the recipient's material failure to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award, the termination decision will be reported to the OMB-designated integrity and performance system accessible through SAM (currently FAPIIS) in accordance with 2 CFR 200.341.

## W.  REPORTING OF MATTERS RELATED TO RECIPIENT INTEGRITY AND PERFORMANCE

1.  General Reporting Requirement

If the total value of the recipient entity's currently active grants, cooperative agreements, and procurement contracts from all Federal awarding agencies exceeds $10,000,000 for any period of time during the period of performance of this Federal award, then the recipient entity during that period of time must maintain the currency of information reported to the System for Award Management (SAM) that is made

available in the designated integrity and performance system (currently, the Federal Awardee Performance and Integrity Information System (FAPIIS)) about civil, criminal, or administrative proceedings described in section 2 of this award condition. This is a statutory requirement under section 872 of Public Law 110-417, as amended (41 U.S.C. 2313). As required by section 3010 of Public Law 111-212, all information posted in the designated integrity and performance system on or after April 15, 2011, except past performance reviews required for Federal procurement contracts, will be publicly available.

2. Proceedings About Which The Recipient Entity Must Report

   Submit the information required about each proceeding that:

   a. Is in connection with the award or performance of a grant, cooperative agreement, or procurement contract from the Federal Government;

   b. Reached its final disposition during the most recent five-year period; and

   c. Is one of the following:

      i. A criminal proceeding that resulted in a conviction, as defined in section 5 of this award condition;

      ii. A civil proceeding that resulted in a finding of fault and liability and payment of a monetary fine, penalty, reimbursement, restitution, or damages of $5,000 or more;

      iii. An administrative proceeding, as defined in section 5 of this award condition, that resulted in a finding of fault and liability and the recipient entity's payment of either a monetary fine or penalty of $5,000 or more or reimbursement, restitution, or damages in excess of $100,000; or

      iv. Any other criminal, civil, or administrative proceeding if:

         a) It could have led to an outcome described in section 2.c.(i), (ii), or (iii) of this award condition;

         b) It had a different disposition arrived at by consent or compromise with an acknowledgment of fault on the part of the recipient entity; and

         c) The requirement in this award condition to disclose information about the proceeding does not conflict with applicable laws and regulations.

3. Reporting Procedures

   Enter in the SAM Entity Management area the information that SAM requires about each proceeding described in section 2 of this award condition. The recipient entity does not need to submit the information a second time under assistance awards that the recipient received if the recipient already provided the information through SAM because the recipient was required to do so under Federal procurement contracts that the recipient entity was awarded.

4. Reporting Frequency

   During any period of time when the recipient entity is subject to the requirement in section 1 of this award condition, the recipient entity must report proceedings information through SAM for the most recent five-year period, either to report new

Revised March 2024                          USDA FPAC General Terms and Conditions
                                            For Grants and Cooperative Agreements

information about any proceeding(s) that the recipient entity has not reported previously or affirm that there is no new information to report. Recipients that have Federal contract, grant, and cooperative agreement awards with a cumulative total value greater than $10,000,000 must disclose semiannually any information about the criminal, civil, and administrative proceedings.

5. Definitions - For purposes of this award condition:

   a. "Administrative proceeding" means a non-judicial process that is adjudicatory in nature in order to make a determination of fault or liability (e.g., Securities and Exchange Commission Administrative proceedings, Civilian Board of Contract Appeals proceedings, and Armed Services Board of Contract Appeals proceedings). This includes proceedings at the Federal and State level but only in connection with performance of a Federal contract or grant (including a cooperative agreement). It does not include audits, site visits, corrective plans, or inspection of deliverables.

   b. "Conviction", for purposes of this award condition, means a judgment or conviction of a criminal offense by any court of competent jurisdiction, whether entered upon a verdict or a plea, and includes a conviction entered upon a plea of nolo contendere.

   c. "Total value of currently active grants, cooperative agreements, and procurement contracts" includes --

      i. Only the Federal share of the funding under any Federal award with a recipient cost share; and

      ii. The value of all expected funding increments under a Federal award and options, even if not yet exercised.

## X. AWARD CLOSEOUT

1. Award closeout is the process by which FPAC determines that all required project activities have been performed satisfactorily and all necessary administrative actions have been completed.

2. The recipient must submit, no later than 120 calendar days after the period of performance end date, all financial, performance, and other reports as required by the terms and conditions of the agreement, including documentation showing that cost share requirements have been met. The awarding agency may approve extensions when requested by the recipient.

3. Unless the awarding agency authorizes an extension, the recipient must liquidate all obligations incurred under the agreement no later than 120 calendar days after the period of performance end date.

4. Recipients must submit all requests for reimbursements no later than 120 calendar days after the period of performance end date.

5. The recipient must promptly refund any balances of unobligated cash that the awarding agency paid in advance or paid and that are not authorized to be retained by the recipient for use in other projects. See OMB Circular A-129 and see §200.345 Collection of amounts due, for requirements regarding unreturned amounts that become delinquent debts.

   Recipients must retain all records pertaining to the agreement in accordance with 2

CFR 200.333-337 and any additional requirements included in the agreement statement of work.

6. Recipients must follow disposition requirements for property acquired with award funds in accordance with 2 CFR 200.310-316 and the terms of this agreement.

7. If the recipient does not submit all reports in accordance with this section and the terms and conditions of the Federal award within one year of the period of performance end date, the Federal awarding agency must proceed to close out with the information available, including de-obligation of remaining funds. In addition, in accordance with 2 CFR 200.344, the Federal awarding agency must report the non-Federal entity's material failure to comply with the terms and conditions of the award with the OMB- designated integrity and performance system (currently FAPIIS).

Refer to https://www.fpacbc.usda.gov/about/grants-and-agreements/required-reports-closing/index.html for applicable forms.

## Y. NON-DISCRIMINATION IN USDA PROGRAMS

The recipient agrees that, in accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at https://www.usda.gov/oascr/how-to-file-a-program-discrimination-complaint and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3) email:program.intake@usda.gov

USDA is an equal opportunity provider, employer, and lender.

## Z. CARE AND USE OF ANIMALS

For any award that involves the care and use of vertebrate animals, the recipient is responsible for complying with the Animal Welfare Act (7 USC, 2131-2156), Public Law 89- 544, 1996, as amended, and the regulations promulgated thereunder by the Secretary of Agriculture in 9 CFR Parts, 1, 2, 3, and 4. In the case of domesticated farm animals housed under farm conditions, the recipient must adhere to the principles stated

in the Guide for the Care and Use of Agricultural Animals in Research and Teaching, published by the American Dairy Science Association®, the American Society of Animal Science, and the Poultry Science Association, 2020. The recipient must have an approved Animal Welfare Assurance Statement on file with the Public Health Service Office for Laboratory Animal Welfare (OLAW) that describes the institution's animal care and use policies, the line of authority for animal care at the institution, veterinary care program, personnel and facilities. If no assurance statement is on file, the organization must contact FPAC to discuss alternatives.

## AA. USE AND ACCEPTANCE OF ELECTRONIC SIGNATURES

Use of electronic signatures is encouraged to increase efficiency when creating and maintaining electronic records. "Electronic signature" means symbols or other data in digital form attached to an electronically submitted document as verification of the sender's intent to sign the document or a method of signing an electronic message that identifies and authenticates a particular person as the source of the electronic message and indicates such person's approval of the information contained in the message along with a date stamp (44 U.S.C. 3504, Sec. 1710). FPAC agencies will accept such signatures on application materials, payment requests, reports, and any other document that requires a signature certification. Scanned or photographed images of manual signatures are also acceptable, though photographs are least preferred due to the large amount of digital storage required to maintain them. Names merely typed in script fonts or other unverified electronic signatures cannot be accepted. Application documents submitted through Grants.gov are deemed "signed" if they bear the Grants.gov date stamp footer.

## BB. SPECIAL PROVISIONS FOR AWARDS TO FOR-PROFIT ORGANIZATIONS

This section contains provisions that apply to awards to for-profit organizations. These provisions are in addition to or in exception of other applicable provisions of these general terms and conditions.

1. In accordance with 2 CFR 200.101, FPAC agencies apply the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal awards to for-profit entities.

2. No funds may be paid as profit to any recipient even if the recipient is a for-profit organization. Profit is any amount in excess of allowable direct and indirect costs.

3. For-profit organizations that receive annual awards totaling more than the audit requirement threshold in Subpart F have two options regarding audits:

    a. If the commercial organization receives awards under only one FPAC program, financial audit of that award in accordance with Generally Accepted Government Auditing Standards issued by the Comptroller General of the United States or, if awards are received under multiple FPAC programs, a financial audit of all awards in accordance with Generally Accepted Government Auditing Standards issued by the Comptroller General of the United States; or

    b. An audit that meets the requirements contained in Subpart F.

Revised March 2024

## CC. AGREEMENT COUNTERPARTS

This Agreement may be executed in one or more counterparts, and by the parties in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

## DD. CONTINUING OBLIGATIONS

The rights and obligations of the parties that, by their nature, would continue beyond the expiration or termination of this agreement (e.g., confidentiality-related clauses) shall survive such expiration or termination of this agreement.

# Exhibit E

**Catalyzing Equitable Access to Land, Capital, and Market Opportunities through an Agroecologically Stewarded Land Commons, Diversified Technical Support Program, and Resource Sharing Cooperative in the Bay Area**

<u>**Introduction and Justification**</u>

Agroecology Commons (AC) is located twenty-three miles outside San Francisco in El Sobrante, California. Though the farm is in Contra Costa County, the program primarily serves small farmers, markets, and marginalized communities in Alameda County. AC is a self-directed worker nonprofit formed in 2020 by Queer, Trans, Black, Indigenous, and Multi-Racial (QTBIMPOC) producers, organizers, educators, artists, and cooperative business owners of color that serve marginalized communities in the Bay Area. To restore the connection between land and liberation, AC cultivates knowledge sharing, community action, and global solidarity for decolonized land stewardship, collective healing, and justice within the food movement. Our values are inclusivity, reciprocity, cooperation, reflection, healing, solidarity, and reverence for the Earth. Through the proposed project and collaboration with the California Alliance of Family Farms (CAFF), AC aims to **develop and implement innovative solutions that catalyze equitable access to land, capital, and market opportunities for QTBIMPOC producers** in the Bay Area.

Currently, AC operates a three-acre cooperative incubator farm that provides beginning farmers with explicit access to land in the Urban Bay Area - a rare opportunity to grow food and medicine while learning, deepening, and returning to the skills of our ancestors from around the world. The incubator farm is collectively held in a land trust. The incubator farm provides access to a portion of the land for beginning farmers to autonomously and cooperatively grow crops, hone skills, launch their farm dreams with mentorship and cooperative support, and access to infrastructure, tools, materials, and seeds.

The Community Alliance with Family Farmers (CAFF) is a California-based nonprofit that builds sustainable food and farming systems through local and statewide policy advocacy and on-the-ground programs to initiate institutionalized change. Programming addresses current problems and challenges in food and farming systems and creates more resilient family farms, communities, and ecosystems. CAFF recognizes the historic and lasting inequities in the California food and farming system. CAFF commits to advancing racial, gender, and environmental justice in larger systems Through the proposed project, CAFF will provide AC's farmer network education and training about current state-level land access policy. In return, AC's network will provide CAFF with insight and context about the current barriers and challenges facing QTBIMPOC farmers seeking to access land and expand their business.

Since its formation, the federal government, USDA, and the Farm Service Agency (FSA) have built a system rooted in discriminatory and racist policies. These policies denied producers loans, subsidies, relief, and other assistance, resulting in a 12% decrease in Black farmers since 1920[1]. Roosevelt's Executive Order 9066 charged the FSA to place over 250,000 acres from Japanese-American farmers under the agency's jurisdiction - even after being identified as "the

---

[1]Klemperer, J. (2022, October 12). *The USDA stumbles as it attempts to address historic racism.* FoodPrint. Retrieved November 18, 2022, from https://foodprint.org/blog/usda-address-historic-racism/

most important racial minority group engaged in agriculture in the Pacific Coast region" in 1942[2]. Even more appalling is that California stole over two-thirds of its land from Indigenous people, with some receiving a $100 check as reparations in 1968[3].

It is essential to note that racist practices are not limited to just land but throughout the entirety of the industrial complex of agricultural systems. Redlining practices of the 1930s have continued to result in significant environmental justice concerns nationwide. Industrial agriculture disproportionately exposes communities of color to harmful pathogens, antibiotic-resistant bacteria, and heavy metals through pesticides and by-products of factory farming that pollute the air, land, and drinking water[4]. This generational trauma paved the way for AC to center agroecological principles to advance transformative environmental justice for its producers and community network.

It is important to recognize farm apprenticeships' significance in passing along agrarian traditions. AC seeks to circumvent the problematic model of unpaid internships, which exploit labor and exclude farming opportunities to a select few with socio-economic privilege. Most farmers we serve are first-generation beginning urban farmers who did not grow up on farms, highlighting the importance of support from experienced farmers. According to a National Young Farmers Coalition study, multigenerational farmers typically inherit family and community connections critical to their success. Additionally, these multigenerational farmers are more likely to be connected to USDA programming, local banks, suppliers, and market opportunities. The National Young Farmers Coalition found in their 2022 National Young Farmer Survey that 49% of respondents had yet to benefit from a USDA program. Sixty-eight percent of young farmers reported never or rarely receiving the technical and business support they require from the USDA. This was increased for BIPOC farmers (75%), and in particular Black farmers (77%), compared to White farmers (66%)[5]. Currently, Agroecology Commons (AC) fosters these connections and opportunities for first-generation farmers by creating networks of cooperation and mentorship through farm apprenticeships. The proposed project would expand this model to support first-generation farmers through a technical assistance program highlighting USDA and other federal resources. To improve farm and farmer viability, the proposed project will arm QTBIMPOC producers with the necessary educational opportunities, technical assistance, access, and community support required to thrive.

Since the creation of the USDA Office for Civil Rights in 1965, federal and local government agencies have tried to right these wrongs but, for the most part, have fallen short. Under the Obama administration, Tom Vilsack, the US Secretary of Agriculture, reported that reformative policies successfully eliminated systemic racism within the agency. However, investigators found this information was false, with evidence of the department advancing foreclosures, ignoring

[2] Krebs, A. V. (1992, February 2). *Bitter harvest*. The Washington Post. Retrieved November 18, 2022, from https://www.washingtonpost.com/archive/opinions/1992/02/02/bitter-harvest/c8389b23-884d-43bd-ad34-bf7b11077135/

[3] Ahtone, T. (2022, April 5). *California offers $100 million for tribes to buy back their land. it won't go far*. Grist. Retrieved November 18, 2022, from https://grist.org/indigenous/california-offers-100-million-for-tribes-to-buy-back-their-land-it-wont-go-far/

[4] Nicole, W. (2013). Cafos and environmental justice: The case of North Carolina. *Environmental Health Perspectives, 121*(6). https://doi.org/10.1289/ehp.121-a182

[5] NYFC_Admin. (n.d.). *Building a Future With Farmers 2022*. National Young Farmers Coalition. Retrieved from https://www.youngfarmers.org/

discrimination complaints, and creating a hostile work environment for marginalized employees. Unfortunately, the Trump era pushed racist extremes to the limit, with a report exposing that the Office of Civil Rights took an average of 799 days to process discrimination complaints (Huber, 2022)[6]. The backlash from white farmers and the conservative party accompanied any restorative advancement, perpetuating skepticism among farmers of color about the possibility of true restorative justice. The Biden-Harris administration has made significant strides to advance racial equity through targeted funding, but the administration cannot assume that funding alone builds farmers' trust in the agency. Truthfully, Agroecology Commons is among those skeptics but views the proposed proposal as a platform to amplify the voices of QTBIMPOC producers while providing the USDA an opportunity to advance restorative justice through three interconnected concepts - encounter, repair, transform[7]. Restorative Justice Colorado defines it as "a philosophical approach to wrongdoing that focuses on the needs of the victim, the offender, and the involved community." While the term is typically used in criminal justice reform, the principles of restorative justice provide a roadmap to transforming the relationship between the USDA and marginalized producers. The proposed project is an opportunity for the USDA to bridge a connection with AC's farmer network by developing strategically planned technical assistance workshops, listening sessions, and culturally relevant curriculum creation.

The USDA Agricultural Census identifies several agricultural characteristics, including farmer demographics, land use, growing practices, crop information, income, and expenditures. The information assists the USDA with allocating funding, conducting research, and educational and programming focus at the state level. Since 1997, the USDA has redefined what constitutes a farm to provide a comprehensive understanding of the vast diversity in operations. Until recently, the Census focused on a minimum of annual sales and acreage, specific crops, and planting schedules. The USDA discovered that the current methodology leaves significant gaps in data and identified the need to assess the landscape accurately to include small farm operations. Research shows that farm operations with socially disadvantaged farmers and ranchers (SDFR) as the principal operators are smaller than those of white farmers. Additionally, SDFRs are more likely to grow specialty crops and share information through agrarian collective community practices versus traditional recordkeeping[8]. The 2017 USDA Agricultural Census identified 838 producers operating 446 farms of 183,282 acres in Alameda County. Of those operations, roughly 70% are owners, 16% are co-owners, and 14% are land tenants. As the USDA's Equity Plan highlights, access to programs, services, land, and capital is historically rooted in systematic racism (USDA, 2022). To this end, it is unsurprising that 70% of producers are white, 62% are male, and 60% are 55 and older. Conversely, 10% are Hispanic, 3% are Asian, less than 1% are Multi-Racial or Indigenous, 1% are Black, and there is no data or recognition of Queer, Trans, and Gender Non-Conforming producers in the Census. QTBIMPOC producers operate only 15% of the total agricultural land and, it is assumed, received USDA assistance in Alameda County. The USDA's Agricultural Census has significant limitations due to its decades of inequitable

[6] Bridget Huber,   F. 15. (n.d.). *USDA takes average of 630 days to process civil rights complaints, lawmakers told.* Food and Environment Reporting Network. Retrieved November 18, 2022, from
https://thefern.org/ag_insider/usda-takes-average-of-630-days-to-process-civil-rights-complaints-lawmakers-told/

[7] *Three core elements of restorative justice.* Restorative Justice. (2022, June 14). Retrieved November 18, 2022, from
https://restorativejustice.org/what-is-restorative-justice/three-core-elements-of-restorative-justice/

[8] *Congress.* (n.d.). Retrieved from https://crsreports.congress.gov/product/pdf/R/R46969

outreach and requirements, and the proposed project aims to increase the representation of our network through the development of a data management and sharing plan(USDA, 2019).

Beginning socially disadvantaged farmers in our community face a plethora of challenges with the changing climate, corporate consolidation of agriculture, legacies of unjust land distribution, systemic racism, and limited access to resources. Our community is defined as socially disadvantaged farmers, food producers, consumers, and values-aligned market operators identifying as QTBIMPOC. Secure land tenure is vital for the wellness and viability of socially disadvantaged farmers. According to Dr. Robert Johansson, the United States Department of Agriculture's Chief Economist, young farmers and those renting land tend to be far more in debt than their assets. Without secure land tenure, farmers cannot invest in on-farm infrastructure and conservation practices critical to building soil quality, financial equity, and their businesses, or they make investments that turn into losses when land is no longer accessible to them. In an annual statewide policy survey led by Community Alliance with Family Farmers (CAFF) in 2019, climate change, affordable and nearby housing, and land tenure emerged as the three greatest priorities for all small and mid-scale farmers. In a more recent set of listening sessions with 16 urban farmers, land access emerged as the primary challenge facing urban farmers in the San Francisco East Bay Area and beyond. Land access in the surrounding Bay Area is astronomically expensive, with California's average acre of cropland costing $13,800, roughly ten times more than the national average (USDA, 2017). In Alameda County, cropland ranges from $7,200/acre to $374,000/acre. The proposed project will support Agroecology Commons in purchasing land to expand our cooperative land stewardship, a direct solution for land access for Bay Area farmers. To overcome this barrier and increase land access, the proposed project will develop an agroecologically stewarded land commons for QTBIMPOC farmers to obtain 99-year land leases, access shared equipment, and market opportunity partnerships with grocery cooperatives and farmers' markets.

This project will serve predominantly women, queer, Black, Indigenous, and people of color (BIPOC) urban farmers, who, due to systemic barriers, are often underrepresented and overburdened within agriculture. These farmers' voices and input will be utilized throughout the project and implement a shared and rotating leadership, participatory planning and budgeting, and a compensation equity process with a social justice lens. In our network of over 150 educators and beginning farmers, 90% are QTBIMPOC and reflect the diversity of the Bay Area's urban residents.

**Objectives and Outcomes**

**Objective #1:** *To increase land tenure and resource access, Agroecology Commons will expand its Farmer Mobilization Program by developing an Agroecological Cooperative Land Commons in the Bay Area.*

**Outputs:**
- Secure realtor
- Hire operations and logistics manager
- Purchase land
- Develop a cooperative governance framework

- Develop a conflict engagement and mediation plan for the land commons
- Identify criteria and develop an application for the land commons
- Develop and fill an Operations and Logistics Manager position
- Offer 5-10 farmers long-term land leases
- Develop cooperative crop planning and market planning strategy
- Learning, mentorship, and long-term land leases at the land commons
- Organize an advisory and accountability team

**Outcomes:**
- 20+ acres of land purchased to develop the land commons.
- 5-10 farmers have secure access to long-term land leases and technical assistance.
- 3 Cooperative crop plans developed.
- A 10-person advisory and accountability team formed.
- Conflict and mediation Plan
- 1 new staff positions created

**Objective #2:** *To eliminate barriers to direct-to-consumer and wholesale markets, Agroecology Commons will develop a sales/marketing position and partnerships with restaurants, farmers' markets, and grocery cooperatives in Oakland, CA, to support small-scale farmers in AC's network to have more reliable market and wholesale outlets.*

**Outputs:**

- Wholesale grocery cooperative sales strategy for Land Commons' farmers
- Direct-to-consumer sales strategy developed for Land Commons' farmers
- Secured farmers market vending spots for Land Commons and network farmers
- Training sessions conducted

**Outcomes:**
- 150 farmers will increase their understanding of post-harvest handling, local marketing strategies, and integrate at least one new marketing practice
- 5-10 land commons farmers will have direct relationships with a local market, wholesale client, or direct-to-consumer outlet for selling products
- 3 local market cooperatives will build relationships with local urban farmer
- Conduct four trainings (2x/year) for 10 farmers on marketing to local coop markets including product planning, social media training, branding, post-harvest, food safety, and delivery schedule.
- Hire/Create a position for a Sales & Marketing Manager
- Develop direct-to-consumer partnerships with 3-5 local markets, farmstand, or wholesale clients
- Develop a wholesale and direct-to-consumer sales management system

**Objective  #3:** *To connect producers to the resources they need to thrive, Agroecology Commons will work collaboratively with the USDA and other Section 1006 cooperators to expand wrap-around technical assistance to QTBIMPOC producers.*

**Outputs:**
- Conduct a Needs Assessment of AC network farmers

- Secured partnership agreements with grocery cooperatives, farmers' markets, philanthropic organizations, and educational institutions
- Host 3 listening sessions with USDA entities
- Host TA workshops with USDA entities
- Expand Agroecology Common's farmer-to-farmer skillshare network to include USDA representatives and programs for 150 participants
- Create and administer Peer-to-Peer Technical Assistance Training to 50 QTBIMPOC farmers.
- Create Business Plan
- Conduct follow-up surveys about experiences with USDA reps through the skillshares

**Outcomes**:
- 150 Farmer Needs Assessments conducted.
- 5 new partnership agreements secured for the project.
- 150 Farmers served through 6 USDA technical assistance workshops.
- 50 Newly formed partnerships with USDA entities.
- 150 Farmers learn about USDA programs available to support them.
- 50 Farmers meet with their local FSA or NRCS official, obtain a farm number, or apply for a program,
- 10 Business plans created for 10 QTBIMPOC farmers.
- AC is able to share farmer challenges accessing available USDA programs.
- 6 USDA Listening sessions for 100 farmers hosted.

**Objective #4:** *To accurately measure impact and promote replication, Agroecology Commons will develop a Data Management and Sharing Plan.*

**Outputs:**
- Identify best practices for data collection and sharing
- Qualitative and quantitative data collection
- Develop data management plan
- Develop and conduct data-sharing agreements
- Create data sharing strategic plan
- Create annual reports to share with community, 1006 cooperators, and USDA

**Outcomes:**
- 300 farmer surveys conducted
- 1 data management plan developed
- 50 farmer data-sharing agreements obtained
- 1 data-sharing strategic plan developed
- 5 data management plan evaluations conducted with advisory and accountability team
- 5 annual reports created

**Objective #5:** *To effectively disseminate information, Agroecology Commons will expand its Farmer Campus Online Learning Platform to include land access and stewardship opportunities, information about federal, state, and resources, and continued education.*

**Outputs:**
- Design curriculum for customized training plans and USDA technical assistance support

- Develop a funding opportunity and technical assistance newsletter

**Outcomes:**
- An expanded AC online education to address access to land, capital, and market opportunity strategies.
- Co-designed customized training plans and USDA support for 5-10 land commons farmers.
- 10 instructional videos created for QTBIMPOC farmers.
- 1,000 farmers reached with a newly expanded virtual curriculum.
- 60 newsletters disseminated to 400 farmer network mailing lists.

**Objective #6:** *To advance equitable programs at the state level, Agroecology Commons will partner and connect its farmers with the Community Alliance of Family Farmers (CAFF) to expand farmer participation in land equity policy education through the Land Equity Task Force.*

**Outputs:**
- Educate the California Land Equity Task Force on the land, capital, and market opportunity access needs of QTBIMPOC farmers in the Bay Area.
- Facilitate space for farmers to develop land access solutions.
- Host leadership development and education for farmers engaged in this work.

**Outcomes:**
- 6 Farmers receive policy education through the Land Equity Task Force.
- Host virtual trainings with 130 farmers to develop land access solutions and recommendations, and present these to task force members and facilitators through check-in meetings, farm tours, and any additional opportunities as they arise.

**<u>Approach</u>**

As a result of this project, at least 150 QTBIMPOC producers will gain knowledge, land access, market opportunities, or TA that will benefit their agricultural and land stewardship enterprises' launch, growth, resilience, and success. The approach of this project aims to:

- Ensure QTBIMPOC farmers secure long-term land tenure and increased market opportunities through cooperative and agroecological systems;
- Demystify and mobilize USDA's copious resources for QTBIMPOC farmers by bridging trust between USDA state offices and farmers, translating USDA jargon in communications, and engaging trusted peer educators;
- Transcend problems with USDA application, qualification, and reporting requirements and processes through farmer workshops, instructional videos, and 1:1 support;
- Ensure that the entire AC farmer network has a comprehensive entry point for support on financial, agricultural production, legal, relational, labor, marketing, land access; and
- Build long-term relationships to address QTBIMPOC farmers' emerging opportunities and concerns.

**Objective #1**: *To increase land tenure and resource access, Agroecology Commons will expand its Farmer Mobilization Program by developing an Agroecological Cooperative Land Commons in the Bay Area.*

An Agroecological Land Commons of 20 + acres will provide land access for communities that

have been systematically disenfranchised from accessing land and also create a diverse learning environment where farmers can exercise an array of ancestral land stewardship practices. The Agroecological Land Commons will expand our current incubator farm and an agricultural park where 5-10 farmers can have 99-year leases, access to shared infrastructure, market outlets, and support for their overall farming business.

| TIMELINE and ACTIVITIES | Y1 Q1 | Y1 Q2 | Y1 Q3 | Y1 Q4 | Y2 Q1 | Y2 Q2 | Y2 Q3 | Y2 Q4 | Y3 Q1 | Y3 Q2 | Y3 Q3 | Y3 Q4 | Y4 Q1 | Y4 Q2 | Y4 Q3 | Y4 Q4 | Y5 Q1 | Y5 Q2 | Y5 Q3 | Y5 Q4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Activities:** | | | | | | | | | | | | | | | | | | | | |
| The internal design process for agroecological commons and criteria. | ■ | ■ | | | | | | | | | | | | | | | | | | |
| Research existing AgParks and Incubator Programs across the county to identify best practices and gain insight into successes, challenges, and recommendations | ■ | | | | | | | | | | | | | | | | | | | |
| Conduct comparative analysis within a selected subset of AgParks and Incubator Programs in the Network of Incubator and Farmer Training | ■ | ■ | | | | | | | | | | | | | | | | | | |
| Conduct outreach to a network BAFFT graduates for participatory design process | | | ■ | | | | | | | | | | | | | | | | | |
| Prepare for the participatory design process and conduct needs assessment with farmer educators and farmer mobilization participants | | | | | ■ | ■ | | | | | | | | | | | | | | |
| Work with a real estate agent to develop land search priorities | | | ■ | | | | | | | | | | | | | | | | | |
| Purchase land | | | | ■ | | | | | | | | | | | | | | | | |
| Identify 5-10 graduates who would like to be a part of a participatory design process of the land commons | | | | ■ | | | | | | | | | | | | | | | | |
| Draft strategic plan for land use and communications agreements for land commons | | | | | ■ | ■ | ■ | | | | | | | | | | | | | |
| Identify 5-10 initial participating farmers in farmer educator and mobilization network | | | | | | | | | ■ | | | | | | | | | | | |
| Confirm participation of 5-10 Agroecological Land Commons farmers | | | | | | | | | ■ | ■ | | | | | | | | | | |
| Launch Agroecological Land Commons | | | | | | | | | | | | | | | | | | | | |
| Collect data for evaluation, reporting, and data sharing. | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |

**Objective #2:** *To eliminate barriers to direct-to-consumer and wholesale markets, Agroecology Commons will develop a sales/marketing position and partnerships with restaurants, farmers'*

*markets, and grocery cooperatives in Oakland, CA, to support small-scale farmers in AC's network to have more reliable market and wholesale outlets.*

To dismantle the obstacles that small-scale farmers in the Agroecology Commons (AC) network face in accessing direct-to-consumer and wholesale markets, Objective #2 takes a holistic approach. Recognizing the critical need for structured market access, AC is committed to developing a dedicated sales and marketing role. This position will focus on nurturing partnerships with key players in the local food ecosystem, including restaurants, farmers' markets, and grocery cooperatives within Oakland, CA. By doing so, AC aims to provide its network of small-scale farmers with more reliable and diversified outlets for their produce, ensuring their hard work finds its way to appreciative consumers and contributes to a sustainable, community-supported food system.

| TIMELINE and ACTIVITIES | Y1 Q1 | Q2 | Q3 | Q4 | Y2 Q1 | Q2 | Q3 | Q4 | Y3 Q1 | Q2 | Q3 | Q4 | Y4 Q1 | Q2 | Q3 | Q4 | Y5 Q1 | Q2 | Q3 | Q4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Activities:** | | | | | | | | | | | | | | | | | | | | |
| Conduct a needs assessment of the network of BAFFT graduates, wholesale clients, grocery cooperatives, and farmers' markets for the participatory design process of educational opportunities. | ● | | | | | | | | | | | | | | | | | | | |
| Create and Fill Sales/Marketing Position | ● | | | | | | | | | | | | | | | | | | | |
| Conduct market training on the laws and regulations governing direct marketing in California, including wholesale, farmers' markets, and farm stands. | | | | | | | | | ● | | | | ● | | | | ● | | | |
| Collect data for evaluation, reporting, and data sharing. | | | | | ● | | | | | | | | | | | ● | | | | ● |
| Conduct a needs assessment of the network of BAFFT graduates, wholesale clients, grocery cooperatives, and farmers' markets for the participatory design process of educational opportunities. | ● | ● | | | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● |

**Objective #3:** *To connect producers to the resources they need to thrive, Agroecology Commons will work collaboratively with the USDA and other Section 1006 cooperators to expand wrap-around technical assistance to QTBIMPOC producers.* In order to address and identify the gaps between farmers and government programs, we will conduct farmer engagement, network development, and listening events for the urban agriculture community. These farmer gatherings will serve as valuable unifying opportunities for farmers to connect, collaborate, and identify their needs from government entities. These conversations will focus on better understanding farmers' previous or current experience with the USDA, how it has supported their work, and how it can improve to meet urban farmer needs. We will also develop a shared working definition of urban agriculture to support the USDA's future efforts. These gatherings will also

serve as a catalyst to invigorate more robust farmer networks in each region that could facilitate greater community communication and collaboration among urban farmers and land stewards.

The success of farm businesses is linked to knowledge implementation. We are increasing the ability of farmers to acquire and disseminate knowledge. Topic area knowledge is critically important in farmer TA, so we ground our project in the foundation of farm-related courses and workshops above.  Yet, to apply these lessons, farmers need direct support to define short-term and long-term objectives to address their problems and goals. From adopting new management practices to interactions with banks, landlords, regulators, and other contacts, QTBIMPOC farmers are more successful with direct support.

| TIMELINE and ACTIVITIES | Y1 Q1 | Q2 | Q3 | Q4 | Y2 Q1 | Q2 | Q3 | Q4 | Y3 Q1 | Q2 | Q3 | Q4 | Y4 Q1 | Q2 | Q3 | Q4 | Y5 Q1 | Q2 | Q3 | Q4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Activities:** | | | | | | | | | | | | | | | | | | | | |
| Make connections with USDA representatives | X | X | X | | | | | | | | | | | | | | | | | |
| Conduct a Needs Assessment of AC network farmers | | X | X | | | | | | | | | | | | | | | | | |
| Secure partnership agreements with grocery cooperatives, farmers' markets, philanthropic organizations, and educational institutions | X | X | X | | | | | | | | | | | | | | | | | |
| Plan and host listening sessions | | | | | X | X | | | X | X | | | X | | | | X | | | |
| Create and organize TA workshops | | | | | X | X | | | X | | | | X | | | | | | | |
| Expand Agroecology Common's farmer-to-farmer skillshare network to include USDA representatives | | | | | X | X | | | | | | | | | | X | | | | X |
| Create business plans | | | | | | | | | | | | | X | X | X | | | | | |
| Conduct follow-up surveys about experiences with USDA reps through the skillshares | | | | | X | | | | | | | | | | | X | | | | X |

**Objective #4:** *To accurately measure impact and promote replication, Agroecology Commons will develop a Data Management and Sharing Plan.*
AC's data management approach includes needs assessments, participant evaluations, and outcome-based reporting. Monitoring and evaluation of stated measurable outcomes will support project completion and success.  Project stakeholders will access assessments and evaluations through Agroecology Commons' online Farmer Campus (farmercampus.com) as a free resource for all urban farmers. Agroecology Commons biannual evaluations will be used to track qualitative and quantitative progress through the assessment of written and verbal evaluations.

Following workshops, participants will be asked to complete surveys to assess learning and improve programming. In-depth needs assessments will help to find compatible matches between farm mentors and farm mentees. The advisory committee will assess and evaluate the curriculum, program design, and implementation, composed of the Agroecology Commons board and advisors. Data collected through the evaluation process will be used to assess program

strengths and shortcomings and shared with partner organizations and farms to strengthen multistakeholder urban farming organizing and collaborative initiatives.

| TIMELINE and ACTIVITIES | Y1 Q1 | Y1 Q2 | Y1 Q3 | Y1 Q4 | Y2 Q1 | Y2 Q2 | Y2 Q3 | Y2 Q4 | Y3 Q1 | Y3 Q2 | Y3 Q3 | Y3 Q4 | Y4 Q1 | Y4 Q2 | Y4 Q3 | Y4 Q4 | Y5 Q1 | Y5 Q2 | Y5 Q3 | Y5 Q4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Activities:** | | | | | | | | | | | | | | | | | | | | |
| Identify the data and metrics the project will generate | ■ | | | | | | | | | | | | | | | | | | | |
| Identify collection methods and limitations | ■ | ■ | | | | | | | | | | | | | | | | | | |
| Develop needs assessments, surveys, and data collection materials | ■ | ■ | | | | | | | | | | | | | | | | | | |
| Create data collection schedule | | | | | ■ | ■ | | | ■ | ■ | | | ■ | | | | ■ | | | |
| Create data management plan | | | | | | ■ | ■ | | | ■ | ■ | | | ■ | | | | ■ | | |
| Create data-sharing agreements | | | | ■ | | | | | | | ■ | | | | ■ | | | | ■ | |
| Develop annual reports | | | | | | | | | | | | ■ | ■ | ■ | ■ | ■ | | | | |

**Objective #5:** *To effectively disseminate information, Agroecology Commons will expand its Farmer Campus Online Learning Platform to include land access and stewardship opportunities, information about federal, state, and resources, and continued education.* Our outreach and communication strategy for this project is multifaceted and entails working with our established farmer network of the Bay Area Farmer-to-Farmer Training Program. This network of farm educators currently includes: Red H Farm, Scott Family Farm, Raised Roots, Feral Heart Farm, Soul Flower Farm, Cultural Roots Nursery, Mandela Grocery Cooperative, and Deep Medicine Circle. They support our outreach through social media, word-of-mouth recommendations, and email newsletters promoting our program. Our outreach communications are currently available in Spanish and English, we will continue to make bilingual outreach materials accessible. We use Farmer Campus, our online learning platform managed by Mighty Networks to streamline our course communications for 1,000+ participants within the Bay Area Farmer-to-Farmer Training Program. Here participants receive weekly module updates including; course content, supplemental course materials, host farm information, community agreements, and more.

According to the USDA, Farmer-to-farmer training is the best approach to TA. Through conversations, farm visits, "drive-by" observations, or more formalized lessons, peer learning can instill trust, build relationships, and provide proof of efficacy. This is especially true among historically underserved communities, where the hegemony and hierarchy of traditional "expert-based" educational models can be traumatizing and counterproductive, and the specificity of the barriers and challenges their farmers face make learning from and with each other particularly fruitful.  AC will design instructions for QTBIMPOC farmers to help traverse barriers to farming success. AC will develop 10 instructional videos covering the following topics:

- *Access to USDA:* FSA readiness w/ business plan and 2 years financials records | NRCS AMA and EQIP funding application intensives | Obtaining a farm tract number |The

importance of the Agriculture Census | USDA required accountability | Data collection processes.

- *Financial Literacy:* Farm fundraising / investing / donations | Business models and management (tools, record keeping, bookkeeping) | holistic planning, visioning, and business development | Diversifying farm income and access to markets
- *Land Access and Stewardship:* Accessing farmland through ethical long-term lease agreements or purchases | Setting up land for farming -- infrastructure planning
- *Legal, Labor, and Governance:* Taxes on the farm -- navigating state and federal taxes to save money and track progress | Hiring help on the farm, best labor practices, and legal guidance | Advocacy by farmers, for farmers - educating policymakers for local and national change | Worker-owned cooperative farm business development and training | Culturally aligned conflict resolution & mediation using transforming justice framework.

| TIMELINE and ACTIVITIES | Y1 Q1 | Q2 | Q3 | Q4 | Y2 Q1 | Q2 | Q3 | Q4 | Y3 Q1 | Q2 | Q3 | Q4 | Y4 Q1 | Q2 | Q3 | Q4 | Y5 Q1 | Q2 | Q3 | Q4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Activities:** | | | | | | | | | | | | | | | | | | | | |
| Design curriculum for customized training plans and USDA technical assistance support | | | | | ■ | ■ | | | | | | | | | | | | | | |
| Create instructional videos | | | | | ■ | ■ | | | | | | | | | | | | | | |
| Send funding opportunity and technical assistance newsletter | ■ | | | | ■ | | | | ■ | | | | ■ | | | | ■ | | | |
| Collect data | ■ | | | | ■ | | | | ■ | | | | ■ | | | | ■ | | | |

**Objective #6:** *To advance equitable policy, Agroecology Commons will partner and connect its farmer with the Community Alliance of Family Farmers (CAFF) to expand farmer participation in land equity policy engagement through the Land Equity Task Force.*

| TIMELINE and ACTIVITIES | Y1 Q1 | Q2 | Q3 | Q4 | Y2 Q1 | Q2 | Q3 | Q4 | Y3 Q1 | Q2 | Q3 | Q4 | Y4 Q1 | Q2 | Q3 | Q4 | Y5 Q1 | Q2 | Q3 | Q4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Activities:** | | | | | | | | | | | | | | | | | | | | |
| Conduct farmer outreach to recruit and identify key farmers to participate in the land equity planning effort. | ■ | | | | ■ | | | | ■ | | | | ■ | | | | ■ | | | |
| Provide farmers with educational resources on current programs and policy in place. | ■ | | | | ■ | | | | ■ | | | | ■ | | | | ■ | | | |
| Host virtual policy cohort meetings. | ■ | | | | ■ | | | | ■ | | | | ■ | | | | ■ | | | |
| Collect data | ■ | | | | ■ | | | | ■ | | | | ■ | | | | ■ | | | |

**Potential Challenges**

As the Census of Agriculture has clarified, it can be difficult to access QTBIMPOC farmers to connect them to services. The BAFFT Program continues to discover and connect with marginalized regional producers, most of whom have never contacted USDA for services. The identified farmers may lack the time and capacity to participate in training and AC will counter this by presenting most training in the winter months. The continued uncertainty caused by the

COVID-19 pandemic is an ongoing challenge. Our collective has created contingencies, including smaller in-person gatherings, outdoor locations, and clear protocols to respond to pandemic-related variabilities as they arise. Lastly, changes to the Farm Bill will impact USDA programs. In response, the partnership with CAFF will allow farmers to advocate for marginalized producers in Farm Bill policy work. Additionally, CAFF will help us analyze and navigate the resulting policy changes.

## Personnel & Resources

**AC's Experience and Leadership:** AC is a nonprofit organization in the East Bay dedicated to cultivating knowledge sharing, community action, and solidarity for agroecological land stewardship, collective healing, and justice within the food movement. Honoring that the foundation of agroecological principles comes from indigenous and peasant land-based traditions, AC envisions a future in which food and farming systems are based on cooperation, sovereignty, and global solidarity. AC currently leads the BAFFT, which has served over 180 beginning underserved farmers in the last five years, 75% of whom are urban and socially disadvantaged. AC takes a direct and long-term relationship-based approach to technical assistance and has worked with hundreds of farmers to help assess their unique challenges, needs, and opportunities. AC's staff team has diverse skill sets with advanced degrees and community experience in farmer-to-farmer pedagogies, agroecology, sustainable food systems, and over 35 years of combined education and experiential training serving underserved beginning farmers. In the educational realm, AC's approach is rooted in collaboration with practicing farmers to advance farmer-led and farmer-to-farmer learning. Ac has co-designed over 23 food systems curriculum modules, led three certificate programs, and is a founding member of Farmer Campus (farmercampus.com), an interactive, online farmer learning platform, which currently offers four online courses to farmers to over 1000 registered users: Organic Seed Production in collaboration with the Organic Seed Alliance, Farmers Build Fire Resilience, On-farm Climate Resilience, and Introduction to Agroecology.

Agroecology Commons is currently funded by the USDA Beginning Farmer and Rancher Development Program to fund the Bay Area Farmer to Farmer Training Program primarily. The Urban Agriculture and Innovation Program also funds our Farmer Mobilization Cooperative Incubator and Seed Grant Programs. We cooperate with our local Resource Conservation District in Contra Costa and have filmed videos about soil conservation on our farm. AC is currently forming a relationship with our new FSA office opening in the East Bay through our Community Alliance with Family Farmers partners.

## AC Key Personnel

**Jeneba Kilgore, Principal Administrator & Cooperative Networks Director:** Jeneba is the Co-Director of AC's Beginning Farmer and Rancher Development Program: The Bay Area Farmer to Farmer Training and Farmer Mobilization program. Jeneba has facilitated workshops for over 100 beginning farmers throughout the Bay Area. She is the online technical lead of the BAFFT's virtual classes and a lead instructor of cooperative organizing and values-aligned market collaboration. Jeneba is a former worker-owner at Mandela Grocery Cooperative. She spent the last ten years specializing in cooperative community economics and has three years of experience running a community grocery store serving low-income customers, teaching nutrition classes, and working to support urban farmers, especially Black, Indigenous, and farmers of color. Jeneba is a beginning farmer passionate about growing ancestral varieties of crops and

teaching people how to cook them.

**Leah Atwood, Farmer-to-Farmer Partnerships Director:** Leah is the Co-Director of AC Beginning Farmer and Rancher Development Program: The Bay Area Farmer-to-Farmer Training and Farmer Mobilization program. Leah has experience managing government grants and has served as a PI or key personnel on eleven USDA and CDFA applications. Over the last 15 years, she has provided technical, educational, facilitation, and interpersonal support to over 700 socially disadvantaged, beginning, and urban farmers via mentorship, workshops, and direct consultations. She co-designed BAFFT, which has served over 180 beginning and urban farmers in California. Leah has facilitated farmer-to-farmer training, mentorship programs, and mini-grants for 120 urban farmers and administered $105k directly to urban farmers for agroecological innovation, capacity building, and mentorship. In 2014 Leah co-founded and currently manages an urban goat farm and livestock mentorship program serving beginning farmers and community members. Leah is fluent in Spanish.

**Brooke Porter, Agroecology and Education Director:** Brooke is AC's Agroecology and Education Director. As a seed sower, agroecologist, and visual storyteller, she is committed to cultivating relationships of reciprocity with the land and communities. Brooke has co-administered various grants from the CDFA, USDA, and private foundations. Brooke has supported education initiatives for socially disadvantaged farmers as a lead facilitator and educator of BAFFT. Brooke has researched BAFFT and farming training programs in Brazil to expand alternative pedagogies for teaching agroecology rooted in popular education and social justice. Brooke holds a Master of Science in agroecology from the Norwegian University of Life Sciences with the Universidad de Córdoba in Spain. Brooke uses her trilingual language skills (English, Spanish, and Portuguese) to strengthen a movement for agroecology throughout the Americas. Brooke has a wide array of farming experience, from vegetable/ herbal production to animal stewardship.

**Alexa Levy, Apprenticeship and Mentorship Director:**  Alexa is a collective AC member and the Cooperative Incubator Farm Director. Their specialty within the organization is on the intersections of collective governance, ecology, community building, resilience, and mutual aid. They are a program manager, lead educator, and facilitator for the BAFFT. Alexa also has many years of experience as a project manager from vision to completion for farms nationwide. They have years of experience designing, building, and acquiring resources based on community needs and over a decade as a public school educator.

**Community Alliance of Family Farmers (CAFF)** has 40 years of experience in serving California's farmers. CAFF's programs advance systems-level change through food and farming advocacy while also carrying out on-the-ground programs that promote on-farm sustainability and sales. CAFF and Agroecology Commons (AC) have partnered to support family farms through advocacy, training, and market access.

**Jamie Fanous**, CAFF Senior Policy Advocate & Organizer, works to advance policies rooted in farmer needs and engage farmers in developing those policies. Jamie has committed nearly 10 years to sustainable food and agriculture systems ranging from on-farm technical assistance, soil health, and agriculture policy to on-farm research and data management. She holds an MS in Agriculture, Food, and Environment and an MA in Environmental Policy and Planning from

Tufts University. Jamie is committed to developing a sustainable agriculture policy rooted in social justice and equity.

## Outcome Evaluation Plan & Reporting

Our evaluation protocol documents and measures progress toward specific project outcomes and impacts, as well as the effectiveness of its systems model and project design and delivery. Findings will be articulated and shared at the formative (close of Years 1, 2, 3, and 4*)* and summative (close of Year 5*)* stages. Our comprehensive project evaluation reports will capture and document:

- Progress and significant accomplishments in achieving outputs, outcomes, and impacts, with a focus on measures of farmers' gains in knowledge, skills, decisions, and actions.
- Identify key levers and actions that aided or impeded project outcomes and success.

The evaluation plan uses a participatory evaluation framework -- a set of approaches in which participants are involved in various stages of evaluation research to build and reinforce participant trust and cohesion. We will identify an evaluation team within the land commons to further this framework as follows: refine or design key tools and processes for collaborative data analysis; review progress and findings quarterly; analyze data to confirm conclusions, identify lessons and recommend activity modifications; review formative and summative report drafts, and identify factors impacting success. Because this project employs multiple strategies to realize shared goals, the target audience, AC, and CAFF will actively participate in the evaluation as follows: (1) review overall evaluation protocols and methods; (2) input to evaluation tool development and revision; (3) collect and compile selected data using tools and processes appropriate to their work; (4) track relevant outcome data; and (5) participate in related data analysis and interpretation. We will use specific quantitative measures to document outcomes**,** accomplishments, and progress toward our desired impact. For this project, activity (output) and outcome measures will focus on QTBIMPOC farmers who are educated and trained but require key areas of TA and access. We will use our existing monitoring and evaluation systems to collect process, baseline, and post-intervention data about farmers and collaborators and educational material usage. Data will be drawn from participant intake and tracking protocols; surveys of training participants, materials, and website site users; selected group participatory method; a constituent database; website analytics; and personal interactions. We assume that QTBIMPOC farmers with more knowledge and more 1:1 support will make better decisions that will increase farm establishment and profitability. Therefore, we will gather data on qualitative and short-term outcome indicators as proxies for longer-term, structural outcomes. Improvements in knowledge, attitudes, and actions will be primarily self-reported. In addition to specific outcome-based metrics and farmer stories, our qualitative component will address several process questions. How and to what extent does our collective, holistic approach provide effective pathways for farmers to transcend barriers to success? What are our collective's roles and growth potential to generate systems-level impacts in response to farmer challenges? Our evaluation plan will measure project outputs and outcomes, assess the effectiveness of the project approach, and generate knowledge to enrich the learning of all participants that can be shared with the wider field.

**Key Outcomes for Objective 1:**
- Secure realtor
- Hire operations and logistics manager

- Purchase land
- Develop a cooperative governance framework
- Develop a conflict engagement and mediation plan for the land commons
- Identify criteria and develop an application for the land commons
- Develop and fill an Operations and Logistics Manager position
- Offer 5-10 farmers long-term land leases
- Develop cooperative crop planning and market planning strategy
- Learning, mentorship, and long-term land leases at the land commons
- Organize an advisory and accountability team

| Primary Beneficiaries: | Performance Metrics: | Targets: |
|---|---|---|
| - AC<br>- QTBIMPOC farmers | -# of acres purchased<br>-# of farmer land leases and TA<br>-# of advisory team members<br>-# of crop plans developed<br>-# of positions created<br>-# of plans created | -20+ acres of land purchased<br>-5-10 farmers secure land and TA access<br>-3 Cooperative crop plans<br>-10 person advisory team<br>-1 positions created<br>-2 commons plans created |

**Key Outcomes for Objective 2:**
- Wholesale grocery cooperative sales strategy for Land Commons' farmers
- Direct-to-consumer sales strategy developed for Land Commons' farmers
- Secured farmers market vending spots for Land Commons and network farmers
- Training sessions conducted

| Beneficiaries: | Performance Metrics: | Targets: |
|---|---|---|
| - AC farmer's network<br>- Grocery cooperatives<br>- Farmers' Markets (FM) | -# farmers with increased knowledge of marketing<br>-# farmers with direct market access<br>-# of farmers vending at FMs<br>-# of grocery cooperatives that secure relationships with farmers<br>-# of field and market days<br>-# of farmers that attend market and field days<br>-# of trainings conducted | -150 farmers will increase their understanding of post-harvest handling, local marketing strategies, and integrate at least one new marketing practice<br>- 5-10 land commons market outlets<br>-3 local market cooperatives relationships |

| | | - Conduct four trainings<br>- 1 Sales and Marketing Manager hired<br>- Develop direct-sales partnerships with 3-5<br>-Develop a sales management system |
|---|---|---|

**Key Outcomes for Objective 3**
- Conduct a Needs Assessment of AC network farmers
- Secured partnership agreements with grocery cooperatives, farmers' markets, philanthropic organizations, and educational institutions
- Host 3 listening sessions with USDA entities
- Host TA workshops with USDA entities
- Expand Agroecology Common's farmer-to-farmer skillshare network to include USDA representatives and programs for 150 participants
- Create and administer Peer-to-Peer Technical Assistance Training to 50 QTBIMPOC farmers.
- Create Business Plan
- Conduct follow-up surveys about experiences with USDA reps through the skillshares

| Beneficiaries: | Performance Metrics: | Targets: |
|---|---|---|
| - AC<br>- AC network of farmers<br>- QTBIMPOC farmers in CA<br>- USDA entities<br>- Newly secured partners | -# of needs assess. Conducted<br>-# of partnerships secured<br>-# of farmer relationships with USDA<br>-# of farmers receive USDA TA<br>-# of TA workshops<br>-# of farmers that learn about USDA programs<br>-# farms that obtain tract number or apply for the program<br>-# of business plans created<br>-# of listening sessions with USDA<br>-# of farmers attend USDA listening sessions<br>-# of follow-up surveys | -150 Farmer Needs Assessments conducted.<br>-5 new partnership agreements secured<br>-150 Farmers served through TA workshops<br>-6 USDA TA workshops.<br>-50 Newly formed farmer partnerships with USDA entities.<br>-150 Farmers learn about USDA programs<br>-50 Farmers obtain a farm number, or apply for a program,<br>-10 Business plans<br>-6 USDA Listening sessions<br>-100 farmers attend listening sessions<br>-200 follow-up surveys |

**Key Outcomes for Objective 4**
- Identify best practices for data collection and sharing
- Qualitative and quantitative data collection
- Develop data management plan (DMP)
- Develop and conduct data-sharing agreements
- Create data sharing strategic plan
- Create annual reports to share with community, 1006 cooperators, and USDA

| Beneficiaries: | Performance Metrics: | Targets: |
|---|---|---|
| <ul><li>AC</li><li>AC network of farmers</li><li>QTBIMPOC farmers in CA</li><li>USDA entities</li></ul> | -# of surveys conducted<br>-# of data plans created<br>-# of data sharing aggreements<br>-# of data-sharing DMPs created<br>-# of DMP evaluations<br>-# of annual reports | -300 farmer surveys conducted<br>-1 data management plan developed<br>-50 farmer data-sharing agreements obtained<br>-1 data-sharing strategic plan developed<br>-5 data management plan evaluations<br>-5 annual reports created |

**Key Outcomes for Objective 5**
- Design curriculum for customized training plans and USDA technical assistance support
- Develop a funding opportunity and technical assistance newsletter

| Beneficiaries: | Performance Metrics: | Targets: |
|---|---|---|
| <ul><li>AC</li><li>AC network of farmers</li><li>QTBIMPOC farmers in CA</li><li>USDA entities</li></ul> | -# of farmers receive customized training plans<br>-# of instructional videos created<br>-# of farmers reached<br>-# of newsletters sent<br>-# of DMP evaluations<br>-# of farmers receive newsletter | -5-10 land commons farmers receive plans<br>-10 instructional videos created<br>-1,000 farmers reached with a newly expanded virtual curriculum.<br>-60 newsletters<br>-400 farmers receive newsletter |

**Key Outcomes for Objective 6**

- Educate the California Land Equity Task Force on the land, capital, and market opportunity access needs of QTBIMPOC farmers in the Bay Area.

18

- Facilitate space for farmers to develop land access solutions.
- Host leadership development and education for farmers engaged in this work.

**Outcomes:**

- 15 Farmers receive policy education through the Land Equity Task Force.
- Host virtual trainings with 130 farmers to develop land access solutions and recommendations, and present these to task force members and facilitators through check-in meetings, farm tours, and any additional opportunities as they arise.

| Beneficiaries: | Performance Metrics: | Targets: |
|---|---|---|
| <ul><li>AC</li><li>AC network of farmers</li><li>QTBIMPOC farmers in CA</li><li>USDA entities</li><li>CAFF</li></ul> | -# of farmers receive policy education<br>-# of farmers receive virtual training | -15 farmers receive policy education<br>-130 farmers attend virtual trainings |

## Management and Partnership Plan

AC has utilized cooperative development systems to manage partnerships and roles successfully. Our cooperative governance practices include shared and rotating leadership, participatory planning and budgeting, and a compensation equity process with a social justice lens.

**Roles and Commitment**

**Alexa Levy, Apprenticeship and Mentorship Director,** will support the AC farmer network, land common farmers, and AC staff as the Project Director. Alexa will commit 60% of their time to providing mentorship, technical assistance, land commons training, data collection, and educational curriculum development. Additionally, Alexa will lead the recruitment of and outreach to AC's farmers network and be the point of contact for the advisory and evaluation team.
**Leah Atwood, Farmer-to-Farmer Partnerships Director,** will develop the partnership with markets, grocery cooperatives, and USDA representatives. Leah will commit 36% of their time to ensuring the AC network is prioritized throughout the project and work with the USDA on how to listen and engage QTBIMPOC farmers effectively. Additionally, they will develop the data management and data-sharing plans/schedules/agreements, assessments, and surveys, assist in the curriculum development, and work with the newly appointed Logistics Manager to organize skillshares, listening sessions, and workshops. In collaboration with the advisory and evaluation team, Leah will create all of the evaluation reports and submit to the USDA.
**Jeneba Kilgore, Sales & Marketing Manager**, will commit 32% of their time to lead efforts in creating and implementing effective sales strategies and marketing campaigns, focusing on expanding market access and building strong partnerships with restaurants, farmers' markets, and grocery cooperatives.
**Brooke Porter, Education & Onboarding,** will commit 20% of their time to support the

19

operations plan, farmer recruitment, and education for the land commons farmers. Her responsibilities will include developing comprehensive educational programs and facilitating the onboarding process for new farmers joining the land commons initiative.

**Lazzlo Jenkins, Land Commons Operations Manager:** The appointed Land Commons Operations Manager will assist in developing and maintaining the operational side of the Land Commons. This manager will commit 60% of their time to managing the day-to-day project administration, including accounting, purchasing, communications, grant administration, and human resources tasks.

**Jamie Fanous**, **CAFF Senior Policy Advocate & Organizer**, will spearhead the organization of the project's Land Equity Task Force. Jamie will work with Alexa Levy to recruit task force participants and organize the educational and meeting schedule (250 hours per year). She will oversee all data collection procedures for the Task Force objective.

**Data Management**

**Data Type:** Through this project, AC will develop new and enhanced curricula, education materials, training products, and outreach materials in digital formats such as Google documents/folders, video content, and audio recordings. We will also collect digital data on attendance, participation, outcomes, and outputs through attendance trackers, assessment questionnaires, surveys, meeting minutes, observation, and interviews.

**Data Format:** Data will be collected in Google documents such as Sheets, Docs, and Forms that are free, accessible, and widely used among our staff, partners, consultants, and target audience. They are easily converted into plain text and comma-separated values for sharing and archiving.

**Data Storage and Preservation:** This project will produce approximately 2 TB of data, approximately 40% raw data, 50% processed data, and 10% reports. This volume is well within the data storage capacity of our current Google Drive admin account, where it will be stored during the project. The Project Director will back up all data produced and stored on Google Drive on a dedicated external hard drive. No detailed personal data unless a data-sharing agreement is signed, and politically sensitive information or trade secrets will be collected. Given the volume and minimal security concerns, a data repository is unnecessary for this project, and data will be retained for at least ten years on Google Drive as well as on the external hard drive dedicated to this purpose.

**Data Sharing and Public Access:** Most processed data and all reports will be available to the public through USDA's FarmAnswers.org by the close of the grant period, and all processed data will be submitted through the Results Verification System annually. We will anonymize the data to protect confidentiality and privacy.

**Roles and Responsibilities:** The Project Director will spearhead the Data Management Plan implementation. The project budget's personnel and indirect cost allocations are sufficient for this implementation.