**IN THE UNITED STATES COURT DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| URBAN SUSTAINABILITY DIRECTORS NETWORK et al., | |
| *Plaintiffs*, | Case No. 1:25-cv-01775-BAH |
| v. | |
| UNITED STATES DEPARTMENT OF AGRICULTURE, BROOKE ROLLINS, et al., | |
| *Defendants*. | |

**PLAINTIFFS' COMBINED REPLY IN SUPPORT OF THEIR MOTIONS FOR A
PRELIMINARY INJUNCTION AND FOR EXPEDITED DISCOVERY**

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................. 1

I.   THIS COURT HAS SUBJECT MATTER JURISDICTION OVER PLAINTIFFS' CLAIMS. 1

A. Grant Agreements Are Not Contracts. .................................................................. 2

B. Plaintiffs' Claims Rest on Rights Found Outside the Grant Agreements and Request Non-Contractual Remedies. ..................................................................................... 3

   i.   Plaintiffs' claims depend on the interpretation of statutes, regulations, and constitutional provisions, not the agreements with Defendants. ............................... 4

   ii.  The relief plaintiffs seek is not contractual. ....................................................... 6

C. *Department of Education v. California* Does Not Change the Outcome. ............................. 7

II.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. ........................................... 8

A. Defendants' Actions Violate the APA. ................................................................. 9

   i.   Defendants' policy and practice is a discrete, final agency action. ..................... 9

   ii.  The terminations are not committed to Defendants' discretion. ......................... 11

   iii. Defendants' terminations are contrary to their own regulations. ...................... 12

B. Defendants' Actions Violate the Fifth Amendment. ............................................. 15

C. Defendants' Actions Violate Separation of Powers, Are Contrary to Law, and Are Ultra Vires. ........................................................................................................... 17

III. PLAINTIFFS HAVE SUFFERED, AND WILL CONTINUE SUFFERING, IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION ............................................................ 19

IV. THE BALANCE OF EQUITIES AND PUBLIC INTEREST HEAVILY FAVOR PLAINTIFFS. ........................................................................................................ 21

V.  THE COURT SHOULD ORDER DEFENDANTS TO CEASE THEIR UNLAWFUL POLICY AND PRACTICE WITHOUT DELAY OR BOND. ................................................ 22

VI. EXPEDITED DISCOVERY COULD ASSIST THE COURT WITH RULING ON JURISDICTION, THE MOTION FOR PRELIMINARY RELIEF, AND THE SCOPE OF ANY SUCH RELIEF ............................................................................................. 23

CONCLUSION ................................................................................................................ 25

**INTRODUCTION**

The Administration directed Defendants to eliminate support for all government assistance related to climate, diversity, equity, and inclusion. Defendants do not dispute that in response, they used form letters to terminate millions of dollars of federal grants to hundreds of nonprofit organizations, businesses, municipalities, and states intended to benefit communities across the country. Unlike in other similar cases, Defendants do not even pretend that these terminations involved individualized review or reasoned decision-making.

Defendants' sweeping policy ignores that the resulting terminations violated multiple statutory, regulatory, and constitutional provisions. Defendants acted with callous and blatant disregard for the grave harms caused by their actions to Plaintiffs, other grantees, and the public. Accordingly, Plaintiffs are entitled to preliminary injunctive relief.

Defendants' arguments do nothing to change this. Their defense depends upon a mischaracterization of Plaintiffs' claims, a misunderstanding of the difference between grants and contracts, and misrepresentations of their statutory and constitutional obligations. This Court should not be taken in. It should grant Plaintiffs' motion and immediately vacate and set aside the entirety of Defendants' unlawful and harmful policy and practice.

**I.     THIS COURT HAS SUBJECT MATTER JURISDICTION OVER PLAINTIFFS' CLAIMS.**

Defendants attempt to avoid the merits of Plaintiffs' claims by characterizing this case as one "based on contracts," and arguing that this Court lacks jurisdiction. Defs.' Br. 11, Dkt. No. 22. To try to bolster this mischaracterization, Defendants reference "contract" nearly *fifty* times in their brief. Despite their best efforts, Defendants cannot magically transform Plaintiffs' claims into something they are not, and their contentions do not survive scrutiny, for three reasons. *First*, by definition, grant agreements such as Plaintiffs' are not contracts. *Second*, Plaintiffs'

claims depend not on the terms and conditions of their grant agreements, but rather on constitutional and statutory provisions. And *third*, the type of relief Plaintiffs seek is not of the kind available for contracts, but rather is equitable in nature. For these reasons, jurisdiction lies in this Court.

### A. Grant Agreements Are Not Contracts.

As an initial matter, the grants awarded to Plaintiffs are, by definition, not contracts, so Defendants' argument that "the Court of Federal Claims [has] exclusive jurisdiction over such claims based on contracts" collapses. Defs.' Br. 11. As this Court recently explained, there is a difference between a contract—which is for the procurement of goods and services and requires consideration that "must render" a "tangible and direct" "benefit to the government, and not merely a detriment to the contractor"—and a grant—which "transfer[s] a thing of value to the . . . recipient to carry out a *public purpose* of support or stimulation authorized by a law of the United States *instead of* acquiring . . . property or services for the direct benefit or use of the United States Government." *Am. Ctr. for Int'l Lab. Solidarity v. Chavez-Deremer*, No. 25-1128 (BAH), 2025 WL 1795090, at *14 (D.D.C. June 30, 2025) ("*ACILS*") (Howell, J.) (cleaned up); *see also* 2 C.F.R. § 200.1 (2024) (defining "grant agreement"); 31 U.S.C. § 6101(3) (defining federal "assistance"). Congress has made clear its intent to "distinguish Federal assistance relationships from Federal procurement relationships." *ACILS*, 2025 WL 1795090, at *14 n.5 (citation omitted).[1]

Defendants nonetheless insist Plaintiffs' agreements "are prototypical contracts." Defs.' Br. 13. Yet, Defendants fail to identify any form of consideration provided to the Government

---

[1] *Compare to* 48 C.F.R. § 2.101 (2025) (defining "contract" as "a mutually binding legal relationship obligating the seller to furnish the supplies or services (including construction) and the buyer to pay for them").

that would render these grant agreements contracts.[2] This is not surprising, given the purpose of grants. By awarding "grants" rather than "contracts," Defendants made a conscious decision to enter a "Federal assistance" relationship with Plaintiffs, not a "Federal procurement" one.[3] *ACILS*, 2025 WL 1795090, at *14 n.5. Lacking the requisite consideration, Plaintiffs' grants simply are not "contracts."

### B. Plaintiffs' Claims Rest on Rights Found Outside the Grant Agreements and Request Non-Contractual Remedies.

Even if Plaintiffs' agreements were contracts (they are not), the caselaw is clear that just because a case involves a contract, this does not somehow "trigger some mystical metamorphosis, automatically transform[ing] an action into one on the contract and depriv[ing] the court of jurisdiction it might otherwise have." *ACILS*, 2025 WL 1795090, at *12 (cleaned up). Indeed, "the D.C. Circuit has explicitly rejected the broad notion that any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act." *Id*. (cleaned up); *see also Green & Healthy Home Initiatives v. U.S. Env't Prot. Agency*, No. 25-cv-1096-ABA, 2025 WL 1697463, at *12 (D. Md. June 17, 2025) ("*GHHI*") ("[T]he fact that Plaintiffs' complaint refers to contractual terms is not determinative; contract issues may arise in various types of cases where the action itself is not

---

[2] The closest Defendants come to referencing some sort of "consideration" is that Plaintiffs have to comply with "obligations." Defs.' Br. 13. As the Court of Federal Claims has explained, this is not sufficient. Rather, "[i]n the context of government contracts . . . consideration must render a benefit to the government, and not merely a detriment to the contractor." *St. Bernard Parish Gov't v. United States*, 134 Fed. Cl. 730, 735 (2017) (ellipsis in original) (quoting *Metzger, Shadyac & Schwarz v. United States*, 12 Cl. Ct. 602, 605 (1987)). Given it is the *public* that benefits from Plaintiffs' grants, these grants do not qualify as "contracts."

[3] Urban Sustainability Directors Network's (USDN) award is labeled a "cooperative agreement" (Brown Decl. Ex. C), a term defined nearly the same as "grant agreement," and to which this analysis applies with the same force. *See* 31 U.S.C. §§ 6304, 6305; 2 C.F.R. § 200.1 (defining same).

3

founded on a contract.") (cleaned up). Instead, courts look not to whether a contract is involved, but rather to "the source of the rights" and the "type of relief sought (or appropriate)." *Crowley Gov't Servs. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106 (D.C. Cir. 2022) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)). Both the source of rights and the relief sought here are non-contractual.

### i. Plaintiffs' claims depend on the interpretation of statutes, regulations, and constitutional provisions, not the agreements with Defendants.

Where "a plaintiff's claim depends on interpretations of statutes and regulations rather than the terms of an agreement negotiated by the parties, the claim is not in essence contractual." *ACILS*, 2025 WL 1795090, at *13 (quoting *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817, at *12 (D.C. Cir. May 3, 2025) (Pillard, J., dissenting from grant of stay pending appeal)); *GHHI*, 2025 WL 1697463, at *12 (noting that "although Plaintiffs' grant agreements gave them certain contractual rights. . . their claim is that EPA has violated the APA, the Constitution, and OMB regulations," and "*those* are the sources of rights that are pertinent to this case"). Consistent with this, claims that seek to enjoin federal officials from acting unconstitutionally belong in federal district courts. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010); *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949); *see also Strickland v. United States*, 32 F. 4th 311, 363–66 (4th Cir. 2022).

On these bases, numerous Courts, including this one, have asserted jurisdiction over cases involving terminations of grants and cooperative agreements.[4] Indeed, the en banc D.C.

---

[4] *See, e.g.*, *ACILS*, 2025 WL 1795090, at *20 (holding that "plaintiffs' claims are not contract claims against the federal government within the exclusive jurisdiction of the Court of Federal Claims, and subject-matter jurisdiction may therefore be exercised by this Court"); *see also GHHI*, 2025 WL 1697463, at *12; *Am. Bar Ass'n v. U.S. Dep't of Just.*, No. 25-cv-1263 (CRC), 2025 WL 1388891, at *5 (D.D.C. May 14, 2025); *Climate United Fund v. Citibank, N.A.*, No. 25-cv-698 (TSC), 2025 WL 1131412, at *9–12 (D.D.C. Apr. 16, 2025); *La. Delta Serv. Corps v.*

Circuit recently adopted this view, as set forth by Judge Pillard in a previous dissent from a Circuit panel decision rejecting jurisdiction. *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1521355, at *1 (D.C. Cir. May 28, 2025) (adopting Pillard, J. dissent in *Widakuswara*, 2025 WL 1288817).[5]

Plaintiffs' claims are no different. Plaintiffs assert that Defendants engaged in a policy and practice of terminating grants *en masse* in a manner contrary to regulatory, statutory, and constitutional provisions. *See, e.g.*, First Am. Compl. ¶¶ 1–7, 132–35 ("FAC"), Dkt. No. 10. None of Plaintiffs' claims depend on whether the grants were breached, but rather on whether Defendants' policy and practice of terminating the grants violated statutory or constitutional provisions. FAC ¶¶ 174–239 (due process clause (counts 1 and 2); APA (counts 3, 4, and 5); separation powers (count 6); and ultra vires action (count 7)). For example, a core aspect of the parties' dispute is whether Defendants have the power to terminate grants based on never-before-heard-of policies articulated by the new Administration. *E.g.*, Defs.' Br. 24–25. The existence of that authority in no way implicates the terms or conditions of the grants. Nor do the questions of whether Defendants' policy is unlawful because it (admittedly) fails to provide pre-deprivation

---

*AmeriCorps*, No. 25-378-JWD-RLB, 2025 WL 1787429, at *16–22 (M.D. La. June 27, 2025); *Elev8 Baltimore, Inc. v. AmeriCorps*, No. MJM-25-1458, 2025 WL 1865971, at *12 (D. Md. July 7, 2025); *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, No. 1:25-cv-00097-MSM-PAS, 2025 WL 1116157, at *14 (D.R.I. Apr. 15, 2025); Pls.' Br. ISO Mot. Prelim. Inj. 19 n.21 [hereinafter Pls.' Br.], Dkt. No. 14-1.

[5] Defendants' statement that the D.C. Circuit's decision in *Widakuswara* supports its position is both confusing and unconvincing. *See* Defs.' Br. 12 n.1. Defendants admit that the decision upon which it relies was later vacated, but ignores the fact that the basis for vacatur was the panel's rejection of the prior jurisdictional analysis and conclusion. And Defendants overlook that application of the later decision to the facts here lead to the inexorable conclusion that, like the claims in *Widakuswara*, Plaintiffs' claims also depend on interpretations of statutes, regulations, and constitutional provisions and that therefore, jurisdiction is appropriate here.

process, or whether the policy and practice is contrary to statutory mandates.[6] Accordingly, it would "be quite extraordinary to find that [P]laintiffs' claims are contractual" where they "do not at all depend on whether the term of particular awards were breached." *ACILS*, 2025 WL 1795090, at *13.[7]

>    ii.    **The relief plaintiffs seek is not contractual.**

The type of relief sought here also underscores why these claims are not contractual and must be heard in district court. In this case, Plaintiffs seek equitable relief, including declaratory and injunctive relief against Defendants' terminations pursuant to their policy and practice, and an order vacating and setting aside terminations made pursuant to the unlawful policy and practice. FAC at 61 (Requests for Relief).[8] The requested relief "resembles neither the explicitly contractual remedy of specific performance nor the prototypical contract remedy of money

---

[6] One subset of claims may require the Court to glance at the agreements: the parties dispute over whether Defendants provide sufficient notice of the regulations under which Defendants could terminate the awards. That is not enough to render that dispute contractual. *Am. Bar Ass'n*, 2025 WL 1388891, at *5 (claim must be "at its essence contractual" (cleaned up)); *La. Delta Serv. Corps*, 2025 WL 1787429, at *20 (finding the source of the rights remains statutory where "terms and conditions direct the organizations back to the same regulatory provisions"). The parties do not dispute the terms of the agreements, but rather what regulations mean when they require "clear[] and unambiguous[]" notice. Defs.' Br. 24 (citing 2 C.F.R. § 200.340(b) (2024)).

[7] In arguing otherwise, Defendants mischaracterize (or misunderstand) this Court's holding in *Pippenger v. U.S. DOGE Service*, No. 25-cv-1090 (BAH), 2025 WL 1148345, at *5 (D.D.C. Apr. 17, 2025), taking the quoted language out of context. Defs.' Br. 15. This Court did not hold that *Department of Education v. California*, 145 S. Ct. 966 (2025), "deprived" it of jurisdiction to hear plaintiffs' claims, but rather noted that the recent Supreme Court ruling "may" do so and that therefore, plaintiffs did not satisfy the heightened standard required for a Temporary Restraining Order. *Pippenger*, 2025 WL 1148345, at *5 (citing *Dep't of Educ.*, 145 S. Ct. at 968). Tellingly, Defendants entirely ignore this Court's more recent decision in *ACILS*, 2025 WL 1795090, at *19–20, which distinguished *Department of Education v. California* when presented with claims similar to those at issue here.

[8] As discussed below, Plaintiffs acknowledge the intervening Supreme Court decision that limits the scope of the equitable relief the Court can grant. However, that does not change the nature of the relief Plaintiffs seek.

damages—the two types of relief that are specific to actions that sound in contract." *ACILS*, 2025 WL 1795090, at *18 (cleaned up).

Contrary to Defendants' arguments, *see* Defs.' Br. 14, "[t]he fact that such relief, if granted, might result in the government paying money to plaintiffs does not change the character of the relief sought." *Id.*; *see also Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (per curiam) ("[A] district court's jurisdiction is not barred by the possibility that an order setting aside an agency's action may result in the disbursement of funds." (cleaned up)).

Moreover, the type of relief Plaintiffs seek—equitable, prospective, nonmonetary relief, and vacatur of terminations made pursuant to unlawful agency action—is the very type of equitable relief the Court of Federal Claims is powerless to grant. *See Widakuswara*, 2025 WL 1288817, at *13. "[A] federal district court cannot be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the Court of Federal Claims," given "[t]here cannot be exclusive jurisdiction under the Tucker Act if there is no jurisdiction under the Tucker Act." *ACILS*, 2025 WL 1795090, at *11 (cleaned up).

In sum,

> [S]o long as an action brought against the United States or an agency thereof is not one that should be classified from the outset as a "contract action" for Tucker Act purposes, the remedies sought are also not contract-related, and the mere fact that an injunction would require the same government restraint that specific (non)performance might require in a contract setting is an insufficient basis to deny a district court the jurisdiction otherwise available and the remedial powers otherwise appropriate.

*ACILS*, 2025 WL 1795090, at *19 (quoting *Megapulse*, 672 F.2d at 971) (cleaned up).

### C. *Department of Education v. California* Does Not Change the Outcome.

Defendants contend—without addressing this Court's subsequent decision rejecting their position—that the Supreme Court's four-paragraph, per curiam order in *Department of*

*Education v. California*, 145 S. Ct. 966 (2025), undoes the rules and analysis above. This is plainly false. To start, *Department of Education*, which addressed only Administrative Procedure Act ("APA") claims, has no bearing on Plaintiffs' constitutional claims. 145 S. Ct. at 968; *see also Widakuswara*, 2025 WL 1288817, at *13 (noting that the *Department of Education* "plaintiffs raised no constitutional claim"). Moreover, central to the decision in *Department of Education* was that fact that the appellate court determined that plaintiffs placed "the terms and conditions of each individual grant award . . . at issue," *California v. U.S. Dep't of Educ.*, 132 F.4th 92, 96–97 (1st Cir. 2025). By contrast, as detailed *supra*, Plaintiffs here do not depend on any term or condition of the underlying grants, but rather center on whether Defendants violated constitutional, statutory, and regulatory provisions when enacting their policy and practice of terminating Plaintiffs' grants.

For this reason, Plaintiffs' claims, like those at issue in *Widakuswara* and *ACILS*, are more analogous to those in *Department of State v. AIDS Vaccine Advocacy Coalition*, 145 S. Ct. 753 (2025). There, like here, plaintiffs "claimed a right to be free from government action—the wholesale termination of the plaintiffs' grant funding—they claimed exceeded the authority conferred by statute and the Constitution," and "their claims did not depend on whether their contracts were breached, but on whether the agency's policy directives were unlawful in the face of federal statutes appropriating funds for specific purposes." *Widakuswara*, 2025 WL 1288817, at *14 (Pillard, J., dissenting). That is precisely the case here.

Accordingly, Plaintiffs' claims properly belong in federal district court.

## II.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

Turning to the merits, there is a strong likelihood that Plaintiffs will prevail on each of their claims, thereby warranting preliminary relief.

## A. Defendants' Actions Violate the APA.

Defendants suggest Plaintiffs are unlikely to prevail under the APA based on three fallacies. *First*, they mischaracterize the agency action to claim it is not discrete or final. Defs.' Br. 17–20. *Second*, they assert unreviewable discretion based on irrelevant authority. *Id.* at 22. *Third*, they misinterpret the regulations governing their grant authority to claim they acted consistent with the law. *Id*. at 23–26. And they do all this while completely disregarding Plaintiffs' arguments that Defendants acted arbitrarily and capriciously. Plaintiffs will prevail.

### i.       *Defendants' policy and practice is a discrete, final agency action.*

Defendants argue Plaintiffs cannot challenge the policy and practice because it consists of "a series of grant terminations," some ongoing, so there is no discrete, final agency action. Defs.' Br. 17–18. Yet, Plaintiffs do not challenge the consequences of Defendants' policy to unlawfully terminate grants, but rather the policy itself. And it is the policy itself—which even Defendants acknowledge exists, *see* Defs.' Br. 6 (describing the Secretary's directive to "terminate[] in whole or in part, or otherwise modif[y]" those "[g]rants that are inconsistent with the Department's priorities")—that is a discrete, final agency action.[9]

Defendants' own cited authority supports Plaintiffs. *Lujan v. National Wildlife Federation*, 497 U.S. 871, 890 n.2 (1990), provides that if there is "some specific order . . . applying some particular measure across the board" that "can of course be challenged under the APA by a person adversely affected," thereby affecting the "entire" program. Following this logic, courts recently

---

[9] Notably, Defendants acknowledge their argument has no bearing on "the termination of [Plaintiffs'] own grants," which are discrete and final. Defs.' Br. 20; *see also Thakur v. Trump*, No. 25-CV-04737-RFL, 2025 WL 1734471, at *16 (N.D. Cal. June 23, 2025) (explaining "Defendants do not contest that the individual grant terminations are final agency actions" and stating plaintiffs can "challeng[e] a number of discrete final agency actions all at once"). Thus, even if Defendants' characterization were correct, Plaintiffs are still entitled to relief.

explained that where Defendants likely "adopted a categorical policy of executing grant terminations via form letters that referenced only an unexplained change in agency priorities"— exactly what Plaintiffs contend—that "is a final agency action" that is reviewable. *Thakur v. Trump*, No. 25-CV-04737-RFL, 2025 WL 1734471, at *16 (N.D. Cal. June 23, 2025); *see also Elev8 Baltimore, Inc. v. AmeriCorps*, No. MJM-25-1458, 2025 WL 1865971, at *18 (D. Md. July 7, 2025) ("categorical decision" to "either [] eliminate or reduce" is a "final," "discrete" agency action); *New York v. Kennedy*, No. 25-CV-196-MRD-PAS, 2025 WL 1803260, at *12 (D.R.I. July 1, 2025) ("communication that foists mass terminations" is "discrete," final agency action).

Defendants' analogy between this case and the "land withdrawal review program" held unchallengeable in *Lujan* is misplaced—that was "simply the name by which petitioners [] occasionally referred" to "all aspects" of the "constantly changing [] operations" of the agency regarding classifying and developing public lands, not any specific policy. 497 U.S. at 890 & n.2. And the additional authority on which Defendants rely, *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006), is likewise inapposite, as it merely reiterates that "generalized complaints about agency behavior" are not reviewable.

Accordingly, Defendants ultimately agree that a policy with numerous consequences is reviewable, but they claim this one is not because it is "preliminary." Defs.' Br. 19. Where, as here, an agency "began sending termination letters with the same type of language within weeks of each other . . . a court is not required to exhibit a naïveté from which ordinary citizens are free, and may infer" the existence of a "categorical policy" that is in no ways "tentative or non-final." *Thakur*, 2025 WL 1734471, at *16 (cleaned up). Were the Court to have any doubt about the existence of such a policy, it should order the discovery Plaintiffs requested—precisely why

Plaintiffs filed their motion for expedited discovery alongside their request for preliminary relief. *See infra*.

Defendants also suggest that because "Plaintiffs' claims of injury" result from their terminations, they cannot challenge the broader policy. Defs.' Br. 20. This Court recently rejected this reasoning, noting that "[t]his framing of the issue presupposes . . . that each grant termination resulted from an individual agency decision." *ACILS*, 2025 WL 1795090, at *23 n.8. Where instead there is an "over-arching decision" that "result[ed] in termination[s]," "plaintiffs are correct, they may challenge that decision, in its entirety." *Id.*

### ii.    The terminations are not committed to Defendants' discretion.

Next, Defendants claim unbridled discretion based on their authority to *enter into* grants, Defs.' Br. 22–23, misdirecting from the fact that this case is about their power to *terminate* grants. As then-Judge Jackson explained, the APA's exclusion from review of discretionary actions is "very narrow" and exists only where "a court would have no meaningful standard against which to judge the agency's" action. *Pol'y & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62, 73 (D.D.C. 2018). It does not apply in cases like this, where agencies "cabin their own discretionary funding determinations by generating formal regulations or other binding policies that provide meaningful standards for a court to employ when reviewing agency decisions under the APA." *Id.* at 76; *see also Elev8 Baltimore*, 2025 WL 1865971, at *21 ("[E]ven where action is committed to absolute agency discretion by law, courts have assumed the power to review allegations that an agency exceeded its legal authority, acted unconstitutionally, or failed to follow its own regulations.").

Accordingly, courts have already held that, even assuming "[d]ecisions about appropriated but not-yet-awarded funds" are unreviewable, the rules regarding terminations at issue here limit

discretion and enable judicial oversight. *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, No. 1:25-cv-00097-MSM-PAS, 2025 WL 1116157, at *16 (D.R.I. Apr. 15, 2025) (citing 2 C.F.R. §§ 200.300–200.346 (2024)); *see also California v. U.S. Dep't of Educ.*, 132 F.4th at 97 (noting that Section 200.340(a) "cabin[s] the Department's discretion as to when it can terminate," subjecting it to judicial review), *stay granted on other grounds*, *Dep't of Educ.*, 145 S. Ct. 966. This is because the regulations do "not reflect standardless discretion" unfit for review. *Thakur*, 2025 WL 1734471, at *17. Section 200.340 only "permits an agency to terminate a grant in certain circumstances" and the surrounding sections create specific procedural requirements. *Id.* (citing 2 C.F.R. §§ 200.340–200.341). These are "meaningful standard[s] by which to judge the agency's action." *Id.* (cleaned up). Under the APA, courts can force Defendants to abide by these rules.[10]

### iii.    Defendants' terminations are contrary to their own regulations.

Because Defendants cannot evade review of Plaintiffs' APA claim, the Court must consider whether Defendants acted contrary to law or arbitrarily and capriciously. Notably, Defendants do not dispute the terminations are arbitrary and capricious. *See* Pls.' Br. 29–33, Dkt. No. 14-1. On that basis alone, the Court can conclude Plaintiffs are likely to prevail. Even putting that aside, Defendants' arguments that they complied with the governing regulations are threadbare. Plaintiffs raised five violations. Defendants fail to address some and are plainly wrong on the others.

**Violations 1 and 2.** Pls.' Br. 26–27. Defendants acknowledge that to terminate under 2 C.F.R. § 200.340, at the time of the award, they had to "clearly and unambiguously specify all termination provisions" on which they could rely to terminate. Defs.' Br. 24. They also agree their

---

[10] Tellingly, Plaintiffs' counsel are not aware of a single case—among the many cases challenging Defendants' unlawful freezes and terminations—where the court has concluded these decisions are committed to agency discretion and thus are unreviewable. Certainly, Defendants cite no such authority.

policy and practice—as shown through Plaintiffs' terminations—is to invoke 2 C.F.R. § 200.340(a)(4), a subsection that did not exist at the time of the awards. *Id.* at 23. They justify their terminations because the awards state they "are subject to the OMB guidance in subparts A through F of 2 CFR Part 200 as adopted and supplemented by the USDA in 2 CFR Part 400." *Id.* at 24. Defendants cite no authority to show that this clearly and unambiguously provides notice of anything. This is not surprising. An "unambiguous" reference must be "explicit." *Unambiguous*, *Black's Law Dictionary* (12th ed. 2024). The statement that an award is subject to an entire regulatory section and its subparts certainly does not provide explicit notice to an awardee that it is on the hook for future changes to those rules, making Defendants' reliance on § 200.340(a)(4)— which did not exist at the time of award—unlawful. It also does not provide explicit notice that Defendants could terminate based on any specific subsections in § 200.340, and for this reason too, the terminations are unlawful.

**Violations 3 and 4.** Pls.' Br. 28. Defendants agree they are relying on § 200.340(a)(4) to terminate awards based on new priorities that were not "articulated when the grant was awarded." Defs.' Br. 25. They ignore that this provision—and its predecessor § 200.340(a)(2)—also requires supporting evidence that Defendants do not possess, thereby rendering the terminations unlawful. Despite this fatal flaw, Defendants offer three rationalizations for why they can terminate based on new priorities, none of which aligns with logic or text.

*First*, Defendants claim that, because they are "democratically accountable," they must have the option to undo funding at their whim. Defs.' Br. 25. Not true. Such power "would undermine the security of all federal awards" going forward, *Metro. Transp. Auth. v. Duffy*, No. 25-CV-1413 (LJL), 2025 WL 1513369, at *28 (S.D.N.Y. May 28, 2025), an untenable proposition for the billions of dollars spent on federal assistance each year.

*Second*, they argue that under the text, they can terminate if a grant "no longer" advances agency priorities, which they say authorizes a new Administration to declare new policies and terminate as desired. Defs.' Br. 25. But the rule allows for termination only "if additional evidence reveals that a specific award objective is ineffective at achieving program goals" or if "additional evidence . . . cause[s] the Federal awarding agency to significantly question the feasibility of the intended objective of the award." 2020 Uniform Guidance, 85 Fed. Reg. 49,506, 49,507–08 (Aug. 13, 2020). Thus, the relevant priorities are those identified at the time of the award. The question is whether the original "intended objective" of the award is being achieved.

*Third*, Defendants cite to the views of "commentators" to the 2024 rule, but conveniently omit the agency's full response, which explained that both the original and revised rules were meant to "underscore[e] the need for agencies . . . to clearly and unambiguously communicate termination conditions" at the time of the award. Financial Assistance, 89 Fed. Reg. 30,046, 30,089 (Apr. 22, 2024). For these reasons, Defendants' reliance on newly invented priorities for termination is *per se* unlawful.

**Violation 5.** Pls.' Br. 28–29. Defendants state Plaintiffs "are correct" that 2 C.F.R. § 200.339 imposes procedural requirements Defendants did not follow, but they claim this is acceptable because it only applies when there is "noncompliance with 'the … terms and conditions of the Federal award,'" and that they did not terminate for noncompliance. Defs.' Br. 26. However, as discussed above, for an agency to terminate because the award no longer achieves its priorities, those priorities must be specified at the time of the award, as part of the conditions of the award. Defendants' allegation that an award no longer complies with agency priorities is a form of noncompliance with those conditions, requiring Defendants to follow Section 200.339, which they admit they failed to do.

For each and all of these reasons, Defendants' policy and practice runs afoul of the APA and should be preliminarily set aside.

**B. Defendants' Actions Violate the Fifth Amendment.**

Defendants do not contest that their policy—as shown through the termination of Plaintiffs' grants—is to terminate without notice, a hearing, or any pre-deprivation process to challenge the terminations. Defs.' Br. 26–27. Instead, Defendants' entire defense is predicated on their flawed mischaracterization of the grants as contracts without property interests protected by due process. *Id.* However, as discussed above, Plaintiffs grants are not contracts. *See supra*, Section IA; *see also Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 669 (1985) (noting that although certain federal grants can have "a contractual aspect," such grants "cannot be viewed in the same manner as a bilateral contract governing a discrete transaction")*.* As such, Plaintiffs are entitled to due process before losing their access to funds. *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53 (1993) ("general rule requir[es] predeprivation notice and hearing").

Moreover, even if grants *were* contracts, these grants would still create a property interest protected by the Fifth Amendment. *See, e.g.*, *Loc. 342, Long Island Pub. Serv. Emps. v. Town Bd. of Huntington*, 31 F.3d 1191, 1194–95 (2d Cir. 1994) (describing "what is necessary to elevate a mere contract right to the level of a protectible entitlement") (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)). Courts have long held that a property interest may be created by "an independent source," such as other laws or regulations, "that secure certain benefits and that support claims of entitlement to those benefits." *Roth*, 408 U.S. at 577. Such an interest can arise if the governing law specifies that the government may not terminate a benefit except "for cause," *see Esparraguera v. Dep't of the Army*, 101 F.4th 28, 33 (D.C. Cir. 2024), or where the "implementing regulations place substantive limitations on official discretion to withhold award

of the benefit upon satisfaction of the eligibility criteria," *see NB ex rel. Peacock v. District of Columbia*, 794 F.3d 31, 41–42 (D.C. Cir. 2015) (cleaned up).

That is precisely the case here. Plaintiffs repeatedly show that 2 C.F.R. § 200.340—the governing regulation for grant terminations—places substantive limitations on Defendants' authority to terminate the grants at issue. *See* FAC ¶¶ 101–118; Pls.' Br. 23–29. Therefore, even if Plaintiffs' grants are contracts (they are not), the governing regulation is exactly the type of "independent source" that elevates a contract to the level of a protectible entitlement. *Roth*, 408 U.S. at 577.

Indeed, courts have found that the substantive limitations on grant terminations imposed by 2 C.F.R. § 200.340 create a "legitimate claim of entitlement" to a grant award, such that the government does "not have unrestrained discretion to terminate [an] award at will but could only do so for noncompliance, with consent, or as provided for in the terms of the grant." *La. Delta Serv. Corps v. AmeriCorps*, No. 25-378-JWD-RLB, 2025 WL 1787429, at *26 (M.D. La. June 27, 2025) (citing 2 C.F.R. § 200.340(a)). In part because 2 C.F.R. § 200.340 creates a property interest in a grant award, awardees like Plaintiffs are "entitled to due process—namely, notice and an opportunity to be heard—prior to the termination of the award." *Id.* at *28 (citing *Adams v. City of Harahan*, 95 F.4th 908, 914 (5th Cir. 2024).

Defendants' argument that Plaintiffs' access to post-deprivation remedies somehow renders their due process violations lawful is a red herring. As an initial matter, Defendants' contention that Plaintiffs did not pursue administrative remedies is false. Defs.' Br. 29. All Plaintiffs appealed their grant terminations, FAC ¶¶ 142, 147, 154, 159, 164, even though many believed such appeals to be futile. *Id.* ¶¶ 142, 154, 159. The fact that none of the appeals has received a response to date undermines any argument that post-deprivation remedies are

sufficient. Further, any post-deprivation procedures are insufficient to cure Defendants' due process violations. *See, e.g.*, *James Daniel Good Real Prop.*, 510 U.S. at 53 (identifying narrow exception to default of pre-deprivation process in "extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event" (cleaned up)). Defendants nowhere suggest "extraordinary situations" exist here.

Defendants' criticism of Plaintiffs' void-for-vagueness claim fares no better. Defendants rely upon a single inapt case, *National Endowment for the Arts v. Finley*, 524 U.S. 569 (1998). Defs.' Br. 27–28. In *Finley*, the question was whether a *prospective* grantee had a constitutional interest in an award not yet conferred. 524 U.S. at 588–90. The Court held it would be illogical for a statute listing the *criteria for* those grants, which used "undeniably opaque" language, to be subject to First or Fifth Amendment restraint and held void for vagueness. *Id.* Here, by contrast, Plaintiffs challenge the *terminations* of awards already allocated, not the selection criteria for *future* awards. As the Supreme Court has made clear, "procedural protection of property is a safeguard of the security of interests that a person *has already acquired* in specific benefits." *Roth*, 408 U.S. at 576 (emphasis added). *Finley* thus does not apply.

Accordingly, Plaintiffs are likely to succeed on their Fifth Amendment claims.

**C. Defendants' Actions Violate Separation of Powers, Are Contrary to Law, and Are Ultra Vires.**

Defendants' attempt to avoid liability for their additional constitutional and statutory violations likewise falls flat. Their argument that nothing in the statutes requires them to fund Plaintiffs' grants specifically, Defs.' Br. 30, does not grapple with the fact that under their policy and practice, they terminated Urban Sustainability Directors Network's (USDN) and Agroecology Commons' grants for *fulfilling the very purposes* that Congress named when it enacted the relevant statutory programs. *See* Pls.' Br. 36–39. For USDN, USFS terminated their

17

award for, among other reasons, relating to "climate change," *see* FAC Ex. A, Dkt. No. 10-3, even though the statutory purpose of the Urban Forestry Program is to "aid in reducing carbon dioxide emissions, mitigat[e] the heat island effect, and reduc[e] energy consumption, thus contributing to efforts to reduce global warming trends." 16 U.S.C. § 2105(a)(5); *see also id.* § 2105(b)(5).  FSA terminated or will be terminating Agroecology Commons' Increasing Land, Capital, and Market Access Program grant because it focuses assistance on Queer, Trans, Black, Indigenous, and Multi-Racial farmers, *see* Pls.' Br. 39. However, the statutory purpose of the program is to serve "underserved farmers, ranchers, or forest landowners," Inflation Reduction Act, Pub. L. No. 117-169 § 22007, 136 Stat. 1818, 2022 (2022), which, according to USDA's website, includes "group[s] whose members have been subjected to racial, ethnic, or gender prejudice because of their identity as members of the group without regard to their individual qualities."[11]  This certainly includes the groups Agroecology Commons' grant serves.

Defendants suggest that even if their terminations are inconsistent with the statute, they "can re-obligate the funds toward" other projects, thereby fulfilling Congress' directive. Defs.' Br. 31. But Defendants' own words belie this contention. DOGE's website prominently claims that Plaintiffs' terminated grants constitute "savings," *see* FAC ¶ 169, and USDA's form termination letters describe the grant terminations as an effort to "conserve" Department resources, *see, e.g.*, FAC Ex. A. Thus, Defendants' suggestion that this case is distinct from one involving agencies' overriding Congressional directives cannot be taken seriously.[12]

---

[11] Farm Serv. Agency, *USDA Offers Targeted Farm Loan Funding for Underserved Groups and Beginning Farmers*, USDA (Mar. 6, 2024), https://www.fsa.usda.gov/news-events/news/03-06-2024/usda-offers-targeted-farm-loan-funding-underserved-groups-beginning.

[12] If the Court wants more information to confirm whether Defendants intend to re-obligate this funding despite their policy and practice, it can order expedited discovery. *See infra*.

In sum, Defendants' policy and practice that led to USDN's and Agroecology Commons' grant terminations violates separation of powers, and is *ultra vires*. *See* Pls. Br. 36–39.

## III. PLAINTIFFS HAVE SUFFERED, AND WILL CONTINUE SUFFERING, IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION

Just as Defendants' efforts to undermine the merits of Plaintiffs' claims are unavailing, so too are their efforts to minimize the harms Plaintiffs have suffered and continue to suffer as a result of these unlawful actions. The record is replete with evidence of irreparable harm. Plaintiffs have ceased operations or discontinued entire programs, laid off or will imminently lay off multiple employees, abandoned financial commitments—thus imperiling the trust of their partners—and diverted limited resources away from their core operations. *See, e.g.*, Thiel Decl. ¶¶ 17, 19; Brown Decl. ¶¶ 16, 19–20; Atwood Decl. ¶¶ 22, 25; Heltman-Weiss Decl. ¶¶ 13, 21–22, 27–29; Vanslooten Decl. ¶ 19. Numerous courts in this Circuit have held that these injuries constitute irreparable harm. *See, e.g.*, *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016); *Am. Bar Ass'n v. U.S. Dep't of Just.*, No. 25-cv-1263 (CRC), 2025 WL 1388891, at *8 (D.D.C. May 14, 2025); *Climate United Fund v. Citibank, N.A.*, No. 25-cv-698 (TSC), 2025 WL 1131412, at *17–20 (D.D.C. Apr. 16, 2025); *see also* Pls.' Br. 40 (collecting additional cases).

Defendants' attempts to undercut these injuries are as callous as they are incorrect. Defendants are wrong that harm caused by a grant termination is irreparable only when it will "shutter [an] organization[] permanently." *See* Defs.' Br. 33; *cf. Elev8 Baltimore*, 2025 WL 1865971, at *25 ("scal[ing] back activities" constitutes irreparable harm). They are also wrong that Plaintiffs' reputational injuries are not cognizable. *Cf. Climate United Fund*, 2025 WL 1131412, at *20. And they are wrong in claiming that those injuries are attenuated from Defendants' unlawful policy and practice. *See, e.g.*, Brown Decl. ¶ 20 (directly linking USDN's

19

inability to "fulfill our responsibilities to our sub-awardees" to "the loss of [its] federal award"); Heltman-Weiss Decl. ¶ 24 (explaining that Defendants' termination letter and public statements have damaged PFC's reputation). Defendants' attempts to minimize the impacts of their unlawful actions are contrary to precedent and belied by the record.[13]

Defendants' objection to the timing of Plaintiffs' motion for preliminary relief is similarly unavailing. Contrary to Defendants' intimations, Defs.' Br. 34–35, Plaintiffs were "not twiddling [their] thumbs" after receiving termination notices. *Capitol Hill Baptist Church v. Bowser*, 496 F. Supp. 3d 284, 302 (D.D.C. 2020) (finding irreparable harm despite six-month delay in seeking preliminary injunction). Rather, Plaintiffs first sought to administratively appeal their grant terminations, either by sending letters to relevant USDA subagencies, FAC ¶¶ 154, 159, 164, or requesting an appeal with USDA's National Appeals Division ("NAD"), *id.* ¶ 147. In all such cases, Plaintiffs waited a reasonable time to hear back on their appeals but received no response. *See id.* ¶¶ 147, 154, 159, 164. Approximately two weeks before Plaintiffs filed this motion, NAD gave its first indication that it categorically would not entertain claims like those raised in this case. *See* Pls.' Br. 18. Only then did Plaintiffs seek preliminary relief. "This is the sort of behavior that courts ordinarily encourage . . . in the interest of efficiency and judicial economy." *Capitol Hill Baptist Church*, 496 F. Supp. 3d at 302 (finding no delay where, in the six months preceding its motion, the plaintiff contacted the government defendant and "sought administrative relief").

---

[13] Defendants' reliance on *Department of Education v. California*, is also misplaced. *See* Defs.' Br. 34. Defendants opportunistically omit the Supreme Court's reason for finding no irreparable harm there: the state-respondents' "represent[ation] . . . that they have the financial wherewithal to keep their programs running" in the absence of terminated grants. *Dep't of Educ.*, 145 S. Ct. at 969. Plaintiffs are not similarly situated. *See, e.g.*, Thiel Decl. ¶ 17; Brown Decl. ¶ 16; Heltman-Weiss Decl. ¶ 21; Atwood Decl. ¶ 22.

Finally, Defendants are incorrect that Office of Management and Budget ("OMB") regulations offer Plaintiffs a pathway towards "mitigat[ing]" their injuries and thus undercut the need for immediate relief. Defs.' Br. 35. Once again, Defendants assume Plaintiffs seek money damages, which, as discussed above, they do not. Moreover, at best, final payment requests would enable Plaintiffs to recover—months in the future—costs incurred pursuant to their grants *prior* to the termination notices. *See* 2 C.F.R. § 200.343. Reimbursement for past expenses cannot remedy the harms Plaintiffs have suffered and will continue to suffer from having to significantly scale back or shut down promised and planned-for projects for their communities. *See, e.g.*, Heltman-Weiss Decl. ¶ 21 (explaining that PFC will soon run out of general funds "to accommodate the loss of federal funding"); *see also Sherley v. Sebelius*, 689 F.3d 776, 781–82 (D.C. Cir. 2012) (describing preliminary relief as "a stopgap measure" before "a trial on the merits can be held"). Given that Plaintiffs are currently "fighting for [their] survival," Brown Decl. ¶ 18, closeout costs will be too little, too late.

Plaintiffs will continue to suffer irreparable harm absent preliminary injunctive relief.

## IV.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST HEAVILY FAVOR PLAINTIFFS.

The third and fourth preliminary injunction factors tip sharply in Plaintiffs' favor. As Plaintiffs previously explained, preliminary relief is necessary to preserve critical services that, among other things, fight food insecurity in low-income communities, help urban communities survive extreme heat waves, and support socially disadvantaged beginning farmers. *See* Pls.' Br. 6–12, 43. Numerous courts have found dispositive such "existential injuries" to plaintiff-organizations and the broader public when assessing the final preliminary injunction factors. *See, e.g.*, *Nat'l Council of Nonprofits v. OMB*, 763 F. Supp. 3d 36, 56–57 (D.D.C. 2025); *Maryland v. AmeriCorps*, No. CV DLB-25-1363, 2025 WL 1585051, at *37 (D. Md. June 5, 2025).

Defendants' side of the ledger pales in comparison. Defendants complain that an injunction would "disrupt" their "efforts to implement" the President's agenda, Defs.' Br. 36, but because those efforts are unlawful, an injunction cannot cause Defendants harm, *see TikTok Inc. v. Trump*, 490 F. Supp. 3d 73, 85 (D.D.C. 2020). Defendants also speculate that an injunction could "harm the public fisc," Defs.' Br. 37, but courts have repeatedly rejected such claims where, as here, the government "offer[s] no evidence" to substantiate them, *see S. Educ. Found. v. U.S. Dep't of Educ.*, No. CV 25-1079 (PLF), 2025 WL 1453047, at *17 (D.D.C. May 21, 2025); *S.F. A.I.D.S. Found. v. Trump*, No. 4:25-cv-018241, 2025 WL 1621636, at *28 (N.D. Cal. June 9, 2025). Finally, Defendants object that this Court lacks power to issue the requested injunction, Defs.' Br. 37, but this argument rests on the same flawed premise—that this is a contract dispute—already rejected by this Court and addressed above, *see ACILS*, 2025 WL 1795090, at *20.

At bottom, Defendants cannot demonstrate that *any* harm would flow from the requested preliminary relief. Given the "concrete harms that [Plaintiffs] and the communities [they] serve[] . . . have suffered and will continue to suffer," *Maryland v. AmeriCorps*, 2025 WL 1585051, at *38, the balance of equities and public interest tip decisively in Plaintiffs' favor.

## V.    THE COURT SHOULD ORDER DEFENDANTS TO CEASE THEIR UNLAWFUL POLICY AND PRACTICE WITHOUT DELAY OR BOND.

While Defendants are correct that *Trump v. CASA, Inc.* narrowed courts' authority to grant nationwide injunctive relief, Defs.' Br. 37-38, they mistakenly believe that this somehow affects the outcome here. Not so. *CASA* is explicit that it does not address the separate statutory authority under the APA to "vacate federal agency action." No. 24A884, 2025 WL 1773631, at *8 n.10 (June 27, 2025). Justice Kavanaugh's concurrence explains that, under the APA "plaintiffs may ask a court to preliminarily 'set aside'" violative conduct. *Id.* at *19. Courts have granted such

relief when faced with essentially identical claims as presented here. *Thakur*, 2025 WL 1734471, at *32–33. The Court may vacate and set aside Defendants' policy and practice.[14]

The requested relief should be granted without delay or the deterrence of a bond. Delay places Plaintiffs and their staff at risk and denies the public access to the programs the money was intended to facilitate. Moreover, courts have consistently declined to order bonds in cases like this as they rightly cannot stomach the irony of the government's weaponizing financial risk to keep parties from recouping wrongfully withheld funds. Pls.' Br. 44 (citing authority).

## VI. EXPEDITED DISCOVERY COULD ASSIST THE COURT WITH RULING ON JURISDICTION, THE MOTION FOR PRELIMINARY RELIEF, AND THE SCOPE OF ANY SUCH RELIEF

As explained in Plaintiffs' initial motion for expedited discovery, Plaintiffs sought the requested discovery in anticipation of factual questions that Defendants have now raised, in case it would help the Court resolve Plaintiffs' claims. While, as explained above, Plaintiffs believe the record is sufficient to grant immediate relief, Plaintiffs recognized that Defendants might seek to raise fact issues and wished to present the Court with a mechanism to address those issues should it have questions.[15] To the extent the Court wants more information to decide the issues before it, the requested discovery is (1) appropriate in timing and scope, (2) warranted by the lack of any published administrative record typically available in APA cases, and (3) otherwise reasonable. The Court can order the expedited discovery at this time.

---

[14] Defendants properly do not dispute that this Court can enjoin conduct directed at Plaintiffs. Defs.' Br. 38. Should the Court deny broader relief, Plaintiffs request the opportunity to amend their Complaint to add additional parties and secure this relief for them as well.

[15] For example, Plaintiffs seek discovery as to whether Defendants' policy, pattern, and practice of terminating grants *en masse* is a final agency action subject to APA judicial review, a factual question Defendants here dispute. *See supra*.

*First*, the requested discovery is timely and appropriate. The questions of jurisdiction and the viability of Plaintiffs' claims for preliminary relief are fully before this Court. Defendants' demand that this Court delay any discovery until it has ruled on a supposedly forthcoming motion to dismiss, which, they concede, "will contain substantially similar arguments" as those they just fully briefed, Defs.' Br. 39, defies logic. To the extent the Court requires more information to decide either jurisdiction or the merits and scope of preliminary relief, it is appropriate to order the discovery now. *See Aljabri v. Bin Salman Bin Abdulaziz Al Saud*, 106 F.4th 1157, 1164 (D.C. Cir. 2024) ("[W]here issues arise as to jurisdiction . . . , discovery is available to ascertain the facts bearing on such issues.") (citation omitted); Defs.' Br. 39–40 (conceding the Court may "permit discovery to resolve factual issues necessary to its jurisdictional inquiry"); *Hosp. Staffing Sols., LLC v. Reyes*, 736 F. Supp. 2d 192, 201–02 (D.D.C. 2010) (granting preliminary injunction and ordering expedited discovery "to determine the nature and extent of [defendant's] alleged breaches").

*Second*, there is no appropriate administrative record in this case, and Defendants make no effort to explain why they have not published one to date, or how any record they submit will adequately document the policy at issue. Instead, Defendants undermine their generic assurance that "[t]he administrative record will of course include 'all records that were before a decision maker at the time the challenged action was taken,'" Defs.' Br. 43 (citation omitted), by claiming elsewhere that it will be "impossible" for them to submit an administrative record documenting their policy and practice*, Defs.' Br. 17–18. Defendants cannot have it both ways. As other courts have found, when the challenged agency actions do not derive from "a formal process," as is the case here, and when Defendants have not "produced a record" as is usually done during a formal rulemaking or administrative adjudication, expedited discovery is appropriate. *See* Pls.' Mot.

24

Expedited Disc. 8–9, Dkt. No. 15 (quoting *Sustainability Inst. v. Trump*, No. 2:25-cv-2152-RMG (D.S.C. Apr. 7, 2025) (order granting expedited discovery)).

*Third,* Defendants have not responded to and thus concede that Plaintiffs have satisfied the other *Guttenberg* reasonableness factors discussed in Plaintiffs' Motion for Expedited Discovery. *Compare* Pls.' Mot. Expedited Disc. 7–11 *with* Defs.' Br. 39–44.

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' motion and preliminarily enjoin Defendants' policy and practice of unlawfully terminating grants as it applies to Plaintiffs, and vacate and set aside the policy and practice in its entirety. In the alternative, should the Court believe there is a relevant factual dispute, it should order the expedited discovery Plaintiffs requested and then supplemental submissions.

Dated this 15th day of July 2025.

Respectfully submitted,

<u>/s/ Carrie Apfel</u>
Carrie Apfel
DC Bar No. 974342
Earthjustice
1001 G Street, NW, Suite 1000
Washington, DC  20001
(202) 667-4500
capfel@earthjustice.org

David S. Muraskin
DC Bar No. 1012451
FarmSTAND
712 H Street NE
Suite 2534
Washington, DC 20002
202-595-8816
david@farmstand.org

Holly Bainbridge
DC Bar No. 90021466 (*Pro Hac Vice*)
FarmSTAND
712 H Street NE
Suite 2534
Washington, DC 20002
202-595-8816
holly@farmstand.org

Scott W. Carlson
MN Bar No. 0338400 (*Pro Hac Vice*)
Farmers Justice Center
6 Fifth Street West
Suite 650
St. Paul, MN 55102
(651) 204-1664
scott.carlson@farmersjustice.org

Benjamin E. Apple
NC Bar No. 52009 (*Pro Hac Vice*)
Farmers Justice Center
6 Fifth Street West
Suite 650
St. Paul, MN 55102
(651) 204-7203
ben.apple@farmersjustice.org

*Counsel for Plaintiffs*