**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| URBAN SUSTAINABILITY DIRECTORS NETWORK, *et al.*, | |
| Plaintiffs, | Civil Action No. 25-1775 (BAH) |
| v. | Judge Beryl A. Howell |
| UNITED STATES DEPARTMENT OF AGRICULTURE, *et al.*, | |
| Defendants. | |

**<u>MEMORANDUM OPINION</u>**

Five nonprofit organizations involved in agriculture and ecology-related projects filed suit against the United States Department of Agriculture ("USDA") and several component agencies (collectively, defendants) challenging the termination of six grants awarded to plaintiffs and defendants' alleged broader "policy, pattern, and practice of unlawfully terminating" *en masse* "hundreds of grants" due to changes in agency priorities driven by certain executive orders, notwithstanding the grants' fulfillment of the purposes set out in authorizing statutes and appropriations acts.  *See* First Am. Compl. ("FAC") ¶¶ 1-3, 11-31, 46-96, ECF No. 10.[1]  A few weeks after filing the original complaint and two days after filing the First Amended Complaint, plaintiffs moved concurrently for a preliminary injunction and for expedited discovery to uncover records that may aid this Court's adjudication of the preliminary injunction motion.  *See* Pls.' Mot. for PI, ECF No. 14; Pls.' Mot. for Expedited Discovery ("Pls.' Discovery Mot."), ECF

---

[1]     Defendants include USDA, the Secretary of Agriculture, the U.S. Forest Service ("USFS") and its Chief, the Natural Resources Conservation Service ("NRCS") and its Chief, the National Institute of Food and Agriculture ("NIFA") and its Director, the Department of Government Efficiency ("DOGE") and its Acting Administrator, the Farm Service Agency ("FSA") and its Administrator, and the Agricultural Marketing Service ("AMS") and its Administrator.  *See* FAC ¶¶ 32-45.

No. 15.  Defendants oppose both motions.  *See* Defs.' Combined Opp'n to Pls.' Mot. for PI and Pls.' Mot. for Expedited Discovery ("Defs.' Opp'n"), ECF No. 22.  For the reasons explained below, this Court grants the motion for preliminary injunction in part, denies it in part, and denies the motion for expedited discovery.

*       *       *

To aid in review of this Memorandum Opinion, given its length to address the myriad issues raised by the parties, an overview is provided.  **Part I** reviews the relevant factual and procedural background in this case, including plaintiffs' federal grant awards (**section A.1**), defendants' termination of these awards (**section A.2**), administrative appeals pursued by plaintiffs (**section B.1**), the initiation of this lawsuit with a summary of the claims asserted (**section B.2**), and the pending motions for preliminary injunction and expedited discovery (**section B.3**).

**Part II** provides the legal standard governing the plaintiffs' motion for preliminary injunction.

**Part III** addresses the merits and disposition of the pending motions.  **Section A** holds this Court has subject matter jurisdiction over plaintiffs' claims, contrary to defendants' arguments that plaintiffs' claims are essentially contractual such that the Tucker Act assigns them exclusively to the Court of Federal Claims.  **Subsection 1** summarizes the current state of the law and recent developments, and **subsection 2** explains why plaintiffs' claims here are not contractual in nature.

**Section B** evaluates plaintiffs' likelihood of success on the merits.  **Subsection 1** concludes that plaintiffs are not likely to succeed on their constitutional due process claims (Counts One and Two).  **Subsection 2** evaluates plaintiffs' challenges, pursuant to the

2

Administrative Procedure Act ("APA"), 5 U.S.C. § 706, and, after determining that APA review is available (**subsection 2(a)**), determines that plaintiffs are not likely to succeed on their claim that defendants violated their own regulations (Count Three) (**subsection 2(b)**). Plaintiffs are likely to succeed, however, on their claim that defendants' termination of Urban Sustainability Network's grant and the announced termination of Agroecology Common's second grant are contrary to statute (Count Five) (**subsection 3(c)**). They are also likely to succeed in showing that the five grant terminations in the record were arbitrary and capricious (Count Four) (**subsection 2(d)**), despite plaintiffs not making a sufficient showing that the broader alleged policy and practice of arbitrarily terminating grants likely violates the APA.

**Section C** explains that plaintiffs have demonstrated they are facing or will face irreparable harm without injunctive relief, and **Section D** determines that the balance of the equities and public interest weigh in favor of granting plaintiffs' relief. **Section E** describes the appropriate relief—plaintiffs' five grant terminations and announced termination of a sixth grant will be preliminarily set aside and their enforcement enjoined, and no bond will be imposed. Finally, **Section F** holds that plaintiffs are not entitled to expedited discovery, given the limitations on discovery in APA cases.

**Part IV** provides a brief conclusion summarizing the disposition of the pending motions.

## I.    BACKGROUND

The factual background and procedural history relevant to the pending motion are described below.

### A.    Factual Background

The five nonprofit organizations, Urban Sustainability Directors Network ("USDN"), Oakville Bluegrass Cooperative ("OBC"), Agroecology Commons ("AC"), the Providence Farm Collective Corp. ("PFC"), and the Institute for Agriculture and Trade Policy ("IATP")

(collectively, plaintiffs) all received federal awards, under various statutorily authorized federal programs, from the USDA or its components that were unexpectedly terminated during from March through July of 2025, after the Trump administration announced changes in policy priorities. *See* FAC ¶¶ 11-31. The following facts, based on the record currently before the Court, are undisputed.

1. ***Plaintiffs' Federal Grant Awards***

The missions of each plaintiff and their respective awards at issue are summarized below.

Plaintiff USDN supports local government sustainability directors in the United States and Canada and, as relevant here, works to promote urban sustainability and green spaces. *See* Pls.' Mot. for PI, Decl. of Jamal Brown, CFO and COO of USDN ("Brown Decl.") ¶ 5, ECF No. 14-2. The Urban and Community Forestry Assistance Program, created by the Cooperative Forestry Assistance Act, authorizes the Secretary of Agriculture "to provide financial, technical, and related assistance" to state entities and in cooperation with nonprofit organizations "to encourage cooperative efforts to plan urban forestry programs and to plant, protect, maintain, and utilize wood from, trees in open spaces, greenbelts, roadside screens, parks, woodlands, curb areas, and residential developments in urban areas." 16 U.S.C. § 2105(c). This program was intended to "improve understanding of the benefits of preserving existing tree cover in urban areas and communities," "implement a tree planting program to complement urban and community tree maintenance and open space programs and to reduce carbon dioxide emissions, conserve energy, and improve air quality in addition to providing other environmental benefits," and to "expand existing research and educational efforts" on "tree growth and maintenance" and the "role of urban trees," among several other purposes. *Id.* § 2105(b). In 2022, Congress appropriated $1.5 billion to USDA specifically to "provide multiyear, programmatic, competitive

grants to" various entities through the Urban Forestry Assistance Program.  Inflation Reduction Act of 2022 ("IRA"), Pub. L. No. 117-169, § 23003(a)(2), 136 Stat. 1818, 2026.

Consistent with these statutory directives in both the Urban Forestry Assistance Program and IRA, the U.S. Forest Service ("USFS") issued a Notice of Funding Opportunity, which indicated that USFS would prioritize projects "working to support disadvantaged communities experiencing low tree canopy and environmental justice" and "locally led conservation and park projects in communities that disproportionately lack access to nature and its benefits."  USDA FOREST SERVICE URBAN & COMMUNITY FORESTRY, *Inflation Reduction Act Notice of Funding Opportunity* (Apr. 12, 2023), https://iraucfgrants.urbanandcommunityforests.org/.  Following a competitive process, USDN received a $28 million award in 2023 to promote urban forestry, increase access to urban tree canopy in disadvantaged communities, and improve resilience to climate change and extreme heat in 25 cities around the country, including Santa Fe, New Mexico, Stow, Ohio, and Westminster, Colorado.  *See* Brown Decl., Ex. B, CRS/USDN USFS Revised Project Narrative for Award Number 24-CA-11132544-016 for project titled "Accelerating Urban Forestry as Equity Centered Climate Action and Sustainable Community Development" at 1, 4; *id.* Ex. C, Federal Financial Assistance Award of Cooperative Agreement.

Plaintiff OBC helps growers transition to more "regenerative" practices that are resistant to climate change, in part by promoting Oakville bluegrass, a climate-smart conservation cover. Pls.' Mot. for PI, Decl. of Jeff Thiel, Dir. of OBC ("Thiel Decl.") ¶¶ 3-4, ECF No. 14-3.  In 2022, USDA created the Partnerships for Climate-Smart Commodities Initiative as an exercise of its authority under the Commodity Credit Corporation Charter Act, which established an entity "within the Department of Agriculture" to "stabiliz[e], support[], and protect[] farm income and prices, . . . assist[] in the maintenance of balanced and adequate supplies of agricultural

commodities," and "facilitat[e] the orderly distribution of agricultural commodities," 15 U.S.C. § 714. *See* Press Release No. 0038.22, *USDA to Invest $1 Billion in Climate Smart Commodities, Expanding Markets, Strengthening Rural America*, USDA (Feb. 7, 2022), https://www.usda.gov/about-usda/news/press-releases/2022/02/07/usda-invest-1-billion-climate-smart-commodities-expanding-markets-strengthening-rural-america. The Partnership was designed to "create market opportunities for U.S. agricultural and forestry products that use climate-smart practices and include innovative, cost-effective ways to measure and verify greenhouse gas benefits." *Id.* The Natural Resources Conservation Service sought proposals for funding opportunities pursuant to that program in 2022 and specified that equity and environmental justice-focused projects would be prioritized. *See* USDA, *Partnership for Climate-Smart Commodities, Fiscal Year (2022) National Funding Opportunity* at 2, 28 (2022), https://www.usda.gov/sites/default/files/documents/climate-smart-nfo-usda-nrcs-comm-22-nofo0001139-02062022-web-final.pdf. OBC received a $4.9 million award, to be paid over the course of five years, to promote the adoption of Oakville bluegrass in specialty crop systems, such as processed almonds. Thiel Decl. ¶¶ 4, 6, 7; *id.*, Ex. A, Notice of Grant and Agreement Award Number NR243A750004G031 to "expand[] markets for climate-smart agricultural specialty crops and products in WA, OR, CA, and AZ and support[] farmer implementation and monitoring of climate-smart practices"; *id.*, Ex. B, Letter from Sharif Branham, Acting Dir. of Climate-Smart Commodities Small Grants Division re: "Funding Opportunity" (Dec. 12, 2022); Pls.' Mem. in Supp. of Mot. for PI ("Pls.' Mem.") at 8, ECF No. 14-1.

Plaintiff AC aims to "cultivate community and global solidarity for decolonized land stewardship, collective healing, and food justice," focusing its work on the Bay Area. Pls.' Mot. for PI, Decl. of Leah Atwood, Dir. of Partnerships for AC ("Atwood Decl.") ¶ 4, ECF No. 14-4.

The Food Stamp Act of 1977 authorizes the Secretary to "make grants to assist eligible private nonprofit entities to establish and carry out community food projects." 7 U.S.C. § 2034(b)(1). Pursuant to that authority, a USDA component, the National Institute of Food and Agriculture ("NIFA"), created the Community Food Competitive Grant Program to provide funding for projects "address[ing] food and nutrition security, particularly among our nation's historically ignored communities." *See* NIFA, *Community Food Projects Competitive Grant Program (CJPCGP)* (last updated Aug. 4, 2025), https://www.nifa.usda.gov/grants/programs/hunger-food-security-programs/community-food-projects-competitive-grant-program-cfpcgp. In 2024, AC received one such grant (referred to herein as "AC Grant #1") for just under $400,000 to support beginning farmers, especially those from underserved backgrounds, by offering educational resources and programs such as a Cooperative Incubator Farm. *See* Atwood Decl. ¶¶ 10-11; *id.*, Ex. B, Project Description; Ex. C, Award Sheet for Award No. 2023-33800-40420 for "Growing Cooperative Networks for Community Food Sovereignty, Nutrition, and Agroecological Land Stewardship."

AC received a second grant in 2024 for $2.5 million under the Farm Service Agency's Land Access Program, which was created under the American Rescue Plan Act of 2021. *See* Atwood Decl. ¶¶ 15-17; *id.*, Ex. D, Notice of Grant and Agreement Award for Award Number FSA24GRA0011610 for "Catalyzing Equitable Access to Land, Capital, and Market Opportunities through an Agroecologically Stewarded Land Commons, Diversified Technical Support Program, and Resource Sharing Cooperative in the Bay Area" ("AC Grant # 2"); Pub. L. No. 117-2, § 1006, 135 Stat. 4, 13-14. In section 1006 of the American Rescue Plan Act, Congress appropriated money to benefit "socially disadvantaged farmers" and those historically experiencing discrimination. 135 Stat. at 13-14. As part of the IRA, in 2022, Congress amended

that section to appropriate additional funds for programs to benefit "underserved farmers, ranchers, or forest landowners, including veterans, limited resource producers, beginning farmers and ranchers, and farmers, ranchers, and forest landowners living in high poverty areas."  IRA, sec. 22007, § 1006(b), 136 Stat. at 2022-23; *see also* USDA FARM SERVICE AGENCY, *Increasing Land, Capital, and Market Access Program*, https://www.fsa.usda.gov/programs-and-services/increasing-land-access (last visited Aug. 14, 2025).  AC's project proposed purchasing land for beginning farmers from marginalized populations in Bay Area communities where access to land and capital is challenging and then supporting them in developing partnerships, expanding education, etc.  *See* Atwood Decl., Ex. E, Catalyzing Equitable Access Project Description.

Plaintiff PFC cultivates "farmer-led and community-rooted agriculture and food systems to actualize the rights of under-resourced people."  Pls.' Mot. for PI, Decl. of Kristin Heltman-Weiss, Exec. Dir. of PFC ("Heltman-Weiss Decl.") ¶ 4, ECF No. 14-5.  In the Agriculture Improvement Act of 2018, Pub. L. No. 115-334, 132 Stat. 4490, 4953, Congress directed the Secretary to "make competitive grants or enter into cooperative agreements to support new and established local and regional training, education, outreach, and technical assistance initiatives to increase opportunities for beginning farmers and ranchers."  7 U.S.C. § 2279(d)(1).  Recipients could be a "collaborative State, Tribal, local, or regionally-based network or partnership of public or private entities."  *Id.* § 2279(d)(3)(A).  Under that direction, NIFA developed the Beginner Farmer Program, which provides funding for "education, mentoring and technical assistance to supply beginning farmers and ranchers with the knowledge, skills, and tools needed to make informed decisions for their operations and enhance their sustainability."  NIFA, *Beginning Farmer and Rancher Development Program Fact Sheet* (last updated June 30, 2025),

https://www.nifa.usda.gov/grants/programs/beginning-farmer-rancher-development-program-bfrdp/fact-sheet.  NIFA stated that it would prioritize programs targeted at socially disadvantaged communities.  *See* Pls.' Mem. at 11.  PFC received in 2023 a Beginner Farmer Program award of around $750,000 over three years for a project on "Empowering Refugee, Immigrant, and Black Beginning Farmers through Personalized, Culturally Adapted Training and Education at PFC."  *See* Heltman-Weiss Decl., Ex. C, Award Face Sheet for Award No. 2023-49400-40904 for "Empowering Refugee, Immigrant, and Black Beginning Farmers Through Personalized, Culturally Adapted Training and Education at PFC."  The program consists of an incubator farm in western New York and related educational programs.  *See* Heltman-Weiss Decl. ¶¶ 8, 10, 12, 13.

Lastly, plaintiff IATP "works locally and globally at the intersection of policy and practice to ensure fair and sustainable food, farm, and trade systems."  Pls.' Mot. for PI, Decl. of Erin McKee VanSlooten, Community Food Systems Program Dir. ("McKee Van Slooten Decl.") ¶ 3, ECF No. 14-16.  The Agriculture Marketing Act of 1946, as amended in § 10102 of the Agriculture Improvement Act of 2018, created the "Local Agriculture Market Program," which "supports the development, coordination, and expansion of . . . local and regional food markets and enterprises," "connects and cultivates regional food economies through public-private partnerships," and "supports the development of business plans . . . for value-added agricultural production and local and regional food system infrastructure," among other things.  7 U.S.C. § 1627c(b).  The Secretary is authorized under this Act to issue grants to further these statutory aims, as specifically articulated in § 1627(d).  USDA's Agricultural Marketing Service ("AMS") developed the Regional Food System Partnerships program under such authority, specifically to provide funding for projects to plan and develop local or regional food systems and economies.

*See* AMS, *Regional Food System Partnerships Fiscal Year 2023 Request for Applications* at 2 (2023), https://www.ams.usda.gov/sites/default/files/media/2023_RFSP_RFA.pdf.  IATP was awarded a grant in 2023 for $111,694 over a period of two years for a project supporting Minnesota farm and food systems organizations.  *See* McKee Van Slooten Decl., Ex. A, Notice of Award for Award No. 23RFSPMN1076-00 for "Community Storytelling to Educate and Advocate Growing Minnesota Farm and Food Democracy"; *id.*, Ex. B, Project Description.

### 2.    *Terminations*

Five of plaintiffs' grants described, *supra* Part I.A.1, have been prematurely terminated with the sixth slated for imminent termination.  The parties agree that these terminations were the outgrowth of at least two executive orders issued by President Trump shortly after he took office for his second term.  *See* Pls.' Mem. at 13-14; Defs.' Opp'n at 5.  Immediately upon entering office, Trump issued Executive Order 14151, "Ending Radical and Wasteful Government DEI Programs and Preferencing," which instructed the Director of the Office of Management and Budget ("OMB"), the Director of the Office of Personnel Management and the Attorney General to "coordinate the termination of all discriminatory programs, including illegal DEI and 'diversity, equity, inclusion, and accessibility' (DEIA) mandates, policies, programs, preferences, and activities in the Federal Government, under whatever name they appear."  90 Fed. Reg. 8339, 8339 (Jan. 20, 2025).  Just a few weeks later, the President issued Executive Order 14222, "Implementing the President's 'Department of Government Efficiency' Cost Efficiency Initiative," which instructed heads of agencies, in consultation with Department of Government Efficiency ("DOGE") leadership, to "review all existing covered contracts and grants and, where appropriate and consistent with applicable law, terminate or modify . . . such covered contracts and grants to reduce overall Federal spending or reallocate spending to

10

promote efficiency and advance the policies of my Administration."  90 Fed. Reg. 11,095,

11,095-96 (Feb. 26, 2025).[2]

The Secretary of Agriculture subsequently released a press statement, in mid-February

2025, indicating that she would review thousands of grants "per the President's directives."

Press Release No. 0023.25, *Secretary Rollins Takes Bold Action to Stop Wasteful Spending and*

*Optimize USDA to Better Serve American Agriculture*, USDA (Feb. 14, 2025),

https://www.usda.gov/about-usda/news/press-releases/2025/02/14/secretary-rollins-takes-bold-

action-stop-wasteful-spending-and-optimize-usda-better-serve-american.  This press release was

followed, in mid-March, with another press release announcing that she had "cut[] wasteful

spending and sav[ed] American taxpayers millions."  Press Release No. 0049.25, *Secretary*

*Brooke Rollins Takes Bold Action in First 30 Days at USDA*, USDA (Mar. 13, 2025),

https://www.usda.gov/about-usda/news/press-releases/2025/03/13/secretary-brooke-rollins-

takes-bold-action-first-30-days-usda.

On March 13, 2025, the Secretary issued two memoranda.  The first, titled "Directive on

Conservation and Natural Resources Priorities," described the agency's priorities, stating that

they "include ensuring that its grants, cooperative agreements, and other similar arrangements

. . . do not support programs or organizations that promote or take part in climate change or

environmental justice initiatives."  USDA Secretary's Memorandum 1078-003 (Mar. 13, 2025),

https://www.usda.gov/directives/sm-1078-003.  She instructed that "all USDA agencies and staff

---

[2]     Plaintiffs also point to two other executive orders as driving the termination decisions made here: Executive
Order 14173, "Ending Illegal Discrimination and Restoring Merit-Based Opportunity," 90 Fed. Reg. 8,633, 8,634
(Jan. 31, 2025), which instructs agency heads to "excise references to DEI and DEIA principles . . . from Federal
acquisition, contracting, grants, and financial assistance procedures," and Executive Order 14154, "Unleashing
American Energy," 90 Fed. Reg. 8,353, 8,353-54, 8,357 (Jan. 29, 2025), which instructed agencies to "immediately
pause the disbursement of funds appropriated through the Inflation Reduction Act of 2022" and review grants for
"consistency with the" new policy of prioritizing domestic energy production.  *See* Pls.' Mem. at 13.

offices that issue awards must conduct an internal review of all active awards" to "ensur[e] that the Department does not fund programs or organizations that promote or take part in climate change or environmental justice initiatives that are either contrary to law or to the Department's policy objectives."  *Id.*  Such grants should be "terminated in whole or in part or otherwise modified to minimize the scope of the Department's obligations."  *Id.*  The second memorandum, titled "Directive on Departmental Grant and Cooperative Agreement Priorities," further articulated priorities, including "ensuring that the Department's grants . . . do not support programs or organizations that promote or take part in diversity, equity, and inclusion ('DEI') initiatives or any other initiatives that discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic."  USDA Secretary's Memorandum 1078-004 (Mar. 13, 2025), https://www.usda.gov/sites/default/files/documents/sm-1078-004.pdf.  "Awards deemed inconsistent" with that priority "shall, to the extent permitted by applicable law, be terminated in whole or in part."  *Id.*

Both before and in the months following the issuance of the Secretary's March 13, 2025, memoranda, plaintiffs' grants were terminated via letter notification.  USDN received a letter on April 2, 2025, informing the organization that its grant was terminated.  This letter expressed "[t]he Department's priorities," including "ensuring that its grants, cooperative agreements, and other similar arrangements do not support programs that promote or take part in climate change or environmental justice initiatives" and "assess[ing] both whether all award payments are free from fraud, abuse, and duplication and whether they are in the best interests of the United States."  Brown Decl., Ex. A, Letter from Lisa Northrup, Associate Deputy Chief of State, Private, and Tribal Forestry, to Brown at 1 (Apr. 2, 2025) ("USDN Termination Letter").

The letter then turned to the specific reason for the grant termination, stating:

12

> The award specified above provides funding for programs that promote or take part in climate change or environmental justice initiatives; that conflict with the Department's policies and priorities; that are not free from fraud, abuse, or duplication; or that otherwise fail to serve the best interests of the United States. The award is therefore inconsistent with, and no longer effectuates, Department priorities. *See* 2 C.F.R. § 200.340(a)(4). Pursuant to, among other authorities, 2 C.F.R. §§ 200.339-343, which are applicable to your award, the Department hereby terminates [your] award.

*Id.* The termination letter references a regulation, codified at 2 C.F.R. § 200.340(a), which provides four bases for termination of "federal award[s]," including "fail[ing] to comply with the terms and conditions of the Federal award," *id.* § 200.340(a)(1), and "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities," *id.* § 200.340(a)(4), as articulated in the USDN Termination Letter.[3]  Though the letter mentions four "Department priorities"—*i.e.*, "(1) not support[ing] programs that promote or take part in climate change" or (2) "environmental justice initiatives" and ensuring programs are (3) "free from fraud, abuse, and duplication" and (4) "in the best interests of the United States"—no explanation is provided as to how USDN's award conflicted with any one of these particular priorities to warrant termination.  USDN Termination Letter at 1.  The letter concludes with close-out processes, such as submission of final reports, and under the title of "appeal process," a reference to the "disputes" provision "of the award document."  *Id.* at 2.

OBC's grant was terminated, on April 14, 2025, by a more specific, though terser letter.  *See* Thiel Decl., Ex. D, Letter from Aubrey Bettencourt, Chief of the Natural Resources Conservation Service, to "Recipient" (Apr. 14, 2025) ("OBC Termination Letter").  The OBC

---

[3]    The letter also cites to four other provisions of the federal regulations regarding termination: § 200.339, which includes termination as an option where "noncompliance cannot be remedied by imposing specific conditions"; § 200.341, which establishes a requirement for written notice of termination; § 200.342, which requires agencies to offer opportunities to object to a remedy for noncompliance; and § 200.343, which explains the effects of termination of an award on costs incurred by the recipient during or after the termination.

termination letter informed OBC that upon review, the agency "overhauled [Partnership for Climate Smart Commodities] . . . and identified changes to better align the initiative with USDA priorities." *Id.* Listing three "Farmer First" priorities, the letter stated that OBC's project "failed to meet the first priority," *i.e.*, that "[a] minimum of 65% of federal funds must go to producers," without elaboration into how OBC failed to meet this priority. *Id.* OBC was given an opportunity to "resubmit a proposal that will be evaluated using the Farmer First policy priorities," *id.*, and has pursued this resubmission opportunity, but so far without results, *see* Rough Draft Tr. of Hearing on Mots. for PI and Expedited Discovery (Aug. 6, 2025) ("Rough Hr'g Tr.") at 16:13-17:9.

AC's Grant #1, which created a cooperative incubator program, was terminated on March 7, 2025, before the Secretary's issuance of the March 13, 2025, memoranda. *See* Atwood Decl., Ex. A, Letter from Matthew Faulkner, Deputy Director of Office of Grants and Financial Management, to Atwood (Mar. 7, 2025) ("AC Termination Letter #1"). The termination was described as "in accordance with 2 C.F.R. § 200.340(a)(4) and the terms and conditions of the award. NIFA has determined that award 2023-33800-40420 no longer effectuates USDA priorities, which are to maximize and promote American agriculture; ensure a safe, nutritious, and secure food supply; enhance rural prosperity; and protect our National forests." *Id.* The letter provided no explanation as to why the award did not effectuate those policies, and merely gave instructions on submitting final reports and final payment requests and retaining records with no reference to any option for administrative appeal. *Id.*

AC's Grant #2, designed to help farmers from disadvantaged backgrounds access land capital and resources, has not yet been terminated, though its funds have been frozen since February 2025. *See* FAC ¶ 22; *see also* Pls.' Notice of Factual Development at 1 n.1, ECF No.

26 (confirming that AC has not received formal notice of termination of this grant as of July 24, 2025).  On June 17, 2025, the Secretary issued a press release announcing that USDA would terminate a $2,500,000 grant for "[e]xpanding equitable access to land, capital, and market opportunities for underserved producers in the Bay Area," referring to AC's second grant.  Press Release 0136.25, *Secretary Rollins Takes Bold Action to Put American Farmers First, Cuts Millions in Woke DEI Funding*, USDA (June 17, 2025), https://www.usda.gov/about-usda/news/press-releases/2025/06/17/secretary-rollins-takes-bold-action-put-american-farmers-first-cuts-millions-woke-dei-funding.  The statement referred to "millions of dollars . . . being wasted on woke DEI propaganda."  *Id.*  Defendants confirm that AC's second grant is "slated for termination."  Defs.' Opp'n at 8.

PFC's grant was terminated on April 25, 2025, with a letter focusing on USDA's rejection of DEI initiatives.  *See* Heltman-Weiss, Ex. A, Letter from Faulkner to Bari Zeiger, Dir. of Finance & Grants at PFC (Apr. 25, 2025) ("PFC Termination Letter").  The termination letter included a paragraph similar in form to the explanatory paragraph in the USDN Termination Letter but targeted DEI initiatives rather than climate change as the problematic policy, stating:

> It is a priority of the Department of Agriculture to eliminate discrimination in all forms throughout the United States. The Secretary of Agriculture has determined, per the Department's obligations to the Constitution and laws of the United States, that priority includes ensuring that the Department's awards do not support programs that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that discriminate on the basis of race, color, sex, national origin, or another protected characteristic. . . . In addition to complying with the letter and spirit of the civil rights laws, it is vital that the Department assess whether all awards are free from fraud, abuse, and duplication, as well as to assess whether current awards are in the best interests of the United States.

Like the USDN Termination Letter, the letter then listed several potential bases for termination without identifying a specific reason:

> Termination. The award specified above provides funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully

> discriminate on the basis of race, color, religion, sex, national origin, or another
> protected characteristic; that violate either the letter or purpose of Federal civil
> rights laws; that conflict with the Department's policies and priorities; that are not
> free from fraud, abuse, or duplication; or that otherwise fail to serve the best
> interests of the United States. The award is therefore inconsistent with, and no
> longer effectuates, Department priorities. *See* 2 C.F.R. § 200.340(a)(4). Pursuant
> to, among other authorities, 2 C.F.R. §§ 200.339-43, which are applicable to your
> award, the Department hereby terminates [it] in its entirety.

PFC Termination Letter at 1. The letter did not explain why the award conflicted with those

priorities or what aspects of the award were discriminatory, nor did it address reliance interests,

and merely explained the provisions for submitting final reports and final payment requests and

pursuing an administrative appeal. *See id.* at 1-2.

Finally, IATP's award was terminated on April 21, 2025, as communicated in a letter

nearly identical to PFC's Termination Letter, focusing on DEI initiatives without specificity as to

why IATP's award was inconsistent with the new policies. McKee Van Slooten Decl., Ex. C,

Letter from Bruce Summers, Adm'r of USDA Agricultural Marketing Service, to Claudia

Aurand, Assoc. Dir. of IATP (Apr. 21, 2025) ("IATP Termination Letter"). The letter included

the same paragraph on general DEI policies as in the PFC Termination Letter, and the same

paragraph starting with "<u>Termination</u>." in the PFC Termination Letter. *Id.* at 1. It contained, as

well, similar language about closing out expense requests and reports and an explanation of how

to pursue an administrative appeal. *See id.* at 2.

Plaintiffs allege that these terminations were only six of about 600 such USDA grant

terminations, based upon termination numbers touted on DOGE's website. FAC ¶¶ 169-171;

Pls.' Mem. at 16 (citing DOGE, *Savings*, https://doge.gov/savings (last visited Jul. 20, 2025)).

Plaintiffs provide an additional example of a termination of another one of AC's grants, which

resembles the termination letters for PFC and IATP. *See* Pls.' Notice of Factual Development at

1-2; *id.*, Ex. A, Letter from Faulkner to Atwood ("Add'l AC Termination Letter").[4]  Ongoing litigation in other courts further confirms that other USDA grants were similarly terminated.  The Pennsylvania Department of Agriculture has challenged the termination of its Local Food Purchase Assistance program grant, which focuses on purchasing local foods from underserved producers and small businesses and distributing it to underserved communities.  *See Shapiro v. USDA*, No. 25-cv-998, Complaint, ECF No. 1 (M.D. Penn. June 5, 2025).  Pennsylvania, along with several other states, also separately sued USDA and numerous other federal agencies to challenge the defendants' allegedly unlawful use of § 200.340(a)(4) to terminate federal funding.  *See New Jersey v. U.S. Office of Mgmt. & Budget*, No. 25-cv-11816, Complaint, ECF No. 1 (D. Mass. June 25, 2025).  A few months ago, researchers in the University of California System also challenged termination of their USDA grants on that basis and were granted a preliminary injunction.  *See Thakur v. Trump*, -- F. Supp. 3d --, 2025 WL 1734471 (N.D. Cal. June 23, 2025).

### B.    Procedural Background

After receiving termination letters, plaintiffs took steps various steps as described next.

#### 1.    *Administrative Appeals*

As a first step, plaintiffs sought relief with USDA and the agency components issuing the awards in an effort to restore their grants.  OBC exchanged emails with USDA officials, explaining that the termination was an error: Because of OBC's cooperative structure, 100% of their funds go to growers, not less than 65% as the OBC Termination Letter indicated.  *See* Thiel Decl., Ex. E, Emails re: basis for termination.  Despite exchanging emails over the course of

---

[4]    Plaintiffs filed a notice of additional factual development on July 24, 2025, noting that a third AC grant had been terminated pursuant to the same alleged policy and practice and explaining that other USDA grant recipients in receipt of termination notices similar to plaintiffs wished to join the litigation if the requested broad relief preliminarily enjoining the broader policy and practice of grant terminations were not granted.

April and May, USDA stuck to the termination decision. *See id.* In mid-May, OBC filed an internal administrative appeal of the termination to the USDA National Appeals Division ("NAD"), *see id.*, Ex. F, eFiling of Appeal (May 16, 2025); FAC ¶ 147, but no action has been taken by NAD.[5]

Around the same time in May, each of the other plaintiffs also submitted administrative appeals to components that issued their respective awards. *See* FAC ¶ 142 (USDN appealed to USFS on May 1); *id.* ¶ 154 (AC appealed its first grant termination to NIFA on May 6); *id.* ¶ 159 (PFC appealed to NIFA on May 15); *id.* ¶ 164 (IATP appealed to AMS on May 21); McKee VanSlooten Decl., Ex. D, Letter from Eric Bakies, Counsel for IATP, to Bruce Summers, Adm'r of AMS (May 21, 2025). Such appeals to USDA components, as opposed to NAD, are completely discretionary—effectively requests for reconsideration with no expectation of formal process or additional review. *See* Rough Hr'g Tr. at 17:10-19.

None of the appeals have been resolved. *Id.* at 11:4-8. Plaintiffs explain, however, that NAD has "issued decisions" in response to other grant appeals expressing "that the claims raised in this case are ones of 'general applicability' that it is not permitted to review." Pls.' Mem. at 18; *see also* Rough Hr'g Tr. at 13:2-18 (plaintiffs' counsel suggesting that NAD is avoiding resolving what it considers to be questions of law). After that position was made clear, plaintiffs decided to pursue relief in court, anticipating that no relief would be forthcoming from the agency. *See* Pls.' Reply in Supp. of Mot. for PI ("Pls.' Reply") at 20, ECF No. 24.

---

[5]     As noted, *supra* Part I.A.2, OBC also submitted a new application pursuant to the invitation in its termination letter and has received no response. *See* Rough Hr'g Tr. at 16:13-23.

### 2.    *Initiation of Instant Lawsuit*

USDN, OBC, and AC filed a complaint before this Court on June 5, 2025, and after being

joined by PFC and IATP, filed the operative first amended complaint on June 24, 2025, s*ee* FAC,

alleging an unlawful "policy, pattern, and practice" where defendants used essentially form

letters to terminate awards "based on termination grounds that were not clearly and

unambiguously allowed for under the awards," "based on a claimed failure to effectuate agency

priorities, when those agency priorities were not specified in the awards," and "based on the

Trump Administration's new priorities that did not exist at the time of the awards."  FAC

¶ 135(a)-(c).  Plaintiffs also allege that defendants' terminations "[l]ack[ed] any evidence that the

awards failed to effectuate the priorities determined at the time of the awards" and "[l]ack[ed]

any reasoned explanation."  *Id.* ¶ 135(d)-(e).  Defendants did not accuse recipients of "any

noncompliance" "with the terms or conditions of their awards" and did not "describe any specific

aspect of the awards that was found to be objectionable, let alone unlawful."  *Id.* ¶ 135(f)-(g).

They did not "provide any advance notice to awardees" or "offer technical assistance or even an

opportunity to address any alleged problems prior to termination."  *Id.* ¶ 135(h)-(i).[6]

Plaintiffs separate their alleged legal violations into seven claims.  Plaintiffs' first two

claims are premised on the Due Process Clause.  First, they allege that defendants violated

plaintiffs' procedural due process rights under the Constitution because they did not provide

reasonable notice and an opportunity to be heard prior to their terminations.  *Id.* ¶¶ 174-82

(Count One).  Second, plaintiffs allege that defendants violated plaintiffs' due process rights

---

[6]    These nine deficiencies are allegedly shared by plaintiffs' six terminated grant awards, *see* FAC ¶¶ 141(a)-
(i) (USDN), 146(a)-(i) (OBC), 153(a)-(i) (AC), 158(a)-(i) (PFC), and 163(a)-(i) (IATP), and also allegedly
characterize the other terminations challenged as part of defendants' policy and practice of unlawful terminations
that plaintiffs allege, *see id*. ¶ 135(a)-(i).

because their "application of 2 C.F.R. § 200.340(a)(4) is unconstitutionally vague and constitutes an arbitrary exercise of authority" and because the form letters used for the terminations were "based on priorities that were never previously identified for awardees." *Id.* ¶¶ 183-90 (Count Two).

Plaintiffs' next assert violations of the APA, alleging, in the Third Count, that defendants' terminations of the grants were not in accordance with law—in particular, the federal regulations consisting of OMB's Uniform Guidance that USDA adopted as its own regulations, 2 C.F.R. § 400 et seq. *See* FAC ¶¶ 191-201 (Count Three). As support for this claim, plaintiffs allege a litany of misapplication or misconstruction of regulations by defendants. For instance, according to plaintiffs, the provision cited in their termination letters as the basis for termination, 2 C.F.R. § 200.340(a)(4), was not yet in effect and did not apply to the grants issued prior to 2024. *See* FAC ¶ 197(a). Further, defendants failed clearly and unambiguously to identify grounds for termination in the conditions of the award, as § 200.340(a)(4) allegedly requires since the awards only generally incorporated the provisions at 2 C.F.R. part 200. FAC ¶ 197(b). Plaintiffs also allege that defendants terminated the grants based on new priorities rather than those in effect at the time of the award and included in the award itself. *Id.* ¶ 197(c). Defendants, moreover, failed to "identify or rely on any specific new evidence about the award that demonstrates the award no longer effectuates the priorities it was initially intended to serve," and that defendants failed to "inform awardees prior to termination of any noncompliance with the award's requirements and offer technical assistance or an opportunity to address any issue," as set out in 2 C.F.R. §§ 200.339, 200.208(c). FAC ¶ 149(d)-(e).

Plaintiffs next allege, in the Fourth Count, that defendants violated the APA because their "policy, pattern, and practice of issuing termination letters to hundreds of federal awardees" is

arbitrary and capricious for several reasons. *Id.* ¶¶ 202-08 (Count Four).  For one, defendants did not provide any reasonable explanation for their terminations—*i.e.*, why the awards are inconsistent with agency priorities or how the awards no longer effectuate USDA priorities established at the time of the awards (which plaintiffs deem the proper standard by which to judge awards). *Id.* ¶ 205(a), (c).  Defendants also did not explain how their new priorities can be reconciled with certain statutory mandates pursuant to which the funds were awarded. *Id.* ¶ 205(b).  Plaintiffs also fault defendants for failing to consider how award terminations would impact the statutory purposes of the awards, the reliance interests at stake, and the possibility that the terminated awards may be consistent with new priorities. *Id.* ¶ 205(e)-(g).  Plaintiffs lastly say that the termination letters were arbitrary and capricious because they do not explain why defendants changed their policy from their previous priorities. *Id.* ¶ 205(h).

Plaintiffs USDN and AC alone allege in the Fifth Count that defendants also violated the APA because they did not act in accordance with the statutory provisions underlying their awards. *Id.* ¶¶ 209-24 (Count Five).  Regarding USDN's grant, plaintiffs argue that Congress specifically intended for awards under the Urban Community Forestry Assistance program, 16 U.S.C. § 2105, to contribute to mitigating global warming. *See id.* ¶ 211.  Defendants' expressed reason, then, for terminating the award, *i.e.*, because it related to climate change and environmental justice and was no longer consistent with agency priorities, is inconsistent with the statute. *Id.* ¶¶ 214-16.  Regarding AC's Grant #2, plaintiffs argue that Congress specifically intended for funds under the Land Access Program to benefit socially disadvantaged farmers, just as AC's award did, and thus the articulated reason for the announced termination, *i.e.*, because the grant is DEI-focused, is inconsistent with the statute. *See id.* ¶¶ 217-222.

Plaintiffs USDN and AC, again alone, allege in the Sixth Count a violation of separation of powers under the Constitution for the same reasons cited in the Fifth Count, namely, defendants' termination of awards for reasons inconsistent with statutory mandates. *Id.* ¶¶ 225-33 (Count Six). Lastly, plaintiff USDN, alone, alleges, in the Seventh Count, that USDA and USFS acted *ultra vires* in seeking to terminate its award for reasons inconsistent with the statute and having no statutory authority to do so. *Id.* ¶¶ 234-38.

As relief, plaintiffs seek a declaration that the terminations are unlawful, vacatur and setting aside of the termination of plaintiffs' awards, plus all other awards pursuant to the same practice, an order to return plaintiffs' awards to the *status quo ante*, and injunctions preventing defendants from implementing the terminations or unlawfully re-terminating the awards. *See id.* at 61 ("Requests for Relief").

### 3.    *Pending Motions for Preliminary Injunctive Relief and Expedited Discovery*

On June 26, 2025, plaintiffs moved for a preliminary injunction and for expedited discovery. *See* Pls.' Mot for PI; Pls.' Discovery Mot. Plaintiffs request that all grant terminations pursuant to the challenged policy and practice be preliminarily vacated, that all defendants be enjoined from giving the terminations any effect, that they be enjoined from further terminating grants pursuant to the unlawful practice, and that defendants be required to restore the *status quo ante*, reinstating all grants that were wrongfully terminated. *See* Pls.' Proposed Order, ECF No. 14-7.

Plaintiffs also request limited discovery should the record not already be sufficient to grant a preliminary injunction, given that there is "no published administrative record of Defendants' mass terminations, and any ad hoc administrative record offered by Defendants will shed little, if any, light on the scope and specifics of the actual decision-making process and the

determinative factors behind Defendants' actions." Pls.' Discovery Mot. at 1-2. Specifically,

plaintiffs request two interrogatories, providing basic information about the slew of grant

terminations: (1) "a description of the process by which Defendants identified and decided to

terminate or did terminate Plaintiffs' Grants and any other grants for failing to effectuate or

otherwise align with USDA's priorities" and (2) "a list of all grant recipients who received

termination notices containing language similar or equivalent to the termination letters received

by Plaintiffs, and the grants impacted by those terminations." *Id.* at 5. Plaintiffs also seek two

"requests for production" for (1) "all documents regarding the creation, development, and

execution of Defendants' policy, practice, or process" and (2) "all records Defendants rely on in

answering the two interrogatories." *Id.* at 6.

Defendants oppose both motions for a preliminary injunction and expedited discovery,

Defs.' Opp'n, and a hearing was held on these motions on August 6, 2025.[7]

## II.     LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a

clear showing that the plaintiff is entitled to such relief." *Sherley v. Sebelius*, 644 F.3d 388, 392

(D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). Relief

---

[7]     At the hearing, defendants asserted that some of plaintiffs' grants were funded pursuant to programs or
appropriations that have since been eliminated by recent legislation but was unable to provide any details about
which grant funding had been so eliminated. *See* Rough Hr'g Tr. at 76:13-77:11. In response to the Court's request,
defendants subsequently clarified that the funding of only one of plaintiffs' six terminated grants was implicated by
recent legislation. Specifically, section 10201(3) of the One Big Beautiful Bill Act of 2025, Pub. L. No. 119-21
"rescinded all unobligated balances of amounts appropriated under Section 23003(a)(2) of the Inflation Reduction
Act," pursuant to which only USDN's now-terminated grant had been funded. Defs.' Notice, ECF No. 27.
Plaintiffs explain that the rescission of unobligated funds does not impact USDN's grant because the funds were
obligated prior to passage of Pub. L. No. 119-21. Pls.' Response to Defs.' Notice at 1, ECF No. 28. Indeed,
according to defendants' own interpretation in the USFS Handbook, funds are considered obligated at the time an
agreement is fully executed. *See id.*, Ex. A at 30, ECF No. 28-1. USDN's grant was fully executed prior to the
rescission, so its funds are not affected by this legislation—nor are the funds for any of the other plaintiffs'
terminated grants at issue in this lawsuit.

is, as a result, "never awarded as of right." *Munaf v. Green*, 553 U.S. 674, 689-90 (2008) (citing *Yakus v. United States*, 321 U.S. 414, 440 (1944)).

To warrant preliminary injunctive relief, moving parties must demonstrate that: (1) they are "likely to succeed on the merits"; (2) they are "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [their] favor; and (4) "an injunction is in the public interest." *Winter*, 555 U.S. at 20. When the federal government is the opposing party, the final two factors "merge" into one, *Nken v. Holder*, 556 U.S. 418, 435 (2009), because "the government's interest *is* the public interest," *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (emphasis in original).

Although a "sliding scale" approach has not been formally disavowed, the D.C. Circuit has suggested that a "strong showing on one factor" cannot "make up for a weaker showing on another." *Sherley*, 644 F.3d at 392-93. Plaintiffs must establish "a likelihood of success on the merits," which "encompass[es] not only substantive theories but also establishment of jurisdiction." *Obama v. Klayman*, 800 F.3d 559, 565 (D.C. Cir. 2015) (quoting *Munaf*, 553 U.S. at 690).

## III.    DISCUSSION

Contrary to defendants' argument, this Court has subject matter jurisdiction over all of plaintiffs' claims because they do not fall within the scope of the Tucker Act conferring exclusive jurisdiction to the Court of Federal Claims. Further, plaintiffs have made the requisite showing that they are entitled to preliminary relief with respect to their six individual grant terminations before this Court as to some but not all of their claims. Plaintiffs do not have sufficient evidence at this point, however, to warrant relief on the broader policy and practice of *en masse* terminations pursuant to § 200.340(a)(4) as alleged. Plaintiffs also are not entitled to

discovery at this stage, considering they do not meet the exceptions to the limitation on discovery in APA cases.

### A.    Jurisdiction

At the outset, defendants argue, as the federal government has in countless other cases regarding federal agency grant terminations, that plaintiffs' constitutional, APA, and *ultra vires* claims belong not here but before the Court of Federal Claims because they stem from contracts plaintiffs had with the government. *See* Defs.' Opp'n at 11-16. The Tucker Act provides the exclusive "remedial scheme to challenge the termination of [p]laintiff[s'] grant[s]," according to defendants, so this Court lacks subject matter jurisdiction over plaintiffs' claims. *Id.* at 11, 16. Plaintiffs counter that the Court has jurisdiction over all of their claims because, under extant D.C. Circuit law, neither the source of the rights upon which plaintiffs base their claims nor the relief sought is contractual in nature. *See* Pls.' Mem. at 20. Jurisdiction is a "threshold" issue and is therefore addressed before reviewing the merits of plaintiffs' pending motions, with this Court holding that jurisdiction may be properly exercised over plaintiffs' claims. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93-94 (1998).

### 1.    *Current State of Law*

The Tucker Act grants jurisdiction to the Court of Federal Claims to "render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). That jurisdiction is "exclusive" for "breach of contract claims against the United States seeking more than $10,000 in damages." *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106 (D.C. Cir. 2022) (quoting *Hammer v. United States*, 989 F.3d 1, 2 (D.C. Cir. 2021)). As a result, the Act "impliedly forbids" such claims "against the Government from being brought in district court" under other provisions, such as the APA, which only provides for a waiver of sovereign immunity where no other statute

25

"grants consent to suit expressly." *Id.* (first passage and third passages quoting *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 618-19 (D.C. Cir. 2017)).

### a)    **D.C. Circuit** Crowley/Megapulse *Framework*

The D.C. Circuit has long determined "whether a claim falls within the exclusive jurisdiction of the Claims Court pursuant to the Tucker Act" by asking whether the "action against the United States . . . is *at its essence* a contract claim." *Id.* at 1106 (emphasis in original) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982)).  That depends on (1) "the source of the right upon which the plaintiff bases its claims" and (2) "the type of relief sought (or appropriate)." *Id.* (quoting *Megapulse*, 672 F.2d at 968).

Regarding the source of the right, the mere involvement of a contract is not dispositive. As the D.C. Circuit explained in *Crowley*, "[c]ontract issues may arise in various types of cases where the action itself is not founded on a contract," so "reference to or incorporation of a contract" does not necessarily mean the Tucker Act applies. *Id.* at 1106-07 (alteration in original) (quoting *Megapulse*, 672 F.2d at 968); *see also id.* at 1107 ("[T]he mere fact that a court may have to rule on a contract issue does not, by triggering some mystical metamorphosis, automatically transform an action . . . into one on the contract and deprive the court of jurisdiction it might otherwise have." (alteration in original) (quoting *Megapulse*, 672 F.2d at 968)).  The Court must ascertain, regardless of how artfully pled, whether the action "sound[s] genuinely in contract" or is "based on truly independent legal grounds." *Id.* (quoting *Megapulse*, 672 F.2d at 969-70).  Factors such as whether the plaintiffs' asserted rights and the government's purported authority arise from a statute as opposed to a contract and "whether the plaintiff's rights 'exist[] prior to and apart from rights created under the contract'" may be considered. *Id.*

(alteration in original) (quoting *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985)).

Regarding the type of relief sought, "[t]he crux of this inquiry . . . boils down to whether the plaintiff effectively seeks to attain money damages in the suit" because that is the only relief the Court of Federal Claims may award. *Id.* The Court of Federal Claims "does not have the general equitable powers of a district court to grant prospective relief." *Bowen v. Massachusetts*, 487 U.S. 879, 905 (1988). In many cases, the distinction between money damages and non-monetary relief is clear. Where a plaintiff is seeking injunctive relief that may result in the payment of money, however, the distinction is less obvious. The relief sought is not considered monetary "merely because . . . success on the merits may obligate the United States to pay the complainant." *Crowley*, 38 F.4th at 1108 (quoting *Kidwell v. Dep't of Army*, 56 F.2d 279, 284 (D.C. Cir. 1995). In other words, an order for "specific relief" (undoing a wrongful action), even if resulting in the payment of money, is not the same as "money damages" (substituting for "that which ought to have been done"). *Bowen*, 487 U.S. at 910. Yet, the non-monetary relief requested by plaintiff must have "'considerable value' independent of any potential future for monetary relief." *Crowley*, 38 F.4th at 1107-08 (quoting *Kidwell*, 56 F.3d at 284).

Importantly, the D.C. Circuit has cautioned that this inquiry cannot lead to the perverse outcome that neither the district court nor the Court of Federal Claims has jurisdiction. The Tucker Act does not deprive the district court of jurisdiction where the Court of Federal Claims would not be able to exercise its jurisdiction over the claim at issue. *Tootle v. Sec'y of Navy*, 446 F.3d 167, 176-77 (D.C. Cir. 2006) ("There cannot be exclusive jurisdiction under the Tucker Act if there is no jurisdiction under the Tucker Act."); *see e.g.*, *Crowley*, 38 F.4th at 1109 ("Because a plaintiff could not bring this type of . . . action in Claims Court in the first place, that Court

would not have exclusive jurisdiction of them.").  That means the district court must also consider, apart from the two *Megapulse* factors, whether "the Court of Federal Claims can exercise jurisdiction over the claim" in the first place because the claims involve agreements qualifying as "contracts" under the Tucker Act.  *Am. Near E. Refugee Aid v. USAID*, 703 F. Supp. 3d 126, 132 (D.D.C. 2023).

### b)    *Recent Supreme Court Stay Orders*

The D.C. Circuit's approach is the prevailing framework around the country for questions about Tucker Act jurisdiction.  *See, e.g.*, *California v. Dep't of Educ.*, 132 F.4th 92, 96-97 (1st Cir. 2025), *aff'g order later stayed by Dep't of Educ. v. California*, 604 U.S. --, 145 S. Ct. 966 (2025); *United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023); *Normandy Apartments, Ltd. v. Dep't of Hous. & Urb. Dev.*, 554 F.3d 1290, 1299-1300 (10th Cir. 2009) (all applying the framework from *Megapulse*).  Recently, two decisions applying this framework have reached the Supreme Court on motions by the current Administration for an emergency stay of injunction orders issued by district courts and not stayed by circuit appellate courts.  In one, the district court issued an order enjoining suspension of federal aid awards after reasoning that plaintiffs' claims under the APA were properly before the court.  *See AIDS Vaccine Advoc. Coal. v. Dep't of State*, 766 F. Supp. 3d 74, 84-85 (D.D.C. 2025); *see also AIDS Vaccine Advoc. Coal.*, No. 25-5046, 2025 WL 621396, *1 (D.C. Cir. Feb. 26, 2025) (dismissing an emergency appeal of the order and rejecting the request to stay the enforcement of the temporary restraining order).  The Supreme Court denied the agency's application to vacate that order, simply directing the district court to clarify its order to ensure compliance and feasibility of any timelines.  *Dep't of State v. AIDS Vaccine Advoc. Coal.*, 145 S. Ct. 753 (Mem.) (2025).

In the other, a District of Massachusetts court enjoined terminations of grants by the Department of Education, determining that jurisdiction was appropriately exercised over APA claims grounded in statutory rights and seeking equitable relief, and the First Circuit denied a stay pending appeal. *See California v. Dep't of Educ.*, 769 F. Supp. 3d 72, 75-76 (D. Mass. 2025); *stay pending appeal denied*, 132 F.4th 92 (1st Cir. 2025). When the agency continued to pursue an emergency stay, however, the Supreme Court granted the stay in a curt order, indicating that the APA's waiver of sovereign immunity did not apply to claims falling within the scope of the Tucker Act. *See Dep't of Educ. v. California*, 604 U.S. --, 145 S. Ct. 966 (2025). "[T]he Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA," the Court wrote. *Id.* at 968. "[A]s we have recognized, the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered here. . . . Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.* (first quoting *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002), and then quoting 28 U.S.C. § 1491(a)(1)).

Much confusion ensued as countless courts—in this district and others—attempted to interpret that cursory explanation when applying the *Megapulse* inquiry in challenges to grant terminations. *See, e.g.*, *Metro. Transp. Auth. v. Duffy*, -- F. Supp. 3d -- , 2025 WL 1513369, *25 (S.D.N.Y. May 28, 2025) (distinguishing the Supreme Court's *Department of Education* order to hold that the court had jurisdiction over APA claims); *Vera Inst. of Just. v. DOJ*, No. 25-cv-1643 (APM), 2025 WL 1865160, *7-11 (D.D.C. July 7, 2025) (holding that *Department of Education* "foreclose[d] the exercise of jurisdiction over Plaintiffs' arbitrary-and-capricious claim," but not of other claims), *appeal filed*, No. 25-5248 (D.C. Cir. July 10, 2025); *Green & Healthy Home*

*Initiatives, Inc. v. EPA*, -- F. Supp. 3d -- , 2025 WL 1697463, *13-14 (D. Md. June 17, 2025) (distinguishing the Supreme Court's *Department of Education* order and collecting cases applying the *Megapulse* test to grant termination challenges); *infra* Part III.A.2(c) (collecting cases).

The D.C. Circuit has provided some guidance in interpreting the Court's stay ruling in *Department of Education*, indicating that the "stay order" did not "change the landscape" established by *Megapulse*.  *Widakuswara v. Lake (No. II)*, No. 25-5144, 2025 WL 1288817, *13 (D.C. Cir. May 3, 2025) (Pillard, J., dissenting).  The district court in *Widakuswara* had granted a preliminary injunction requiring the United States Agency for Global Media to, among other things, restore grants to network stations Radio Free Asia and Middle East Broadcasting Network that were unlawfully terminated.  *See Widakuswara v. Lake (No. I)*, -- F. Supp. 3d --, 2025 WL 1166400, *18 (D.D.C. Apr. 22, 2025).  The government sought an emergency stay order from the D.C. Circuit, which the initial panel granted over a dissent from Judge Pillard. *See Widakuswara No. II*, 2025 WL 1288817, at *1.  The panel majority cited the Supreme Court's limited "reasoning" in the *Department of Education* order to find that decision "controls this case."  *Id.* at *3.  Judge Pillard explained, to the contrary, that the plaintiffs' APA, statutory, and constitutional claims were not "in essence contractual" under *Crowley* and *Megapulse*, and the Supreme Court's stay order did not change the outcome.  *See id.* at *11-14 (Pillard, J., dissenting).  The Circuit took the panel's stay order *en banc*, vacated the panel majority's order, and explicitly adopted Judge Pillard's reasoning.  *Widakuswara v. Lake (No. III)*, No. 25-5144, 2025 WL 1521355, at *1 (D.C. Cir. May 28, 2025) (*en banc*).  In light of that guidance, especially given the paucity of clear reasoning to apply from *Department of Education*, district courts have continued to apply *Megapulse* and *Crowley* while addressing the Supreme Court's

30

stay with respect to the particular facts in their cases.  *See, e.g.*, *S. Educ. Found. v. Dep't of Educ.*, -- F. Supp. 3d--, 2025 WL 1453047, at *8-9 (D.D.C. May 21, 2025) (distinguishing the Supreme Court's stay order and further noting that it "does not displace governing law that guides this Court's assessment of whether [plaintiff]'s claims are essentially contract claims"); *La. Delta Serv. Corps v. Corp. for Nat'l & Cmty. Serv.*, No. 25-cv-378, 2025 WL 1787429, at *22 (M.D. La. June 27, 2025) (applying existing law governing the Tucker Act inquiry, including *Bowen*, 487 U.S. at 893, because the Supreme Court did not "overrule" that case, nor did the Court "provide any dicta" distinguishing it).

### 2.    *Analysis*

Taking that approach here, the Court addresses the nature of the rights asserted by plaintiffs and the nature of the relief sought.  *See Megapulse*, 672 F. 2d at 968.  The grants at issue here would not be considered contracts and therefore would not be subject to the Court of Federal Claims' jurisdiction.  Regardless, plaintiffs are not seeking relief arising directly from the grants themselves and are requesting relief that is decidedly not contractual in nature. Plaintiffs' claims are properly before this Court.

### a)    *Rights Asserted: Constitutional and Statutory*

The source of plaintiffs' claims is not contractual in nature for two reasons: (1) plaintiffs' grants are not contracts under applicable jurisprudence in the Court of Federal Claims, meaning that court would not have jurisdiction over these claims, and (2) plaintiffs' claims arise out of rights protected not by contracts but rather by statutes and the Constitution.

First, the "Court of Federal Claims" is granted jurisdiction by the Tucker Act over only "contract suits against the United States," and because plaintiffs' grants do not fall within the Federal Circuit's jurisprudence defining "contracts" with the United States, this Court cannot be deprived of jurisdiction by the Tucker Act.  *Nat'l Leased Hous. Ass'n v. United States*, 105 F.3d

1423, 1427 (Fed. Cir. 1997). A contract with the United States must "contain[] the four required elements of offer, acceptance, consideration, and proper government authority." *San Antonio Hous. Auth. v. United States*, 143 Fed. Cl. 425, 463 (2019); *see also Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1326 (Fed. Cir. 1997) ("[A]ny agreement can be a contract within the meaning of the Tucker Act, provided that it meets the requirements for a contract with the Government, specifically: mutual intent to contract including an offer and acceptance, consideration, and a Government representative who had actual authority to bind the Government."). With respect to consideration, "[i]n the context of government contracts," consideration "must render a benefit to the government, and not merely a detriment to the contractor." *St. Bernard Parish Gov't v. United States*, 134 Fed. Cl. 730, 735 (2017) (quoting *Metzger, Shadyac & Schwarz v. United States*, 12 Ct. Cl. 602, 605 (1987)). "The crucial distinction is between an *incidental* and a *direct* benefit." *Id.* at 736. Indirectly benefitting the government by "advanc[ing] the agency's overall mission" is not sufficient consideration. *Hymas v. United States*, 810 F.3d 1312, 1328 (Fed. Cir. 2016); *see also Penn. Dep't of Pub. Welfare v. United States*, 48 Fed. Cl. 785, 791 (2001) ("By funding and regulating programs designed for the public good, the U.S. is acting in its role as sovereign and the moneys promised are gifts or gratuities which do not establish any contractual obligation, express or implied, on the part of the United States." (quoting *Marshall N. Dana Constr., Inc. v. United States*, 229 Ct. Cl. 862, 864 (1982))). Rather, the kinds of contracts subject to Court of Federal Claims jurisdiction are those that allow the government to "obtain a service" or property. *Hymas*, 810 F.3d at 1328-29.

Defendants make the conclusory assertion that plaintiffs' grant agreements "are prototypical contracts" because "they set out obligations that Plaintiffs must accept and fulfill in

exchange for consideration from the government."  Defs.' Opp'n at 13 ("[T]he mutual intent to contract, along with other terms outlined in the grant agreement, constitute government contracts for Tucker Act purposes.").  Plaintiffs respond that "grant agreements are not contracts," comparing them to the "cooperative agreements" this Court has previously differentiated from contracts subject to the Court of Federal Claims jurisdiction because they lacked consideration. Pls.' Reply at 2, 4 (cleaned up) (citing *Am. Ctr. for Int'l Lab. Solidarity v. Chavez-DeRemer* ("*ACILS*"), -- F. Supp. 3d --, 2025 WL 1795090, *14-18 (D.D.C. June 30, 2025)).

Plaintiffs are correct that not all grant agreements are contracts, and those at issue here lack consideration to constitute contracts for Court of Federal Claims jurisdiction.  As an initial matter, although the label on the agreement is not dispositive, *see Penn. Dep't of Pub. Welfare*, 48 Fed. Cl. at 790 ("Grant related agreements have been held to be contracts within Tucker Act jurisdiction when all the requisite elements of a contract were present."), "how the government agency classifies or denominates an agreement has probative value in assessing the sufficiency of the consideration the agency expects."  *ACILS*, 2025 WL 1795090, at *14.  Federal law instructs agencies to use "grant agreement[s] as the legal instrument reflecting a relationship between the United States Government and . . . other recipient[s] when—(1) the principal purpose of the relationship is to transfer a thing of value to the . . . recipient to carry out a public purpose of support or stimulation authorized by a law of the United States instead of acquiring . . . property or services for the direct benefit or use of the United States Government; and (2) substantial involvement is not expected" in carrying out that purpose.  31 U.S.C. § 6304. Cooperative agreements are defined similarly, but as to the second part of the definition, "substantial involvement is expected between the executive agency and the . . . recipient" for such arrangements.  *Id.* § 6305.  By contrast, "procurement *contract[s]*" reflect acquisition of

"property or services for the direct benefit or use of the United States Government." *Id.* § 6303 (emphasis added). Federal regulations define the different forms of agreements similarly to the statute. *See* 2 C.F.R. § 200.1. In particular, by regulation, "contract" is defined as a "procurement transaction[] under a Federal award." *Id.*

Here, none of the six agreements currently in the record are labeled as "contracts." Three are labeled as "award[s]," *see* Heltman-Weiss Decl., Ex. C, PFC Award; McKee VanSlooten Decl., Ex. A., IATP Award; Atwood Decl., Ex. C, AC Grant #1, suggesting a kind of gratuity rather than agreement of mutual obligation, *see Pennsylvania Department of Public Welfare*, 48 Fed. Cl. at 791. Two are labeled as "grant and agreement award[s]," Thiel Decl., Ex. A, OBC Grant; Atwood Decl., Ex. D, AC Grant # 2, which by statutory definition, are different from contracts, *see* 31 U.S.C. § 6304, and one is labeled as a "cooperative agreement," Brown Decl., Ex. C, USDN Cooperative Agreement, which also differs from contracts under the statute and in the caselaw, *see* 31 U.S.C. § 6305; *Hymas*, 810 F.3d at 1329-30 (holding that a properly construed "cooperative agreement" is "not subject to Tucker Act review"); *see also Am. Near East Refugee Aid*, 703 F. Supp. 3d at 134 (holding that the district court had jurisdiction over a claim about termination of cooperative agreements because they lacked consideration to be considered contracts for purposes of Tucker Act review); *ACILS*, 2025 WL 1795090, at *18 (same).

The labels here indeed reflect the contents of these awards, which lack the kind of consideration sufficient to constitute a contract before the Court of Federal Claims. Aside from referring vaguely to "obligations," defendants do not point to any consideration at all—let alone any direct benefit the government would receive. *See* Defs.' Opp'n at 13. While the awards set out specific expectations and requirements—for instance, the award recipient must provide

performance reports and comply with other reporting obligations, audit requirements, prohibitions on using funds in ways that contradict the law, restrictions on use of funds for certain non-essential items, procurement standards, and so forth—those obligations on the recipients reflect conditions on the awards and do not constitute "direct benefit[s]" to the government. *St. Bernard Parish*, 134 Fed. Cl. at 735; *see, e.g.*, USDN Cooperative Agreement at 6-15 (establishing requirements for financial status reporting, program performance, and purchase of equipment under the award, and prohibitions on trafficking in persons, hiring ineligible workers, using drugs in the workplace, etc.); OBC Grant at 4 (requiring compliance with "the applicable version of the General Terms and Conditions"); AC Grant #1 at 1 (requiring compliance with "Research Terms and Conditions" and "USDA/NIFA Agency-Specific Terms and Conditions," as well as progress reporting); AC Grant #2, Attachment "General Terms and Conditions for Non-ezFedGrants" (describing "unallowable costs" such as those above the amount authorized or "souvenirs," prior approval requirements, financial reporting and performance monitoring requirements, and preferences for purchasing materials for construction from American companies); PFC Award at 1 (setting out very minimal obligations); IATP Award at 5-6 (requiring only adherence to civil rights law, paperwork requirements, and public announcement restrictions). The benefit that these agreements provide to the government is advancing certain policy priorities, statutory goals, and the mission of the USDA. *See* Rough Hr'g Tr. at 79:21-80:5 (defendants' counsel at the hearing arguing that the direct benefit is "these nonprofits [] implementing a government program" or aim set out by Congress). That is not consideration according to the Court of Federal Claims. *See Hymas*, 810 F.3d at 1328.

    At least one other Judge on this Court considering similar claims reached a different conclusion that grants need not offer "direct, tangible" benefit to the government to be contracts

before the Court of Federal Claims, *Vera Institute*, 2025 WL 1865160, at *10, in reliance on

*Columbus Regional Hospital v. United States*, 990 F.3d 1330 (Fed. Cir. 2021), where the Federal

Circuit "held that there was consideration in a disaster grant agreement, where the grant recipient

'agreed to comply with an array of requirements attached to the receipt, use, and distribution of

the grant money,'" *Vera Institute*, 2025 WL 1865160, at *10 (quoting *Columbus Reg'l*, 990 F.3d

at 1340). *Columbus Regional* does not, however, suggest that mere conditions for compliance by

a recipient of a grant award always suffice as consideration. That case involved an agreement

between the state of Indiana and FEMA for disaster assistance. *See* 990 F.3d at 1335-36. After

the Court of Federal Claims had dismissed the case for lack of jurisdiction under the Tucker Act,

the Federal Circuit disagreed, holding that the grant had all four necessary elements to qualify as

a contract. *Id.* at 1339-41. The grant especially evinced an intent to contract, considering FEMA

offered the grant pursuant to a regulation that explicitly "impos[es] binding obligations on

FEMA" as well as the recipients, "in the form of conditions for assistance which are legally

enforceable." *Id.* at 1339 (quoting 44 C.F.R. § 206.44(a)).

With respect to consideration, the court cited the grant's imposition of obligations on

Indiana, not as traditional conditions of compliance for receiving federal funds, but as

obligations conferring a direct benefit to FEMA. *See id.* at 1340. FEMA is statutorily required

to provide disaster assistance and relief and may do that in part by making grants to states. *See*

42 U.S.C. § 5131(c); 44 C.F.R. § 206.200(b)(1) ("The Stafford Act requires that we deliver

eligible assistance as quickly and efficiently as possible consistent with Federal laws and

regulations."). States receiving FEMA public assistance grants are therefore considered to

"administer federal programs" in providing disaster assistance "under their own procedures." 44

C.F.R. § 206.200(b)(2). States are essentially delegated a portion of FEMA's duties to distribute

disaster assistance to regions and localities—acting as "the grant administrator for all funds provided." *Id.* § 206.202(b). Indiana, therefore, took on specific responsibilities to, for instance "provide 'technical advice and assistance to eligible subrecipients' and to ensure that 'all potential applicants [we]re aware of available public assistance.'" *Columbus Reg'l*, 990 F.3d at 1340 (quoting 44 C.F.R. § 206.202(b)(1), (b)(3)). As the court described this arrangement: "Indiana *agreed to act on FEMA's behalf* to," for example, "recover any funds that were dispensed 'through error, misrepresentation, or fraud.'" *Columbus Reg'l*, 990 F.3d at 1340 (emphasis added) (quoting the record).

In other words, pursuant to the public assistance grant agreement, the state was performing services FEMA would otherwise have to perform in distributing, monitoring, and vetting disaster aid, thus conferring a direct benefit distinct from generally advancing FEMA's mission. That distinguishes *Columbus Regional* from this case where plaintiffs do not perform any services directly on the government's behalf that the government agency would otherwise be obliged to perform. Plaintiffs are not performing specific USDA functions or working with beneficiaries to whom USDA has an independent obligation, but rather developing their own, unique projects to pursue general statutory aims. *See Penn. Dep't of Pub. Welfare*, 48 Fed. Cl. at 790-91 (distinguishing a Federal Disaster Act award "involv[ing] a statutory provision expressly authorizing a representative to contractually bind the United States," which was held to be a contract, from the agreement at issue, where "no statute authoriz[ed] HHS to enter into a contract" and the plan "appear[ed] to implement a public benefit program that has the purpose of assisting the States in providing welfare services to children").

The Supreme Court's order in *Department of Education* sheds no light on the distinction between a grant and a contract for Tucker Act jurisdiction. *See* 145 S. Ct. 966. Though the

agreements were not even in the record at the time of the district court's order, with the exception of one "notification of award" as an exhibit, the parties in that case did not raise the issue challenging whether the grants were contracts and the lower courts did not consider it. *See California v. Dep't of Educ.*, 769 F. Supp. 3d 72 (D. Mass. 2025) (district court order on March 10, 2025); *id.*, Compl., Attachment B, No. 25-cv-10548, ECF No. 1-2; *California v. Dep't of Educ.*, 132 F.4th 92 (1st Cir. 2025) (denying stay pending appeal); Opposition to Application, *Dep't of Educ. v. California*, No. 24A910, 2025 WL 963588 (U.S.); Reply in Supp. of Application, *id.*, 2025 WL 1139974, at *7 (Mar. 2025) (government pointing out that "[r]espondents d[id] not dispute that th[e] grants are contracts for jurisdictional purposes"). As a result, the Supreme Court's jurisdictional determination seemingly assumed that the grants in that case were subject to Tucker Act jurisdiction, without considering whether different grant agreements may not be contracts falling within the Court of Federal Claims' exclusive jurisdiction.

Even if the agreements here were contracts under the Tucker Act, the source of plaintiffs' claims is not the particular agreements but rather the rights conferred by the APA and the Constitution. *See Crowley*, 38 F.4th at 1106. Plaintiffs have alleged that defendants have violated the due process clause, acted contrary to federal regulations and statutes in violation of the APA, acted arbitrarily and capriciously contrary to the APA, and violated the separation of powers structure of the Constitution. *See supra* Part I.B.2. Although plaintiffs are challenging the termination of their grant agreements—so in that broad sense, their claims arise from factual circumstances involving the agreements—the rights they assert are not protected by the agreements at all, but rather by statutes, regulations, the Constitution, and the APA. *See Crowley*, 38 F.4th at 1108 (noting that the plaintiff did "not seek to enforce any duty imposed

upon" the defendant by the contract at issue (quoting *Perry Cap.*, 846 F.3d at 619)); *La. Delta Serv. Corps*, 2025 WL 1787429, at *19 ("The rights [plaintiff] asserts—to a notice and hearing prior to termination, to the right to appeal termination, to termination only for the reasons stated in . . . Uniform Guidance regulations—are rights that arise not from the alleged contract (that is, the terms and conditions of the grant), but from statute and regulations."). For this reason, "even proving a breach of the" agreements "would not entitle plaintiffs to relief on their claims." *ACILS*, 2025 WL 1795090, at *12. Where "a plaintiff's claim depends on interpretations of statutes and regulations rather than the terms of an agreement negotiated by the parties, the claim is not in essence contractual." *Widakuswara No. II*, 2025 WL 1288817, at *12 (Pillard, J., dissenting).

To be sure, plaintiffs' Third Count, alleging a violation of the APA because the terminations did not comply with Uniform Guidance provisions, would require the Court to reference the terms of the agreement because § 200.340(a)(4) provides for termination "pursuant *to the terms and conditions of the Federal award* . . . if an award no longer effectuates the program goals or agency priorities" (emphasis added). *See* FAC ¶ 197. The D.C. Circuit has "explicitly rejected," however, "the 'broad' notion 'that any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act.'" *Crowley*, 38 F.4th at 1107 (quoting *Megapulse*, 672 F.2d at 967-68). As *Megapulse* noted, "[c]ontract issues may arise in various types of cases where the action itself is not founded on a contract." *Id.* at 1106-07 (alteration in original) (quoting *Megapulse*, 672 F.2d at 968). In short, it "would be quite extraordinary to consider [p]laintiffs' claims to sound in breach of contract when they do not at all depend on whether the terms of particular awards were breached—they instead challenge whether the agency action here was unlawful, irrespective of

any breach." *AIDS Vaccine Advoc. Coal. v. Dep't of State*, 770 F. Supp. 3d 121, 137 (D.D.C. 2025), *vacated and remanded on other grounds*, *Global Health Council v. Trump*, -- F. 4th --, 2025 WL 2326021 (D.C. Cir. Aug. 13, 2025); *see also Md. Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*, 763 F.2d 1441, 1449 (D.C. Cir. 1985) (Bork, J.) (holding that, where "claims arise under a federal grant program and turn on the interpretation of statutes and regulations rather than on the interpretation of an agreement negotiated by the parties," the claims "are not contract claims for Tucker Act purposes").[8]

### b)    Relief Sought: Injunctive

As to the second inquiry under the D.C. Circuit's *Megapulse* framework, the relief plaintiffs seek here is not contractual in nature. Plaintiffs seek vacatur of the terminations effectuated by defendants' allegedly unlawful policy or practice, an injunction against further terminations pursuant to that practice, and further injunctive relief that defendants treat the agreements as if they had never been terminated. *See* Proposed Order. Those remedies are ones the Court of Federal Claims, which awards "money judgment[s] against the United States," cannot afford. *See Widakuswara No. II*, 2025 WL 1288817, at *13 (Pillard, J., dissenting) (alteration in original) (quoting *Bowen*, 487 U.S. at 905); *see also id.* ("The type of relief plaintiffs seek is unavailable in the Court of Federal Claims, which 'has no power to grant equitable relief.'" (quoting *Bowen*, 487 U.S. 905)). They are distinct in both form and substance from the essential contractual remedy of money damages. *Crowley*, 38 F.4th at 1107.

---

[8]    Other district courts considering claims nearly identical to Count Three—*i.e.*, premised on § 200.340(a)(4), which contemplates a reference to specific terms and conditions—have likewise found they had jurisdiction over the claim. *See, e.g., La. Delta Serv. Corps*, 2025 WL 1787429, at *5, 20-22 (describing plaintiffs' claim that termination under § 200.340(a)(4) was invalid because that basis for termination—"no longer effectuat[ing] the program goals or agency priorities"—was not clearly specified in the award's terms and conditions); *Green & Healthy Home Initiatives*, 2025 WL 1697463, at *10, 15 (same).

The Supreme Court's opinion in *Bowen v. Massachusetts*, 487 U.S. 879 (1988), makes that distinction clear. The Court there explained that money damages "refers to a sum of money used as compensatory relief." *Id.* at 895 (quoting *Md. Dep't of Human Res.*, 763 F.2d at 1446). Specific remedies in the form of equitable relief "are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled." *Id.* (quoting *Md. Dep't of Human Res.*, 763 F.2d at 1446). Plaintiffs here seek vacatur of the termination of their grants and restoration of those grants not to compensate for the harm caused by the unlawful termination of their grants but rather to return to their positions before the unlawful actions and to "clarify future obligations" as to their rights, protecting from future harm. *Me. Cmty. Health Options v. United States*, 590 U.S. 296, 298 (2020). Such relief cannot be characterized as monetary damages. Moreover, the certainty provided by plaintiffs' requested equitable relief provides value independent of any funds paid—the ability to conduct its programs without fear of arbitrary and abrupt termination. *See Crowley*, 38 F.4th at 1111 (describing the benefits of equitable relief requested there including "the certainty of knowing whether [certain procedures] apply" and "an answer to the question whether [the government] has authority" to take certain challenged actions).

Defendants argue that plaintiffs are disingenuously "recast[ing] [their] breach of contract claim as a claim for equitable relief . . . when the requested relief is the same: reopening the spigot of grant disbursements." Defs.' Opp'n at 14. Yet, as the Supreme Court has plainly stated, the "fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Bowen*, 487 U.S. at 893. Plaintiffs here "do[] not ask the district court to issue an order compelling [USDA] to pay or award any monetary relief whatsoever." *Crowley*, 38 F.4th at 1111. In short, because "the Court

41

of Federal Claims 'does not have the general equitable powers of a district court to grant

prospective relief'" as requested, this case must "belong[] in district court." *Me. Cmty Health*,

590 U.S. at 327 (quoting *Bowen*, 487 U.S. at 905).

### c) Defendants' Additional Counter Arguments

Defendants offer two final points to challenge this conclusion that subject matter

jurisdiction may be exercised over plaintiffs' claims. First, defendants argue that plaintiffs'

artful pleading cannot manufacture jurisdiction in this Court. *See* Defs.' Opp'n at 15 ("Under

Plaintiffs' reasoning, all contract-related actions or terminations could be pleaded as statutory or

constitutional claims—not contract claims—and proceed in district court."). Still, defendants'

"jurisdictional challenge" must be analyzed "in light of the . . . claims the [plaintiffs] actually

bring[]." *De Csepel v. Republic of Hungary*, 714 F.3d 591, 598 (D.C. Cir. 2013). Defendants

express concern about creating an "end-run around the exclusive jurisdiction of the Court of

Federal Claims," Defs.' Opp'n at 16, but their concern that all plaintiffs will simply start to plead

their contract claims as constitutional violations to get into district court is unfounded: Where

parties do have a right grounded in contract, they will likely have a more secure path to relief

bringing that claim in plain contract form before the specialized court. This concern is especially

misplaced here, where plaintiffs do not have a contract with the government at all. *See supra*

Part III.A.2(a).

Second, defendants further point to *Department of Education* as clearly "dispell[ing]"

"[a]ny lingering doubts as to whether this Court has jurisdiction." Defs.' Opp'n at 13. As

already explained, however, the Supreme Court's order does not resolve the dispute here because

the issue was simply not addressed as to whether the specific agreements qualified as contracts

for which the Tucker Act grants the Court of Federal Claims jurisdiction. *See supra* Part

III.A.2(a).  The *Department of Education* order is not controlling here for at least two additional reasons.  The Supreme Court's order is not binding precedent purporting to overturn *Bowen* or other existing law but merely a "stay . . . *pending a ruling on the merits*."  *Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022) (Kavanaugh, J., concurring) (emphasis in original) ("The stay order does not make or signal any change to voting rights law. The stay order is not a ruling on the merits, but instead simply stays the District Court's injunction *pending a ruling on the merits*."); *Bosse v. Oklahoma*, 580 U.S. 1, 3 (2016) (per curiam) ("[I]t is [the Supreme] Court's prerogative alone to overrule one of its precedents." (first alteration in original) (quoting *United States v. Hatter*, 532 U.S. 557, 567 (2001))).  The order, by contrast, cited *Bowen*.  *See Dep't of Educ.*, 145 S. Ct. at 968.  In the absence of a clear abrogation of that law or clear reasoning distinguishing it, this Court is left to apply existing law from *Bowen* and *Megapulse*.  *See La. Delta Serv. Corps*, 2025 WL 1787429 ("Under these circumstances, the Court remains bound by the precedent set by *Bowen*."); *see also, e.g.*, *S. Educ. Found.*, 2025 WL 1453047, at *9 ("[T]he Supreme Court's stay order in *Department of Education* does not displace governing law that guides this Court's assessment of whether [plaintiffs'] claims are essentially contract claims.").

Additionally, the Supreme Court was faced with a finding made below that "the terms and conditions of each individual grant award [we]re at issue."  *California v. Dep't of Educ.*, 132 F.4th at 96-97.  The reliance on specific terms and conditions in the grant awards may have resulted in the Supreme Court's understanding that the district court's order "was essentially one to 'enforce a contractual obligation to pay money.'"  *ACILS*, 2025 WL 1795090, at *19 (quoting *Dep't of Educ.*, 145 S. Ct. at 968); *see also Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, -- F.4th--, 2025 WL 2017106, at *7 (1st Cir. July 18, 2025) ("[T]he Supreme Court construed the district court as having ordered 'the Government to pay out past-due grant obligations.'"

(quoting *Dep't of Educ.*, 145 S. Ct. at 968)), *application for stay filed with Supreme Court* (July 24, 2025).  Here, the agreements do not give rise to any contractual obligations against the government, and plaintiffs do not seek to have any such obligation enforced.  The terms and conditions of the individual grant awards are not relevant to any of plaintiffs' claims—except in a limited way in Count Three, where the terms of the awards are not "at issue" but merely incorporated by reference.[9]

The conclusion that this Court has jurisdiction over these claims is consistent with that reached by countless other courts considering similar claims.  *See, e.g.*, *Am. Pub. Health Ass'n*, 2025 WL 2017106, at *7-8 (First Circuit denying stay of preliminary injunction declaring unlawful and setting aside under the APA an agency policy resulting in arbitrary and capricious grant terminations, and distinguishing the stay order in *Department of Education*); *Nat'l Fair Hous. All. v. Dep't of Hous. & Urb. Dev.*, No. 25-cv-1965 (SLS), 2025 WL 2105567, at *8-9 (D.D.C. July 28, 2025) (holding that an APA unreasonable delay claim did not fall within the Tucker Act's exclusive jurisdiction); *Porwancher v. Nat'l Endowment for the Humanities*, -- F. Supp. 3d --, 2025 WL 2097740, at *4 (D.D.C. 2025) (holding the court had jurisdiction over an APA claim based on the agency not following its regulations in terminating a grant); *Elev8 Baltimore, Inc. v. Corp. for Nat'l & Cmty. Serv.*, No. 25-cv-1458, 2025 WL 1865971, at *13-14 (D. Md. July 7, 2025) (finding that plaintiffs' APA and *ultra vires* claims "are for forward-facing equitable relief founded upon constitutional and statutory violations"—so they were not subject

---

[9]    As plaintiffs also point out, the Supreme Court did not consider in *Department of Education* any nonstatutory claims, including those brought under the Constitution, and thus the order cannot be read to suggest that such nonstatutory claims may not proceed in district court. Pls.' Mem. at 22.  "In fact, while the Supreme Court's order revolved around lack of sovereign immunity waiver for the APA claims, constitutional and other nonstatutory claims need not rely on any waiver of sovereign immunity because where an 'officer is not doing the business which the sovereign has empowered him to do'" such immunity did not attach in the first place. *Id.* (quoting *Chamber of Com. v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996)).

to the Tucker Act, and collecting cases coming to the same conclusion); *Amica Ctr. for Immigrant Rights v. DOJ*, No. 25-cv-298 (RDM), 2025 WL 1852762, at *1, 13-15 (D.D.C. July 6, 2025) (holding the court had jurisdiction over APA, constitutional, and nonstatutory *ultra vires* claims brought by subcontractors whose contracts to provide legal services to individuals in immigration proceedings were terminated), *appeal filed*, No. 25-5254 (D.C. Cir. July 16, 2025); *La. Delta Serv. Corps*, 2025 WL 1787429, at *9, 16-22 (holding that the Tucker Act did not deprive the district court of jurisdiction over similar APA claims); *Thakur*, 2025 WL 1734471, at *18-21 (holding that the court had jurisdiction over very similar APA and constitutional claims challenging termination of USDA grants), *appeal filed*, No. 25-4249 (9th Cir. June 23, 2025); *Green & Healthy Home Initiatives*, 2025 WL 1697463, at *12-15 (determining that the Tucker Act did not abrogate the court's jurisdiction over similar APA and constitutional claims regarding termination of EPA grants, and collecting cases); *Maryland v. Corp. for Nat'l & Cmty. Serv.*, -- F. Supp. 3d --, 2025 WL 1585051, at *22-28 (D. Md. June 5, 2025) (holding that APA claims challenging the termination of Americorps grants are not subject to exclusive jurisdiction of the Court of Federal Claims); *Metro. Transp. Auth.*, 2025 WL 1513369, at *25-26 (holding that the terminated grant in question lacked consideration and thus was not a contract under the Tucker Act and that the APA claims were not fundamentally contractual); *S. Educ. Found.*, 2025 WL 1453047, at *8-11 (holding that similar APA and constitutional claims were not subject to the Tucker Act), *appeal filed*, No. 25-5256 (D.C. Cir. July 21, 2025); *Climate United Fund v. Citibank N.A.*, 778 F. Supp. 3d 90, 107-11 (D.D.C. 2025) (concluding the Court had jurisdiction over APA, constitutional, and statutory claims challenging termination of nonprofit clean technology investment banks), *modified by, motion to amend judgment granted by* 2025 WL 1569275 (D.D.C. Apr. 19, 2025); *Woonasquatucket River Watershed Council v. USDA*, 778 F.

Supp. 3d 440, 464-66 (D.R.I. 2025) (holding the court had jurisdiction over APA challenges to the termination of grants by USDA and other agencies), *appeal filed*, No. 25-1428 (1st Cir. May 1, 2025); *Maine v. USDA*, 778 F. Supp. 3d 200, 224-26 (D. Me. 2025) (granting a temporary restraining order barring defendants from freezing or terminating state funds and concluding that these claims were properly reviewed under the APA, applying *Bowen*); *Massachusetts v. Nat'l Insts. of Health*, 770 F. Supp. 3d 277, 291-95 (D. Mass. 2025) (holding the court had jurisdiction over similar APA challenges to grant terminations), *appeal filed sub nom. Ass'n of Am. Med. Coll. v. Nat'l Insts. of Health*, No. 25-1344 (1st Cir. April 9, 2025); *see also Am. Bar Ass'n v. Dep't of Just.*, -- F. Supp. 3d -- , 2025 WL 1388891, at *5-6 (D.D.C. May 14, 2025) (holding the Court had jurisdiction over a First Amendment constitutional claim challenging grant terminations); *Women in Trades v. Trump*, 778 F. supp. 3d 959, 980-83 (N.D. Ill. Apr. 14, 2025) ("Of course, [plaintiff's] claims implicate its grant agreements; it would have no basis to pursue its claims were it not a grant recipient or subgrantee.  But its rights under the First Amendment, the Fifth Amendment, and the other constitutional provisions it cites exist independent of the Termination Provision's enforcement.").

Non-binding decisions to the contrary, based on different factual circumstances or different interpretations of the various governing opinions, do not persuade this Court.  *See, e.g.*, *Sustainability Inst. v. Trump*, No. 25-1575, 2025 WL 1587100, at *1-2 (4th Cir. June 5, 2025) (granting, over a dissent, motion for stay of district court's injunction in case involving APA challenges to grant terminations, in light of *Department of Education*); *Vera Inst.*, 2025 WL 1865160, at *7, 11; *Harris Cnty. v. Kennedy*, -- F. Supp. 3d --, 2025 WL 1707665, *4-6, 11-15 (D.D.C. June 17, 2025) (holding that the Court had jurisdiction over a separation of powers claim but not an APA arbitrary-and-capricious claim in light of *Department of Education*); *Ass'n*

46

*for Educ. Fin. & Pol'y, Inc. v. McMahon*, -- F. Supp. 3d --, 2025 WL 1568301, at *10-11

(D.D.C. June 3, 2025) (rejecting claims about grant terminations as "programmatic challenge"

under *Lujan* that if brought as individual challenges, would be barred by Tucker Act); *Sols. in*

*Hometown Connections v. Noem*, No. 25-cv-885, 2025 WL 1103253, at *7-11 (D. Md. Apr. 14,

2025) (determining the Tucker Act gave the Court of Federal Claims exclusive jurisdiction over

APA claims regarding terminations of grants from the USCIS's Office of Citizenship),

*injunction denied*, 2025 WL 1530318 (May 29, 2025); *U.S. Conf. of Catholic Bishops v. Dep't of*

*State*, 770 F. Supp. 3d 155, 162-65 (D.D.C. 2025) (holding that the requested relief in a

challenge to termination of contracts was essentially contractual).[10]

As a result, the Tucker Act does not grant the Court of Federal Claims exclusive

jurisdiction over plaintiffs' claims here, and the APA's waiver of sovereign immunity applies.

There is no jurisdictional barrier to review of plaintiffs' claims or to resolution of plaintiffs'

pending motions.

---

[10]    Defendants also cite as authority in their favor *Pippenger v. U.S. DOGE Serv.*, No. 25-cv-1090 (BAH),
2025 WL 1148345, at *5 (D.D.C. Apr. 17, 2025), but that order denying an emergency request for a temporary
restraining order is not at all relevant here.  In that case, former employees, program partners, a personal services
contractor, and a donor of the U.S. Institute of Peace sued DOGE and DOGE-related officials, as well as other
executive branch officials, challenging the removal of the Institute's Board members, the transfer of the Institute's
assets, and the discontinuation of the Institute's activities, which included termination of contracts. *See id.* at *1.
The underlying legal issues related to the scope of presidential removal power and the nature of the organization,
*e.g.*, whether the Institute was located in the Executive Branch and exercised executive powers or not.  In resolving
the plaintiffs' emergency TRO, the Court did not opine on whether the Supreme Court's *Department of Education*
stay order, issued less than two weeks earlier, deprived the Court of jurisdiction over APA claims related to the
termination of the Institute's contracts but rather simply noted, in the face of the other disputed fundamental issues
about the nature of the Institute, the absence of fulsome consideration by the parties of that issue as well: "[I]n this
preliminary posture with incomplete briefing presented in short form after the TRO hearing when raised by the
Court, plaintiffs" had not "sufficiently distinguished" that holding. *Id.* at *5.  Here, the issue has been fully briefed
and discussed at the hearing, and the Supreme Court's order has been amply distinguished both here and in other
cases.

B.       **Likelihood of Success on the Merits**

Turning to the merits of plaintiffs' claims, plaintiffs are likely to succeed on Count Five

with respect to the USDN grant termination and the anticipated termination of AC's Grant #2

and on Count Four with respect to the five already-terminated grants in the record.  Plaintiffs

have not, at this stage, however, demonstrated a likelihood of success with respect to their

constitutional challenges (Counts One and Two) or their contrary-to-regulation APA challenge

(Count Three).  Plaintiffs also have not demonstrated on the present record a likelihood of

success on their claims with respect to the broader alleged policy, practice, or pattern of

terminations due to changed policy priorities.[11]

Each claim is addressed *seriatim*.

1.       *Constitutional Due Process Challenge: Counts One and Two*

Plaintiffs cannot demonstrate that they are likely to succeed on either of their

constitutional due process claims.  Starting with plaintiffs' procedural due process challenge, in

Count One, plaintiffs argue that they "have a constitutionally protected property interest in the

grant funding they applied for [and] were awarded" and thus "were entitled to due process before

Defendants summarily terminated their awards without prior notice or opportunity to be heard."

Pls.' Mem. at 34.  Defendants respond that plaintiffs have no "protected property interest in

continued grant funding" and, in any event, did not exhaust all administrative appeal procedure,

barring their constitutional due process claims in court.  Defs.' Opp'n at 26, 29.  Even assuming

that exhaustion is no bar to plaintiffs' claims, defendants are correct that plaintiffs likely have no

---

[11]       The Chesapeake Bay Foundation, Inc. filed an amicus brief in support of plaintiffs' motion for preliminary
injunctive relief, arguing, *inter alia*, that USDA's "policy, pattern, and practice of terminating grants intended to
support conservation agriculture is arbitrary and capricious," Chesapeake Bay Amicus Br. at 18, ECF No. 23, and
has caused irreparable harm that has "already been felt by farmers and conservation organizations alike," pointing
out that "[w]hen one organization has their grant terminated, entire projects are halted keeping trees out of the
ground and other BMPs [Best Management Practices] from being adopted . . .," *id*. at 20.

constitutionally protected property interest in their grant funding and thus have no likelihood of success on their constitutional due process claim.

"The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'liberty' or 'property.'" *NB ex rel. Peacock v. District of Columbia*, 794 F.3d 31, 41 (D.C. Cir. 2015) (quoting *Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 117 (D.C. Cir. 2010)). "Only after finding the deprivation of a protected interest do we look to see if the government's [actions] comport with due process." *Id.* (alteration in original) (quoting *Gen. Elec. Co.*, 610 F.3d 117). While the D.C. Circuit has recognized property interests in "certain government benefits" to which one has "a legitimate claim of entitlement," *id.* (second passage quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)), courts have generally rejected, aside from certain employment contexts, that parties have a constitutionally protected property interest in other anticipated payments from the federal government, *see, e.g.*, *New Vision Photography Program, Inc. v. District of Columbia*, 54 F. Supp. 3d 12, 29 (D.D.C. 2014) (collecting cases and explaining that the "Supreme Court 'has never held that government contracts for goods and services create property interests protected by due process'" (quoting 2 Richard J. Pierce Jr., *Administrative Law Treatise* 764 (5th ed. 2010))).

Plaintiffs compare their grants to government benefits, citing the observation in *NB ex rel. Peacock* that if "the statute or implementing regulations place substantive limitations on official discretion to withhold award of the benefit upon satisfaction of the eligibility criteria, there is a legitimate claim of entitlement, as to which the Due Process Clause affords protection." Pls.' Mem. at 33-34 (quoting *NB ex rel. Peacock*, 794 F.3d at 41-42). Plaintiffs' grants, however, do not satisfy that premise. The basis for plaintiffs' awards was completely

discretionary and plaintiffs do not cite anything in the statutes requiring the USDA to award them grants even they satisfy certain criteria.

Plaintiffs posit, however, that the awarding of the grant converts the award to an "entitlement" because 2 C.F.R. § 200.340 places "substantive limitations on official discretion" to terminate the awards and "withhold" the funds at issue, *NB ex rel. Peacock*, 794 F.3d at 41-42 (quoting *Wash. Legal Clinic for the Homeless v. Barry*, 107 F.3d 32, 36 (D.C. Cir. 1997)), and that the grant awards are not traditional government contracts. *See* Pls.' Reply at 15-16. Plaintiffs are correct that they do have *legal* rights to ongoing funds under their grants, conferred by the regulations, the APA, and the agreements themselves, but not every legal interest is a constitutionally protected one. *See Am. Fed. of Gov't Emps., AFL-CIO, Local 446 v. Nicholson*, 475 F.3d 341, 353 (D.C. Cir. 2007) ("[T]his court has held that a mere violation of law does not give rise to a due process claim."). To constitute substantive limits "giv[ing] rise to a" constitutionally "protected interest," "the regulations [must] contain explicitly mandatory language, *i.e.*, specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow." *Tarpeh-Doe v. United States*, 904 F.2d 719, 722-23 (D.C. Cir. 1990) (alteration in original) (second passage quoting *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454 (1989)). As the D.C. Circuit has instructed, "when a statute leaves a benefit to the discretion of a government official, no protected property interest in that benefit can arise." *Bloch v. Powell*, 348 F.3d 1060, 1069 (D.C. Cir. 2003).

Section 200.340 of the OMB regulations, while placing some limits on termination, still leaves officials with far too much discretion to confer a constitutionally protected entitlement. This regulation instructs that a "federal award *may* be terminated" under certain circumstances, not that certain circumstances *must* be met as prerequisites. 2 C.F.R. § 200.340(a) (emphasis

50

added); *contra Tarpeh-Doe*, 904 F.2d at 722-23.  In particular, the fourth subpart leaves agency

officials with ample discretion to determine whether and how the program is no longer

effectuating "agency priorities."  *Id.* § 200.340(a)(4).  The regulations also reference the "terms

and conditions of the Federal award," indicating that plaintiffs' rights are dependent upon the

assurance and guarantees provided within the award—thus not creating a separate constitutional

right apart from the award itself.  *Id.*  These are not the "mandatory, non-discretionary terms"

found to result in entitlements elsewhere.  *NB ex rel. Peacock*, 794 F.3d at 42 (holding that a

plaintiff had a property interest in prescription drug coverage under Medicaid given that the law

required reimbursement "upon the satisfaction of all eligibility criteria" and the agency

"retain[ed no] discretion to deny a claim for a covered prescription drug"); *see also Roth*, 408

U.S. at 577-78 (describing property interests in public welfare payments and in certain unique

public employment contexts); *Esparraguera v. Dep't of the Army,* 101 F.4th 28, 33 (D.C. Cir.

2024) (noting "a property interest [in public employment] exists if the employee can 'be

removed only for cause,'" under applicable statutory and regulatory provisions)

(quoting *Thompson v. District of Columbia*, 530 F.3d 914, 918 (D.C. Cir. 2008))).  Despite

lacking sufficient consideration directly benefitting the government to be considered "contracts"

under the Tucker Act for purposes of jurisdiction, the grants at issue here—analogously to

government contracts—provide for certain legal protections to grant recipients without

enshrining a constitutional entitlement since those protections are far less than mandatory in

dictating an outcome if regulatory predicates are met.  *See New Vision Photography*, 54 F. Supp.

3d at 29 (noting that enforcement of commercial contracts is "qualitatively different from the

interests the Supreme Court has thus far viewed as 'property' entitled to procedural due process

protection" (quoting *S&D Maint. Co. v. Goldin*, 844 F.2d 962, 966 (2d Cir. 1988))).

Finally, while plaintiffs point to one case where a court has recognized a constitutionally protected property interest in grant agreements of the kind at issue here, *see* Pls.' Reply at 16 (citing *La. Delta Serv. Corps*, 2025 WL 1787429, at *26), that case is neither binding on nor persuasive on this issue to this Court. *See Vera Inst.*, 2025 WL 1865160, at *15-16 (concluding no such property interest exists in grant agreements); *see also Nat'l Urb. League v. Trump*, -- F. Supp. 3d --, 2025 WL 1275613, at *17-18 (D.D.C. 2025) (in considering a challenge to the DEI-related executive order based on potential termination of federal awards, rejecting a due process claim and explaining that government contracts do not give rise to a protected due process interest). Without a constitutionally protected property interest, plaintiffs are not likely to establish a due process violation warranting preliminary injunctive relief here.

Turning to plaintiffs' second due process claim (Count Two), plaintiffs argue that defendants' "policy and practice . . . violates the Due Process Clause by terminating grants in an unconstitutionally vague manner." Pls.' Mem. at 35. In particular, plaintiffs indicate that under defendants' interpretation of § 200.340(a)(4), which allows for termination of grants based on new policy priorities, the regulation enables "boundless discretion," Rough Hr'g Tr. at 50:13-51:6, and "arbitrar[y] impos[ition]" of new requirements, Pls.' Mem. at 35. This claim fails for the same reason as the first due process challenge: plaintiffs do not have a constitutionally protected property interest. *See Nat'l Urb. League*, 2025 WL 1275613, at *17 ("[A] void-for-vagueness challenge is,' at bottom, 'a due-process claim,' so Plaintiffs must show that they were 'deprived of a constitutionally-protected property or liberty interest.'" (alterations in original) (quoting *McClelland v. Katy Ind. Sch. Dist.*, 63 F.4th 996, 1013 (5th Cir. 2023))). In any case, given that "economic regulation is subject to a less strict vagueness test," *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982), and that the effects of

"imprecision are not constitutionally severe" when "the Government is acting as patron rather than as sovereign," *National Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998), plaintiffs are unlikely to succeed on Count Two, even assuming they did have a constitutionally protected property interest in their grants.

### 2.    *APA Challenges: Counts Three, Four, and Five*

Having determined that plaintiffs' first two counts do not justify relief at this preliminary stage, plaintiffs' challenges under the APA are considered next.  Plaintiffs USDN and AC have shown they are likely to succeed on the merits of Count Five with respect to the terminations of USDN and AC's Grant #2, and all plaintiffs have shown they are likely to succeed on the merits of Count Four with respect to the five original individual grant terminations in the record— USDN's grant, OBC's grant, AC's Grant #1, PFC's grant, and IATP's grant.  Yet, because the record lacks sufficient evidence to establish the scope and contours of the alleged policy and practice, no broader relief affecting parties or grants not before this Court is warranted.

#### a)    *Availability of APA Review*

At the outset, defendants argue that APA review is not available because "grant funding decisions are committed to agency discretion by law" and because plaintiffs are not challenging a final, discrete agency action.  Defs.' Opp'n at 17-18, 20.  Neither constitutes a bar to APA review here.

##### (1)    *Committed to Agency Discretion by Law*

First, regardless of whether "grant funding" decisions may be committed to agency discretion, grant termination decisions are not fully discretionary but are subject to the limits set in applicable regulations, so the grant terminations at issue here are reviewable under the APA. Despite the "strong presumption that Congress intends judicial review of administrative action," *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 670 (1986), the APA does not

allow for review of agency action "committed to agency discretion by law," 5 U.S.C.

§ 701(a)(2). A decision is considered to be committed to the agency's judgment in "those rare

circumstances where the relevant statute 'is drawn so that a court would have no meaningful

standard against which to judge the agency's exercise of discretion.'" *Lincoln v. Vigil*, 508 U.S.

182, 191 (1993) (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)). In *Lincoln*, the

Supreme Court held that where Congress simply allocated an annual "lump-sum appropriation[]"

to the agency, the decision to no longer fund a particular program was "committed to agency

discretion." *Id.* at 192-93. "After all," the Court explained, "the very point of a lump-sum

appropriation is to give an agency the capacity to adapt to changing circumstances and meet its

statutory responsibilities in what it sees as the most effective or desirable way." *Id.*; *see also*

*Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002) (holding that even where

Congress has stated funds should be used for a specific purpose, the agency has sole discretion to

determine the manner in which they are employed). Where, by contrast, "Congress . . . put[s]

restrictions in the operative statutes," funding decisions may be reviewable. *Lincoln*, 508 U.S. at

193.

Defendants rely on these principles to argue that APA review is unavailable because

"[t]he statutes that authorize the Department to issue the grants" here do not provide criteria by

which "courts [can] meaningfully second-guess" agency determinations. Defs.' Opp'n at 20-21.

Defendants conflate, however, an initial funding decision from a termination decision.

Regardless of whether the statutes at issue here do not meaningfully constrain defendants'

*funding* decisions, plaintiffs have not challenged any of defendants' denials of awards. They

rather challenge agency decisions prematurely to terminate their awards arbitrarily and

capriciously and contrary to regulation and statute.

54

Then-Judge Jackson explained in *Policy and Research, LLC v. Department of Health and Human Services*, 313 F. Supp. 3d 62 (D.D.C. 2018), that despite the existence of a statute giving an agency discretion over funding decisions, regulations may still "expressly address—and limit—the agency's discretion to 'terminate' monetary awards," and those rules provide standards for judicial review. *Id.* at 76 (citing 45 C.F.R. § 75.372, which restricts HHS's ability to terminate a federal award to four reasons, including having a "for cause" justification or the recipient failing to comply with conditions). The court ultimately held that the agency "violated the APA because the agency failed to explain its reasoning and acted contrary to its regulations when it terminated plaintiffs' grants." *Id.* at 83.

Similarly, here defendants have constrained their discretion to terminate grants by adopting the OMB Uniform Guidance regulations. Defendants do not contest that they are bound by 2 C.F.R. § 200.340(a)-(b), which provides four reasons for termination, and § 200.341, which establishes a "notification of termination" requirement. These are meaningful standards by which this Court may review termination decisions. *See, e.g.*, *Thakur*, 2025 WL 1734471, at *17 (holding that the termination of grants was not committed to agency discretion because of regulations like § 200.340 and § 200.341, which limit the "agencies' discretion [and] create 'meaningful standard[s] by which to judge the [agency]'s action" (alterations in original) (quoting *California v. Dep't of Educ.*, 132 F.4th at 97)); *Woonasquatucket River Watershed Council*, 778 F. Supp. 3d at 468 (holding that the termination of grants was not committed to agency discretion because "[t]his case closely tracks [*Policy and Research*]—the main difference being, instead of one program's termination, that the Government's actions here involve summarily, indefinitely freezing already-awarded money affecting many more"); *cf. Elev8 Baltimore*, 2025 WL 1865971, at *21 ("[E]ven where action is committed to absolute agency

55

discretion by law, courts have assumed the power to review allegations that an agency exceeded its legal authority, acted unconstitutionally, or failed to follow its own regulations[.]" (alterations in original) (quoting *Elecs. of N.C., Inc. v. Se. Power Admin.*, 774 F.2d 1262, 1267 (4th Cir. 1985))).  APA review, therefore, is not barred either by the discretionary nature of the initial decision to fund an award to a particular recipient or by the more limited discretion allowed to the agency in the challenged termination decision.

### (2) Final, Discrete Agency Action

Second, plaintiffs' claims of both invalid individual grant terminations and an unlawful broad policy or practice of grant terminations are final and discrete and thus subject to APA review.  Nonetheless, plaintiffs lack sufficient evidence in the record to establish the contours of the alleged policy or practice and therefore cannot demonstrate they are likely to succeed on any of their claims with respect to that practice today.

The APA provides for review only of "final agency action."  5 U.S.C. § 704.  "As a general matter, two conditions must be satisfied for agency action to be 'final': First, the action must mark the 'consummation' of the agency's decisionmaking process . . .—it must not be of a merely tentative or interlocutory nature."  *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (quoting *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948)).  "And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'"  *Id.* at 178 (quoting *Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)).  For instance, a "policy announcement, which has no legal consequence" and has not resulted in any particular decision or action that has violated any rights, is not a final agency action subject to review.  *In re Aiken Cnty.*, 645 F.3d 428, 437 (D.C. Cir. 2011).  By contrast, a formal written opinion explaining

"how [a] proposed action will affect" an interest is considered final where it "alter[s] the legal regime to which the action agency is subject, authorizing it to take" certain actions only if abides by certain conditions. *Bennett*, 520 U.S. at 158, 178 (describing the Biological Opinion provided by the Fish and Wildlife Service that "explain[s] how the proposed action will affect a species or its habitat" and outlines alternatives to avoid that consequence or conditions to minimize impact before certain projects may be approved).

Just as the challenged action must be, in some sense, complete, it must also be discrete. A plaintiff cannot "seek *wholesale* improvement of" an agency "program by court decree." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990) (emphasis in original) (describing a bar on "programmatic" challenges). Rather, a plaintiff must "direct its attack against some particular 'agency action' that causes it harm." *Id.* The "scope of the controversy" generally must be "reduced to . . . manageable proportions, and its factual components fleshed out, by some concrete action" affecting the plaintiff. *Id.* In other words, "[c]ourts may 'intervene in the administration of the laws only when, and to the extent that, a specific "final agency action" has an actual or immediately threatened effect.'" *Fund for Animals, Inc. v. Bureau of Land Mgmt.*, 460 F.3d 13, 20 (D.C. Cir. 2006) (quoting *Lujan*, 497 U.S. at 894).

Defendants do not seem to contest that the individual grant terminations challenged by plaintiffs are final and discrete. *See* Defs.' Opp'n at 18-20. Indeed, grant terminations are clearly final agency actions that can be challenged under the APA. Here, the grant terminations at issue are the "consummation" of the decision-making process to review and terminate grants as instructed in the Secretary's March 13, 2025 memoranda. *Bennett*, 520 U.S. at 178. Moreover, these terminations formally establish that recipients will no longer receive funds; no further action by the agency follows. *See id.*; *see also S. Educ. Found.*, 2025 WL 1453047, at

*15 ("Here, the 'final' agency action . . . is the Department's termination of the EAC-South grant."); *Woonasquatucket River Watershed Council*, 778 F. Supp. 3d at 467-68. Notably, defendants do not contend that the terminations are non-final based on any argument that plaintiffs have not exhausted certain appeal rights or pursued to completion internal remedial processes. Plaintiffs therefore have no need to wait until some later agency action to bring their claims.

Defendants do argue, however, that plaintiffs' "claims[,] stemming from [defendants'] alleged 'policy, pattern, and practice' of unlawfully terminating grants is a general challenge to agency operations, not discrete challenges to agency actions" and that this policy, because it is "ongoing implementation of the Secretary's directives" is only the "initiation, not the consummation of the agency's decisionmaking process." Defs.' Opp'n at 18-19. Defendants argue, in other words, that plaintiffs' challenges are too "sweeping" and target agency processes or practices that are nonfinal. *Id.* at 17. According to defendants, plaintiffs' "APA claims seek to bring a collective, programmatic challenge to a series of grant terminations, including terminations to grants that Plaintiffs themselves do not hold and never held." *Id.* at 18.

The practice alleged by plaintiffs, as defined by the nine characteristics of the terminations alleged in FAC ¶ 135, *see supra* Part I.A.B and n.6, is not too diffuse and programmatic to sustain APA review. While litigants cannot successfully challenge the whole of agencies' activities by seeking, for instance, general improvement across the board, plaintiffs can challenge specific policies or rules implemented by the agency. As *Lujan* explained, "[if] there is in fact some specific order . . . applying some particular measure across the board to all . . . terminations," and that order is final, "it can of course be challenged under the APA by a person adversely affected—and the entire '. . . program,' insofar as the content of that particular action

is concerned, would thereby be affected." 497 U.S. at 890 n.2 (differentiating such a situation from the general "programmatic" concern of plaintiffs there, seeking wholesale improvement of agency policy). *Hispanic Affairs Project v. Acosta*, 901 F.3d 378 (D.C. Cir. 2018), is illustrative. There, the D.C. Circuit held that plaintiffs could challenge under the APA the Department of Homeland Security's "practice of habitually approving and extending H-2A visas for lengthy periods of time," *id.* at 388 (relying on the previously quoted passage from *Lujan* for this conclusion), and consequently, the plaintiffs were not limited to challenging piecemeal individual decisions to extend the visas, *see id.* at 387-88.

Plaintiffs challenge the implementation of this kind of categorical practice here. They allege that the agency adopted a global policy of terminating *en masse*, without individualized consideration or reasoned review, all grants "it can portray as related to . . . DEI or climate change," citing in a conclusory manner that the grants "no longer effectuate new USDA priorities." *See* FAC ¶ 1. That policy is embodied in the Secretary's March 13 memoranda, *see supra* Part I.A.2, and demonstrated by the agency "sending termination letters with the same type of language." *Thakur*, 2025 WL 1734471, at *16; *see also Elev8 Baltimore*, 2025 WL 1865971, at *19 (collecting cases). Consequently, the policy is sufficiently discrete to be challenged under the APA, and plaintiffs can accordingly request that it be vacated and enjoined on a prospective basis across the board. *See Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) ("The Administrative Procedure Act permits suit to be brought by any person adversely affected or aggrieved by agency action. In some cases the agency action will consist of a rule of broad applicability; and if the plaintiff prevails, the result is that the rule is invalidated, not simply that the court forbids its application to a particular individual. Under these circumstances a single plaintiff, so long as he is injured by the rule, may obtain

'programmatic' relief that affects the rights of parties not before the court." (internal quotation marks omitted) (quoting *Lujan*, 497 U.S. at 913 (Blackmun, J., dissenting))).

The alleged agency-wide practice of terminating USDA grants based on new policy priorities articulated in the Secretary's March 13, 2025, memoranda also is not barred from review for being ongoing.  Defendants' argument to the contrary relies on a disingenuous framing of plaintiffs' claim—that plaintiffs are challenging an effort "to realign their policy goals and actions consistent with the current administrative directives," which is an ongoing process.  Defs.' Opp'n at 19.  Yet, plaintiffs are in fact alleging the implementation of a specific decision that has already been made—*i.e.*, to terminate grants *en masse* with form letters and little to no individualized review—as conveyed in the Secretary's memoranda.  That decision is clearly not "preliminary" in nature, *contra* Defs.' Opp'n at 19, because implementation is already being carried out, allegedly with respect to 600 or more different grants, *see* FAC ¶ 171; *see* Rough Hr'g Tr. at 68:5-15 (defendants' counsel not disputing that number of grants as having been terminated due to changing priorities), providing a "scope of the controversy" and "factual components fleshed out."  *Lujan*, 497 U.S. at 891.  Even though the agency may still be in the process of terminating grants, the decision to do so has already been made—which defendants do not contest, *see, e.g.*, Defs.' Opp'n at 8 (agreeing that "Agroecology . . . learned through a Department press release that the Department intended to terminate a $2.5 million grant," and AC's Grant #2 is "indeed, slated for termination")—and has "immediately threatened effect." *Fund for Animals*, 460 F.3d at 20 (quoting *Lujan*, 497 U.S. at 894).  Defendants' alleged policy and practice of allegedly perfunctory, unreasoned terminations is sufficiently final for plaintiffs to obtain relief across the board from both its past and future applications.  *See Nat'l Min. Ass'n*, 145 F.3d at 1409.

While the alleged policy and practice is thus not wholly barred from APA review, the record at this stage lacks sufficient evidence of the scope and application of the alleged policy and practice to determine that its implementation has likely violated the APA, beyond the grants and termination letters currently before the Court. On the current record, it is not clear if the broader set of USDA terminations meet the nine characteristics that plaintiffs allege make these terminations arbitrary and unlawful. *See* FAC ¶ 135(a)-(i); *supra* Part I.B.2 & n.6. The hundreds of additional termination letters are not in the record, and the lack of complete uniformity among even the six termination letters in the record—*i.e.*, the five original termination letters attached as exhibits to plaintiffs' motion and described in plaintiffs' complaint and the additional example of the termination of a third AC grant, *see* Add'l AC Termination Letter—makes drawing an inference as to what the others state as the reason(s) for termination difficult. For instance, the OBC letter identifies a specific, concrete requirement within a set of broader priorities that the grant apparently did not satisfy, whereas the other letters offer only a reason connected to a vaguer, more general policy priority. *Compare* OBC Termination Letter ("[Y]ou have failed to meet the first" of the Farmer First priorities, *i.e.*, having "[a] minimum of 65% of federal funds . . . go to producers."), *with* AC Termination Letter # 1 ("NIFA has determined that award 2023-33800-40420 no longer effectuates USDA priorities, which are to maximize and promote American agriculture; ensure a safe, nutritious, and secure food supply; enhance rural prosperity; and protect our National Forests."). Without knowing whether the hundreds of letters look like some or other of the letters here or whether they have additional differences that bear on the APA claims, the Court cannot evaluate their deficiencies and effectively prescribe relief.

Moreover, the fact that the terminations occurred over the course of several months, starting in March and continuing through July, *see supra* Part I.A.2, distinguishes this case from other cases where agencies conducted mass terminations via identical letters on the same day, which more clearly evinced an agency-wide policy of arbitrary terminations. *See Ass'n for Educ. Fin. & Pol'y*, 2025 WL 1568301, at *7 (noting that the termination of contracts over the course of several weeks indicated there was not a single "circumscribed [and] discrete" action (alteration in original) (quoting *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004))); *cf. ACILS*, 2025 WL 1795090, at *6-7 (describing terminations of numerous agreements over the course of two weeks, many on the same day, using "identical language"); *Thakur* 2025 WL 1734471, at *6 (noting that plaintiffs received "four identical EPA grant termination letters" over the course of just two weeks). The differences in timing and reasons for the terminations here, rather, could be consistent with some degree of individualized review by the agency or suggestive of multiple different agency policies of smaller scope than the one plaintiff has alleged. A more fulsome administrative record, including termination letters for other grants and information revealing defendants' decision-making and implementation process, may enable plaintiffs to substantiate the policy as alleged, but the record today does not so evince as to all 600 (or more) USDA grants that have been terminated.

Without a better sense of the scope and application of the infirmities underlying the alleged policy, the Court cannot meaningfully evaluate its lawfulness under the APA or describe with specificity what agency action is to be set aside. Plaintiffs' APA claims are therefore considered only with respect to the six grant terminations in the record for the five plaintiffs before the Court.[12]

---

[12]    Plaintiffs' additional termination letter, submitted with their Notice of Factual Development, *see* Add'l AC Termination Letter, is considered to supplement their attempt to demonstrate the alleged broad policy or practice of

With those two over-arching challenges by defendants to the APA claims rejected, plaintiffs' likelihood of success on the remaining claims is considered.

### b)    Contrary to Regulation Claim: Count Three

Plaintiffs have not demonstrated they are likely to succeed on their claim that the grant terminations are contrary to the regulations in the OMB Uniform Guidance adopted by USDA. "It is 'axiomatic' . . . 'that an agency is bound by its own regulations.'"  *Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (quoting *Panhandle E. Pipe Line Co v. FERC*, 613 F.2d 1120, 1135 (D.C. Cir. 1979)).  "Thus, an agency action may be set aside as arbitrary and capricious" under 5 U.S.C. § 706(2)(A) "if the agency fails to 'comply with its own regulations.'"  *Id.* (quoting *Environmentel, LLC v. FCC*, 661 F.3d 80, 85 (D.C. Cir. 2011)). Defendants do not dispute that they are bound by these regulations.  Plaintiffs allege five deficiencies, but none actually demonstrates that defendants have failed to comply with those provisions with respect to any of the terminations at issue here.  *See* FAC ¶ 197; Pls.' Mem. at 26-27.

Plaintiffs first argue that § 200.340(a)(4), which defendants cited as the reason for their grant terminations, is not applicable because that version of the provision was not yet adopted at the time the grants were awarded. Pls.' Mem. at 27.  Yet, as plaintiffs themselves admit, the version in effect at the time the grants were awarded— § 200.340(a)(2) of the 2020 Uniform Guidance— was substantively the same.  *Id.* at 25-27.  Defendants simply cited to the current numbering in the regulation instead of the old numbering, which does not indicate that their

---

arbitrary terminations—not to amend plaintiffs' complaint to challenge the individual termination of a third AC grant.  Given that the Court cannot evaluate the broader policy or practice on the current record, as described above, and that the third AC grant is not mentioned in plaintiffs' complaint or briefing, nor is the grant itself in the record, such that the termination's legality may be individually evaluated under plaintiffs' claims, the termination of this third AC grant is not further considered here.

*actions* were inconsistent with the regulations and therefore cannot sustain a violation to the APA.[13]

Second, plaintiffs argue that whether under current § 200.340(a)(4) or the prior version, defendants had to "clearly and unambiguously" include as a ground for termination that the award "no longer effectuates the program goals or agency priorities" in the actual terms and conditions of the award. Pls.' Mem. at 27-28. The awards' textual references to "2 C.F.R. Part 200 or 2 C.F.R. § 200.340" is, in plaintiffs' view, insufficient, stating that "[n]o reasonable awardee would read a reference to 2 C.F.R. Part 200 or 2 C.F.R. § 200.340 and understand that it means that the award may be terminated if it no longer effectuates agency priorities." *Id.* at 28. Plaintiffs do not explain why, however, a reader would somehow fail to interpret a reference to "2 C.F.R. part 200 or 2 C.F.R. § 200.340" to incorporate the current § 200.340(a)(4) or the previous version of that provision with identical text at § 200.340(a)(2). They contend that "unambiguous" means "explicit" according to Black's Law Dictionary, Pls.' Reply at 13, but the definition cited is more nuanced—describing "unambiguous as "having only one reasonable and definite meaning; *conveying* a clear and explicit *sense* when reasonably interpreted." *Unambiguous*, BLACK'S LAW DICTIONARY (12th ed. 2024) (emphasis added). A reference, such as a statutory number or an abbreviation ("U.S.A.") may have an explicit meaning without explicitly stating that to which it refers ("United States of America"). Here, any reference to the general provision, of which § 200.340(a)(4) is a subpart, clearly incorporates that sub-provision's rationale for termination, despite not explicitly spelling that out.[14]

---

[13]    Plaintiffs also suggest that citing the current regulation in the termination letters demonstrates defendants' explanation for the terminations was arbitrary and capricious, *see* Rough Hr'g Tr. at 35:20-36:6, but, again, given that the difference between the regulations is substantively immaterial, this does not alone render defendants' explanations arbitrary and capricious.

[14]    Plaintiffs' argument on this point is further hampered by the fact that they do not evaluate the clarity of the particular language in each award, and at least some of the awards *are* explicit in invoking the "no longer

Third, plaintiffs insist that the terminations are unlawful because the "priorities allegedly no longer being served by the grant must also be 'clearly and unambiguously' listed in the awards," and none of the new priorities here were.  Pls.' Mem. at 26-27.  Sections 200.340(a)(4) and (b) only require, however, that the *reason* for termination, *i.e.*, the fact of a change in priorities under § 200.340(a)(4), be "clearly and unambiguously" listed in the awards, not the priorities themselves.  *See* 2 C.F.R. § 200.340(a)(4) (allowing for termination "pursuant to the terms and conditions of the Federal award . . . if an award no longer effectuates the program goals or agency priorities); *id.* § 200.340(b) ("The Federal agency . . . must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award.").  Plaintiffs further do not provide any support for the implied assertion that defendants cannot terminate grants due to shifting priorities.  Although the language of § 200.340(a)(4)— particularly, the phrase "no longer"—might suggest that the goals and priorities that are not being fulfilled are ones that were established at the beginning of the grant, the language is also broad enough to contemplate termination based on shifting goals or priorities.  Moreover, as defendants point out, Defs.' Opp'n at 25, the comments in the Guidance for Federal Financial Assistance are consistent with the latter interpretation.  *See* Guidance for Federal Financial Assistance, 89 Fed. Reg. 30,046, 30,089 (Apr. 22, 2024).  In the process of adopting the most recent version of the rules, some commenters expressed concern about the provision allowing agencies to "terminat[e] high-performing projects based on shifting agency priorities" and proposed its removal, while others believed the text was important to allow for "unilateral termination based on changes in program goals or agency priorities."  *Id.*  OMB did not

---

effectu[ating] program goals or agency priorities" basis for termination under 2 C.F.R. § 200.340.  *See* Atwood Decl., Ex. D, AC Grant # 2, General Terms & Conditions ¶ V2, at 21.

explicitly credit either of these concerns but retained the rule, suggesting that the possibility of terminating "projects based on shifting agency priorities" did not justify a change.  *Id.*

Fourth and relatedly, plaintiffs contend that termination is only possible where "new evidence shows the award no longer meets those original goals and priorities."  Pls.' Mem. at 28.  For the reasons explained, plaintiffs have not demonstrated that § 200.340(a)(4) contemplates only terminations based on lack of adherence to *initial* goals.  Further, plaintiffs do not cite to any regulation requiring specific "evidence" of failure to fulfill goals to be included in the *termination letter*—which is all this Court can evaluate on the current record.  *See* Pls.' Mem. at 28; Pls.' Reply at 14.  Instead, plaintiffs cite to language in the 2020 Guidance for Grants and Agreements discussing the prior version of § 200.340(a)(4).  Guidance for Grants and Agreements, 85 Fed. Reg. 49,506, 49,507-08 (Aug. 13, 2020); *see* Pls.' Reply at 14.  The guidance explains that the

> intent . . . is to ensure that Federal awarding agencies prioritize ongoing support to Federal awards that meet program goals.  For instance, following the issuance of a federal award, if additional evidence reveals that a specific award objective is ineffective at achieving program goals, it may be in the government's interest to terminate the Federal award.  Further, additional evidence may cause the Federal awarding agency to significantly question the feasibility of the intended objective of the award, such that it may be in the interest of the government to terminate the Federal award.

85 Fed. Reg. at 49,507-08.  The references here to "evidence" demonstrating an inability to meet goals are not establishing prerequisites to termination but merely serve as illustrative examples of when termination under § 200.340(a)(4) would be appropriate.

Finally, plaintiffs argue that defendants did not "comply with separate requirements in the Uniform Guidance that awardees have an opportunity to address any issues before termination."  Pls.' Mem. at 28.  They point to 2 C.F.R. § 200.339, "[r]emedies for noncompliance," which indicates that suspending or terminating the award is only appropriate if

66

"noncompliance cannot be remedied by imposing specific conditions," as laid out in § 200.208(c), such as "[r]equiring additional or more detailed financial reports," or "[r]equiring additional project monitoring," *id.* § 200.208(c)(3)-(4).  Pls.' Mem. at 28-29.  Plaintiffs also point to another provision for certain components of USDA that indicates a grantee should be given an opportunity for corrective action based on termination for "fail[ure] to materially comply with the terms and conditions of the award," 7 C.F.R. § 3430.60(a)-(b).  *See* Pls.' Mem. at 29.  None of those provisions are relevant here, however, because defendants did not terminate the grants due to noncompliance with the terms and conditions of the award but rather for not effectuating agency priorities under 2 C.F.R. § 200.340(a)(4).  *See* Defs.' Opp'n at 26.

In plaintiffs' view, "no longer effectua[ting] . . . agency priorities" amounts to a "form of noncompliance with the conditions" because "those priorities must be specified at the time of the award, as part of the conditions of the award," such that they become a condition to which plaintiffs must comply.  Pls.' Reply at 14; *see also* Rough Hr'g Tr. at 53:5-7 (plaintiffs' counsel noting that 2 C.F.R. §§ 200.339-.343 all address "Remedies for Noncompliance," so § 200.340(a)(4) should be considered a type of termination for noncompliance).  As explained previously, however, the regulations only require defendants to specify in the award the potential *reasons* the agency may invoke for termination—such as a change in agency priorities—not the priorities themselves.  A termination based on § 200.340(a)(4) due a change in agency priorities can therefore be appropriate without the grantee having failed to meet any requirements in the award.  Section 200.341(b) makes clear, in fact, that the regulations allow for termination for reasons other than traditional noncompliance, so § 200.340(a)(4) need not be construed as a noncompliance-related termination to which § 200.339 and 7 C.F.R. § 3430.60 apply.  By stating that "*[i]f* the Federal award is terminated for the recipient's material failure to comply with a

Federal award, the notification must state" certain things, section 200.341(b) plainly

contemplates terminations in spite of a grantee's full compliance with the award.  2 C.F.R.

§ 200.341(b) (emphasis added).  Plaintiffs therefore likely cannot demonstrate that defendants

did not comply with the regulations requiring an opportunity for corrective action prior to any

terminations for noncompliance.

In short, plaintiffs fall short of demonstrating a likelihood of success on their claim that

defendants acted contrary to regulations and thus in violation of the APA with respect to the six

grant terminations in the record.

### c)    *Contrary to Statute Claim: Count Five*

Plaintiffs USDN and AC are the only two plaintiffs to bring Count Five, and they have

demonstrated a likelihood of success on the merits of their claim that defendants violated the

APA by acting contrary to statute in terminating their grants for the reasons stated in USDN's

termination letter and the press release announcing termination of AC's second grant.  An

agency's power to act is circumscribed by Congress.  *See generally La. Pub. Serv. Comm'n v.*

*FCC*, 476 U.S. 355, 374 (1986).  Put bluntly, an agency does not have the authority to "decline

to follow a statutory mandate or prohibition simply because of policy objections."  *In re Aiken*

*Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013).  Thus, under the APA, courts "hold unlawful and set

aside agency action . . . found to be . . . not in accordance with law."  5 U.S.C. § 706(2)(A).

Here, plaintiffs are likely to demonstrate that the USDA and USFS acted contrary to the

Cooperative Forestry Assistance Act and the Inflation Reduction Act in terminating USDN's

grant for "promot[ing] or tak[ing] part in climate change or environmental justice initiatives."

USDN Termination Letter at 1.

USDN received a five-year $28 million grant in 2023 to support urban forestry in communities, focusing on training youth on planting and maintaining trees in their neighborhoods.  *See* Brown Decl. ¶¶ 7, 9, 11.  The funding was appropriated by the 2022 IRA § 23003, for projects under the Urban and Community Forestry Assistance Program, established by the Cooperative Forestry Act of 1978, 16 U.S.C. § 2105(c).  *See* Brown. Decl., Ex. C, Federal Financial Assistance Award of Cooperative Agreement at 1.  That Act gave the USDA Secretary "general authority" to provide assistance to States, including via nonprofit organizations, "to plan urban forestry programs and to plant, protect, and maintain . . . trees in open spaces, greenbelts, . . . and residential developments in urban areas."  16 U.S.C. § 2105(c).  The purposes of the program are plainly stated as "improv[ing] understanding of the benefits of preserving existing tree cover in urban areas" and "implement[ing] a tree planting program to complement urban and community tree maintenance and open space programs and to reduce carbon dioxide emissions, conserve energy, and improve air quality in addition to providing other environmental benefits," among other things.  *Id.* § 2105(b)(1), (5).  These purposes align with Congress's findings, listed in the opening subsection, that "tree plantings and ground covers such as low growing dense perennial turfgrass sod in urban areas and communities can aid in reducing carbon dioxide emissions, mitigating the heat island effect, and reducing energy consumption, thus contributing to efforts to reduce global warming trends."  *Id.* § 2105(a)(5).  Put plainly, through the Cooperative Forestry Act and the Inflation Reduction Act, Congress clearly intended for USDA to expend money promoting tree coverage in urban areas for the purposes of reducing carbon dioxide emissions and thus mitigating "global warming trends," which are commonly referred to as "climate change."

USDN's grant was then terminated for addressing these very issues Congress intended for such programs to address. The USDN Termination Letter states that "[t]he Department's priorities include ensuring that its grants, cooperative agreements, and other similar arrangements do not support programs that promote or take part in climate change or environmental justice initiatives. . . . The award specified above provides funding for programs that promote or take part in climate change or environmental justice initiatives; that conflict with the Department's policies and priorities; that are not free from fraud, abuse, or duplication, or that otherwise fail to serve the best interests of the United States. The award is therefore inconsistent with, and no longer effectuates, Department priorities." USDN Termination Letter at 1. Congress identified tree planting and protection of tree coverage as a climate change initiative in 16 U.S.C. § 2105(a)(5). That is precisely USDN's project. Defendants cannot terminate a grant for filling the express statutory aim described and enacted by Congress.

Defendants do not argue that the grant was actually terminated for any other reason, such as abuse or duplication, such that the language about climate change and environmental justice initiatives was superfluous. Nor do they find meaningful daylight between the meaning of "global warming trends" or "carbon dioxide emissions" in the statute and "climate change" in the USDN Termination Letter. *See* Rough Hr'g Tr. at 72:12-18 (defendants' counsel responding to the Court's question about the meaning of "climate change" in the letter by stating "it's climate change in the ordinary meaning of the term . . . Climate change caused by greenhouse gases"). Rather, defendants argue simply that "[n]othing in the Inflation Reduction Act requires the Department to fund any one particular grant or any one particular time." Defs.' Opp'n at 30-31. "Certainly, the . . . enabling statute did not require it to fund [USDN's project] specifically, or any other specific . . . project." *Thakur*, 2025 WL 1734471, at *12. "But," as one court recently

observed, when Congress instructed the funding of grants for a specific activity meant to address climate change, defendants were "barred from terminating such grants *on the basis* that they" addressed climate change. *Id.* (emphasis in original); *Green & Healthy Home Initiatives*, 2025 WL 1697463, at *19 (holding that the statute, by establishing a grant program to support "environmental justice" and requiring EPA to use appropriated funds for such programs, prohibited "expressly terminating grants *because* they are for . . . 'environmental justice' programs" (emphasis in original)).

Likewise, the announced termination of AC's Grant #2 based on the agency's new opposition to what it deems to be "DEI" is at odds with the Land Access Program's statutory purpose in aiding socially disadvantaged and underserved farmers. In 2024, AC received Grant #2, in the amount of $2,500,000 over four years, under the Land Access Program to promote access to land and capital "for Queer, Trans, Black, Indigenous, and Multi-Racial producers that serve marginalized communities in the Bay Area." Atwood Decl. ¶¶ 15, 17-18. The Land Access Program originated with section 1006 of the American Rescue Plan Act, entitled "USDA Assistance and Support for Socially Disadvantaged Farmers, Ranchers, Forest Land Owners and Operators, and Groups," which appropriated funds for supporting the designated people or groups. Pub. L. No. 117-2, 135 Stat. at 13-14. The 2022 IRA amended that section and appropriated additional funds for programs to benefit "underserved farmers, ranchers, or forest landowners, including veterans, limited resource producers, beginning farmers and ranchers, and farmers, ranchers, and forest landowners living in high poverty areas" and to "provide financial assistance . . . to farmers, ranchers, or forest landowners determined to have experienced discrimination prior to January 1, 2021, in Department of Agriculture farm lending programs." IRA sec. 22007, § 1006(b), (e), 136 Stat. at 2022-23. The codified statute, to which section 1006

of the American Rescue Plan Act was added as a "Note," employs the term "socially disadvantaged" multiple times and defines this term as meaning people who "have been subjected to racial or ethnic prejudice because of their identity as members of a group without regard to their individual qualities." 7 U.S.C. § 2279(a)(5)-(6).

The Secretary stated in her press release that she was terminating AC's Grant #2 because it was a "Diversity, Equity, and Inclusion (DEI) focused awar[d]," "wast[ing money] on woke DEI propaganda." Press Release 0136.25. Defendants are thus terminating AC's grant because the grant supported specific groups, like racial minorities, that have historically faced discrimination—despite Congress's explicit instruction for funding to be used to support such "underserved" groups. Again, defendants cannot terminate a grant for the very reason that the grant satisfies Congress's mandate.

Defendants do not argue that this announcement was merely tentative and AC's second grant might not be terminated at all or that the reasons in the Secretary's press release might differ from the reasons in the termination letter such that the action should not yet be considered unreviewable as nonfinal. Nor do defendants argue that the agency had some different, unique interpretation of DEI. Rather, defendants respond that "[s]ection 22007(b)," of the IRA which amended section 1006(b) of the American Rescue Plan Act, "funds initiatives based on farmers' financial status and does not mention race, sex, or sexual orientation," and thus allows defendants to "continue to find initiatives that assist 'underserved' and 'limited resource' producers without funding" those that discriminate on the basis of race or sex. Defs.' Opp'n at 31. Defendants' attempt to recast the statute as one that contemplated aid to growers based purely on financial status is not credible. Section 1006(e) of the American Rescue Plan Act, as amended in section 22007 of the IRA, is entitled "Discrimination Financial Assistance" and

specifically appropriates funding "in addition to amounts otherwise available" to go to farmers

"determined to have experienced discrimination prior to January 1, 2021." 136 Stat. at 2022.

Defendants do not explain what kind of discrimination Congress would be referring to unless

tied to race, ethnicity, gender, or sexual orientation. The section also appears plainly concerned

with addressing racial discrimination given that § 1006(c), as amended in the IRA, instructs the

provision of funding to "equity commissions" to "address racial equity issues within" USDA. *Id.*

Defendants do not explain why Congress would have been targeting different concerns by its use

of the term "underserved" in subsection (b). Nor do defendants grapple with the definition of

"socially disadvantaged" in 7 U.S.C. § 2279, explicitly mentioning race, which was the term

used in the appropriations bill that preceded the IRA or explain how the term "underserved"

meaningfully differs.

Defendants have complete discretion to choose what grants to award, and defendants also

have broad authority to terminate grants. Defendants flout Congress's mandates, however, when

they terminate grants for the very reason that the grants further the aims Congress explicitly

instructed defendants to pursue.[15] *Cf. CREW v. OMB*, No. 25-5266, Dkt. # 2129438, Order

Denying Stay at 19 (D.C. Cir. Aug. 9, 2025) (Henderson, J., statement respecting the denial of a

stay pending appeal) ("The courts have long recognized the Congress's 'absolute control of the

money of the United States'" (quoting *Hart's Case*, 16 Ct. Cl. 459, 484 (1880), *aff'd sub nom.*

*Hart v. United States*, 118 U.S. 62 (1886)) and the "mechanism" for "check[ing] unbridled

Executive power" through "congressional control over funds in the Treasury" (last passage

quoting *OPM v. Richmond*, 496 U.S. 414, 425 (1990))); *Nat'l Endowment for Democracy v.*

---

[15]    Given that Counts Six and Seven target largely the same conduct as Count Five, *see* Rough Hr'g Tr. at 45:4-13 (plaintiffs' counsel's general agreement with that characterization), and are not pursued by any of the other plaintiffs, and thus unable to be the basis for any further relief, those last two Counts need not be considered here.

*United States*, -- F. Supp. 3d --, 2025 WL 2305477, at *4-5 (D.D.C. 2025) (rejecting the government's attempt to withhold appropriated funds based on plaintiff's pursuit of its statutory mission through projects that "do not align with the Executive's priorities").

### d)      Arbitrary & Capricious Claim: Count Four

Lastly, plaintiffs have demonstrated a likelihood of success in showing that all five of their already terminated grants were terminated arbitrarily and capriciously.  An agency action is considered "arbitrary and capricious" if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicles Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  This requirement for a "reasoned explanation" means that when an agency is changing its policy, the agency must demonstrate recognition of that change and provide "good reasons for the new policy," and those reasons must be especially strong where the "prior policy has engendered serious reliance interests" or where the "new policy rests upon factual findings that contradict those which underlay its prior policy."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009).

Plaintiffs identify several failures with defendants' terminations, namely that they used form letters without adequate explanation, failed to identify the specific reasons for the terminations, did not consider plaintiffs' reliance interests, and did not justify their change in course.  Pls.' Mem. at 30-32.  Defendants, in their briefing, offered no response to plaintiffs' arbitrary and capricious arguments, resting on their insistence about the lack of both subject matter jurisdiction and a final agency action to review under the APA.  At the motions hearing,

when given an opportunity to respond to the plaintiffs' arbitrary-and-capricious APA claims and arguments, defendants posited that the termination letters included sufficient reason, by mentioning new policy priorities and summarizing some of the substance in the Secretary's March 13, 2025 memoranda—without any explicit reference or citation to those memoranda— and indicated defendants planned to wait until merits briefing to address more directly plaintiffs' arguments on this APA claim.  Rough Hr'g Tr. at 85:7-87:18.

At the outset, plaintiffs cannot demonstrate a likelihood of success with respect to this claim for AC's Grant #2 given that the termination has not yet officially occurred, and thus the Court cannot evaluate the adequacy of defendants' explanation.  In any case, the determination that the Secretary's announced basis for terminating that grant is contrary to statute, *see supra* Part III.B.2(c), is sufficient for AC's requested relief at this juncture.

The five other of plaintiffs' grant terminations clearly lacked sufficient explanation.  The termination letters offered only vague and conclusory reasoning with no consideration of reliance interests, dispelling any assumption that the agency conducted an individualized review.  Although each termination letter offers a citation to § 200.340(a)(4) and mentions that the grant is not consistent with agency priorities, no letter explains *why* the particular grant is not consistent with the cited priorities and *why* the change in priorities justifies terminating an awarded grant on which plaintiffs have substantially relied.

To start, USDN, PFC, and IATP's grant termination letters confusingly list multiple, unrelated potential bases for termination, failing to identify a particular reason for termination at all.  They each include a paragraph discussing a policy conflict—climate change and environmental justice in the case of USDN and DEI in the case of the other two—but that paragraph ends with a statement that "it is vital that the Department assess whether all awards are

free from fraud, abuse, and duplication" and list under "termination" that the "award specified"

has one of several potential flaws, including inconsistency with the discussed policy, "not

[being] free from fraud, abuse, or duplication," or "fail[ing] to serve the best interests of the

United States."  USDN Termination Letter at 1; PFC Termination Letter at 1; IATP Termination

Letter at 1.  A list of several potential reasons is as informative as no reason at all.  While

plaintiffs and defendants seem to all have assumed the grants were due to a change in policy

priorities, the letters leave equally open that plaintiffs' grants were terminated for fraud or abuse,

pursuant to the list of potential bases that appears to be form language copied into each letter.

*See Thakur*, 2025 WL 1734471, at *14 ("Based on the form termination letters . . ., it is

impossible to determine which item in the disjunctive list of 'priorities' and 'reasonable causes'

resulted in the termination of the grant, much less why the specific project was found to be

incompatible with the Agency's priorities.").  The vague accusation that plaintiffs engaged in

fraud and abuse is not only completely unsupported by any evidence or reasoning but also

doubly damaging to the reputations of these nonprofit organizations.

Assuming, nonetheless, that defendants' terminations were at least based on the singular

reason of not fulfilling a newly adopted USDA priority, they nonetheless lack sufficient

justification and individualized explanation.  Taking each of these three in turn, USDN's grant

termination, in addition to likely being contrary to the statute, *see supra* in Part III.B.2(c), is

likely arbitrary and capricious.  As previously described, the policy priority-related reason for

termination was that "[t]he Department's priorities include ensuring that its grants . . . do not

support programs that promote or take part in climate change or environmental justice

initiatives," and "[t]he award specified [] provides funding for programs that promote or take

part in climate change or environmental justice initiatives . . . . The award is therefore

inconsistent with, and no longer effectuates Department priorities." USDN Termination Letter at 1. Despite identifying some concrete reason, these are mere "conclusory statements," which "will not do; an 'agency's statement must be one of *reasoning*.'" *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (emphasis in original) (quoting *Butte Cnty v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010)). Yet, no further reasoning is offered. Nowhere does the letter define "climate change or environmental justice initiatives" or explain why those programs are disfavored. Nor does the letter explain what about USDN's grant "promote[s] or take[s] part in climate change or environmental justice initiatives." *Id.* The letter does not reference USDN's reliance interests or anything about USDN's grant that suggests the agency did anything more than locate USDN via a keyword search for terms like "climate" and "sustainable"—which are both in the grant project's title—and print out a form letter, which even defendants admit would likely not be permissible approach to terminating grants. *See* Rough Hr'g Tr. at 69:3-70:7 (defendants' counsel agreeing that "go[ing] in and see[ing] the words 'climate change 'and press[ing] a delete button" would not be acceptable and "wouldn't be in accordance with best practices"); *Thakur*, 2025 WL 1734471, at *14 (observing that, based on "large waves of terminations via form letters," defendants "appear to have flagged grants for termination based on keyword searches or other cursory review"). There is, fatally, no "satisfactory explanation" establishing "a rational connection" between "facts found and the choice made." *State Farm*, 463 U.S. at 43; *see also Green & Healthy Home Initiatives*, 2025 WL 1697463, at *21 (holding that EPA did not provide reasoned explanation when the agency "offered no individualized analysis or discussion about why *these grants* failed to comply with the clean Air Act or other legal requirements, or any other basis for terminating these grants" (emphasis in original)).

The two grant terminations premised on anti-DEI priorities (PFC and IATP's), were also lacking in sufficient reasoning tied to an individualized assessment of the grants and thus likely arbitrary and capricious.  Both include identical paragraphs about USDA's priority to "eliminate discrimination in all forms" and how "DEI policies and practices" conflict with that aim and other USDA priorities.  PFC Termination Letter at 1; IATP Termination Letter at 1. Then, each letter states "[t]he award . . . provides funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights laws; that conflict with the Department's policies and priorities; that are not free from fraud, abuse, or duplication; or that otherwise fail to serve the best interests of the United States," so "[t]he award is therefore inconsistent with, and no longer effectuates, Department priorities."  PFC Termination Letter at 1; IATP Termination Letter at 1.

This explanation, again, falls far short of the reasoned explanation the law requires. Neither letter explains how the grant implements a DEI initiative or what specifically about the grant is problematic.  The letters even leave vague what the agency means by "DEI" or "initiatives that discriminate on the basis of . . . protected characteristic[s]."  PFC Termination Letter at 1; IATP Termination Letter at 1.  Neither makes any reference to reliance interests.  The letters strongly suggest that defendants identified grants for the chopping block via a blunt keyword search, without much, if any, further inquiry.  Tellingly, the PFC Termination Letter is addressed "dear recipient," seemingly using a form template with little attention to grant-specific details.  PFC Termination Letter at 1.

The termination of AC's Grant #1 is especially deficient in reasoning.  Though AC's Termination Letter #1 does not proffer the laundry list of potential bases for termination as in the

three letters just discussed, the letter is equally inadequate and devoid of any explanation.  The

letter states that it "serves as written notification that the subject agreement . . . is terminated . . . ,

in accordance with 2 C.F.R. § 200.340(a)(4) and the terms and conditions of the award.  NIFA

has determined that [the] award . . . no longer effectuates USDA priorities, which are to

maximize and promote American agriculture; ensure a safe, nutritious, and secure food supply;

enhance rural prosperity; and protect our National Forests."  AC Termination Letter # 1 at 1.

The letter proceeds to explain reporting requirements and offers no other rationale for the

termination.  The broad, sweeping nature of the priorities listed—such as "promot[ing] American

agriculture—makes it difficult to imagine why the grant would not effectuate such aims, and the

letter offers no suggestion.  Nor does the letter suggest why the priorities were chosen, or why

the change in course is justified despite AC's reliance interests on the grant.  The perfunctory

nature of this letter belies any suggestion that more fulsome reasoning was provided by the

agency in other records.  The heading, "dear recipient," likewise suggests that no individualized

consideration was given.  *Id.*

Turning lastly to OBC's grant, OBC's termination facially differs from that for the other

grants because OBC's termination letter cites the following specific, objective criterion, adopted

as a new policy priority, that OBC apparently failed to meet: "A minimum of 65% of federal

funds must go to producers."  *See* OBC Termination Letter.  The termination, though, is flawed

for similar reasons.  The letter provides no explanation as to why OBC fails to meet that

criterion, why such a priority was adopted, or why such a new requirement would be justified

considering the reliance interests.  Moreover, the criterion is ill-defined, and thus its application

to this case arbitrary and misleading.  Per the declaration from OBC's Director, OBC is

producer-owned with no sub-awardees, so 100% of the grant funds go to producers.  Thiel Decl.

¶ 16.  OBC therefore believes its grant meets the specific criterion for which the grant was terminated.  After raising this factual discrepancy via email with the agency, defendants informed OBC that 65% of federal funds had to go "*directly* to producers in the *form of payments*," despite that additional restriction being absent from the termination letter, as well as any explanation of why OBC falls short of meeting this new requirement, as defined by the agency.  *Id.* ¶ 16 (emphasis added) (citing *id.*, Ex. E at 8-9, Email from Colton Buckley, Chief of Staff at USDA Natural Resources Conservation Service).  Defendants' adoption of an apparently new requirement without explanation or apparent justification and their application of that requirement, again without explanation and pursuant to a specific unintuitive and undisclosed interpretation, appears likely to be arbitrary and capricious.

   To be sure, the termination letters themselves may not reflect the full extent of the agency's analysis in each case.  The administrative record may elsewhere contain individualized explanations exemplifying well-supported, reasoned decision-making.  The general and highly similar nature of the termination letters, however, suggests the agency did *not* engage in such a reasoned process, and defendants opted to make no argument or present evidence to the contrary on plaintiffs' arbitrary and capricious APA claim.  *Cf. Thakur*, 2025 WL 1734471, at *14 ("Agency Defendants do not contest that the termination letters represent the sum-total of their 'reasoned explanation.'").  On this record, then, plaintiffs have demonstrated a likelihood of success on their APA claim that defendants' terminations of plaintiffs' grant awards were arbitrary and capricious.  *See id.* at 14-15 (coming to the same conclusion).

### C.    Irreparable Harm

Having found a likelihood of success on the merits, the requisite factor for the requested injunctive relief of whether plaintiffs are experiencing or will experience irreparable harm is evaluated next.  To warrant preliminary equitable relief, plaintiffs must demonstrate "a clear and

present need for equitable relief to prevent irreparable harm." *Wisc. Gas Co. v. FERC*, 758 F.2d

669, 674 (D.C. Cir. 1985) (quoting *Ashland Oil, Inc. v. FTC*, 409 F. Supp. 297, 307 (D.D.C.),

*aff'd* 548 F.2d 977 (D.C. Cir. 1976)).  That injury must be "actual and not theoretical" and must

be such that "adequate compensatory or corrective relief" will likely not be possible "at a later

date, in the ordinary course of litigation."  *Id.* (second passage quoting *Va. Petroleum Jobbers*

*Ass'n v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958)).  Thus, "economic loss does not, in and of

itself, constitute irreparable harm."  *Id.*  Economic harm can constitute irreparable harm,

however, where it threatens the existence of the organization.  *Id.*  Further, "obstacles [that]

unquestionably make it more difficult for the [plaintiff] to accomplish [its] primary mission"

may "provide injury for purposes . . . of . . . irreparable harm."  *League of Women Voters v.*

*Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016).  Reputational injury may also be considered irreparable.

*See, e.g.*, *Patriot, Inc. v. Dep't of Hous. & Urb. Dev.*, 963 F. Supp. 1, 5 (D.D.C. 1997).  All five

plaintiffs have demonstrated ongoing irreparable harm due to the termination of their grants.

    USDN has entirely stopped its urban forestry program in the absence of federal funding,

cancelling contracts with sub-awardees and cutting down operations and staff.  Brown Decl.

¶ 16; *see also* Pls.' Resp. to Defs.' Notice at 3, ECF No. 28 ("USDN has been forced to lay off

nine staff members.").  This has harmed USDN's reputation as a reliable partner to other

organizations, having left them unable to fulfill their goals and pay their staff members.  Brown

Decl. ¶¶ 16-18, 20.  Crucially, given the large size of the grant—"60% of [USDN's] annual

budget," *id.* ¶ 9—the organization is "fighting for USDN's survival," looking for "alternative

funding options to sustain [the] organization," *id.* ¶ 18.

    Likewise, AC has halted its programs as a result of losing its grant funding.  AC put on

hold its Cooperative Incubator Farm project (which was funded by their first grant), terminating

contracts with its beginning farmers who will consequently lose land access and growing time. Atwood Decl. ¶¶ 21-22.  The land has gone fallow as a result, and AC's reputation with the farmers has been tarnished.  *Id.* ¶¶ 23, 28.  AC has also paused all efforts on its Land Access Program, which was funded by their second grant.  *Id.* ¶ 24.  AC describes significant harm to its overall operations as a result, including likely layoffs of staff.  *Id.* ¶ 26.  Further, AC has had to divert resources from other programs; such opportunity costs are impossible to quantify.  *Id.* ¶ 23.

PFC, too, is facing imminent shut-down of its Incubator Farm Program, relying now on a limited pool of unrestricted operations funds to keep the program alive.  Heltman-Weiss Decl. ¶ 21.  Loss of the Program would negatively impact the farmers who rely on the program for education, resources, land access, equipment, and so forth, as well as their communities who benefit from the food and economic activity the program generates.  *Id.*  Already, PFC has experienced harm to its relationships with its farmers and other community partners who rely on and trust PFC to provide necessary resources.  *Id.* ¶¶ 24, 26-27.

IATP also faces significant risk to its organization and mission.  Its terminated grant supported a "network of Minnesota farm and food systems organizations" by providing educational resources.  McKee VanSlooten Decl. ¶¶ 7-8.  Without the grant, IATP is unlikely to be able to carry out this program.  *Id.* ¶ 19.  Already, IATP has delayed publication of its educational resources.  *Id.*

Finally, OBC "will no longer be able to function as an organization" without relief.  Thiel Decl. ¶ 23.  The organization has already "effectively cease[d] operations as the only distributor of Oakville bluegrass in California" and has lost an entire growing season due to the termination of funding.  Thiel Decl. ¶ 17.  The organization has laid off multiple staff members, given up

rented equipment, and fallen behind on payments to other organizations. *Id.* ¶¶ 19-21. OBC also risks harming its reputation with growers in the cooperative and private entities that contributed to OBC's funding. *Id.* ¶ 23.

The complete termination of the organizations' programming, impairing their central missions and damaging their reputations and relationships, and the existential threat to the ongoing operation of the organizations constitute irreparable harms justifying preliminary injunctive relief. *See, e.g.*, *S. Educ. Found.*, 2025 WL 1453047, at *15 (finding plaintiff "sufficiently demonstrated that it will suffer irreparable harm because the defendants' actions threaten the livelihoods of [plaintiff's] employees, its professional reputation, and the very existence of its programs"); *Climate United Fund*, 778 F. Supp. 3d at 117 (holding that plaintiffs demonstrated irreparable harm because the "very purpose of [their] existence and their business operations, including the financing for their projects, depends on their grant money"); *Nat'l Council of Nonprofits v. OMB*, 763 F. Supp. 3d 36, 56-57 (D.D.C. 2025) (finding irreparable harm where plaintiff organizations would have to shutter programs, causing "existential injuries").

Defendants argue that plaintiffs' harms are not irreparable because they are fundamentally economic, and "[p]laintiffs do not suggest they will have to shutter their organizations permanently." Defs.' Opp'n at 33. To the contrary, USDN and OBC explicitly express concern about the ongoing existence of their organizations, *see* Brown Decl. ¶ 18; Thiel Decl. ¶ 23, and regardless, "in cases involving government expenditures, 'once the relevant funds have been obligated, a court cannot reach them in order to award relief.'" *Climate United Fund*, 778 F. Supp. 3d at 117 (quoting *City of Houston v. Dep't of Hous. & Urb. Dev.*, 24 F.3d 1421, 1426-27 (D.C. Cir. 1994)). Such economic losses are thus not recoverable, and for the

reasons previously explained, *see supra* Part III.A.2, plaintiffs could not simply get monetary damages from the government through the Court of Federal Claims, as defendants suggest, *see* Defs.' Opp'n at 34.  This risk of losing their grants permanently if the funds are otherwise obligated makes urgent the need for equitable relief.

Defendants further insist that plaintiffs' reputational injuries are not irreparable harm because customer goodwill and business opportunities are generally recoverable and such reputational harm "does not flow directly from the challenged action" but rather due to "independent market variables, such as how [a company's] customers . . . might react" to certain actions.  Defs.' Opp'n at 34 (alteration in original) (second passage quoting *Am. Meat Inst. v. USDA*, 968 F. Supp. 2d 38, 81 (D.D.C. 2013), *aff'd*, 746 F. 3d 1065 (D.C. Cir. 2014)).  The reputational injury alleged here, however, is not a downstream effect resulting from the effect of market forces on a company having experienced some injury.  By contrast, the harm to plaintiffs' reputation is a direct result of the termination of federal funding that plaintiffs had been using to partner with community groups and provide resources to sub-awardees.  Such reputational harm is considered to result from the challenged action and is indeed irreparable, considering such harm is impossible to quantify.  *See, e.g.*, *S. Educ. Found.*, 2025 WL 1453047, at *14-15 (describing as irreparable harm the damage to reputational injury due to loss of grant funding); *Woonasquatucket River Watershed Council*, 778 F. Supp. 3d at 474-75 (same); *see also HIAS, Inc. v. Trump*, 985 F.3d 309, 326 (4th Cir. 2021) (describing as irreparable harm the erosion of community connections even if the organizations survive).

Finally, defendants suggest that preliminary injunctive relief is not proper due to plaintiffs' "unexplained delay in seeking a preliminary injunction."  Defs.' Opp'n at 34. Defendants are correct that plaintiffs did not immediately seek a preliminary injunction when

plaintiffs' grants were terminated in March and April, but as plaintiffs point out, they sought an administrative appeal and only turned to federal court once that effort appeared to be futile since the agency made clear they would not get relief.  *See* Pls.' Reply at 20.  Defendants cannot argue on the one hand, as they do for plaintiffs' due process claim, that plaintiffs have not satisfied their administrative exhaustion requirement, Defs.' Opp'n at 29, and on the other that they did not act expeditiously to seek relief before this Court.[16]

Plaintiffs have therefore demonstrated they will face irreparable harm in the absence of preliminary injunctive relief.

### D.    Balance of the Equities and Public Interest

The final two factors, the balance of the equities and the public interest, weigh in favor of granting relief to plaintiffs.  These factors merge where the government is the opposing party. *Nken*, 556 U.S. at 435.  "[C]ourts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief[,]' . . . 'paying particular regard for the public consequences.'"  *Winter*, 555 U.S. at 24 (first passage quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987); second passage quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).  Here, plaintiffs and the public face significant injury from defendants' actions, which are likely violative of the APA, and defendants' relative delay in fulfilling their agency priorities pales in comparison.

As plaintiffs explain, "[t]here is generally no public interest in the perpetuation of unlawful agency action."  *League of Women Voters*, 838 F.3d at 12; *see* Pls.' Mem. at 43.  By

---

[16]    Defendants further note that plaintiffs also have options to mitigate harms arising from the pause in funding because they can recover costs from qualifying events that occurred prior to the termination.  *See* Defs.' Opp'n at 35.  That plaintiffs can receive reimbursement for costs prior to the alleged injury does not actually mitigate the harm caused by the injury—*i.e.*, the termination.  Without funding for current and future costs, plaintiffs still have to shut down their programs and projects.  *See* Pls.' Reply at 21.

contrast, "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operation.'" *League of Women Voters*, 838 F.3d at 12 (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). In this case, plaintiffs—as previously explained—and the public alike benefit from defendants terminating grants only in ways consistent with the statutes authorizing those grants. They also benefit from defendants abiding by the APA, engaging in reasoned decision-making and providing explanations for their opinions. *See Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017).

Defendants identify two harms they will face if plaintiffs are granted relief. First, "the injunction plaintiffs seek would disrupt the Department's efforts to implement the President's and Secretary's directives," interfering with the agency's discretion to choose what activities to fund. Defs.' Opp'n at 36. Defendants have an obligation, however, to carry out those directives in lawful ways. The limited injunction contemplated—preliminarily vacating plaintiffs' grant terminations—would not prevent defendants from effectuating agency priorities through *proper* terminations of those grants or others. Second, defendants posit that an injunction "will harm the public fisc" because defendants will not be able to recover funds once they are paid out. Defs.' Opp'n at 37. Yet, at this point, defendants remain obligated to pay those funds previously allocated, so they have not demonstrated any cognizable harm to the public fisc. The balance of the equities and public interest thus favor the granting of relief.

### E.    Relief and Bond

Given that plaintiffs have demonstrated a likelihood of success on the merits of their APA claims for the six individual grant terminations in the record, as well as irreparable harm and the balance of equities in their favor, those terminations will be preliminarily set aside and vacated under the APA. *See* 5 U.S.C. §§ 705, 706(2). Plaintiffs' alleged policy will not be set

aside, however, due to the difficulties of identifying on the current record the specific grant

terminations that are part of the *en masse* implementation of that policy.

Defendants request that a bond be required to accompany any injunctive relief under

Federal Rule of Civil Procedure 65(c), which states that the "court may issue a preliminary

injunction or a temporary restraining order only if the movant gives security in an amount that

the Court considers proper to pay the costs and damages sustained by any party found to have

been wrongfully enjoined or restrained." FED. R. CIV. P. 65(c).  Plaintiffs point out the "irony of

the government's weaponizing financial risk to keep parties from recouping wrongfully withheld

funds" and that the Court has the discretion to decline imposing a bond.  Pls.' Reply at 23.

Indeed, the Rule "vests 'broad discretion in the district court to determine the appropriate amount

of an injunction bond," *Nat'l Endowment for Democracy*, 2025 WL 2305477, at *7 (quoting

*DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999)), "including the 'discretion to

require no bond at all,'" *id.* (quoting *P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d

492, 520 (D.D.C. 2020)).  Requiring a significant bond here would impair plaintiffs' ability to

seek recourse in court to vindicate alleged violations of their rights, especially considering

plaintiffs' already difficult financial straits.  Accordingly, the Court declines, in its discretion, to

impose any bond on plaintiffs.  *See, e.g.*, *id.* ("The defendants have likely unlawfully frozen the

[plaintiff's] funding.  It makes little sense to exacerbate the financial strain by requiring the

[plaintiff] to post bond."); *N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, No. 25-cv-1070 (RC),

2025 WL 1423610, at *15 (D.D.C. May 16, 2025) ("Where the risk of financial harm is

speculative at best and where a bond would have a chilling effect on access to justice, the

balance of equities firmly supports waiving the bond."); *Harris Cnty.*, 2025 WL 1707665, at *18

(declining to impose any bond); *Widakuswara No. I*, 2025 WL 1166400, at *17 (same);

*Woonasquatucket River Watershed Council*, 778 F. Supp. 3d at 477 (same).

### F.    Expedited Discovery

Plaintiffs seek expedited discovery concurrently with their preliminary injunction motion

because they "wished to present the Court with a mechanism to address" any factual questions

necessary to resolving the preliminary injunction motion.  Pls.' Reply at 23.  Plaintiffs explain,

for example, that they seek discovery in anticipation of "the question of subject matter

jurisdiction," Pls.' Discovery Mot. at 8, and items of factual dispute with defendants, such as

"whether Defendants' policy, pattern, and practice of terminating grants *en masse* is a final

agency action subject to APA judicial review," Pls.' Reply at 23 n.15.  Discovery is not

necessary to resolve the question of subject matter jurisdiction, however, *see supra* Part III.A,

and plaintiffs have not shown they are otherwise entitled to discovery related to the merits of

their claims.

Typically, the record in an APA suit is limited to the "information" before the "agency

when it made its decision."  *Hill Dermaceuticals v. FDA*, 709 F.3d 44, 47 (D.C. Cir. 2013)

(quoting *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984)).  That

limit "flows from the text of the APA itself," *Univ. of Cal. Student Ass'n v. McMahon*, No. 25-

cv-354 (RDM), 2025 WL 1906548, at *2 (D.D.C. Mar. 18, 2025), which states that the court's

review of agency action is based on "the whole record or those parts of it cited by a party," 5

U.S.C. § 706.  As a result, courts rely on the administrative record produced by the agency, and

discovery is "unavailable in APA cases, except in 'two circumstances': (1) where the party

seeking discovery makes 'a strong showing' of 'bad faith or improper behavior'; or (2) 'in the

rare case in which the record is so bare as to frustrate judicial review.'"  *Univ of Cal. Student

Ass'n*, 2025 WL 1906548, at *2 (quoting *Cmty. for Creative Non-Violence v. Lujan*, 908 F.2d

992, 997-98 (D.C. Cir. 1990)).  Thus, while district courts do have "broad discretion" to order

discovery in most civil cases, *Strike 3 Holdings, LLC v. Doe*, 964 F.3d 1203, 1208 (D.C. Cir.

2020), as plaintiffs contend, Pls.' Discovery Mot. at 6, the Court's discretion is more limited

when discovery is sought to pursue APA claims.  *See Univ. of Cal Student Ass'n*, 2025 WL

1906548, at *2.[17]

Plaintiffs do not make any argument here that either of the two described exceptions to

the  discovery limitations in APA cases applies.[18]  Plaintiffs instead insist that "[t]he lack of any

typical administrative record . . . renders inapplicable th[is] general prohibition," reasoning that

because they are "challenging a policy, pattern, and practice of terminating" grants, "not

deriv[ing] from a 'formal process,'" defendants will be unable to "'produce[] a record' as is

usually done during a formal rulemaking or administrative adjudication."  Pls.' Discovery Mot.

at 8-9 (quoting *Sustainability Inst. v. Trump*, No. 25-cv-2152, ECF No. 45 at 2-3 (D.S.C. Apr. 7,

2025) (order granting expedited discovery)).  Defendants, however, assert that they will compile

and produce the administrative record at the required time, assuming plaintiffs' claims survive a

motion to dismiss, and that record "will of course include 'all records that were before a decision

maker at the time the challenged action was taken.'"  Defs.' Opp'n at 43 (quoting *Cmty. for

Creative Non-Violence*, 908 F.2d at 998).

---

[17]     If one of the two exceptions applied to allow for discovery in an APA case, then the Court would consider
whether *expedited* discovery, as requested here, was "reasonable[] . . . in light of all of the surrounding
circumstances," considering factors such as "(1) whether a preliminary injunction is pending; (2) the breadth of the
discovery requests; (3) the purpose for requesting the expedited discovery; (4) the burden on the defendants to
comply with the requests; and (5) how far in advance of the typical discovery process the request was made."
*Guttenberg v. Emery*, 26 F. Supp. 3d 88, 98 (D.D.C. 2014) (quoting *In re Fannie Mae Derivative Litig.*, 227 F.R.D.
142, 142-43 (D.D.C. 2005)); *see also Univ of Cal. Student Ass'n*, 2025 WL 1906548, at *2 n.2; Pls.' Discovery Mot.
at 7 (applying that framework).  Plaintiffs do not make it past the threshold question here, however.

[18]     Nor do plaintiffs make any argument that they should be separately afforded discovery on their non-APA
claims or that their requested discovery pertains solely to those claims.

Plaintiffs may have reason to *suspect*—based on their own theory of how defendants went about arbitrarily terminating USDA grants—that defendants' administrative record will be unsatisfying. Yet, until that record is produced, plaintiffs cannot demonstrate "a strong showing of bad faith" or that the "record is so bare as to frustrate judicial review" to support their need for further discovery. *Cmty. for Creative Non-Violence*, 908 F.2d at 997-98. Additionally, defendants gave assurance at the motions hearing that the administrative record would include what plaintiffs have requested in their discovery motion, as well as materials reflecting "the process" defendants took when evaluating the grants at issue. *See* Rough Hr'g Tr. at 64:14-65:5, 67:15-22 ("Q. "[I]n my view the things that the plaintiffs are asking for in their discovery requests are items and information that will be in the administrative record when that is compiled . . . if I find on the jurisdictional issue that I can exercise subject matter jurisdiction here. Do you share that understanding? A. "I do, Your Honor."). [19] Nonetheless, upon production of that administrative record in just a matter of weeks, plaintiffs will be able to evaluate whether supplementation of that record is necessary to "ascertain the contours of the precise policy at issue," Pls.' Discovery Mot. at 8 (quoting *Hisp. Affs. Project*, 901 F.3d at 388), or discovery is warranted for other reasons. [20] Before seeing the administrative record, however, plaintiffs have

---

[19]     Plaintiffs' concern about a deficient administrative record also derives in part from defendants' suggestion in their briefing that documenting the alleged policy and practice would be "impossible," because plaintiffs are making a wholesale programmatic challenge to the agency's operations, Defs.' Opp'n at 17-18. *See* Pls.' Reply at 24. This Opinion should clarify for defendants that plaintiffs are challenging the implementation of an alleged policy, derived from the Secretary's March 13, 2025 memoranda, and resulting in defendants' actions to terminate, from about March to July 2025, possibly hundreds of grant awards that were fulfilling the objectives of the grant and statutory authorizations under which the grants were awarded and were in compliance with the terms or conditions of the awards, but terminations were nonetheless abruptly made due to a change in agency priorities for which no reasoned explanation was communicated to grant recipients, who also were not offered technical assistance or an opportunity to address any alleged problems prior to termination. This is indeed a reviewable agency action and thus should be conducive to the production of a fulsome administrative record.

[20]     Defendants' administrative record is due 30 days after service of its answer to the complaint, which is due 60 days after service of the complaint. *See* FED. R. CIV. P. 12(a)(2); D.D.C. Local Civil Rule 7(n)(1). Based on plaintiffs' service of the amended complaint on June 27, 2025, *see* Certificate of Service, ECF No. 17, the administrative record will likely be due, at the latest, by September 25, 2025, which is 90 days from June 27, 2025.

not demonstrated that discovery is needed. *See Univ. of Cal. Student Ass'n*, 2025 WL 1906548, at *3 ("[W]ithout the administrative record in *this* case, the Court is unable to conclude that the . . . exception" to the restriction on APA discovery where such discovery is necessary for effective judicial review "applies. . . . If the administrative record is sufficient to permit meaningful review, that should put the question of discovery to rest." (emphasis in original)).

Plaintiffs cite to *Hispanic Affairs Project*, 901 F.3d at 388, to support their argument that there is no "prohibition on discovery in cases challenging administrative action" where the challenge is to an alleged pattern or practice that plaintiffs have deduced in the absence of a formal rulemaking or decision. Pls.' Discovery Mot. at 8. *Hispanic Affairs* does not suggest that under such circumstances the discovery limitation does not apply, but rather, more precisely, that the second exception might be satisfied in cases where "the record does not reveal 'whether [the] agency's challenged policy exists.'" *Univ. of Cal. Student Ass'n*, 2025 WL 1906548, at *2 (quoting *Hisp. Affs. Project*, 901 F.3d at 386 n.4). In order to make that determination, however, the administrative record must have already been produced and thus the need for further discovery apparent. Indeed, in *Hispanic Affairs*, the administrative record had already been produced when the court suggested that "further discovery" on remand might be necessary "to ascertain the contours of the precise policy at issue." *Hisp. Affs. Project*, 901 F.3d at 388 (second passage quoting *Venetian Casino Resort LLC v. EEOC*, 530 F.3d 925, 928 (D.C. Cir. 2008)). Here, the need for discovery cannot be apparent before any administrative record has been produced.[21] Plaintiffs' motion for expedited discovery at this juncture is thus denied.

_____

[21]    Plaintiffs cite to a few decisions where courts have granted expedited discovery prior to resolution of a preliminary injunction in APA cases, *see* Pls.' Discovery Mot. at 9, but those cases are not binding on this Court, and at least some have significant distinguishing circumstances. For instance, in *American Federation of Labor and Congress of Industrial Organizations v. Department of Labor*, 349 F.R.D. 243 (D.D.C. 2025), the discovery motion granted prior to the preliminary injunction motion was limited to facts relevant to irreparable harm and thus specific to the particular showing needed for the preliminary injunction decision, not general facts related to the merits of

## IV.    CONCLUSION

For the reasons explained, plaintiffs' motion for preliminary injunction is granted in part and denied in part, and plaintiffs' motion for expedited discovery is denied.  Plaintiffs have demonstrated that the terminations of their individual grants were likely arbitrary and capricious and, for two of the plaintiffs, also contrary to statute, in violation of the APA, and that they will suffer irreparable harm in the absence of relief.  The grant terminations that have already occurred are therefore preliminarily vacated, and defendants are enjoined from giving them any effect.  Defendants are also enjoined from carrying out the termination of AC's Grant #2 on the ground articulated.  Plaintiffs have not made the requisite showings, however, to warrant broader relief at this preliminary stage, nor are they entitled to expedited discovery.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  August 14, 2025

_____
**BERYL A. HOWELL**
United States District Judge

---

plaintiffs' factual allegations, as requested here.  *See id.* at 250.  Further, defendants there had "already put into the record some facts relevant to the issues," so plaintiffs sought discovery to counter those facts.  *Id.*  Further, in *Alliance for Retired Americans v. Bessent*, 25-cv-313 (CKK), 2025 WL 1114350 (D.D.C. Mar. 20, 2025), the defendants had already filed the administrative record, so the court was able to determine the record was insufficient to allow for review of the alleged policy.  *Id.* at *2-3.  Plaintiffs also cite *Sustainability Institute v. Trump*, 25-cv-2152, ECF No. 45 (D.S.C. Apr. 7, 2025), where little consideration was given to the limitations on discovery in APA actions, thus providing scarce guidance on how to evaluate the need for discovery here.  *See* Pls.' Discovery Mot., Ex. B, ECF No. 15-3.  These cases are, consequently, not persuasive, especially considering that in other cases, even outside of the APA context, orders granting expedited discovery as to an executive branch entity have been stayed.  *See, e.g.*, *New Mexico v. Musk*, 770 F. Supp. 3d 192, 204 (D.D.C. 2025) (granting expedited discovery prior to resolving a motion to dismiss in a case with *ultra vires* and constitutional claims against DOGE), *stayed by* No. 25-5072, 2025 WL 926608 (D.C. Cir. Mar. 26, 2025); *CREW v. DOGE Serv.*, 349 F.R.D. 1, 10 (D.D.C. 2025) (granting in part a motion for expedited discovery in a FOIA case), *stayed by U.S. DOGE Serv. v. CREW*, 145 S. Ct. 1981 (Mem.) (2025).