**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| URBAN SUSTAINABILITY DIRECTORS NETWORK, *et al.*,<br><br> *Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF AGRICULTURE, *et al*.,<br><br> *Defendants*. | Case No. 1:25-cv-01775-BAH |

**LAND ACCESS PROGRAM PLAINTIFFS' STATEMENT OF POINTS AND
AUTHORITIES IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY
INJUNCTION**

i

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................................ii

INTRODUCTION ...................................................................................................................... 1

BACKGROUND .......................................................................................................................... 4

    I.    USDA's Increasing Land, Capital, and Market Access Program...................................... 4

    II.    Plaintiffs' Land Access Program Grant Awards and Terminations.................................. 5

STANDARD OF REVIEW ...................................................................................................... 9

ARGUMENT................................................................................................................................ 10

    I.    The Court Has Jurisdiction Over Plaintiffs' Claims and Jurisdiction to Rule on this Motion.................................................................................................................................. 10

    II.    Plaintiffs Are Likely to Succeed on the Merits of Their APA Claims. ........................... 12

        i.    Defendants' Decision to Terminate the Land Access Program Plaintiffs' Grants Was Contrary to Law. ........................................................................................................ 12

        ii.    Defendants' Decision to Terminate the Land Access Program Plaintiffs' Grants was Arbitrary and Capricious................................................................................................ 14

            a.    Defendants Fail to Justify the Change in Position. ............................................... 15

            b.    Defendants' Termination Decision Lacks Reasoned Decision-Making............... 17

            c.    Defendants' Termination Decision is Counter to the Evidence............................ 21

            d.    Defendants Failed to Consider Reliance Interests ................................................ 24

    III.    The Land Access Program Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief. 25

    IV.    The Balance of Equities and Public Interest Weigh Heavily in Plaintiffs' Favor. ....... 29

    V.    The Court Should Not Require a Bond............................................................................ 30

CONCLUSION............................................................................................................................ 30

**TABLE OF AUTHORITIES**

**Cases**

*AIDS Vaccine Advoc. Coal. v. U. S. Dep't of State*, 803 F. Supp. 3d 164 (D.D.C. 2025)............ 12

*AIDS Vaccine Advoc. Coal. v. U. S. Dep't of State*, No. 25-5317, 2026 WL 476138 (D.C. Cir. Feb. 18, 2026) ...................................................................................................................... 12

*Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, 770 F.Supp.3d 822 (D. Md. 2025)........... 20, 25

*C.G.B. v. Wolf*, 464 F. Supp. 3d 174 (D.D.C. 2020)........................................................ 27

*Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142 (2012) ................................................. 24

*Chrysler Corp. v. Brown*, 441 U.S. 281 (1979) ............................................................ 11

*City of Houston v. Dep't of Hous. & Urb. Dev*, 24 F.3d 1421 (D.C. Cir. 1994) .......................... 27

*Climate United Fund v. Citibank, N.A.*, 778 F.Supp.3d 90 (D.D.C. 2025) ................................. 27

*Cmty. Legal Servs. in E. Palo Alto v. HHS*, 777 F. Supp. 3d 1039 (N.D. Cal. 2025)................... 28

*Coal. for Humane Immigrant Rts. v. Noem*, 805 F. Supp. 3d 48 (D.D.C. 2025)........................... 9

*Colorado v. HHS*, 783 F. Supp. 3d 641 (D.R.I. 2025)................................................... 28

*Council for Opportunity in Educ. v. U.S. Dep't of Educ.*, No. 25-CV-03491 (TSC), 2026 WL 120984 (D.D.C. Jan. 16, 2026)* ................................................................................... 17, 18

*Ctr. for Biological Diversity v. Zeldin*, 171 F.4th 356 (D.C. Cir. 2026)..................................... 11

*Deaf Smith Cnty. Grain Processors, Inc. v. Glickman*, 162 F.3d 1206 (D.C. Cir. 1998)............. 10

*Dep't of Com. v. New York*, 588 U.S. 752 (2019)........................................................ 17

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016) ........................................................ 24

*Enter. Nat'l Bank v. Johanns*, 539 F. Supp. 2d 343 (D.D.C. 2008)................................. 10

*Enter. Nat'l Bank v. Vilsack*, 568 F.3d 229 (D.C. Cir. 2009) ...................................................... 10

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)........................................................ 15

*Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56 (1982)................................................ 11

*Horn & Hardart Co. v. Nat'l Rail Passenger Corp.*, 843 F.2d 546 (D.C. Cir. 1988) .................. 11

*In re Aiken County*, 725 F.3d 255 (D.C. Cir. 2013)..................................................................... 12

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ................................... 24

*Motor Vehicle Manufacturers Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ................................................................................................................................ 17, 20

*Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167 (D.D.C. 1971) ................................... 28

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 763 F. Supp. 3d 36 (D.D.C. 2025) ....... 24

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 775 F. Supp. 3d 100 (D.D.C. 2025) ..... 28

*Nken v. Holder*, 556 U.S. 418 (2009) ......................................................................................... 9

*Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148 (D.D.C. 2017) ............................................... 27

*P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492 (D.D.C. 2020) ........................ 28

*Planned Parenthood of Greater N.Y. v. U.S. Dep't of Health & Hum. Servs.*, No. CV 25-2453 (BAH), 2025 WL 2840318 (D.D.C. Oct. 7, 2025)* ......................................... 14, 15, 16, 18, 24

*RFE/RL, Inc. v. Lake*, 772 F.Supp.3d 79 (D.D.C. 2025) ............................................................. 24

*S. Educ. Found. v. U.S. Dep't of Educ.*, 784 F.Supp.3d 50 (D.D.C. 2025) ................................. 25

*Simms v. District of Columbia*, 872 F. Supp. 2d 90 (D.D.C. 2012)............................................. 28

*St. Bernard Par. Gov't v. United States*, 916 F.3d 987 (Fed. Cir. 2019)..................................... 10

*Tourus Recs., Inc. v. Drug Enf't Admin.*, 259 F.3d 731 (D.C. Cir. 2001)..................................... 17

*Urb. Sustainability Dirs. Network v. U.S. Dep't of Agric.*, No. CV 25-1775 (BAH), 2025 WL 2374528 (D.D.C. Aug. 14, 2025 ................................................. 1, 2, 11, 13, 14, 17, 19, 27, 29

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008)............................................................. 9

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 440 (D.R.I. 2025) ................................................................................................................ 28

**Statutes**

5 U.S.C. § 706(2)(A)................................................................................................... 11, 14

7 U.S.C. § 6992............................................................................................................ 10

7 U.S.C. § 6999............................................................................................................ 10

American Rescue Plan Act of 2021, Pub. L. No. 117-2, §1006, 135 Stat. 4 (2021) ...................... 4

Inflation Reduction Act, Pub. L. No. 117-69, § 22007, 136 Stat. 1818 (2022)........................ 4, 12

**INTRODUCTION**

Beginning in February 2025, the U.S. Department of Agriculture ("USDA") instituted a widespread policy and practice of terminating active grants related to diversity, equity and inclusion ("DEI") or climate change, *en masse*. In June 2025, five nonprofit organizations who had grants terminated, or targeted for termination, pursuant to this policy (Urban Sustainability Directors Network, Oakville Bluegrass Cooperative, Agroecology Commons, Providence Farm Collective Corporation, and Institute for Agriculture and Trade Policy) initiated this lawsuit challenging both their individual terminations and the broader policy, and filed a motion for a preliminary injunction to enjoin both. The Court granted the motion as to those entities' individual grants, concluding there was a substantial likelihood that they could succeed on their claims that their individual terminations were arbitrary and capricious, but declined to enjoin USDA from implementing the challenged policy as to nonparty grant recipients given the lack of record evidence at that time to establish the scope of the policy. *See Urb. Sustainability Dirs. Network v. U.S. Dep't of Agric.* ("USDN"), No. CV 25-1775 (BAH), 2025 WL 2374528, at *41 (D.D.C. Aug. 14, 2025).

With no injunction barring implementation of the challenged policy, USDA has continued to terminate grants *en masse*. On or around March 23, 2026, USDA terminated 49 out of 50 grant awards under the Farm Service Agency's ("FSA") Increasing Land, Capital, and Market Access Program ("Land Access Program"), resulting in the cancelation of approximately $300 million in promised federal funding. The only grant in the program FSA did not terminate was that of Plaintiff Agroecology Commons, a grant subject to this Court's preliminary injunction and thus protected from termination.

Following this mass termination, 24 Land Access Program grant recipients joined this lawsuit (the "Land Access Program Plaintiffs") to challenge both their individual terminations and Defendants' termination policy. *See* Second Am. Compl. Each Land Access Program Plaintiff received a boilerplate termination letter that largely rejected the program as a whole. *See* Ashe, Avila, D'Ambrosio, Darby, Desai, Elliott, Frazier, Friedrich, Galaviz, Garriott, Grimm, Horsey, Kolawole, Koppa, Mallory, Manabe, Maqubela, Martin, Padilla, Reece, Sarmiento, Stephens, and Vogel Decls., at Ex. B; Lewis Decl., at Ex. C. ("Termination Letters").  Indeed, the initial pages of each termination letter include only generalized and conclusory objections to the program's overall goals and priorities. Each letter references Secretary Rollins' March 2025 Memorandum as the authority under which Defendants selected the grant for termination, which "instructed USDA agencies and staff offices to review existing rewards to ensure they reflect the Department's priorities of unity, equality, meritocracy, and color-blindness." *Id*. And each notes the primary rationale for the termination was that the Land Access Program "involved discriminatory preferences based on Diversity, Equity, and Inclusion (DEI)"—a rationale this Court considered previously and found to be clearly contrary to the program's Congressional mandate. *USDN*, 2025 WL 2374528, at *33.

Only after that long windup preordaining the agency's conclusion do the letters offer anything particularized to the specific grant terminations. At best, the letters identify one or more purported facts about each grant the agency claims are consistent with its negative views of the program as a whole. Each letter then copies and pastes a list of partners of the awardee on the project and claims that this list reflects the agency's consideration—and rejection—of reliance interests, although in all instances the letter *ipse dixit* declares reliance interests are insufficient to

overcome the agency's declared concerns. That is the full extent of the reasoning provided for each termination.

The Land Access Program Plaintiffs now ask the Court for preliminary relief enjoining Defendants' termination of their grants and restoring the *status quo ante*. Such relief is appropriate, for four reasons. *First*, this Court has jurisdiction over the Land Access Program Plaintiffs' claims because they challenge terminations that have been finally reviewed by the National Appeals Division ("NAD"), and 7 U.S.C. § 6999 grants jurisdiction to the District Court to subsequently examine those terminations under the APA. *Second*, Plaintiffs are likely to prevail on the merits of their APA claims, given Defendants' termination of the grants at issue on "DEI"-related grounds is contrary to statute, as this Court has already concluded, as well as arbitrary and capricious. *Third*, the Land Access Program Plaintiffs will suffer irreparable harm absent immediate relief. Without this funding, the Land Access Program Plaintiffs are faced with layoffs, forced to abandon projects and investments, subject to reputational harm in the community for failing to deliver promised programs, and likely to suffer drastic reductions in their organizations' operations. Some organizations may have to shutter their operations entirely. And *fourth*, the equities and the public interest tip heavily in favor of a preliminary injunction to stop those harms while Defendants themselves face no recognizable harm from following the law.

For these reasons, and as discussed more fully below, the Land Access Program Plaintiffs respectfully request that the Court issue a preliminary injunction enjoining Defendants from giving the terminations any effect. As noted below, the same analysis would also allow the Court to grant preliminary relief under the APA, such as vacating the terminations. In the event that Defendants do not timely oppose, the Land Access Program Plaintiffs request *ex parte* relief.

**BACKGROUND**

**I.      USDA's Increasing Land, Capital, and Market Access Program**

USDA's Land Access Program is authorized by Section 1006 of the American Rescue Plan Act of 2021, Pub. L. No. 117-2, as amended by Section 22007 of the Inflation Reduction Act of 2022 ("IRA"). Section 1006 of the American Rescue Plan Act of 2021 appropriated over $1 billion to the Secretary of Agriculture for fiscal year 2021 and directed that the Secretary "shall" use those funds on various agricultural programs that benefit "socially disadvantaged farmers, ranchers, or forest landowners, or other members of socially disadvantaged groups." Pub. L. No. 117-2, 135 Stat. 4, 13–14 (2021). In Section 22007 of the Inflation Reduction Act of 2022 ("IRA"), Congress amended Section 1006 of the American Rescue Plan Act and appropriated an additional $2.9 billion to fund agricultural programs to benefit "underserved farmers, ranchers, or forest landowners," certain educational institutions that serve underserved communities, and "farmers, ranchers, or forest landowners determined to have experienced discrimination prior to January 1, 2021, in Department of Agriculture farm lending programs." IRA, Pub. L. No. 117-69, § 22007, 136 Stat. 1818, 2022–23 (2022).

Through the IRA, Congress directs that these funds be used, in part, "to provide outreach, mediation, financial training, capacity building training, cooperative development and agricultural credit training and support, and other technical assistance on issues concerning food, agriculture, agricultural credit, agricultural extension, rural development, or nutrition;" and "to provide grants and loans to . . . improve land access (including heirs' property and fractionated land issues)." USDA, through FSA, used these IRA funds to create the Land Access Program and issued a Notice of Funding Opportunity ("NOFO") for grant funding through the program. *See* Ex. 1, Increasing Land Capital, and Market Access Program National Funding Opportunity. The NOFO states that, based on the statutory mandates, the purpose of the funding is to "address[] the needs of

underserved producers through outreach, education, engagement, and technical assistance to increase land, credit, and market access." *Id.* at 6. The NOFO identifies that the ultimate beneficiaries of the program must be "underserved farmers, ranchers, and forest landowners, including veterans, limited resources producers, beginning farmers and ranchers, and/or farmers, ranchers and forest landowners living in high poverty areas." *Id*. at 3. The NOFO directs applicants to identify in their Project Narratives "the number of underserved producers to be served as well as their geographic, demographic, and socioeconomic status," *id*. at 17, and cautions that "[f]ailure to discuss the relevant demographics of the target audience to be served may result in lower ranking of the project proposal." *Id*. at 27. USDA ultimately awarded $300,000,000 in federal funding across a total of 50 grants through this program.[1]

## II.     Plaintiffs' Land Access Program Grant Awards and Terminations

Each Land Access Program Plaintiff applied for and was awarded a Land Access Program grant that complied with the statutory mandates of the program. *See* Ashe Decl. ¶¶ 5-6, Avila Decl. ¶¶ 5-6, D'Ambrosio Decl. ¶¶ 5-6, Darby Decl. ¶¶ 5-6, Desai Decl. ¶¶ 5-6, Elliott Decl. ¶¶ 5-6, Frazier Decl. ¶¶ 5-6, Friedrich Decl. ¶¶ 5-6, Galaviz Decl. ¶¶ 9-10, Garriott Decl. ¶¶ 5-6, Grimm Decl. ¶¶ 5-6, Horsey Decl. ¶¶ 5-6, Kolawole Decl. ¶¶ 5-6, Koppa Decl. ¶¶ 4-5, Lewis Decl. ¶¶ 5-6, Mallory Decl. ¶¶ 5-6, Manabe Decl. ¶¶ 5-6, Maqubela Decl. ¶¶ 5-6, Martin ¶¶ 4-5, Padilla Decl. ¶¶ 5-6, Reece Decl. ¶¶ 5-6, Sarmiento Decl. ¶¶ 5-6, Stephens Decl. ¶¶ 5-6, and Vogel Decl. ¶¶ 6, 8. The Land Access Program awards were multi-year awards, most of which were scheduled to continue through November 2028. *Id.* The Land Access Program grant application process

---

[1] *See Biden-Harris Administration Announces Intended Investment of Approximately $300 Million in 50 Projects Increasing Land, Capital, and Market Access for Underserved Producers*, USDA (July 5, 2023), https://www.fsa.usda.gov/news-events/news/07-05-2023/biden-harris-administration-announces-intended-investment-0.

required significant time and resources, as outlined in detail in the NOFO. *See* NOFO, Ex. 1 at 10-25. Exemplifying the time and resources expended on this grant application, one Land Access Program Plaintiff, Rural Advancement Foundation International—USA ("RAFI-USA") expended over 200 hours, split among six staff members and several partners, in designing their program and completing the application for funding. Koppa Decl. ¶ 5.

Beginning on March 23, 2026, each of the Land Access Program Plaintiffs received largely identical template letters from USDA. *See* Termination Letters. Each letter, addressed generically to "Dear Recipient," begins by stating that FSA "is terminating your federal award," and that USDA "has determined that awards under this program involved discriminatory preferences based on Diversity, Equity, and Inclusion (DEI) and wasteful spending that did little to further lawful agricultural land purchases." *Id.* In the following paragraph, each letter claims that, in accordance with "[t]he Secretary's Memorandum 1078-004, 'Directive on Departmental Grant and Cooperative Agreement Priorities' (March 2025)," the agency "conducted a thorough review of the Increasing Land, Capital, and Market Access Program" and found that the "awards, including yours, do not align with the Department's goals and priorities." *Id*. The letters then each list the same three boilerplate explanations for why the Land Access Program awards fail to align with USDA's "goals and priorities," specifically that: (1) "Awards Discriminate Based on Immutable Characteristics"; (2) "Awards Do Not Align with Congressional Intent"; and (3) "ILA Award Structure Unacceptably Exposed Taxpayers to Fraud, Waste, and Abuse." *Id*. Each letter claims that because these issues are "endemic" across the program, "[i]t is necessary to fully realign the program to ensure consistency with statutory requirements, equal protection principles, and prudent fiscal management." *Id*.

After two full pages of boilerplate language, the letters quote language excerpted – without context – from each grant's project narrative. *Id*. Typically, these quotations are less than a sentence. *Id*. For the majority of the Land Access Program Plaintiffs, the letters claim that the cited language underscores "the fundamental inconsistency with equal protection principles and USDA policy and priorities," when, in reality, the Project Narratives simply identify the demographics of the "underserved" beneficiaries of the proposed program, as explicitly directed by Defendants in the NOFO. *See, e.g.* Desai Decl. ¶ 9 (explaining that the letter contained false and misleading claims about the "limitations" of the San Diego Food System Alliance's project). Much less frequently, the termination letters cite language from the project narrative and claim some vague risk of "waste, fraud, and abuse" of federal funds, *see* D'Ambrosio, Darby, and Vogel Declarations,  Ex. B at 3, without acknowledgement that all grants were subject to USDA's "risk review process" prior to receiving final approval, which includes a check to ensure "proposed costs are allowable, allocable and necessary." NOFO, Ex. 1 at 28. The letters also fail to acknowledge that program costs were reviewed a second time, through USDA's separate review of each individual expense submitted for reimbursement. *See*, *e.g.*, Galaviz Decl. ¶ 18, Darby Decl. ¶¶ 10–11, Koppa Decl. ¶ 9.

Each letter then makes a cursory acknowledgement that the grantee had "undertaken efforts in connection with this project"—an obvious statement given the grants were awarded more than two years prior—and also acknowledges that the project includes partners, listing the names of various partnerships included in the project narrative. *See* Termination Letters at 3. There is no mention in any of the letters of the many months of programmatic and budget planning and implementation and execution of these projects each organization undertook in reliance on the

grant award prior to termination, or the grave and irreparable impact these terminations will have on the Land Access Program Plaintiffs.

The letters conclude with more formulaic language stating that "USDA has determined the best use of resources and advancing USDA's goals and priorities requires a full termination to realign the program to be consistent with its statutorily mandated purpose and the policies and priorities of the Department." *Id*. at 4. Each letter tells the recipient that "You may appeal this determination to the National Appeals Division (NAD) by filing a written request no later than 30 calendar days after you received this notice according to the NAD appeal procedures found at 7 C.F.R. Part 11." *Id*.

Following receipt of the termination letter, each Land Access Program Plaintiff appealed USDA's termination decision to the NAD. *See* Ashe, Avila, D'Ambrosio, Darby, Desai, Elliott, Frazier, Friedrich, Galaviz, Garriott, Grimm, Horsey, Kolawole, Koppa, Mallory, Manabe, Maqubela, Martin, Padilla, Reece, Sarmiento, Stephens, and Vogel Decls., at Ex. C; Lewis Decl., Ex. D ("NAD Appeals"). Each Land Access Program Plaintiff, other than THRIVE Santa Ana "(THRIVE)"[2], has received a letter from NAD making the "final determination" that FSA's "decision terminating your ILA grant is not appealable because it concerns matters of general applicability." *See* Ashe, Avila, D'Ambrosio, Darby, Desai, Elliott, Frazier, Friedrich, Galaviz, Garriott, Grimm, Horsey, Kolawole, Koppa, Mallory, Manabe, Maqubela, Martin, Padilla, Reece, Stephens, and Vogel Decls., at Ex. D; Lewis Decl., Ex. E ("NAD Determinations"). In reaching

---

[2] THRIVE has yet to receive a final determination from NAD, but Plaintiffs anticipate that it will receive this determination during the pendency of this motion. THRIVE received the same formulaic termination letter as all other Land Access Program Plaintiffs, and there is no reason to believe that the outcome of THRIVE's NAD appeal will be different from the others. This Motion seeks relief for THRIVE to the extent it receives a NAD determination while this motion is pending.

8

this decision, NAD noted that "FSA's decision is *not based on the individual application of specific program criteria*," but instead FSA terminated the grants "*based on the general policy priorities of USDA* and its decision to cancel the [Land Access] program. The Secretary of Agriculture has determined that this program, and awards made thereunder, no longer support USDA priorities." *Id*. (emphasis added).

Without this grant funding, the Land Access Program Plaintiffs will be unable to accomplish their core missions. They have already had to stop the projects funded by their terminated grants, divert significant resources away from other projects to find alternative funding sources, plan for reductions in staffing, and cancel relationships with partners and contractors. The cut in funding has and will continue to cause significant and irreparable reputational harm given their inability to deliver on promises made to the communities they serve.

## STANDARD OF REVIEW

To obtain preliminary injunctive relief, plaintiffs must show: (1) a likelihood of success on the merits; (2) that they are likely to suffer irreparable harm absent preliminary relief; (3) the balance of equities weighs in their favor; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The balance of equities and public interest factors merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009).[3]

---

[3] Preliminary relief under the APA, which this Court could grant instead of or in addition to an injunction, is governed by the same analysis. *Coal. for Humane Immigrant Rts. v. Noem*, 805 F. Supp. 3d 48, 71 (D.D.C. 2025).

## ARGUMENT

**I.     The Court Has Jurisdiction Over Plaintiffs' Claims and Jurisdiction to Rule on this Motion.**

As a threshold matter, this Court unquestionably has jurisdiction over the Land Access Program Plaintiffs' claims due to the existence of a special jurisdiction-providing statute concerning these individual grant terminations. Moreover, while the Court has raised questions about its jurisdiction to resolve disputes related to the parties for whom it has already granted a preliminary injunction that is on appeal, Minute Order, May 4, 2026, Defendants and Plaintiffs both agreed this Court's jurisdiction concerns were misplaced. JSR, Dkt. No. 59. And at any rate, the relief sought here concerns new parties over which there is no pending appeal, so any jurisdictional concerns related to the Court's ability to adjudicate claims of parties with a stayed appeal do not apply.

The Land Access Program Plaintiffs here each challenge a termination that has been appealed to NAD and received final determinations from NAD concluding that FSA's "decision terminating your ILA grant is not appealable because it concerns matters of general applicability." *See* NAD Determination Letters. Per statute, "[t]he determination of the Director as to whether a decision is appealable shall be administratively final." 7 U.S.C. § 6992.

Clear statutory authority then provides that district courts have jurisdiction over final NAD determinations. Title 7 U.S.C. § 6999 states that "[a] final determination of the [NAD] shall be reviewable and enforceable by any United States district court of competent jurisdiction in accordance with chapter 7 of Title 5." 7 U.S.C. § 6999; *see also Enter. Nat'l Bank v. Johanns*, 539 F. Supp. 2d 343, 345 (D.D.C. 2008), *aff'd sub nom. Enter. Nat'l Bank v. Vilsack*, 568 F.3d 229 (D.C. Cir. 2009) ("Final determinations by the NAD are enforceable by the U.S. District Courts pursuant to 7 U.S.C. § 6999."). Jurisdiction over appeals from NAD lie "solely in the district

court." *Deaf Smith Cnty. Grain Processors, Inc. v. Glickman*, 162 F.3d 1206, 1213 (D.C. Cir. 1998) (finding that appeals from NAD could proceed only in the district court, and not in the Court of Federal Claims). That jurisdiction empowers district courts to provide "*de novo*" review of the underlying challenge presented to NAD. *Id.*

Put another way, Section 6999 is designed to "remove the specter of the Tucker Act—and the Claims Court—from the judicial review of NAD decisions." *Id.* This has been the view of the United States since Section 6999 was enacted. *Id.* It is also the view of the Federal Circuit. *See St. Bernard Par. Gov't v. United States*, 916 F.3d 987, 994 (Fed. Cir. 2019). Thus, the dispute over district court or court of federal claims jurisdiction that has plagued so many grant termination cases is not present here.

To the extent the Court still has concerns related to Defendants' appeal of the preliminary injunction currently in place, Dkt. No. 39, that concern does not apply here. The current preliminary injunction has no bearing on the Court's jurisdiction to rule on this Motion, given the claims at issue here fall beyond the scope of that injunction and thus are not subject to the appeal. "[W]hen a party files a notice of appeal the district court *only* surrenders 'its control over those aspects of the case involved in the appeal.'" *Horn & Hardart Co. v. Nat'l Rail Passenger Corp.*, 843 F.2d 546, 548 (D.C. Cir. 1988) (emphasis added) (quoting *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982)). The preliminary injunction subject to appeal relates only to the individual terminations of the initial five Plaintiffs' grants. *See USDN*, 2025 WL 2374528, at *11, *31; *see also id.* at *31–*36. The Land Access Program Plaintiffs' Motion currently before the Court concerns parties and grant terminations outside the scope of the preliminary injunction and thereby any appeal of that injunction. Accordingly, this Court has jurisdiction to provide relief to new parties. *See* JSR, Dkt. No. 59, at 1-2

11

II.      **Plaintiffs Are Likely to Succeed on the Merits of Their APA Claims.**

Plaintiffs are likely to prevail on their claims because Defendants' termination of their grant awards is both contrary to statute and arbitrary and capricious.

   i.      ***Defendants' Decision to Terminate the Land Access Program Plaintiffs' Grants Was Contrary to Law***.

The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be…not in accordance with law." 5 U.S.C. § 706(2)(A). "[A]n agency action that violates a statute is not in accordance with law within the meaning of the APA." *Ctr. for Biological Diversity v. Zeldin*, 171 F.4th 356, 376 (D.C. Cir. 2026) (citing *Chrysler Corp. v. Brown*, 441 U.S. 281, 318 (1979) (cleaned up)). Defendants "may not disregard a statutory mandate to spend funds simply because of policy objections." *AIDS Vaccine Advoc. Coal. v. U. S. Dep't of State*, 803 F. Supp. 3d 164, 182 (D.D.C. 2025) (cleaned up), *appeal dismissed*, No. 25-5317, 2026 WL 476138 (D.C. Cir. Feb. 18, 2026) (*citing In re Aiken County*, 725 F.3d 255, 259 (D.C. Cir. 2013)).

Per Congress's mandate, the funds for the Land Access Program "shall" be awarded by Defendants for "USDA Assistance and Support for *Underserved* Farmers, Ranchers [and] Foresters." IRA § 22007, 136 Stat. at 2022 (emphasis added). Along with the money used for the Land Access Program, IRA § 22007 appropriated money to "address racial equity issues within the Department of Agriculture and the programs of the Department of Agriculture," and to "farmers, ranchers, or forest landowners determined to have experienced discrimination prior to January 1, 2021, in Department of Agriculture farm lending programs," *id*., evidencing the Congressional intent for the IRA funds to be used to remedy past discrimination. Despite the statutory directive, Defendants' primary reason for terminating the Land Access Program grants was that the awards were being used precisely as Congress intended. The termination letters

12

received by each of the Land Access Program Plaintiffs make numerous references to "DEI" and "discrimination." In the opening boilerplate paragraph, the letters each state that USDA "has determined that awards under this program involved discriminatory preferences based on Diversity, Equity, and Inclusion (DEI)," and claim further that each award "was made pursuant to a program rife with DEI preferences." *See* Termination Letters. This Court has already considered and rejected this same stated rationale for terminating Land Access Program grants when deciding Plaintiffs' previous motion for a preliminary injunction. Specifically, this Court considered the intended and imminent termination of Plaintiff Agroecology Commons' ("AC") Land Access Program grant and concluded:

> The Secretary stated in her press release that she was terminating AC's Grant #2 because it was a "Diversity, Equity, and Inclusion (DEI) focused award," "wasting money on woke DEI propaganda." Defendants are thus terminating AC's grant because the grant supported specific groups, like racial minorities, that have historically faced discrimination—despite Congress's explicit instruction for funding to be used to support such "underserved" groups. Again, defendants cannot terminate a grant for the very reason that the grant satisfies Congress's mandate.

*USDN*, 2025 WL 2374528, at *32–33 (cleaned up); *see also id.* at *32 (stating, when discussing the termination of Plaintiff Urban Sustainability Directors Network's grant, that "Defendants cannot terminate a grant for filling the express statutory aim described and enacted by Congress."). The termination letters received by the Land Access Program Plaintiffs suffer from the same fatal flaw.

To support their already rejected justification, Defendants contend in the termination letters that a shift in statutory language from "socially disadvantaged" to "underserved farmers" was meant as a "de-authorization" for any preference based on race, ethnicity, sexual orientation, or sex. *See* Termination Letters. But, as this Court previously recognized, this interpretation fails to account for the language and history of the broader statute:

13

Section 1006(e) of the American Rescue Plan Act, as amended in section 22007 of the IRA, is entitled "Discrimination Financial Assistance" and specifically appropriates funding "in addition[] to amounts otherwise available" to go to farmers "determined to have experienced discrimination prior to January 1, 2021." 136 Stat. at 2022. Defendants do not explain what kind of discrimination Congress would be referring to unless tied to race, ethnicity, gender, or sexual orientation. The section also appears plainly concerned with addressing racial discrimination given that § 1006(c), as amended in the IRA, instructs the provision of funding to "equity commissions" to "address racial equity issues within" USDA. *Id.* Defendants do not explain why Congress would have been targeting different concerns by its use of the term "underserved" in subsection (b). Nor do defendants grapple with the definition of "socially disadvantaged" in 7 U.S.C. § 2279, explicitly mentioning race, which was the term used in the appropriations bill that preceded the IRA or explain how the term "underserved" meaningfully differs.

*USDN*, 2025 WL 2374528, at *33.

For these same reasons, Defendants' termination of the Land Access Program Plaintiffs' grants based on DEI rationales and related agency policies and priorities is contrary to law and violates the APA. Defendants may point to the non-DEI related justifications they drummed up for the terminations and claim that these rationales are not contrary to law. But as the letters state clearly in the second paragraph, the only reason the grants were subject to review was "to ensure they reflect the Department's priorities of unity, equality, meritocracy, and colorblindness," *i.e.*, to purge the existence of anything the Department labeled DEI. *See* Termination Letters. The anti-DEI agenda was the foundation for every termination, and Defendants "flout Congress's mandates" by "terminat[ing] grants for the very reason that the grants further the aims Congress explicitly instructed defendants to pursue." *USDN*, 2025 WL 2374528, at *33.

### ii.     *Defendants' Decision to Terminate the Land Access Program Plaintiffs' Grants was Arbitrary and Capricious.*

Defendants' termination of the Land Access Program Plaintiffs' grants separately violates the APA because it is arbitrary and capricious. The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, [or] an abuse

14

of discretion." 5 U.S.C. § 706(2)(A). Defendants' terminations meet this standard for four reasons. *First*, Defendants failed to justify their change in position. *Second*, Defendants failed to conduct any reasoned decision making when terminating the individual Land Access Program grants. *Third*, Defendants offered explanations for their decisions that run counter to the evidence before them. And *fourth*, Defendants failed to adequately consider the Land Access Program Plaintiffs' reliance interests.

a.  Defendants Fail to Justify the Change in Position.

To begin, Defendants' decision to terminate the Land Access Program grants is arbitrary and capricious because they completely fail to justify their change in position regarding both the validity and efficacy of the Land Access Program grants.

When an agency changes course, in this case by terminating grants for the very reason it awarded them in the first place, "the agency must demonstrate recognition of that change and provide 'good reasons for the new policy.'" *Planned Parenthood of Greater N.Y. v. U.S. Dep't of Health & Hum. Servs.*, No. CV 25-2453 (BAH), 2025 WL 2840318, at *22 (D.D.C. Oct. 7, 2025) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009)). Further, "the justification must be more detailed when," like here, the "prior policy has engendered serious reliance interests" or when, like here, the "new policy rests upon factual findings that contradict those which underlay its prior policy." *Id.* (cleaned up).

Defendants' decision to terminate each Land Access Program grant is predicated on their position that the grant awards fail to "align with the Department's goals and priorities" for three broad and unrelated reasons. Each is directly contrary to Defendants' previous decision to approve each Land Access Program Plaintiff for funding. None of those shifts are explained. First, Defendants now claim that they are canceling all the projects funded under the Land Access

15

Program in part because they are "discriminatory," but they fail to explain why Defendants believed otherwise at the time of grant approval. This shift is particularly peculiar given that the NOFO required that all projects operate consistent with anti-discrimination laws, a requirement clearly incorporated into Land Access Program Plaintiffs' grant agreements. *See* NOFO, Ex. 1 at 36; *see, e.g.* Mallory Decl., Ex. A at 2 ("Non-Discrimination Statement").

Second, Defendants claim that the Land Access Program grants "do not align with Congressional intent," but again fail to explain why Defendants reached the opposite conclusion when they reviewed the project and budget narratives and approved the grants for funding. Each grant award clearly states its project's intended goals and objectives, and aligns those with the NOFO's requirement that the projects "[a]ssist USDA in addressing longstanding systemic discrimination and barriers to program delivery," and the NOFO's mandate that the applications provide "[t]he number of underserved producers to be served" and their "Justice 40[4] Criteria." NOFO at 16-18.

Finally, Defendants do not explain why grant programs that had been selected for funding after consideration of detailed budget narratives and a "final administrative and risk review," *see* NOFO, Ex. 1 at 28, are now being canceled for allegedly exposing taxpayers to fraud, waste, and abuse. In other words, Defendants' current position is wholly inconsistent with their previous conclusions that the Land Access Program as a whole and the individual grants did not violate agency anti-discrimination policies, aligned with Congressional intent, and were not likely to risk

---

[4] The Justice40 Initiative focused on ensuring that benefits of federal investments reached "disadvantaged communities that are marginalized, underserved, and overburdened by pollution." *See USDA Announces Next Steps in Biden-Harris Administration Initiative to Increase the Benefits of Federal Investments Going to Underserved Communities*, USDA (June 24, 2022), https://www.usda.gov/about-usda/news/press-releases/2022/06/24/usda-announces-next-steps-biden-harris-administration-initiative-increase-benefits-federal.

fraud, waste, or abuse. Defendants offer no explanation for the complete about-face in their factual findings.

The only justification offered for Defendants' change in position is that the Land Access Program awards "do not align with the Department's goals and priorities." The letters claim that that the grant awards "violate[] principles" set out in various agency memoranda and "violate[] at least two executive orders." Incorporated into this justification is Defendants' attempt to redefine "underserved" to omit racial or ethnic groups that had suffered from past discrimination, a strained interpretation that fails to account for the clear intent of IRA Section 22007. That in and of itself is another inadequately explained shift in policy.

Regardless, "[t]he invocation of an EO," and agency guidance memoranda, "[are] an insufficient justification for any policy change and especially insufficient to justify an interpretation of a statute, considering that EOs [and agency memoranda] do not supersede but are rather subject to statutory provisions." *Planned Parenthood*, 2025 WL 2840318, at \*28. Defendants' "failure to articulate anything beyond conclusory statements regarding applicants' noncompliance with 'federal civil rights laws' and the Administration's policies does not pass muster." *Council for Opportunity in Educ. v. U.S. Dep't of Educ.*, No. 25-CV-03491 (TSC), 2026 WL 120984, at \*11 (D.D.C. Jan. 16, 2026).

b.  <u>Defendants' Termination Decision Lacks Reasoned Decision-Making.</u>

Relatedly, Defendants' decision to terminate the Land Access Program grants is arbitrary and capricious because it lacks reasoned decision-making. "A 'fundamental' requirement of administrative law is that an agency 'set forth its reasons' for its decision; failure to do so constitutes arbitrary and capricious agency action." *Council for Opportunity in Educ.*, 2026 WL 120984, at \*11 (*citing Tourus Recs., Inc. v. Drug Enf't Admin.*, 259 F.3d 731, 737 (D.C. Cir.

2001)). "[An] agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Manufacturers Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up). The "reasoned explanation requirement . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).

Defendants point to three separate reasons for the termination of the Land Access Program grants, but just as this Court found with respect to the termination letters for the other plaintiffs in this case, "[d]espite identifying some concrete reason, these are mere conclusory statements, which will not do; an agency's statement must be one of *reasoning*.' *USDN*, 2025 WL 2374528, at *35 (cleaned up). Each of Defendants' three purported justifications for the terminations of the Land Access Program Plaintiffs' grants lack the requisite reasoning.

First, Defendants do not provide a sufficiently reasoned explanation for their conclusion that the Land Access Program grantees "discriminated based on immutable characteristics." The letters claim that the Land Access Program was "rife with DEI preferences" but fail to offer a specific definition of "DEI," or identify the specific "preferences" they deem problematic. "The lack of agreed-upon meaning of terms like 'diversity, equity, and inclusion' ('DEI') have led other courts to deem arbitrary and capricious agency actions premised on those concepts where not adequately defined therein." *Planned Parenthood*, 2025 WL 2840318, at *25.

The letters state further that "the vast majority of projects . . . violated equal protection principles by selecting beneficiaries based on race, ethnicity, sexual orientation, or sex," but fail to identify any programmatic-wide data supporting this conclusion or to validly connect this allegation to the individual grants. The letters equate the identification of a program's

18

"beneficiaries" in the Project Narratives—as Defendants required—with a program's required criteria for participation. *See, e.g.* Ashe Decl. ¶ 10; Maqubela Decl. ¶ 8. The letters contain no other evidence to support this accusation and, in fact, Defendants made no effort to check their unsubstantiated assumption. *See* Ashe Decl. ¶ 11, Avila Decl. ¶ 9, D'Ambrosio Decl. ¶ 11, Darby Decl. ¶ 9, Desai Decl. ¶¶ 10–11, Elliott Decl. ¶¶ 10–11, Frazier Decl. ¶ 14, Friedrich Decl. ¶ 11, Galaviz Decl. ¶ 20, Grimm Decl. ¶ 10, Kolawole Decl. ¶¶ 9–10, Koppa Decl. ¶ 7, Lewis Decl. ¶ 9, Mallory Decl. ¶¶ 11–12, Manabe Decl. ¶ 9, Maqubela Decl. ¶ 8, Martin Decl. ¶ 14, Padilla Decl. ¶ 9, Reece Decl. ¶ 9, Sarmiento Decl. ¶ 9, and Stephens Decl. ¶ 12.

The termination letters' reference to specific project narratives evidences the cursory use of keyword searches, and a quick copy and paste into the termination letter template sent to each unspecified "Recipient," "as opposed to any information regarding the discontinued grantees' actual performance." *Council for Opportunity in Educ.*, 2026 WL 120984, at \*14 (finding grant denials citing DEI language found in application statements to be arbitrary and capricious). That alone, even without the errors described above, would render the terminations arbitrary and capricious.

Second, Defendants likewise fail to provide adequate reasoning for the conclusion that the Land Access Program grants "do not align with congressional intent," because the awards allegedly "did little to improve land access," had "high overhead costs and excessive spending on outreach and technical assistance," and "do not do enough to help producers." *See* Termination Letters. Defendants offer no explanation to support this accusation and provide no evidence that they examined any data related to any individual grant in reaching this conclusion. Aside from this generalized allegation, the vast majority of Land Access Program Plaintiffs' termination letters do not return to this accusation when the letter moves from its general statement of reasons to address

19

the specific projects.  The "perfunctory nature" of this justification "belies any suggestion that more fulsome reasoning was provided by the agency in other records." *USDN*, 2025 WL 2374528, at \*35.

Third, Defendants' justification that the Land Access Program "award structure unacceptably exposed taxpayers to fraud, waste, and abuse" is equally devoid of reasoning. The boilerplate support for this rationale is that the program's "innovative framework and minimal guardrails" resulted in "exposing" taxpayers to such "risks." The letters fail to provide any actual data regarding apparent "fraud, waste, and abuse" by the Land Access Program Plaintiffs, any concrete explanation for when a purchase constitutes "waste" or "abuse," or what specifically was problematic about the program's "innovative framework and minimal guardrails." All of the letters offer the same examples of allegedly problematic expenses, "such as purchasing gazebos, massages, a camper/RV, and oversized office supply budgets," but none explains how any of the expenses constituted waste or abuse, let alone fraud, and none connect these expenses to any particular grantee. *See* Termination Letters. Again, the vast majority of letters never talk about the individual terminated awardees' expenses whatsoever, and no letter acknowledges that these expenses were proposed to and approved by Defendants. Moreover, as discussed further below, to the extent the letters cite specific costs of concern those costs were directly in service of the land-access aims of the grants.

When terminating a grant, Defendants are required to provide recipients with a "workable, sensible, or meaningful reason or basis for the termination of their awards." *Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, 770 F.Supp.3d 822, 856 (D. Md. 2025). The explanation provided by Defendants for why, suddenly, these congressionally authorized and agency approved grants

20

no longer "align[] with Congressional intent" fails to supply any such reasoning, rendering the termination decisions arbitrary and capricious and thus unlawful.

c.  Defendants' Termination Decision is Counter to the Evidence.

Defendants' decision to terminate the Land Access Program Plaintiffs' grants is also arbitrary and capricious because it "runs counter to the evidence before the agency" *Motor Vehicle Manufacturers Ass'n*, 463 U.S. at 43. Defendants claim that the Land Access Program awards were discriminatory based on immutable characteristics, but the language quoted from various Project Narratives to allegedly support this finding was often taken out of context or mischaracterized. For example, the termination letter received by Iowa Valley RC&D ("IVRCD") claims that IVRCD's project intended to "limit program resources to specific producers on the basis of race and ethnicity," but the language quoted by the letter actually describes IVRCD's work more broadly and was not in reference to limiting program resources. *See* Grimm Decl. ¶ 10. Likewise, the termination letter received by Sustainable Iowa Land Trust ("SILT") claimed that the "project's intention" was to allocate resources "based on race and ethnicity;" but SILT's project narrative stated, in full, that "[b]ased on demographic data, we predict that this project will serve primarily Black farmers in Waterloo, primarily immigrant and Black farmers in Cedar Rapids; and primarily refugee farmers in Des Moines." *See* Horsey Dec. ¶ 10. And the termination letter received by 2020 Farmers Cooperative claims the program was "limited" to serving "black and historically underserved farmers," when the grant application suggests no such limit, but merely explains that the program expected to reach many Black farmers, who are historically underserved. *See* Mallory Dec. ¶ 10.

Defendants also ignore Land Access Program grant applications that clearly identify criteria for participation unrelated to any immutable characteristic. For example, Cultivate KC's

project narrative identifies the project's beneficiaries as "urban farmers in the Kansas City metro area." Darby Decl. ¶ 9; Darby Decl. Ex. A at Attachment 2. Heru Urban Farming's Project Narrative identifies the demographics of the geographical region they serve, which includes Black, Hispanic, Asian, Multi-Racial, and White, and explains that "participants in the project are expected to reflect these races/ethnicities." Lewis Decl., Ex. A at 2. NDN Collective, Inc.'s ("NDN Collective") program identified the Shoshone and Paiute tribal communities as the ultimate beneficiaries of the program, and tribal membership is a political status—not a racial, ethnic, or any other category based on immutable characteristic. Garriott Decl. ¶ 9.

In claiming the Land Access Program grants "do not align with congressional intent," because the awards allegedly "did little to improve land access" and "do not do enough to help producers," Defendants ignore the substantial progress many of the Land Access Program Plaintiffs made in performing their grants and improving land access, despite Defendants' lengthy freeze and then delays in funding under the program. *See* Ashe Decl. ¶¶ 7–8, Avila Decl. ¶ 7, D'Ambrosio Decl. ¶¶ 7–8, Darby Decl. ¶ 7, Desai Decl. ¶ 7, Elliott Decl. ¶ 7, Galaviz Decl. ¶¶ 22–23, Garriott Decl. ¶¶ 6–7, Grimm Decl. ¶ 7, Horsey Decl. ¶¶ 7–8, Koppa Decl. ¶ 8, Lewis Decl. ¶ 7, Mallory Decl. ¶¶ 7–8, Manabe Decl. ¶ 7, Maqubela Decl. ¶ 7, Martin Decl. ¶ 6, Padilla Decl. ¶ 7, Reece Decl. ¶ 7, 9, Sarmiento Decl. ¶ 7, Stephens Decl. ¶¶ 7–8, and Vogel Decl. ¶ 9. Many of the Land Access Program Plaintiffs' efforts to purchase land and progress in their projects – each of which was specifically designed to increase access to land, capital, and markets, per the NOFO requirements – were thwarted by Defendants' own actions. *See, e.g.*, Padilla Decl. ¶ 9; Stephens Decl. ¶ 8. Further, even the limited examples cited by Defendants as apparent proof that the programs do little to improve land access are counter to the evidence. For example, Plaintiff Agraria Centers's termination letter stated that "a disproportionate portion of the award is

22

dedicated to administrative expenditures, including salaries ($943,750), travel ($40,557), and workshops ($28,000) which represent a departure from the statutory intent of the program to increase land access," D'Ambrosio Decl., Ex. B at 3, while Plaintiff Cultivate KC's termination letter claimed that "[t]he predominant use of award funds on items outside the program's mission of increasing land access" because "the project reserves more than half of its award dollars on salaries, stipends, and subawards." Darby Decl., Ex. B at 3. In both cases, Defendants simply ignore that the cited expenditures unequivocally relate to the core land-access mission, as stated clearly in the program descriptions. For example, Cultivate KC's grant included a budget item for the City of Kansas City, Missouri, to hire the first ever Food System Coordinator, who focuses on reducing municipal barriers related to food production, farmland, acquisition, and development, and thus, a large portion of funding was reserved to pay this salary. Darby Decl. ¶ 11.

As for concerns about "fraud," Defendants overlook the fact that expenses for these grants were approved by Defendants as part of the initial award process, *see* NOFO, Ex. 1 at 21 (budget narrative requirements,); 24 (funding restrictions); and 28 (administrative and risk review process), and are subject to a second review by Defendants at the point of reimbursement. *See*, *e.g.*, Galaviz Decl. ¶ 18, Darby Decl. ¶¶ 10–11, Koppa Decl. ¶ 9. Defendants terminated the grant to a governmental entity, King County, without acknowledgment of its own robust internal controls to prevent fraud above and beyond those imposed by USDA. Martin Decl. ¶ 12. Defendants made a vague claim that the project run by Land Access Program Plaintiff Four Bands "creates significant vulnerabilities in the responsible stewardship of taxpayer dollars," ignoring the fact that Four Bands has successfully deployed funds under numerous USDA programs for over a decade and is certified by the U.S. Treasury as a Native Community Development Financial Institution. Vogel Decl. ¶ 15.

For these reasons, Defendants' claimed justifications for the termination of the Land Access Program Plaintiffs' awards runs counter to the evidence before it and its termination decisions are therefore arbitrary and capricious.

    d.   Defendants Failed to Consider Reliance Interests

Finally, Defendants' decision to terminate the Land Access Program Plaintiffs' grant awards is arbitrary and capricious because it did not account for the Land Access Program Plaintiffs' reliance interests, which were substantial. The Land Access Program Plaintiffs and other awardees relied on their understanding that so long as they complied with the requirements from their awards, they would have this funding until the award end date, which for the majority of Land Access Program Plaintiffs was until 2028. They started programs, hired employees, entered contracts, bought land and equipment, forewent alternate funding opportunities, and developed relationships, all in reliance on receipt of the Land Access Program grants, only to have their funding abruptly terminated by Defendants. *See* Ashe Decl. ¶¶ 7, 14–16, Avila Decl. ¶¶ 12–14, D'Ambrosio Decl. ¶¶ 18–23, 23, Darby Decl. ¶¶ 7, 12–14, Desai Decl. ¶¶ 14–17, Elliott Decl. ¶¶ 7, 14–16, Frazier Decl. ¶ 17, Friedrich Decl. ¶ 14, Galaviz Decl. ¶¶ 7, 22–24, Garriott Decl. ¶¶ 13–15, Grimm Decl. ¶¶ 7, 13–14, Horsey Decl. ¶¶ 7, 14–18, Kolawole Decl. ¶¶ 12–13, Koppa Decl. ¶¶ 5, 13–14, Lewis Decl. ¶¶ 12–13, Mallory Decl. ¶¶ 19, 21, Manabe Decl. ¶¶ 7, 11–12, Maqubela Decl. ¶¶ 7, 11–12, Martin Decl. ¶¶ 16–19, Padilla Decl. ¶¶ 7, 11, Reece Decl. ¶¶ 11–14, Sarmiento Decl. ¶ 11, Stephens Decl. ¶¶ 17–18, and Vogel Decl. ¶ 17. Where there has been good-faith reliance on Defendants' prior position, the government must account for that reliance when explaining a shift in policy. *See Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156-57 (2012); *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 224 (2016). While the termination letters received by the Land Access Program Plaintiffs make cursory reference to "reliance

24

interests," Defendants give these short shrift, merely listing partners copied and pasted from the project narratives while downplaying or altogether ignoring the significant investments of time, effort, and money spent in reliance on the awards. "In light of the serious reliance interests at stake, [USDA's] conclusory statements do not suffice to explain its decision." *Planned Parenthood*, 2025 WL 2840318, at *28 (citing *Encino Motorcars*, 579 U.S. at 224).

## III.    The Land Access Program Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief.

To be entitled to a preliminary injunction, a plaintiff must show that it has suffered harm that is "certain and great," "actual and not theoretical," and so "imminent that there is a clear and present need for equitable relief to prevent irreparable harm." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (cleaned up). "Obstacles [that] unquestionably make it more difficult for [organizations] to accomplish their primary mission . . . provide injury for purposes both of standing and irreparable harm." *Id.* at 9. In the context of the government's withholding of an organization's funding, irreparable harm is established where the cessation of funding affects the existence of programs, the organizations' reputation, or the livelihoods of organizations' staff and the communities they serve. *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 763 F. Supp. 3d 36, 57 (D.D.C. 2025); *RFE/RL, Inc. v. Lake*, 772 F.Supp.3d 79, 85 (D.D.C. 2025); *S. Educ. Found. v. U.S. Dep't of Educ.*, 784 F.Supp.3d 50, 72 (D.D.C. 2025); *Am. Ass'n of Colls. for Tchr. Educ.*, 770 F.Supp.3d at 858-59.

The Land Access Program Plaintiffs readily meet this standard. If Defendants' unlawful termination decisions remain in effect and the Land Access Program Plaintiffs' grants are not reinstated, the Land Access Program Plaintiffs, and the communities they serve, will be irreparably and irreversibly harmed, as set forth in detail in the declarations accompanying this motion. *See* Ashe Decl. ¶¶ 14-16, Avila Decl. ¶¶ 12-15, D'Ambrosio Decl. ¶¶ 18-24, Darby Decl. ¶¶ 12-14,

Desai Decl. ¶¶ 14-19, Elliott Decl. ¶¶ 14-17, Frazier Decl. ¶¶ 17-19, Friedrich Decl. ¶¶ 14-16, Galaviz Decl. ¶¶ 24-28, Garriott Decl. ¶¶ 13-16, Grimm Decl. ¶¶ 13-16, Horsey Decl. ¶¶ 16-21, Kolawole Decl. ¶¶ 12-15, Koppa Decl. ¶¶ 10-18, Lewis Decl. ¶¶ 12-14, Mallory Decl. ¶¶ 19-23, Manabe Decl. ¶¶ 11-13, Maqubela Decl. ¶¶ 11-13, Martin ¶¶ 16-23, Padilla Decl. ¶¶ 11-14, Reece Decl. ¶¶ 11-14, Sarmiento Decl. ¶¶ 11-13, Stephens Decl. ¶¶ 17-24, and Vogel Decl. ¶¶ 16-18.

Across the board, the Land Access Program Plaintiffs will have to stop their projects or drastically reduce the scope of work funded by their terminated grants. *See, e.g.* Avila Decl. ¶ 12 ("Many components of our project will no longer go forward"); Lewis Decl. ¶ 12 ("All of the plans we made for this project have been interrupted") Martin Decl. ¶ 19 ("[B]ecause of the complexities of government funding, even if King County is able to obtain funding from alternative sources, many of the programs funded by the grant will have to be shut down."). Absent locating replacement funding, groups risk having to shutter their operations entirely. *See, e.g.* Padilla Decl. ¶ 13 ("HOPE may not be able to stay operational beyond September 2026, when our one other very small grant ends."); Reece ¶ 14 ("We have not yet been able to identify any funding source that would account for this large of a loss, and without other grants, KBFA will only be able to stay operational until March 2027."). They have had to divert significant resources away from their organizations' core missions to comply with grant close out requirements while simultaneously attempting to find alternative funding sources. *See, e.g.* Grimm Decl. ¶ 15 ("We have been forced to make significant budgetary adjustments and redirect staff time away from critical work to address the termination"); Padilla Decl. ¶ 13 ("We are in the position of having to either spend our limited funds to hire grant writers, or save the money and write the grant applications ourselves and get behind on other work"). Some Land Access Program Plaintiffs have already had to lay off staff, and many others face imminent layoffs, hiring freezes, and additional reductions in

26

operations if funding cannot be secured. *See, e.g.* Galaviz Decl. ¶ 25 ("Agrarian Trust has already had to reduce staff capacity, including laying off four staff members"); Friedrich Decl. ¶ 14 (explaining that Urban Oasis has stopped the process of hiring eighteen apprentice-workers and eight farmer-mentors for its apprenticeship program, and has had to lay off the two full-time staff members hired specifically for the Land Access Project). Others are at risk of failing to meet contractual obligations, which threatens their ability to continue to conduct programming and operations. *See, e.g.* Reece Decl. ¶ 12 ("[M]any instructors and service providers with whom KBFA entered into agreements are unwilling to accept short notice to cease services and are therefore requesting payment in accordance with the full terms of their contract"); Ashe Decl. ¶ 7, 15 (explaining that the Black Oregon Land Trust used bridge financing to acquire a $600,000 loan to purchase 45-acres of farmland and does not know how it will repay this loan without the Land Access Program funding); D'Ambrosio Decl. ¶ 23 ("The Agraria Center…is presently having difficulty meeting contractor obligations…and without emergency funding or delaying other activities it may not be able to continue all its non-grant-related activities.").

Without the promised funding, the Land Access Program Plaintiffs will be unable to deliver on promises made to the communities they serve, causing harm to their reputations as reliable partners. *See, e.g.* Vogel Decl. ¶ 18 (explaining that Four Bands serves communities where financial institutions have historically failed or harmed borrowers, and a loss of funding such as this can cause negative perceptions that circulate widely and persist over time); Horsey Decl. ¶ 19 ("SILT's reputation as a reliable source of funding, training, and resources to new farmers, landowners, and community members" has been harmed by the termination); Galaviz Decl. ¶ 27 (explaining that the grant termination has damaged "Agrarian Trust's relationships with farmers, farmer-led groups, subaward partners, community-based organizations, landowners, and local

27

Agrarian Commons leaders."). Additionally, Land Access Program Plaintiffs will experience reputational harm based on the accusations that their programming was discriminatory and fiscally irresponsible. *See, e.g.* Mallory Decl. ¶ 23; D'Ambrosio Decl. ¶ 25; Stephens Decl. ¶ 22.

The termination of the Land Access Program Plaintiffs' grants also will cause immediate and irreparable harm to the livelihoods of the communities that were intended to benefit from the Land Access Program. *See, e.g.* Friedrich Decl. ¶ 14 ("These impacts are undermining existing small-scale farmers, the future of would-be farmer-apprentices, and the long-term coalition we have been building to grow and support sustainable local food systems"); Grimm Decl. ¶ 16 ("The termination will also harm Iowa's beginning and existing farmers. Beginning farmers who could have participated in our fellowship program will be more likely to struggle to secure land access, build customer relationships, and launch their businesses—all of which our fellowship aimed to help them with."); Galaviz Decl. ¶ 26 ("If a farm transaction fails, if a retiring farmer walks away from an active purchase agreement due to delays, or if farmer groups and partners lose capacity or confidence, later payment of money cannot recreate the same land opportunity."); Frazier Decl. ¶ 17 ("With every passing day, more and more farmland in Washington state is lost to residential, commercial, and industrial development…further funding delays mean that additional underserved farmers will not be able to secure long-term land tenure").

Moreover, without immediate intervention, the funding to which Plaintiffs are entitled may be rendered unrecoverable. "[I]n cases involving government expenditures, 'once the relevant funds have been obligated, a court cannot reach them in order to award relief.'" *Climate United Fund v. Citibank, N.A.*, 778 F. Supp. 3d 90, 117 (D.D.C. 2025) (quoting *City of Houston v. Dep't of Hous. & Urb. Dev*, 24 F.3d 1421, 1426–27 (D.C. Cir. 1994)). Thus, "[a]ny transfer, re-allocation, or re-obligation of these funds would be an irreparable loss—one that threatens the very

28

existence of Plaintiffs' businesses." *Id*. Accordingly, a preliminary injunction is required to prevent the irreparable loss of Defendants' reallocating funds promised to Plaintiffs.

**IV.    The Balance of Equities and Public Interest Weigh Heavily in Plaintiffs' Favor.**

"It is well established that the Government cannot suffer harm from an injunction that merely ends an unlawful practice." *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (quotation marks and citations omitted). Similarly, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017) (quotation marks and citation omitted). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws—such as the APA, as well as regulations . . . that govern their existence and operations." *Id.* (internal quotation marks and citations omitted).

As this Court concluded regarding the last preliminary injunction, "plaintiffs and the public face significant injury from defendants' actions, which are likely violative of the APA, and defendants' relative delay in fulfilling their agency priorities pales in comparison." *USDN*, 2025 WL 2374528, at *38. On one side of the ledger in favor of relief is the harm to the Land Access Program Plaintiffs, the communities they serve, and the public from violations of the APA. On the other side, there are no countervailing weights. There can be no harm to the public fisc given the funds are already allocated. *See id*. at 39 (concluding that "defendants remain obligated to pay those funds previously allocated, so they have not demonstrated any cognizable harm to the public fisc."). Any purported harm to Defendants' policy objectives is counteracted by the fact that Defendants are acting contrary to statute. And, even were that not the case, Defendants have failed to substantiate how these grants are truly contrary to Defendants' purported goals. The balance of equities and public interest strongly support a preliminary injunction to preserve the status quo until this Court can rule on the merits of Land Access Program Plaintiffs' claims.

29

## V.      The Court Should Not Require a Bond.

Federal Rule of Civil Procedure 65(c) "'vest[s] broad discretion in the district court to determine the appropriate amount of an injunction bond,' including the discretion to require no bond at all." *P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020) (quoting *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 107 (D.D.C. 2012)). A bond "is not necessary" where it "would have the effect of denying the plaintiffs their right to judicial review of administrative action." *Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971) (collecting cases).

When enjoining unlawful funding terminations, courts have declined to require plaintiffs to post bond. *See*, *e.g. Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 775 F. Supp. 3d 100, 130 (D.D.C. 2025); *Colorado v. HHS*, 783 F. Supp. 3d 641, 651 (D.R.I. 2025); *Cmty. Legal Servs. in E. Palo Alto v. HHS*, 777 F. Supp. 3d 1039, 1046 (N.D. Cal. 2025). As one court explained, "[i]n a case where the Government is alleged to have unlawfully withheld [large sums] of previously committed funds to countless recipients, it would defy logic—and contravene the very basis of this opinion." *Nat'l Council of Nonprofits*, 775 F. Supp. 3d at 130; *see also Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 778 F. Supp. 3d 440, 477 (D.R.I. 2025). This Court declined to require Plaintiffs to post bond in the previous preliminary injunction order on the basis that "[r]equiring a significant bond here would impair plaintiffs' ability to seek recourse in court to vindicate alleged violations of their rights, especially considering plaintiffs' already difficult financial straits." *USDN*, 2025 WL 2374528, at *39. Plaintiffs require the same relief here.

## CONCLUSION

For the reasons stated above, the Court should grant the Land Access Program Plaintiffs' motion and preliminarily enjoin Defendants' termination of the Land Access Program Plaintiffs'

grants and return the Land Access Program Plaintiffs to the condition they were in before commencement of this unlawful conduct. Likewise, as noted above, the Court could also grant preliminary relief under the APA. And, in the event that Defendants do not timely oppose, the Land Access Program Plaintiffs request *ex parte* relief.

Dated this 26 day of May, 2026.

Respectfully submitted,

/s/Carrie Apfel
Carrie Apfel
DC Bar No. 974342
Earthjustice
1001 G Street, NW, Suite 1000
Washington, DC  20001
(202) 667-4500
capfel@earthjustice.org

David S. Muraskin
DC Bar No. 1012451
FarmSTAND
712 H Street NE
Suite 2534
Washington, DC 20002
202-595-8816
Email: david@farmstand.org

Hannah Wolf
TX Bar No. 24137413 (*Pro Hac Vice Pending)*
FarmSTAND
712 H Street NE
Suite 2534
Washington, DC 20002
202-595-8816
Email: hannah@farmstand.org

Scott W. Carlson
MN Bar No. 0338400 (*Pro Hac Vice*)
Farmers Justice Center
6 Fifth Street West
Suite 650
St. Paul, MN 55102
(651) 204-1664
scott.carlson@farmersjustice.org

Benjamin E. Apple
NC Bar No. 52009 (*Pro Hac Vice*)
Farmers Justice Center
6 Fifth Street West
Suite 650
St. Paul, MN 55102
(651) 204-7203
ben.apple@farmersjustice.org

*Counsel for Plaintiffs*

31