# IN THE UNITED STATES COURT DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

URBAN SUSTAINABILITY DIRECTORS
NETWORK, et al.,

 *Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF
AGRICULTURE, et al.,

 *Defendants*.

Case No. 1:25-cv-01775-BAH

## DECLARATION OF WIZIPAN LITTLE ELK GARRIOTT

I, Wizipan Little Elk Garriott, declare as follows:

1. My name is Wizipan Little Elk Garriott, and I live in the United States. This declaration is based on my personal knowledge. I am over the age of eighteen and suffer from no legal incapacity. I submit this declaration in support of NDN Collective, Inc. ("NDN Collective"), which is one of several grant recipients affected by the termination of U.S. Department of Agriculture ("USDA") grant funding in the Farm Service Agency's ("FSA") Increasing Land, Capital, and Market Access Program ("ILA"). If called to testify, I could and would state the facts herein.

2. NDN Collective is a 501(c)(3) nonprofit organization headquartered in Rapid City, South Dakota.

3. I have been the President of NDN Collective since January 2025. I am deeply familiar with NDN Collective's mission, policies, and programs.

4. NDN Collective's mission is to build the collective power of Indigenous Peoples, communities, and Nations to exercise our inherent right to self-determination, while fostering a world that is built on a foundation of justice and equity for all people and Mother Earth. One of our primary strategies is acquiring land to return to indigenous peoples for sustainable farming and ranching.

5. In 2023, NDN Collective applied for an ILA grant to fund its Pine Creek Ranch Land and Water Conservation Project. This Project involves the restoration of and debt paydown on the historic Pine Creek Ranch Land, located in central Nevada, and ultimate return of that land to the Shoshone and Paiute tribal communities for their long-term use and benefit. NDN Collective acquired the Ranch in or around early 2022. At that time, the Ranch was in a state of disrepair after 30 years of neglect. By restoring the Ranch and returning it in good working order and free of debt to the Shoshone and Paiute tribal communities, the Project addresses and mediates the longstanding barriers for these tribal communities to accessing land, capital, and markets in their traditional lands in Nevada. NDN Collective's Project Narrative is included as Attachment 3 to the amended grant agreement, of which a true and correct copy is attached hereto as **Exhibit A**.

6. FSA approved NDN Collective's grant application for $2,500,000 on or around November 18, 2023. Funding for this project was authorized through November 30, 2027. See **Exhibit A**. FSA's internal delays prevented us from commencing work for the first year. We did not commence grant activities until after executing an amended grant agreement on December 5, 2024. See **Exhibit A.** Thereafter, we experienced many more delays due to USDA's failure to promptly reimburse us and our inability to make additional expenditures without the guarantee of prompt reimbursement.

2

7.  To date, NDN Collective has spent approximately $870,000 in grant funds. USDA has never questioned or rejected any reimbursement requests for this grant. This spent sum represents the following work:

- Investing significant capital in improvements to the Ranch, as detailed in the Project Narrative;

- Preparing pasture lands for rotational grazing by the cattle herd;

- Paying down a portion of the banknote on the Ranch property.

8.  On March 23, 2026, I received a letter from USDA and FSA terminating NDN Collective's federal award. Beyond the termination letter, NDN Collective has received no further communication from USDA and FSA about the termination of our award. A true and correct copy of the termination letter is attached hereto as **Exhibit B**.

9.  The termination letter asserts that ILA awards, including NDN Collective's, "do not align with the Department's goals and priorities," and alleges that our award "was made pursuant to a program rife with [Diversity, Equity, and Inclusion] preferences that discriminated based on immutable characteristics." This allegation is meritless as to NDN Collective. As stated in NDN Collective's Project Narrative, the ultimate beneficiaries of the project are the Shoshone and Paiute tribal communities, who will own and operate the Ranch. Tribal membership is a political status—not a racial category, nor any other type of immutable characteristic.[1] Indeed, the Secretary of Agriculture has explicitly recognized that tribal membership is a political status not related to Diversity, Equity, and Inclusion in a May 2025 memorandum.[2]

---

[1] *See Morton v. Mancari*, 417 U.S. 535, 555 (1974).

[2] *See* USDA Office of the Secretary, Clarifying the Application of Certain Executive Orders to Federally Recognized Indian Tribes, American Indian Tribal Citizens, and the Native Hawai'ian Community, Secretary's Memorandum 1078-010 (May 5, 2025) ("The Department's unique

*Continued on next page*

3

10. The termination letter alleges that the ILA awards "do not align with Congressional intent" because "most" of the ILA awards do "little to improve land access." See **Exhibit B**. Again, this is incorrect as to NDN Collective. The entirety of NDN Collective's award funds is devoted to restoring the Ranch, paying off the banknote on the Ranch, and then returning ownership of these ancestral lands to the Shoshone and Paiute tribal communities for their long-term ownership and operation of the Ranch.

11. The termination letter states that ILA awards were used for frivolous expenses, such as "gazebos, massages, a camper/RV." See **Exhibit B**. NDN Collective did not make any such purchases, and USDA and FSA do not claim that we did. Rather, we used all funding to date for improving and operating the Ranch and paying off the banknote on it. USDA has approved all spending to date.

12. Finally, the termination letter alleges that

> Although the project indicates a long-term goal of providing land access opportunities to producers, the efforts within this project are focused on addressing deferred maintenance necessary on the land. The predominant use of award funds on items outside the program's mission of increasing land access represents a departure from the statutory intent of the program as required by Congress.

See **Exhibit B**. This final allegation is also meritless. As an initial matter, the letter's allegation is internally inconsistent; the letter itself admits that the "long-term goal" of our Project is "providing land access opportunities to producers." Indeed, FSA reviewed and awarded the grant based on the Project Narrative's description of work. Nonetheless, FSA wrongly suggests that the restoration work on the Ranch—"deferred maintenance"—is unrelated to the long-term goal of land access. Not so; the restoration work is crucial to ensuring the Shoshone and Paiute tribal

---

government-to-government and political relationship with . . . American Indian Tribal citizens . . . are [sic] legally distinct from policy-based Diversity, Equity, and Inclusion programs such as those covered by [recent] executive orders.").

4

communities have access to land that is adequately capitalized, productive, and viable long-term. Second, the letter's allegation ignores the other two explicit goals of the ILA program, providing access to "capital" and "markets." By restoring the Ranch to a viable operation, NDN Collective is providing the necessary capital and market relationships for the tribal communities to succeed in owning and operating the Ranch long-term. Third, the "predominant" use of award funds is not maintenance—as the letter wrongly claims—but rather the $1,537,000 (of $2.5 million total) devoted to paying off the banknote on the Ranch and to making capital investments in equipment, supplies, and a warehouse. By paying of the banknote and making these capital investments in sustainable operations before transferring the Ranch to tribal communities, NDN Collective is providing the exact access to land, capital, and markets that the ILA program envisioned. The only costs that could be called purely "maintenance" would be the contractual services to oversee and maintain the Ranch, with costs totaling $225,000—less than 10% of the total grant funds.

13. The termination of our award and loss of the over $1.6 million in remaining grant funding has had and will continue to have devastating and irreparable impacts on NDN Collective's ability to carry out this project. Namely, we no longer have the funding to pay off the banknote on the Ranch, to finish capital improvements, and to build long-term operational viability. The ILA funding is not easily replaced, so the Project is now delayed for an unknown amount of time and may ultimately fall short of its objectives.

14. The loss of funding and resulting delays or elimination of Project elements is severely harming NDN Collective's reputation as a reliable source of funding and services to indigenous community members.

15. NDN Collective will need to spend additional time seeking alternative funding opportunities to sustain operations and continue critical programming. This effort will reduce the time available to apply for and manage other grants and programs. The funding delay will likely also create challenges in meeting organizational financial obligations, including staffing, operational expenses, and program-related costs. To address these challenges, the organization may need to reallocate limited unrestricted funds, reduce expenses, delay activities, and pursue emergency or bridge funding. These mitigation efforts will increase administrative and fundraising costs and place additional strain on organizational resources.

16. Staff attention has already been diverted toward project closeout planning and maintaining limited project execution without this grant support, reducing capacity to focus on implementation and other organizational priorities. Staff are experiencing overwhelming stress and anxiety from the sudden loss of funding and the resulting uncertainties in completing the Project.

17. On or around April 21, 2026, NDN Collective submitted an Appeal Request via letter to the USDA National Appeals Division ("NAD"). A true and correct copy of this Appeal Request is attached hereto as **Exhibit C**.

18. On April 29, 2026, NAD notified NDN Collective that FSA's March 23, 2026, decision terminating our ILA grant is not appealable because it concerns matters of general applicability, and that, accordingly, NAD does not accept our request for an appeal of FSA's decision. A true and correct copy of this determination is attached hereto as **Exhibit D**.

19. The injury to NDN Collective and its interests would be redressed by an order from the Court granting Plaintiffs' their requested relief. NDN Collective would be able to avoid the immediate and irreparable harms described above and to continue towards the deployment of

over $1.6 million to continue building a viable ranch operation that can be transferred to the Shoshone and Paiute tribal communities.

I declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed this 20th day of May 2026 in Rapid City, South Dakota.

_____

Wizipan Little Elk Garriott

President

NDN Collective, Inc.

# Exhibit A

U.S. Department of Agriculture

ADS-093
7/2012

## NOTICE OF GRANT AND AGREEMENT AWARD

| 1. Award Identifying Number<br>FSA24GRA0011625 | 2. Amendment No.<br>1 | 3. Award/Project Period<br>11/18/2023 - 11/30/2027 | 4. Type of Award Instrument<br>Grant |
|---|---|---|---|

| 5. Agency:<br>(Name and Address)<br><br>USDA, FSA Office of Outreach<br>1400 INDEPENDENCE AVENUE, SW<br>Stop 0511, Room 3086-S<br>WASHINGTON, DC 20250 | 6. Recipient Organization:  (Name and Address)<br><br>NDN Collective, Inc.<br>408 Knollwood DRIVE, Rapid CITY, Sd 57701<br>Rapid City, South Dakota 57701 |
|---|---|

| | UEI:<br><br>SQBWNGW7HW61 | EIN: |
|---|---|---|

| 7. Agency Program Contact:<br>Michael Mannigan<br>michael.mannigan@usda.gov<br>541-699-3215 x 00000 | 8. Agency Administrative Contact:<br>Kenneth James<br>kenneth.james@usda.gov<br>301-395-2816 | 9. Recipient Program Contact:<br>Robby Burroughs<br>robby@ndncollective.org<br>(605) 791-3999 | 10. Recipient Administrative Contact:<br>Robby Burroughs<br>robby@ndncollective.org<br>(605) 791-3999 |
|---|---|---|---|

| 11. CFDA Number<br>10.968 | 12. Authority<br>Section 1006 American Rescue Plan Act, as<br>amended by the Inflation Reduction Act | 13. Type of Action<br>ii. Amendment/Revision | 14. Project Director<br>Nick Tilsen<br>nick@ndncollective.org<br>(605) 791-3999 |
|---|---|---|---|

**15. Project Title/Description:**

Complete agreement includes this ADS-093 (NOA) and attachments listed on page 2.

**16. Entity Type:** _____Profit  _X_ Nonprofit  _____Higher Education  _____Federal  _____State/Local  _____Indian/Native American

_____Other

| 17.  Select Funding Type: | ✔ Federal | ☐ Non-Federal |
|---|---|---|
| Original Funds Total: | $ 2,500,000.00 | |
| Additional Funds Total: | | |
| Grand Total: | $ 2,500,000.00 | $ 0.00 |

**18. Accounting and Appropriation Data**

| Financial Code | Amount | Budget Period | Treasury Symbol |
|---|---|---|---|
| WBS: FA.AD.ORCH.CA | $ 2,500,000.00 | 2231 | 12-1124 2022/2031 |
| BOC: 2559 | | | Fund: FAPMB1124D |
| Fund Center: FA10402000 | | | Functional Area: FA6011IRALLA |

## 19. APPROVED BUDGET

| | | | | | |
|---|---|---|---|---|---|
| Personnel | $ | 233,279.52 | Fringe Benefits | $ | 69,983.85 |
| Travel | $ | 20,782.08 | Equipment | $ | 257,000.00 |
| Supplies | $ | 15,500.00 | Contractual | $ | 550,000.00 |
| Construction | $ | 0.00 | Other | $ | 1,264,500.00 |
| Total Direct Cost\ | $ | 2,411,045.45 | Total Indirect Cost | $ | 88,954.55 |
| | | | Total Non-Federal Funds | $ | 0.00 |
| | | | Total Federal Funds Awarded | $ | 2,500,000.00 |
| | | | Total Approved Budget | $ | 2,500,000.00 |

This agreement is subject to applicable USDA statutory provisions and Financial Assistance Regulations.  In accepting this award or amendment and any payments made pursuant thereto, the undersigned represents that he or she is duly authorized to act on behalf of the awardee organization, agrees that the award is subject to the applicable provisions of this agreement (and all attachments), and agrees that acceptance of any payments constitutes an agreement by the payee that the amounts, if any found by USDA to have been overpaid, will be refunded or credited in full to USDA.

Page 1

U.S. Department of Agriculture

ADS-093
7/2012

(Continuation)

| NOTICE OF GRANT AND AGREEMENT AWARD | | | |
|---|---|---|---|
| **Award Identifying Number** | **Amendment No.** | **Award/Project Period** | **Type of Award Instrument** |
| FSA24GRA0011625 | 1 | 11/18/2023 - 11/30/2027 | Grant |

List of Attachments:

Attachment 1 - Amendment Narrative; Attachment 2 - Statement of Work; Attachment 3 - Project Narrative; Attachment 4 - Budget Narrative; Attachment 5 - Prior Approval Equipment Template; Attachment 6 - Lending Policy

| **Name and Title of Authorized Government Representative** | **Signature** | **Date** |
|---|---|---|
| Steven Peterson, Associate Administrator | STEVEN PETERSON  Digitally signed by STEVEN PETERSON  Date: 2024.12.05 18:15:15 -05'00' | |
| **Name and Title of Authorized Recipient Representative** | **Signature** | **Date** |
| Nick Tilsen, President & CEO | | 12/5/2021 |

### NONDISCRIMINATION STATEMENT

The U.S. Department of Agriculture (USDA) prohibits discrimination in all its programs and activities on the basis of race, color, national origin, age, disability, and where applicable, sex, marital status, familial status, parental status, religion, sexual orientation, genetic information, political beliefs, reprisal, or because all or a part of an individual's income is derived from any public assistance program. (Not all prohibited bases apply to all programs.) Persons with disabilities who require alternative means for communication of program information (Braille, large print, audiotape, etc.) should contact USDA's TARGET Center at (202) 720-2600 (voice and TDD). To file a complaint of discrimination write to USDA, Director, Office of Civil Rights, 1400 Independence Avenue, SW., Washington, DC 20250-9410 or call (800) 795-3272 (voice) or (202) 720-6382 (TDD). USDA is an equal opportunity provider, employer, and lender.

### PRIVACY ACT STATEMENT

The above statements are made in accordance with the Privacy Act of 1974 (5 U.S.C. Section 522a).

Attachment 1
Amendment Narrative

**AMENDMENT NO. 1**
**AGREEMENT NUMBER FSA24GRA0011625**

**PURPOSE**

The purpose of this amendment is to lift funding restrictions on project activities, including allowing the recipient to pay off existing real estate debt in accordance with the program lending policy (attached), the purchasing of equipment, and to realign the project narrative and budget narrative due to updated information.

**In the case of any conflict between language in this amendment and the award General Terms and Conditions, the provisions of this amendment will control.**

**REVISIONS TO THE NOTICE OF AWARD (FORM ADS-093):**

1. The Approved Budget for the agreement was revised as shown in Block 19.

2. The list of Attachments on page 2 of the NOA was revised.

**REVISIONS TO AGREEMENT ATTACHMENTS**

1. The Agreement Statement of Work (Attachment 2) was revised to include instructions for purchasing equipment and a summary of the program lending policy.

2. The Project Narrative (Attachment 3) was revised.

3. The Budget Narrative (Attachment 4) was revised.

**ADDITIONS TO AGREEMENT ATTACHMENTS**

1. Request for Prior Approval for Equipment Template (Attachment 5)

2. Program Loan Policy (Attachment 6)

Attachment 2

**Agreement Number: FSA24GRA0011625**

**Statement of Work**

### 1. PURPOSE AND OBJECTIVES

The authorizing statute for this agreement is Section 1006 of the American Rescue Plan Act (Pub. L 117-2), as amended by Section 22007 of the Inflation Reduction Act of 2022 (Pub. L 117-169). Section 1006(b)(1) and (b)(2) of the American Rescue Plan Act authorizes assistance and support to farmers, ranchers, and forest landowners and operators; and focuses on addressing the needs of underserved producers through outreach, education, engagement, and technical assistance to increase land, credit, and market access. Section 1006 also provides resources for grants to improve land access, including providing resources related to heirs' property and other land access issues that affect access to USDA programs.

### 2. SPECIAL CONDITIONS IN EFFECT

This is formal correspondence notifying you that all special conditions included in the original agreement statement of work are rescinded except those included in section 7, NATIONAL ENVIRONMENTAL POLICY ACT (NEPA) REQUIREMENTS and those listed below. Other project activities may commence unless they are associated with NEPA or those outlined below.

**<u>EQUIPMENT</u>**

The recipient must obtain agency prior approval for purchase of any equipment not included in the approved budget or risk not being compensated with grant funds. Submit prior approval requests via email to FPAC.BC.GAD@usda.gov with a copy to Land.Access@usda.gov and include a written justification (a template to facilitate submission of this information is included as Attachment 5) containing the following information:

1. Award Identifying Number (Block 1 of the FSA Notice of Award)
3. Description of the proposed equipment (manufacturer, model number, special functionality, etc.)
4. Justification of why the equipment purchase is necessary to accomplish grant objectives
5. List of available vendors for the proposed equipment and either an average estimated cost or actual costs per vender
6. Explanation why federal funds are needed and non-Federal funds cannot be utilized
7. Description of the research performed or practical experience that supports the choice of the particular type of equipment
8. Cost comparison of lease vs. purchase, if appropriate

The agency may also require a revised budget narrative, which will be requested during the prior approval process, as applicable.

Recipients purchasing equipment must also provide evidence of a UCC Financing Statement (UCC-1) filing with the applicable State government agency for each piece of equipment purchased with Federal grant funds valued at $5,000 or more. Instructions for filing by state are available at https://www.nass.org/business-services/ucc-filings.  Evidence of filing must be provided at the time payment is requested for the equipment purchase. If the recipient requests an advance of funds for equipment purchase, a draft copy of the UCC-1 must be provided with the request for advance payment. Subsequent evidence of filing will be due within 30 business days of payment by email to Land.Access@usda.gov, or future agreement payments will be withheld until the evidence of UCC filing is completed. Recipients are also required to renew the UCC Financing Statement every five years by completing a UCC Financial Statement Amendment (UCC-3) in accordance with the applicable state rules and regulations to ensure notice

of the government's interest in the equipment does not lapse for as long as the recipient continues to use the equipment for the project and it retains a fair market value in excess of $5,000. Evidence of the filed UCC-3 must be provided to Land.Access@usda.gov.

At least once every two years from the agreement period of performance start date, the recipient must take physical inventory of the property, reconcile it with the property records, and submit a copy of the property records report to Land.Access@usda.gov.

<u>LENDING</u>

While the following is a summary of the lending policy, Recipients are responsible for adherence to the full policy included as attachment (Include Attachment 6). If there are any discrepancies between the policy and the summary, the policy takes precedence.

For purposes of this agreement, loans can be utilized for land acquisition down payments, real estate taxes, lease or rental payments, to implement conservation practices, purchase livestock, improve soil quality, purchase on-farm infrastructure, or provide cost share for supplies, equipment, and maintenance. Purchases must be agricultural only, based on the IRS Agricultural Form 1040 Schedule F.

Policy Guidance:
- Recipients shall create their own lending policy.
- All policies must adhere to the standards as outlined in this FSA Lending Policy.
- Recipient must obtain FSA approval of policies prior to lending program implementation. FSA will not review individual loan applications.
  **Policies must address how recipient intends to ensure interest rates are fair and are not burdensome to Beneficiaries.
- USDA Non-Discrimination Policy – When developing and reviewing loan applications, recipients must adhere to USDA's Non-Discrimination Policy.
- Loan Documentation – Application forms used by the Recipient must include the following information:
  - Name and address of the beneficiary;
  - Loan purpose;
  - Interest rate and term;
  - Location, nature, and scope of the project being financed;
  - Uses and sources of funds;
  - Nature and lien priority of the collateral;
  - Proof there is no conflict of interest between recipient and beneficiary; (FSA requires a checked box on the application and a signature, or another means as agreed to by the agency); and
  - Proof of citizenship in accordance with 7 CFR 764.101(c).

    The Recipient must notify FSA and obtain prior written approval from FSA before making any significant changes in approved forms, security policy, or the ILA revolving loan fund policy.

3. **PROJECT NARRATIVE**

   The recipient will carry out the project described in the Project Proposal in the original SOW and any amendments.

4. **BUDGET NARRATIVE**

   The official budget as noted in the amendment is the total budget. Amounts included in the approved budget are estimates. Reimbursements or advance liquidations will be based on actual expenditures, not to exceed the obligated amount.

5. **REPORTING REQUIREMENTS**

a.  The recipient must submit performance progress reports to the Results Verification System (RVS) quarterly, according to the following schedule for each year of the agreement.  Attach only 1 report per email with a copy to FPAC.BC.GAD@usda.gov.

Progress Report#1: March 31
Progress Report #2: June 30
Progress Report #3: September 30
Progress Report#4: December 31

b.  The recipient must submit financial reports (SF-425) to the Farm Production and Conservation (FPAC) Grants and Agreements Division via email to FPAC.BC.GAD@usda.gov.  If the recipient requests reimbursement payments only, financial reports are due semi-annually. Thus, for year 1 of the agreement, the financial report due dates are as follows. Subsequent years of the agreement follow a similar schedule. Attach only 1 report per email.

Financial Report #1: June 30
Financial Report #2: December 31

If the recipient requests advance payments, financial reports are due at the same time as performance progress reports, which are as follows:

Financial Report#1: March 31
Financial Report #2: June 30
Financial Report #3: September 30
Financial Report#4: December 31

## 6.  PAYMENT INFORMATION

Payments under this award will be made upon submission to FPAC.BC.GAD@usda.gov of a properly executed SF-270, Request for Advance or Reimbursement, with appropriate supporting documentation. Additional information regarding payment supporting documentation is provided in the General Terms and Conditions for Agreements Processed Outside of ezFedGrants (eFG) (see Attachment 4A). Also see https://www.fpacbc.usda.gov/about/grants-and-agreements/awardpayments/index.html for preparation and submission guidance.

## 7.  NATIONAL ENVIRONMENTAL POLICY ACT (NEPA) REQUIREMENTS

The National Environmental Policy Act (NEPA) environmental review process must be completed for activities under this agreement, with potential impacts to the human environment prior to the recipient drawing down funds or incurring expenses under this Grant Agreement. Before the NEPA process is completed, Federal regulations specify acceptable actions in 40 CFR 1506.1. FSA reserves the right to de-obligate funds obligated under this grant agreement (or to require the return of such funds) in the event a recipient breaches or otherwise fails to perform under any of the grant requirements.

## 8.  GENERAL TERMS AND CONDITIONS

The General Terms and Conditions applicable to this award (General Terms and Conditions for Agreements Processed Outside of ezFedGrants (eFG)) are attached and incorporated as Attachment 4A. They are also available online at the following link: General Terms and Conditions - March 2024

**Project Narrative**

The NDN Collective was founded in 2018 and is the most ambitious, systemic approach to empowering Native American communities in the history of philanthropy and impact investing. The change, liberation, and justice we seek require the centering of Indigenous experiences and leadership as well as the sacrifice of privilege, decision-making power, and the expenditure of significant resources by those currently overseeing the concentration of wealth in modernity. NDN Collective's unique organizational ecosystem, integrated capital perspective, and holistic approach to problem-solving are focused on building the collective power of Indigenous Peoples, communities, and Nations in North America by investing in and supporting the empowerment of its people (see Appendix A). This powerful work will continue through the proposed Pine Creek Ranch Land and Water Conservation Project that will take place at Pine Creek Ranch, located in southern central Nevada.

The Pine Creek Ranch Land and Water Conservation Project will be a place-based project at Pine Creek Ranch that actively addresses and mediates the longstanding barriers for local Shoshone and Paiute tribal communities needing land, capital, and market access in their traditional lands in Nevada. NDN Collective consistently strives to create an inclusive environment for local tribal communities to participate in the development of Pine Creek Ranch, envisioning a viable ranch operation that will provide an opportunity for underserved Indigenous farmers and ranchers to take the helm and exercise Indigenous self-determination and economic mobility. NDN Collective is applying to the fourth funding tier (local/state/territorial land access) that this opportunity provides, requesting $2,500,000 to support underserved Indigenous farmers and ranchers, both in the Shoshone and Paiute tribal communities located in Nevada, in helping to reclaim and develop lands that have traditionally belong to their respective local tribal communities.

The process to bring this project to fruition will first focus on using awarded funds from this opportunity to help develop Pine Creek Ranch from its dilapidated state to a higher operational success level. Through a combination of unique modernization processes that involve both innovative and traditional modes of agriculture, we can further ensure the longevity of Pine Creek Ranch as an Indigenous-led ranching operation willing to adapt to contemporary standards. Secondly, once accomplished, NDN Collective will deliver Pine Creek Ranch back to the Shoshone and Paiute tribal communities, effectively returning it in a manner that will support the livelihood of those communities and situate Pine Creek Ranch as a prime example of the 'Land Back' movement that has and is currently occurring across the United States and beyond. Land Back is a movement that has existed for generations with a long legacy of organizing and sacrificing to get Indigenous Lands back into Indigenous hands. NDN Collective desires to continue this legacy through Pine Creek Ranch by developing and returning the stolen land to the Indigenous Peoples from which it belonged to initially decades ago.

To provide contextual background for the Pine Creek Ranch Land and Water Conservation Project, NDN Holdings is a division of the NDN Collective, with NDN Holdings being in place to maintain assets for NDN Collective. NDN Holdings exists to help bring the land back under Indigenous control that will serve and develop Indigenous people, communities, and tribal nations. NDN Holdings acquired the Pine Creek Ranch property and Nevada Water

1

Conservancy, LLC business entity in the first quarter of 2022. Regarding Nevada Water Conservancy, it was part of the real estate transaction of Pine Creek Ranch. The former owners created Nevada Water Conservancy to hold the real estate asset and perform ranch operations.

This strategic land acquisition resulted in the purchase of the approximately 7,500-acre Pine Creek Ranch in Nevada, which has obtained land and water rights to about 700,000 acres (see Appendix B & C). Historically, the Bureau of Land Management (BLM) and United States Forestry Services (USFS) provided grazing and leasing permits to the ranch property. In 2019, Nevada Water Conservancy applied to the local field office to reacquire historically held BLM grazing permits, with that application still under review with the local field office. Due to the lengthy processing, NDN Holdings also bought Nevada Water Conservancy to avoid potentially restarting the process. Additional efforts are needed to start the application process with the local office for the once-held USFS grazing permits. Overall, the Pine Creek Ranch is in fair shape but needs capital expenditures to bring it back to proper and effective operation successfully.

As a historical overview of Pine Creek Ranch property, the Homestead Act of 1862 was a popular way to redistribute land from the public to private citizens. It was readily used in Nevada, effectively stealing Indigenous lands to redistribute to settlers. Despite these massive setbacks, The Homestead Act also paved the way for Indigenous people to apply for free federal lands and sometimes achieve ownership. However, most Indigenous people lacked the resources, capacity, and trust in the federal government to proceed with the land acquisition process. The Pine Creek Ranch had Indigenous ties before, during, and after the Homestead Act of 1862. One prominent example was Tim Hooper, an off-reservation Shoshone Indian living on parts of the present-day Pine Creek Ranch. Tim applied for the Homestead Act and hoped to gain land ownership. Unfortunately, Tim and his family were over 40 miles away from the nearest post office, regularly battled cattle conglomerates for access and water rights, and constantly found themselves against harsh government regulations, deadlines, and stipulations. Even though Tim Hooper and his family lived on the ranch for many years, operating it sustainably, he could never get the ownership he desired.

The community from which the Pine Creek Ranch Land and Water Conservation Project will take place, according to agriculture census data, consists mainly of a vast expanse of irrigated lands, drylands, abandoned ranch properties, and ghost towns. It is an unincorporated town in Nye County, Nevada, with Round Mountain as the nearest populated town with a population of 1,868. According to U.S. Census data, the total population of Nye County is 53,450, the largest county by area and the third-largest county in the contiguous United States. Age demographic data includes 4.2% of persons under five years, 16.7% of persons under 18 years, and 30.6% of persons 65 years and over. Race demographic data includes 87.6% identifying as White, 4.0% identifying as African American, 2.0% identifying as American Indian/Alaskan Native, 2.1% identifying as Asian, 0.7% identifying as Native Hawaiian, 16.6% identifying as Hispanic or Latino, and 3.6% identifying as two or more races. Poverty demographic data includes 14.2% of persons living in poverty.

For the 2.0% of individuals identifying as American Indian/Alaskan Native in Nye County, Nevada, the need for land, capital, and market access as viable forms of representation and economic mobility remains a consistent presence for Indigenous Peoples and tribal communities

2

in the region. From a historical basis, much of the land surrounding Nye County and the larger landscape of the State of Nevada once belonged to Indigenous Peoples and tribal communities, particularly the Shoshone and Paiute. Throughout the centuries, the federal government, coupled with colonial systems based on land removal, suppression, and violence, led many tribal communities to undergo immense struggles to retain their traditional lands. Tribal communities and Indigenous individuals, such as the story of Tim Hooper, were met with consistent barriers to land ownership and opportunities for economic development. Many tribal communities in the region were placed into reservation systems and removed from their traditional lands and waters, which they had historically been associated with spiritually, culturally, and agriculturally for countless generations prior. The Pine Creek Ranch Land and Water Conservation Project will work to rectify this situation by developing and returning Pine Creek Ranch to the Shoshone and Paiute people in a state that will reinforce Indigenous self-determination, economic development, and land reclamation.

## Objectives and Outcomes

Pursuing the local/state/territorial land access tier under this opportunity, the purchase of Pine Creek Ranch and the proposed project presents an excellent opportunity for NDN Holdings to implement and steward a severely unmaintained ranch property to a higher level of ecological and financial performance in addition in making a name for NDN Collective as an organization as a successful Indigenous acquirer and steward of lands for Indigenous Peoples. Much of this stewardship work will require a substantial collaboration with government agencies such as the BLM, USFS, and Nevada Department of Wildlife, for all these agencies are significant stakeholders in this immense ranch landscape. In addition, Pine Creek Ranch has not been functional operationally in roughly 30 years due to a lack of proper management, meaning getting the ranch property back to a state of operability will require both on-the-ground work and investments in its aging infrastructure to bring it up to modern standards for it to be an effective, sustainable, and comprehensive ranching operation that is to be inevitably transitioned (see Appendix D).

The overall goal of the Pine Creek Ranch Land and Water Conservation Project is to address this longstanding deferred maintenance of the Pine Creek Ranch property by implementing effective grazing management systems and rangeland restoration measures to sustain future operations, conservation planning, and income sustainability for socially disadvantaged Indigenous Peoples (see Appendix E). Once the ranch is fully operational and economic sustainability is sustained through addressing the deferred maintenance of the ranch property through a relational incubating process, NDN Collective will actively work to transition the Pine Creek Ranch into the jurisdictional control of the Shoshone and Paiute tribal communities, providing the land access measures needed for those tribal communities to retain proper land ownership and utilize a viable operation for economic and agricultural purposes. Rightfully returning the lands would only be respectful if there is an assurance of long-term sustainable success. The lack of capital access and upfront costs as part of this project is why there will be a 3-to-5-year approach to return the lands to complete Indigenous stewardship. This approach can only be accomplished once Pine Creek Ranch is operational. Such an approach will primarily benefit the tribal communities involved when the transition is completed. By alleviating the

3

upfront capital costs, we can directly address capital limitations experienced by nearby Shoshone and Paiute tribal communities in operating such as a vast ranch property.

Once the ranch is fully operational and functional for cattle ranching, grazing, and ecosystem restoration, we will look to address market access concerns. We will discuss this concern primarily through strategic partnerships (most directly with Sustainable Northwest - a networking coalition to provide access to high-quality, organic, grass-fed cattle and beef). In addition, market access will also become a priority as Pine Creek Ranch will be an Indigenous-led, newly established ranching operation seeking to establish itself in an environment where many Indigenous-led ranch operations are relatively small, both in sales, acreage, and capacity. Establishing key partnerships to gain market access will be critical, as it will allow for the long-term sustainability of Pine Creek Ranch. Without these partnerships, a concern for Pine Creek Ranch is that it may not adequately access critical outlets from which livestock and agricultural resources from Pine Creek Ranch can be sold and bought on marketplaces. The inaccessibility of such marketplaces would inevitably hinder the productivity of Pine Creek Ranch and its ability to function as a ranching operation.

Currently, the number of underserved individuals to initially be served at Pine Creek Ranch consists of 2% of individuals identifying as American Indian/Alaskan Native that live in the area, as well as 15 contractors, some working full-time or part-time, actively addressing the deferred maintenance of the Pine Creek Ranch property. The lead contractor is enrolled in the Makah Nation, a tribe in the Pacific Northwest; however, he currently resides in Bishop, California, and has hired an all-Native American construction crew, all of whom are local to Nevada, to perform the needed work. In the future, NDN Holdings will employ at least 15-30 additional Indigenous contractors, laborers, farmers, ranchers, and skilled tradespeople full-time or part-time to work the ranch. This expectation will depend on capital allocation and the required work for infrastructure, deferred maintenance, solar equipment restoration, invasive species removal, and various needs regarding having Pine Creek Ranch reach successful operating status.

Four prominent areas for technical assistance will reside in the note payment, the collaborative planning with Ranch Advisory Partners, Inc., and Sustainable Northwest, tribal programming involving workforce development, and support of daily ranch operations. The note payments will expedite the process from which Pine Creek Ranch can transition from that of NDN Collective to that of the Shoshone and Paiute tribal communities. Full ownership can be transferred to the tribal communities without concern by assuring that the ranch property is paid for during this project. Next is the collaborative planning and implementation processes that will take place between NDN Collective, Ranch Advisory Partners, Inc., and Sustainable Northwest to modernize and support the ranch property. Ranch Advisory Partners, Inc. will primarily develop the innovative internal and monitoring infrastructure necessary for the Pine Creek Ranch to function appropriately as a contemporary ranching operation. Sustainable Northwest will bring its climate-smart beef production practices to the cattle livestock at the ranch. We will then use tribal programming to help facilitate and train the workforce development from Indigenous contractors, laborers, farmers, ranchers, and workers to run the Pine Creek Ranch. Finally, we will utilize ranch operations for the daily supplies used at Pine Creek Ranch to function appropriately, which will scale up as the ranch property progresses through the project.

4

Two online digital meetings leading up to the transfer of the ranch property are to be held each quarter to facilitate outreach to the larger tribal and non-tribal communities who want to learn more about the innovative processes at Pine Creek Ranch. There is expected to be an average of fifteen or more producers, partners, and community members that will attend these online digital meetings. Provided the capacity for growth, the number of sessions will grow as needed. On-site educational seminars will also take place, offering insight into the innovative approaches from which Pine Creek Ranch establishes itself as a modern, Indigenous-led ranch operation. Once the ranch transfer is complete, members from the Shoshone and Paiute tribal communities will take over entire operations and continue to hold meetings, seminars, and tours on the progress of Pine Creek Ranch, as intended.

**Approach**

Primary activities conducted to accomplish this goal are the creation of measurable improvements to the ranch's grazing areas through the implementation of regenerative, innovative, and culturally relevant grazing practices; extensive data collection on the ranch property; building a viable livestock operation; restoring the ranch's stock water systems, fencing, and corrals to functionality to strengthen the ecosystem and community resilience; and lastly, laying the structural foundation for achieving a positive net operating income to contribute to the future sustainability of the ranch property. Furthermore, Ranch Advisory Partners, Inc. has an in-depth understanding of federal and state policies to help NDN Holdings as it pursues re-authorization of the necessary BLM and USFS grazing permits. Ranch Advisory Partners, Inc. will also collaborate with NDN Holdings on creating dormant and growing season grazing plans for usage at Pine Creek Ranch.

Due to the longstanding inoperable status of Pine Creek Ranch, the necessity for creating updated site location data remains a vital component of making informed decisions regarding the continued management of the ranch property and its grazing areas. One of the ways the Pine Creek Ranch Land and Water Conservation Project will address the demand for updated information is by Ranch Advisory Partners, Inc. introducing a detailed backend client portal that will allow Pine Creek Ranch staff to review the culminating ranch property data collected in collaboration with Ranch Advisory Partners, Inc., providing in-depth rangeland health monitoring, ecological trends, and analysis of the grazing areas of Pine Creek Ranch. In the first and second years, the partnership with Ranch Advisory Partners, Inc. will allow for data collection and its extensive customization to fit the ranch's operational needs, whether that's following the BLM's Assessment, Inventory & Monitoring protocol, collecting rangeland health monitoring data as a Natural Resources Conservation Service technical service provider, or developing a customized protocol to fit the needs and budget of Pine Creek Ranch.

Furthermore, by having such a comprehensive client portal utilized throughout the daily operations of the ranch property, ranch staff will be able to look up pasture history and plan livestock move records, make informed decisions about carrying capacity and rest days, will be able to easily find paddocks, gates, and water in the field, take photos to monitor pasture and soil health, log herd records, individual animal notes, and forecast livestock performance and average daily gains. This collection of data will provide staff at Pine Creek Ranch with improved methodologies for grazing planning, in turn providing a pathway to discerning advantageous

5

grazing development opportunities for the ranch property in the immediate and near future. This data-driven approach will remove longstanding barriers that the ranch property had developed throughout not being adequately managed for roughly 30 years, with the newfound accessibility to grazing information significantly improving successful decision-making methodologies at Pine Creek Ranch.

The Pine Creek Ranch Land and Water Conservation Project will utilize the above data, in partnership with Ranch Advisory Partners, Inc., to simultaneously focus on implementing culturally relevant rangeland management training and capacity building on regenerative agriculture and livestock health. As an Indigenous-led organization, NDN Collective, and therein NDN Holdings, adheres to an Indigenous land ethic in which everything is interconnected in an egalitarian system and strongly encourages regenerative practices of the land and our relationship to it as living ones, also actively seeking partnerships that do so as well. NDN Holdings firmly recognizes and affirms the vital importance of such a philosophy and its role as Indigenous environmental stewards of the Pine Creek Ranch property and the land and areas of water on which it resides and shares with all living ones.

This land ethic will be primarily exercised at Pine Creek Ranch by introducing and establishing a rotational grazing system. In traditional grazing, left alone on a section of land, livestock can quickly destroy all signs of life, compacting the soil as they traverse. However, the soil sees significant returns if the livestock is managed with a rotational grazing process. Rotational grazing involves containing and moving livestock through the pasture to improve soil, plant, and animal health. Only one portion of the pasture is grazed at a time, while the remainder can freely rest. We will subdivide the pastures at Pine Creek Ranch into smaller grazing areas, referred to as paddocks, and livestock will be moved from one paddock to another. Resting grazed paddocks allows forage plants to recover and deepen their root systems. Rotational grazing encourages plants to send out more and deeper roots. Those roots are continually sloughed off to decompose in the ground, boosting soil biomass and fertility and sequestering carbon from the atmosphere. Rotational grazing also helps prevent erosion and agriculture runoff, which damages the land and makes it difficult for it to recover.

The primary rotational grazing management strategies to be utilized by NDN Holdings and Ranch Advisory Partners, Inc. at Pine Creek Ranch are to not graze in one pasture twice in the same grazing season; to vary the time of year livestock are in any one unit over several years; provide periodic season-long rest when possible; limit the amount of time livestock are in any area to minimize impacts of grazing regrowth; provide adequate time for growth before grazing or for regrowth after livestock have been removed; do not allow for multiple entries into a given pasture within a season, unless necessary for trailing; and critical areas would be established in allotments to monitor changes as a result of livestock management. Furthermore, since there will be a difference in elevations on the ranch property, the cattle will naturally be on lower-elevation land and graze on those allotments during the winter seasons. During summer, they will travel up to the mountains with greener pastures. This approach is one that NDN Holdings and Ranch Advisory Partners, Inc. would like to continue as it had been a traditional practice of the ranch property in the past.

6

For improvements to ranch infrastructure, revitalizing water, land, and grazing areas remains vitally important. Water developments will ensure that some water flow remains in the source area while providing livestock water. This process will require replacing stock water systems, many of whose components were produced in World War II. Ranch Advisory Partners, Inc. will perform a hydrologic analysis at the location to determine the proper diversion rate necessary to sustain the spring ecosystem. Depending on the spring type, water developments will be designed so that the water table does drop below the threshold identified during the hydrologic analysis. Shut-off valves will keep water from diverting outside the annual grazing period. Float valves will be used to keep troughs full while preventing excess flow away from the spring. Tanks may be installed to store water if additional water is needed at the troughs during high-use periods. Troughs will be fitted with wildlife escape ramps and designed to facilitate wildlife access and use. This process will expand water infrastructure to provide for ample livestock grazing systems.

Backhoes, tractors, or similar equipment would be used to level the trough and tank placement sites, dig and cover ditches for laying pipe, create gravel aprons underneath the troughs, and place the tanks and troughs. Future maintenance of the water systems would also require the occasional use of equipment. Spring sources would be fenced to prevent uncontrolled livestock access to the source area. Fences would be designed with wire spaced at appropriate intervals to avoid wildlife entanglement. Wire or rail heights would be set to facilitate wildlife passage. Wildlife-friendly designs would be incorporated into spring exclosures, significantly reducing any possible injury to wildlife passing through the ranch property. This practice aligns with the land ethic upheld by NDN Collective, from which all living things are respected and acknowledged in our Indigenous worldview. In getting infrastructure repaired or replaced and the permits renewed, NDN Holdings will try to acquire livestock to run on the ranch and generate income. Once these factors are addressed, the ranch should generate operational profit and serve as a model for collaborative stewardship practices.

Landscape restoration plans are a part of the overall programming with Ranch Advisory Partners, Inc. and NDN Holdings. Ranch monitoring is also crucial and will be a primary focus in the second and third years. This process includes identifying and removing invasive species, such as the white top, and using spot treatments to remove them effectively. There will also be a beaver dam analog system established that helps combat erosion. Some areas up in Meadow Canyon, higher in the mountains, would benefit from reintroducing beavers into the wild, which subscribes once again to NDN Collective's restorative land ethic philosophy. Ranch Advisory Partners, Inc. has a full Range and Soil Monitoring program. This approach includes charting and testing for carbon, soil organic matter, and species composition testing. This program will be able to test baseline monitoring of the soil and compare and improve it as time passes. Ranch monitoring will remain consistent as the Pine Creek Ranch property evolves.

Recruitment methods for the project will be for NDN Collective to establish communication pathways with the local tribal communities and their respective Tribal Employment Rights Ordinance or Office (TERO) to facilitate tribally enacted Indian Preference law to ensure that American Indian/Alaska Native people gain their rightful share to employment. This practice will not only reinforce local tribal community participation but also assert the overall need for Indigenous Peoples to first handily develop their agricultural infrastructure and provides a

pathway for local tribal ownership. This focus will help sustain Pine Creek Ranch as it evolves. It will offer an immense opportunity for those local tribal community members to learn and become better accustomed to modern agricultural practices for longevity. To coincide with the focus of including tribal community members in the development of the project, the sustainability of the project depends primarily on the partnership with Ranch Advisory Partners, Inc., as they will also help to formulate workforce knowledge banks with the local tribal community members who are working on the project.

With the development of Pine Creek Ranch, NDN Collective is working to showcase that Indigenous-led projects, particularly in agriculture, can be successfully conceptualized, developed, and operated by Indigenous Peoples. With a systematic approach undertaken by NDN Collective and Ranch Advisory Partners, Inc. to develop Pine Creek Ranch, the ability of Pine Creek Ranch to properly scale and reflect what can be accomplished in other Indigenous-led projects is vitally important to the overall focus of what NDN Collective subscribes to. The knowledge gained from the partnership with Ranch Advisory Partners, Inc. is only to support the eventual transfer of the ranch property to local tribal communities, with Ranch Advisory Partners, Inc. understanding the need for active Indigenous involvement and leadership throughout the project and beyond.

With the partnership with Sustainable Northwest, Pine Creek Ranch will implement and actively support regenerative ranching measures developed by Sustainable Northwest to ensure climate-smart beef production from its cattle livestock at the ranch. This innovative approach is one of the first in the nation to holistically develop, implement and measure how beef producers can sequester and reduce greenhouse gasses. Adopting regenerative ranching practices will also improve water efficiency and quality and promote wildlife habitat at Pine Creek Ranch. While demonstrating a suite of scientifically sound and replicable climate-smart practices, this approach will result in climate-smart grazing practices that will reduce the carbon intensity of beef production by 50-100% compared to conventionally raised beef, provide annual carbon sequestration equivalent to emissions from consumption of one billion gallons of gasoline or 10 billion pounds of coal, and provide $67 million in annual increased market returns for producers.

Future challenges to implementing the project would derive from simply recognizing that Pine Creek Ranch is a new ranching operation. With the acknowledgment, it will have to contend with the fact that it will have to be built from the ground up. This acknowledgment proposes unique challenges that, like any longstanding dilapidated property, may prove difficult to address every single issue the ranch property may have gained over 30 years. Infrastructure surveying repair may be problematic. NDN Collective and Ranch Advisory Partners, Inc. will work diligently to discover and address any infrastructure issues that may arise, striving to modernize the entirety of the ranch property for the future. On recruitment challenges, the timely acquirement and subsequent training of potential workforce members from the local tribal communities may influence the speed of the development process, leading to possible difficulties. NDN Collective will conduct preliminary scoping sessions to seek workforce involvement before Pine Creek Ranch is fully operational to mediate any concerns involving acquirement and training processes.

**Timeline for Pine Creek Ranch Land and Water Conservation Project**

8

| Action | Completion | Status |
|---|---|---|
| Initial land acquisition | Late 2021 - Early 2022 | Completed |
| Hire Ranch Advisory Partners | March 2022 | Completed |
| Meet with BLM and USDA (US Forest Service) in local offices | June 2022 | Completed |
| Comment on Environmental Assessment by BLM and USDA | October 2022 | Completed |
| Apply for federal grant funding | Oct - Nov 2022 | In Process/Completed |
| Deferred maintenance construction and upgrades to main lodge | In Process | Expected November 2022 |
| Receive grant funding awards, finalize the 2023 Capital plan | Initialize soon | December 2022 |
| New warehouse building, solar infrastructure, and equipment | Initialize soon | March 2023 |
| Begin soil analysis and baseline testing (potential remote sensing equipment) | Initialize soon | May 2023 (Annual Analysis) |
| Obtain permittee status for grazing on vacant allotments by BLM & USDA | Initialize soon | May 2023 |
| Co-management plan review and finalization | Initialize soon | July 2023 |
| Award of federal grazing permits | Initialize soon | August 2023 |
| Complete water infrastructure, construct new fencing, and ready Ranch for cattle. | Initialize soon | Sept 2023 |
| Fully stock ranch with cattle (Sustainable Northwest) | Initialize soon | End 2023 - Early 2024 |
| Hire a full-time caretaker, ranch operator | Initialize soon | End 2023 - Early 2024 |
| Construct new buildings, workshop, and any lingering issues | Initialize soon | Spring 2024 |
| Look to transition ownership back to tribal nations | Initialize soon | January 2025 |

These activities will lead to successful project outcomes because they all culminate and provide a focused restorative process that will transform the Pine Creek Ranch into a highly functional recovery and grazing management project that will rapidly revitalize the ranch property from its current dilapidated state. As with all land in the United States of America, the Pine Creek Ranch was once under Indigenous stewardship and control. Native Americans had to battle removal, relocation, and assimilation policies during the late nineteenth and early twentieth centuries. Furthermore, Native American people had to deal with settler militia and vigilante individuals obsessed with manifest destiny and white supremacy. During this time, the United States' policy was to eliminate Native American land possession. Once the Pine Creek Ranch is

fully restored and grazing systems are established, amongst other items, it will serve as a vital example of how Indigenous sovereignty and land reclamation can occur in a contemporary era.

Outcomes from this project consist of meaningful and measurable grazing improvements to the ranch property, such as the implementation of improved grazing networks and rangeland health, with plans to operate the farm with solar panels and utilize electric energy resources; to implement innovative grazing management technologies throughout the ranch property as to assure the ease of data collection; building a viable livestock operation through a farming and grazing scan for suitable areas for livestock integration; as well as striving to achieve a positive net operating income to sustain future operation costs and income sustainability. These outcomes are vitally important, as well as highly achievable, due to NDN Collective's consistent overall mission to defend, develop, and decolonize, with a primary emphasis envisioned through the Pine Creek Ranch Land and Water Conservation Project on regenerative community development, renewable energy investments, Indigenous traditional ecological knowledge, and regenerative practices all taking place.

To ensure successful financial accountability, NDN Holdings will work closely with Ranch Advisory Partners, Inc. and the finance department at NDN Collective to allocate monies to the proper activities outlined in the Pine Creek Ranch Land and Water Conservation Project. This process includes appropriately adhering to purchasing policies regarding equipment, such as the ranch monitoring software Ranch Advisory Partners, Inc. will implement, and supplies, such as standardized farming supplies, hardware, fencing, gate materials, and exterior lighting. Although there will be a close collaboration with Ranch Advisory Partners, Inc., NDN Holdings will be the primary facilitator in pursuing and completing each task necessary for proper ranch operation and sustainability, both in the near and long term of the trajectory of the Pine Creek Ranch Water and Grazing Conservation Project.

The benefits of a restored Pine Creek Ranch property to the community reside in three key areas. The first area is historical, as the revitalized ranch property will serve as a culturally significant reminder of the past and its connection to the Indigenous battle over ownership and the historical dispossession of Indigenous lands. NDN Collective will work adamantly to highlight this historical connection throughout the restoration process. The second area is the economy, as the development and subsequent operation of the ranch property will involve job growth. While the location of Pine Creek Ranch is relatively isolated, once it is fully restored to its total capacity, the sustenance of effective stewardship of the ranch property will allow employment opportunities, especially for the tribal members from neighboring tribal communities, envisioned as an expression of Indigenous economic development and sovereignty.

The third area is the environment, including green and energy-efficient building measures implemented through the restoration process. This approach will adhere to NDN Collective's focus on creating and developing Indigenous projects in a regenerative and sustainable manner based on Indigenous values and connection to land, culture, and identity, helping to preserve the present generation's environmental needs without compromising the ability of future generations to meet their own needs. In addition, after the Pine Creek Ranch establishes sustainable operations, with revenue-generating leases obtained from federal government entities, NDN Holdings will look to later transition ownership to local tribal communities to transition

10

ownership back, helping to sustain future income sources for Indigenous generations to come for their and that of their descendants benefit.

## Personnel and Resources

Project collaboration for the Pine Creek Ranch Land and Water Conservation Project will take place through agencies such as the BLM, USFS, the Nevada Department of Wildlife, Sustainable Northwest, and Ranch Advisory Partners, Inc., all of which will help to strengthen restorative measures through on-the-ground conservation work and investments towards ecosystem services to restore the relationship with the mentioned agencies that unfortunately had diminished under the previous owners of the ranch property. One of the critical partnerships for project success is with Ranch Advisory Partners, Inc., and their ecological and financial expertise. NDN Holdings contracted with Ranch Advisory Partners, Inc., led by Todd Graham and James Rogers, to run day-to-day operations and grazing management, create a feasibility study/plan, and obtain new ten-year leases with BLM and USFS.

Ranch Advisory Partners, Inc. has extensive knowledge, expertise, and experience running and operating large-scale ranches nationwide. With over 20 years of experience, they have managed millions of acres in the west, with their team managing working lands on behalf of landowners, many of which include Indigenous tribal communities. They've become known for managing enterprises with complex environmental and operational considerations. They are one strategic partner supporting every facet of Pine Creek Ranch's operation (see Appendix F). Their unique approach focuses on the ecological and financial performance they bring to private and public lands. For every section of land they manage, their goal is to enhance the ecological value. This understanding means that they work to increase ecological assets (like clean water, nutrient-rich soil, and native plant species) while decreasing ecological liabilities (like impaired streams, depleted soil, and invasive plant species). When the ecological value of land increases, so does the financial performance of enterprises that depend on the land. For this reason, their approach to ranch management for Pine Creek Ranch starts and ends with stewardship and conservation.

From Ranch Advisory Partners, Inc., Todd Graham has over twenty years of experience improving working ranches' ecological and financial performance, influencing the management of roughly eight million acres in the western United States. Through consulting, control, and ownership, he has helped over 20 ranches convert operations from more traditional practices toward conservation-oriented approaches that carried themselves financially. Mr. Graham brings a systems-based approach to the work, focusing on the joint improvement of the team, natural resources, and the financial performance of lands under management. He has extensive experience in public land grazing issues and has helped design and quantify the improvements of multiple wildlife habitat improvement projects. Born and raised in Wyoming, Mr. Graham obtained a degree in rangeland science from the University of Wyoming.

Also from Ranch Advisory Partners, Inc. is Katie Meiklejohn. Mrs. Meiklejohn manages Ranch Advisory's Monitoring Program, collecting the ecological data that underpins the company's Advisory and Management services. Mrs. Meiklejohn has over 15 years of experience in landscape-scale conservation. She has worked extensively with farmers and ranchers to identify strategies that enhance ecological health, financial success, and human well-being.

11

Before joining Ranch Advisory Partners, Mrs. Meiklejohn headed up the Sonoran Institute's Working Landscapes Program in the Northern Rockies, was a Program Director for American Wildlands, and helped establish the Center for Large Landscape Conservation in Bozeman, Montana. Mrs. Meiklejohn is a Kinship Conservation Fellow and obtained a Master's in Conservation Biology from Columbia University.

Another critical partnership for the Pine Creek Ranch Land and Water Conservation Project is from Sustainable Northwest (see Appendix G). Sustainable Northwest has over 25 years of collective experience in supporting healthy landscapes through new models of natural resource stewardship to protect and restore working lands, providing essential ecological and economic benefits, building up resilient communities through new business and finance models valuing ecological health on ranches, farms, and forests and in cities that achieve durable conservation outcomes and generate economic benefits; and engage new models of community empowerment that foster leadership development, collaborative governance, and a renewed stewardship ethic to achieve equitable decision-making and durable community-driven natural resource conservation. They acknowledge the structural inequities that persist to this day resulting from America's long history of institutional racism and policies and practices that excluded Black, Indigenous, and People of Color from opportunities and benefits, such as failing to honor Tribal Treaties, Homestead Act laws, redlining neighborhoods for loans or redevelopment and numerous other policies.

Sustainable Northwest has worked with over 100 ranches, which includes Pine Creek Ranch, and two finishing operations across 6.5 million acres of private and public land in Arizona, California, Colorado, Hawaii, Idaho, Montana, New Mexico, Nevada, Oregon, Texas, Utah, Washington, and Wyoming. It will demonstrate on Pine Creek Ranch a suite of scientifically sound, quantifiable, and replicable climate-smart practices that will significantly reduce the carbon intensity of beef products compared to conventional options. This approach also provides quantifiable economic benefits to producers and promotes new incentives and market opportunities for increased adoption, with an emphasis on maintaining family operations and a dedicated focus on underserved Tribal ranchers for Pine Creek Ranch. Technical assistance from Sustainable Northwest will be made available to producers at Pine Creek Ranch to ensure implementation and durability after the project period. Innovative monitoring tools and practices will also be deployed at Pine Creek Ranch, including remote sensing, mapping applications, and information dashboards to achieve scalability, traceability, reduced transaction costs, and barriers to replicability.

From Sustainable Northwest, Dallas Hall Defrees is a fifth-generation cattle rancher with an established rangeland ecology and management career. Mrs. Dallas is an engaged, active member of her family's operation, which has received honors in recognition of excellent land management, including the National Tree Farmer of the Year. Since childhood, Mrs. Dallas has been passionate about land stewardship and sustainable management. She has catered her education and professional life towards natural resources and taking care of the land. Mrs. Dallas received a master's degree in Rangeland Ecology and Management from Oregon State University to gain the skills and scientific knowledge needed to help preserve natural lands. As a trained rangeland ecologist, Mrs. Dallas seeks to find the best uses for an array of ecological environments. Her passion lies in the interface between science, land management, and

underserved communities. Mrs. Dallas' roots in eastern Oregon, her extensive educational training in rangeland science, and her passion for finding consensus for complex ecological challenges influence her passion for thriving and resilient ecosystem management.

From NDN Collective, Robby Burrough, Managing Director of NDN Holdings, will manage the Pine Creek Ranch Land and Water Conservation Project. Mr. Burroughs is an enrolled member of the Dry Creek Rancheria Band of Pomo Indians in Northern California. Mr. Burroughs has years of experience as a creative business professional with a wide range of expertise in communication, development, and financial valuation. He holds a bachelor's degree in Business Management and a master's degree in American Indian Studies at UCLA. NDN Collective has developed a collaborative stewardship approach to natural resource management through capacity building with the agencies listed, with Ranch Advisory Partners, Inc. working closely to help craft the vision and narrative of land health on the Pine Creek Ranch property, and Sustainable Northwest with their smart-climate beef production practices, such that Nevada Water Conservancy powered by NDN Collective is recognized as a collaborative land steward.

### Outcome Evaluation Plan and Reporting

Project metrics for the Pine Creek Ranch Land and Water Conservation Project will be monitored and measured through the joint managing oversight of the Ranch Advisory Partners, Inc. in the overall stewardship of the ranch property alongside NDN Holdings, as well as the future inclusion of organizations wanting to collaborate for the development of institutional capacity. Under this collaborative management partnership are two methodologies for ascertaining how metric tracking will occur. The first is consistent ranch oversight, focusing on active stewardship of the Pine Creek Ranch property. NDN Holdings has found a compatible operating partner, Ranch Advisory Partners, Inc., to help begin this collaborative stewardship process. One of the staff members of Ranch Advisory Partners, Inc., based in Twin Falls, Idaho, has a long history of stewarding large Nevada properties and will lend their experience to the ranch property as a project lead. They will focus extensively on developing grazing plans and systems, land restoration, riparian restoration, and improved management practices to prepare the ranch property for proper operation. NDN Holdings will handle green space and infrastructure implementation, primarily focusing on integrating solar energy systems at the ranch property.

The second is natural resource monitoring, which proposes creating a natural resource monitoring program, with the help of Ranch Advisory Partners, Inc., focused chiefly on rangeland health and riparian habitat. This program will align with existing federal monitoring practices, and the results will be used collaboratively with other agencies to make forward-looking management decisions. Such data would also be valuable during permit renewal processes in the future. Ranch Advisory Partners, Inc. and NDN Holdings will be collaboratively measuring and overseeing the project metrics throughout the project, creating a system of checks and balances that reinforce responsibility and focus on completing the project. Due to the extensive managerial capacity experience of the individuals in Ranch Advisory Partners, Inc. and NDN Holdings, there are projected to be no challenges or limitations to tracking the metrics mentioned above. An amount of $140,000 annually in award monies over three years through this opportunity will be used for monitoring and performance measurement by Ranch Advisory Partners, Inc., and their staff.

13

Once Pine Creek Ranch has completed its restoration process, efforts for long-term project sustainability will stem primarily from income systems originating from grazing and livestock management, as well as the potential development of income-generating enterprises, such as livestock operations, water leasing, and alternative energy. Alongside these efforts will be the continued stewardship of the ranch property as it evolves, utilizing the partnership with Ranch Advisory Partners, Inc., and the Nevada Department of Wildlife to develop sustainable measures for monitoring and maintenance, all of which will keep the ranch property in operational shape. Through the inclusion of natural resource monitoring, the creation of permanently marked monitoring sites will be established so that they can be revisited over time and ease the ability of the collection of data.

Plans for reporting these project metrics will be conducted through monthly meetings with detailed evaluation data on Pine Creek Ranch shared between NDN Holdings and Ranch Advisory Partners, Inc., with general oversight and measuring of these data points being handled by the latter. While primary reporting during these meetings will reside mainly on ranching oversight and natural resource monitoring, the inclusion of soil analysis, baseline testing, water and ranch infrastructure, and livestock operations, as outlined in the project timeline, will also occur. This cumulative process will synthesize the collected data in a way that will more clearly bring out details that are succeeding, steadily improving, or needing considerable adjustments. Furthermore, these project metrics can be shared with USDA staff and programs to strengthen collaborative efforts to benefit the overall Pine Creek Ranch Land and Water Conservation Project and further develop communication pathways between the USDA and NDN Collective.

## Management and Partnership Plan

The strong partnership between NDN Holdings, Ranch Advisory Partners, Inc., and Sustainable Northwest will be exercised in the segmented sharing of time per selected action(s) between the three partners. NDN Holdings (40%) will handle most of the daily communication pathways and coordination efforts between the various partners and manage the project scope. Todd Graham and Katie Meiklejohn from Ranch Advisory Partners, Inc. (35%) will work primarily on integrating monitoring and implementing the grazing management systems and rangeland restoration measures for Pine Creek Ranch. Dallas Hall Defrees from Sustainable Northwest (25%) will handle the area of cattle livestock to implement their innovative smart-climate beef production practices.

Coordination and communication between NDN Holdings, Ranch Advisory Partners, Inc., and Sustainable Northwest will occur through weekly meetings with Robby Burrough, Managing Director of NDN Holdings. Mr. Burrough will be the main point of contact regarding receiving and sharing information between the partners, developing communication pathways that will encourage successful workflow, and being available for any issues that may arise during the project. The strong partnerships shared between the three are grounded in need to support underserved communities, with both Ranch Advisory Partners, Inc. and Sustainable Northwest solidifying their status as long-term partners willing to help the growth and development of the ranch property after the completion of the Pine Creek Ranch Land and Water Conservation Project.

14

NDN Collective is deeply committed to preserving and protecting its internal processes and partners' confidentiality, personal privacy, proprietary interests, confidential business information, and intellectual property rights. All data, documentation, and reporting shared between NDN Holdings, Ranch Advisory Partners, Inc., Sustainable Northwest, and amongst future partners will be stored securely in the server database at NDN Collective headquarters in Rapid City, South Dakota. NDN Collective's Information Technology Director, Tom Swift Bird, is Oglala Lakota, whose family is from Wolf Creek on the Pine Ridge reservation. Mr. Swift Bird has 11 years of experience in the IT industry, working for numerous organizations in the Black Hills, Pine Ridge reservation, and Nebraska panhandle. He has a bachelor's degree in IT from Oglala Lakota College and has been accepted to the Black Hills State University Masters of Sustainability program. Mr. Swift Bird will oversee and store the sensitive data from the above areas, placing it within a secured server database consisting of encrypted password protection, two-factor authentication, and personal authorization from internal NDN Collective staff to access the shared data, sensitive documentation, and data reports.

After Pine Creek Ranch reaches a sustainable condition through better land stewardship methods and economically viable operations with reinstated federal grazing leases, NDN Collective will then explore, in the long term, to properly transition ownership back to local tribes and Indigenous people. They will engage with the traditional stewards of the land to transition ownership back to the people, helping to sustain future income sources for generations to come. NDN Collective is more interested in restoring a relationship with the land, Indigenous communities, and the ecosystem than participating in the traditional free market system. NDN Collective is looking to recoup all costs put into this project and is not looking for a profitable revaluation or land appreciation sale. They hope the project reimbursements can be re-invested into similar projects across Indigenous nations, helping build and strengthen communities.

With a data-driven approach, monitoring of the land, water, and infrastructure, consideration of renewable energies, economics, livestock, and wildlife, all encompassed in an Indigenous land ethic that looks toward restoring lands to Indigenous hands in the long term to address the historical injustices exemplified by the case of Tim Hooper, and others, NDN Collective is excited about this opportunity to bring the Pine Creek Ranch Water and Grazing Conservation Project to fruition. With a strong emphasis on fulfilling the purpose and priorities established by the USDA, NDN Collective has intensely focused intentions to make Pine Creek Ranch a fully operational, sustainable, profitable, and successful part of the southern central Nevada community as it had been many years ago.

15

Attachment 4
FSA24GRA0011625

# Budget Narrative

**Personnel – $233,279.52**
Robinson Burroughs, in his role as the Managing Director, holds the critical responsibility of ensuring the seamless execution of all project activities in a timely, cost-efficient, and responsible manner. His oversight plays a pivotal role in directing the project towards a successful and sustainable completion.

In terms of financial aspects, Mr. Burroughs' annual salary is $138,936.56, reflecting a 10% commitment of his efforts over the course of the 60-month project duration. The total funds requested for this initiative amount to $69,468.28.

| Salary | % effort | Project Duration | Funds Requested |
|---|---|---|---|
| $138,936.56 | 10% | 60 months | $69,468.28 |

In addition, the included Grants Manager position will play a critical role in overseeing and implementing the basic day-to-day operations of Pine Creek Ranch and administering the USDA grant award. This includes but is not limited to resource allocation and maintaining the ranch's overall ecological health and sustainability daily. In addition to managing operational details, the Grants Manager will play a key role in participating in strategic planning initiatives and budget reconciliation. This includes collaborating with NDN and Ranch Advisory Partners, Inc. on formulating long-term goals and implementing industry-leading methodologies to improve ranch management practices as well as USDA and ensuring smooth processes and systems. Central to their role is the overarching goal of environmental and financial stewardship for the Ranch. The Grants Manager is dedicated to maintaining sustainable practices that minimize ecological impact while ensuring the surrounding community's well-being and natural resources, including adhering to Indigenous land steward practices that support the rejuvenation and health of the ranch land. The Grants Manager is responsible for processing invoices, administering budgets, providing clear documentation and facilitating payment and reimbursement process.

This role is a four-year commitment with total compensation of $163,811.24. The annual salary will be $40,953.81 over the course of this term. Additional NDN Collective internal funding will be provided as needed to supplement salary cost. The primary responsibility of this position is to devote 100% of their time to advancing the revitalization initiatives of Pine Creek Ranch as mandated by the grant award. Upon completion of the initial four-year term, the status of this position will be subject to possible expansion based on comprehensive review and evaluation.

| Salary (Annual) | % effort | Funds Requested |
|---|---|---|
| $40,952.81 | 100% | $163,811.24 |

**Fringe Benefits – $69,983.85**
Fringe Benefits, constituting 30% of salaries and wages within the project budget, serve as a pivotal component in enhancing the overall compensation package for project team members. In

1

the context of Robinson Burroughs, the Managing Director, whose annual salary and wages amount to $69,468.28 for the project, and the Grants Manager calculated at $163,811.24 for 4 years, a calculated 30% allocation towards Fringe Benefits translates to an Amount Requested of **$69,983.85**

For Mr. Burroughs and the Grants Manager position, the designated **$69,983.85** for Fringe Benefits underscores the project's commitment to providing a comprehensive and competitive compensation package. This allocation is tailored to recognize the value of Mr. Burroughs and the Grants Manager in regards to contributing to the project, acknowledging the importance of not only fair wages but also additional benefits that contribute to their overall job satisfaction and professional welfare.

**Travel – $20,782.08**
A team of two individuals from NDN Collective, which include Robby Burroughs and Grants Manager, will embark on strategic visits over the course of the project period to Pine Creek Ranch, each lasting approximately three days, to engage in activities such as observation, tracking, and positive management practices. This initiative is designed to ensure comprehensive oversight and contribute to the overall enhancement of and provide proper feedback and input on the status of Pine Creek Ranch. The Ranch visits will be scheduled strategically to be able to administer grant funding, purchase supplies and equipment and ensure the ranching operation is built sustainably

The budget breakdown for each visit over the project period:

**Airfare:**
Assume a round-trip airfare cost of $400 per person. So, for two people, it's $400 x 2 = $800 per trip. Over 8 trips (biannual for four years), the total airfare cost will be $800 x 8 = $6,400.

**Accommodation**:
Assuming $200 per night for a hotel room for two people, that's $200 x 2 = $400 per night. Over 8 trips (2 days hotel stay), the total accommodation cost will be $400 x 16 = $6,400. NDN Collective will use their monies for the remainder one out of the three days pertaining to renting hotel rooms for the two traveling or stay at the Ranch at no cost.

**Rental Car Cost:**
Let's assume a rental car costs $200 per day for three days, that's $200 x 3 = $600 per trip. Over 8 trips, the total rental car cost will be $600 x 8 = $4,800.

**Meals:**
Assuming $25 per person (2 people) per day (3 days) for meals, that's $25 x 2 x 3 = $150 per trip. Over 8 trips, the total meals cost will be $150 x 8 = $1,200.

**Gas Expenses:**
Let's assume $247.76 for gas for the entire trip (gas is estimated at two full tanks per truck or suburban size vehicle). Expenses per trip: $247.76

2

Over 8 trips, the total gas expenses will be $247.76 x 8 = $1,982.08. This is based upon the estimated mileage per trip to Pine Creek Ranch and other approximated meeting locations, as necessary.

Now, let's sum up the costs:

Airfare: $6,400.00
Accommodation: $6,400.00
Rental Car Cost: $4,800.00
Meals: $1,200.00
Gas Expenses: $1,982.08

Total: $6,400 + $6,400 + $4,800 + $1,200 + $1,982.08 = **$20,782.08**

In total, the budget for these biannual visits to Pine Creek Ranch over the course of four years is estimated at **$20,782.08**, based on NDN Collective, Inc. travel policy. This financial allocation is a strategic investment in fostering positive ranch management practices, ensuring effective oversight, and promoting the well-being of the property. NDN Collective will be seeking out alternative costs for any other trips, as necessary. allocated monies from alternative sources. In addition, NDN Collective will add to and cover any additional costs necessary for travel.

**Equipment – $257,000**
This comprehensive budget outlines a strategic allocation of funds to establish, enhance, and sustain our ranch operations. Each item has been carefully selected to contribute to the overall efficiency, productivity, and sustainability of our ranching endeavors. All the equipment will be used 100% for Increasing Land Access grant purposes to revitalize Pine Creek Ranch and make it operational.

1. Ford Truck suitable for Ranch activities ($45,000) (Year 1):
   ○ Purpose: The acquisition of a Ford Truck is essential for the day-to-day operations on the ranch. This versatile vehicle will facilitate efficient transportation of equipment, supplies, and personnel, thereby enhancing overall productivity.

2. Flatbed Trailer ($5,000) (Year 1):
   ○ Purpose: A flatbed trailer is a crucial addition to the ranch infrastructure, providing the means to transport large or heavy items. This will significantly contribute to the logistical efficiency of the ranch operations.

3. 60 Hz Mobile Stock Well Generator ($15,000) (Year 1):
   ○ Purpose: The investment in a mobile stock well generator aims to ensure a reliable and independent power source for various ranch activities. This equipment will prove instrumental in securing a continuous and stable energy supply for remote locations on the ranch.

4. Forklift ($8,500) (Year 1):

3

- ○ Purpose: The forklift is a strategic investment in enhancing operational capabilities. It will significantly aid in the movement of heavy loads and streamline logistical processes, ultimately contributing to time and resource efficiency across various ranch activities. This includes pallet forks that play a crucial role in streamlining material handling processes. By investing in this equipment, we aim to improve efficiency in transporting and organizing materials, contributing to a more organized and productive working environment.

5. Backhoe ($45,000) (Year 2):
   - ○ Purpose: Year 2 introduces the acquisition of a backhoe, a pivotal piece of machinery for construction and excavation purposes. This addition will enable the ranch to undertake necessary infrastructure projects efficiently.

6. (2) UTV Side by Side @ $25,000 each ($50,000) (Year 2):
   - ○ Purpose: The purchase of two UTVs is earmarked for increased mobility across the ranch, particularly in areas where larger vehicles may face limitations. These UTVs will be instrumental in managing and monitoring various aspects of ranch activities.

7. Solar System Installation ($88,500) (Year 4):
   - ○ Purpose: Year 4 focuses on sustainability and cost-effectiveness by implementing a solar system. This installation aims to harness renewable energy, reducing the ranch's environmental footprint and long-term energy costs. This includes the integration of solar-based panels that align with our commitment to sustainable practices. These panels will harness renewable energy, reducing our dependence on traditional power sources and contributing to a more eco-friendly and cost-effective energy solution for Pine Creek Ranch. The solar system will be installed on the top of the modular warehouse, so there will be no ground disturbance. This includes purchasing a propane tank and shed to house any additional solar system-related items. Tanks of considerable size, around 1000 gallons, may range in price from $1,500 to $5,000. Our estimate for the propane tank's total cost is approximately $2,500. Additionally, we anticipate allocating another $2,500 for the construction of a shed, to accommodate the solar system. The propane tank and shed will not require or have the potential to require ground disturbance, removal of trees/vegetation, and/or change in land use. We also factored in the variable costs of materials and installation, considering the inflationary impact since the initial estimate was provided, but have arrived at $88,500.

Total Equipment Cost: **$257,000**

Collectively, these budget allocations for equipment represent a holistic and strategic approach to ranch development at Pine Creek Ranch, encompassing infrastructure, technology, agriculture, and the well-being of both livestock and the ranching team, setting the foundation for years to come in the future. This comprehensive plan positions our ranch for long-term success and adaptability in the dynamic agricultural landscape, contributing to the overall success and

longevity of the ranch while also bolstering its significance and endurance within the Indigenous agricultural community.

**Supplies – $15,500**
Our budget allocation of $15,500 for supplies is carefully structured to address key needs in improving Pine Creek Ranch's infrastructure and operational efficiency. This narrative provides a detailed breakdown of each category, emphasizing the intended impact of these investments. All the supplies will be used 100% for Increasing Land Access grant purposes to revitalize Pine Creek Ranch and make it operational.

1. Tools and Shop Miscellaneous ($5,000) (Year 1):
   - Purpose: Acquiring a comprehensive set of tools, including wrenches, hammers, axes, and nails, is fundamental to supporting day-to-day ranch activities. This investment ensures that the ranch team has access to high-quality tools, enhancing their ability to carry out tasks efficiently and maintain the property effectively. Including a shed to house the solar system equipment.

2. Water Trough ($5,000) (Year 1):
   - Purpose: Ensuring the well-being of our livestock is a top priority. The water trough investment addresses this by providing a reliable water source, promoting hydration and overall health for the ranch animals. No ground disruption, removal of trees/vegetation and/or change in land use will occur since it will be utilizing existing natural water resources, which will also benefit livestock as well.

3. Ranch Furniture and Fixtures ($2,500) (Year 1):
   - Purpose: Investing in ranch-specific furniture and fixtures is aimed at enhancing the overall aesthetics and functionality of the property. This contributes to creating a welcoming and comfortable environment for both visitors and ranch staff. This will require no ground disturbance, removal of trees/vegetation and/or change in land use.

4. Painting Supplies ($3,000) (Year 1):
   - Purpose: Premium painting supplies, including high-quality paint, brushes, and tarps, are essential for maintenance and aesthetic improvements. This investment ensures the ranch's infrastructure remains well-maintained, visually appealing, and protected against environmental elements.

Total Supplies Cost: **$15,500**

**Contractual – Total: $550,000**

| Services | % effort | Project Duration | Expenses |
|---|---|---|---|
| Ranch Oversight Services | 50% | 36 months | $225,000 |

5

| | | | |
|---|---|---|---|
| Natural Resource Monitoring Services | 40% | 36 months | $180,000 |
| Bookkeeping Services | 10% | 36 months | $45,000 |
| | | | **Total: $450,000** |

The first contract is with Ranch Advisory Partners, Inc., (RAP) marking the beginning of a contractual initiative over the course of three years to collaborate with them to primarily help implement a comprehensive rotational grazing system on Pine Creek Ranch. NDN Collective was in search of an operational collaborator to kickstart the revitalization of the Pine Creek Ranch property. This endeavor involved working collaboratively in upgrading outdated stock water systems, rejuvenating idle fences, and reconstructing corrals, many of which trace back to the World War II period. Moreover, NDN Collective was looking for a partner well-versed in federal and state regulations, crucial for the reauthorization of vital BLM and USFS grazing permits. Simultaneously, as infrastructure is restored and permits secured, NDN Collective aims to procure livestock to populate the ranch and generate revenue. With each element addressed, the ranch is poised to yield operational profits and exemplify collaborative stewardship practices. Ranch Advisory Partners, Inc. was contracted due to their extensive experience and knowledge in all the above, with three defined areas of contracted services: Ranch Oversight Services, Natural Resource Monitoring Services, and Bookkeeping Services.

**Ranch Oversight Services:**
Ranch Oversight Services with RAP aim to ensure active stewardship of Pine Creek Ranch, encompassing a wide range of responsibilities. First, it ensures open lines of communication with NDN Collective representatives, collaborating to create a vision and goals for Pine Creek Ranch. This involves devising an operational strategy and establishing benchmarks for progress. The service also oversees the Ranch's ground-based staff, provides monthly progress reports to NDN Collective, and produces a yearly summary highlighting major accomplishments, challenges, and future opportunities.

For grazing management, the service works closely with various agencies to develop comprehensive grazing plans for both dormant and growing seasons. These plans are meticulously crafted to promote sustainable land use and optimal grazing practices. The collaboration involves detailed discussions and planning sessions with agricultural experts, environmental scientists, and local land management authorities to ensure that the grazing strategies are effective and environmentally responsible.

Once the grazing plans are established, the service takes on the responsibility of overseeing their implementation. This includes coordinating with ranch staff and herders to ensure that the livestock grazing follows the planned schedules and areas. The service also monitors the grazing activity to ensure compliance with the established guidelines and to assess the health of the pasture.

A key component of these grazing plans is the incorporation of a rotational grazing system. This system involves moving livestock between different pasture areas to allow vegetation in

6

previously grazed areas to recover and regrow. Rotational grazing helps maintain the health of the soil, prevents overgrazing, and supports the long-term sustainability of the pastureland.

Additionally, the service retains the authority to approve amendments to the grazing plans as needed. This flexibility allows for adjustments based on changing environmental conditions, such as droughts or other unseasonable weather, and other unforeseen factors that could impact the effectiveness of the grazing strategy. By staying adaptable and responsive, the service ensures that the grazing management practices remain aligned with both ecological sustainability and the operational needs of the ranch as established by NDN Collective.

The service also facilitates collaborative stewardship processes with federal and state agencies, pursuing the reauthorization of federal grazing permits and organizing regular agency meetings to build trust, open communication, and enable stakeholders to follow a common strategy.

The service will oversee infrastructure improvements, including stock water systems, fencing, and corrals, working with contractors and Ranch personnel. It purchases equipment, vehicles, tools, and supplies on behalf of NDN Collective and at NDN Collective's expense, and oversees improvements to housing, barns, sheds, and other facilities. In livestock management, the service handles the potential purchase of cattle and/or sheep, oversees livestock care, and develops a stock flow strategy to manage herd growth to a steady state.

**Natural Resource Monitoring Services:**
RAP, in collaboration with NDN Collective, will work to create a natural resources monitoring program and a cooperative monitoring agreement with various agencies, with a primary focus on rangeland health and riparian habitat. This program will be designed to align with existing federal monitoring practices. The results generated will be used collaboratively with these agencies to inform forward-looking management decisions. Additionally, the data from this program will be valuable during future permit renewal processes. The monitoring will include approximately 25 sites and 10 photopoints each year. This work is expected to be conducted in a single trip by two individuals traveling from Montana.

The attributes of the monitoring program will include several key components. There will be permanently marked monitoring sites that can be revisited over time. The program will involve a review of 14 qualitative indicators of rangeland health. It will also collect data on various soil-based metrics, including bare ground, space between perennial plants, and gap spacing. Additionally, data on plant canopy metrics, such as plant species composition, canopy height, and canopy gap, will be collected. Based on this data, management recommendations for improving overall resource performance will be developed. Photopoints and other measures within riparian systems will also be included as part of the monitoring efforts.

**Bookkeeping Services:**
In finance and accounting, the service collaborates with NDN Collective to create a chart of accounts and codes vendor invoices for bookkeeping. It collaboratively prepares quarterly and annual financial statements with bookkeepers, ensuring these statements are complete for NDN Collective's CPA to use in tax return preparation. Additionally, RAP creates multi-year financial

performance projections and manages line of credit accounts for operations with local vendors. It also generates monthly purchase orders.

RAP will handle bookkeeping services for the Ranch, encompassing the collaborative creation of financial statements, preparation of tax returns, and ensuring the accuracy and timeliness of accounts receivable and accounts payable. Key areas of focus for these services will include oversight of the chart of accounts, payroll management, and the administration of various tax forms such as W2s, W4s, 1099s, and 943s.

RAP will also be responsible for the weekly payment of vendor invoices using NDN Collective funds and will maintain regular communication with NDN Collective regarding cash management and future cash needs. Additionally, RAP will establish a server to manage a desktop version of QuickBooks, which NDN Collective representatives can access remotely. Furthermore, RAP will prepare both quarterly and annual financial statements for NDN Collective's CPA.

NDN Collective is requesting $450,000 for its contract with Ranch Advisory Partners, Inc. to cover the costs associated with implementing the revitalization efforts at Pine Creek Ranch. This amount has been carefully calculated to ensure sufficient funding for the above collaborative initiatives outlined, including infrastructure upgrades, grazing permit reauthorization, livestock procurement, and the establishment of a rotational grazing system. In addition, the budget includes expenses related to the development of a client portal for data collection and analysis to further enhance the ranch's management strategy. The $450,000 budget reflects the comprehensive nature of the partnership and the strategic use of resources necessary to effectively achieve the project's goals.

This contractual initiative with Ranch Advisory Partners, Inc. will involve a culminating 100% collaborative effort between them and NDN Collective. One of the primary reasons that NDN Collective is contracting with Ranch Advisory Partners, Inc. is due to their profound understanding and intimate connection with Pine Creek Ranch's property and heritage, positioning itself as an invaluable collaborative ally in revitalizing the ranch's dilapidated condition. Ranch Advisory Partners, Inc. possesses an extensive understanding of Nevada's unique ranching landscape, honed through 20 years of hands-on experience and dedicated study of supporting ranching operations. Their team members have immersed themselves in the nuances of Nevada's ranching operations, from the vast expanses of high desert terrain to the intricate dynamics of water rights and land management regulations specific to the state.

Through NDN Collective working with Ranch Advisory Partners, Inc. and the subsequent implementation of the rotational grazing system at Pine Creek Ranch will re-establish the ranch as a sustainable operation. The goal is to create an environment that is consistent with Indigenous land ethics, emphasizing responsible stewardship of the land and its resources. Through this collaborative effort, Pine Creek Ranch will become a model of sustainability, embodying the principles of indigenous land stewardship and respect for the environment.

With Pine Creek Ranch being out of commission for an extended period of time prior to NDN Collective's active involvement, the need to generate updated and accurate site location data is

8

paramount to making informed decisions regarding the sustainable management of the ranch property and its rangelands. The Pine Creek Ranch Water and Grazing Conservation Project, in partnership with Ranch Advisory Partners, Inc. aims to meet this need by implementing a sophisticated back-end client portal. This portal will serve as a comprehensive repository, allowing Pine Creek Ranch staff to review collected ranch property data, providing insights into rangeland health, ecological trends, and detailed analysis of grazing areas.

Working with Ranch Advisory Partners, Inc. ensures that the data collection process and portal customization seamlessly aligns with Pine Creek Ranch's operational needs. This partnership will play a pivotal role in improving the ranch's overall management strategy by fostering a data-driven approach that informs decision-making for sustainable land use and conservation.

This budget allocation has been meticulously crafted to foster a seamless collaboration between Ranch Advisory Partners, Inc. and NDN Collective, facilitating the successful realization of the outlined objectives. Through strategic resource allocation, both entities will synergize their efforts, leveraging their respective strengths to drive impactful outcomes. This financial framework lays the foundation for a robust partnership, enabling the efficient deployment of resources, expertise, and innovative strategies necessary to achieve the shared goals of restoring Pine Creek Ranch.

Total Ranch Advisory Partners, Inc Contract Cost: **$450,000**

| Services | % effort | Project Duration | Expenses |
|---|---|---|---|
| Engage Tribal Governments | 25% | 20 months | $25,000 |
| Advise NDN Collective | 25% | 20 months | $25,000 |
| Manage Structural Communications | 25% | 20 months | $25,000 |
| Identify Spiritual Leader | 25% | 20 months | $25,000 |
| | | | **Total: $100,000** |

The second contract, which will last a period of twenty months, will be established with Amber Torres, whose dedicated effort towards the project is estimated to be a culminated 100% in collaboration with NDN Collective. Mrs. Torres will play a crucial role in facilitating engagement with the federally-recognized Tribal governments in Nevada and California, with the primary objective of identifying a suitable Tribal partner or partners for NDN Holdings in the context of the Pine Creek Ranch transfer. This is segmented into four areas; Engage Tribal Governments, Advise NDN Collective, Manage Structural Communications, and Identify as Spiritual Leader.

Mrs. Torres has extensive experience and knowledge in navigating federal, state, and tribal systems of government, all of which will benefit NDN Collective and restoration of Pine Creek Ranch. In 2010, she was elected to the Walker River Tribal Council, and since 2016, she has

9

proudly served as Chairwoman, being the first Chairwoman elected to a four-year term. During her tenure, she chaired the Congressionally Mandated Intergovernmental Executive Committee, collaborating closely with the Fallon Naval Air Station, Tribal nations from Nevada, and various stakeholders such as BLM, NFWF, and BIA, to address historical damage and foster ongoing dialogue regarding expansion efforts. Additionally, she has represented Nevada tribes on the Executive Board of the Inter-Tribal Council of Nevada, served on the Equity Cabinet established by Congressman Steven Horsford, contributed to the Western Leaders Committee, and was appointed by Governor Sisolak to the Nevada Tribal Advisory Board.

Mrs. Torres will utilize her extensive knowledge and skills to effectively advocate for and guide NDN Holdings in their engagements with the pertinent Tribal communities. This encompasses establishing and nurturing transparent lines of communication, fostering an atmosphere of mutual respect, and developing a collaborative framework that resonates with the shared values and objectives of both entities. Through her expertise, Mrs. Torres will facilitate productive interactions aimed at fostering long-term partnerships built on trust, understanding, and mutual benefit towards the development of Pine Creek Ranch.

By incorporating tribal programming into her efforts, Mrs. Torres endeavors to cultivate an environment that uplifts and empowers Indigenous contractors, laborers, farmers, ranchers, and other community members within Nevada. Her commitment to inclusivity extends to partnering with Tribal Employment Rights Ordinance (TERO) departments, thereby guaranteeing the meaningful involvement and advancement of a proficient Indigenous-centered workforce. Through these collaborative initiatives, Mrs. Torres aims to foster economic growth, promote sustainable development, and strengthen the fabric of the local community by harnessing the talents and expertise of Indigenous individuals and businesses.

Furthermore, Mrs. Torres assumes the responsibility of overseeing communications pertaining to the structural alternatives for establishing a recipient entity for the Pine Creek Ranch property. This entails conducting comprehensive research alongside NDN Holdings and providing detailed presentations on a range of legal, organizational, and operational frameworks that could be evaluated during the transfer process. She will meticulously analyze each option, considering factors such as tax implications, regulatory compliance, and long-term viability, in order to facilitate informed decision-making by all stakeholders involved. Through her expertise and attention to detail, the collaborative effort with Mrs. Torres aims to ensure a seamless transition that maximizes the potential benefits for both NDN Holdings and the tribal communities involved.

Mrs. Torres also plays a pivotal role in the intricate spiritual tapestry of Pine Creek Ranch's transition. Central to her responsibilities is the meticulous identification and engagement of a spiritual leader whose roots run deep within the surrounding region. This designated figure will not only bring invaluable wisdom and insight but will also serve as a guiding beacon, illuminating the path forward with profound cultural sensitivity and a steadfast reverence for the spiritual sanctity inherent to Pine Creek Ranch.

Her extensive network includes connections with tribal elders intimately acquainted with the landscape and history of Pine Creek Ranch. These relationships form the cornerstone of an

10

Indigenous knowledge base, enriching the understanding of the land's significance and complexities. Through collaboration and consultation with these esteemed individuals, Mrs. Torres ensures that NDN Holdings approaches the transfer process with the utmost respect and understanding, honoring the deep cultural heritage intertwined with the ranch's legacy.

This budget allocation provides the necessary resources for Mrs. Torres to fully commit her time and expertise towards several crucial aspects of the Pine Creek Ranch transfer process. By dedicating her efforts to identifying suitable Tribal partner(s), effectively representing NDN Holdings, and managing communications, cultural, and spiritual considerations with care, Mrs. Torres can navigate the complexities of this endeavor alongside NDN Holdings with precision and sensitivity.

Engaging Mrs. Torres in this capacity is not merely an expenditure but a strategic investment. It serves to cultivate and nurture positive relationships with the relevant tribal communities, laying the foundation for collaboration built on trust and mutual respect. Moreover, Mrs. Torres' involvement ensures that the project remains firmly aligned with the cultural and spiritual values held dear by these communities, thereby honoring their heritage and traditions throughout the entire process.

The contractual agreement for Mrs. Torres provides for a total compensation package of $100,000 to be paid at the rate of $5,000 per month over a period of 20 months. This compensation structure is consistent with prevailing market rates for professional services of similar scope and caliber. In addition, it is expressly provided that the term of the contract shall not extend beyond the agreed upon 20-month period.

Total Amber Torres Contract Cost: **$100,000**

Total Contractual Cost: **$550,000**

**Construction – None**

**Other – Total: $1,264,500**
1. Repaying the Loan: $1,080,000
   ○ Purpose: Will help Pine Creek Ranch transition smoothly to the Shoshone and Paiute tribal communities. The plan is to pay **$270,000 per year for four years**. This money is essential for successfully repaying the loan. Once payment is completed in full, Pine Creek Ranch will then be transferred to the Shoshone and Paiute tribal communities, who will then begin to take care of the land, building additional necessary structures, and engaging with the community through their own respective funding pathways and resources. The phased payment approach ensures a steady and sustained financial support for the successful operation of Pine Creek Ranch and its eventual transition into the responsibility and management of the Shoshone and Paiute tribal communities.

2. Modular Warehouse ($184,500) (Year 4):

11

&#9675;   Purpose: The modular warehouse is a significant investment in infrastructure designed to enhance storage capabilities. This facility will serve as a centralized storage solution, contributing to streamlined operations and improved organization of ranch resources. This will be sited on an existing concrete pad so no ground disturbance is expected. The budget includes purchasing, delivery, and assembly of the modular warehouse.

**Indirect – Total: $88,954.55**

Indirect costs for NDN Collective were factored in utilizing the 10% De Minimis Rate of the awarded monies under the project total. However, it's important to note that this factoring does not include budget categories such as Equipment and Other. These indirect costs cover general administrative support, encompassing general financial management, grants accounting, and human resources, which are essential for the project's success but are not directly attributable to it. The process of calculating indirect costs is detailed in the table below:

|  | Budget | Indirect Eligible Amounts |
|---|---|---|
| Personnel | $233,279.52 | $233,279.52 |
| Fringe Benefits | $69,983.85 | $69,983.85 |
| Travel | $20,782.08 | $20,782.08 |
| Equipment | $257,000.00 | -0- |
| Supplies | $15,500.00 | $15,500.00 |
| Contractual | $550,000.00 | $550,000.00 |
| Other | $1,264,500.00 | -0- |
|  |  | $889,545.45 x 10% = $88,954.55 Indirect Costs |

**Matching – None**

12

**Request for Prior Approval for Equipment Template**

| Recipient: | Agreement Number: | Date: |
|---|---|---|
| | | |

Pursuant to 2 CFR 200.439 and FPAC Award General Terms and Conditions, grantees must obtain agency prior approval before purchasing equipment. Equipment means tangible personal property (including information technology systems) having a useful life of more than one year and a per-unit acquisition cost which equals or exceeds the lesser of the capitalization level established by the non-Federal entity for financial statement purposes, or $5,000 (2 CFR 200.1).

To request prior approval, please provide the following information to FSA. You may use this template or submit a request via a letter, in which case, the request must include the following information and be signed by an Authorized Representative. Email requests to FPAC.BC.GAD@usda.gov with a copy to Land.Access@usda.gov.

Equipment Item 1.

| | |
|---|---|
| Description of the proposed equipment (manufacturer, model number, special functionality, etc.) | |
| Explanation of why the equipment purchase is necessary to accomplish grant objectives | |
| List of available sources for the proposed equipment and an estimate of cost | |
| Description of the research to be performed or practical experience to be gained that supports the choice of particular type of equipment | |
| Cost comparison of lease vs. purchase | |
| Explanation why federal funds are needed and non-Federal funds cannot be utilized | |

Equipment Item 2.

| | |
|---|---|
| Description of the proposed equipment (manufacturer, model number, special functionality, etc.) | |
| Explanation of why the equipment purchase is necessary to accomplish grant objectives | |
| List of available sources for the proposed equipment and an estimate of cost | |
| Description of the research to be performed or practical experience to be gained that supports the choice of particular type of equipment | |
| Cost comparison of lease vs. purchase | |
| Explanation why federal funds are needed and non-Federal funds cannot be utilized | |

Authorized Representative Signature and Date:

Authorized Representative Name:

Phone Number:

Email:

**Lending Policy**

**Increasing Land, Market and Capital Access Program Description**

*Legislative Authority*

The authorizing statute and regulation for this opportunity is Section 1006 of the American Rescue Plan Act of 2021 (hereafter referred to as the Act) (Pub. L 117-2), as amended by Section 22007 of the Inflation Reduction Act of 2022 (Pub. L 117-169)). Section 1006(b) of the Act, as amended, provides resources for grants to improve land access, including heirs' property, highly fractionated land, and related land ownership and land access issues, for underserved farmers, ranchers, and forest landowners.

**Loan Types:**

1.  A "direct loan" is a disbursement of funds by the recipient to a participant (Beneficiary) under a contract that requires the repayment of such funds with or without interest.

2.  Revolving Loan Fund (RLF): A recipient that establishes an RLF makes direct loans to Beneficiaries with ILA Program funds.  The proceeds from loan repayments flow back to the fund and become available to lend again to other beneficiaries.
    i.      RLF Income means interest earned on outstanding loan principals and RLF accounts holding RLF funds, all fees and charges received by the RLF, and other income generated from RLF operations.
    ii.     An RLF recipient may use RLF Income only to capitalize the RLF for financing activities and to cover eligible and reasonable costs necessary to administer the RLF. RLF Income excludes repayments of principal.
    iii.    A recipient may use revolved funds to make loans to additional Beneficiaries in accordance with this policy without obtaining prior FSA concurrence.

**Loan Uses:**

Loans can be utilized for land acquisition down payments, pay real estate taxes, lease or rental assistance, leverage or implement conservation practices, purchase livestock, improve soil quality, purchase on-farm infrastructure, or provide cost share for supplies, equipment, and maintenance. Purchases must be agricultural only, based on the IRS Agricultural Form 1040 Schedule F (Attachment A).  Please contact your Grant Management Specialist to discuss any uses not identified above.

**Loan Policy Guidance:**

- Recipients shall create their own lending policy.
- All policies must adhere to the standards as outlined in this FSA Lending Policy.
- Recipient policies will be reviewed by FSA Staff for approval, prior to lending program implementation.  FSA will not review individual loan applications.
  **Policies should include how recipient intends to ensure interest rates are fair and are not burdensome to Beneficiaries.

- USDA Non-Discrimination Policy – When developing and reviewing loan applications, recipients must adhere to USDA's Non-Discrimination Policy below:

  "In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident."

- Loan Documentation – Application forms used by the recipient must include the following information:
    - Name and address of the beneficiary;
    - Loan purpose;
    - Interest rate and term;
    - Location, nature, and scope of the project being financed;
    - Uses and sources of funds;
    - Nature and lien priority of the collateral;
    - Proof there is no conflict of interest between recipient and beneficiary; (FSA requires a checked box on the application and a signature, or by other means as agreed to by the agency); and
    - Proof of citizenship in accordance with 7 CFR 764.101(c). (Attachment B)

**Post Award Requirements**

1. Applicability.
Recipients receiving grants under this program shall be governed by this policy, 2 CFR Part 200 or successor regulation, the grant award agreement, the approved project narrative, recipient loan policy, and any other conditions which FSA may impose in making the grant. Whenever this policy imposes a requirement on loans made from the "ILA revolving loan fund," such requirement shall apply to all loans made by a recipient to a Beneficiary from the recipient's ILA revolving loan fund during the grant period of performance. Whenever this policy imposes a requirement on loans made by recipients from "FSA ILA grant funds," without specific reference to the ILA revolving loan fund, such requirement shall apply only to loans made by a recipient using FSA ILA grant funds and will not apply to loans made from revolved funds.

2. Grant Disbursement
FSA will disburse grant funds to the recipient in accordance with 2 CFR Part 200 or successor regulation, as applicable, its grant award agreement, and the terms and provisions of this policy. Any funds disbursed in advance will be supported by financial need substantiated in writing by the recipient. Form SF-270 must be completed by the recipient and submitted to FSA no more often than monthly to request an advance of funds.

Specifically, FSA will disburse the grant funds in advance if the following requirements are met:

(a) The recipient has established written procedures that will minimize the time elapsing between the transfer of funds from FSA and their disbursement to beneficiaries;

(b) The management system of the recipient meets the requirements of 2 CFR Part 200 or successor regulation, as applicable;

(c) The requests for cash advances made by the recipient are limited to the minimum amounts needed and timed to be in accordance with the actual immediate cash needs of the beneficiary to carry out the project.

(d) Before the initial lending of FSA ILA grant funds to a beneficiary, the recipient must obtain written FSA approval of all forms to be used for relending purposes, including application forms, loan agreements, promissory notes, and security instruments.

3.   Maintenance of ILA Revolving Loan Fund.

The recipient must maintain the ILA grant in compliance with its FSA grant award agreement, and the terms and provisions of this policy. All ILA grant funds to be used for revolving loan purposes, received by a recipient, must be deposited in an ILA revolving loan fund. The ILA revolving loan fund can only be used for receiving advances from FSA, receiving cash from fees assessed from activities of the ILA revolving loan fund, interest earned, disbursing beneficiary loans, and collecting beneficiary loan repayments. Interest earned, cash obtained from fees assessed from activities of the ILA revolving loan fund, etc. must remain part of the ILA revolving loan fund though these monies may be used to pay administrative expenses as provided below. All FSA ILA loan activity must be managed through the ILA revolving loan fund.  The recipient may transfer additional assets into the ILA revolving loan fund to cover any shortage at any time.  The recipient must maintain adequate documentation of any additional assets that are transferred into the account.

Recipients may use an operating account, general fund, or Automated Clearing House (ACH) account to initially collect payments from beneficiaries, as long as those payments are transferred to the ILA revolving loan fund within ten working days of receipt or by the end of the Federal fiscal quarter, whichever occurs first. All moneys deposited to the ILA revolving loan fund bank account or accounts must be money of the ILA revolving loan fund. The receivables created by making loans to beneficiaries, the recipient's security interest in collateral pledged by beneficiaries, collections on the receivables, interest, fees, and any other income or assets derived from the operation of the ILA revolving loan fund are considered a part of the ILA revolving loan fund.

(a) The recipient can use the portion of the ILA revolving loan fund that consists of FSA ILA grant funds only for making loans in accordance with this policy. The recipient may use the portion of the ILA revolving loan fund that consists of revolved funds for debt service reserve (a cash reserve that ensures the borrowers have enough to cover debt service payments in the event of cash flow disruptions), and reasonable administrative costs, in accordance with this section, or for making additional beneficiary loans, provided, however, that the recipient cannot use proceeds received from the collection of principal repayment by a beneficiary for administrative

expenses. The amount removed by the recipient from the ILA revolving loan fund for administrative costs in any year must be reasonable, and must not exceed the actual cost of operating the ILA revolving loan fund, including loan servicing and providing technical assistance.

(b) If FSA determines that the recipient has substantial amounts of FSA ILA grant funds available for lending that is not being regularly loaned out to beneficiaries, FSA may require, at its discretion, that those funds be returned to FSA .

(c) The recipient must deposit all reserves and other cash of the ILA revolving loan fund in accounts in depository financial institutions. Such accounts must be fully covered by Federal deposit insurance or fully collateralized with other securities in accordance with normal banking practices and all applicable State laws. The account must be interest-bearing if feasible and any interest earned thereon remains a part of the ILA revolving loan fund. The recipient cannot use funds for any certificates of deposit over a 30-day duration or for investments in securities. All instruments associated with the revolving loan fund must be liquid and not impose fees associated with the withdrawal or movement of cash.

(d) ILA revolving loan funds are intended to provide an ongoing source of funding to strengthen land access with additional opportunities to focus on capital access and market access for use in agriculture.  Any FSA ILA grant funds that are obligated by the recipient within the five years of the grant award date can continue to be revolved.

4.  Agency oversight.
(a) FSA will monitor each recipient based on progress reports submitted by the recipient, audit findings, disbursement transactions, visitations, and other contact with the recipient, as necessary.

(b) In the event the recipient's financial condition deteriorates, such that it cannot operate any portion of the loan portfolio, the recipient takes action detrimental to prudent fund operation, or the recipient fails to take action required of a prudent lender, execute documents and/or undertake any reasonable acts and manage their loan portfolio, FSA may request, to protect the agency's interest, to transfer the ILA revolving loan fund to FSA or to a third party designated/approved by FSA.

5.  Notification.
(a) The recipient must notify FSA and obtain prior written approval from FSA before making any significant changes in approved forms, security policy, or the ILA revolving loan fund policy The FSA Grant Management Specialist may approve changes in forms, security policy, or the ILA revolving loan fund policy at any time upon a written request from the recipient and determination by FSA that the change will not violate any requirements of FSA. The recipient must comply with the approvals by FSA, during the grants period of performance.

6.  Responsibilities
(a) Recipient.  The recipient shall remain in compliance with all applicable laws, regulations, Executive Orders, and other generally applicable requirements for the duration of the Agreement, including 2 CFR parts 200, 400, 415, 416, 417, 418, 421, and 422.  The most commonly-referenced provisions are identified below.

(1) Closeout. The recipient must comply with the closeout requirements in 2 CFR § 200.344 – The revolving loan fund will be allowed to continue into perpetuity.

Funds that are held by a Federally Recognized Tribe or an economic entity of the Tribe tribal organization will have the federal interest released at the end of the grant period.  The FSA Grant Management Specialist will continue to monitor the Recipient's ILA Lending Program to ensure funds are loaned as outlined in the project narrative.

(2) Post-Closeout Adjustments and Continuing Responsibilities.  The recipient must continue to comply with the requirements in 2 CFR § 200.345 even after the Period of Performance for this Agreement has ended.

(3) Audits.  The Recipient must comply with the provisions in 2 CFR Part 200, Subpart F.

7. Monitoring and Enforcement.  FSA will monitor the project to ensure that recipients compliance with the terms of the award.  If FSA determines that a recipient is not in compliance, the Agency will enforce the terms of this Agreement using the provisions of 2 CFR § 200.339-343.

Attachment A

**Part II**  **Farm Expenses—Cash and Accrual Method.** Do not include personal or living expenses. See instructions.

| | | | | | | |
|---|---|---|---|---|---|---|
| 10 | Car and truck expenses (see instructions). Also attach **Form 4562** | 10 | | 23 | Pension and profit-sharing plans . . | 23 | |
| 11 | Chemicals . . . . . . . . . | 11 | | 24 | Rent or lease (see instructions): | | |
| 12 | Conservation expenses (see instructions) | 12 | | a | Vehicles, machinery, equipment . . | 24a | |
| 13 | Custom hire (machine work) . . . | 13 | | b | Other (land, animals, etc.) . . . . | 24b | |
| 14 | Depreciation and section 179 expense (see instructions) . . . . . . | 14 | | 25 | Repairs and maintenance . . . . | 25 | |
| 15 | Employee benefit programs other than on line 23 . . . . . . . . | 15 | | 26 | Seeds and plants . . . . . . | 26 | |
| 16 | Feed . . . . . . . . | 16 | | 27 | Storage and warehousing . . . | 27 | |
| 17 | Fertilizers and lime . . . . . | 17 | | 28 | Supplies . . . . . . . . . | 28 | |
| 18 | Freight and trucking . . . . . | 18 | | 29 | Taxes . . . . . . . . | 29 | |
| 19 | Gasoline, fuel, and oil . . . . . | 19 | | 30 | Utilities . . . . . . . . . | 30 | |
| 20 | Insurance (other than health) . . | 20 | | 31 | Veterinary, breeding, and medicine . | 31 | |
| 21 | Interest (see instructions): | | | 32 | Other expenses (specify): | | |
| a | Mortgage (paid to banks, etc.) . . | 21a | | a | | 32a | |
| b | Other . . . . . . . . . | 21b | | b | | 32b | |
| 22 | Labor hired (less employment credits) | 22 | | c | | 32c | |
| | | | | d | | 32d | |
| | | | | e | | 32e | |
| | | | | f | | 32f | |

Attachment B

For direct loan programs, 7 CFR 764.101(c) states:

> Citizenship. The applicant and anyone who will sign the promissory note must be a citizen of the United States, United States non-citizen national, or a qualified alien under applicable Federal immigration laws.

# Exhibit B

 **Farm Service Agency**
U.S DEPARTMENT OF AGRICULTURE

U.S. Department of Agriculture
Farm Service Agency
Office of the Administrator
1400 Independence Ave , S W
Washington, DC, 20250-0506

March 23, 2026

NDN Collective, Inc.
Attn: Wizipan Little Elk Garriott
408 Knollwood Drive
Rapid City, South Dakota 57701

Dear Recipient,

This letter provides notice that the Farm Service Agency (FSA) is terminating your federal award, *Pine Creek Ranch Land and Water Conservation Project* (FSA24GRA0011625), in accordance with the terms and conditions of your award and applicable regulations (including 2 C.F.R. 200.340(a)(4)). The United States Department of Agriculture (USDA) has determined that awards under this program involved discriminatory preferences based on Diversity, Equity, and Inclusion (DEI) and wasteful spending that did little to further lawful agricultural land purchases. Accordingly, as discussed below, USDA has determined your award no longer effectuates the program goals or agency priorities. Termination of your award is effective Thursday, March 26, 2026.

The Secretary's Memorandum 1078-004, *"Directive on Departmental Grant and Cooperative Agreement Priorities"* (March 2025), instructed USDA agencies and staff offices to review existing awards to ensure they reflect the Department's priorities of unity, equality, meritocracy, and color-blindness. Accordingly, USDA conducted a thorough review of the Increasing Land, Capital, and Market Access Program ("ILA" or "the program"). That review revealed that ILA awards, including yours, do not align with the Department's goals and priorities, for the following reasons:

1. *Awards Discriminate Based on Immutable Characteristics*.
   Your award was made pursuant to a program rife with DEI preferences that discriminated based on immutable characteristics. USDA programs must be consistent with principles of equal protection and should never pick winners in the land market based on immutable characteristics like race or sex. When Congress amended the program authority through Section 22007 of the Inflation Reduction Act (IRA), it removed any reference to "socially disadvantaged" (*i.e.*, distinctions based on race, ethnicity, or sex) and focused the program's eligibility for "underserved farmers, ranchers, and forest landowners including veterans, limited resource producers, beginning farmers and ranchers, and farmers, ranchers, and forest landowners living in high poverty areas." Yet despite this de-authorization, the vast majority of projects across the ILA program violated equal protection principles by selecting beneficiaries based on race, ethnicity, sexual orientation, or

**Farm Service Agency**
*USDA is an equal opportunity provider, employer, and lender.*

sex. Eligible groups referenced in the statute should never have been de-prioritized for awards in favor of groups that Congress specifically removed. This award violates the principles laid out in Secretary's Memorandum 1078-021, "*Establishment of USDA General Terms and Conditions for Grants, Cooperative Agreements, and Similar Arrangements,*" (December 2025) (which supersedes Secretary's Memorandum 1078-004); Secretary's Memorandum 1078-001, "*Prioritizing Unity, Equality, Meritocracy, and Color-Blind Policies, in the United States Department of Agriculture,*" (Feb. 2025); USDA's final rule, "*Removal of Unconstitutional Preferences Based on Race and Sex in Response to Court Ruling,*" 90 Fed. Reg. 30555 (July 10, 2025); and FSA's notice, "*Agricultural Disaster Assistance Programs,*" 90 Fed. Reg. 44623 (Sep. 16, 2025). It also violates at least two executive orders, including Executive Order 14148, "*Initial Recissions of Harmful Executive Orders and Actions,*" and Executive Order 14173, "*Ending Illegal Discrimination and Restoring Merit-Based Opportunity.*"

2. *Awards Do Not Align with Congressional Intent.*
Most of the funding for ILA came from Section 1006(b) of the American Rescue Plan Act (ARPA), as amended by Section 22007 of the IRA, which sought "to provide grants and loans ... to improve land access (including heirs' property and fractionated land issues)." Yet most of the awards did little to improve land access. With high overhead costs and excessive spending on outreach and technical assistance, existing awards do not do enough to help producers.

3. *ILA Award Structure Unacceptably Exposed Taxpayers to Fraud, Waste, and Abuse.*
The program's open "innovative" framework and minimal guardrails resulted in awards improperly exposing taxpayers to unacceptable risks of fraud, waste and abuse. The program's awards enabled spending inconsistent with sound public policy or market logic. Instances of excessive or frivolous expenditures — such as purchasing gazebos, massages, a camper/RV, and oversized office supply budgets (in one case, over $130,000) — instead of land are an affront to taxpayers. The absence of robust oversight mechanisms further amplifies the risk of fraud and abuse.

These issues are endemic across the ILA program; they have biased the application and selection processes and fail to safeguard taxpayer funds in the administration of the program. It is necessary to fully realign the program to ensure consistency with statutory requirements, equal protection principles, and prudent fiscal management.

As stated in the project narrative supporting your award, "The overall goal of the Pine Creek Ranch Land and Conservation Project is to address this longstanding deferred

maintenance of the Pine Creek Ranch property by implementing effective grazing management systems and rangeland restoration measures to sustain future operations, conservation planning, and income sustainability for socially disadvantaged Indigenous peoples." Although the project indicates a long-term goal of providing land access opportunities to producers, the efforts within this project are focused on addressing deferred maintenance necessary on the land. The predominant use of award funds on items outside the program's mission of increasing land access represents a departure from the statutory intent of the program as required by Congress.

We acknowledge that NDN Collective, Inc. has undertaken efforts in connection to this project. We also acknowledge that the project includes partnerships with Ranch Advisory Partners, Inc., Sustainable Northwest, and others, who support the project's efforts to update site location data and implement regenerative ranching practices. However, the public has a significant interest in ensuring that the ILA program, as a whole, accomplishes its statutory purpose to improve land access and that the selection of beneficiaries does not discriminate based on immutable characteristics. The public also has a significant interest in ensuring the effective and efficient use of federal funds. As such, following careful consideration of your award – including any potential reliance interests, intended outcomes described, as well as consideration of alternatives to termination – USDA has determined the best use of resources and advancing USDA's goals and priorities requires a full termination to realign the program to be consistent with its statutorily mandated purpose and the policies and priorities of the Department.

Your award is terminated pursuant to 2 C.F.R. § 200.340(a)(4) and Section XXII of your Notice of Grant and Agreement Award, effective Thursday, March 26, 2026. You may be reimbursed for costs incurred up to the effective date of termination that are determined to be consistent with 2 C.F.R. § 200.343. Any applicable payment requests must be submitted no later than 120 calendar days after the date of this notice. Any open balance remaining 120 days after the date of this notice will be unavailable for payment.

Any applicable final reports must be submitted to FPAC.BC.GAD@usda.gov no later than 120 calendar days after the date of this notice. If you do not submit all reports in accordance with the terms and conditions of the Federal award within one (1) year of the effective termination date, FSA must proceed to close out the award with the information available. In these circumstances, in accordance with 2 C.F.R. § 200.344, FSA must report your material failure to comply with the terms and conditions of the award in SAM.gov using the Contractor Performance Assessment Reporting System (CPARS). Failure to submit timely and accurate final reports may affect your future funding.

Farm Service Agency
*USDA is an equal opportunity provider, employer, and lender.*

Federal regulation requires recipients to retain all Federal award records consistent with 2 C.F.R. § 200.334. Termination of the agreement does not affect a Federal agency's or a pass through entity's right to disallow costs and recover funds based on a later audit or other review. In accordance with 2 C.F.R. § 200.345, termination does not affect a recipient's obligation to return any funds due because of later refunds, corrections, or other transactions, including final indirect cost rate adjustments.

You may appeal this determination to the National Appeals Division (NAD) by filing a written request no later than 30 calendar days after you receive this notice according to the NAD appeal procedures found at 7 CFR Part 11. If you appeal to NAD, you have the right to a hearing that you or your representative may attend. Once a hearing with NAD begins, you waive any rights you might have to reconsideration, appeal to FSA, and mediation. You can find information for how to file an appeal with a NAD on its website at https://nad.usda.gov/. If you do not timely exercise one of the preceding options, this shall be the final administrative determination with respect to this matter according to the regulations at 7 CFR Part 780 and 7 CFR Part 11.

If you have questions, contact your FSA Program Contact at land.access@usda.gov.

Sincerely,

STEVEN PETERSON
Digitally signed by STEVEN PETERSON
Date: 2026.03.23 10:24:17 -04'00'

Steven Peterson
Associate Administrator, Farm Service Agency

# Exhibit C



**NDN COLLECTIVE**

April 21, 2026

National Appeals Division
13922 Denver West Parkway
Suite 100-NAD
Lakewood, CO 80401-3102

*Submitted via: **NAD e-file website** and **FedEx***

Subject:      Appeal of Grant Termination
                  USDA Increasing Land, Capital, and Market Access ("ILA" or "LCM") Program
                  Pine Creek Ranch Land and Water Conservation Project (FSA24GRA0011625)

Dear National Appeals Division:

We formally appeal the USDA Farm Service Agency's (FSA) decision to terminate our ILA award, Pine Creek Ranch Land and Water Conservation Project (FSA24GRA0011625) as stated in the enclosed termination notice dated March 23, 2026.  Our organization was awarded this ILA grant to address and mediate longstanding barriers for local Shoshone and Paiute tribal communities needing land, capital, and market access in their traditional lands.  Our project was reviewed, approved, and funded by USDA. We have implemented the project in accordance with the approved agreement and applicable program rules.

In the termination letter, FSA states: "The United States Department of Agriculture (USDA) has determined that awards under this program involved discriminatory preferences based on [DEI] and wasteful spending that did little to further lawful agricultural land purchases." The termination further claims that "ILA awards, including [ours] do not align with the Department's goals and priorities" because they (1) discriminate based on immutable characteristics; (2) do not align with Congressional intent; and (3) expose taxpayers to fraud, waste, and abuse. We disagree with FSA's decision and believe their decision both to effectively cancel the program and to terminate our specific project are unlawful and should be reversed.

## I.      Matters of General Applicability

The termination letter indicates that USDA has made a program-wide determination that LCM awards "do not align" with agency priorities and has acted to unilaterally terminate nearly all awards under the program. We believe this decision is one of general applicability, rather than one based on the specific facts of our award. We contend that this program-wide termination:

- Is contrary to law, because Congress expressly authorized and funded the ILA program under the Inflation Reduction Act to support underserved producers;
- Is arbitrary and capricious, including because it relied on improper factors, failed to

consider important aspects of the problem, is contrary to evidence, is insufficiently reasoned, is implausible, reverses prior agency policy without adequate explanation, and/or fails to properly consider reliance interests; and

- Unlawfully applies new policy interpretations retroactively to existing agreements.

We recognize that NAD may determine our termination is non-appealable as a matter of general applicability if the decision to terminate the program in its entirety is the basis for terminating our individual award. If NAD determines that these claims are not appealable, we respectfully request a prompt determination of non-appealability so that we may preserve and pursue these claims in district court.

In the alternative, if NAD determines that our grant termination is appealable, we request a hearing where we can elaborate on our reasons why we believe this decision is in error. A summary of our arguments as to why the termination of our individual agreement was in error follows.

## II.    Our ILA agreement aligns with underlying programmatic and statutory requirements and congressional intent

The beneficiaries of our project are Indian Tribes, who are a distinct political group, not a racial group.  As we described in our application, our project aims to return agricultural lands to the Shoshone and Paiute Tribes, in whose homelands the Pine Creek Ranch lies.  Return of lands to federally recognized Indian Tribes is not race-based discrimination.  USDA Secretary Rollins re-affirmed the unique political, nation-to-nation relationship between the United States and Indian Tribes in Secretarial Memorandum #1078-010 (May 5, 2025).  In it she stated:

> The Department's unique government-to-government and political relationship with federally recognized Indian Tribes, American Indian Tribal citizens and Alaska Natives, and the Native Hawai'ian Community are legally distinct from policy-based Diversity, Equity, and Inclusion programs such as those covered by [the President's] Executive Orders. Accordingly, these Executive Orders did not eliminate, rescind, hinder, impair, or otherwise affect activities, services, or programs that implement the legal and political relationship carried out by the Department of Agriculture arising by Treaty or statute with respect to federally recognized Indian Tribes, American Indian Tribal citizens and Alaska Natives, and the Native Hawai'ian Community.

In stating in our termination letter that our award "was made pursuant to a program rife with DEI preferences that discriminated based on immutable characteristics," USDA FSA erroneously characterized a project designed to support Indian Tribes and American Indian Tribal citizens as a DEI project.  That is not correct.  Our project was expressly designed to fulfill the statutory mandates and the priorities outlined in USDA's LCM funding announcement. Therefore, the termination violates the Administrative Procedure Act under 5 U.S.C. § 706(2)(A) and (C).

Furthermore, our project activities and objectives directly align with the statutory purpose of the

2

ILA program, which Congress established to address historic and ongoing barriers faced by underserved farmers and ranchers. Congress expressly recognized these barriers in:

- The original authorization of the program through Section 1006 of the American Rescue Plan Act (ARPA), entitled "USDA Assistance and Support for Socially Disadvantaged Farmers, Ranchers, Forest Land Owners and Operators, and Groups," which appropriated funds to support farmers and organizations serving populations that have experienced discrimination;
- The amended authorization of the program through Section 22007 of the Inflation Reduction Act (IRA), which amended Section 1006, broadening the program to serve "underserved farmers, ranchers, or forest landowners" and included express mention that the program was authorized to address "heirs' property and fractionated land issues," and which also provided additional financial assistance under a separate subsection to anyone determined to have experienced discrimination in USDA programs prior to January 1, 2021. See IRA § 22007, § 1006(b), (e), 136 Stat. 2022–23; and
- The existing statutory definition of "socially disadvantaged" in 7 U.S.C. § 2279(a)(5)-(6), which defines the term as individuals who "have been subjected to racial or ethnic prejudice because of their identity as members of a group without regard to their individual qualities." ARPA as amended by the IRA is included as a note to this statutory definition.

Although Congress expanded the scope of eligibility for the ILA program from "socially disadvantaged farmers and ranchers" to "underserved farmers and ranchers," that amendment did not prohibit individual grants made through the program from focusing their services and support to groups that fall within USDA's existing statutory definition of "socially disadvantaged." In fact, through the LCM Notice of Funding Opportunity, the program was designed to deliver services to specific groups who have historically been underserved by USDA programming. That Notice included a non-exhaustive list of producers who may be considered "underserved" and emphasized a commitment "to funding projects that support a diverse set of farmers, ranchers, forest landowners, and operators (producers) on the edge of viability, moving them from surviving to thriving as they address core barriers to attain land, capital, and market access." The term "underserved" most certainly includes Native American Tribes and Native American ranchers who would benefit from our project.

Our application was reviewed, approved, and funded by USDA based on these statutory and programmatic criteria. Our executed agreement reflects these requirements and authorized activities. We have implemented our program in accordance with the approved scope of work and applicable program rules.

Although the program fund disbursements were significantly delayed, since receiving the award, we have already achieved measurable public benefits, including returning a dilapidated ranch back to a state of operability by making capital improvements to buildings and equipment on the land.  Had the program been funded as scheduled, we would have achieved even greater public benefits by the time of our termination. USDA's arbitrary delay in releasing ILA funds was beyond

3

our control.

### III.    Termination is not in accordance with law and exceeds statutory authority

This termination is not in accordance with law and exceeds statutory authority in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) and (C). USDA's authority is defined and limited by Congress.

The termination letter does not identify any aspect of our project that falls outside the statutory authority of the ILA program. Instead, it relies on a reinterpretation of program priorities that conflicts with Congress's express authorization and funding of this program.

The stated basis for termination – the program overall was "rife with DEI preferences" - is directly at odds with the statutory purpose of the ILA program, which explicitly prioritizes support for underserved producers. At USDA, "underserved" is an umbrella term which has historically included socially disadvantaged farmers and ranchers as one of several categories of farmers who have historically been underserved by USDA programs, such as women farmers, beginning, veteran, limited resource, and other categories of producers. Although Congress amended the ILA programs authorization in Section 22007 (b) of the Inflation Reduction Act and replaced the term "socially disadvantaged" with "underserved," nothing in the reauthorization prevented funding from going to individuals who fall within the "socially disadvantaged" definition. The amendment expanded the scope of who could be served by the program; it didn't exclude those producers who were originally the program's sole intended recipients when ILA was originally authorized under the American Rescue Plan Section 1006(b)(2). Congress specifically authorized and funded this program to achieve the objectives outlined in our award. USDA cannot lawfully terminate our award for fulfilling them.

Our project was designed, approved, and implemented in alignment with ILA's statutory mandates, which was "to improve land access (including heirs' property and fractionated land issues) for underserved farmers, ranchers, and forest landowners, including veterans, limited resource producers, beginning farmers and ranchers, and farmers, ranchers, and forest landowners living in high poverty areas." Section 22007(b), Inflation Reduction Act of 2022 (P.L. 117-169). Our project directly supports access to land capital for underserved ranchers which are expressly identified in the statute and funding announcement as eligible and prioritized activities. Moreover, our project was intended to benefit Tribes and Tribal citizens, who are recognized as a political – not racial – class by the USDA.

### IV.    The termination is arbitrary,  capricious, procedurally deficient, and unsupported by substantial evidence

The termination is arbitrary and capricious, without observance of required procedures, and unsupported by substantial evidence in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (D) and (E). USDA previously encouraged and approved projects like ours through its funding announcements and award process. The agency now penalizes us for implementing

4

those same priorities without providing a reasoned explanation or identifying evidence of noncompliance.

As applied to our award, the decision fails to conduct an individualized assessment of our project. The termination letter relies on generalized concerns about the ILA program as a whole rather than evaluating our specific activities, expenditures, compliance, or outcomes. It does not explain how our project violates program requirements or statutory authority and fails to consider relevant facts in the administrative record for our grant, including compliance and measurable impacts.

The decision is arbitrary and unsupported because it:
- Fails to analyze our specific project. The letter references in one sentence that our project's use of award funds are for "items outside the program's mission of increasing land access," and therefore "represents a departure from the statutory intent of the program," but it does not specifically explain how the activities undertaken in our grant give rise to the stated concerns.  In fact, a significant portion of our projects funds were going to be used to acquire land, and the remaining funds were going to be used to make improvements to that land so that it could become an operating ranch for underserved (Native American) ranchers.
- Relies on generalized claims without applying them to our award. For example, the letter:
  ○ Asserts the LCM program involves impermissible "preferences" or discrimination, but it fails to identify any specific activity within our grant that violates applicable law, regulation, or program requirements.  As stated previously, a project intended to benefit Native American ranchers is not a "DEI" or "racial" preference, rather it is a political designation.
  ○ Makes general assertions about waste, inefficiency, and overspending in the LCM program, but it fails to analyze or explain how our project violates laws or program requirements.  We were never the subject of any allegation of misuse or waste of federal funds in our project, which you list as one of the reasons the ILA Program was terminated.  In fact, we were under the impression we had a successful project that would ultimately culminate in a huge success for the ILA program, as Congress intended when it appropriated funds to help support underserved farmers and ranchers.
  ○ Makes general statements that ILA awardees were not able to achieve land access. To the contrary, our project made a ranch that was previously inoperable, operable.  Had our funds not been delayed, we would have been able to complete the next phase of our project, which involved implementing regenerative ranching practices on the project land.  To the extent our project was unable to do so, it is because of the agency's delays. The United States Government officially shutdown on October 1, 2025. The current administration then proceeded with layoffs, furloughs and/or termination of federal government employees starting on October 10, 2025.  This greatly impacted our USDA federal grant – during this process we could not drawdown any awarded funds and could not contact any key USDA personnel. During this time, we tried unsuccessfully to contact key grant

5

personnel.  Due to the unique nature of the Pine Creek Ranch property, NDN had to move forward with implementing key goals and objectives during the shutdown period. Part of this project included purchasing key ranch vehicles, equipment and fuel and making infrastructural improvements. We sought approval for these activities but did not receive a response. Due to inflation, annual CPI increases, and tariffs, the vehicles and equipment were much more expensive in 2025 than in our original grant budget approved in 2022. NDN eventually contacted Galon Hall, Director of Grants and Agreement Division, on October 31, 2025. Mr. Galon Hall was officially designated as Excepted Employee during the shutdown. However, he could not relay information on any key staff or help with requests. He instructed us to wait until the government opened back up to assist with requests. These delays that were completely beyond our control prevented us from hitting significant milestones in our project.

- Mischaracterizes our program or participants and fails to explain how our specific program is unlawfully discriminatory.  As previously explained, our project serves Native American Tribes and their citizens, which the USDA Secretary has clearly agreed are not "DEI" recipients.

- Attempts to apply new terms and policies retroactively, including Secretary's Memorandum 1078-021, "Establishment of USDA General Terms and Conditions for Grants, Cooperative Agreements, and Similar Arrangements," (December 2025). Our award is not governed by these updated general terms and conditions, and no formal amendment was executed to apply those terms to our award. The letter also fails to provide good reasons for the new policy.

- Fails to explain why alternatives to termination were not feasible. Although the letter states that alternatives were considered, it provides no reasoned explanation for why modification or corrective action was not pursued in our case.  We were never approached about modifying our project scope.  USDA did not ever give NDN an opportunity to re-assess our grant objectives and see if they could be adjusted to better align with the USDA's new program priorities.  We had no communication at all from our program manager indicating that our grant would be abruptly terminated, despite the statement in the March 23 letter that USDA "considered alternatives to termination." Had we been given a chance to meet prior to the grant being terminated, perhaps we might have been able to find a path forward under the agency's new policy priorities.

- Fails to meaningfully consider our reliance interests. The letter acknowledges some reliance interests but does not account for all reliance interests nor explain how those interests were evaluated or why termination was nonetheless appropriate.

- The termination letter treats our award as part of a broader program decision rather than evaluating our individual agreement. Even if USDA is reconsidering broader priorities, it must still apply governing law and contractual requirements to our award. That did not occur here.

## V.    Equitable Relief is Warranted

Equitable relief is warranted under 7 U.S.C. § 7996, 7 U.S.C. §6998(d) and 7 C.F.R. §11.9(e). The

termination of our award is not based on any finding that we failed to comply with program requirements. Rather, it reflects a subsequent shift in agency interpretation or priorities applied after the award was made and implementation had begun.

Our organization relied in good faith on USDA's approval and executed agreement. We structured staffing, budgeting, and operations around this funding. We have incurred negative financial, operational, and reputational consequences as a result of the agency's action, including staff time and effort setting up the project, increased costs to complete the project, and the inability to make the land completely operable for ranching. Equitable relief is necessary to prevent our organization from being penalized for circumstances beyond our control.

We respectfully request:
1.     An evidentiary hearing before NAD;
2.     Reinstatement of our LCM grant in full, including an extension of time to allow completion of all deliverables delayed as a result of the agency's misactions;
3.     In the alternative, modifications or corrective action rather than termination, including an extension of time to allow completion of all deliverables under the modified or corrected agreement; and
4.     Equitable relief as appropriate.

Please confirm receipt of this appeal. We look forward to: (1) the opportunity to present our case on our individualized claims, and (2) NAD's determination regarding the general applicability of the program-wide claims.

Sincerely,

Wizipan Garriott
President
NDN Collective

Attachments:
- Termination letter dated March 23, 2026
- USDA Secretarial Memorandum #1078-010 (May 5, 2025)

7

 **Farm Service Agency**
U.S. DEPARTMENT OF AGRICULTURE

U.S. Department of Agriculture
Farm Service Agency
Office of the Administrator
1400 Independence Ave., S.W.
Washington, DC, 20250-0506

March 23, 2026

NDN Collective, Inc.
Attn: Wizipan Little Elk Garriott
408 Knollwood Drive
Rapid City, South Dakota 57701

Dear Recipient,

This letter provides notice that the Farm Service Agency (FSA) is terminating your federal award, *Pine Creek Ranch Land and Water Conservation Project* (FSA24GRA0011625), in accordance with the terms and conditions of your award and applicable regulations (including 2 C.F.R. 200.340(a)(4)). The United States Department of Agriculture (USDA) has determined that awards under this program involved discriminatory preferences based on Diversity, Equity, and Inclusion (DEI) and wasteful spending that did little to further lawful agricultural land purchases. Accordingly, as discussed below, USDA has determined your award no longer effectuates the program goals or agency priorities. Termination of your award is effective Thursday, March 26, 2026.

The Secretary's Memorandum 1078-004, *"Directive on Departmental Grant and Cooperative Agreement Priorities"* (March 2025), instructed USDA agencies and staff offices to review existing awards to ensure they reflect the Department's priorities of unity, equality, meritocracy, and color-blindness. Accordingly, USDA conducted a thorough review of the Increasing Land, Capital, and Market Access Program ("ILA" or "the program"). That review revealed that ILA awards, including yours, do not align with the Department's goals and priorities, for the following reasons:

1. *Awards Discriminate Based on Immutable Characteristics.*
   Your award was made pursuant to a program rife with DEI preferences that discriminated based on immutable characteristics. USDA programs must be consistent with principles of equal protection and should never pick winners in the land market based on immutable characteristics like race or sex. When Congress amended the program authority through Section 22007 of the Inflation Reduction Act (IRA), it removed any reference to "socially disadvantaged" (*i.e.*, distinctions based on race, ethnicity, or sex) and focused the program's eligibility for "underserved farmers, ranchers, and forest landowners including veterans, limited resource producers, beginning farmers and ranchers, and farmers, ranchers, and forest landowners living in high poverty areas." Yet despite this de-authorization, the vast majority of projects across the ILA program violated equal protection principles by selecting beneficiaries based on race, ethnicity, sexual orientation, or

**Farm Service Agency**
*USDA is an equal opportunity provider, employer, and lender.*

sex. Eligible groups referenced in the statute should never have been de-prioritized for awards in favor of groups that Congress specifically removed. This award violates the principles laid out in Secretary's Memorandum 1078-021, *"Establishment of USDA General Terms and Conditions for Grants, Cooperative Agreements, and Similar Arrangements,"* (December 2025) (which supersedes Secretary's Memorandum 1078-004); Secretary's Memorandum 1078-001, *"Prioritizing Unity, Equality, Meritocracy, and Color-Blind Policies, in the United States Department of Agriculture,"* (Feb. 2025); USDA's final rule, *"Removal of Unconstitutional Preferences Based on Race and Sex in Response to Court Ruling,"* 90 Fed. Reg. 30555 (July 10, 2025); and FSA's notice, *"Agricultural Disaster Assistance Programs,"* 90 Fed. Reg. 44623 (Sep. 16, 2025). It also violates at least two executive orders, including Executive Order 14148, *"Initial Recissions of Harmful Executive Orders and Actions,"* and Executive Order 14173, *"Ending Illegal Discrimination and Restoring Merit-Based Opportunity."*

2. *Awards Do Not Align with Congressional Intent.*
   Most of the funding for ILA came from Section 1006(b) of the American Rescue Plan Act (ARPA), as amended by Section 22007 of the IRA, which sought "to provide grants and loans ... to improve land access (including heirs' property and fractionated land issues)." Yet most of the awards did little to improve land access. With high overhead costs and excessive spending on outreach and technical assistance, existing awards do not do enough to help producers.

3. *ILA Award Structure Unacceptably Exposed Taxpayers to Fraud, Waste, and Abuse.*
   The program's open "innovative" framework and minimal guardrails resulted in awards improperly exposing taxpayers to unacceptable risks of fraud, waste and abuse. The program's awards enabled spending inconsistent with sound public policy or market logic. Instances of excessive or frivolous expenditures — such as purchasing gazebos, massages, a camper/RV, and oversized office supply budgets (in one case, over $130,000) — instead of land are an affront to taxpayers. The absence of robust oversight mechanisms further amplifies the risk of fraud and abuse.

These issues are endemic across the ILA program; they have biased the application and selection processes and fail to safeguard taxpayer funds in the administration of the program. It is necessary to fully realign the program to ensure consistency with statutory requirements, equal protection principles, and prudent fiscal management.

As stated in the project narrative supporting your award, "The overall goal of the Pine Creek Ranch Land and Conservation Project is to address this longstanding deferred

maintenance of the Pine Creek Ranch property by implementing effective grazing management systems and rangeland restoration measures to sustain future operations, conservation planning, and income sustainability for socially disadvantaged Indigenous peoples." Although the project indicates a long-term goal of providing land access opportunities to producers, the efforts within this project are focused on addressing deferred maintenance necessary on the land. The predominant use of award funds on items outside the program's mission of increasing land access represents a departure from the statutory intent of the program as required by Congress.

We acknowledge that NDN Collective, Inc. has undertaken efforts in connection to this project. We also acknowledge that the project includes partnerships with Ranch Advisory Partners, Inc., Sustainable Northwest, and others, who support the project's efforts to update site location data and implement regenerative ranching practices. However, the public has a significant interest in ensuring that the ILA program, as a whole, accomplishes its statutory purpose to improve land access and that the selection of beneficiaries does not discriminate based on immutable characteristics. The public also has a significant interest in ensuring the effective and efficient use of federal funds. As such, following careful consideration of your award – including any potential reliance interests, intended outcomes described, as well as consideration of alternatives to termination – USDA has determined the best use of resources and advancing USDA's goals and priorities requires a full termination to realign the program to be consistent with its statutorily mandated purpose and the policies and priorities of the Department.

Your award is terminated pursuant to 2 C.F.R. § 200.340(a)(4) and Section XXII of your Notice of Grant and Agreement Award, effective Thursday, March 26, 2026. You may be reimbursed for costs incurred up to the effective date of termination that are determined to be consistent with 2 C.F.R. § 200.343. Any applicable payment requests must be submitted no later than 120 calendar days after the date of this notice. Any open balance remaining 120 days after the date of this notice will be unavailable for payment.

Any applicable final reports must be submitted to FPAC.BC.GAD@usda.gov no later than 120 calendar days after the date of this notice. If you do not submit all reports in accordance with the terms and conditions of the Federal award within one (1) year of the effective termination date, FSA must proceed to close out the award with the information available. In these circumstances, in accordance with 2 C.F.R. § 200.344, FSA must report your material failure to comply with the terms and conditions of the award in SAM.gov using the Contractor Performance Assessment Reporting System (CPARS). Failure to submit timely and accurate final reports may affect your future funding.

Federal regulation requires recipients to retain all Federal award records consistent with 2 C.F.R. § 200.334. Termination of the agreement does not affect a Federal agency's or a pass through entity's right to disallow costs and recover funds based on a later audit or other review. In accordance with 2 C.F.R. § 200.345, termination does not affect a recipient's obligation to return any funds due because of later refunds, corrections, or other transactions, including final indirect cost rate adjustments.

You may appeal this determination to the National Appeals Division (NAD) by filing a written request no later than 30 calendar days after you receive this notice according to the NAD appeal procedures found at 7 CFR Part 11. If you appeal to NAD, you have the right to a hearing that you or your representative may attend. Once a hearing with NAD begins, you waive any rights you might have to reconsideration, appeal to FSA, and mediation. You can find information for how to file an appeal with a NAD on its website at https://nad.usda.gov/. If you do not timely exercise one of the preceding options, this shall be the final administrative determination with respect to this matter according to the regulations at 7 CFR Part 780 and 7 CFR Part 11.

If you have questions, contact your FSA Program Contact at land.access@usda.gov.

Sincerely,

STEVEN PETERSON
Digitally signed by STEVEN PETERSON
Date: 2026.03.23 10:24:17 -04'00'

Steven Peterson
Associate Administrator, Farm Service Agency



*Secretary Brooke L. Rollins*

**UNITED STATES DEPARTMENT OF AGRICULTURE**
**OFFICE OF THE SECRETARY**
**WASHINGTON, D.C. 20250**

**SECRETARY'S MEMORANDUM 1078-010**

**May 5, 2025**

**CLARIFYING THE APPLICATION OF CERTAIN EXECUTIVE ORDERS TO FEDERALLY RECOGNIZED INDIAN TRIBES, AMERICAN INDIAN TRIBAL CITIZENS AND ALASKA NATIVES, AND THE NATIVE HAWAI'IAN COMMUNITY**

1.  PURPOSE

    The purpose of this Secretary Memorandum is to clarify the applicability to federally recognized Indian Tribes, American Indian Tribal citizens and Alaska Natives, and the Native Hawai'ian Community of Executive Order (EO) 14151, Ending Radical and Wasteful Government DEI Programs and Preferencing, 90 Fed. Reg. 8339 (Jan. 29.2025); EO 14168, Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, 90 Fed. Reg. 8615 (Jan. 30, 2025); and EO 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity Executive Order, 90 Fed. Reg. 8633 (Jan. 31. 2025). The Department's unique government-to-government and political relationship with, federally recognized Indian Tribes, American Indian Tribal citizens and Alaska Natives, and the Native Hawai'ian Community are legally distinct from policy-based Diversity, Equity, and Inclusion programs such as those covered by these Executive Orders. Accordingly, these Executive Orders did not eliminate, rescind, hinder, impair, or otherwise affect activities, services, or programs that implement the legal and political relationship carried out by the Department of Agriculture arising by Treaty or statute with respect to federally recognized Indian Tribes, American Indian Tribal citizens and Alaska Natives, and the Native Hawai'ian Community.

2.  DELEGATIONS

    It is the policy of the Department of Agriculture to honor the United States' trust relationship and Tribal treaty rights and to faithfully execute the laws of the United States as they relate to federally recognized Indian Tribes, American Indian Tribal citizens and Alaska Natives, and the Native Hawai'ian Community. In the implementation of programs administered by the Department of Agriculture, all agencies will pay particular attention to the policies articulated in the Indian Self-Determination and Education Assistance Act, the Alaska Native Claims Settlement Act, and the Hawai'ian Homes Commission Act. Agencies will consult with the Office of Tribal Relations and the Office of the General

Counsel when implementing statutes that provide specific reference to federally recognized Indian tribes, American Indian Tribal citizens and Alaska Natives, and the Native Hawai'ian Community to ensure these statutes are implemented properly.

3. EFFECTIVE DATE AND TERMINATION

This Secretary Memorandum is effective immediately and will remain in effect until it is amended, superseded, or revoked, whichever occurs first.

/s/ Brooke L. Rollins
Secretary
U.S. Department of Agriculture

2

# Exhibit D

**UNITED STATES DEPARTMENT OF AGRICULTURE**
**OFFICE OF THE SECRETARY**
**NATIONAL APPEALS DIVISION**

April 29, 2026

**XXXXX**
**XXXXX**
**XXXXX**
**XXXXX**

RE:    NAD Case No. 2026W000310

Dear **XXXXX**:

This letter responds to the appeal you filed with the National Appeals Division (NAD) challenging a decision issued by the Farm Service Agency (FSA) on March 23, 2026, to terminate your federal grant, (**XXXXX XXXXX**, **XXXXX**), under the Increasing Land, Capital, and Market Access (ILA) program. Although FSA's adverse decision includes appeal rights, NAD ultimately determines whether a matter is appealable to our division.

In its decision, FSA noted that "the United States Department of Agriculture (USDA) has determined that the awards under this program involved discriminatory preferences based on Diversity, Equity and Inclusion (DEI) and wasteful spending that did little to further lawful agricultural land purchases."  FSA further explained that the ILA awards, including yours, did not align with USDA's goals and priorities because: (i) ILA awards discriminated based on immutable characteristics; (ii) ILA awards did not align with congressional intent; and (iii) the ILA award structure unacceptably exposed taxpayers to fraud, waste, and abuse. FSA noted that USDA should not pick winners based on immutable characteristics, most of the awards did little to improve land access, and the program enabled spending inconsistent with sound public policy or market logic.

In your appeal request, you disagree with FSA's decision and believe such decision cancelling the program and terminating your specific project is unlawful and should be reversed. Among other arguments, you contend the decision is contrary to Congressional authorization, is arbitrary and capricious, and unlawfully applies new policy interpretations to existing agreements.

NAD's implementing regulations codified at 7 C.F.R. Part 11, provide the relevant authority for determining whether an agency's decision is appealable to NAD. Pursuant to 7 C.F.R. § 11.6(a)(2), the NAD Director "shall determine whether the decision is adverse to the individual participant and thus appealable or is a matter of general applicability and thus not subject to appeal …." There are two components to making an appealability determination. First, the decision must be adverse to the program participant. Second, the decision must be based on an individual application of the program rather than a generalized application. Thus, program participants may not seek NAD review of agency regulations or statutory provisions that establish basic program requirements or eligibility criteria. *See* 7 C.F.R. § 11.3(b) (clarifying that the NAD appeals process may not be used to seek review of statutes or USDA regulations issued under federal law). On the other hand, program participants may seek review of decisions that are based on an individual application of an agency's regulations, policies, or specified criteria.

In this case, the first prong of the appealability determination is met because FSA's decision is adverse to you. NAD's regulations codified at 7 C.F.R. § 11.3(a)(1) make clear that the term "adverse decision" is intended to include administrative decisions made by an agency denying participation in, or receipt of benefits under, certain agency programs. Thus, FSA's decision terminating your grant is adverse to you.

However, the second prong of the appealability determination--whether the matter is one of general applicability--supports the conclusion that this matter is not subject to a NAD appeal.  FSA's decision is not based on the individual application of

specific program criteria. Instead, your grant termination is based on the general policy priorities of USDA and its decision to cancel the ILA program. The Secretary of Agriculture has determined that this program, and awards made thereunder, no longer support USDA priorities.

Therefore, in accordance with 7 C.F.R. § 11.6(a)(2), I have made the following final determination:

**FSA's March 23, 2026, decision terminating your ILA grant is not appealable because it concerns matters of general applicability.**

Accordingly, I decline to accept your request for an appeal of FSA's decision.

Sincerely,

/S/


Jennifer K.M. Nicholson
Acting Director