Docusign Envelope ID: 6F57DB4A-40B5-8C53-82C7-45AAC0BEC5F8

## IN THE UNITED STATES COURT DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

URBAN SUSTAINABILITY DIRECTORS
NETWORK, et al.,

     *Plaintiffs,*

v.

UNITED STATES DEPARTMENT OF
AGRICULTURE, et al.,

     *Defendants.*

Case No. 1:25-cv-01775-BAH

## DECLARATION OF RICHARD PETER MARTIN, KING COUNTY

I, Richard Peter Martin, declare as follows:

1. My name is Richard Peter Martin, and I live in the United States. This declaration is based on my personal knowledge. I am over the age of eighteen and suffer from no legal incapacity. I submit this declaration in support of King County, Washington ("King County" or the "County"), which is one of several grant recipients affected by the termination of U.S. Department of Agriculture ("USDA") grant funding in the Farm Service Agency's ("FSA") Increasing Land, Capital, and Market Access Program ("ILCMAP," "ILA," "LCM"). If called to testify, I could and would state the facts herein.

2. King County is a governmental body in the State of Washington. The geographical extent of the County includes Seattle and the surrounding environs. The ILCMAP grant specifically funded the Water and Land Resource Division ("Division"), which sits within Department of Natural Resources and Parks for King County. That Division is charged with protecting, restoring, and managing King County's water and land using the best available science and

innovation, in collaboration with our partners and the community. The Division administers King County's Farmland Access program, which is focused on aiding new and beginning farmers endeavoring to establish or expand their farm businesses, farmland preservation, and farmland management.

3. I am an Environmental Programs Managing Supervisor, within the Division. I have held that role for ten years and am deeply familiar with the Division's work and the Department's and County's related activities.

4. King County applied for an ILCMAP grant related to a project entitled "King County (WA) Farmland Access Program." That grant proposal identified three primary objectives, all of which supported the priorities identified in the ILCMAP Notice of Funding Opportunity, and one objective focused on program management:

- Test alternative land tenure models that directly improve opportunities for farmland access;

- Expand education and outreach efforts to improve access to federal, state, and local capital access programs and technical training;

- Increase famers' access to markets; and

- Meet all grant program reporting and information sharing requirements and ensure that lessons learned are widely accessible via publication of results and presentations at professional conferences.

The grant application sought $2,499,984 in federal funds. A true and correct copy of King County's Application for this grant is included as Attachment 2 to the grant award agreement, attached hereto as **Exhibit A**.

2

5. USDA originally approved the award on November 17, 2023. Funding for this project was authorized through November 30, 2028 (**Exhibit A**). However, before that money was spent the agency sought certain clarifications, and the parties executed an agreement with those clarifications on April 3, 2024, with the understanding that funding would run from that date.

6. To date, the grant has enabled King County to support approximately 120 new and beginning farmers to establish or expand businesses on farmland owned by the County, provide 19 workshops to 225 participants on issues of concern to farmers, provide more than 250 coaching session to farmers, aid four community-based organizations to expand their farmer support and farmland access programs, provide technical support and guidance to five organizations to navigate the land purchase process, enable Highline College to continue their Sustainable Agriculture Program, and create structures, frameworks, and procedures to increase such work in the future.

7. Had the grant moved forward it would have supported additional efforts for King County and community-based organizations to acquire and cooperatively manage farmland, pilot a loan program to support beginning farmers, purchase tools and equipment for shared use by farmers, support additional education and technical assistance including enabling new farmers to enroll in Washington State University's Cultivating Success program, pilot alternative land tenure models, and facilitate communication among beginning farmers.

8. On March 23, 2026, the County (and me personally) received a letter from USDA and FSA terminating King County's ILCMAP award. Beyond the termination letter, neither I nor King County have received any further communications from USDA or FSA to provide reasons or rationales for the termination. A true and correct copy of the termination letter is attached hereto as **Exhibit B**.

3

9. The termination letter contains pages of boilerplate asserting that the ILCMAP program does not further the agency's current agenda, which objects to DEI and purported wasteful spending.

10. When the letter turns to addressing King County's grant, its rationale is limited, quoting language that states the project will aid "new and beginning; and BIPOC and other historically underserved farmers" and then stating, without citation, that "many of the initiatives are intended to improve opportunities specifically for BIPOC farmers."

11. The termination letter also asserts that the ILCMAP program has been subject to "wasteful spending" and "did little to further lawful agricultural land purchases." However, the letter provides no support for these statements in connection with King County's project.

12. As a governmental body, King County takes its role as a responsible steward of public funds extremely seriously and has a lengthy history of successfully managing government grants. Indeed, the Division within the County receiving this grant assigned a grant specialist to the program who is trained in federal grant management and supervised by superiors with such training and experience. The County utilizes a highly respected procurement and financial tracking system, which is subject to frequent audits. As part of that system, the County has independent mechanisms to ensure the propriety of all of its contractors' expenditures, with each invoice reviewed at multiple levels prior to processing for reimbursement.

13. Thus, unsurprisingly, all of King County's and its contractors' reimbursement requests were approved by USDA (although some recent requests remain pending at the time of this declaration). No USDA or other federal official has ever even raised a question regarding the expenditures under the grant.

14. No one from USDA ever contacted us to discuss any of the concerns in the termination letter and whether the project could be modified to address those concerns.

15. The termination letter claims to consider the County's and contractors' "reliance" interests in the grant, but only does so by listing certain partners on the project.

16. In fact, the termination has had and will continue to have devastating and irreparable impacts. King County made significant investments based on the award. These included: reorganizing the existing structure of the County's agriculture program to focus staff and budget on actions supported by the grant, extending terms of service for existing staff through the anticipated four-year term of the award, adding farmland to the County's farmland portfolio to test new approaches to farmland access, and coordinating with the entities named in the County's grant proposal to begin the process of developing scopes of work to support contracts with these entities, which allowed those entities to hire/retain staff with the expectation that they would collaborate with King County on farmland access issues for at least the four-year term of the award.

17. King County takes its responsibility to farmers extremely seriously and this termination occurs in the middle of growing season. Thus, it has chosen to use independent funds to maintain the program through the end of 2026.

18. For King County to do so, it must redirect funds from other programs. This necessarily means other County work will be delayed or cancelled, including equipment purchases to support efforts to educate farmers about more efficient irrigation systems, development of tree code guidance for cities and King County to conserve urban forest canopy on publicly owned land, restoration of urban forest in unincorporated King County, and training and education to reduce wildfire risk in communities within the wildland-urban interface.

19. If sufficient replacement funding cannot be found by the end of 2026—which King County is diverting resources to look for—King County will have to cancel six different contracts that enabled the County to implement the grant, including County contracts with one college (Highline College), one local Community Development Financial Institution (Business Impact Northwest), and four community-based organizations (collectively, the County's "Contractors"). As a result, we expect staff both within King County and at some of our Contractors may be laid off, and our Farmland Access program would be significantly scaled back, starting January 1, 2027.

20. In addition to the financial impacts to staff, King County would be responsible for all unemployment claims of its laid off staff, and we expect the same will be true for Contractors who lay off staff.

21. For two of our Contractors, SnoValley Tith's Experience Farming Project and Highline College's Sustainable Agriculture Program, the grant was the primary source of revenue, thus it is likely that without the grant or new sources of funds those entities will shut down. Of course, Contractors are also redirecting time from their work to look for alternative funding sources.

22. Moreover, because of the complexities of government funding, even if King County is able to obtain funding from alternative sources, many of the programs funded by the grant will have to be shut down.

23. Without the grant or replacement funding, King County will be unable to provide the same support to the land and farmers it had intended, which in turn harms the County's reputation with those farmers, as well as the community groups on which those farmers rely (including some of the Contractors). In the long term, this will undermine the County's effort to

expand farmland access and support the next generation of farmers, which will reduce agricultural production and community benefits.

24. On April 21, 2026, King County submitted an appeal via letter to the USDA National Appeals Division ("NAD"). A true and correct copy of this Appeal Request is attached hereto as **Exhibit C**.

25. On April 29, 2026, NAD notified King County that FSA's March 23, 2026, decision terminating our ILA grant is not appealable because it concerns matters of general applicability, and that, accordingly, NAD does not accept our request for an appeal of FSA's decision. A true and correct copy of this determination is attached hereto as **Exhibit D**.

26. The injury to King County and its interests would be redressed by an order from the Court granting Plaintiffs their requested relief. The County would be able to complete most of the scope of work outlined in the Notice of Award. In particular, restoration of grant funding will eliminate the need to cancel agreements with contractors, which will save one full-time and several part-time positions, and avoid the possible need to lay off two full-time King County employees.

I declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed this 21st day of May 2026 in Washington State.

Signed by:

*Richard Martin*

24A669931DE74DA...

Richard Martin

Environmental Programs Managing Supervisor

Water and Land Resources Division

Department of Natural Resources and Parks

King County, Washington

EXHIBIT A

NOTICE OF GRANT AND AGREEMENT AWARD

Docusign Envelope ID: 6F57DB4A-40B5-8C53-82C7-45AAC0BEC5F8

Docusign Envelope ID: 6E57DB4A-40B5-8C53-8207-45AAC0BEC5E8

U.S. Department of Agriculture

ADS-093
7/2012

## NOTICE OF GRANT AND AGREEMENT AWARD

| 1. Award Identifying Number<br>FSA24GRA0011608 | 2. Amendment No.<br>01 | 3. Award/Project Period<br>Date of Final Signature - 11/30/2028 | 4. Type of Award Instrument<br>Grant |
|---|---|---|---|

| 5. Agency:<br>(Name and Address)<br><br>USDA, FSA Office of Outreach<br>1400 INDEPENDENCE AVENUE, SW<br>Stop 0511, Room 3086-S<br>WASHINGTON, DC 20250 | 6. Recipient Organization: (Name and Address)<br>King County<br>201 S Jackson ST STE 5600<br>Seattle, Washington 98104-3855 |
|---|---|

| | | DUNS:<br>LZQMTMARC8Q3 | EIN: |
|---|---|---|---|

| 7. Agency Program Contact:<br>TOSCHA STOKES<br>toscha.matthews@usda.gov | 8. Agency Administrative Contact:<br>Michelle Cruz<br>michelle.cruz@usda.gov | 9. Recipient Program Contact:<br>Melissa Borsting<br>mborsting@kingcounty.gov<br>206.263.0780 | 10. Recipient Administrative Contact:<br>Melissa Borsting<br>mborsting@kingcounty.gov<br>206.263.0780 |
|---|---|---|---|

| 11. CFDA Number<br>10.968 | 12. Authority<br>Section 1006 of American Rescue Plan Act,<br>amended by Inflation Reduction Act of 2022 | 13. Type of Action<br>ii. Amendment/Revision | 14. Project Director<br>Richard Martin<br>richard.martin@kingcounty.gov<br>206.477.3876 |
|---|---|---|---|

**15. Project Title/Description:**

Complete agreement includes this ADS-093 (NOA) and attachments listed on page 2.

**16. Entity Type:** ____Profit ____Nonprofit ____Higher Education ____Federal __X__State/Local ____Indian/Native American ____Other

| 17. Select Funding Type: | ✔ Federal | ☐ Non-Federal |
|---|---|---|
| Original Funds Total: | $ 2,499,984.00 | |
| Additional Funds Total: | | |
| Grand Total: | $ 2,499,984.00 | $ 0.00 |

**18. Accounting and Appropriation Data**

| Financial Code | Amount | Budget Period | Treasury Symbol |
|---|---|---|---|
| WBS: FA.AD.ORCH.CA | $ 2,499,984.00 | 2231 | 12-1124 2022/2031 |
| BOC: 2559 | | | Fund: FAPMB1124D |
| Fund Center: FA10402000 | | | Functional Area: FA6011IRALLA |

**19. APPROVED BUDGET**

| | | | | | |
|---|---|---|---|---|---|
| Personnel | $ | 789,261.00 | Fringe Benefits | $ | 274,584.00 |
| Travel | $ | 13,400.00 | Equipment | $ | 0.00 |
| Supplies | $ | 14,836.00 | Contractual | $ | 1,297,035.00 |
| Construction | $ | 0.00 | Other | $ | 3,000.00 |
| Total Direct Cost\ | $ | 2,392,116.00 | Total Indirect Cost | $ | 107,868.00 |
| | | | Total Non-Federal Funds | $ | 0.00 |
| | | | Total Federal Funds Awarded | $ | 2,499,984.00 |
| | | | Total Approved Budget | $ | 2,499,984.00 |

This agreement is subject to applicable USDA statutory provisions and Financial Assistance Regulations. In accepting this award or amendment and any payments made pursuant thereto, the undersigned represents that he or she is duly authorized to act on behalf of the awardee organization, agrees that the award is subject to the applicable provisions of this agreement (and all attachments), and agrees that acceptance of any payments constitutes an agreement by the payee that the amounts, if any found by USDA to have been overpaid, will be refunded or credited in full to USDA.

Page 1

U.S. Department of Agriculture

ADS-093
7/2012

(Continuation)

## NOTICE OF GRANT AND AGREEMENT AWARD

| Award Identifying Number | Amendment No. | Award/Project Period | Type of Award Instrument |
|---|---|---|---|
| FSA24GRA0011608 | 01 | Date of Final Signature - 11/30/2028 | Grant |

List of Attachments:

Amendment Narrative; Attachment 1A - Revised Statement of Work; Attachment 2A - Revised Project Narrative; Attachment 3A - Revised Budget Narrative; Attachment 4A - Revised General Terms and Conditions

| Name and Title of Authorized Government Representative | Signature | | Date |
|---|---|---|---|
| Steven Peterson, Associate Administrator | STEVEN PETERSON | Digitally signed by STEVEN PETERSON Date: 2024.04.03 08:29:46 -04'00' | 04/03/2024 |
| **Name and Title of Authorized Recipient Representative** | **Signature** | | **Date** |
| Josh Baldi, Director, Water and Land Resources Division | Baldi, Josh | Digitally signed by Baldi, Josh Date: 2024.04.02 15:52:17 -07'00' | |

### NONDISCRIMINATION STATEMENT

The U.S. Department of Agriculture (USDA) prohibits discrimination in all its programs and activities on the basis of race, color, national origin, age, disability, and where applicable, sex, marital status, familial status, parental status, religion, sexual orientation, genetic information, political beliefs, reprisal, or because all or a part of an individual's income is derived from any public assistance program. (Not all prohibited bases apply to all programs.) Persons with disabilities who require alternative means for communication of program information (Braille, large print, audiotape, etc.) should contact USDA's TARGET Center at (202) 720-2600 (voice and TDD). To file a complaint of discrimination write to USDA, Director, Office of Civil Rights, 1400 Independence Avenue, SW., Washington, DC 20250-9410 or call (800) 795-3272 (voice) or (202) 720-6382 (TDD). USDA is an equal opportunity provider, employer, and lender.

### PRIVACY ACT STATEMENT

The above statements are made in accordance with the Privacy Act of 1974 (5 U.S.C. Section 522a).

Page 2

Amendment Narrative

## AMENDMENT NO. 1
## TO AGREEMENT NUMBER FSA24GRA0011608

### PURPOSE

The purpose of this amendment is to update the Notice of Award (NOA), Statement of Work (Attachment 1), Project Narrative (Attachment 2), and Budget Narrative (Attachment 3), and General Terms and Conditions (Attachment 4).

**Except as provided herein, all other terms and conditions of the original agreement and any previous amendments remain unchanged and in full force and effect.**

### REVISIONS TO THE NOTICE OF AWARD (FORM NRCS-ADS-093):

1. The Approved Budget for the agreement is revised as shown in Block 19.
2. The list of Attachments on page 2 of the NOA has been appended to include this amendment narrative and revised attachments.

### REVISIONS TO AGREEMENT ATTACHMENTS

1. The Agreement Statement of Work (Attachment 1) is replaced in its entirety with Attachment 1A to this amendment.

2. Agreement Project Narrative (Attachment 2) is replaced in its entirety with Attachment 2A to this amendment.

3. The Agreement Budget Narrative (Attachment 3) is replaced in its entirety with Attachment 3A to this amendment.

4. The General Terms and Conditions (Attachment 4) is replaced in its entirety with Attachment 4A to this amendment.

1

Attachment 1A

## Agreement Number: FSA24GRA0011608
## Statement of Work

### 1.  PURPOSE AND OBJECTIVES

The authorizing statute for this agreement is Section 1006 of the American Rescue Plan Act (Pub. L 117-2), as amended by Section 22007 of the Inflation Reduction Act of 2022 (Pub. L 117-169). Section 1006(b)(1) and (b)(2) of the American Rescue Plan Act authorizes assistance and support to farmers, ranchers, and forest landowners and operators; and focuses on addressing the needs of underserved producers through outreach, education, engagement, and technical assistance to increase land, credit, and market access. Section 1006 also provides resources for grants to improve land access, including providing resources related to heirs' property and other land access issues that affect access to USDA programs.

### 2.  SPECIAL CONDITIONS AND PROJECT ORIENTATION MEETING

All special conditions included in the original agreement statement of work are rescinded except those included in section 7, NATIONAL ENVIRONMENTAL POLICY ACT (NEPA) REQUIREMENTS.

### 3.  PROJECT NARRATIVE

The recipient will carry out the project described in the Project Proposal; the referenced Project Proposal is incorporated as Attachment 2A.

### 4.  BUDGET NARRATIVE

The official budget as noted in the award and described in the attached Budget Narrative (Attachment 3A) will be considered the total budget. Amounts included in this budget narrative are estimates. Reimbursement or advance liquidations will be based on actual expenditures, not to exceed the obligated amount.

### 5.  REPORTING REQUIREMENTS

   a.  The recipient must submit performance progress reports to the Results Verification System (RVS), according to the following schedule. The first performance progress report is due by March 31, 2024, and quarterly thereafter. Thus, for year 1 of the

1

agreement, the progress report due dates are as follows. Subsequent years of the agreement follow a similar schedule. Attach only 1 report per email. Further details on reporting to RVS will be provided during negotiation with the awarding agency.

Progress Report #1: March 31, 2024
Progress Report #2: June 30, 2024
Progress Report #3: September 30, 2024
Progress Report #4: December 31, 2024

b.  The recipient must submit financial report (SF-425) to the Farm Production and Conservation (FPAC) Grants and Agreements Division via email to FPAC.BC.GAD@usda.gov.  If the recipient requests reimbursement payments only, the first financial report is due June 30, 2024, and bi-annually thereafter. Thus, for year 1 of the agreement, the financial report due dates are as follows. Subsequent years of the agreement follow a similar schedule. Attach only 1 report per email.

Financial Report #1: June 30, 2024
Financial Report #2: December 31, 2024

If the recipient requests advance payments, financial reports are due at the same time as performance progress reports, which are as follows:

Financial Report #1: March 31, 2024
Financial Report #2: June 30, 2024
Financial Report #3: September 30, 2024
Financial Report #4: December 31, 2024

## 6.  PAYMENT INFORMATION

Payments under this award will be made upon submission to FPAC.BC.GAD@usda.gov of a properly executed SF-270, Request for Advance or Reimbursement, with appropriate supporting documentation. Additional information regarding payment supporting documentation is provided in the General Terms and Conditions for Agreements Processed Outside of ezFedGrants (eFG) (see Attachment 4A). Also see https://www.fpacbc.usda.gov/about/grants-and-agreements/awardpayments/index.html for preparation and submission guidance.

## 7.  NATIONAL ENVIRONMENTAL POLICY ACT (NEPA) REQUIREMENTS

The National Environmental Policy Act (NEPA) environmental review process must be completed for activities under this agreement with potential impacts to the human environment prior to the recipient drawing down funds or incurring expenses under this Grant Agreement. Before the NEPA process is completed, Federal regulations specify acceptable actions in 40 C.F.R. § 1506.1. USDA Farm Service Agency reserves the right to de-obligate funds obligated under this Grant Agreement (or to require the return of such funds) in the event a Recipient breaches or otherwise fails to perform under any of the Grant requirements.

FSA must approve the project plan before the land access and/or land improvement portion of the project is implemented (refer to the Programmatic Environmental Assessment for the Increasing Land, Capital, and Market Access Program). Prior to project plan approval, USDA Farm Service Agency will complete the NEPA process and provide a determination of whether further review, documentation, and/or mitigation measures are required. The Recipient must satisfy any requirements contained in USDA Farm Service

2

Agency's determination prior to drawing down funds, or incurring expenses related to the land access and/or land improvement activities. Once these conditions have been successfully completed, USDA Farm Service Agency will then notify the Recipient that the review is complete. At that time, the distribution and expenditure of funds associated with land access and/or land improvement activities will be authorized. Before the NEPA process is completed, Federal regulations specify acceptable actions in 40 C.F.R. § 1506.1.

## 8. GENERAL TERMS AND CONDITIONS

The General Terms and Conditions applicable to this award (General Terms and Conditions for Agreements Processed Outside of ezFedGrants (eFG)) are attached and incorporated as Attachment 4A. They are also available online at the following link:
https://www.fpacbc.usda.gov/about/grants-and-agreements/award-terms-and-conditions/index.html

Docusign Envelope ID: 6E57DB4A-40B5-8C53-8267-45AAG0BEC5F8

Agreement Number: FSA24GRA0011608                                   Attachment 2A

## INCREASING LAND, CAPITAL, AND MARKET ACCESS PROGRAM

### USDA-FSA-LANDACCESS-22-NOFO0001219

### King County (WA) Farmland Access Program

### Local/State/Territorial Land Access Tier

**Project Contact:** Richard Martin, King County, Department of Natural Resources and Parks
Email: Richard.Martin@kingcounty.gov Phone: (206) 477-3876

**List of Project Partners:**

Black Farmers Collective                                   Living Well Kent
Business Impact Northwest                                  Wakulima USA
International Rescue Committee

## A. Introduction

### 1. King County Farmland Access Program

King County is committed to being anti-racist and pro-equity, in every aspect of its culture and its business - including in its Farmland Access Program. The 2015 King County Local Food Initiative[1] identified several strategies to expand the farming economy and increase access to farmland. Two themes common to those strategies were improving farmland productivity and reducing barriers to land access and capital by historically underserved farmers. To support the establishment and expansion of farm businesses operated by beginning and black, indigenous and people of color ("BIPOC") farmers, the King County agriculture program works to make farmland and infrastructure accessible to groups who face systemic barriers to accessing land, capital, and technical support for farm business establishment and growth.

King County has long operated a Farmland Leasing Program and under that program the lands leased to area residents engaged in farming are owned by King County. However, this USDA grant is not being used to fund the administration, leases or any work related to the Farmland Leasing Program. Instead, this USDA grant is being used to fund the King County Farmland Access Program, the activities of which include instructing farmers in all aspects of accessing and farming land. As a result of the instruction that they receive, it is possible that a farmer may locate and negotiate a lease on land owned by King County, but the Access Program is not intended to create this result and would not steer farmers to do so. The only certain link between the two distinct programs is that the Access Program is benefitting from the knowledge, relationships and community-building that has been done under the Farmland Leasing Program and as a result its effectiveness and outcomes are almost certainly assured.

---

[1] King County Local Food Initiative https://kingcounty.gov/elected/executive/constantine/initiatives/local-food-initiative.aspx

1

Farmland in King County, and other periurban areas around the country is becoming increasingly expensive (high quality farmland regularly sells for over $50,000 per acre) and farmland access challenges for historically underserved communities are almost insurmountable. The King County agriculture program has built a portfolio of farms that provide farmers who otherwise are not able to secure farmland an opportunity to produce healthy food for their communities, and to establish and grow new, thriving businesses. The King County farmland portfolio is diverse (see section D2 for a description of the primary farms in King County's farmland leasing program), but all farms are managed with the same objectives:

- Support new and beginning and historically underserved farmers.
- Provide equitable access to land and infrastructure that can support establishment and growth of local farm businesses.
- Incorporate management practices that conserve water, reduce reliance on fossil fuels, and maximize the short- and long-term farming potential of King County owned farms.

King County-owned farms support over 50 farm businesses, most of which are BIPOC owned, and over 100 individual farmers. Demand for reasonably priced farmland is great and, although King County continues to expand its farmland portfolio, the demand cannot be accommodated through traditional landowner-tenant models and cannot be solved through public farmland ownership alone. Thus, alternate tenure models need to be developed and tested. Additionally, BIPOC and other historically underserved farming communities often lack knowledge of and access to agricultural education, technical training and capital that can only be addressed through focused, culturally sensitive engagement.

## 2. Statement of Goals

The overarching goals of the **King County Farmland Access Program** are to 1) support establishment and expansion of farm businesses operated by new and beginning; and BIPOC and other historically underserved farmers, and 2) provide technical and business assistance needed to enable those farms to become economically viable. The work outlined in this proposal builds upon the foundation established by King County's Farmland Access Program and creates a more comprehensive approach to land access, technical support, and farm program education. One of the key strategies outlined in this proposal is to make farmland and infrastructure accessible to individuals and groups who have faced historic and systemic barriers to accessing land  by providing alternative land tenure models that can potentially be adopted in this region and beyond.

## 3. Justification

The proposed body of work aligns with the President's *Justice40 Initiative* and King County's Equity and Social Justice Strategic Plan[2], Local Food Initiative, Strategic Climate Action Plan[3], and Clean Water Healthy Habitat Strategic Plan[4]. Each of these initiatives have explicitly acknowledged historical and ongoing barriers to accessing farmland and other resources by

---

[2] King County Equity and Social Justice Strategic Plan https://kingcounty.gov/elected/executive/equity-social-justice/strategic-plan.aspx
[3] King County Strategic Climate Action Plan https://kingcounty.gov/services/environment/climate/actions-strategies/strategic-climate-action-plan.aspx
[4] King County Clean Water Healthy Habitat Initiative
https://kingcounty.gov/elected/executive/constantine/initiatives/clean-water-healthy-habitat.aspx

historically underserved farmers and farming communities. Many of the strategies outlined in those initiatives are intended to improve opportunities for farmland access for beginning and BIPOC farmers and have informed development of the work described in this proposal. The **King County Farmland Access Program** will increase access to fresh, healthy, culturally relevant foods, provide farm business development opportunities for members of historically underserved farming communities, and provide much-needed access to local, state, and federal programs aimed at providing critically important capital needed to support small farm businesses.

According to the 2015 Census of Agriculture, 80 percent of King County farms generated less than $10,000 in gross farm sales annually. The potential for growth of those businesses is great if they are supported to overcome issues related to land access, capital for infrastructure improvements and equipment, and assistance to access market opportunities. Although annual revenue from many King County farms is relatively low, it is especially acute among members of the BIPOC farming communities. King County has invested in multiple efforts over the years to gather information from, and engage with, immigrant and refugee communities to support fair and just access to farmland and farming services.

Several South King County NGOs and Community Based Organizations ("CBOs") have responded to the needs of historically underserved communities by developing farmer training programs and providing land access and technical support to a growing number of individuals. Farmland managed by King County's agriculture program has been central to the development of those programs and often serve as the location for farmer training.

King County has a long history of supporting immigrant and refugee farmers. Collaboration between King County and Pike Place Market resulted in the launch of the Indochinese Farm Project in 1980 on Sammamish River Farm. More recent examples of collaborative ventures that are focused on supporting BIPOC farmers include Tilth Alliance using Green River Farm for education and outreach for BIPOC farmers, SnoValley Tilth using Snoqualmie River Farm as a platform for their Experience Farming Project, and Highline College using Horseneck Farm for program delivery to underserved farmers as part of their Beginning Farmer and Rancher Development grant.

In 2019, King County and partners interviewed 115 immigrant and refugee farmers who had expressed an interest in establishing or expanding their farming businesses in King County. Members of the Bhutanese/Nepalese, Burmese, Congolese, Hmong, Kenyan, Karenni, Senegalese, Somalian and Sudanese communities were included in the interviews. Five key challenges that limit the ability of immigrant/refugee farmers to establish or expand commercial farming businesses in King County were identified through the interviews, four of which are addressed in this proposal: access to farmland, market accessibility, communication, and technical education.

As King County Department of Natural Resources and Parks (DNRP) became aware of the growing interest in farmland access within the expanding BIPOC community, especially among immigrants and refugees, it became clear that there was a need for significant, targeted, investment to develop and implement additional strategies that would directly contribute to two key objectives outlined in the Local Food Initiative:

- Increase the land base dedicated to food production by at least 400 acres per year.

3

Agreement Number: FSA24GRA0011608                                                    Attachment 2A

- Increase the number of new and beginning farmers by 25 per year.

King County and surrounding counties comprise the 13th largest metropolitan center in the US, and it supports a large and growing BIPOC community (King County population 44% BIPOC in 2020). Preservation and expansion of a viable agricultural landscape is a priority for King County as a key component of the growth management plan, as an important core economic sector, and to respond to the demand from residents who desire to launch or expand farm businesses. Farming in a periurban landscape is especially challenging for BIPOC and other historically underserved communities due to land prices, with farmland values regularly exceeding $50,000 per acre.

### 4. Target Audience

This proposal is intended to directly support immigrant/refugee and other BIPOC farmers, as well as new and beginning farmers, all of whom have experienced extreme challenges accessing farmland in King County and have also had difficulty obtaining needed technical and financial services due to significant communication barriers.

The 2017 Census of Agriculture indicated that approximately 13% of the commercial farms in King County were BIPOC owned while 44% of county residents were identified as BIPOC. Beyond significant challenges of access to capital, historically underserved communities often lack access to information about agricultural programs, so participation in farm education programs, technical training and farm support programs are also typically low. Agencies and NGOs have significantly increased efforts to reach underserved farming communities and we have learned that success hinges on being directly connected to the communities being served.

The objectives, activities and actions described in this proposal were all developed through many years of outreach and partnership building with BIPOC farmers and the community organizations that support them. We have historically taken an adaptive management approach and tailored the County's farmland leasing program to meet the needs of tenants and partner organizations, which includes deliberate efforts to share decision-making power. That same approach will be used in the **King County Farmland Access Program**, to ensure that the needs of the target audience are both heard and addressed.

### B. Objectives and Outcomes:

1. **Objectives** (described in detail in section D3)
   - **Objective 1**: Continue to develop and expand the **King County Farmland Access Program**, which includes testing alternative land tenure models that directly improve opportunities for farmland access by historically underserved communities.
   - **Objective 2**: Expand education and outreach efforts so that historically underserved communities gain access to federal, state, and local capital access programs and technical training.
   - **Objective 3**: Support immigrant/refugee/BIPOC and other historically underserved farmers to improve access to markets.

4

Agreement Number: FSA24GRA0011608        Attachment 2A

- **Objective 4**: Meet all grant program reporting and information sharing requirements and ensure that lessons learned are widely accessible via publication of results and presentations at professional conferences.

## 2. Outputs (metrics)

The following key performance indicators (program outputs) will be used to measure program activities. All indicators are focused on the targeted communities for this program (new/beginning farmers and BIPOC farmers) and measures will include demographics that mirror what is presented in the Census of Agriculture to ensure that services reflect the agricultural community in King County. Demographics will also be compared against the demographics of King County to ensure that we are providing equitable access to our services.

| Program Area | Key Performance Indicators (Outputs) | Goal |
|---|---|---|
| Land Access | Number of meetings with individual farmers to understand need and provide coaching on farmland access programs | 50 / year |
| | Number of presentations to organizations to understand level of demand and to provide support to pursue land tenure options | 1 / quarter |
| | Number of on-farm workshops to discuss land access options and opportunities | 2 / year |
| | Number of RFPs for access to farmland parcels issued | 1 / year |
| | Number of farmland access teams established to assist organizations expand or establish new farming enterprises | 2 / year |
| Capital Access | Number of workshops (in-person, on-farm, virtual) to provide information about available financial support for land access, infrastructure/equipment purchase, and farm practice cost-share | 2 / year |
| | Number of small farm loans secured by historically underserved farmers for farm/infrastructure/equipment purchases (loan funding will be from established programs, not the FSA Increasing Land Access grant funds). | 15 / year |
| Market Access | Number of farmers from target audience that access education and outreach programs about markets and marketing | 50 / year |
| | Number of new markets where product is sold by these farmers | 5 / year |
| Program Management | Securing dedicated County funding to ensure long-term program viability | Funding secured by project end |
| | All required progress and final reports are submitted on time and are of high quality. | All timelines met |

## 3. Outcomes (metrics)

The following key measures of success (outcomes) will track effectiveness of program investments. All measures are focused on individuals and organizations in the program's targeted

5

Agreement Number: FSA24GRA0011608                                    Attachment 2A

communities (new/beginning and BIPOC farmers), which have historically not been able to readily access farm programs.

| Program Area | Key Measures of Success (Outcomes) | Goal |
|---|---|---|
| Land Access | Number of farmers successful in securing new acreage to begin or expand their farm businesses | 20 / year |
| | Number of organizations able to secure new acreage to begin or expand collaborative farming programs (long-term lease or fee title) | 1 / year |
| | Percentage of King County-owned farmland leased to BIPOC growers | 90% |
| Capital Access | Amount of public and private funds secured to assist organizations with land access | $2 million / year |
| | Number of farmers who successfully access capital for infrastructure, equipment, and farm management through existing federal, state, or local cost-share or loan programs for the first time (FSA Increasing Land Access grant funds are not providing loans). | 15/year |
| | Percent increase in farms participating in federal crop insurance | Double current rate |
| | Number of BIPOC farmers who apply for FSA loan programs for the first time. | Double current rate |
| Market Access | Number of farmers newly able to market farm products at established farm stands, farmers markets, etc. | 15 / year |
| | Increase in volume of farm products sold by farmers and organizations participating in the land tenure model pilot projects | 10% / year |
| Program Management | Ensure program continues beyond grant period and project team competency grows | Long-term program stability |
| | Required grant reports meet expectations of grant program administrators | Reports approved |
| | Lessons learned disseminated widely | Journal publication and professional presentation |

## D. Approach

### 1. Formalize the King County Farmland Access Program

Although the King County farmland leasing program has successfully enabled a large number of BIPOC farmers to build their farm businesses, there is significant unmet demand that requires a more comprehensive approach and one that recognizes that there is no single land tenure model that works for all farmers and all organizations. King County is very diverse, with residents coming

6

Agreement Number: FSA24GRA0011608                                                  Attachment 2A

from over 150 countries, and approximately 25% of the county's 2.25 million residents are foreign-born. Many of those immigrants and refugees come from a strong farming background and are working hard to access farmland in King County and to learn how to farm in a new region. Many of those farmers want to expand production and availability of culturally appropriate foods that are in high demand by members of their community.

Most BIPOC farmers in King County own or lease relatively small plots (1-5 acres) and often work collaboratively with other members of their community on a shared, larger farm. Historically, those farmers have employed traditional farming practices but are eager for education as well as technical and financial support that would allow them to adopt practices that best match the local food system and are more environmentally friendly and climate resilient.

King County has built relationships with community organizations that represent many of the BIPOC farming communities in the County. Those organizations include the International Rescue Committee[5], which serves immigrants and refugees from around the world; Wakulima USA[6], which serves African immigrants and refugees; Hmong Association of Washington[7]; Black Famers Collective[8], which focuses on black-led food systems; Living Well Kent[9], which strives to improve the health of residents of the city of Kent, WA, through increased access to locally produced food; and others. The work described in this proposal will formalize the **King County Farmland Access Program**, establishing a much more coordinated, efficient, and effective approach to meeting the needs expressed by underserved farmers in King County.

## 2. Current Farmland Portfolio

King County currently owns and manages a suite of farms that comprises approximately 280 farmable acres. Those properties provide important farmland access opportunities for individuals and community/farm organizations that have historically had little access to farmland in King County. Of the 107 farmers currently farming on King County-owned farmland, 94 are BIPOC farmers. Although there are 10 farms in the County's portfolio, six are considered core components of the Farmland Leasing Program. Each provides opportunities for King County to explore creative models for land access. Knowledge of and access to USDA farm programs by immigrant/refugee and other BIPOC farmers has been extremely limited, owing in part to language barriers, so most farmers have never been able to take advantage of technical training, cost-share, etc., that could help them grow their farm businesses.

- **Green River Farm**: this 26-acre farm is part of a patchwork of high-quality farmland in the rapidly developing Kent Valley. This farm has been home to immigrant and BIPOC-owned farm businesses for twenty years and currently supports 18 immigrant and BIPOC farmers.
- **Hamakami Farm**: this 37-acre property, which includes 19 farmable acres and was farmed by a succession of family-owned businesses until it was recently acquired by King

---

[5] International Rescue Committee, Seattle https://www.rescue.org/united-states/seattle-wa
[6] Wakulima USA https://wakulimausa.org/home.php
[7] Hmong Association of Washington https://www.hmongofwa.org/
[8] Black Farmers Collective https://www.blackfarmerscollective.com/
[9] Living Well Kent https://livingwellkent.org/index.html

7

Agreement Number: FSA24GRA0011608                                                            Attachment 2A

County. The property is now leased to two immigrant-owned farm businesses, which are managed by eight farmers.

- **Horseneck Farm**: King County leases 26 acres of farmland to organizations and individual farmers to maximize opportunities for BIPOC farmers to establish, develop, and expand their farm businesses. King County's Agriculture Program has partnered with multiple organizations to coordinate farmland access for over 40 farm businesses on 13 acres of the farm. King County will expand their program to the full 26 acres by 2024. When fully transitioned, the farm will support over 50-75 new and beginning BIPOC farm businesses.
- **Issaquah Creek Farm**: This 123-acre property, which includes about 50 acres of farmable land, was acquired primarily to support salmon recovery efforts. In 2023 4 acres were leased to five BIPOC farmers for food and flower production. The goal is to provide up to 50 acres for a combination of livestock, vegetable, and flower production by multiple BIPOC and historically underserved farmers by 2026.
- **Sammamish River Farm**: This 18-acre farm was the launching pad for Hmong and Mien farm businesses in King County and from this core farming community, over 75 Hmong and Mien businesses have been established in King County and adjacent counties. This farm also serves as a cornerstone for the Black Farmers Collective farm program. There are currently 22 immigrant/BIPOC farmers on this property.
- **Snoqualmie River Farm**: Continually operated as a family farm for over 100 years, this 69-acre farm (19 farmable acres) was acquired by King County to support a farm business incubator program managed by SnoValley Tilth, a local farm support and advocacy organization. The farm currently supports 16 farmers, five of whom are BIPOC.

## 3. Proposed Activities

A set of priority activities have been identified as key to achieving each objective. Those activities have all been created to meet a shared set of principles:

- **Commercial food production is prioritized** to promote the local food economy and meet the demand for culturally relevant food that is sold through a variety of outlets, including farmers markets, produce delivery boxes, and restaurants.
- **Production and business support resources are provided** to enhance commercial viability, promote soil health, and ensure food handling safety.
- **Farm infrastructure and/or access to necessary capital** to meet the needs of farmers while adhering to land use code requirements and protecting natural resources.
- **Tenant and farm owner selection is transparent** to ensure the prioritization of land access for socially disadvantaged and new and beginning farm businesses.
- **Decision-making power will be shared and alternative pathways to farm ownership will be strongly supported** to achieve desired equity outcomes.

**Objective 1: Develop and expand the King County Farmland Access Program, which includes testing alternative land tenure models that directly improve opportunities for farmland access by historically underserved communities.**

Around the country, partnerships have coalesced around the goal of connecting farmers with farmland (e.g., Jefferson (WA) LandWorks Collaborative, California FarmLink, Maine FarmLink, Seattle (WA) Tilth Alliance FarmLink, etc.). In 2017, King County collaborated with King

8

Conservation District and Washington Farmland Trust's Farm-to-Farmer Program to form the Working Farmland Partnership (WFP), which focuses partner resources on strategies that support effective farmer-landowner connections.

The WFP collaboration has led to successful placements of farmers on leased land and been an opportunity to gauge demand for farmland access as well as types of land tenure being sought by farmers in King County. The WFP collaboration has helped identify the areas where King County is uniquely situated to play a critical role in expanding land access options. Our Farmland Leasing Program is effective at providing land access for a subset of underserved farmers. But there are many other individuals and organizations who seek farmland access who we cannot serve with our Farmland Leasing Program. King County's Farmland Access Program is poised to address this demand, leveraging our existing relationships with community-based organizations, technical agricultural service providers, and lenders and grantors who fund farmland purchases.

Although there have been many discussions about the need to explore alternative land tenure models in King County, to date there have been no significant attempts to do so. Funding through this grant program will provide the staff necessary to finally pilot a suite of innovative land tenure models that target the needs of historically underserved farmers and community-based organizations. Because we understand that no one approach will solve the land access challenges faced by diverse communities in a large and growing metropolitan (King County and surrounding counties comprise the 13th largest metropolitan center in the US), we propose testing a range of alternative farmland tenure models.

**Activity 1: Expand support for access to farmland by individual, independent farmers, with an emphasis on immigrant/refugee/BIPOC and other historically underserved communities.** Individual farmers will assume primary responsibility for farm management, but King County and partners will provide education, training and assistance with access to capital.
  - o  Action 1: Hire farmer education and outreach staff to partner with WFP so there is expanded capacity for land matching working groups and coordination/leadership of individual project teams.
  - o  Action 2: Reach out to farmers and landowners to encourage participation in WFP.
  - o  Action 3: Increase outreach to historically underserved farmers so they are aware of farm support programming.

**Activity 2: Support collaborative farming on King County owned farmland under the umbrella of one of more community organizations that support immigrant/refugee/BIPOC and other historically underserved farmers.** Organizations will be given significant influence on site management decision-making; recruitment and support of individual farmers; and shared equipment and infrastructure. Organizations and King County will share responsibility for farm management and infrastructure development and provide support to organizations, so they are able secure needed resources. County and partners provide technical support and education about accessing federal, state, and local farm capital support programs.
  - o  Action 1: Support organizational capacity building through collaboration and contracts with five Community Based Organizations for community outreach coordination and support.

9

Agreement Number: FSA24GRA0011608                                      Attachment 2A

> o Action 2: Develop a master charter for tenure model and individual charter for Horseneck Farm and any additional collaborative farming trial that clearly identifies roles, responsibilities, and expectations.
> o Action 3: Continue to invest in initial pilot project (Horseneck Farm) to better understand challenges and approaches to problem solving.
> o Action 4: If requested by organizations, secure additional farmland to replicate Horseneck Farm pilot project.

**Activity 3: Coaching and education to support fee title purchase of privately owned farmland by community organization, cooperative, or individual farmers, with an emphasis on immigrant/refugee/BIPOC farmers and farmers from other historically underserved communities.** Owners would have responsibility for all farm management, County and partners would provide technical support, education, and coaching to successfully utilize federal, state, and local farm capital support programs.

> o Action 1: Work with organizations interested in piloting this land tenure mode to develop acquisition and business plans.
> o Action 2: Provide outreach, education and technical support on how to secure capital for land purchase. Collaborate with funders (e.g., King County Conservation Futures Fund) to develop written guides and technical assistance that will assist organizations seeking funds to secure necessary capital for purchase. Provide coaching as requested.
> o Action 3: Work through WFP or direct engagement with landowners to identify suitable farmland and assist organization(s) with negotiations and purchasing using their own funds.

**Objective 2: Expand education and outreach efforts so that historically underserved communities can gain access to federal, state, and local capital access programs and technical training.**

Access to working capital, cost share programs, and technical training are critical components of meaningful land tenure. Farmers must utilize a diverse set of resources to establish and grow their farm businesses. This is especially true for new farmers and those who are not inheriting a farm business or bringing generational wealth to their farming operation. Previous research and pilots conducted by project partners and others have crystalized understanding of the barriers that exist for BIPOC farmers and other historically underserved farmers. That group of farmers typically own or lease small farms and have struggled to access technical support and gain access to much-needed capital. NRCS and NASS have frequently reported that they have been challenged to reach many of the BIPOC farming communities in King County and are interested in collaborating to ensure more equitable delivery of services. For example, King County actively supported NASS with efforts to reach the Hmong farming community so there was significantly enhanced participation in the Census of Agriculture and local NRCS staff have suggested that King County owned farms would provide a valuable platform to reach traditionally underserved farmers more effectively. There are many good programs already in place, and King County is uniquely positioned to serve as a clearinghouse for program coordination and outreach. Activities under

Agreement Number: FSA24GRA0011608                                      Attachment 2A

Objective 2 will ensure producers can successfully utilize farmland by expanding loan opportunities for underserved producers and effectively connecting them to training and education.

**Activity 1: Increase capital access for traditionally underserved producers** throughout the Puget Sound region. Expenses are high when starting or expanding a farm, and underserved producers face similar barriers when they are seeking loans as they do when securing farmland. This grant will allow Business Impact NW ("BINW")[10], a nonprofit Community Development Financial Institution, to improve its ability to pursue and underwrite small-dollar agriculture lending by committing program capacity to expand opportunities for smaller loans. BIPOC farmers have been challenged to secure working capital because of lack of access to land, good credit, and adequate collateral. Farmers often need small amounts of flexible capital for initial farm investments including seeds, tools, equipment, and site improvements. While many farmers have come to rely on local grant funds, these can be restrictive and highly competitive. Building the skills in underserved producers around how to successfully utilize loans will expand their options for securing capital. ILA funds will enable BINW to build a strong base of agriculture lending, helping those most in need, regardless of the loan size. BINW staff will be responsible for outreach about farm loan opportunities, delivering at least two workshops/year for farmers, and providing 1/1 coaching to help farmers identify and apply for appropriate loans based on their needs. In addition, BINW will expand program capacity to manage small-dollar lending, with the primary goal of serving a significant number of historically disadvantaged farmers. While BINW has flexible lending structures to serve farmers, the ability to do small-dollar, time-consuming loans is limited by administration and staff costs. Note: federal funds will be used for BINW program costs. Federal funds will not be used for loans.
   - o Action 1: agricultural lender will develop outreach and education tools, deliver workshops, and provide coaching to support historically underserved farmers in securing small business loans (between $5,000 and $40,000)
   - o Action 2: pay for expanded program capacity to deploy loans secured from other sources to historically underserved farmers.

**Activity 2: Improve access to federal, state, local sources of technical training, farm business planning, and capital.** There are a number of successful outreach and education programs available to farmers in King County. However, many immigrant/refugee and other BIPOC farmers have not been able to take advantage of those offerings due to financial concerns, language barriers and lack of awareness. This activity aims to reduce those barriers, which will lead to greater participation by historically underserved communities.
   - o Action 1: Host technical support programs to provide business services to farmers through the Food Business Resources Center (FBRC). The FRBC offers classes and one-on-one advising on practical business skills such as accounting, bookkeeping, marketing, social media, and leveraging capital to grow an agriculture business. The ability of the new small-dollar agriculture lender to work closely with FBRC food and farm advisors increases the power of small, historically disadvantaged specialty crop farmers to access and successfully implement strategies to start and grow their farm operations.

---

[10] Business Impact NW https://businessimpactnw.org/

11

Agreement Number: FSA24GRA0011608                                                          Attachment 2A

   o Action 2: Provide interpretation, translation, and program development support to ensure that existing agricultural training programs and workshops are accessible to farmers who do not have English as their first language.

   o Action 3: Provide up to 12 pre-paid registrations for Washington State University Extension's Cultivating Success, which educates new farm business owners about available resources, business planning, legal issues, marketing strategies, budgets, financial statements, and how to obtain financial resources.

**Activity 3: Develop innovative and effective communication plans to disseminate information** about: farmland access opportunities, education and technical training, and business capital for historically underserved farmers. Individuals, especially those from different cultures, respond differently to forms of outreach and education. We will work with farmers and community organizations to understand the preferred methods of communication and modify programming accordingly. The objective is to provide timely and culturally relevant technical assistance to producers on how and when to apply for local, state, and federal programs.

   o Action 1: Work with farmers and community organizations to identify and apply new forms of information sharing that are more likely to reach target audiences, such as social media (e.g., WhatsApp).

   o Action 2: Customize existing workshops and webinars to feature farmers from BIPOC communities, emphasizing peer-to-peer farm tours and trainings at project "demonstration farms." These events will be offered in multiple languages and will be recorded and made available for farmers to watch on their own schedule.

**Objective 3: Support immigrant/refugee/BIPOC and other historically underserved farmers to improve access to markets.**

Formal and informal conversations with BIPOC farmers and community organizations that support BIPOC farmers have made it clear that our target audience does not understand how to: prepare for, locate, and be successful selling their products at farmers markets; or develop or sell into CSAs, farm stands, restaurants, distributors, etc. Farmers at some King County owned farms have not been able to capture maximum value for their products because they are unfamiliar with post-harvest handling techniques to ensure product quality, how to include the cost of production in their pricing, and how to market and engage customers from behind the market table. In addition, there have been challenges arising from limited or no public facing marketing signage at farmers markets leaving customers with the challenge of not knowing the farm or farmer's name or contact info, making it hard for a willing return customer to find them. There are also numerous food safety and marketing requirements - from handling to packaging and even display building, refrigeration, etc. - that farmers need to learn to be successful. Focused, culturally sensitive, language appropriate education and technical training is required, and King County owned farms can serve as teaching locations for King County sponsored programs as well as programs led by partner organizations. King County owned farms can also serve as the needed new farm businesses to help diversify product mix at King County farmers markets and other markets.

Smaller farmers markets in King County are ideal for beginning farmers as they provide supportive opportunities to enhance marketing and sales skills and are near a large population of customers

12

Agreement Number: FSA24GRA0011608                                               Attachment 2A

who are looking for culturally relevant fruits and vegetables not readily available elsewhere, and almost all King County farmers markets have SNAP and Snap Market Match programs to enhance food accessibility.

Marketing culturally relevant food is also an opportunity to connect many consumers who seek preferred and familiar foods with  historically underserved farmers who want to expand production, crop selection and customers. This connection will greatly help to  chart the way to business viability.  With adequate support to build needed business relationships, there is significant opportunity to develop substantial and long-term markets for culturally appropriate, traditional foods for immigrants and unique and new foods for other shoppers.

**Activity 1: Customize programming so that market access education and training is accessible to historically underserved farming communities**. Opportunities for small-scale farmers to sell produce at farmers markets in King County are relatively limited and access to the more lucrative markets in major cities is challenging. Similarly, selling to institutional buyers, restaurants and other retail outlets requires building relationships, and most farmers with limited abilities to communicate in English don't have those affiliations; thus, they are challenged to initiate, and build needed new associations.
- o Action 1: Work closely with community partners to increase producers' access to local markets, developing innovative partnerships with retail stores and farmers markets to increase access to market channels.
- o Action 2:  Use King County farms as platforms for culturally relevant training about produce safe handling and packaging and how best to access markets for their scale of production (e.g., farm stands, farmers markets, CSA, restaurants).
- o Action 3: Host annual, preseason trade shows to make connections between King County Farmers Markets and farmers.

**Activity 2:  Support connections to buyers** that are willing to source fresh, culturally relevant producers from non-traditional sources.
- o Action 1: Collaborate with partner organizations to identify potential  buyers and work together to build demand for produce grown by historically underserved farmers.
- o Action 2: Hold educational workshops about best practices for processing and packaging produce to both ensure a high level of food safety and product quality.

**Objective 4**: Meet all grant program reporting and information sharing requirements and ensure that lessons learned are widely accessible via publication of results and presentations at professional conferences.

**Activity 1:  Meet all reporting and information sharing requirements of grant program**. Summarize outcomes of efforts to implement the range of land tenure models and approaches to enhance access to education, technical support, and capital. Pursue multiple outlets to disseminate project findings and recommended best practices.
- o Action 1: Submit all required progress and final reports on-time and ensure that content and quality meet expectations of grant program administrators.
- o Action 2: Adapt final report to a publishable  article and submit to an appropriate journal so that lessons learned and recommendations made are available to others

Agreement Number: FSA24GRA0011608                                      Attachment 2A

exploring alternative land tenure models or challenged to reach immigrant/refugee and other BIPOC farmers.
- o Action 3: Present project finding and recommendations to at least one meeting of farmland access professionals, agencies, and organizations.

## 4. Timeline

Although work on individual objectives, activities and actions will often occur simultaneously, the following is a general anticipated timeline for most of the project staff investment in each activity (May 2023 through April 2027; four years total).

| Objective | Activity | Action | Implementation Schedule | | | | |
|---|---|---|---|---|---|---|---|
| | | | 2024 | 2025 | 2026 | 2027 | 2028 |
| 1 | 1 | 1 | | | | | |
| | | 2 | | | | | |
| | | 3 | | | | | |
| | 2 | 1 | | | | | |
| | | 2 | | | | | |
| | | 3 | | | | | |
| | | 4 | | | | | |
| | 3 | 1 | | | | | |
| | | 2 | | | | | |
| | | 3 | | | | | |
| 2 | 1 | 1 | | | | | |
| | | 2 | | | | | |
| | 2 | 1 | | | | | |
| | | 2 | | | | | |
| | | 3 | | | | | |
| | 3 | 1 | | | | | |
| | | 2 | | | | | |
| 3 | 1 | 1 | | | | | |
| | | 2 | | | | | |
| | | 3 | | | | | |
| | 2 | 1 | | | | | |
| | | 2 | | | | | |
| 4 | 1 | 1 | | | | | |
| | | 2 | | | | | |
| | | 3 | | | | | |

## 5. Innovation

King County and many partners and stakeholders have developed and implemented innovative strategies to accomplish the goals outlined in three key County initiatives: Local Food Initiative, Strategic Climate Action Plan, and Equity and Social Justice Strategic Plan. Those initiatives are fully aligned with goals established in the American Rescue Plan Act/Inflation Reduction Act to

Agreement Number: FSA24GRA0011608                                                    Attachment 2A

ensure underserved producers have the resources, programming and technical support needed to succeed. However, historically underserved farming communities in King County continue to lag behind others in their ability to access farmland, technical training, education, and capital due to communication challenges, language barriers and lack of established networks. The activities outlined in this proposal include several innovative approaches that improve opportunities to access farmland and capital, and foster a higher degree of participation in technical training and outreach programs.

Although the proposed work outlined in this proposal includes a number of innovative approaches to improving access to capital, technical training and program outreach, the core of the proposed work is the exploration of alternative land tenure models that are tailored to meet the needs of the target audience. Lessons learned from those pilot projects will have broad applications regionally and throughout the country.

## 6. Recruitment and Outreach

King County has a network of organizations that supports historically underserved segments of the local farming community, especially residents from immigrant and refugee communities comprised of residents from Africa and Asia. Those organizations have been instrumental in guiding development of King County's farmland leasing program and have contributed significantly to our evolving approach to development of the more holistic **King County Farmland Access Program** that is envisioned through the work described in this proposal. We will work with organization leaders to determine how best to reach members of their communities and will provide translation/interpretation services, when needed, to minimize communication challenges.

King County is approximately ten percent Hispanic/Latino; however, only 4 percent of King County farms are Hispanic/Latino owned. As is common elsewhere in the U.S., Hispanic/Latino workers are an important component of the King County farm economy, especially on the largest farms. A study in nearby Skagit County indicated that many farm workers would be interested in farm ownership/leasing, rather than being limited to seasonal work as employees, if they were supported/made aware of opportunities - we assume the situation is the same in King County. Viva Farms[11], which has a presence in Skagit and King counties, has included Latino farmers, who were previously farm workers, in their farm incubator program and can provide guidance as to how we can reach members of the King County Hispanic/Latino farming community.

The population of King County is approximately seven percent African American; however, only about 0.5 percent of the commercial farms are owned by African Americans. Although there is not a history of significant African American farm ownership in King County, organizations like Black Farmers Collective are responding to the demand among members of their community for more locally produced, culturally relevant foods, by supporting farmer training and farmland access programs. Their partnership with King County at Sammamish River Farm has significantly expanded their ability to respond to that demand. We will work closely with Black Farmers Collective and other community organizations that support African American farmland access to

[11] Viva Farms https://vivafarms.org/

15

ensure that members of their communities are a part of program development and guide outreach strategies.

## 7. Sustainability

Success building an inclusive, sustainable network of individuals and organizations focused on new and beginning farmers, especially farmers from BIPOC and other historically underserved communities, is key to long-term success. This collaboration will be catalyzed by the activities outlined in this proposal. King County is proud to have collaborated with community organizations and partners in the initial phase of building an equitable farmland access program that is based upon County owned farmland.  The County is committed to working with community organizations and advocates for BIPOC farmers to leverage the good work that has happened thus far and build a comprehensive **King County Farmland Access Program**. King County will continue to allocate local funding annually to support the various agricultural programs and services, and both the County Executive and King County Council have expressed strong support for the County farmland leasing program and development of the King County Farmland Access Program, so we fully anticipate continued and expanded support for the work outlined in this proposal.

## 8. Scalability

Issues related to farmland access and education/technical support among members of historically underserved communities are ubiquitous in periurban regions of the US. Work outlined in this proposal will directly benefit many organizations and agencies active in King County. Lessons learned can be exported country-wide to support those who are considering adoption of alternative land tenure models and are working to support immigrant/refugee and BIPOC farmers to access land and services. Upon project completion, we will commit King County staff resources to ensure the results of this work are shared widely.

## 9. Potential Challenges

Key potential challenges identified for this project include the ability to acquire suitable farmland for program development, communication, and organizational capacity. None of those issues are considered high-risk or likely to limit project success, but strategies have been developed to mitigate potential risk.

**E. Personnel and Resources**:

**King County Department of Natural Resources and Parks** ("DNRP") works in support of sustainable and livable communities and a clean and healthy natural environment. Their mission is to foster environmental stewardship and strengthen communities by providing regional parks, protecting the region's water, air, land, and natural habitats, and reducing, safely disposing of, and creating resources from wastewater and solid waste. The following staff (with current DNRP titles) will form the primary team for the **King County Farmland Access Program**.

Agreement Number: FSA24GRA0011608                                                                                    Attachment 2A

**Patrice Barrentine (Agriculture Policy and Economic Development Specialist).** Patrice Barrentine has worked in the farm and food business sector in Washington State for twenty-five years as a buyer, economic development, and policy specialist. Patrice has consistently worked with underserved producers and established a regional network of women farmers. Patrice has worked with new and beginning commercial farmers across the state to help them market their products, meet regulations and was responsible for writing and publishing two the 2010 and 2014 versions of the Washington State Department of Agriculture's Handbook for Small and Direct Marketing Farms: Regulations and Strategies for Farm Businesses, as well as a second Farm Wisdom video series to support the written book with on-farm, and at-market examples for farmers. She helped create FarmKingCounty.org, an online, educational resource for farmers; hosts quarterly meetings of the managers of King County's 40 farmers markets; focuses on solving local meat processing bottlenecks, especially for East African and Afghan immigrant communities; serves as liaison to the King County Agriculture Commission; and serves on the Pike Place Market Preservation and Development Authority Council. Patrice will lead marketing and communications actions as part of the **King County Farmland Access Program**.

**Melissa Borsting (Agriculture Land Access Coordinator).** Before joining King County in 2018, Melissa was the Executive Director of SnoValley Tilth, a nonprofit serving farmers and consumers in the Snoqualmie Valley of western Washington. In that role, she led development of the Experience Farming Project, a program to provide farmland access to new and beginning farmers. The program team designed the services to address the specific needs of the farmers and working to improve the infrastructure on the land leased by the non-profit. She also successfully managed many local, state, and federal grant awards. At King County, Melissa has expanded on the established successes of the County's farmland leasing program by identifying ways to ensure the program is designed to better serve the immigrant, refugee, and BIPOC farming communities of King County. Melissa will serve as Grant Manager for the **King County Farmland Access Program**.

**Bee Cha (Farm Manager / Immigrant Farmer Outreach Coordinator):** Prior to joining the King County agriculture team, Bee served as Hmong Program Coordinator at Washington State University Extension, where he was an outreach educator and worked with Hmong farmers in King, Snohomish and Pierce counties in production, marketing, and business management. While at WSU Extension, Bee served on the Governor's Commission on Asian Pacific American Affairs. Bee has held several contract and staff positions with DNRP since 2012. Initially, Bee focused on providing support for Hmong farmers and members of other immigrant farming communities, and in 2019 coordinated an assessment of immigrant/refugee farmers in King County. Bee is regularly consulted by members of the immigrant/refugee farming community and provides much-needed translation/interpretation services for Hmong farmers so that language is not a barrier to access programming. Bee has a great passion for farming, understanding of resource challenged farmers, especially those in the Hmong and other immigrant farming communities and farms commercially alongside members of his family. Bee will serve as Farm Manager for the **King County Farmland Access Program** and will be the primary point of contact for tenant farmers.

**Michael Lufkin (Food Economy Manager).** For more than 20 years Michael Lufkin has been bringing diverse stakeholders together to tackle complex social and environmental problems. He has designed and implemented innovative policies and programs across a range of natural resource,

17

Agreement Number: FSA24GRA0011608                                          Attachment 2A

sustainable agriculture, climate change and renewable energy issues, both in the U.S. and internationally. Michael enjoys and excels at rallying groups with very different interests to work together toward a common goal. He has worked with policymakers, scientists, farmers, and large corporations to bridge their different interests and create tangible solutions that benefit them and their communities. Michael currently leads King County's Local Food Initiative, where he works with cross-sectoral teams developing innovative solutions that grow the local food economy and increase access to healthy, nutritious food for low-income communities. Michael is an attorney by training and has practiced law in the public, private and non-profit settings. Michael will provide high level leadership support for the **King County Farmland Access Program** and will work closely with community organizations to help them build capacity.

**Richard Martin (Environmental Programs Managing Supervisor).** Prior to coming to work for King County, Richard spent 25 years as a conservation director for The Nature Conservancy in multiple states and regions in the Southeast US. Richard worked closely with state and federal agencies, and private forestland and farmland owners to conserve and restore important resource areas. Richard successfully managed many large ($1 million or more) federal grants during his tenure with TNC. For the past seven years, Richard has managed the Agriculture, Forestry and Open Space Incentives Unit within DNRP, which strives to preserve farmland and support farmers, with a strong equity lens influencing all the work the unit engages in. Most significantly, Richard has guided a reframing and expansion of the County's farmland leasing program to better support new and BIPOC farmers. Richard will provide management support for all aspects of the **King County Farmland Access Program**.

## 1. Agencies and Organizations

The following organizations will be key contributors to the work outlined in this proposal.

**International Rescue Committee's New Roots** (IRC) program helps refugees become food secure and contribute to their new homes and communities. Since 2008, New Roots has helped new Americans to navigate their food resources, facilitated low-income families to enter urban agriculture, developed local food systems and community green space infrastructure, and provided a platform for youth and adults to build job and life skills. As of 2021, the IRC has a network of more than 62 New Roots gardens, farms, and markets across ten U.S. cities, where more than 5,000 people a year grow, prepare, share, buy, and sell local, healthy foods in their communities. These initiatives use food as a vehicle for positive change and leverage the knowledge and power of IRC's clients and partners to promote holistic health and wellness, new options for building livelihoods, and unique pathways for community integration.

**Living Well Kent Collaborative** (LWK) is a community-based organization united to achieve health equity through policy, systems, and environmental change. LWK was established to empower members of the greater Kent, Washington community to advocate for actions to reduce disparities and increase the opportunities to make healthy lives. LWK helps to build communities through collaboration, communication, engagement, promotion, education, and advocacy and has been a key partner in the Horseneck Farm collaborative.

**Wakulima USA** (Wakulima) is a farming and food business cooperative that advances small business development and food sovereignty for low-income immigrants and people of color in the

Puget Sound region. Wakulima's founding members are Kiswahili speaking African immigrants who are committed to preserving traditional farming and food ways and creating shared prosperity through cooperative economics. Our organization empowers people to harness their traditional food ways, modern farming techniques and food innovation strategies to build successful businesses centered around healthy, sustainable, local farming and food production. Wakulima produces and sells healthy produce and foods to consumers, restaurants and food businesses throughout Washington State. The cooperative currently includes 20 farmers from various countries in Africa who cultivate in Western Washington. Wakulima aims to increase the total number, net income, success rate and growth rate of farmers and food business entrepreneurs from the communities they serve.

**Black Farmer Collective** aims to build a black-led food system by developing a cooperative network of food system actors, acquiring, and stewarding land, facilitating food system education, and creating space for black liberation. BFC envisions black liberation through food sovereignty, in spaces bult on cooperation and interconnectedness with the environment and the community. BFC currently operates two farms in King County: Yes Farm in Seattle and Small Axe Farm on King County's Sammamish River Farm. They are considering options for program expansion and will explore opportunities to participate in one of the land tenure model pilot projects.

**Business Impact Northwest** (BINW) is a nonprofit Community Development Financial Institution (CDFI) dedicated to serving underbanked entrepreneurs since 1997. BINW provides coaching, classes, and access to capital to community small businesses, with an emphasis on working with historically underserved populations – entrepreneurial low/moderate income earners, women, BIPOC, veterans, immigrants, or members of the LGBTQ+ community. BINW promotes long-term positive economic change through financial services, business advice and training. BINW's objective is to provide financial and technical support to entrepreneurs in economically marginalized communities who would not otherwise have access to financial services. They serve startups as well as existing businesses and are dedicated to helping underserved entrepreneurs at every stage in their business growth. BINW is a certified, rated, and regulated financial institution, and while deliberate during the decision-making process, they can take considered risks on underserved small businesses in order to achieve their mission.

### Other organizations that will be important to the success of the project

There are several organizations that have programming focused on technical training, education, and access to capital. Although those organizations will not be direct recipients of grant funds and will not be modifying their existing programming to meet the needs of the **King County Farmland Access Program**, we will direct farmers and community organizations to those organizations when they can directly benefit members of our target audience. We will work closely with each organization to help improve program visibility and access by our target audience. We will encourage that the organizations consider King County owned farmland as platforms for their programming, and we will provide translation/interpretation services, when needed or requested. Among the organizations that will potentially provide contributions to the King County Farmland Access Program are King Conservation District, Washington Farmland Trust, and Washington Farmers Market Association.

Agreement Number: FSA24GRA0011608                                    Attachment 2A

**F.  Collaboration with USDA programs and staff.**

King County and local NRCS staff have initiated discussions about how King County can assist with USDA program outreach to historically underserved farmers and how best to assist farmers who are interested in pursuing NRCS technical support and cost-share. As part of the **King County Land Access Program**, we will partner with NRCS to encourage greater participation in USDA programs by BIPOC and other historically underserved farmers.  Efforts will include a series of training workshops on King County owned farmland.  NASS has recognized King County's unique role in communicating with immigrant/refugee farmers and has specifically asked for support to reach members of the Hmong farming community to increase participation in the Census of Agriculture. Lastly, Highline College has received a USDA Beginning Farmer and Rancher Development grant and through this program, we will be able to provide King County owned farmland for training as well as farm management staff and equipment to train in farm management practices.

**G. Data sharing, protection, and public access**

All data collected and reports developed through this grant will be archived in secure files maintained by DNRP.  As a public agency, we are subject to public disclosure requests, but are committed to protecting confidentiality, personal privacy, proprietary interests, business confidential information, and intellectual property rights.

Agreement Number: FSA24GRA0011608                                    Attachment 3A

**Budget Narrative**
**King County (WA) Farmland Access Program**

**Total Federal Project Budget: $ 2,499,984**

**1. Federal Budget Breakdown**

**Personnel**

Funds Requested: $789,261 (Annual salary assumes 3 percent annual salary increase.)

Positions Supported (3): Farm Manager (1 FTE), Project Manager (.50 FTE), Grant Manager (0.25 FTE)

Farm Manager. Works directly with farmers and farming organizations to identify farmland management priorities and needs for infrastructure improvements. Provides education and technical training to farmers and farming organizations so they learn what is required to manage a farm property, including support in applying for and implementing NRCS cost share programs. Also includes farm management activities on land farmed by individuals and organizations. Those activities include demonstration of soil management and climate resilient agricultural practices, construction of wildlife exclusion fencing, road maintenance, and installation of irrigation systems, that are conducted as a component of larger farmer training programs. Works countywide to support BIPOC farmers (especially Hmong farmers) so they have equitable access to land and services. Federal funds will not be used to lease any land nor to administer leases on land owned by King County.

Project Manager. Responsible for developing and implementing new County approaches to land access. This will include working closely with NGO partners to build their capacity to manage farms, work to implement the County's surplus process on select sites, and partner with the County's Conservation Futures Program to develop resources and provide support to organizations seeking capital for farmland acquisition.

Grant Manager. Accountable for assuring that all project actives are carried out in a timely, cost-efficient manner. They will provide oversight of daily activities and lead and direct the project toward accomplishment of the objectives of the project. They will be responsible for working with applicant and contractor financial coordinators to ensure all expenses are recorded accurately, all invoices are processed as per applicant's procurement procedures and all required reports are prepared and submitted.

Agreement Number: FSA24GRA0011608 Attachment 3A

| Project Staff | Role | Unit Cost (*unit cost is an average accounting for annual pay increases*) | Number of Units | Total |
|---|---|---|---|---|
| Farm Manager (1 FTE) | Farmer outreach, education, and technical assistance related to farm management, technical growing expertise in western Washington, business development, and market access. | $105,040/yr | 4 years | $ 420,160 |
| Project Manager (0.50 FTE) | Develop and implement new approaches for King County farmland access | $61,218 /yr | 4 years | $244,873 |
| Grant Manager (0.25 FTE) | Project management and partner coordination | $ $31,057/yr | 4 years | $124,228 |
| | | | | $789,261 |

**Fringe Benefits**

Funds Requested: $274,584

Description: Fringe benefits cover paid leave, insurance, retirement, and other benefits provided for full-time employees. Current King County fringe benefit rate is .3479% of salary.

$789,261 x 0.3479 = $274,584

**Travel**

Funds Requested: $13,400

Description: Travel will adhere to King County and federal travel policies. Project-related, in-county and regional vehicle travel by Farm Manager, Program Manager and Grant Manager. Mileage accrued when County-owned vehicles are not available and personal vehicles are required for project related work. Estimated average of 100 trips per year and an average round-trip of 50 miles, or approximately 5,000 miles per year (20,000 miles over four years). Assumes one in-person, overnight, partnership network meeting per year. Current King County travel reimbursement rate for use of personal vehicle is $0.67/mi.

| Purpose | Project Staff | Item | Unit Cost | Number of Units | Total |
|---|---|---|---|---|---|
| | | | | | |

2

Agreement Number: FSA24GRA0011608                                    Attachment 3A

| Local Travel | Farm Manager | Personal mileage | $0.67/mi | 4,000 | $2,680 |
|---|---|---|---|---|---|
| Local Travel | Program Manager | Personal mileage | $0.67/mi | 12,000 | $8,040 |
| Local Travel | Grant Manager | Personal mileage | $0.67/mi | 4,000 | $2,680 |
| | | | | | $13,400 |

## Equipment

Funds Requested: $0 (all needed equipment provided by King County and project partners)

## Supplies

Funds Requested: $14,836
Description: small farm tools and equipment needed to launch new farm businesses. Creation of on-farm tool lending libraries to support under-resourced farmers at business start-up until they generate capital to acquire their own supplies and equipment. Farm tools and equipment will be stored at Horseneck Farm. Farm Manager will train farmers on use of equipment including following a check-out and check-in policy for each item.

| Item | Unit Cost | Number of Units | Total |
|---|---|---|---|
| Walk behind tiller | 4700 | 2 | $9,400 |
| Seed spreader | 610 | 3 | $1,830 |
| Wheelhoe and biodisc | 700 | 3 | $2,100 |
| Broadforks | 300 | 3 | $900 |
| Flex tine weeder | 303 | 2 | $606 |
| | | | $14,836 |

## Contractual

Funds Requested: $1,297,035

Description: **Community Outreach Coordination and Support** for five community organizations. Organizations will include International Rescue Committee, Wakulima USA, Black Farmers Collective, Living Well Kent to provide outreach to connect farmers to trainings (including those provided by the Outreach and Education Manager), connect farmers to resources as they implement learnings from trainings, and support farmers in finding and securing farmland. These organizations will ensure trainings are culturally relevant and interpretation/translation needs are met.
**Outreach and Education Manager** works with community organizations and individual farmers that are launching/expanding farm businesses. The Outreach and Education Manager will provide training and technical support on farming skills including soil management, production education,

3

Agreement Number: FSA24GRA0011608            Attachment 3A

farm management, and business and market planning. They will serve farms and farmers in south King County.

**Small Loan Program** through Business Impact Northwest (a nonprofit CDFI). BINW staff will be responsible for outreach about farm loan opportunities, delivering at least two workshops/year for farmers, and providing 1/1 coaching to help farmers identify and apply for appropriate loans based on their needs. In addition, BINW will expand program capacity to manage small-dollar lending, with the primary goal of serving a significant number of historically disadvantaged farmers. While BINW has flexible lending structures to serve farmers, because of staffing and administrative costs, the ability to do small-dollar, time-consuming loans has been very limited (currently their smallest loan amount is $30,000, this program will expand that to $5,000). Federal funds will be used for program support. Federal funds will not be used for loans.

All contracts will have measurable deliverables and invoices will include number of hours worked.

**Translation and Interpretation Services** will be secured as needed to reduce communication barriers.

| Purpose | Contractor | Item and Cost Basis | Total |
|---|---|---|---|
| Interpretation - meetings | TBD | Interpretation Services - $100/hour * 40 hours * 4 years (10 meetings/year at 4 hours each) | $16,000 |
| Interpretation – technical support | TBD | Interpretation Services - $100/hour * 40 hours * 4 years (20 sessions/year at 2 hours each) | $16,000 |
| Translation Services | TBD | Translation Services - $75/hour * 50 hours * 4 years (10 documents/year at 5 hours each) | $15,000 |
| Community Outreach Coordination and Support | Five Community Organizations (see above) | Communication with members of their community; support in developing outreach and education plans; assistance with obtaining needed translation/interpretation services [625 hours/year @$40/hour for 5 organizations for 4 years] | $500,000 |
| Small Agricultural Loan Support Program | Business Impact Northwest | Reducing barriers to capital by funding outreach, education, coaching, and loan administration focused on small agricultural loans. [$40/hour for 2,080 hours | $200,000 |

4

Agreement Number: FSA24GRA0011608 Attachment 3A

| | | | |
|---|---|---|---|
| | | year 1, $41.30/hour for 1,461 hours year 2, $43.27/hour for 940 hours year 3, $45.70/hour for 350 hours in year 4.] | |
| Outreach and Education Manager | Highline College | Provides site coordination and farmer training. [$66.11/hour for 2080 hours/year for 4 years.] | $550,035 |
| | | | $1,297,035 |

**Construction**

Funds Requested: $0

**Other**

Funds Requested: $3,000
Description:

**Pre-paid registration** for up to 12 farmers/farm families to attend the 12-week Cultivating Success training course coordinated by Washington State University Extension. The course is aimed at small- to mid-size farms in the early stages of farm business development and provides a foundation in farm business planning, production, and marketing. The relatively modest registration fee of $250 per farmer/farm family can be a barrier to many traditionally underserved farmers.

| Purpose | Funding Recipient | Item and Cost Basis | Total |
|---|---|---|---|
| | | | |
| Farm Business Planning Support | WSU Extension | Cultivating Success Scholarships [12@$250/each] | $3,000 |
| | | | $3,000 |

**Indirect Charges**

Funds Requested: $107,868

Description: de minimis indirect cost recover calculated as 10 percent of Modified Total Direct Cost.

| Budget Item | Total | Amount Eligible for Indirect | Indirect Rate | Total |
|---|---|---|---|---|
| | | | | |

Agreement Number: FSA24GRA0011608                                    Attachment 3A

| Personnel | 789,260 | 789,260 | 10% | $78,926 |
|-----------|---------|---------|-----|---------|
| Fringe | 274,583 | 274,583 | 10% | $27,458 |
| Supplies | 14,836 | $14,836 | 10% | $1,484 |
| Other | $3,000 | 0 | 10% | 0 |
| | | | | $107,868 |

## Budget Narrative Summary

This proposal requests $2,499,984 from USDA/FSA. The requested USDA funds will be used to support staff, travel, supplies, and project materials needed by King County and collaborators to significantly increase access to farmland, technical training and capital by traditionally underserved farmers, especially immigrant/refugee and other BIPOC farmers. To achieve those goals, we will:

- Develop and implement a number of pilot projects to examine alternative land tenure models that provide expanded access to farmland for individual farmers and community organizations (these USDA grant funds will not be used for farmland leases or farmland acquisition).
- Provide education and technical training to historically underserved farmers and farm community organizations, which includes exposure to the range of farm equipment and infrastructure, as well as regenerative and climate-friendly agricultural practices.
- Provide timely and culturally relevant outreach and technical assistance to ensure equitable access to farmland, farm training, and local, state and federal agricultural assistance programming.
- Increase non-profit lender staff capacity so that small loans and associated outreach, education, and coaching are more readily available to historically underserved farmers that are beginning or expanding farm businesses (these USDA grant funds will not be used for loans, only program capacity-building).

Docusign Envelope ID: 6E57DB4A-40B5-8C53-8267-45AAC0BEC5F8

Agreement Number: FSA24GRA0011608

Attachment 4A
Revised March 2024

### U.S. DEPARTMENT OF AGRICULTURE
### FARM PRODUCTION AND CONSERVATION

### GENERAL TERMS AND CONDITIONS FOR
### GRANTS AND COOPERATIVE AGREEMENTS

The Farm Production and Conservation (FPAC) mission area encompasses the following USDA agencies: Natural Resources Conservation Service (NRCS), Farm Service Agency (FSA), Risk Management Agency (RMA), the Commodity Credit Corporation (CCC), and the FPAC Business Center.

### A. APPLICABLE REGULATIONS

1. As a condition of this award, the recipient assures and certifies that it has and/or will comply and require subrecipients to comply with the requirements contained in the following statutes and regulations, as applicable. The full text of Code of Federal Regulations (CFR) references may be found at https://www.gpo.gov/fdsys/browse/collectionCfr.action?collectionCode=CF R and http://www.ecfr.gov/.

   a. 2 CFR Part 25, "Universal Identifier and System of Award Management"

   b. 2 CFR Part 170, "Reporting Subaward and Executive Compensation Information"

   c. 2 CFR Part 175, "Award Term for Trafficking in Persons"

   d. 2 CFR Part 180, "OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement)"

   e. 2 CFR Part 182, "Governmentwide Requirements for Drug- Free Workplace (Financial Assistance)"

   f. 2 CFR Part 183 Never Contract with the Enemy

   g. 2 CFR Part 184, "Buy America Preferences for Infrastructure Projects"

   h. 2 CFR Part 200, "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards"

   i. 2 CFR Part 400, "Uniform Administrative Requirements, Cost Principles, And Audit Requirements for Federal Awards"

   j. 2 CFR Part 417, "Nonprocurement Debarment and Suspension"

   k. 2 CFR Part 418, "New Restrictions on Lobbying"

   l. 2 CFR Part 421, "Requirements for Drug-Free Workplace (Financial Assistance)"

   m. 2 CFR Part 422, "Research Institutions Conducting USDA-Funded Extramural Research; Research Misconduct"

2. Allowable project costs will be determined in accordance with the authorizing statute, the purpose of the award, and, to the extent applicable, to the type of organizations receiving the award, regardless of tier. The following portions of the Code of Federal Regulations are hereby incorporated by reference. The full text of Code of Federal Regulations references may be found at https://www.ecfr.gov/current/title-2/subtitle-A/chapter-II/part-200 , 2 CFR Part 200, "Uniform Administrative Requirements, Cost Principles and Audit Requirements for Federal Awards"

Docusign Envelope ID: 6E57DB4A-40B5-8C53-8207-45AAG0BEG5F8

Agreement Number: FSA24GRA0011608
Revised March 2024

3. For corporate recipients, by accepting this award the recipient acknowledges: (1) that it does not have a Federal tax delinquency, meaning that it is not subject to any unpaid Federal tax liability that has been assessed, for which all judicial and administrative remedies have been exhausted or have lapsed, and that is not being paid in a timely manner pursuant to an agreement with the authority responsible for collecting the tax liability, **and** (2) that it has not been convicted of a felony criminal violation under any Federal law within 24 months preceding the award, unless a suspending and debarring official of the USDA has considered suspension or debarment of the recipient corporation based on these convictions and/or tax delinquencies and determined that suspension or debarment is not necessary to protect the interests of the Government. If the recipient fails to comply with these provisions, the agency will annul this agreement and may recover any funds the recipient has expended in violation of the above cited statutory provisions.

## B. UNALLOWABLE COSTS

The following costs are not allowed:

1. Profit and management fees. Recipients may not earn and keep income resulting from an award.

2. Costs above the amount authorized for the project.

3. Costs incurred after the award period of performance end date.

4. Costs not identified in the approved budget or approved budget revisions.

5. Costs of promotional items and memorabilia, including models, gifts, and souvenirs.

6. Compensation for injuries to persons or damage to property arising from project activities.

7. Meals: Meals may be charged to an award only if they are necessary for the performance of the project. For instance, meals (normally only lunch) that are a necessary part of the costs of meetings and conferences (i.e., required attendance and continuity of a meeting), the primary purpose of which is the dissemination of information, are allowable, as are costs of transportation, rental of facilities, speakers' fees, and other items incidental to such meetings or conferences. Note: Meals consumed while in official travel status do not fall in this category. They are considered to be per diem expenses and should be reimbursed in accordance with the organization's established travel policies subject to statutory limitations or in accordance with Federal travel policies.

8. Costs normally charged as indirect costs may not be charged as direct costs without proper justification and agency approval. Proper justification includes documentation that the costs meet the criteria for allowability (see 2 CFR 200.403). Examples of such costs include rent, utilities, depreciation on buildings and equipment, the costs of operating and maintaining facilities, and general administration and general expenses, such as the salaries and expenses of executive officers, personnel administration, and accounting.

9. Salaries that are not commensurate with level of work: All costs must be reasonable to be allowable (2 CFR 200.403), and 2 CFR 200.404 defines a reasonable cost as one if, in its nature and amount, it does not exceed that which would be incurred by a prudent person under the circumstances prevailing at the time the decision was made to incur the cost. Salaries determined not to be reasonable compared to the

level of work will be unallowable.

10. Honoraria. Speaker fees are allowable.

11. Costs which lie outside the scope of the approved project and amendments thereto.

12. Entertainment costs, regardless of their apparent relationship to project objectives.

13. Consulting services performed by a Federal employee during official duty hours when such consulting services result in the payment of additional compensation to the employee; and

14. Unless specifically allowed by the agency or program, renovation or refurbishment of facilities, the purchase or installation of fixed equipment in facilities, and the planning, repair, rehabilitation, acquisition, or construction of buildings or facilities.

This list is not exhaustive. For general information about the allowability of particular items of costs, please see 2 CFR Part 200, "Subpart E - Cost Principles", or direct specific inquiries to the administrative contact identified in the award. The allowability of some items of costs may be difficult to determine. To avoid disallowance or dispute of such costs, the recipient may seek prior approval before incurring them. See 2 CFR 200.407.

## C. PRIOR APPROVAL REQUIREMENTS

Certain items of cost and award revisions require the prior written approval of the awarding agency. The following are the most common situations requiring prior approval. However, this list is not exhaustive, and the recipient is also bound by any other prior approval requirements identified in the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards. Submit all requests for the approvals described below via e-mail to FPAC.BC.GAD@usda.gov. All requests for prior approval must reference the applicable agreement number.

1. Pre-award costs --To receive reimbursement for costs incurred prior to the award date, recipients must request written approval. This restriction also applies to costs intended to meet cost share requirements. Even with approval, recipients incur pre-award costs at their own risk. The Federal awarding agency is under no obligation to reimburse such costs if for any reason the recipient does not receive a Federal award or if the Federal award is less than anticipated and inadequate to cover the costs.

2. Revisions to scope, objective, or deliverables -- When it is necessary to modify the scope, objective, or deliverables of an award, the recipient must submit a written request and justification for the change along with the revised scope, objective, or deliverables of the award.

3. Additions or changes to subawards and contracts -- The subawarding, transferring, or contracting out of any work (i.e., services) under a Federal award not identified in the original award budget or any changes to subaward or contracts requires prior written approval. The recipient must submit a justification for the proposed subaward/contract, and a detailed budget for the subaward/contract. This provision does not apply to the acquisition of supplies, material, equipment, or general support services.

4. Permanent change in a key person specified in the award -- When there is a permanent change in key personnel, the recipient must request prior written approval

for the substitution or change. The request must identify the replacement personnel and provide his or her qualifications.

5.  Absence or temporary change in project leadership -- If the approved project director or principal investigator disengages from the project for more than three months or reduces time devoted to the project by 25 percent or more, the recipient must request prior approval in writing, identifying who will be in charge during the project director's absence. The notification must include the qualifications of the replacement.

6.  Budget revisions -- Recipients must request prior written approval for deviations from the approved budget in the instances described below. For budget revisions, the recipient may be required to submit a new SF 424A or 424C and budget narrative, even those that do not require prior approval.

    a.  The inclusion of costs that require prior approval in accordance with Subpart E— Cost Principles of this part or 45 CFR part 75 Appendix IX, "Principles for Determining Costs Applicable to Research and Development under Awards and Contracts with Hospitals," or 48 CFR part 31, "Contract Cost Principles and Procedures," as applicable.

    b.  Where the cumulative amount of transfers of funds among direct cost categories or programs, functions, and activities exceeds or is expected to exceed 10 percent of the total budget as last approved by the Federal awarding agency, and where the Federal share of the project exceeds the simplified acquisition threshold. Recipients must notify the Government of budget changes that do not meet the threshold described above.

    c.  The transfer of funds budgeted for participant support costs to other categories of expense requires prior written approval. Participant support costs means direct costs for items such as stipends or subsistence allowances, travel allowances, and registration fees paid to or on behalf of participants or trainees (but not employees) in connection with conferences or training projects.

    d.  Changes in the approved cost share provided by the recipient, including to the amount, source, or type.

    e.  Additional Federal funds needed to complete the project. This change also requires a formal agreement amendment.

    f.  Adjustments to Indirect Cost Rates -- Recipients must have either a current NICRA or elect to use the de minimis in order to charge indirect costs. If an indirect rate indirect cost rate increases during the award's period of performance, the agency is not obligated, but retains discretion to, either add funds to the award or allow a budget realignment. If an indirect rate indirect cost rate decreases during the award's period of performance, indirect costs must be charged in accordance with the current rate.

    g.  If the change is due to receipt of a new negotiated indirect costs rate agreement (NICRA), the prior approval request must include a copy of the new agreement.

7.  No-Cost Extensions of Time -- When a no-cost extension of time is necessary, the recipient authorized signatory must submit a written request via e-mail to FPAC.BC.GAD@usda.gov. Except in limited circumstances, a no-cost extension of time cannot exceed 12 months. FPAC cannot approve requests for no-cost extensions received after the expiration of the award. In addition, time may not allow extension requests submitted less than 30 calendar days before the period of

performance end date to be processed, so recipients are encouraged to submit requests as soon as possible. FPAC agencies cannot approve no-cost extensions requested merely to expend remaining funds. The request must contain the following:

    a. Amount of additional time requested

    b. Explanation for the need for the extension

    c. A summary of progress to date and revised milestones

## D. PAYMENTS

1. Recipients must request reimbursement or advances using a properly completed and executed SF-270, submitted with a Budget Expense Table or Deliverable Expense Table (or similar summary document), as applicable. Submit requests to either the ezFedGrants system or to FPAC.BC.GAD@usda.gov. Payment request preparation guidance and templates for Budget Expense Tables and Deliverable Expense Tables are available at this link: https://www.fpacbc.usda.gov/about/grants-and-agreements/award-payments/index.html. Documents must be provided as attachments; documents submitted via weblink or other document services will not be accepted.

2. Recipients requesting advances should request payments in amounts necessary to meet their current needs pursuant to procedures contained in the Federal administrative provisions and 31 CFR Part 205. Requests must be submitted no less than 15 days prior to the start of the requested advance period. The recipient must provide a summary document showing the amount of advanced funds spent within 30 days of the end of the advance period. If applicable, the recipient must also submit a summary of the cost share provided.

3. The recipient must maintain records of supporting documentation all costs incurred under this award. Such documentation includes, but is not limited to, canceled checks, paid bills, payroll records, and subaward documents. Labor cost charges to this award must be based upon salaries actually earned and the time actually worked on this award. All project costs must be incurred within the period of performance of this award, including any approved no-cost extension of time. The Government may disallow costs that cannot be supported by supporting documentation or that are incurred outside of the agreement period of performance and budget and may require the return of any funds paid out for those costs. The level of detail and documentation required to be provided to support any individual payment request is at the discretion of the Government. Do not provide supporting documentation unless it is specifically requested.

4. Recipients must pay all costs incurred (i.e., liquidate obligations) under the award and request all final requests for payment no later than 120 calendar days after the period of performance end date. The Government must timely close-out expired agreements, which includes de-obligation of unspent funds. Therefore, funds may not be available for payment requests received more than 120 days after the period of performance end date and the Government is not obligated to make such payments.

5. Payments under fixed-amount awards are made based on deliverables completed, milestones achieved, or as a single payment upon award completion rather than costs incurred. The Government and recipient must utilize 2 CFR 200, Subpart E,

Docusign Envelope ID: 6E57DB4A-40B5-8C53-8267-45AAG0BEG5F8

Cost principles to support unit prices included in fixed amount awards prior to agreement execution.

6. The method of payment between the recipient and its contractors will be in accordance with the policies and procedures established by the recipient except that the contractors may not use the USDA Office of Financial Management/National Finance Center method to request payments. If the recipient makes advance payments to contractors, the recipient must ensure that the timing of such payments is designed to minimize elapsed time between the advance payment and the disbursement of funds. Recipients must not submit requests from their contractors for review or approval.

## E. FINANCIAL REPORTING

1. Recipients must submit a Federal Financial Report (FFR), SF 425 in accordance with the schedule included in the award statement of work. Recipients must submit reports to either the ezFedGrants system or via e-mail to FPAC.BC.GAD@usda.gov (SF425 and instructions are available at https://www.fpacbc.usda.gov/about/grants-and-agreements/required-reports-closing/index.html.) Failure to submit reports as required may result in suspension or termination of award.

2. The recipient must submit a final financial report no later than 120 calendar days after the period of performance end date. Failure to do so may result in a negative report to the Federal Awardee Performance and Integrity Information System (FAPIIS).

3. The FPAC awarding agency will withhold payments under this award if the recipient is delinquent in submitting required reports.

4. Reports submitted via e-mail must be provided as attachments; documents submitted via weblink or other document services will not be accepted.

## F. PERFORMANCE MONITORING AND REPORTING

1. The recipient is responsible for monitoring day-to-day performance and for reporting to the FPAC awarding agency..If the project involves subaward/contractual arrangements, the recipient is also responsible for monitoring the performance of project activities under those arrangements to ensure that approved goals and schedules are met.

2. The recipient must submit a written progress report at the frequency specified in the statement of work to either the ezFedGrants system or via e-mail to FPAC.BC.GAD@usda.gov. Reports submitted via e-mail must be provided as attachments; documents submitted via weblink or other document services will not be accepted. Each report must cover—

   a. A comparison of actual accomplishments with the milestones and deliverables established for the reporting period and, where project output can be quantified, a computation of the costs per unit of output.

   b. The reasons why milestones and deliverables targets were not met, if appropriate.

   c. Additional pertinent information including, where appropriate, analysis and explanation of cost overruns or high unit costs.

Agreement Number: FSA24GRA0011608
Revised March 2024

Attachment 4A
USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

3. The recipient must submit a final report no later than 120 calendar days after the period of performance end date. Failure to do so may result in a negative report to the Federal Awardee Performance and Integrity Information System (FAPIIS).

4. The FPAC awarding agency will withhold payments under this award if the recipient is delinquent in submitting required reports.

## G. REPORTING SUBAWARDS AND EXECUTIVE COMPENSATION

1. Reporting of first-tier subawards.

   a. Applicability. Unless you are exempt as provided in paragraph 4 of this award term, you must report each action that obligates $30,000 or more in Federal funds that does not include Recovery funds (as defined in section 1512(a)(2) of the American Recovery and Reinvestment Act of 2009, Pub.L. 111-5) for a subaward to an entity (see definitions in paragraph e. of this award term).

   b. Where and when to report.

      i. You must report each obligating action described in paragraph 1.a. of this award term to *http://www.fsrs.gov*.

      ii. For subaward information, report no later than the end of the month following the month in which the obligation was made. (For example, if the obligation was made on November 7, 2010, the obligation must be reported by no later than December 31, 2010.)

   c. What to report. You must report the information about each obligating action that the submission instructions posted at *http://www.fsrs.gov*.

2. Reporting Total Compensation of Recipient Executives.

   a. Applicability and what to report. You must report total compensation for each of your five most highly compensated executives for the preceding completed fiscal year, if—

      i. the total Federal funding authorized to date under this award is $30,000 or more;

      ii. in the preceding fiscal year, you received—

         (a) 80 percent or more of your annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); and

         (b) $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); and

      iii. The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986. (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at *http://www.sec.gov/answers/execomp.htm*

Docusign Envelope ID: 6E57DB4A-40B5-8C53-82C7-45AAG0BEC5F8

Agreement Number: FSA24GRA0011608
Revised March 2024

Attachment 4A
USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

    b. Where and when to report. You must report executive total compensation described in paragraph 2.a. of this award term:

        i. As part of your registration profile at https://sam.gov

        ii. By the end of the month following the month in which this award is made, and annually thereafter.

3. Reporting of Total Compensation of Subrecipient Executives.

    a. Applicability and what to report. Unless you are exempt as provided in paragraph d. of this award term, for each first-tier subrecipient under this award, you shall report the names and total compensation of each of the subrecipient's five most highly compensated executives for the subrecipient's preceding completed fiscal year, if—

        i. In the subrecipient's preceding fiscal year, the subrecipient received—

            (a) 80 percent or more of its annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); and

            (b) $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts), and Federal financial assistance subject to the Transparency Act (and subawards); and

        ii. The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986. (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at *http://www.sec.gov/answers/execomp.htm*

    b. Where and when to report. You must report subrecipient executive total compensation described in paragraph 3.a. of this award term:

        i. To the recipient.

        ii. By the end of the month following the month during which you make the subaward. For example, if a subaward is obligated on any date during the month of October of a given year (*i.e.,* between October 1 and 31), you must report any required compensation information of the subrecipient by November 30 of that year.

4. Exemptions - If, in the previous tax year, you had gross income, from all sources, under $300,000, you are exempt from the requirements to report:

    a. Subawards, and

    b. The total compensation of the five most highly compensated executives of any subrecipient.

5. Definitions. For purposes of this award term:

    a. Entity means all of the following, as defined in 2 CFR part 25:

        i. A Governmental organization, which is a State, local government, or Indian Tribe;

ii.    A foreign public entity;

iii.    A domestic or foreign nonprofit organization;

iv.    A domestic or foreign for-profit organization;

v.    A Federal agency, but only as a subrecipient under an award or subaward to a non- Federal entity.

b.  Executive means officers, managing partners, or any other employees in management positions.

c.  Subaward:

i.    This term means a legal instrument to provide support for the performance of any portion of the substantive project or program for which you received this award and that you as the recipient award to an eligible subrecipient.

ii.    The term does not include your procurement of property and services needed to carry out the project or program (for further explanation, see Sec.210 of the attachment to OMB Circular A-133, "Audits of States, Local Governments, and Non-Profit Organizations").

iii.    A subaward may be provided through any legal agreement, including an agreement that you or a subrecipient considers a contract.

d.  Subrecipient means an entity that:

i.    Receives a subaward from you (the recipient) under this award; and

ii.    Is accountable to you for the use of the Federal funds provided by the subaward.

e.  Total compensation means the cash and noncash dollar value earned by the executive during the recipient's or subrecipient's preceding fiscal year and includes the following (for more information see 17 CFR 229.402(c)(2)):

i.    Salary and bonus.

ii.    Awards of stock, stock options, and stock appreciation rights. Use the dollar amount recognized for financial statement reporting purposes with respect to the fiscal year in accordance with the Statement of Financial Accounting Standards No. 123 (Revised 2004) (FAS 123R), Shared Based Payments.

iii.    Earnings for services under non-equity incentive plans. This does not include group life, health, hospitalization or medical reimbursement plans that do not discriminate in favor of executives and are available generally to all salaried employees.

iv.    Change in pension value. This is the change in present value of defined benefit and actuarial pension plans.

v.    Above-market earnings on deferred compensation which is not tax-qualified.

vi.    Other compensation, if the aggregate value of all such other compensation (e.g. severance, termination payments, value of life insurance paid on behalf of the employee, perquisites or property) for the executive exceeds $10,000.

Docusign Envelope ID: 6E57DB4A-49B5-8C53-8207-45AAC0BEC5F8

Agreement Number: FSA24GRA0011608
Revised March 2024

Attachment 4A
USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

## H. AUDIT REQUIREMENTS

The recipient is responsible for complying with audit requirements in accordance with 2 CFR 200, Subpart F. A recipient entity that expends $750,000 or more during the recipient's fiscal year in Federal awards must have a single or program-specific audit conducted for that year. A single audit is required to be uploaded by the recipient to the Federal Audit Clearinghouse within 30 calendar days after receipt of the auditor's report, or nine (9) months after the end of the audit period, whichever comes first.

## I. AWARDS WITH RESEARCH ACTIVITIES

1. Recipients who engage or assist in scientific related activities on behalf of USDA must uphold the principles of scientific integrity established by Departmental Regulations 1074-001, Scientific Integrity. Covered activities include engaging in, supervising, managing, and reporting scientific work; analyzing and publicly communicating information resulting from scientific work; and utilizing information derived from scientific work in policy and decision making.

2. In accordance with USDA Departmental Regulation (DR) 1020-006, recipients of awards that produce scholarly publications and digitally formatted scientific data assets resulting from unclassified scientific research supported wholly or in part by USDA funds must make the publications and data sets publicly accessible, to the extent feasible with law, agency mission, and resources. Final peer-reviewed, accepted manuscripts must be made freely accessible to the public through the USDA public access archive system (PubAg, hosted by the National Agricultural Library (NAL)). Public access through PubAg must be established within 12 months of the date on which the publisher makes the article available online. The final published article may be submitted to PubAg in lieu of the final peer-reviewed, accepted manuscript, provided the author has the right to submit the published version (e.g., open access articles). Recipients can access NAL at https://www.nal.usda.gov.

   Digital scientific research data assets connected to a scholarly publication must also receive a digital persistent identifier, such as a Digital Object Identifier (DOI), that allows a scholarly publication and its catalog metadata to link to the published digital scientific research data asset from which the publication was developed. Authors of scholarly publications, at their discretion, are also encouraged to obtain digital persistent identifiers for other associated scientific research products, such as software, workflow documentation, curricular materials, and multi-media materials, if these products are not subject to statutory restrictions and would provide information that would help future users of the scholarly publication. Recipients can receive a DOI via NAL.

   Recipients can access DR 1020-006 at https://www.usda.gov/directives/dr-1020-006

## J. SPECIAL PROVISIONS

1. The recipient assures and certifies that it will comply with the minimum-wage and maximum-hour provisions of the Federal Fair Labor Standards Act.

2. Employees of FPAC agencies will participate in efforts under this agreement solely as representatives of the United States. They may not participate as directors, officers, employees, or otherwise serve or hold themselves out as representatives of the recipient. They also may not assist the recipient with efforts to lobby Congress or

Docusign Envelope ID: 6E57DB4A-40B5-8C53-8267-45AAG0BEG5F8

to raise money through fundraising efforts. Further, FPAC employees must report to their immediate supervisor any negotiations with the recipient concerning future employment and must refrain from participation in projects or agreements with such recipients.

3.  Except for agreements entered under the Agriculture Conservation Experienced Services (ACES) program authorized by the Food, Conservation, and Energy Act of 2008, employees of the recipient will not be considered Federal employees or agents of the United States for any purposes under this agreement. An individual providing services under the ACES program is deemed to be an employee of the United States Government solely for purposes of chapter 171 of title 28, United States Code, provided the individual is acting within the scope of the agreement.

4.  Except in very limited circumstances (e.g., construction agreements), no agreement period of performance can exceed a total of five years, including extensions.

5.  The recipient and its employees are prohibited from promoting, recommending, or discussing the availability of specific commercial products or services with FPAC agency clients in the course of carrying out activities under this agreement, including any products or services offered by the recipient, except as may be specifically allowed in the agreement.

6.  The recipient agrees to comply with USDA's Department-wide enterprise geospatial data management policy implemented in DR 3465-001, which establishes the USDA policy for defining the strategic direction necessary to optimize the management of the USDA geospatial data and geospatial infrastructure, including all geospatial data created for, by, and enhanced by USDA. Recipients can access DR 3465-001 at https://www.usda.gov/directives/dr-3465-001

## K.  PATENTS, INVENTIONS, COPYRIGHTS, AND ACKNOWLEDGMENT OF SUPPORT AND DISCLAIMER

1.  The following acknowledgment of USDA support must appear in the publication of any material, whether copyrighted or not, and any products in electronic formats (web sites, computer programs, etc.) that is substantially based upon or developed under this award:

    "This material is based upon work supported by the U.S. Department of Agriculture, under agreement number [recipient should enter the applicable award number here]."

    In addition, all publications and other materials, except scientific articles or papers published in scientific journals, must include the following statement:

    "Any opinions, findings, conclusions, or recommendations expressed in this publication are those of the author(s) and do not necessarily reflect the views of the U.S. Department of Agriculture. In addition, any reference to specific brands or types of products or services does not constitute or imply an endorsement by the U.S. Department of Agriculture for those products or services."

    All publications printed with Federal Government funds will include the most current USDA nondiscrimination statement, available from the Public Affairs Division, Civil Rights Division, or on the USDA home page. If the material is too small to include the full nondiscrimination statement, the material must, at a minimum, include the following statement:

Docusign Envelope ID: 6E57DB4A-40B5-8C53-8267-45AAC0BEC5F8

Agreement Number: FSA24GRA0011608
Revised March 2024

Attachment 4A
USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

"USDA is an equal opportunity provider, employer, and lender."

The recipient is responsible for ensuring that an acknowledgment of USDA is made during news media interviews, including popular media such as radio, television, and news magazines, that discuss work funded by this award in a substantial way.

2. Allocation of rights of patents, inventions, and copyrights must be in accordance with 2 CFR Part 200.315. This regulation provides that small businesses normally may retain the principal worldwide patent rights to any invention developed with USDA support.

3. In accordance with 37 CFR Section 401.14, each subject invention must be disclosed to the Federal agency within 2 months after the inventor discloses it in writing to recipient personnel responsible for patent matters. Invention disclosure statements pursuant to 37 CFR Section 401.14(c) must be made in writing to FPAC.BC.GAD@usda.gov.

4. USDA receives a royalty-free license for Federal Government use, reserves the right to require the patentee to license others in certain circumstances, and requires that anyone exclusively licensed to sell the invention in the United States must manufacture it domestically.

## L.  COST SHARING REQUIREMENTS

1. If the award has specific cost sharing requirements, cost sharing participation in other projects must not be counted toward meeting the specific cost share requirement of this award. Cost share must come from non-Federal sources unless otherwise stated in the applicable program authorizing statute.

2. Cost share costs must be necessary and reasonable for accomplishment of project or program objectives.

3. Cost sharing must be documented on each SF 425 and payment requests as it is provided by the recipient or third party. The required cost sharing ratio must be met by the end of the agreement period of performance; however, it does not have to be maintained for every payment request.

4. Should the recipient become aware that it may be unable to provide the cost share amount identified in this award, it must—

   a. Immediately notify the FPAC Business Center Grants and Agreements Division via e-mail to FPAC.BC.GAD@usda.gov, and

   b. Either specify the steps it plans to take to secure replacement cost share or specify the plans to phase out the project in the absence of cost share.

   Failure by the recipient to notify FPAC in accordance with this section or failure to submit an acceptable remediation plan may result in the disallowance of some or all the costs charged to the award, the subsequent recovery by FPAC of some of the FPAC funds provided under the award, and/or termination of the award. It may constitute a violation of the terms and conditions of the award so serious as to provide grounds for subsequent suspension or debarment.  FPAC reviews and approves or disapproves cost sharing remediation plans on a case-by-case basis.

5. The recipient must maintain records of all project costs that are claimed a s cost sharing as well as records of costs to be paid by FPAC. If the recipient's cost sharing includes in-kind contributions, the basis for determining the valuation for volunteer

services and donated property must be documented.

6. Recipients must also request prior approval before changing the source or type of cost sharing. See the Prior Approval Section.

## M. PROGRAM INCOME

1. Program income does not include Federal funds received under an award. Program income means gross income earned by the non-Federal entity that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance except as provided in §200.307(f). Examples include fees charged for conferences or workshops, fees for services performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds. Interest earned on advances of Federal funds is not program income. Except as otherwise provided in Federal statutes, regulations, or the terms and conditions of the Federal award, program income does not include rebates, credits, discounts, and interest earned on any of them.

2. Unless recipients specifically request to use the deductive or cost share method, program income must be additive.

3. If program income is earned and not already identified and addressed in the award, the recipient must provide notification to the FPAC BC GAD via e-mail to FPAC.BC.GAD@usda.gov and indicate the preferred treatment method. Use of the deductive or cost share method may require an amendment or prior approval.

4. Program income may be used to meet recipient cost sharing requirements with prior approval of the Government.

5. Recipients must report all program income on the applicable SF 270 and SF 425 as it is earned.

## N. PROCUREMENT STANDARDS

The recipient must have and use documented procurement procedures, consistent with State, local, and tribal laws and regulations, for the acquisition of property or services (including construction) required under a Federal award or subaward. Those procedures must comply with the procurement standards set out in 2 CFR 200.317-327, including the requirements regarding conflicts of interest, competition, and methods of procurement. Procurements must be well-documented, and those records are subject to inspection and audit.

## O. BUILD AMERICA, BUY AMERICA FOR CONSTRUCTION

Buy America Preference -- Recipients of an award of Federal financial assistance from a program for infrastructure are hereby notified that none of the funds provided under this award may be used for an infrastructure project unless:

1. All iron and steel used in the project are produced in the United States—this means all manufacturing processes, from the initial melting stage through the application of coatings, occurred in the United States;

2. All manufactured products used in the project are produced in the United States—

this means the manufactured product was manufactured in the United States; and the cost of the components of the manufactured product that are mined, produced, or manufactured in the United States is greater than 55 percent of the total cost of all components of the manufactured product, unless another standard that meets or exceeds this standard has been established under applicable law or regulation for determining the minimum amount of domestic content of the manufactured product; and

3. All construction materials are manufactured in the United States—this means that all manufacturing processes for the construction material occurred in the United States. The construction material standards are listed below.

*Incorporation into an infrastructure project.* The Buy America Preference only applies to articles, materials, and supplies that are consumed in, incorporated into, or affixed to an infrastructure project. As such, it does not apply to tools, equipment, and supplies, such as temporary scaffolding, brought to the construction site and removed at or before the completion of the infrastructure project. Nor does a Buy America Preference apply to equipment and furnishings, such as movable chairs, desks, and portable computer equipment, that are used at or within the finished infrastructure project, but are not an integral part of the structure or permanently affixed to the infrastructure project.

*Categorization of articles, materials, and supplies.* An article, material, or supply should only be classified into one of the following categories: (i) Iron or steel products; (ii) Manufactured products; (iii) Construction materials; or (iv) Section 70917(c) materials. An article, material, or supply should not be considered to fall into multiple categories. In some cases, an article, material, or supply may not fall under any of the categories listed in this paragraph. The classification of an article, material, or supply as falling into one of the categories listed in this paragraph must be made based on its status at the time it is brought to the work site for incorporation into an infrastructure project. In general, the work site is the location of the infrastructure project at which the iron, steel, manufactured products, and construction materials will be incorporated.

*Application of the Buy America Preference by category.* An article, material, or supply incorporated into an infrastructure project must meet the Buy America Preference for only the single category in which it is classified.

*Determining the cost of components for manufactured products.* In determining whether the cost of components for manufactured products is greater than 55 percent of the total cost of all components, use the following instructions:

1. For components purchased by the manufacturer, the acquisition cost, including transportation costs to the place of incorporation into the manufactured product (whether or not such costs are paid to a domestic firm), and any applicable duty (whether or not a duty-free entry certificate is issued); or

2. For components manufactured by the manufacturer, all costs associated with the manufacture of the component, including transportation costs as described in paragraph (a), plus allocable overhead costs, but excluding profit. Cost of components does not include any costs associated with the manufacture of the manufactured product.

*Construction material standards.* The Buy America Preference applies to the following construction materials incorporated into infrastructure projects. Each construction material is followed by a standard for the material to be considered "produced in the United States." Except as specifically provided, only a single standard should be applied

to a single construction material.

1. Non-ferrous metals. All manufacturing processes, from initial smelting or melting through final shaping, coating, and assembly, occurred in the United States.

2. Plastic and polymer-based products. All manufacturing processes, from initial combination of constituent plastic or polymer-based inputs, or, where applicable, constituent composite materials, until the item is in its final form, occurred in the United States.

3. Glass. All manufacturing processes, from initial batching and melting of raw materials through annealing, cooling, and cutting, occurred in the United States.

4. Fiber optic cable (including drop cable). All manufacturing processes, from the initial ribboning (if applicable), through buffering, fiber stranding and jacketing, occurred in the United States. All manufacturing processes also include the standards for glass and optical fiber, but not for non-ferrous metals, plastic and polymer-based products, or any others.

5. Optical fiber. All manufacturing processes, from the initial preform fabrication stage through the completion of the draw, occurred in the United States.

6. Lumber. All manufacturing processes, from initial debarking through treatment and planing, occurred in the United States.

7. Drywall. All manufacturing processes, from initial blending of mined or synthetic gypsum plaster and additives through cutting and drying of sandwiched panels, occurred in the United States.

8. Engineered wood. All manufacturing processes from the initial combination of constituent materials until the wood product is in its final form, occurred in the United States.

*Waivers:* When necessary, recipients may apply for, and the agency may grant, a waiver from these requirements. The agency should notify the recipient for information on the process for requesting a waiver from these requirements.

When the Federal agency has made a determination that one of the following exceptions applies, the awarding official may waive the application of the Buy America Preference in any case in which the agency determines that:

1. applying the Buy America Preference would be inconsistent with the public interest;

2. the types of iron, steel, manufactured products, or construction materials are not produced in the United States in sufficient and reasonably available quantities or of a satisfactory quality; or

3. the inclusion of iron, steel, manufactured products, or construction materials produced in the United States will increase the cost of the overall project by more than 25 percent.

A request to waive the application of the Buy America Preference must be in writing.

The agency will provide instructions on the format, contents, and supporting materials required for any waiver request. Waiver requests are subject to public comment periods of no less than 15 days and must be reviewed by the Made in America Office.

Docusign Envelope ID: 6E57DB4A-40B5-8C53-8267-45AAG0BEG5E8

Agreement Number: FSA24GRA0011608
Revised March 2024

There may be instances where an award qualifies, in whole or in part, for an existing waiver described at https://www.usda.gov/ocfo/federal-financial-assistance-policy/USDABuyAmericaWaiver

*Definitions*

**"Buy America Preference"** means the "domestic content procurement preference" set forth in section 70914 of the Build America, Buy America Act, which requires the head of each Federal agency to ensure that none of the funds made available for a Federal award for an infrastructure project may be obligated unless all of the iron, steel, manufactured products, and construction materials incorporated into the project are produced in the United States.

**"Construction materials"** means articles, materials, or supplies that consist of only one of the items listed in paragraph 1. of this definition, except as provided in paragraph 2 of this definition. To the extent one of the items listed in paragraph 1 contains as inputs other items listed in paragraph 1, it is nonetheless a construction material.

1. The listed items are:
   a. Non-ferrous metals;
   b. Plastic and polymer-based products (including polyvinylchloride, composite building materials, and polymers used in fiber optic cables);
   c. Glass (including optic glass);
   d. Fiber optic cable (including drop cable);
   e. Optical fiber;
   f. Lumber;
   g. Engineered wood; and
   h. Drywall.

2. Minor additions of articles, materials, supplies, or binding agents to a construction material do not change the categorization of the construction material.

**"Infrastructure"** means public infrastructure projects in the United States, which includes, at a minimum, the structures, facilities, and equipment for roads, highways, and bridges; public transportation; dams, ports, harbors, and other maritime facilities; intercity passenger and freight railroads; freight and intermodal facilities; airports; water systems, including drinking water and wastewater systems; electrical transmission facilities and systems; utilities; broadband infrastructure; and buildings and real property; and structures, facilities, and equipment that generate, transport, and distribute energy including electric vehicle (EV) charging.

**"Infrastructure project"** means any activity related to the construction, alteration, maintenance, or repair of infrastructure in the United States regardless of whether infrastructure is the primary purpose of the project. See also paragraphs (c) and (d) of 2 CFR 184.4.

**"Iron or steel products"** means articles, materials, or supplies that consist wholly or predominantly of iron or steel or a combination of both.

**"Manufactured products"** means:

1. Articles, materials, or supplies that have been:

a.  Processed into a specific form and shape; or

b.  Combined with other articles, materials, or supplies to create a product with different properties than the individual articles, materials, or supplies.

2.  If an item is classified as an iron or steel product, a construction material, or a Section 70917(c) material under 2 CFR 184.4(e) and the definitions set forth in 2 CFR 184.3, then it is not a manufactured product. However, an article, material, or supply classified as a manufactured product under 2 CFR 184.4(e) and paragraph 1 of this definition may include components that are construction materials, iron or steel products, or Section 70917(c) materials.

**"Predominantly of iron or steel or a combination of both"** means that the cost of the iron and steel content exceeds 50 percent of the total cost of all its components. The cost of iron and steel is the cost of the iron or steel mill products (such as bar, billet, slab, wire, plate, or sheet), castings, or forgings utilized in the manufacture of the product and a good faith estimate of the cost of iron or steel components.

**"Section 70917(c) materials"** means cement and cementitious materials; aggregates such as stone, sand, or gravel; or aggregate binding agents or additives. See Section 70917(c) of the Build America, Buy America Act.

## P.  NONEXPENDABLE EQUIPMENT

1.  Recipients purchasing equipment or products with funds provided under this award are encouraged to purchase only American-made equipment and products. A state must use, manage and dispose of equipment acquired under a Federal award by the state in accordance with state laws and procedures. All other recipients must follow these procedures.

2.  Title to equipment acquired under a Federal award will vest conditionally in the recipient upon acquisition. The recipient must not encumber the property without prior approval of the Government.

3.  The recipient must use the equipment for the authorized purposes of the project for as long as needed whether or not the project or program continues to be supported by the Federal award. When no longer needed for the original program or project, the equipment may be used in other activities supported by the Federal awarding agency, in the following order of priority:

    a.  Activities under a Federal award from the Federal awarding agency which funded the original program or project, then.

    b.  Activities under Federal awards from other Federal awarding agencies.

4.  The recipient must maintain property records that include a description of the property, a serial number or other identification number, the source of funding for the property (including the FAIN), who holds title, the acquisition date, and cost of the property, percentage of Federal participation in the project costs for the Federal award under which the property was acquired, the location, use and condition of the property, and any ultimate disposition data including the date of disposal and sale price of the property.

5.  The recipient must take a physical inventory of the property and reconcile the results with the property records at least once every two years until final disposition.

6.  When equipment is no longer needed for any of the purposes set out in this provision

and the per-unit fair market value is less than $5,000, the recipient may retain, sell, or dispose of the equipment with no further obligation to FPAC. However, if the per-unit fair market value is $5,000 or more, the recipient must submit a written request for disposition instructions to FPAC.BC.GAD@usda.gov.

## Q. LIMIT OF FEDERAL LIABILITY

1. The maximum financial obligation of FPAC to the recipient is the amount of funds indicated in the award as obligated by FPAC. However, if an erroneous amount is stated on the approved budget, or any supporting document relating to the award, FPAC will have the unilateral right to make the correction and to make an appropriate adjustment in the FPAC share of the award to align with the Federal amount authorized.

2. For awards where it is anticipated that the period of performance will include multiple budget periods, all subsequent budget periods are subject to the availability of funds, program authority, satisfactory performance, and compliance with the terms and conditions of the Federal award.

## R. AMENDMENTS

The parties may modify this agreement via formal amendment executed by the authorized signatories of each. The FPAC Business Center's Grants and Agreements Division has developed streamlined procedures for certain agreement changes, including no-cost extensions and some changes to agency and recipients contacts that do not require formal amendments. Contact the administrative contact for this award for instructions.

## S. PRIVACY ACT AND PROHIBITION AGAINST CERTAIN INTERNAL CONFIDENTIALITY AGREEMENTS

1. Activities performed under this award may involve access to confidential and potentially sensitive information about governmental and landowner issues. The term "confidential information" means proprietary information or data of a personal nature about an individual, or information or data submitted by or pertaining to an organization. This information must not be disclosed without the prior written consent of FPAC.

2. The recipient's personnel will follow the rules and procedures of disclosure set forth in the Privacy Act of 1974, 5 U.S.C. Section 552a, and implementing regulations and policies with respect to systems of records determined to be subject to the Privacy Act. The recipient's personnel must also comply with privacy of personal information relating to natural resources conservation programs in accordance with section 1244 of Title II of the Farm Security and Rural Investment Act of 2002 (Public Law 107-171).

3. The recipient agrees to comply with the **"Prohibition Against Certain Internal Confidentiality Agreements:"**

   a. You may not require your employees, contractors, or subrecipients seeking to report fraud, waste, or abuse to sign or comply with internal confidentiality agreements or statements prohibiting or otherwise restricting them from lawfully reporting that waste, fraud, or abuse to a designated investigative or law

enforcement representative of a Federal department or agency authorized to receive such information.

b. You must notify your employees, contractors, or subrecipients that the prohibitions and restrictions of any internal confidentiality agreements inconsistent with paragraph a. of this award provision are no longer in effect.

c. The prohibition in paragraph a. of this award provision does not contravene requirements applicable to any other form issued by a Federal department or agency governing the nondisclosure of classified information.

d. If FPAC determines that you are not in compliance with this award provision, FPAC:

   i. Will prohibit your use of funds under this award, in accordance with sections 743 and 744 of Division E of the Consolidated Appropriations Act, 2016, (Pub. L. 114-113) or any successor provision of law;

   ii. May pursue other remedies available for your material failure to comply with award terms and conditions.

## T. ACKNOWLEDGMENT OF SECTION 1619 COMPLIANCE

The recipient agrees to comply with FPAC guidelines and requirements regarding the disclosure of information protected under Section 1619 of the Food, Conservation, and Energy Act of 2008 (PL 110- 246), 7 U.S.C. 8791 as described below.

1. Acceptance of this award indicates acknowledgment and understanding that the recipient is legally bound by Federal statute to comply with the provisions of Section 1619 and that the recipient will not subsequently disclose information protected by section 1619 to any individual or organization that is not directly covered by this award. Any such subsequent disclosure of the protected information (except as permitted under Section 1619) will be considered a violation of Section 1619. The recipient will be held responsible should disclosure of the protected information occur.

2. Acceptance of this award legally binds every owner, manager, supervisor, employee, contractor, agent, and representative of the recipient to comply with the provisions in Section 1619. The recipient must consult with FPAC prior to providing protected information to an entity or individual outside of the recipient and as necessary to implement the program to ensure that such release is permissible.

3. The recipient will use the protected information only to perform work that is directly connected to this award. Use of the protected information to perform work that is not directly connected to this award is expressly prohibited.

4. The recipient must internally restrict access to the protected information to only those individuals who have a demonstrated need to know the protected information to perform work under this award.

5. The provisions in Section 1619 are continuing obligations. Even when the recipient is no longer a recipient, or when individuals currently affiliated with the recipient become no longer so affiliated, every person having been provided access to the protected information will continue to be legally bound to comply with these provisions.

6. The recipient must notify all managers, supervisors, employees, contractors, agents,

Agreement Number: FSA24GRA0011608
Revised March 2024

Attachment 4A
USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

and representatives about this provision and the requirements of Section 1619. Notifications about the existence of this provision must be made to those individuals who are new to the organization and periodic notifications must be sent throughout the organization (as well as to all contractors and agents) to remind all about the ongoing and continuing requirements.

7. When the recipient is unsure whether particular information is covered or protected by Section 1619, the recipient must consult with FPAC to determine whether the information must be withheld.

8. Use of the protected information for any purpose is expressly prohibited after the period of performance end date of this award. Upon the award end date, any protected information provided under this award must be immediately destroyed or returned to FPAC. The recipient must provide to FPAC written certification that the protected information (paper copy, electronic copy, or both) has been properly destroyed, removed from any electronic storage media, or both.

9. Any State's "sunshine law," "open records act" or other version of the Freedom of Information Act is superseded by section 1619 under the Supremacy Clause of the U.S. Constitution. Accordingly, information protected from disclosure by section 1619 must not be released under such State laws.

10. Protected Information. Examples of the types of information prohibited by disclosure under Section 1619 include, but are **not limited to**, the following:

    a. State identification and county number (where reported and where located).

    b. Producer or landowner name, business full address, phone number, Social Security Number, and similar personal identifying information.

    c. Farm, tract, field, and contract numbers.

    d. Production shares and share of acres for each Farm Serial Number (FSN) field.

    e. Acreage information, including crop codes.

    f. All attributes for Common Land Units (CLUs) in USDA's Geospatial Information System

    g. Any photographic, map, or geospatial data that, when combined with other maps, can be used to identify a landowner.

    h. Location of conservation practices.

11. Section 1619 allows disclosure of "payment information (including payment information and the names and addresses of recipients of payments) under any Department program *that is otherwise authorized by law*" (emphasis added). The names and payment information of producers generally may be provided to the public; however, the recipient shall consult with FPAC if there is any uncertainty as to the provision of such information.

12. Section 1619 also allows disclosure of otherwise protected information if "the information has been transformed into a statistical or aggregate form without naming any (i) individual owner, operator, or producer; or (ii) specific data gathering site." The recipient must consult with FPAC as to whether specific information falls within this exception prior to relying on this exception.

13. Violations. The recipient will be held responsible for violations of this provision and Section 1619. A violation of this provision by the recipient may result in action by

Docusign Envelope ID: 6E57DB4A-40B5-8C53-8267-45AAG0BEC5F8

Agreement Number: FSA24GRA0011608
Revised March 2024

Attachment 4A
USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

FPAC, including termination of the underlying Federal award.

14. Effective Period. The requirements of this provision are effective on the date of the final signature and will continue until FPAC notifies the recipient that it is no longer required based on changes in applicable Federal law.

## U. NATIONAL POLICY REQUIREMENTS

The recipient must comply with all relevant public policy requirements, including those in general appropriations provisions, which can be accessed at this link: https://www.usda.gov/sites/default/files/documents/Regulatory_Statutory_National_Policy_Requirements_Overlay.pdf

## V. TERMINATION

In accordance with 2 CFR 200.340, the recipient understands this agreement may be terminated in whole or in part as follows:

1. By the Federal awarding agency or pass-through entity, if a recipient fails to comply with the terms and conditions of a Federal award;

2. By the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities;

3. By the Federal awarding agency or pass-through entity with the consent of the recipient, in which case the two parties must agree upon the termination conditions, including the effective date and, in the case of partial termination, the portion to be terminated; or

4. By the recipient upon sending to the Federal awarding agency or pass-through entity written notification setting forth the reasons for such termination, the effective date, and, in the case of partial termination, the portion to be terminated. However, if the Federal awarding agency or pass-through entity determines in the case of partial termination that the reduced or modified portion of the Federal award or subaward will not accomplish the purposes for which the Federal award was made, the Federal awarding agency or pass-through entity may terminate the Federal award in its entirety.

5. If the Federal award is terminated for the recipient's material failure to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award, the termination decision will be reported to the OMB-designated integrity and performance system accessible through SAM (currently FAPIIS) in accordance with 2 CFR 200.341.

## W. REPORTING OF MATTERS RELATED TO RECIPIENT INTEGRITY AND PERFORMANCE

1. General Reporting Requirement

   If the total value of the recipient entity's currently active grants, cooperative agreements, and procurement contracts from all Federal awarding agencies exceeds $10,000,000 for any period of time during the period of performance of this Federal award, then the recipient entity during that period of time must maintain the currency of information reported to the System for Award Management (SAM) that is made

Page 21 of 26

available in the designated integrity and performance system (currently, the Federal Awardee Performance and Integrity Information System (FAPIIS)) about civil, criminal, or administrative proceedings described in section 2 of this award condition. This is a statutory requirement under section 872 of Public Law 110-417, as amended (41 U.S.C. 2313). As required by section 3010 of Public Law 111-212, all information posted in the designated integrity and performance system on or after April 15, 2011, except past performance reviews required for Federal procurement contracts, will be publicly available.

2. Proceedings About Which The Recipient Entity Must Report

Submit the information required about each proceeding that:

a. Is in connection with the award or performance of a grant, cooperative agreement, or procurement contract from the Federal Government;

b. Reached its final disposition during the most recent five-year period; and

c. Is one of the following:

    i. A criminal proceeding that resulted in a conviction, as defined in section 5 of this award condition;

    ii. A civil proceeding that resulted in a finding of fault and liability and payment of a monetary fine, penalty, reimbursement, restitution, or damages of $5,000 or more;

    iii. An administrative proceeding, as defined in section 5 of this award condition, that resulted in a finding of fault and liability and the recipient entity's payment of either a monetary fine or penalty of $5,000 or more or reimbursement, restitution, or damages in excess of $100,000; or

    iv. Any other criminal, civil, or administrative proceeding if:

        a) It could have led to an outcome described in section 2.c.(i), (ii), or (iii) of this award condition;

        b) It had a different disposition arrived at by consent or compromise with an acknowledgment of fault on the part of the recipient entity; and

        c) The requirement in this award condition to disclose information about the proceeding does not conflict with applicable laws and regulations.

3. Reporting Procedures

Enter in the SAM Entity Management area the information that SAM requires about each proceeding described in section 2 of this award condition. The recipient entity does not need to submit the information a second time under assistance awards that the recipient received if the recipient already provided the information through SAM because the recipient was required to do so under Federal procurement contracts that the recipient entity was awarded.

4. Reporting Frequency

During any period of time when the recipient entity is subject to the requirement in section 1 of this award condition, the recipient entity must report proceedings information through SAM for the most recent five-year period, either to report new

information about any proceeding(s) that the recipient entity has not reported previously or affirm that there is no new information to report. Recipients that have Federal contract, grant, and cooperative agreement awards with a cumulative total value greater than $10,000,000 must disclose semiannually any information about the criminal, civil, and administrative proceedings.

5. Definitions - For purposes of this award condition:

   a. "Administrative proceeding" means a non-judicial process that is adjudicatory in nature in order to make a determination of fault or liability (e.g., Securities and Exchange Commission Administrative proceedings, Civilian Board of Contract Appeals proceedings, and Armed Services Board of Contract Appeals proceedings). This includes proceedings at the Federal and State level but only in connection with performance of a Federal contract or grant (including a cooperative agreement). It does not include audits, site visits, corrective plans, or inspection of deliverables.

   b. "Conviction", for purposes of this award condition, means a judgment or conviction of a criminal offense by any court of competent jurisdiction, whether entered upon a verdict or a plea, and includes a conviction entered upon a plea of nolo contendere.

   c. "Total value of currently active grants, cooperative agreements, and procurement contracts" includes --

      i. Only the Federal share of the funding under any Federal award with a recipient cost share; and

      ii. The value of all expected funding increments under a Federal award and options, even if not yet exercised.

## X.  AWARD CLOSEOUT

1. Award closeout is the process by which FPAC determines that all required project activities have been performed satisfactorily and all necessary administrative actions have been completed.

2. The recipient must submit, no later than 120 calendar days after the period of performance end date, all financial, performance, and other reports as required by the terms and conditions of the agreement, including documentation showing that cost share requirements have been met. The awarding agency may approve extensions when requested by the recipient.

3. Unless the awarding agency authorizes an extension, the recipient must liquidate all obligations incurred under the agreement no later than 120 calendar days after the period of performance end date.

4. Recipients must submit all requests for reimbursements no later than 120 calendar days after the period of performance end date.

5. The recipient must promptly refund any balances of unobligated cash that the awarding agency paid in advance or paid and that are not authorized to be retained by the recipient for use in other projects. See OMB Circular A-129 and see §200.345 Collection of amounts due, for requirements regarding unreturned amounts that become delinquent debts.

   Recipients must retain all records pertaining to the agreement in accordance with 2

CFR 200.333-337 and any additional requirements included in the agreement statement of work.

6. Recipients must follow disposition requirements for property acquired with award funds in accordance with 2 CFR 200.310-316 and the terms of this agreement.

7. If the recipient does not submit all reports in accordance with this section and the terms and conditions of the Federal award within one year of the period of performance end date, the Federal awarding agency must proceed to close out with the information available, including de-obligation of remaining funds. In addition, in accordance with 2 CFR 200.344, the Federal awarding agency must report the non-Federal entity's material failure to comply with the terms and conditions of the award with the OMB- designated integrity and performance system (currently FAPIIS).

Refer to https://www.fpacbc.usda.gov/about/grants-and-agreements/required-reports-closing/index.html for applicable forms.

## Y. NON-DISCRIMINATION IN USDA PROGRAMS

The recipient agrees that, in accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at https://www.usda.gov/oascr/how-to-file-a-program-discrimination-complaint and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3) email:program.intake@usda.gov

USDA is an equal opportunity provider, employer, and lender.

## Z. CARE AND USE OF ANIMALS

For any award that involves the care and use of vertebrate animals, the recipient is responsible for complying with the Animal Welfare Act (7 USC, 2131-2156), Public Law 89- 544, 1996, as amended, and the regulations promulgated thereunder by the Secretary of Agriculture in 9 CFR Parts, 1, 2, 3, and 4. In the case of domesticated farm animals housed under farm conditions, the recipient must adhere to the principles stated

Agreement Number: FSA24GRA0011608
Revised March 2024

Attachment 4A
USDA FPAC General Terms and Conditions
For Grants and Cooperative Agreements

in the Guide for the Care and Use of Agricultural Animals in Research and Teaching, published by the American Dairy Science Association®, the American Society of Animal Science, and the Poultry Science Association, 2020. The recipient must have an approved Animal Welfare Assurance Statement on file with the Public Health Service Office for Laboratory Animal Welfare (OLAW) that describes the institution's animal care and use policies, the line of authority for animal care at the institution, veterinary care program, personnel and facilities. If no assurance statement is on file, the organization must contact FPAC to discuss alternatives.

## AA. USE AND ACCEPTANCE OF ELECTRONIC SIGNATURES

Use of electronic signatures is encouraged to increase efficiency when creating and maintaining electronic records. "Electronic signature" means symbols or other data in digital form attached to an electronically submitted document as verification of the sender's intent to sign the document or a method of signing an electronic message that identifies and authenticates a particular person as the source of the electronic message and indicates such person's approval of the information contained in the message along with a date stamp (44 U.S.C. 3504, Sec. 1710). FPAC agencies will accept such signatures on application materials, payment requests, reports, and any other document that requires a signature certification. Scanned or photographed images of manual signatures are also acceptable, though photographs are least preferred due to the large amount of digital storage required to maintain them. Names merely typed in script fonts or other unverified electronic signatures cannot be accepted. Application documents submitted through Grants.gov are deemed "signed" if they bear the Grants.gov date stamp footer. Documents transmitted via ezFedGrants are digitally authenticated and acceptable.

## BB. SPECIAL PROVISIONS FOR AWARDS TO FOR-PROFIT ORGANIZATIONS

This section contains provisions that apply to awards to for-profit organizations. These provisions are in addition to or in exception of other applicable provisions of these general terms and conditions.

1. In accordance with 2 CFR 200.101, FPAC agencies apply the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal awards to for-profit entities.

2. No funds may be paid as profit to any recipient even if the recipient is a for-profit organization. Profit is any amount in excess of allowable direct and indirect costs.

3. For-profit organizations that receive annual awards totaling more than the audit requirement threshold in Subpart F have two options regarding audits:

   a. If the commercial organization receives awards under only one FPAC program, financial audit of that award in accordance with Generally Accepted Government Auditing Standards issued by the Comptroller General of the United States or, if awards are received under multiple FPAC programs, a financial audit of all awards in accordance with Generally Accepted Government Auditing Standards issued by the Comptroller General of the United States; or

   b. An audit that meets the requirements contained in Subpart F.

Agreement Number: FSA24GRA0011608
Revised March 2024

## CC. AGREEMENT COUNTERPARTS

This Agreement may be executed in one or more counterparts, and by the parties in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

## DD. CONTINUING OBLIGATIONS

The rights and obligations of the parties that, by their nature, would continue beyond the expiration or termination of this agreement (e.g., confidentiality-related clauses) shall survive such expiration or termination of this agreement.

EXHIBIT B

TERMINATION LETTER



**Farm Service Agency**
U.S. DEPARTMENT OF AGRICULTURE

U.S. Department of Agriculture
Farm Service Agency
Office of the Administrator
1400 Independence Ave., S.W.
Washington, DC, 20250-0506

March 23, 2026

King County
Attn: Richard Martin
201 S. Jackson St Ste 5600
Seattle, Washington 98104-3855

Dear Recipient,

This letter provides notice that the Farm Service Agency (FSA) is terminating your federal award, *King County (WA) Farmland Access Program* (FSA24GRA0011608), in accordance with the terms and conditions of your award and applicable regulations (including 2 C.F.R. 200.340(a)(4)). The United States Department of Agriculture (USDA) has determined that awards under this program involved discriminatory preferences based on Diversity, Equity, and Inclusion (DEI) and wasteful spending that did little to further lawful agricultural land purchases. Accordingly, as discussed below, USDA has determined your award no longer effectuates the program goals or agency priorities. Termination of your award is effective Thursday, March 26, 2026.

The Secretary's Memorandum 1078-004, *"Directive on Departmental Grant and Cooperative Agreement Priorities"* (March 2025), instructed USDA agencies and staff offices to review existing awards to ensure they reflect the Department's priorities of unity, equality, meritocracy, and color-blindness. Accordingly, USDA conducted a thorough review of the Increasing Land, Capital, and Market Access Program ("ILA" or "the program"). That review revealed that ILA awards, including yours, do not align with the Department's goals and priorities, for the following reasons:

1. *Awards Discriminate Based on Immutable Characteristics.*
   Your award was made pursuant to a program rife with DEI preferences that discriminated based on immutable characteristics. USDA programs must be consistent with principles of equal protection and should never pick winners in the land market based on immutable characteristics like race or sex. When Congress amended the program authority through Section 22007 of the Inflation Reduction Act (IRA), it removed any reference to "socially disadvantaged" (*i.e.*, distinctions based on race, ethnicity, or sex) and focused the program's eligibility for "underserved farmers, ranchers, and forest landowners including veterans, limited resource producers, beginning farmers and ranchers, and farmers, ranchers, and forest landowners living in high poverty areas." Yet despite this de-authorization, the vast majority of projects across the ILA program violated equal protection principles by selecting beneficiaries based on race, ethnicity, sexual orientation, or

**Farm Service Agency**
*USDA is an equal opportunity provider, employer, and lender.*

sex. Eligible groups referenced in the statute should never have been de-prioritized for awards in favor of groups that Congress specifically removed. This award violates the principles laid out in Secretary's Memorandum 1078-021, "*Establishment of USDA General Terms and Conditions for Grants, Cooperative Agreements, and Similar Arrangements,*" (December 2025) (which supersedes Secretary's Memorandum 1078-004); Secretary's Memorandum 1078-001, "*Prioritizing Unity, Equality, Meritocracy, and Color-Blind Policies, in the United States Department of Agriculture,*" (Feb. 2025); USDA's final rule, "*Removal of Unconstitutional Preferences Based on Race and Sex in Response to Court Ruling,*" 90 Fed. Reg. 30555 (July 10, 2025); and FSA's notice, "*Agricultural Disaster Assistance Programs,*" 90 Fed. Reg. 44623 (Sep. 16, 2025). It also violates at least two executive orders, including Executive Order 14148, "*Initial Recissions of Harmful Executive Orders and Actions,*" and Executive Order 14173, "*Ending Illegal Discrimination and Restoring Merit-Based Opportunity.*"

2. *Awards Do Not Align with Congressional Intent.*
   Most of the funding for ILA came from Section 1006(b) of the American Rescue Plan Act (ARPA), as amended by Section 22007 of the IRA, which sought "to provide grants and loans ... to improve land access (including heirs' property and fractionated land issues)." Yet most of the awards did little to improve land access. With high overhead costs and excessive spending on outreach and technical assistance, existing awards do not do enough to help producers.

3. *ILA Award Structure Unacceptably Exposed Taxpayers to Fraud, Waste, and Abuse.*
   The program's open "innovative" framework and minimal guardrails resulted in awards improperly exposing taxpayers to unacceptable risks of fraud, waste and abuse. The program's awards enabled spending inconsistent with sound public policy or market logic. Instances of excessive or frivolous expenditures — such as purchasing gazebos, massages, a camper/RV, and oversized office supply budgets (in one case, over $130,000) — instead of land are an affront to taxpayers. The absence of robust oversight mechanisms further amplifies the risk of fraud and abuse.

These issues are endemic across the ILA program; they have biased the application and selection processes and fail to safeguard taxpayer funds in the administration of the program. It is necessary to fully realign the program to ensure consistency with statutory requirements, equal protection principles, and prudent fiscal management.

As stated in the project narrative supporting the award, an overarching goal of the project is to "support establishment and expansion of farm business operated by new and beginning;

and BIPOC and other historically underserved farmers…" The narrative goes on to state that many of the initiatives are intended to improve opportunities specifically for BIPOC farmers. The project's intention to allocate program resources to specific producers based on race and ethnicity underscores the fundamental inconsistency with equal protection principles and USDA policy and priorities. USDA will prioritize unity, equality, meritocracy, and color-blindness in furtherance of the Department's mission.

We acknowledge that King County has undertaken efforts in connection to this project. We also acknowledge that the project includes partnerships with Black Farmers Collective, Business Impact Northwest, International Rescue Committee, Living Well Kent, and Wakulima USA, who hold unique roles in providing technical assistance and education to support the project's overarching goals referenced above. However, the public has a significant interest in ensuring that the ILA program, as a whole, accomplishes its statutory purpose to improve land access and that the selection of beneficiaries does not discriminate based on immutable characteristics. The public also has a significant interest in ensuring the effective and efficient use of federal funds. As such, following careful consideration of your award – including any potential reliance interests, intended outcomes described, as well as consideration of alternatives to termination – USDA has determined the best use of resources and advancing USDA's goals and priorities requires a full termination to realign the program to be consistent with its statutorily mandated purpose and the policies and priorities of the Department.

Your award is terminated pursuant to 2 C.F.R. § 200.340(a)(4) and Section XXII of your Notice of Grant and Agreement Award, effective Thursday, March 26, 2026. You may be reimbursed for costs incurred up to the effective date of termination that are determined to be consistent with 2 C.F.R. § 200.343. Any applicable payment requests must be submitted no later than 120 calendar days after the date of this notice. Any open balance remaining 120 days after the date of this notice will be unavailable for payment.

Any applicable final reports must be submitted to FPAC.BC.GAD@usda.gov no later than 120 calendar days after the date of this notice. If you do not submit all reports in accordance with the terms and conditions of the Federal award within one (1) year of the effective termination date, FSA must proceed to close out the award with the information available. In these circumstances, in accordance with 2 C.F.R. § 200.344, FSA must report your material failure to comply with the terms and conditions of the award in SAM.gov using the Contractor Performance Assessment Reporting System (CPARS). Failure to submit timely and accurate final reports may affect your future funding.

Federal regulation requires recipients to retain all Federal award records consistent with 2 C.F.R. § 200.334. Termination of the agreement does not affect a Federal agency's or a pass

through entity's right to disallow costs and recover funds based on a later audit or other review. In accordance with 2 C.F.R. § 200.345, termination does not affect a recipient's obligation to return any funds due because of later refunds, corrections, or other transactions, including final indirect cost rate adjustments.

You may appeal this determination to the National Appeals Division (NAD) by filing a written request no later than 30 calendar days after you receive this notice according to the NAD appeal procedures found at 7 CFR Part 11. If you appeal to NAD, you have the right to a hearing that you or your representative may attend. Once a hearing with NAD begins, you waive any rights you might have to reconsideration, appeal to FSA, and mediation. You can find information for how to file an appeal with a NAD on its website at https://nad.usda.gov/. If you do not timely exercise one of the preceding options, this shall be the final administrative determination with respect to this matter according to the regulations at 7 CFR Part 780 and 7 CFR Part 11.

If you have questions, contact your FSA Program Contact at land.access@usda.gov.

Sincerely,

STEVEN PETERSON
Digitally signed by STEVEN PETERSON
Date: 2026.03.23 10:12:38 -04'00'

Steven Peterson
Associate Administrator, Farm Service Agency

EXHIBIT C

APPEAL LETTER

Docusign Envelope ID: 6E57DB4A-40B5-8C53-9207-45AAC0BEC5E8
Docusign Envelope ID: 035E5EB1-C4BC-8425-808F-D44FEB4CA81E



**King County**

**Water and Land Resources Division**

Department of Natural Resources and Parks
King Street Center
201 South Jackson Street, Suite 6300
Seattle, WA 98104-3855
**206-477-4800**   Fax 206-296-0192
TTY Relay: 711

April 22, 2026

National Appeals Division
Western Regional Office
13922 Denver West Parkway
Suite 100-NAD
Lakewood, CO 80401-3102

*Filed via National Appeals Division (NAD) eFile Web Site*

**Subject:    Appeal of Grant Termination**
**United States Department of Agriculture ("USDA")**
**Increasing Land, Capital, and Market Access ("ILA") Program**
**King County (WA) Farmland Access Program, Agreement Number**
**FSA24GRA0011608**

Dear National Appeals Division:

King County, a home rule charter county in the State of Washington ("King County" or the "County"), respectfully submits this notice of appeal of the USDA Farm Service Agency's ("FSA") decision to terminate King County's ILA award, King County (WA) Farmland Access Program, Agreement Number FSA24CRA0011608 (the "King County Program" or the "County's ILA Program"), as stated in the enclosed termination notice dated March 23, 2026 (the "Termination Notice").

Following a rigorous and exhaustive application and evaluation process, USDA chose to support the County's vision for the King County Program because it directly aligned with, and significantly furthered the goals proposed by, the federal ILA program authorized by Congress. USDA based this selection on explicit and objective criteria set out in the Notice of Funding Opportunity ("NOFO")—criteria the USDA selected to best implement Congress's funding authorization. In reliance on USDA's funding commitment, the County and its partners in the King County Program have achieved demonstrable success in supporting underserved farmers within King County, just as Congress envisioned. And the King County Program continues to meet the criteria set by Congress in authorizing funding for the overall federal ILA program.

The ILA funding allocated by USDA expanded and strengthened King County's pre-existing Farmland Access Program ("Farmland Access Program"), with a focus on improving equitable

1

Docusign Envelope ID: 6E57DB4A-40B5-8C53-9207-45AAC0BEC5F8
Docusign Envelope ID: 035E5EB1-C4BC-8425-808F-D44FEB4CA81E

National Appeals Division
April 21, 2026
Page 2 of 17

access to farmland for underserved farmers and supporting individual farmers to ensure that their farming operations remain economically viable. The portion of the County's Farmland Access Program funded through the USDA's ILA award—referred to herein as the King County Program or the County's ILA Program—advances several key objectives, including coaching and supporting farmland leasing and purchase, developing and testing alternative land tenure models, expanding education and outreach to connect farmers with capital and technical training opportunities, and increasing access to markets. To carry out this work, the King County Program increased staffing capacity, enhanced technical assistance for farmers operating on King County-owned farmland as well as those who own or lease elsewhere, and formalized partnerships with community-based organizations that have deep experience working directly with farmers.

The King County Program was designed to serve exactly the target audience envisioned by the congressionally authorized federal ILA program—historically underserved farmers, a term that includes limited resource producers, beginning farmers, and farmers living in high poverty areas—who often face significant barriers to accessing land, capital, and support services. For the purposes of the King County Program, the definition of "qualified beginning farmer or rancher" presented in 7 USC 1991(a)(11)(A) and (B) was applied: a farmer who is eligible for agricultural credit assistance and "who has not operated a farm or ranch, or who has operated a farm or ranch for not more than 10 years."

Through a combination of pilot projects, culturally relevant outreach, technical assistance, and access to small-scale financing, the King County Program helped farmers establish and grow viable operations while strengthening the broader local food system. This integrated approach reflected the understanding that farmers need more than land alone—they also require training, infrastructure, and community connections to succeed.

USDA's FSA Office of Outreach reviewed and approved the County's proposal for the King County Program through the Notice of Grant and Agreement Award, which the parties fully executed on December 13, 2024. The USDA sent a Negotiation Letter on December 11 with programmatic and budgetary clarifications. The grant proposal and budget narrative were revised based on conversations with USDA, resulting in amendment number 01 to the Notice of Grant and Agreement Award ("ILA Award Agreement"), which the parties fully executed on April 3, 2024. The County formally launched the King County Program at that time and always implemented the Program in accordance with the ILA Award Agreement, applicable program rules, and relevant county, state, and federal grant management protocols.

In the Termination Notice, FSA states: "The United States Department of Agriculture (USDA) has determined that awards under this program involved discriminatory preferences based on Diversity, Equity, and Inclusion (DEI) and wasteful spending that did little to further lawful agricultural land purchases." The termination further claims that "ILA awards, including yours [i.e., the County's] do not align with the Department's goals and priorities" because they discriminate based on immutable characteristics; do not align with Congressional intent; and expose taxpayers to fraud, waste, and abuse." The County strenuously disagrees with FSA's

National Appeals Division
April 21, 2026
Page 3 of 17

basis for the decision and believes the decision both to effectively cancel the federal ILA Program and to terminate the King County Project is unlawful and should be reversed.

Contrary to FSA's generic assertions in the Termination Notice, the County's ILA Program does not discriminate based on immutable characteristics, and the County's robust grant oversight procedures negate the specter of fraud, waste, or abuse in administering these grant funds. Withdrawal of USDA's support at this critical time would cripple the County's ILA Program and result in a significant setback for underserved farmers in our region. The County respectfully seeks to reverse FSA's termination decision so it may continue the King County Program as approved by USDA and complete the mission set by Congress.

## I.    Matters of General Applicability

The Termination Notice indicates that USDA has made a program-wide determination that ILA awards "do not align" with agency priorities and has acted to terminate all but one of the awards under the program. The County believes this decision is one of **general applicability**, rather than one based on the specific facts of the County's ILA Program award as addressed in more detail in Section IV, below. King County contends that this program-wide termination:

- Is contrary to law, because Congress expressly authorized and funded the federal ILA program under the *Inflation Reduction Act* to support underserved farmers;

- Is arbitrary and capricious, because it relied on improper factors, failed to consider important aspects of the problem, is contrary to evidence, is contrary to governing regulations), is insufficiently reasoned, is implausible, reverses prior agency policy without adequate explanation, and/or fails to properly consider reliance interests; and

- Unlawfully applies new policy interpretations retroactively to existing agreements; a shift in USDA priorities does not supersede legislation authorized by Congress.

King County recognizes that NAD may determine that the USDA's decision to terminate the County's ILA Program award is non-appealable as a matter of general applicability, if the decision to terminate the program in its entirety is the basis for terminating the County's individual award. If NAD determines that these claims are not appealable, King County respectfully requests a prompt **determination of non-appealability** so that the County may preserve and pursue these claims in district court.

In the alternative, if NAD determines that USDA's decision to terminate King County's ILA Program award is appealable, then the County requests a hearing where it can elaborate on the reasons why it believes this decision is in error. The following is a summary of King County's arguments as to why the termination of the County's individual agreement was in error.

## II.    King County's ILA Program Award aligns with underlying programmatic and statutory requirements and congressional intent

The terms of the NOFO provided grant funding for ILA projects that strengthened land access with at least one of the following related areas of concern: capital access that affects the ability

3

Docusign Envelope ID: 6E57DB4A-49B5-8C53-8207-45AAG0BEC5F8
Docusign Envelope ID: 035E5EB1-C4BC-8425-808F-D44FEB4CA81E

National Appeals Division
April 21, 2026
Page 4 of 17

to access land; market access that affects the ability to access land; or a combination of one or more of land, capital, and market access. The program requirements established in the NOFO required grantees to embed technical assistance in their program design and approach and defined technical assistance as "targeted services and support collectively designed to improve understanding of and equitable participation in the full range of USDA programs and services among underserved farmers, ranchers, and forest landowners and operators."

The ILA Program proposed by King County and funded by the USDA award significantly advanced most, if not all, of those stated goals. Through the structure of the County's pre-existing Farmland Access Program, the County received ILA funding to develop and expand a range of services that met the requirements outlined in the NOFO. Specifically, the Farmland Access Program was created to provide integrated services that strengthen land access in combination with access to capital, enhanced market access, and embedded technical assistance. With USDA ILA award funds, the King County Program leveraged and expanded on the County's existing Farmland Access Program through the planned development and implementation of pilot projects that test alternative land tenure models, such as cooperative farming on shared land, long-term leasing, and buy-hold-sell, with the objective of increasing opportunities for farmers to access farmland. The King County Program was also structured to improve capital access by connecting historically underserved farmers to federal, state, and local financing programs and providing small loans to support farm start-up and expansion. In addition, the King County Program planned to support new and beginning farmers with increased market access by strengthening connections to local and regional markets.

Consistent with the NOFO requirement to embed technical assistance, the King County Program delivered targeted outreach and one-on-one support through partnerships with technical service providers and community-based organizations to improve farmers' understanding of farm management in the Puget Sound region. This outreach and support enhanced the potential for successful farm business operations and increased participation in USDA and other public programs that provide technical and financial support. Together, these services addressed barriers to land, capital, and market access faced by beginning and other underserved farmers. Although King County's ILA Program anticipated providing focused outreach to underserved farmers in certain areas, such as providing additional interpretation/translation services to immigrant and refugee farmers, those focus efforts areas did not diminish support for—or equal access to—program services for underserved farmers, such as new or beginning farmers (or anyone who wanted to participate in the County's ILA Program). Indeed, most of the farmers who receive the assistance, guidance, and support of the King County Program qualify as beginning farmers under USDA's definition because they have farmed for less than 10 years.

The King County Program was developed to broadly support new and beginning farmers across King County, where farmland costs often range from $30,000 to $50,000 per acre, which creates significant barriers to entry regardless of race, gender, or socioeconomic background. Eligibility for King County Program services was based on factors such as interest in farming, stage of business development, and ability to benefit from land access and

4

National Appeals Division
April 21, 2026
Page 5 of 17

support services, rather than any immutable characteristics or discriminatory preferences, thereby ensuring that all farmers facing barriers to accessing land, capital, and markets could participate.

These activities and objectives directly aligned with the statutory purpose of the federal ILA program, which Congress established to address historic and ongoing barriers faced by underserved farmers and ranchers. Congress expressly recognized these barriers in:

- The original authorization of the program through Section 1006 of the American Rescue Plan Act ("ARPA"), entitled *"USDA Assistance and Support for Socially Disadvantaged Farmers, Ranchers, Forest Land Owners and Operators, and Groups,"* which appropriated funds to support farmers and organizations serving populations that have experienced discrimination. *See* ARPA of 2021, Pub. L. 117-2, § 1006(b), (e), 135 Stat. 4, 13-14 (2021);

- Section 1006(a) of the ARPA of 2021, as amended by Section 22007 of the Inflation Reduction Act of 2022 ("IRA"), which provides funding to "provide outreach, mediation, financial training, capacity building training, cooperative development and agricultural credit training and support, and other technical assistance on issues concerning food, agriculture, agricultural credit, agricultural extension, rural development, or nutrition to underserved farmers, ranchers, or forest landowners, including veterans, limited resource farmers, beginning farmers and ranchers, and farmers, ranchers, and forest landowners living in high poverty areas." IRA of 2022, Pub. L. 117-169, § 22007, § 1006(b), 136 Stat. 1818, 2022–23 (2022), *amending* ARPA of 2021, Pub. L. 117-2, § 1006(b), (e), 135 Stat. 4, 13-14 (2021);

- Section 22007 of the IRA, which amended the program authorization in Section 1006, broadening the program to serve "underserved farmers, ranchers, or forest landowners" – a term which includes "limited resource producers, beginning farmers and ranchers, and farmers, … living in high poverty areas." The IRA amendment also included express mention that the program was authorized to address "heirs' property and fractionated land issues," and which also provided additional financial assistance under a separate subsection to anyone determined to have experienced discrimination in USDA programs prior to January 1, 2021. *See* IRA § 22007, § 1006(b), (e), 136 Stat. 2021–23; and

- The existing statutory definition of "socially disadvantaged" in 7 U.S.C. § 2279(a)(5)-(6), which defines the term as individuals who "have been subjected to racial or ethnic prejudice because of their identity as members of a group without regard to their individual qualities." The ARPA as amended by the IRA is included as a note to this statutory definition.

Congress expanded the scope of eligibility for the federal ILA program in Section 22007 of the IRA of 2022 by replacing "socially disadvantaged farmers and ranchers" with "underserved farmers and ranchers." The NOFO outlined a grant program that, in addition to serving the larger community of farmers, was designed to deliver services to specific groups who have

National Appeals Division
April 21, 2026
Page 6 of 17

historically been underserved by USDA programming, including new and beginning farmers, limited resource farmers, farmers in high poverty areas, etc. The NOFO included a non-exhaustive list of farmers who may be considered "underserved" and emphasized a commitment "to funding projects that support a diverse set of farmers, ranchers, forest landowners, and operators (producers) on the edge of viability, moving them from surviving to thriving as they address core barriers to attain land, capital, and market access." It is important to reiterate that while the King County Program directed resources toward supporting underserved farmers, the County's ILA Program did not exclude any farmer from participating or taking advantage of the services provided by the County based on discriminatory preferences.

The King County Program was expressly designed to fulfill the ARPA and IRA statutory mandates and the priorities outlined in USDA's ILA funding NOFO. Therefore, the termination violates the Administrative Procedure Act, under 5 U.S.C. § 706(2)(A) and (C).

The County's application was reviewed, approved, and funded by USDA based on these statutory and programmatic criteria, and the County's ILA Program executed award agreement reflected those requirements and authorized activities. At all times, the County has implemented the County's ILA Program in accordance with the approved scope of work and applicable program rules.

Since receiving the award, King County achieved measurable public benefits, including

- Supported approximately 120 new and beginning farmers to establish or expand their farm businesses on farmland owned by King County.

- Provided direct farmland access opportunities for 10 farmers who established new farm businesses on County-owned farms.

- Provided 19 workshops to 225 participants on a range of farm management practices, including operation of water-saving irrigation systems, operation of solar-powered wells, improved produce washing and packing practices, and soil health improvements, including expanded use of compost.

- Provided over 250 coaching sessions to support farmers on topics including developing business plans, identifying and applying for capital, land access, and production practices that conserve water and soil.

- Coached one community-based organization through the land acquisition process and served in an advisory capacity as they activated their newly purchased 22-acre farm site.

- Supported an additional four community-based organizations to secure funding for the purchase of farmland. The award had been supporting County staff to advise these groups as they identify and evaluate farmland for purchase.

- Continued to build out a county-wide, multi-partner Farmland Access Program that was established to support connections between farmland owners who are considering fee

National Appeals Division
April 21, 2026
Page 7 of 17

sale or leasing and farmers looking to establish or expand their farm business; secured significant outside funding to match USDA funds in support of this effort.

- Continued to create frameworks and operating procedures for collaborative farming on shared farmland.

- Provided interpretation and translation services for beginning farmers who do not speak English as a first language.

The County had already achieved many demonstrated successes and had expected to build on these during the anticipated life of the USDA grant over the next two years. Equally important, the County intended to use the remaining grant period to identify sources of long-term financial support to ensure that the work initiated through the grant award could be continued and expanded.

### III.    Termination is not in accordance with law and exceeds statutory authority

This termination is not in accordance with law and exceeds statutory authority in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) and (C). USDA's authority is defined and limited by Congress. The Termination Notice does not identify any aspect of the King County Program that falls outside the congressionally approved statutory authority of the federal ILA program. Instead, it relies on unsupported and false assumptions to justify an impermissible reinterpretation of program priorities that conflict with Congress's express authorization and funding of this program.

The stated basis for termination—that the County's ILA Program intended to "allocate program resources to specific producers based on race and ethnicity"—is not only misleading and wrong, but also directly at odds with the statutory purpose of the federal ILA program, which explicitly prioritizes support for underserved farmers. At USDA, "underserved" is an umbrella term which has historically included socially disadvantaged farmers and ranchers as one of several categories of farmers who have historically been underserved by USDA programs, such as women, beginning, veteran, limited resource, and other categories of farmers and producers. Although Congress amended the federal ILA program authorization in Section 22007 of the IRA and replaced the term "socially disadvantaged" with "underserved," nothing in the reauthorization prevented funding from going to individuals who fall within the "socially disadvantaged" definition as part of a larger program scope.

Section 22007 of the IRA of 2022 amended Section 1006(a) of the ARPA of 2021 to *expand* the scope of who could be served by the program; it didn't intend to exclude those farmers who were originally the program's sole intended recipients when the ILA was originally authorized under the ARPA Section 1006(b)(2). Congress specifically authorized and funded this program to achieve the objectives outlined in the County's ILA Program award. USDA cannot lawfully terminate the County's ILA Program award for fulfilling congressional mandate.

But even if King County accepted USDA's version of Congress's intent in Section 22007 of the IRA as true, the allegations in the Termination Notice are still insufficient to show that the County's ILA Program does not align—and align directly—with Congress's stated intent.

7

National Appeals Division
April 21, 2026
Page 8 of 17

Indeed, by any metric, the King County Program was designed, approved, and implemented in alignment with Congress's statutory mandate: *i.e.*, "to improve land access (including heirs' property and fractionated land issues) for underserved farmers, ranchers, and forest landowners, including veterans, limited resource producers, beginning farmers and ranchers, and farmers, ranchers, and forest landowners living in high poverty areas." IRA § 22007, § 1006(b), 136 Stat. 2021–23. The King County Program aligns closely with the statutory mandates of Section 1006 of the ARPA, as amended by Section 22007 of the IRA of 2022, by focusing on improving land access and reducing barriers for underserved farmers – a term which by Congress's own language includes "beginning farmers," "limited resource producers," and "farmers … living in high poverty areas." *See* Section 1006(a) of the ARPA of 2021, as amended by Section 22007 of the IRA of 2022. King County's ILA Program advances these goals by expanding access to farmland through alternative tenure models, connecting farmers to capital and financing opportunities, and strengthening pathways to viable markets. The King County Program integrated targeted outreach and technical assistance to support participation in USDA and other agricultural programs, with a focus on underserved farmers.

USDA awarded ILA funding to expand the County's existing Farmland Access Program to better support underserved farmers in establishing and growing farm businesses. The King County Program, which was directly supported by the grant award, increased access to land, capital, and markets through pilot initiatives, coordinated technical assistance, and partnerships with community-based organizations. It also supported expansion of staff and collaboration with organizations and Highline College to expand capacity for outreach, education, and technical training to ensure farmers could develop necessary skills and access resources needed to build sustainable operations. The County's ILA Program was reviewed, approved, and funded in its entirety by USDA.

Moreover, the NOFO prioritized projects that supported farmers "on the edge of viability" by addressing barriers to land, capital, and market access, and Section 22007 of the IRA broadened eligibility to include underserved farmers such as limited resource and beginning farmers, as well as those in high-poverty areas. Consistent with this direction, King County designed its program to address economic and structural barriers to land access rather than prioritize or exclude individuals based on immutable characteristics. In particular, the County's ILA Program aligns with USDA's definition of limited resource farmers—those with total household income below the poverty level for a family of four or less than half of the county median household income for two consecutive years.

This approach is reflected in the County's RFP process for access to County-owned farmland, which applied neutral criteria to all applicants, and scored applications based upon the strength of the farm vision, well-developed operational and business plans, farmer experience, and connections to the local agricultural community. The RFP also incorporated geographic targeting through designated "Opportunity Areas," defined as communities in the lowest one-third of median household incomes using objective indicators such as income, health outcomes, and access to open space. This framework closely paralleled USDA's income-based criteria for limited resource farmers, since both rely on clear economic thresholds to

Docusign Envelope ID: 6E57DB4A-40B5-8C53-8207-45AAG0BEG5F8
Docusign Envelope ID: 035E5EB1-C4BC-8425-808F-D44FEB4CA81E

National Appeals Division
April 21, 2026
Page 9 of 17

identify disadvantage, thereby demonstrating that the program is grounded in addressing financial barriers and access constraints. Taken together, the King County Program reflected a lawful, inclusive approach consistent with Congressional intent and USDA guidance. King County's identification of "Opportunity Areas" captures the NRCS definition of "limited resource farmer" (*i.e.*, "producer") which includes farmland owners and operators whose total household income is less than 50% of the county median household income in each of the previous two years.

Moreover, the termination does not comport with the governing Office of Management and Budget regulation that USDA relied on for support, including but not limited to 2 C.F.R. 200.340(b)(4).

## IV.    The termination is arbitrary, capricious, procedurally deficient, and unsupported by substantial evidence

The termination is arbitrary and capricious, without observance of required procedures, and unsupported by substantial evidence in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (D) and (E). USDA previously encouraged and approved projects like the King County Program through its funding announcements and award process. The agency now penalizes King County for implementing those same priorities without providing a reasoned explanation or identifying evidence of noncompliance.

As applied to the County's award, the decision fails to conduct an individualized assessment of the King County Program. The Termination Notice relied on generalized concerns about the federal ILA program rather than evaluating the County's specific activities, expenditures, compliance, or outcomes. It does not explain how the King County Program violated program requirements or statutory authority and failed to consider relevant facts in the administrative record for our award, including compliance and measurable impacts.

The decision is arbitrary and unsupported because it:

- **Failed to analyze the County's specific Project**. The Termination Notice references isolated statements in the County's project narrative to conclude that the "project's intention to allocate program resources to specific farmers based on race and ethnicity" is impermissible.  Yet it fails to explain how the activities undertaken in the King County Program gave rise to the stated concerns.

- **Relied on generalized claims** without applying them to the County's ILA Program award. For example, the Termination Notice:
    - Asserted the federal ILA program involves impermissible "preferences" or discrimination, but failed to identify any specific activity within the King County Program that violated applicable laws, regulations, or program requirements.
    - Made general assertions about waste, inefficiency, and overspending in the federal ILA program, but failed to analyze or explain how the King County Program violated laws or program requirements.

9

National Appeals Division
April 21, 2026
Page 10 of 17

- Made general statements that ILA awardees could not make meaningful progress with providing enhanced land access opportunities to farmers but utterly failed to assess the King County Program for progress towards funding goals.

- **Mischaracterized the County's program or participants, without evidence** and failed to explain how the County's specific program is unlawfully discriminatory. The Termination Notice asserted that the King County Program was discriminatory based on immutable characteristics, but this claim mischaracterized both the County's design and implementation and failed to identify any evidence of unlawful discrimination. While the King County Program included a focus on historically underserved farmers, consistent with ILA goals, it was countywide in scope and did not exclude participation based on race, gender, or any other protected characteristic. Eligibility for various components of the King County Program was based on neutral criteria such as interest in farming, stage of business development, and the ability to benefit from land access and support services, thereby ensuring that all farmers facing barriers to accessing land, capital, and markets could participate. In practice, the King County Program had broadly supported new and beginning farmers across the county, where high land costs create significant barriers to entry for a wide range of farmers. Technical assistance and business support services were delivered by partners such as Highline College and Business Impact NW, both of which provided programming to all farmers, and our network of nonprofit partners served a diverse range of agricultural communities. This collaborative structure reflected an inclusive, non-discriminatory approach that aligned with the intent of the federal ILA program to expand access and opportunity.

- **Attempted to apply new terms and policies retroactively,** including Secretary's Memorandum 1078-021, "Establishment of USDA General Terms and Conditions for Grants, Cooperative Agreements, and Similar Arrangements," (December 2025). The County's ILA Program award is not governed by these updated general terms and conditions, and no formal amendment was made to apply those terms to our award. The Termination Notice also failed to provide good reasons for the new policy.

- **Failed to explain why alternatives to termination were not feasible.** Although the Termination Notice stated that alternatives were considered, it provided no explanation for why modification or corrective action was not pursued in the County's case. The decision to terminate the County's ILA Program award in its entirety was overly broad and unsupported.

- **Failed to meaningfully consider the County's reliance interests**. The Termination Notice acknowledged some reliance interests but did not account for all reliance interests nor explain how USDA evaluated those interests or why USDA determined termination was nonetheless appropriate.

National Appeals Division
April 21, 2026
Page 11 of 17

The Termination Notice treated the award to King County as part of a broader program decision rather than evaluating the County's individual agreement. Even if USDA is reconsidering broader priorities, it must still apply governing law and contractual requirements to our award. That did not occur here. Specifically, the Termination Notice, while attempting to be specific to King County, included several statements that imply that possible actions or outcomes on the part of one or more grant recipients were broadly attributed to all program recipients, including:

- "…vast majority of projects across the ILA violated equal protection principles by selecting beneficiaries based on race, ethnicity, sexual orientation, or sex."

- "most awards did little to improve land access."

- "The program's open "innovative" framework and minimal guardrails resulted in awards improperly exposing taxpayers…"

- "The program's awards enabled spending inconsistent with sound public policy or market logic."

- "Instances of excessive or frivolous expenditures…instead of land are an affront to taxpayers."

- "These issues are endemic across the ILA program…"

Those allegations broadly condemn all the ILA-funded programs, but none of them apply to the King County Program. Indeed, FSA's utter lack of specificity in justifying the termination of the County's award is staggering. In the entire Termination Notice, only three sentences appear directed at the perceived shortcomings of the King County Program. The rest of the Termination Notice lobs unsubstantiated allegations, such as the potential for fraud, waste, and abuse, which are demonstrably false when applied to the County. The lack of clarity regarding the County's specific transgressions suggests that FSA could find no valid reason to terminate the King County Program.

The Termination Notice identified three generalized reasons for termination, none of which can be reasonably applied to the body of work outlined in the grant agreement for the County's ILA Program. The first stated reason was that **"Awards discriminate based on immutable characteristics"** and there were several specifics that intended to support that assertion. As explained above, the County disagrees with FSA's premise in the Termination Notice that the IRA amendment narrowed the definition of groups that could receive outreach and technical assistance to exclude "socially disadvantaged farmers." But even if King County accepted that version as true, the allegations in the Termination Notice are still inapposite to the work performed by King County under the ILA Award Agreement, as explained in detail below.

1. Allegation that the Program is rife with DEI preferences that discriminated based on immutable characteristics.

    o Throughout the County's proposal it referred to "new and beginning farmers," which is independent of "immutable characteristics."

11

National Appeals Division
April 21, 2026
Page 12 of 17

    o   The County's RFP to identify potential new farmers for county-owned farmland did not contain <u>any</u> preferences based upon immutable characteristics.

2. Reliance on the amendment to Section 22007 of IRA that removed reference to "socially disadvantaged" and focused on "underserved farmers, ranchers, and forest landowners including veterans, limited resource farmers, beginning farmers and ranchers, and farmers, ranchers, and forest landowners living in high poverty areas."

    o   The County's proposal contained a single reference to the term "socially disadvantaged," but even that was in the context of a more expansive statement about supporting "socially disadvantaged and *new and beginning farm businesses*," which undoubtedly comports with Congress's intent. *See* Section 22007 of IRA ("… to **underserved farmers**, ranchers, or forest landowners, **including** veterans, limited resource producers, **beginning farmers and ranchers,** and **farmers,** ranchers, and forest landowners living in high poverty areas." (emphasis added)).

    o   In contrast, the County's proposal states, 27 times, its intent to work with "underserved farmers," which strongly supports the County's contention that our work was not exclusionary based upon immutable characteristics.

3. Allegation that projects violated equal protection principles by selecting beneficiaries based on race, ethnicity, sexual orientation, or sex.

    o   Contractors engaged through the King County Program were not selected based upon race, ethnicity, sexual orientation, or sex. As noted above, the County's RFP to select new farmers to establish farm businesses on farmland newly acquired by King County, which was an important deliverable for the King County Program, did not provide any preference for immutable characteristics.

    o   Individuals served by contractors hired as part of the King County Program were not selected based upon immutable characteristics.

4. Allegation that the award violates Secretary's Memorandum 1078-021 "Establishment of USDA General Terms and Conditions for Grants, Cooperative Agreements, and Similar Arrangements."

    o   King County met performance benchmarks and demonstrated substantial progress as per the workplan included in the grant agreement.

    o   None of the work supported by grant funding discriminated on the basis of immutable characteristics.

    o   Washington Administrative Code 162-16-200 prohibits discrimination based on "age, sex, sexual orientation, gender expression or gender identity, marital status, race, creed, color, national origin…" and discrimination is further prohibited under Revised Code of Washington 49.60.180 (Unfair Practices of Employers).

National Appeals Division
April 21, 2026
Page 13 of 17

5. The award violates Secretary's Memorandum 1078-001 "Prioritizing unity, equality, meritocracy, and color-blind polices in the United States Department of Agriculture."

   o County staff assigned to the King County Program worked with farming communities across King County, and delivery of the County's ILA Program was not restricted to any identity group.

6. The award violates 90 Fed. Reg. 30555, USDA rule "Removal of unconstitutional preferences based on race and sex in response to court ruling."

   o As noted above, the King County Program did not provide benefits based on race or sex. Rather than focusing the Program on "socially disadvantaged" farmers (which the County maintains was still authorized within the IRA's amended language), the County intended to—and in fact does—support "underserved farmers" and "beginning farmers," neither of which exclude individuals based upon immutable characteristics, and both of which are specifically authorized under the FSA's interpretation of the amended language in the IRA.

7. The award violates 90 Fed. Reg. 44623, FSA notice "Agricultural Disaster Assistance Programs."

   o If FSA took the time to review the specifics of the King County Program, that review would have revealed the Program was clearly focused on "underserved farmers and communities" and "new and beginning farmers," both of which are congressionally authorized.

8. The award violates Executive Order 14148 "Initial Rescissions of Harmful Executive Orders and Actions."

   o The King County Program neither maintained obstacles nor established barriers to participation based upon color or other immutable attributes.

9. The award violated Executive Order 14173 "Ending Illegal Discrimination and Restoring Merit-based Opportunity."

   o The ILA Award Agreement included a nondiscrimination statement as well as a "Non-discrimination in USDA Programs" requirement and those grant agreement terms are fully supported by the Washington state anti-discrimination laws.

The second stated reason for terminating the King County Program award was that **"Awards do not align with congressional intent."** Congressional intent is documented in Section 1006(b) of ARPA, which authorized funds to USDA to take action to ensure underserved farmers have the tools, programs and support they need to succeed. The King County Program was fully aligned with that requirement.

Additionally, ARPA was amended by Section 22007 of the IRA, which directed USDA to "provide grants and loans for improvement of land access for underserved farmers, ranchers,

13

National Appeals Division
April 21, 2026
Page 14 of 17

or forest landowners, including veterans, limited resource farmers, beginning farmers and ranchers, and farmers, ranchers, and forest landowners living in high poverty areas." The focus of the King County Program on "underserved farmers" and "new and beginning farmers" was aligned with that directive, as many of our contractors and tenant farmers have been farming for less than 10 years, and many may also be considered "limited resource producers."

Moreover, the Termination Notice's assertion, without citation or reference to King County's program, that the ILA "does not align with Congressional intent" and fails to improve land access due to high overhead and excessive spending on outreach and technical assistance, is demonstrably incorrect as applied to King County. The County's ILA Program directly advanced land and capital access by partnering with Business Impact NW, a nonprofit Community Development Financial Institution, to expand agricultural lending and provide targeted coaching and workshops that help underserved producers—who often lack collateral, credit history, or land—successfully access financing for essential start-up and expansion costs. At the same time, USDA's criticism of technical assistance contradicts its own long-standing guidance recognizing that effective land access depends on producers understanding tenure options, aligning land with business goals, and navigating capital pathways. King County's approach reflects this proven model by pairing capital access with practical, skills-based technical assistance, ensuring producers can secure and sustain land access.

The third reason provided as support for termination was that **"ILA award structure unacceptably exposed taxpayers to fraud, waste, and abuse."** Three specific alleged sources of potential fraud, waste, and abuse were identified, none of which have anything to do with King County or the King County Program. Indeed, the County's Department of Natural Resources and Parks, which includes the Water and Land Resources Division, takes seriously its role as a responsible steward of public funds and is proud of its history of managing federal funds and for continually enhancing policies and protocols to ensure that there is no opportunity for "fraud, waste, or abuse." As further evidence of this commitment to being a good steward of public funds, the County's Department of Natural Resources and Parks, Water and Land Resources Division restructured its grant management program and hired additional grant specialists, all of whom are highly experienced with management of federal grants and those staff have guided and supported the King County Program manager throughout the term of the County's ILA Program agreement. To refute the implication that there was any "fraud, waste, or abuse" associated with ILA funding received by King County, the County intends to submit evidence at the NAD hearing demonstrating that the County maintains well-established and robust grant oversight procedures that were fully exercised in administering this award. For the FSA to suggest that King County has allowed improper use of ILA funds—even by implication—is simply baseless with respect to the County. FSA's general alleged sources of improper stewardship of public funds are listed below, along with brief explanations why none apply to the King County Program:

- USDA's program framework and minimal guardrails resulted in awards improperly exposing taxpayers to unacceptable risks of fraud, waste, and abuse.

14

National Appeals Division
April 21, 2026
Page 15 of 17

- o  In the County's case, nothing could be further from the truth. King County, and more particularly relevant here, the County's Department of Natural Resources and Parks, Water and Land Resources Division, manages many government grants each year and has established a highly respected procurement and financial tracking system, which is subject to frequent audits.

- o  King County's Department of Natural Resources, Water and Land Resources Division, the division within which the Farmland Access Program resides, supports a robust grant management program; a grant strategist is assigned to all programs from the initiation of proposal development through final grant close-out to ensure that all local, state, and federal grant policies are followed (e.g., 2 C.F.R. Part 200).

- o  All contracts under this grant award were structured as reimbursement-based agreements, meaning that contractors were paid only after work had been completed, the work reviewed, and costs had been incurred and documented.

- o  Contractors were required to submit invoices that include the billing period, descriptions of work performed, and supporting documentation.

- Program's awards enabled spending inconsistent with sound public policy or market logic.

- o  Each invoice was reviewed at multiple levels prior to processing for reimbursement with grant funds. This review included confirming that the work described aligned with the contract scope, that costs were reasonable, and that expenses were allowable. The County maintains that these expenditures resulted in demonstrable results in line with the congressionally authorized purpose.

- Absence of robust oversight mechanisms further amplifies the risk of fraud and abuse.

- o  County staff who contributed to the King County Program are respected subject matter experts, with extensive experience in the range of program activities, and worked closely with all contractors to ensure that the terms of the County's ILA Program grant award agreement were honored.

## V.    Equitable Relief is Warranted

Equitable relief is warranted under 7 U.S.C. § 7996, 7 U.S.C. § 6998(d) and 7 C.F.R. § 11.9(e). The termination of the County's ILA Program award is not based on any finding that King County failed to comply with program requirements. Rather, it reflects an improper, retroactive change in agency interpretation or priorities applied after the award was made and implementation had begun.

The County relied in good faith on USDA's approval and executed agreement; structured staffing, budgeting, and operations around this funding; and incurred significant financial and operational consequences because of the agency's impermissible action. Equitable relief is

15

National Appeals Division
April 21, 2026
Page 16 of 17

warranted here because the termination of this award—absent any finding of noncompliance—has caused significant and immediate harm to a program that was approved, staffed, and launched in good faith reliance on USDA funding. King County structured core operations of its Farmland Access Program around this grant, and its sudden cancellation resulted in lost program momentum, disruption to services for farmers who were preparing to launch or expand operations in 2026, and the potential reallocation of County resources away from other priority projects to responsibly wind down grant-funded activities.

The impacts are both operational and programmatic: reduced capacity to manage approximately 250 acres of public farmland; reduced capacity to directly support farmers with leasing or purchasing of farmland; delays in onboarding new farmers and maintaining infrastructure; and diminished ability to provide technical assistance related to soil health, water conservation, and market access. The termination also jeopardizes critical partnerships with community-based organizations—including the Black Farmers Collective, International Rescue Committee, Wakulima USA, and SnoValley Tilth—whose work is central to delivering on-the-ground support and who face immediate funding gaps. More broadly, the County incurred substantial sunk costs – which were funded by other public monies - in staffing, program development, and relationship-building, while facing reputational harm and the loss of future funding opportunities. In the long term, this action undermines the County's efforts to expand farmland access, test innovative land tenure models, and support the next generation of farmers, all of which will ultimately reduce agricultural production and community benefits. Equitable relief is warranted and necessary to prevent this harm and to avoid penalizing the County and its partners for circumstances beyond their control.

The County respectfully requests:

1. An evidentiary hearing before NAD;

2. Reinstatement of the County's ILA Program award in full, including an extension of time to allow completion of all deliverables delayed because of the agency's misactions;

3. In the alternative, modifications or corrective action rather than termination, including an extension of time to allow completion of all deliverables under the modified or corrected agreement; and

4. Equitable relief as appropriate.

Please confirm receipt of this appeal. King County looks forward to: (1) the opportunity to present our case on our individualized claims, and (2) NAD's determination regarding the general applicability of the program-wide claims.

Sincerely,

Signed by:

*Josh Baldi*
207AF316BE0B4B6...

Josh Baldi
Division Director

Docusign Envelope ID: 035E5EB1-C4BC-8425-808F-D44FEB4CA81E

National Appeals Division
April 21, 2026
Page 17 of 17


cc:    Russell Prugh, Senior Deputy Prosecuting Attorney, King County Prosecuting
       Attorney's Office, appointed as King County representative in NAD appeal

EXHIBIT D

FSA DENIAL OF NAD APPEAL REQUEST



## UNITED STATES DEPARTMENT OF AGRICULTURE
### OFFICE OF THE SECRETARY
### NATIONAL APPEALS DIVISION

April 29, 2026

King County
Attn: Josh Baldi
201 S. Jackson St., Ste. 6300
Seattle, WA 98104

RE:    NAD Case No. 2026W000316

Dear Mr. Baldi:

This letter responds to the appeal you filed with the National Appeals Division (NAD) challenging a decision issued by the Farm Service Agency (FSA) on March 23, 2026, to terminate your federal grant, (*King County (WA) Farmland Access Program*, FSA24GRA0011608), under the Increasing Land, Capital, and Market Access (ILA) program. Although FSA's adverse decision includes appeal rights, NAD ultimately determines whether a matter is appealable to our division.

In its decision, FSA noted that "the United States Department of Agriculture (USDA) has determined that the awards under this program involved discriminatory preferences based on Diversity, Equity and Inclusion (DEI) and wasteful spending that did little to further lawful agricultural land purchases." FSA further explained that the ILA awards, including yours, did not align with USDA's goals and priorities because: (i) ILA awards discriminated based on immutable characteristics; (ii) ILA awards did not align with congressional intent; and (iii) the ILA award structure unacceptably exposed taxpayers to fraud, waste, and abuse. FSA noted that USDA should not pick winners based on immutable characteristics, most of the awards did little to improve land access, and the program enabled spending inconsistent with sound public policy or market logic.

In your appeal request, you disagree with FSA's decision and believe such decision cancelling the program and terminating your specific project is unlawful and should be reversed. Among other arguments, you contend the decision is contrary to Congressional authorization, is arbitrary and capricious, and unlawfully applies new policy interpretations to existing agreements.

NAD's implementing regulations codified at 7 C.F.R. Part 11, provide the relevant authority for determining whether an agency's decision is appealable to NAD. Pursuant to 7 C.F.R. § 11.6(a)(2), the NAD Director "shall determine whether the decision is adverse to the individual participant and thus appealable or is a matter of general applicability and thus not subject to appeal ...." There are two components to making an appealability determination. First, the decision must be adverse to the program

Docusign Envelope ID: 6E57DB4A-40B5-8C53-82C7-45AAG0BEC5E8

King County                                                                                           2
NAD Case No. 2026W000316

participant. Second, the decision must be based on an individual application of the program rather than a generalized application. Thus, program participants may not seek NAD review of agency regulations or statutory provisions that establish basic program requirements or eligibility criteria. *See* 7 C.F.R. § 11.3(b) (clarifying that the NAD appeals process may not be used to seek review of statutes or USDA regulations issued under federal law). On the other hand, program participants may seek review of decisions that are based on an individual application of an agency's regulations, policies, or specified criteria.

In this case, the first prong of the appealability determination is met because FSA's decision is adverse to you. NAD's regulations codified at 7 C.F.R. § 11.3(a)(1) make clear that the term "adverse decision" is intended to include administrative decisions made by an agency denying participation in, or receipt of benefits under, certain agency programs. Thus, FSA's decision terminating your grant is adverse to you.

However, the second prong of the appealability determination--whether the matter is one of general applicability--supports the conclusion that this matter is not subject to a NAD appeal. FSA's decision is not based on the individual application of specific program criteria. Instead, your grant termination is based on the general policy priorities of USDA and its decision to cancel the ILA program. The Secretary of Agriculture has determined that this program, and awards made thereunder, no longer support USDA priorities.

Therefore, in accordance with 7 C.F.R. § 11.6(a)(2), I have made the following final determination:

**FSA's March 23, 2026, decision terminating your ILA grant is not appealable because it concerns matters of general applicability.**

Accordingly, I decline to accept your request for an appeal of FSA's decision.

Sincerely,

JENNIFER    Digitally signed by
MICHAEL     JENNIFER MICHAEL
            NICHOLSON
NICHOLSON   Date: 2026.04.29
            11:05:00 -04'00'
Jennifer K.M. Nicholson
Acting Director

cc:   Farm Service Agency