## IN THE UNITED STATES COURT DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| URBAN SUSTAINABILITY DIRECTORS NETWORK, et al., <br><br> *Plaintiffs,* <br><br> v. <br><br> UNITED STATES DEPARTMENT OF AGRICULTURE, et al., <br><br> *Defendants.* | Case No. 1:25-cv-01775-BAH |

## DECLARATION OF LAKOTA VOGEL

I, Lakota Vogel, declare as follows:

1. My name is Lakota Vogel, and I live in the United States. This declaration is based on my personal knowledge. I am over the age of eighteen and suffer from no legal incapacity. I submit this declaration in support of Four Bands Community Fund, Inc. ("Four Bands"), which is one of several grant recipients affected by the termination of U.S. Department of Agriculture ("USDA") grant funding in the Farm Service Agency's ("FSA") Increasing Land, Capital, and Market Access Program ("ILA"). If called to testify, I could and would state the facts herein.

2. Four Bands is a 501(c)(3) nonprofit organization headquartered in Eagle Butte, South Dakota.

3. I have been the Executive Director of Four Bands since 2015. I am deeply familiar with Four Bands' mission, policies, and programs.

4. Four Bands is a non-profit loan fund that promotes economic revitalization and community development through increased access to affordable capital in low-income communities.

5. Four Bands is certified as a Native Community Development Financial Institution by the U.S. Department of Treasury.

6. In 2023, Four Bands applied for an ILA grant, entitled "Increasing Land and Capital Access for the Mountain Plains Region's Tribal Areas." The objective of the grant project is to assist underserved, low-income agricultural producers in overcoming systemic barriers to accessing land and capital in the tribal areas of the Mountain Plains Region. The Mountain Plains Region spans North Dakota, South Dakota, Montana, and Wyoming. The Region includes twenty Indian reservations, and much of the land within those reservations is held in trust by the federal government. Such trust lands face significant legal barriers to sale and collateralization. Thus, these lands' trust status limits access to capital, prevents farmers from building equity, and adds additional layers of complexity in estate and succession planning. Four Bands has developed programs to effectively assist producers who are navigating these and other barriers to develop profitable agricultural operations in this region. These issues and related objectives are discussed in Four Bands' Project Narrative, which is included as Attachment 3 to the amended grant agreement. A true and correct copy of the amended grant agreement is attached hereto as **Exhibit A.**

7. The ILA grant would have helped producers overcome the many barriers to land and capital access by deploying approximately $7.3 million in lending capital and equity bundles for land purchases, land loss prevention, and tribal trust mortgages. Four Bands also planned to establish a revolving loan fund that would create a long-term, self-sustaining system for funding

2

underserved agricultural producers in the tribal areas of the Mountain Plains Region. The breakdown of use of funds is as follows:

- Deploy $6,615,359.45 in lending capital for the purposes of land purchases, land loss prevention, or tribal trust mortgages to be part of a revolving loan fund;

- Disburse $733,750 in equity bundles to support land purchases, land loss prevention strategies, or tribal trust mortgages; and

- Deliver 500 hours of customized one-on-one technical assistance to agricultural producers.

8. FSA approved Four Bands' grant application for $8,490,667.21 on or around November 18, 2023. Funding for this project was authorized through November 30, 2028. See **Exhibit A.** FSA's internal delays prevented us from commencing work for the first year. We did not commence grant activities until after executing an amended grant agreement on October 10, 2024. See **Exhibit A.**

9. Additional FSA-caused delays since October 2024 have prevented Four Bands from advancing beyond the planning stages for the lending and equity activities of the project, which comprise approximately $7.3 million of the $8.5 million grant total. Namely, FSA failed to review and approve the Revolving Loan Fund Lending Policy that Four Bands submitted on March 11, 2025. Nonetheless, Four Bands moved forward with providing over 317 hours of technical assistance to 40 producers, and leveraged other limited sources of capital to fund five loans for the purchase of farmland.

10. To date, Four Bands has spent approximately $210,000 in grant funds, excluding a final invoice for outstanding reimbursable costs. USDA has never questioned or rejected any reimbursement requests for this grant.

11. On March 23, 2026, I received a letter from USDA and FSA terminating Four Bands' federal award. Beyond the termination letter, Four Bands has received no further communication

3

from USDA and FSA about the termination of our award. A true and correct copy of the termination letter is attached hereto as **Exhibit B**.

12. The termination letter asserts that ILA awards, including Four Bands', "do not align with the Department's goals and priorities," and alleges that our award "was made pursuant to a program rife with [Diversity, Equity, and Inclusion] preferences that discriminated based on immutable characteristics." This allegation is meritless as to Four Bands. As stated in Four Bands' Project Narrative, the beneficiaries of the project are underserved, low-income farmers who operate on tribal lands in the Mountain Plains Region. None of these categories entail discrimination based on "immutable characteristics," e.g., race. Four Band helps both Native and non-Native people who are underserved, low-income farmers that operate on tribal lands, regardless of race.[1] Further, the termination letter fails to adequately explain how our Project Narrative's use of the term "underserved farmers" is inconsistent with the authorizing statute's use of the term.[2]

13. The termination letter secondly alleges that the ILA awards "do not align with Congressional intent" because "most" of the ILA awards do "little to improve land access." See **Exhibit B**. Again, this is meritless as to Four Bands. The lion's share of Four Bands' award—

---

[1] Though tribal membership is not a determinative factor in our grant funding distribution, it is worth noting that tribal membership is a political status, not a racial category. *See Morton v. Mancari*, 417 U.S. 535, 555 (1974). Indeed, the Secretary of Agriculture has explicitly recognized that tribal membership is a political status not related to Diversity, Equity, and Inclusion in a May 2025 memorandum. *See* USDA Office of the Secretary, Clarifying the Application of Certain Executive Orders to Federally Recognized Indian Tribes, American Indian Tribal Citizens, and the Native Hawai'ian Community, Secretary's Memorandum 1078-010 (May 5, 2025) ("The Department's unique government-to-government and political relationship with . . . American Indian Tribal citizens . . . are [sic] legally distinct from policy-based Diversity, Equity, and Inclusion programs such as those covered by [recent] executive orders.").

[2] Inflation Reduction Act of 2022, Pub. L. No. 117-169, sec. 22007, § 1006(b), (e), 136 Stat. at 2022-23.

4

approximately $7.3 million—is devoted to loans and equity bundles specifically for land

purchases, land loss prevention, and tribal trust mortgages. And most of the remaining funds are

devoted to technical assistance to help farmers understand their financial situation, apply for loan

or equity assistance, and evaluate their use of received funds and the financial health of their

operations moving forward, consistent with the ILA Notice of Funding Opportunity's request for

such technical assistance.

14. Third, the termination letter states that ILA awards were used for frivolous expenses,

such as "gazebos, massages, a camper/RV." See **Exhibit B**. Four Bands did not make any such

purchases, and USDA and FSA do not claim that we did. Rather, we used the relatively limited

funding to date to provide 317 hours of technical assistance to 40 qualifying farmers and develop

our Revolving Loan Fund Lending Policy.

15. Fourth and finally, the termination letter quotes the lending and equity amounts in Four

Bands' grant and alleges without evidence or explanation that

> [the ILA] program's absence of oversight mechanisms and lack of internal controls
> present significant risks in the large scale distribution of federal dollars. The
> program, in its current form, creates significant vulnerabilities in the responsible
> stewardship of taxpayer dollars.

See **Exhibit B**. Again, the allegation is meritless as to Four Bands. Four Bands is an experienced

lender with a long track record of responsible lending, including successful lending and

deployment of funds under several USDA programs. We have successfully deployed funds as a

grantee under USDA's Rural Microentrepreneur Assistance Program since 2013 and under

USDA's Intermediary Relending Program since 2015. Four Bands was also selected as one of the

first pilot sites for relending under USDA's 502 Direct Loan Relending Demonstration Program

and was approved by FSA in 2021 to serve as a guaranteed lender under FSA's guaranteed loan

programs. Additionally, to remain certified by the U.S. Treasury as a Native Community

Development Financial Institution, we must comply with a strict reporting regime to ensure funds are lawfully and appropriately used. As to the specific use of these ILA grant funds, Four Bands submitted its Revolving Loan Fund Lending Policy to USDA for approval but never heard back. The Policy outlined strict internal controls and guidelines to ensure responsible stewardship of grant funds in compliance with grant requirements. In response to the submission, USDA staff communicated only that they were "awaiting guidance from leadership." Because USDA never approved our lending policy, Four Bands never began distributing funds, demonstrating USDA's complete control and oversight over the distribution of the grant funds.

16. The termination of our award and loss of the nearly $8.3 million in remaining grant funding has had and will continue to have devastating and irreparable impacts on Four Bands' ability to carry out its projects, achieve its mission, and maintain its operations. Namely, we cannot distribute the $7.3 million in loans and equity bundles to assist farmers with land purchases, land loss prevention, and tribal trust mortgages. In the meantime, those farmers who qualified for assistance will suffer from lack of necessary capital; they may go out of business, or they may give up on starting or expanding their agricultural operations.

17. The ILA funding is not easily replaced. Four Bands declined to pursue other funding sources because of the funding promised by this ILA grant agreement. Now, Four Bands must divert staff from our mission and other critical projects to address the termination, comply with award close out procedures, and attempt to find other funding. Four Bands will also have to restructure staffing and staff responsibilities in significant ways to address the lack of funding promised by the ILA grant agreement. Finding replacement funding may take years, if it's possible to do so at all. Every day that Four Bands cannot make up the funds, the farmers who do not receive said funds are suffering.

6

18. The grant termination also is severely harming Four Bands' reputation as a reliable source of funding and services to community members. Four Bands' reputation is foundational to its success. On tribal lands, reputation and trust are everything; they are the primary driver of client participation, partner collaboration, and capital deployment. Communities are tightly connected, and information travels quickly, so reputational harm is both rapid and durable. A single negative perception can circulate widely and persist over time, especially in communities where financial institutions have historically failed or harmed borrowers. Rebuilding that trust is not a short-term communications effort; it requires sustained, consistent performance over years, which is particularly difficult given our limited staffing and resources. This massive loss of expected ILA grant funding will reverberate throughout our community. The reputational damage to Four Bands is immediate and also growing and becoming more persistent with every passing day.

19. On April 21, 2026, Four Bands submitted an Appeal Request via letter to the USDA National Appeals Division ("NAD"). A true and correct copy of this Appeal Request is attached hereto as **Exhibit C**.

20. On April 29, 2026, NAD notified Four Bands that FSA's March 23, 2026, decision terminating our ILA grant is not appealable because it concerns matters of general applicability, and that, accordingly, NAD does not accept our request for an appeal of FSA's decision. A true and correct copy of this determination is attached hereto as **Exhibit D**.

21. The injury to Four Bands and its interests would be redressed by an order from the Court granting Plaintiffs' their requested relief. Four Bands would be able to avoid the immediate and irreparable harms described above and to continue towards the deployment of $7.3 million to help underserved, low-income farmers with land purchases, land loss prevention, and tribal trust mortgages.

I declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed this 20th day of May 2026 in Eagle Butte, South Dakota.

Lakota Vogel

Executive Director

Four Bands Community Fund, Inc.

8

# Exhibit A

U.S. Department of Agriculture

ADS-093
7/2012

## NOTICE OF GRANT AND AGREEMENT AWARD

| 1. Award Identifying Number<br>FSA24GRA0011582 | 2. Amendment No.<br>2 | 3. Award/Project Period<br>11/18/2023 - 11/30/2028 | 4. Type of Award Instrument<br>Grant |
|---|---|---|---|

| 5. Agency:<br>   (Name and Address)<br><br>USDA, FSA Outreach Office<br>1400 Independence Ave SW<br>Stop 0511 Rm 3086-S<br>Washington DC 20250 | 6. Recipient Organization:   (Name and Address)<br>Four Bands Community Fund, Inc.<br>412 South Main Street<br>Eagle Butte SD 57625 |
|---|---|

|  | DUNS/UEI:<br>RL33T3PNZGE3 | EIN: |
|---|---|---|

| 7. Agency Program Contact:<br>Toscha Matthews Stokes<br>Toscha.Matthews Stokes@usda.gov | 8. Agency Administrative Contact:<br>Kenneth James<br>kenneth.james@usda.gov<br>301-395-2816 | 9. Recipient Program Contact:<br>Shalyn Hawley<br>shalyn@fourbands.org<br>(605)519-5039 | 10. Recipient Administrative Contact:<br>Shalyn Hawley<br>shalyn@fourbands.org<br>(605)519-5039 |
|---|---|---|---|

| 11. CFDA Number<br>10.968 | 12. Authority<br>Increasing Land, Capital, and Market Access<br>Program ARPA Section 1006 | 13. Type of Action<br>ii. Amendment/Revision | 14. Project Director<br>Lakota Vogel<br>lakota@fourbands.org<br>(605)964-3687 |
|---|---|---|---|

**15. Project Title/Description:**
Title: Increasing Land and Capital Access for the Mountain Plains Region's Tribal Areas
Complete agreement includes this ADS-093 (NOA) and attachments listed on page 2.

**16.  Entity Type:**_____Profit   _X_ Nonprofit _____Higher Education _____Federal _____State/Local _____Indian/Native American
_____Other

| 17.  Select Funding Type: | ✔ Federal | ☐ Non-Federal | 18. Accounting and Appropriation Data |
|---|---|---|---|
| Original Funds Total: | $ 8,490,667.21 | | |
| Additional Funds Total: | $ 9,332.79 | | |
| Grand Total: | $ 8,500,000.00 | $ 0.00 | |

| Financial Code | Amount | Fiscal Year | Treasury Symbol |
|---|---|---|---|
| FA.AD.ORCH.CA | $ 8,500,000.00 | 2231 | 12-1124 2022/2031 |
| Cost Center: FA10402000 | Fund: FAPMB1124D | BOC:2559 | Functional Area:<br>FA6011IRALLA |
| DEF Code: Q | | | |

**19.  APPROVED BUDGET**

| Personnel | $ 634,218.00 | Fringe Benefits | $ 171,238.86 |
|---|---|---|---|
| Travel | $ 48,080.00 | Equipment | $ |
| Supplies | $ 20,000.00 | Contractual | $ 180,000.00 |
| Construction | $ | Other | $ 7,354,109.45 |
| Total Direct Cost\ | $ 8,407,646.31 | Total Indirect Cost | $ 92,353.69 |
| | | Total Non-Federal Funds | $ 0.00 |
| | | Total Federal Funds Awarded | $ 8,500,000.00 |
| | | Total Approved Budget | $ 8,500,000.00 |

This agreement is subject to applicable USDA statutory provisions and Financial Assistance Regulations.  In accepting this award or amendment and any payments made pursuant thereto, the undersigned represents that he or she is duly authorized to act on behalf of the awardee organization, agrees that the award is subject to the applicable provisions of this agreement (and all attachments), and agrees that acceptance of any payments constitutes an agreement by the payee that the amounts, if any found by USDA to have been overpaid, will be refunded or credited in full to USDA.

U.S. Department of Agriculture

ADS-093
7/2012

(Continuation)

## NOTICE OF GRANT AND AGREEMENT AWARD

| Award Identifying Number | Amendment No. | Award/Project Period | Type of Award Instrument |
|---|---|---|---|
| FSA24GRA0011582 | 2 | 11/18/2023 - 11/30/2028 | Grant |

List of Attachments:

Attachment 1 - Amendment 2 Narrative; Attachment 2 - Statement of Work; Attachment 3 - Project Narrative; Attachment 4 - Budget Narrative; Attachment 5 - Lending and Land Acquisition Policies

| Name and Title of Authorized Government Representative | Signature | | Date |
|---|---|---|---|
| Steven Peterson, Associate Administrator | STEVEN PETERSON | Digitally signed by STEVEN PETERSON Date: 2024.10.10 13:00:39 -04'00' | 10/10/2024 |
| Name and Title of Authorized Recipient Representative | Signature | | Date |
| Lakota Vogel, Executive Director | Lakota Vogel | Digitally signed by Lakota Vogel Date: 2024.10.10 09:15:35 -06'00' | |

### NONDISCRIMINATION STATEMENT

The U.S. Department of Agriculture (USDA) prohibits discrimination in all its programs and activities on the basis of race, color, national origin, age, disability, and where applicable, sex, marital status, familial status, parental status, religion, sexual orientation, genetic information, political beliefs, reprisal, or because all or a part of an individual's income is derived from any public assistance program. (Not all prohibited bases apply to all programs.) Persons with disabilities who require alternative means for communication of program information (Braille, large print, audiotape, etc.) should contact USDA's TARGET Center at (202) 720-2600 (voice and TDD). To file a complaint of discrimination write to USDA, Director, Office of Civil Rights, 1400 Independence Avenue, SW., Washington, DC 20250-9410 or call (800) 795-3272 (voice) or (202) 720-6382 (TDD). USDA is an equal opportunity provider and employer.

### PRIVACY ACT STATEMENT

The above statements are made in accordance with the Privacy Act of 1974 (5 U.S.C. Section 522a).

Attachment 1

**AMENDMENT NO. 2 NARRATIVE**
**TO AGREEMENT NUMBER FSA24GRA0011582**
**WITH FOUR BANDS COMMUNITY FUND INC.**

1. **PURPOSE**

   The purpose of this amendment is to lift funding restrictions on the Loan Capital and Equity Bundles programs of the project and to add Lending and Land Acquisition Policies (Attachment 5).

   **Except as provided herein, all other terms and conditions of the original agreement and any previous amendments remain unchanged and in full force and effect.**

2. **REVISIONS TO THE NOTICE OF AWARD (FORM NRCS-ADS-093):**

   The List of Attachments on page 2 has been revised to include Attachment 5.

3. **REVISIONS TO AGREEMENT ATTACHMENTS**

   The Statement of Work was revised as Attachment 2.

   Lending and Land Acquisition Policies were added as Attachment 5.

Attachment 2

**Agreement Number: FSA24GRA0011582**

**Statement of Work**

## 1.  PURPOSE AND OBJECTIVES

The authorizing statute for this agreement is Section 1006 of the American Rescue Plan Act (Pub. L 117-2), as amended by Section 22007 of the Inflation Reduction Act of 2022 (Pub. L 117-169). Section 1006(b)(1) and (b)(2) of the American Rescue Plan Act authorizes assistance and support to farmers, ranchers, and forest landowners and operators; and focuses on addressing the needs of underserved producers through outreach, education, engagement, and technical assistance to increase land, credit, and market access. Section 1006 also provides resources for grants to improve land access, including providing resources related to heirs' property and other land access issues that affect access to USDA programs.

## 2.  SPECIAL CONDITIONS IN EFFECT

This is formal correspondence notifying you that all special conditions included in the original agreement statement of work are rescinded except those included in section 7, NATIONAL ENVIRONMENTAL POLICY ACT (NEPA) REQUIREMENTS and those listed below. Other project activities may commence unless they are associated with NEPA or those outlined below.

While the following is a summary of the policy, Recipients are responsible for adherence to the full policy included as attachment 5. If there are any discrepancies between the policy and the summary, the policy takes precedence.

<u>LENDING</u>

For purposes of this agreement, loans can be utilized for land acquisition down payments, real estate taxes, lease or rental payments, to implement conservation practices, purchase livestock, improve soil quality, purchase on-farm infrastructure, or provide cost share for supplies, equipment, and maintenance. Purchases must be agricultural only, based on the IRS Agricultural Form 1040 Schedule F. (The full Lending Policy is included as Attachment 5.)

Policy Guidance:
- Recipients shall create their own lending policy.
- All policies must adhere to the standards as outlined in this FSA Lending Policy.
- Recipient must obtain FSA approval of policies prior to lending program implementation.  FSA will not review individual loan applications.
  **Policies must address how recipient intends to ensure interest rates are fair and are not burdensome to Beneficiaries.
- USDA Non-Discrimination Policy – When developing and reviewing loan applications, recipients must adhere to USDA's Non-Discrimination Policy.
- Loan Documentation – Application forms used by the Recipient must include the following information:
  - Name and address of the beneficiary;
  - Loan purpose;
  - Interest rate and term;
  - Location, nature, and scope of the project being financed;
  - Uses and sources of funds;
  - Nature and lien priority of the collateral;

- Proof there is no conflict of interest between recipient and beneficiary; (FSA requires a checked box on the application and a signature, or another means as agreed to by the agency); and
- Proof of citizenship in accordance with 7 CFR 764.101(c).

The Recipient must notify FSA and obtain prior written approval from FSA before making any significant changes in approved forms, security policy, or the ILA revolving loan fund policy.

<u>LAND ACQUISITION</u>

The acquisition of land requires certain activities to ensure the appropriate use of Federal funds and that landowners are justly compensated. (The full Land Policy is included as Attachment 5.)  Acquisition typically requires the following tasks, in the approximate order set forth below.  However, FSA for good cause may determine that there is a need to deviate from this order.

1. Title Search and Title Insurance
2. Legal Description/Survey
3. Environmental Review
4. Mineral Determination-Surface and Subsurface Mineral Exploration and Extraction
5. Water Rights
6. Document Preparation and Legal Advice
7. Amicable Agreement Acknowledgement
8. Fee Simple Purchase Deed Language
9. Insurance Coverage
10. Appraisal and Appraisal Review
11. Submission of Pre-Closing Documents
12. Escrow

Mandatory Documents

After closing, the recipient will provide FSA with the documents detailed below if not previously provided (email documents to Land.Access@usda.gov).  The recipient and FSA will be required to maintain the following documents in accordance with 2 CFR Part 200, Subpart D (Non- Federal entities must retain records related to federal awards for three years. Records must be retained for three years from the date of submitting the final expenditure report):

1. Copy of recorded acquired interest in land (whether conservation easement or fee deed, including any conservation easement amendment(s)) with signatures, and book and page stamp from recording.
2. Copy of Settlement/Closing Statement, including signatures, and proof of payment, such as a copy of a check or electronic funds transfer.
3. Final title insurance policy or letter from the recipient assuring title.
4. Minerals determination (if mineral rights are severed).
5. Appraisal Review Report indicating appraisal conformance to Uniform Appraisal Standards for Federal Land Acquisitions (Yellow Book) or Certification of appraiser and non-Federal review appraiser.
6. Amicable Agreement acknowledgment or documentation that the landowner has been notified of the appraised value and understands that ILA is a voluntary program.
7. Landowner inspection consent agreement.
8. Sales agreement.
9. Notification of county or local government (if required – Some county or local governments require notification of some projects that are occurring in their area).
10. Completed Federal Notice of Interest form (Attachment C)
11. Documentation of water rights (if applicable)

FSA staff must be granted access to the real property and capital assets to be purchased and/or purchased with ILA Program funds as long as the recipient is required to report to FSA on the real property and capital assets. The records for property and equipment acquired with the support of Federal funds must be retained for three years after final disposition.

3. **PROJECT NARRATIVE**

The recipient will carry out the project described in the Project Proposal in the original SOW and any amendments.

4. **BUDGET NARRATIVE**

The official budget as noted in the previous amendment is the total budget. Amounts included in the approved budget are estimates. Reimbursements or advance liquidations will be based on actual expenditures, not to exceed the obligated amount.

5. **REPORTING REQUIREMENTS**

   a. The recipient must submit performance progress reports to the Results Verification System (RVS) quarterly, according to the following schedule for each year of the agreement. Attach only 1 report per email with a copy to FPAC.BC.GAD@usda.gov.

   Progress Report #1: March 31
   Progress Report #2: June 30
   Progress Report #3: September 30
   Progress Report #4: December 31

   b. The recipient must submit financial reports (SF-425) to the Farm Production and Conservation (FPAC) Grants and Agreements Division via email to FPAC.BC.GAD@usda.gov. If the recipient requests reimbursement payments only, financial reports are due semi-annually. Thus, for year 1 of the agreement, the financial report due dates are as follows. Subsequent years of the agreement follow a similar schedule. Attach only 1 report per email.

   Financial Report #1: June 30
   Financial Report #2: December 31

   If the recipient requests advance payments, financial reports are due at the same time as performance progress reports, which are as follows:

   Financial Report #1: March 31
   Financial Report #2: June 30
   Financial Report #3: September 30
   Financial Report #4: December 31

6. **PAYMENT INFORMATION**

Payments under this award will be made upon submission to FPAC.BC.GAD@usda.gov of a properly executed SF-270, Request for Advance or Reimbursement, with appropriate supporting documentation. Additional information regarding payment supporting documentation is provided in the General Terms and

Conditions for Agreements Processed Outside of ezFedGrants (eFG) (see Attachment 4A). Also see https://www.fpacbc.usda.gov/about/grants-and-agreements/awardpayments/index.html for preparation and submission guidance.

### 7.    NATIONAL ENVIRONMENTAL POLICY ACT (NEPA) REQUIREMENTS

The National Environmental Policy Act (NEPA) environmental review process must be completed for activities under this agreement, with potential impacts to the human environment prior to the recipient drawing down funds or incurring expenses under this Grant Agreement. Before the NEPA process is completed, Federal regulations specify acceptable actions in 40 CFR 1506.1. FSA reserves the right to de-obligate funds obligated under this grant agreement (or to require the return of such funds) in the event a recipient breaches or otherwise fails to perform under any of the grant requirements.

### 8.    GENERAL TERMS AND CONDITIONS

The General Terms and Conditions applicable to this award (General Terms and Conditions for Agreements Processed Outside of ezFedGrants (eFG)) are attached and incorporated as Attachment 4A. They are also available online at the following link:  General Terms and Conditions - March 2024

Attachment 3
FSA24GRA0011582

## Project Narrative

**I.        INTRODUCTION & JUSTIFICATION**

*Native American Communities in the Mountain Plains Region*
The proposed project will serve tribal areas across a four-state region comprised of North Dakota, South Dakota, Montana, and Wyoming – four of the least and most sparsely populated states in the nation, but with some of the highest concentrations of Native American people. For example, South Dakota's population is comprised of over 10% of Native Americans, compared to under 2% nationwide. Similarly, Montana's and North Dakota's populations are 7% and 6% Native American respectively. The area represents 20 Indian reservations (Fort Berthold, Spirit Lake, and Turtle Mountain in North Dakota; Cheyenne River, Crow Creek, Flandreau, Lake Traverse, Lower Brule, Pine Ridge, Rosebud, Standing Rock, and Yankton in South Dakota; Blackfeet, Crow, Flathead, Fort Belknap, Fort Peck, Northern Cheyenne, and Rocky Boy's in Montana; and Wind River in Wyoming), and 62% of the total population of 188,245 within these reservation communities is Native American.

While some of the most rural and remote areas, these Indian reservations are also some of the nation's most economically distressed areas. About a third (30.7%) of all people live in poverty, more than double the national average of 14.1%. At $42,524, the median household income in the four-state region is about 30% less than the national average of $60,293. Sitting at 11.5%, unemployment is nearly double the national average. However, other studies have determined rates to be as high as 85% on some of these reservations. Over a third of all residents are unbanked or underbanked, and have few banking relationships. Although much larger than the state of Delaware, the Pine Ridge Reservation in South Dakota has only one depository institution. With few investments from traditional financial institutions, the economies of these reservation communities are heavily weighted by federal programs. Thirty-nine percent of all those employed are government workers, more than double the national level of 14%. About half are employed in the private sector, 30% less than the national average. While 6% of the nation's workforce is self-employed, nearly 10% of the workforce in these reservation communities is self-employed, demonstrating an eagerness and determination to generate income through nontraditional methods.

Many of these indicators of economic distress are compounded by rural living with fewer available resources and more time and money required for travel. For example, it is not uncommon for reservation residents to travel 50 to 100 miles per day on poorly maintained roads to access employment and basic services. However, on the Cheyenne River Sioux Reservation in South Dakota, 11% of households do not even have a single vehicle available. Even as more goods and services transitioned to virtual platforms in response to the COVID-19 pandemic, many of these Native communities were left further behind without ready access to modern technology. Only about three quarters of households have a computer (14% less than the national average), and only 61% of households have access to broadband internet, compared to 80% nationwide.

*The Racial Wealth Divide in Agriculture*

While many inequities can be seen in the data above, many more can be identified through an examination of the agricultural industry. The most recent Ag Census data demonstrates how wealth in agriculture is becoming more concentrated within fewer operations, all while excluding people of color in high poverty areas. Between 2012 and 2017, the acres of agricultural land and number of agricultural operations decreased. Not only do fewer operators now own more land, but the value of agricultural land continues to climb. Between 2012 and 2017, the average market value of an acre of agricultural land rose nearly 20% to $2,976. At the time of the last Ag Census, average net income of ag producers in the United States was $32,217. While significantly lower than national income levels, 58% of ag producers supplement farm income with off-farm employment – a move confirming the difficulties in achieving profitability in ag operations.

Trends in our nation's agriculture sector are following those of mainstream America, ever widening the racial wealth divide. A deeper examination of the 2017 Ag Census reveals that increasing numbers of agricultural operations are struggling to achieve positive revenue streams. Despite a less than mediocre income average for ag producers across the nation, data shows a dramatic divide between those making a profit and those taking a loss. While the average net gain for ag producers at the national level is $104,000, the average net loss is $22,000. The number of producers reporting gains decreased by 10% between 2012 and 2017, while the number of producers reporting losses increased slightly. At the time of the last Ag Census, the majority (57%) of producers reported a net loss. An analysis of data in the Mountain Plains Region – a region with significantly lower income and higher poverty levels – unveils a much deeper wealth divide. Ag producers who are profitable have net gains of $115,000 – about 10% higher than the national average. But, the producers taking losses are in the red by $36,000 – about 40% more than the national average. Those winning are winning big, while the average operator struggles to stay out of the red.

A look at the Ag Census's race data, brings to light the systemic asset stripping and wealth prevention policies that have been impressed upon Native American communities since the Reservation Era over 150 years ago. Approximately 2% – or about 43,000 – agricultural producers in the country are Native American. Less than half (44%) are full owners of their operations, compared to 70% of white producers. On average, Native American operations had $56,000 in ag-related sales, while white operations saw three and a half times that with over $198,000 in sales. In fact, nearly half of all Native American agricultural operations had less than $1,000 in sales. Approximately 20% – or 170,000,000 million acres – of the country's agricultural land lies within the four-state Mountain Plains Region, and nearly 20,000,000 acres are located within Indian reservations. However, less than half (44%) of the agricultural land base on reservations is operated by Native Americans. Despite the fact that Native Americans comprise about two thirds of the population in this area, less than a third (29%) of agricultural producers on reservations in the Mountain Plains Region are Native American.

*Systemic Barriers to Equity in Agriculture*

Derived from the data presented above, Native Americans face the following challenges when it comes to agricultural operations:

- Native Americans have been and continue to be systemically excluded from entering the agricultural field.
- Native Americans who have been able to enter the agricultural field and build an agricultural operation struggle to achieve profitability and generate a living wage.

These challenges stem from several barriers, including lack of access to capital and resources as well as trust land status, which will be addressed through the unique design of the proposed project. The average market value of a farm in the Mountain Plains Region is $2.3 million, and the average annual farm expenses are $195,000. Without access to significant sums of capital or large asset bases, it is impossible to purchase or lease the land required to operate a successful agricultural operation. Even those who have ready access to family-owned land still require large sums of capital for operations or to purchase livestock and equipment.

Traditional financial institutions have historically neglected the demand for investment and even basic financial services in Native American communities, citing lending impediments such as lack of jurisdiction or barriers to collateralization. The Native American communities in the four-state Mountain Plains Region are significantly lacking basic financial systems. In the 10 counties with the highest Native American populations, residents have access to 75% fewer banks per square mile and 48% fewer banks per capita than their counterparts in non-minority counties. Consequently, 43% of the Native American households in the area are unbanked or underbanked. Lack of access to capital has resulted in limited lending to small, emerging, and non-traditional businesses, including agricultural operations, effectively stunting economic growth. The standardized lending products with rigid terms that have been deployed in the Mountain Plains Region do not take into account the unique needs of Native communities, but rather have been designed to keep underserved ag producers in a state of perpetual poverty. Furthermore, with little experience in banking and finance, Native American producers have a great need for individualized technical assistance so they can better understand financing options and strategies for profitability.

Most prevalent of all the asset-stripping policies in Native American history, is land. From 1887 to 1934 a total of 83.5 billion acres was ceded from tribes, equating to $313.3 billion in lost wealth by tribes and tribal members. In addition to land theft, tribal lands were placed in a trust held by the federal government. Trust land, prevalent in Native American communities, creates a complex and uncertain governance of assets because the land can't be sold, collateralized, or developed. As related to agriculture, trust land limits access to capital, prevents producers from building equity within their operations, and creates an additional layer of complexity in estate and succession planning. It is commonly cited by traditional financial institutions as a barrier to providing lending services in Native communities because it can't be collateralized. While most Americans are able to leverage land or home ownership to build assets and generate wealth, Native Americans face a complex set of bureaucracies that prevent any true growth. This is evidenced by the fact that Native American families residing on trust land have $11,243 less in median household assets than families that live on non-trust land. Today, one-third of all tribal

trust land in the country is in the Mountain Plains Region. However, only 14% of that is currently being monetized by Native Americans; the remainder is utilized by non-Native ranchers and farmers.

Although there have been some federal programs designed to deploy capital on trust lands, a historic distrust – rightly justified – of federal government as well as burdensome application processes create barriers to access for Native Americans. With local partners on the ground, uptake in federal programs greatly increases. Take USDA's 502 Direct Loan Program as an example. Although the 502 Direct Loan is highly utilized by low-income families across the country, it has historically been an untapped resource in reservation communities even though it is one of the few loan products that can be used on tribal land. In FY 2019, of the 6,194 direct loans made nationally by Rural Development, 127 were to Native American borrowers but only six of them were on tribal land. In the summer of 2018, USDA Rural Development and two Native CDFIs – Four Bands Community Fund on the Cheyenne River Sioux Reservation and Mazaska Owecaso Otipi Financial on the Pine Ridge Reservation – formed the first-of-its-kind partnership to launch the 502 Direct Native CDFI Relending Pilot Program. According to USDA, the CDFIs' deep ties in local communities would help them to reach borrowers more effectively. They were right! Approval of funds for deployment began in October 2019, and within two months, approximately 50% of the loan capital allocated to the pilot program was deployed. By partnering with Native CDFIs, the deployment of 502 Direct Loans on tribal lands in South Dakota increased more than ten-fold.  On October 5, 2022, USDA Rural Development expanded the pilot with a $4 million investment to continue the partnership with Four Bands and Mazaska.

*Identifying & Meeting Needs in Native Communities*
For decades, Native Americans have been denied credit from traditional banking systems. Through several court cases in more recent years, it has also been revealed that minorities have been denied equitable access to federal agricultural programs. Today, Native CDFIs, like Four Bands Community Fund, are stepping up to the plate to fill these gaps, creating access to capital and credit for consumers, homeowners, small businesses, and ag producers. Often times, Native CDFIs are the only source of capital within Native communities. Four Bands drives economic growth in the Native American communities we serve by combining flexible and patient lending products with intensive customized models of financial capacity, asset building, business development, and systems change strategies. Four Bands has spent the last 20-plus years, not only investing in individual capacity building initiatives for Native American people, but also in building equitable systems aimed at permanently closing the racial wealth gap. Our organization was born out of a desire to dismantle the many barriers – including trust land status, access to capital, and limited experience and resources – that Native people face in accessing capital. The proposed project will scale Four Bands' proven and successful models to a regional landscape, increasing access to capital and land for underserved ag producers in the Mountain Plains Region.

Equity must be at the center of our efforts to achieve our primary purpose, which is advancing economic opportunity for underrepresented low-income populations. We continuously strive

to meet the unique needs of the people we serve; we don't assume we know the solution but rather let community feedback shape our programming. We regularly facilitate stakeholder sessions and mobilize diverse groups of people to elicit input from our clients, partners, peers, and community members that informs action steps to remedy identified areas of inequity. Using a variety of collection tools, Four Bands has collected and analyzed feedback on topics such as workforce development, business training, art businesses, business health and growth, program development, organizational brand, market demands, potential new products, and even COVID-19 relief strategies. Gathering accurate information and conducting thorough analyses of data lies at the foundation of our equitable program design and delivery.

## II.      OBJECTIVES & OUTCOMES

With a focus on *land access* and *capital access*, Four Bands Community Fund has designed the proposed 5-year project to overcome the challenges described above so that at least 25 underserved, low-income agricultural producers in the tribal areas of the Mountain Plains Region can start, expand, or sustain a profitable agricultural operation. We will achieve this overarching goal through the following two objectives:

1. Deliver 500 hours (approximately 20 hours annually to each participant) of customized one-on-one technical assistance to agricultural producers through a variety of methods, including in-person, telephone, or video conference.
2. Deploy $6,615,359.45 in lending capital for the purposes of land purchase, land loss prevention, or tribal trust mortgages.
3. Disburse $733,750 in equity bundles to support land purchases, land loss prevention strategies, or tribal trust mortgages.

By developing a customized blend of capital and assistance for each producer we work with through the proposed project, we will increase land ownership opportunities, support land succession strategies to preserve assets across generations, mitigate land loss, and help improve the viability of ag operations in the region. Four Bands expects the following outcomes:

- Approximately 50% of participants will purchase land.
- Approximately 50% of participants will mitigate land loss.
- Approximately 75% of participants will increase profitability.
- Approximately 50% of participants will seek additional capital through a project collaborator.
- Approximately 25% of participants will seek or participate in other USDA programs.
- 100% of participants will increase knowledge concerning land access issues, agricultural finance products, and agricultural business planning.

Justice40 criteria will be met through the proposed project by ensuring that historically underserved communities fully benefit from these investments and prosper as a result of the proposed activities. Four Bands Community Fund has been certified as a Native CDFI by the

Department of Treasury's CDFI Fund. CDFI certification is a designation given by the CDFI Fund to specialized organizations that provide financial services in low-income communities and to people who lack access to financing. As a certified Native CDFI, we must demonstrate that we have a primary mission of promoting community development, are a financing entity, primarily serve a Native American market, provide development services in conjunction with our financing activities, maintain accountability to our target market, and are not under control of a government entity. Essentially, we are a non-profit loan fund that embraces a mission of promoting economic revitalization and community development through increased access to affordable capital in low-income communities. Sixty-eight percent of our clients are low-, very low- and extremely low-income, and approximately 95% are of Native American descent. In addition, the majority (74%) of our beneficiaries are female headed households. We are committed to removing systemic barriers and replacing them with equitable platforms. We regularly engage stakeholders to inform program design, ensuring that our programs are accessible to all.

### III.    APPROACH

*Description of Activities & Approach*
Four Bands staff will guide project participants through five synergistic pathways designed to break through the barriers associated with entering the agriculture industry and building a viable operation: 1) Initial Assessment; 2) Business Planning; 3) Capital Access; 4) Equity Building; and 5) Annual Evaluation & Adjustments. These pathways will cross over the three dimensions of services delivered through the project – technical assistance, lending, and equity bundles – so that project participants will gain ***increased access to capital and land***.

**Four Bands will deliver 500 hours (approximately 20 hours annually to each participant) of customized one-on-one technical assistance to agricultural producers through a variety of methods, including in-person, telephone, or video conference. Technical assistance activities will include:**

*Initial Assessment* – Project participants will be paired with a coach who will guide them through a series of intensive assessment and goal setting exercises using our proprietary assessment tools. This foundational step will allow them to honestly evaluate their current circumstances, identify available and needed resources, and assess existing skillsets. The result will be the development of a set of goals that ag producers will strive to achieve through their participation in the project.

*Business Planning* – After their initial assessment participants will continue to work with their coach to develop a new or enhance an existing business plan and prepare to successfully access the capital required to execute their plan. Through the business planning phase, project participants will take a 360-degree view of their operation, carefully examining inputs and outputs and how those components relate to the goals they set in their assessment phase. As participants walk through budgeting and financial projections, their coach will plant seeds for

more in-depth financial planning. Participants will begin to consider the benefits of retirement and estate planning, as well as determine feasibility of annual investments. The coach will continue to support the participant through the implementation of the business plan, often times providing information and bridging connections with other collaborators so the producer can obtain legal or accounting services, access online markets, flow through the trust land lease/mortgage process, determine available resources, or identify additional sources of capital.

*Annual Evaluation & Adjustments* – Annual evaluations occur for borrowers each year, typically after the ag producer has harvested or sold the majority of products produced. The project participant will meet with their coach to evaluate the financial state of their operation, taking into account current market trends, levels of income and expenses, as well as the producer's business goals. As a proactive loss-prevention step, the producer and coach will discuss strategies to maintain assets and increase profitability. Loan terms may be adjusted to realign with the strategies set forth during the annual evaluation.

**Four Bands will deploy $6,615,359.45 in lending capital for the purposes of land purchase, land loss prevention, or tribal trust mortgages. Lending activities will include:**

*Capital Access* – Through the technical assistance services delivered, project participants will determine their capital needs and complete loan applications. Depending on their needs, project participants will have the opportunity to access patient capital through a variety of low-interest (as low as 4%) lending products. The design of our loan products takes into account that our borrowers need to have the flexibility to use the loan proceeds for a variety of uses, and that many will need to provide collateral from non-traditional sources. We have created a system where there are "no closed doors." For example, if an applicant is not ready to successfully take on a loan, they will have the opportunity to receive financial coaching to expand their skills and strengthen their financial position. This is a solid strategy for enhancing a borrower's ability to qualify for an ag loan, often opening the door for future financing opportunities. Furthermore, if a borrower's needs extend beyond our standard terms, we leverage partnerships within our network to create customized financing solutions. We have successfully engaged in participation loans with various partners in the Mountain Plains Region to create greater access to capital.

Through the proposed project, Four Bands will offer the following lending products to ag producers:
- Our **Ag Loan** will provide up to $400,000 in capital with flexible terms to increase land access. Exceptions to this loan amount will require loan committee approval, and borrower's circumstances would have to justify any exception to policy.
- Our **Ag Line of Credit** can be utilized by existing ag producers to reorganize debt in a way that will mitigate land loss. The maximum loan amount will be $100,000. Exceptions to this loan amount will require loan committee approval, and borrower's circumstances would have to justify any exception to policy.

- Our **Trust Land Mortgage** will provide up to $400,000 with more flexibility so that borrowers can overcome the challenges associated with the unique status of land on Indian reservations. Exceptions to this loan amount will require loan committee approval, and borrower's circumstances would have to justify any exception to policy.
- The **Participation Loan** model will be utilized when a participant's capital needs exceed the limits of our standard loan products.  The maximum loan amount for Four Bands' portion of a participation loan will be $400,000.

| | Ag Line of Credit | Ag Business Loan |
|---|---|---|
| **Loan Size** | $1,000 to $100,000 | $1,000 to $400,000 |
| **Borrower** | Underserved, low-income agricultural producers in the tribal areas of the Mountain Plains Region. | |
| **Applicant's Credit** | Minimum Credit Score of 600 | |
| **Use of Proceeds** | a)  Reorganize debt in a way that will mitigate land loss. | a)  Capital used to increase land access. <br> b)  Acquisition of real estate |
| **Collateral Value** *(including financial assets, after discounts for liquidity)* | • Collateral value (after discounts for liquidity) must be <u>75%</u> of the loan amount. <br> • First priority liens only; 2nd priority liens are acceptable when they facilitate third party financing. | |
| **Business Plan** | Prior to funding, applicants will have completed an Ag Plan, that includes all items form the following list: <br><br> a)  outlines how the business will operate and perform during the loan term, <br> b)  highlights key assumptions driving the business, includes all foreseeable expenses, and shows cash available to meet proposed loan payments. | |
| **Equity** | Business owners must have invested equity in the form of cash or other assets of at least 10% of the total business capitalization or project cost. | |
| **Guarantees** | In some cases, Four Bands may require personal guarantees from third parties. Individuals owning 20% or more interest in an applicant business must personal guarantee the loan. Spouses of owners and key staff members must guarantee loans to businesses in which they haven an ownership interest or are clearly active in the business. | |
| **No Prior Uncured Defaults** | Applicants with a history of foreclosure in connection with a prior Four Bands' loan are not eligible for further loans from Four Bands. | |

**Four Bands will disburse $733,750 in equity bundles to support land purchases, land loss prevention strategies, or tribal trust mortgages.**

*Equity Bundles* – Designed to support equitable access to capital, Four Bands' Equity Bundles are strategic financial investments placed into ag operations that may fund various business expenses, such as accounting software, equipment purchases, or other operating cash flow needs. Equity Bundles will provide up to 10% of a borrower's total project cost. With extra support from the Equity Bundle, the project participant will increase their access to capital, raise profitability, expand their asset base, and build a solid foundation for their ag operation's future growth.

Throughout the proposed project, Four Bands will collaborate with USDA and other partners to inform equitable program implementation and participation in USDA programs, openly sharing ideas and successful models. As a leader in the Native American community and economic development movement and an organization that has successfully dismantled systemic barriers, Four Bands will gladly assist USDA in addressing longstanding systemic discrimination and barriers to program delivery.

*Timeline & Outcomes*

In Year 1, Four Bands will:

1. Deliver 100 hours (approximately 20 hours to 5 participants) of customized one-on-one technical assistance to agricultural producers through a variety of methods, including in-person, telephone, or video conference.
2. Deploy $661,535.95 in lending capital for the purposes of land purchase, land loss prevention, or tribal trust mortgages.
3. Disburse $146,750.00 in equity bundles to support land purchases, land loss prevention strategies, or tribal trust mortgages.

Four Bands expects the following outcomes in Year 1:

- Approximately 2 participants will purchase land.
- Approximately 3 participants will mitigate land loss.
- Approximately 4 participants will increase profitability.
- Approximately 3 participants will seek additional capital through a project collaborator.
- Approximately 1 participant will seek or participate in other USDA programs.
- Five participants will increase knowledge concerning land access issues, agricultural finance products, and agricultural business planning.

In Year 2, Four Bands will:

1. Deliver 100 hours (approximately 20 hours to 5 participants) of customized one-on-one technical assistance to agricultural producers through a variety of methods, including in-person, telephone, or video conference.
2. Deploy $2,315,375.81 in lending capital for the purposes of land purchase, land loss prevention, or tribal trust mortgages.
3. Disburse $146,750.00 in equity bundles to support land purchases, land loss prevention strategies, or tribal trust mortgages.

Four Bands expects the following outcomes in Year 2:

- Approximately 2 participants will purchase land.
- Approximately 3 participants will mitigate land loss.
- Approximately 4 participants will increase profitability.
- Approximately 3 participants will seek additional capital through a project collaborator.
- Approximately 1 participant will seek or participate in other USDA programs.
- Five participants will increase knowledge concerning land access issues, agricultural finance products, and agricultural business planning.

In Year 3, Four Bands will:

1. Deliver 100 hours (approximately 20 hours to 5 participants) of customized one-on-one technical assistance to agricultural producers through a variety of methods, including in-person, telephone, or video conference.

2. Deploy $2,315,375.81 in lending capital for the purposes of land purchase, land loss prevention, or tribal trust mortgages.
3. Disburse $146,750.00 in equity bundles to support land purchases, land loss prevention strategies, or tribal trust mortgages.

Four Bands expects the following outcomes in Year 3:
- Approximately 2 participants will purchase land.
- Approximately 3 participants will mitigate land loss.
- Approximately 4 participants will increase profitability.
- Approximately 3 participants will seek additional capital through a project collaborator.
- Approximately 1 participant will seek or participate in other USDA programs.
- Five participants will increase knowledge concerning land access issues, agricultural finance products, and agricultural business planning.

In Year 4, Four Bands will:
1. Deliver 100 hours (approximately 20 hours to 5 participants) of customized one-on-one technical assistance to agricultural producers through a variety of methods, including in-person, telephone, or video conference.
2. Deploy $1,323,071.89 in lending capital for the purposes of land purchase, land loss prevention, or tribal trust mortgages.
3. Disburse $146,750.00 in equity bundles to support land purchases, land loss prevention strategies, or tribal trust mortgages.

Four Bands expects the following outcomes in Year 4:
- Approximately 2 participants will purchase land.
- Approximately 3 participants will mitigate land loss.
- Approximately 4 participants will increase profitability.
- Approximately 3 participants will seek additional capital through a project collaborator.
- Approximately 1 participant will seek or participate in other USDA programs.
- Five participants will increase knowledge concerning land access issues, agricultural finance products, and agricultural business planning.

In Year 5, Four Bands will:
1. Deliver 100 hours (approximately 20 hours to 5 participants) of customized one-on-one technical assistance to agricultural producers through a variety of methods, including in-person, telephone, or video conference.
2. Disburse $146,750.00 in equity bundles to support land purchases, land loss prevention strategies, or tribal trust mortgages.

Four Bands expects the following outcomes in Year 5:
- Approximately 2 participants will purchase land.
- Approximately 3 participants will mitigate land loss.
- Approximately 4 participants will increase profitability.

- Approximately 3 participants will seek additional capital through a project collaborator.
- Approximately 1 participant will seek or participate in other USDA programs.
- Five participants will increase knowledge concerning land access issues, agricultural finance products, and agricultural business planning.

*Innovation*

Four Bands Community Fund is an innovation leader. With over 20 years of experience working in rural, economically distressed areas, we have perfected our products and services to financially empower entrepreneurs (including ag entrepreneurs), families, and communities with information, tools, and coaching necessary to build assets, achieve financial sustainability, establish businesses, and create jobs.

At the foundation of our success is our theory of change. We utilize an integrated asset building and entrepreneurial development approach, a model called *Icahya Woecun* (The Place to Grow), to deliver our programs. This approach was developed early in our development as a strategy for achieving our mission. *Icahya Woecun* combines Lakota values and tradition with the wisdom of best practices to support Native American entrepreneurs, including ag producers, and asset builders by offering four dimensions of services:

1. **Education** – Empowering entrepreneurs and asset-builders by providing fundamental financial knowledge necessary for them to achieve their goals.
2. **Financing** – Creating access to capital through a variety of business, consumer, and agricultural lending products.
3. **Incubation** – Providing ongoing customized support to achieve financial self-sufficiency.
4. **Advocacy** – Working in the tribal, state, and national political arenas to advocate for policies that are supportive to asset building strategies and the development of Native businesses or operations.

This holistic approach of *Icahya Woecun* is critical to expand prosperity to low-income individuals and families through asset building and entrepreneurial development strategies, which translates into broader scale economic progress in the communities we serve. It is an integral part of our approach to financially empowering individuals, families, and entrepreneurs, and serves as the foundation of our core program areas.

*Recruitment & Reach*

As a leader in the Mountain Plains Region's equitable finance field, Four Bands has deep ties within Native communities, especially in our home state of South Dakota. We have an existing pipeline of applicants that will provide a base for recruiting participants of the proposed project. Understanding the importance of personal relationships within Native American culture, we will leverage partnerships to reach through extended regional networks and engage additional participants. In addition, Four Bands is developing a collaboration with the MiNKota Regional Food Business Center, a proposed project to USDA Agricultural Marketing Service. If awarded, Four Bands will serve as a technical assistance provider to Native American food and farm businesses. These activities will expand our pipeline and help us identify underserved ag

producers that can benefit from increased access to land and capital. If additional recruitment efforts are needed beyond these networks, Four Bands will develop and implement a comprehensive marketing campaign utilizing a variety of traditional and digital methods to reach broader audiences.

*Sustainability*

The proposed project will be sustained beyond the life of the agreement through interest earned on revolving loan funds as well as several other sources of grant funding and investments. Four Bands implements aggressive fundraising strategies to attract funds through a variety of state, local, federal, and private sources. We have increased our level of grant awards every year and anticipate that trend will continue.

*Scalability*

The proposed project has the ability to be replicated in other Native communities and scaled across larger regions. Four Bands has successfully scaled our program models from our original target market of the Cheyenne River Sioux Reservation to the entire state of South Dakota and now to the Mountain Plains Region.

*Potential Challenges*

Four Bands sees the volatility in today's agricultural markets to be the biggest challenge to implementing the proposed project. With decreases in market prices – from cattle to wheat – ag producers, especially those in low-income communities, are hesitant to take on the risks associated with starting or expanding operations. At a time when experienced ag producers are scaling back operations – selling off livestock or leaving fields fallow – underserved producers may not have the confidence to go in the opposite direction. However, we see this trend as a market opportunity. With patient, flexible capital and a high level of customized technical assistance, the proposed project is designed to support underserved ag producers during times of economic down turns so that they can sustain operations through the long term. In short, the program design itself mitigates this challenge.

An additional challenge we anticipate is level of participation from project collaborators. The Native American community and economic development field is comprised of many small nonprofits that operate with limited staff and budgets. Many struggle to meet the demand of the communities they serve. Participating in the proposed project will stretch their staff thinner yet. To help project collaborators overcome these challenges, we have built quarterly collaborator meetings into the timeline. The regular frequency is designed to eliminate the potential for overwhelming staff while maintaining a consistent schedule that provides the space to connect and collaborate about project activities. In addition, the collaborator roles have been designed so they integrate well into the collaborator's regular programming, being careful not to add additional tasks outside of staff members' regular workload. Furthermore, fulfilling roles outlined in our management plan will enable project collaborators to also fulfill their respective missions. In essence, there are incentives for engaging in the proposed project.

## IV.      PERSONNEL & RESOURCES

At Four Bands' founding, less than one percent of businesses in our original geographic service area, the Cheyenne River Sioux Reservation, were Native-owned, although more than seventy percent of residents in the area were Native American. Today, we manage a $15 million lending portfolio comprised of over 95% Native American borrowers. Many of our borrowers are breaking the cycle of generational poverty that has been perpetuated by historic injustices; they are building assets that can be passed from generation to generation. This type of sustainable change has been possible because we closely examine all of the barriers and have taken a holistic systems approach to closing the racial wealth gap. Our dedicated staff members, all of whom are tribal members or are life-long residents of tribal areas, have a combined experience of 130 years working in Native communities. Over the years, our staff has leveraged their intimate knowledge of Native culture and community dynamics, and as a result, we have seen a transformation of the economic landscape in the communities we serve. From 2000 to 2021 year-end, we have:

- Provided nearly 11,000 customers with technical assistance.
- Supported hundreds of individuals in various stages of business development (including for ag operations) through the deployment of 564 loans totaling $16,515,383.
- Approved 933 credit builder loans valuing $2,477,332 so that recipients could achieve an average credit score increase of 78 points within one year.
- Deployed $4,938,767 in loans so that 114 families could improve or purchase a home.
- Created or retained 1,016 jobs.
- Graduated 530 individuals from our business training course.
- Increased financial literacy of 904 individuals through training.
- Guided 98 individuals through actionable financial goals with a 91% achievement rate.
- Connected 276 youth entrepreneurs to local internship opportunities, 76% of whom seek post-secondary education.
- Committed $712,612 so that 485 matched savings program participants could reach a savings goal for homeownership, education, or business.
- Electronically filed 7,427 tax returns to produce a total federal refund of $16,846,217 to our local community.

Specifically related to agriculture, our loan volume has continued to increase year over year. To support increased access to capital for borrowers in our service area, we became an approved lender of the Farm Service Agency guarantee program in 2021. To date, we have approved 68 ag loans totaling $5.9 million. Loan proceeds have been used for a range of purposes, including operating lines of credit, livestock and equipment purchases, debt refinances, land mortgages, and FSA participations. We currently have an ag portfolio of $2.3 million outstanding, of which 100% of the loans are performing.  We have a 0% delinquency rate on this product line.

We have assembled a highly qualified team to carry out the proposed activities and competently achieve the stated objectives.

**Lakota Vogel** (Cheyenne River Sioux) is the Executive Director at Four Bands. In this role, Lakota provides leadership for Four Bands, establishes new and fosters existing partnerships, and leads and manages efforts to reach organizational goals. Prior to becoming the Executive Director, Lakota served as the Assistant Director at Four Bands for five years. She was recently appointed to USDA's Equity Commission Subcommittee on Rural Community Economic Development.

Lakota graduated from the University of Notre Dame with a Bachelor of Arts Degree in Sociology. Upon graduation, she joined Teach for America and taught on the Rosebud Sioux Reservation at Todd County High School. Lakota obtained her Masters in Social Work Degree from Washington University in St. Louis with the Kathryn M. Buder Center for American Indian Studies. Lakota individualized her course of study to concentrate in economic security and social development through the life course of American Indians. In addition to her educational experience, Lakota has completed a summer fellowship with National Congress of American Indians. She has served on the Native American Alumni Board of Directors at the University of Notre Dame. Lakota initiated program evaluations at the Consortium for Graduate Study in Management and Washington Internships for Native Students to develop program components for American Indian participants.

**Darla Lawrence** (Cheyenne River Sioux) is the Director of Finance at Four Bands and is responsible for all accounting operations, including generating required reports, developing required information for audits, cash and investment management, budgeting, planning, and database management. She has an Associate's Degree in both Business and Computer Information from Sisseton Wahpeton Community College and is also a certified trainer in the *Building Native Communities* curriculum. Before coming to Four Bands in 2006, Darla worked for the Cheyenne River Sioux Tribe for 12 years serving as the Payroll Director, Office Manager, and Business Technician. In 2005, Darla was the Employee of the Year for the Tribe. Darla resides in Eagle Butte, South Dakota and spends her free time with her family.

As Director of Operations, **Shalyn Hawley** plays a critical role in Four Bands' systems, processes, and organizational culture. She is responsible for the application, management, and reporting of grants and works across departments and with several program management databases to maintain performance and impact data. She utilizes that data to communicate Four Bands' impact to a range of audiences. In addition, Shalyn provides oversight and direction to ensure strong organizational-wide systems are in place and manages our talented team in a way that not only enhances our internal culture, but also fosters individual employee growth so that we maximize mission achievement.

Shalyn brings over 14 years of experience working in the nonprofit and humanities field to Four Bands. Prior to joining our team, she served as the Deputy Finance Officer for the City of Faith for four years. Shalyn is a founding Board Member and currently serves as President of the Faith Area Community Foundation where she helps manage an endowment that is leveraged to make a variety of community-based grant awards. She also serves on the Board of Directors for the Faith Education Foundation. Shalyn obtained a Bachelor's degree in Psychology and a Bachelor's degree in Human Services from Black Hills State University. She grew up in Faith,

South Dakota, where she currently lives on her family ranch with her husband and two children. In her spare time, she enjoys attending her children's activities, camping, and riding horses.

**Kristen Stambach** is the Director of Lending at Four Bands. In this position, her primary responsibility is to manage Four Bands' revolving loan fund program that provides loan capital to support private business development. Kristen also supports organizational development by analyzing and managing the client database for outcomes tracking, program deliverables, and performance measures. She has been an integral part of developing our revolutionary program models, designed specifically for underserved ag producers. Kristen holds an Agriculture Business Degree from Western Dakota Tech and a Bachelor of Science Degree in Biology from Black Hills State University. She has continued to build her professional skills by attending conferences and trainings on mixed-use real estate; new markets tax credits, real estate finance, and economic development finance. She has completed FINPACK training to support our growing ag portfolio. Prior to coming on board at Four Bands in November 2010, Kristen worked at Premier Bankcard for over four years. A native to the Cheyenne River area, she grew up on a buffalo ranch near Red Scaffold, South Dakota. Kristen currently lives in Dupree, a small town west of Eagle Butte. In her free time Kristen enjoys painting and horseback riding.

In her role as Loan Officer at Four Bands, **April Anderson** has been an integral part of launching and growing our homeownership program. Although she handles all types of loans within Four Bands, her main focus is our mortgage and ag product lines. April develops strong working relationships with our clients and is with them every step of the way, from pre-application to loan closing and everything in between. To help streamline the lending process for our borrowers, she interfaces with various community partners. April has a strong background in finance and has completed FINPACK training to build capacity in ag underwriting. Prior to coming to Four Bands, she was the Branch Manager at Western Dakota Bank in Eagle Butte for five years. She also has several years of experience working in the nonprofit sector, and has two Bachelor's degrees – one in Professional Accounting and another in Business Management. April is a life-long resident of Eagle Butte, South Dakota, and comes from a family of entrepreneurs. She currently helps manage a ranch in partnership with her husband and is active in the community, serving on the United Eagle Butte Cemetery Board and the Windswept Academy Board.

In her position as Loan Administrator, **Tori Chasing Hawk** is often times the first point of contact for our clients, providing program information to those who make inquiries. Tori serves as the main interface for clients who are in the process of accessing capital and ensures all documents and information are collected and prepared for processing. In addition, Tori plays an active role in the collections process, corresponding with clients, filing legal documents, and working with the Tribal Court and other jurisdictions. Tori brings several years of experience in the financial sector to Four Bands. Her previous positions include Personal Financial Associate, Member Service Representative, and Teller. Tori graduated from Cheyenne Eagle Butte High School and is a member of the Cheyenne River Sioux Tribe. She likes spending time with her husband and children outside of work and is excited to be a part of the Four Bands team.

Throughout the project, our team will leverage partnerships to extend additional resources in for form of capital and/or technical assistance to project participants. Project collaborators and their roles are detailed in the Management and Partnership section below.

## V.    OUTCOME EVALUATION PLAN & REPORTING

Through the proposed project, Four Bands will deliver 500 hours of technical assistance, deploy $6,615,359.45 in lending capital, and disburse $733,750 in equity bundles to low-income ag producers in the tribal areas of the four-state Mountain Plains Region. By meeting these designated objectives, we expect the following outcomes:

- 10-15 participants will purchase land.
- 10-15 participants will mitigate land loss.
- 16-20 participants will increase profitability.
- 10-15 participants will seek additional capital through a project collaborator.
- 5-7 participants will seek or participate in other USDA programs.
- 25 participants will increase knowledge concerning land access issues, agricultural finance products, and agricultural business planning.

The above list of indicators of success will be measured and monitored by our Director of Operations and Director or Lending. $165,921.50 of our personnel budget, will be allocated to monitoring and performance measurement activities. To monitor progress of project performance measures our staff will track various metrics through a variety of evaluation methods and tools. Our set of proprietary assessment tools will enable staff to assess each participant's strengths in business planning, finance, and growth strategies, as well as support progress toward achieving their goals. Work completed through annual evaluation meetings will determine the level of each participant's profitability and engagement with project partners. In addition, we will track loan deployment, uses of loan proceeds, portfolio performance, and hours of technical assistance services delivered. All of this information will be entered, stored, and analyzed through our database, The Exceptional Assistant (TEA), a software designed specifically for CDFIs. With the TEA database, we have the ability to generate reports based on our established measures of success.

Four Bands will develop an annual project report infographic to communicate impact. The report will communicate number of participants served, TA hours delivered, number and volume of loans deployed, number of participants who purchased land or mitigated land loss, number of participants who increased profitability, number of participants who sought additional capital through project partners, volume of capital accessed by leveraging partnerships, number of participants who sought participation in USDA programs, and number of participants who increased knowledge or skills. In addition to the infographic that will communicate key indicators of success, the annual project report will include a participant success story detailing the lived experience and personal impact of the proposed project. The annual project report will be distributed through various communications channels, including

mass media and Four Bands' website, social media platforms, semi-annual newsletter, and email marketing system. Each project annual report will reach an audience of at least 6,000 stakeholders.

Four Bands is committed to meeting the project participants' needs. We are willing to collaborate with USDA so that project participants can access the full range of resources relevant to their designated operations and profitability goals.

## VI.    MANAGEMENT & PARTNERSHIP PLAN

To execute the proposed project in a streamlined and efficient manner, Four Bands has developed a management plan to clearly define the roles of our internal team members as well as our project collaborator organizations.

*Internal Team Roles*
Our Executive Director will provide general oversight of the project, imparting thought leadership regarding strategies for increasing access to land and capital for the target audience. Our Director of Operations will work with our Director of Finance and Director of Lending to monitor overall project performance and ensure objectives and outcomes are met within specified timelines and budgets. Specifically, the Director of Finance will provide budget-to-actual reports, and the Director of Lending will generate reports from our database on lending and technical assistance activities, as well as other designated metrics.

Our Director of Lending, Loan Officer, and Loan Administrator will provide direct services to participants, delivering technical assistance and deploying loan capital. Four Bands operates with a Board-approved Loan Policies and Procedures manual which is reviewed annually. Our staff follows these policies with each product line to ensure fair and impartial services are delivered to all clients. Lending staff will connect participants to project collaborators as appropriate. All staff who work directly with project participants will update client database records with information related to technical assistance and lending, as well as all other designated metrics.

Internal team members will meet monthly to evaluate project performance and make adjustments as necessary.

*Project Collaborators & Roles*
In addition to creating an equitable platform for Native American entrepreneurs, credit builders, homeowners, and ag producers, Four Bands has a long history of leading and participating in local, statewide, and national coalitions to drive change in our service area and beyond. We believe that forming strategic alliances with organizations that share a similar mission increases our community impact. Thus, we are part of multiple collaborative networks and coalitions that bring together minds from various backgrounds to share ideas and leverage our collective efforts. Through a cultural lens, Four Bands has harnessed collective leadership to

call upon a highly diverse group of collaborator organizations that are committed to creating equity across the region through inclusive and culturally empowered strategies.

Four Bands has developed innovative collaborations with the organizations listed below, will work with all organizations as a cohesive group during the project, and will continue working with them to amplify access to land, capital, and resources beyond the project period. Four Bands will facilitate quarterly project meetings with all project collaborators to discuss and coordinate access to technical assistance, capital, and resources for project participants. The following organizations are committed to attending these quarterly meetings, providing reports on services delivered to project participants, and fulfilling roles as outlined below.

The **Mountain | Plains Regional Native CDFI Coalition** is a group of Native CDFIs from South Dakota, Montana, and Wyoming, that are committed to solving persistent poverty in rural and Native communities, obstacles to minority-led small business lending, and access to fair and responsible finance for all. Spearheaded by Four Bands, this group of industry thought leaders provided a frontline response to the COVID-19 pandemic and immediately began working to share effective strategies and leverage shared resources and partnerships. Within a few months, the Coalition launched a data collection initiative to determine the proportion of Native American markets that would take the largest economic hit and develop recovery and resilience strategies in the region. Over two years later, Coalition members continue to work collaboratively to create greater access to resources for Native-owned small businesses and ag operations. Most recently the Coalition was awarded $45 million from Economic Development Administration's Build Back Better Regional Challenge for a five-component holistic project that will build an innovation ecosystem for Native entrepreneurs, including agricultural entrepreneurs, in the region. The Build Back Better project will design and implement a regional revolving loan fund that will infuse $25 million in capital across the Mountain Plains Region.

*Project Role* – Four Bands will leverage partnerships with the nine Native CDFI members of the Mountain | Plains Regional Native CDFI Coalition to create greater access to land and capital for project participants through their successful participation loan model. Four Bands has successfully engaged in participation loans with two Coalition members to date. In addition, the Coalition's Regional Revolving Loan Fund Manager will share regional information on lending activity and identify opportunities for increased land and capital access.

The **Native American Agriculture Fund (NAAF)** provides grants to eligible organizations for business assistance, agricultural education, technical support, and advocacy services to support Native farmers and ranchers. The charitable trust was created by the settlement of the landmark Keepseagle v. Vilsack class-action lawsuit. NAAF is the largest philanthropic organization devoted solely to serving the Native American farming and ranching community. Four Bands has been a NAAF grantee for five consecutive years. Recently, Four Bands and other Native CDFIs have been engaged in a new venture with NAAF to create an Other Financial Institution (OFI), which will be a certified nonprofit member of the federally backed Farm Credit System. In early 2023, NAAF's OFI will start doing participatory lending with Native CDFIs, including Four Bands.

*Project Role* – Through the proposed project, Four Bands will engage NAAF's OFI in participation loans to extend greater amounts of lending capital to increase or preserve land access for underserved ag producers in the four-state Mountain Plains Region.

The **Farm Service Agency (FSA)**, a USDA agency, delivers various programs to ag producers across the nation. As an FSA guaranteed lender, Four Bands has developed a strong working relationship with their local FSA representatives, even engaging in participation loans when appropriate.

*Project Role* – Through the proposed project, Four Bands will engage in participation loans with FSA to extend greater amounts of lending capital to increase or preserve land access for underserved ag producers in the four-state Mountain Plains Region.

The **Intertribal Agriculture Council (IAC)** conducts a wide range of programs designed to further the goal of improving Indian agriculture. The IAC promotes the Indian use of Indian resources and contracts with federal agencies to maximize resources for tribal members. IAC provides direct assistance with USDA program access, including outreach, eligibility, applications, and contract implementation support as needed. Specifically, the IAC works with the Natural Resources Conservation Service in an effort to further enhance the stewardship of Native American lands by providing improved access to conservation planning technical assistance, management resources, and useful land stewardship tools. Headquartered in the same town, the IAC and Four Bands have developed a strong working relationship and often work together to support Native American ag producers.

*Project Role* – Throughout the proposed project, Four Bands will connect project participants with the IAC so that they may access the vast array of resources they offer in conjunction with USDA.

Four Bands takes several measures to secure data in safe places, whether in physical locations or in virtual spaces, and our databases are not accessible to the public or even project collaborators. Our clients' confidentiality is of utmost importance to us. Employees, volunteers, and contracted professionals sign a confidentiality agreement stating they will protect personal information collected through applications and intake forms. The agreement states that personal names, information, financial data, or planning documents may not be released to any party outside of Four Bands' staff or board of directors without written consent of related parties. In addition, our Loan Policies and Procedures state: Staff members acknowledge that all information collected from or on behalf of the Borrower is private and confidential and should not be disclosed to anyone who is not a member of the Loan Staff, Loan Committee, Board of Directors or Consultant and only for the purpose of performing responsibilities outlined in this policy.

Because we have honored client confidentiality and respected the privacy of the people we work with for over 20 years, we have earned unwavering trust and respect from the

communities we serve. Although Four Bands regularly shares aggregated community impact data (i.e. – loans disbursed, people served, etc.), we do not share personally identifiable information on public platforms. In the event we produce a client success story, we obtain permission from the client to share the story through our communications channels. Even then, we typically do not share specific financial information in order to protect personal data.

Attachment 4
FSA24GRA0011582

# Budget Narrative

## I.    PERSONNEL

The budget allocates a total of $634,218.00 for personnel expenses, which will cover time spent on the project for our Director of Operations, Director of Lending, Loan Officer, and Loan Administrator. Roles, annual salaries, percent of effort, period of time and funds requested are detailed in the matrix below.

| STAFF POSITION | PROJECT ROLE | ANNUAL SALARY | % EFFORT | PERIOD OF TIME | FUNDS REQUESTED |
|---|---|---|---|---|---|
| Director of Operations | Monitor overall project performance and ensure objectives and outcomes are met within specified timelines and budgets | $89,681.00 | 40% | 5 years | $179,362.00 |
| Director of Lending | Monitor project objectives and outcomes, deliver technical assistance, deploy capital | $102,000.00 | 40% | 5 years | $204,000.00 |
| Loan Officer | Deliver technical assistance, deploy capital | $85,280.00 | 40% | 5 years | $170,560.00 |
| Loan Administrator | Conduct outreach, process intakes, deploy capital | $40,148.00 | 40% | 5 years | $80,296.00 |
| | | | | **TOTAL SALARIES** | **$634,218.00** |

## II.    FRINGE BENEFITS

The budget allocates $171,238.86 to cover fringe benefits, which are calculated at 27%.

**Fringe Benefits ($634,218.00 x 27%) = $171,238.86**

## III.    TRAVEL

The budget allocates $48,080 for travel, which would cover expenses for two staff members to attend the Intertribal Agricultural Council's annual conference as well as site visits to various ag producer's locations.

*Intertribal Agricultural Council Conference*

Budget Narrative
Submitted By: Four Bands Community Fund

Airfare $800 x 2 = $1,600
Parking = $200
Hotel for 4 Nights x 2 = $900
Meals for 4 Days x 2 = $480
Rental Car for 4 Days = $500
*Total for Each Trip = $3,680 ($3,680 x 5 years = $18,400)*

*Site Visit Travel*
500 miles/month x 60 months @ 63 cents/mile = $18,900
Airfare $800 x 7 trips = $5,600
Hotel for 14 Nights = $2,800
Meals for 14 Days = $840
Rental Car for 14 Days = $1,540
*Total Site Visit Travel = $29,680*

**Total Travel = $48,080**

## IV.    SUPPLIES

The budget allocates a total of $20,000 for supplies, which will be used to purchase two new computer towers, four new computer screens, and accompanying software licenses for the Loan Officer and Loan Administrator.

**Supplies**
Computer Screen x 4 = $1,600
Computer Tower x 2 = $2,000
Software Licenses (5 years) = $6,400
Printing = $5,000
Marketing Materials = $5,000
**Total Supplies = $20,000**

## V.    CONTRACTUAL

The budget allocates a total of $180,000 to cover consultant expenses, which will go towards an evaluation consultant and marketing consultant. Four Bands has a long working relationship with Sweetgrass Consulting, a firm that will provide additional support in the way of data analysis to the project. In addition, Cuny Communications will be contracted to design, produce, and distribute outreach materials and annual project reports. Legal will be used as necessary to navigate land purchases on tribal trust land and other consultation as needed.

**Consultants**

*Sweetgrass Consulting 8% effort @$125/hr*
Annual Contract ($20,000 x 5 years) = $100,000

*Sweetgrass Consulting Subtotal = $100,000*

*Cuny Communications 7% effort @$80/hr*
Service Fees (annual contract $12,000 x 5 years) = $60,000

Legal @$300/hr
Annual Contract ($4,000 x 5 years) = $20,000

**Total Contractual = $180,000**

## VI.    OTHER

The budget allocates $7,354,109.45 for other expenses, all of which will be critical to delivering the proposed project. A breakdown of this line item is below.

**Other**
Loan Capital = $6,615,359.45
Equity Bundles = $733,750.00
Exhibitor Fees for Intertribal Ag Council Conference ($1,000 x 5 years) = $5,000
*Recruit ag producers at the Intertribal Ag Council (IAC) annual Conference.  FBCF would put up a booth and advertise our program to IAC staff members who are client facing as well as the producers who attend the conference.*

**Total Other = $7,354,109.45**

## VII.    INDIRECT

The budget allocates $92,353.69 for indirect costs, which is calculated at the 10% de minimus rate using the following figures.

| $ | 634,218.00 | salary |
|---|---|---|
| $ | 171,238.86 | Fringe |
| $ | 48,080.00 | Travel |
| $ | 20,000.00 | Supplies |
| $ | 50,000.00 | Contractual |
| **$** | **923,536.86** | **Total MTDC** |
| **$** | **92,353.69** | **10% Indirect Costs** |

**Total Indirect = $92,353.69**

# Lending Policy

**Increasing Land, Market and Capital Access Program Description**

*Legislative Authority*

The authorizing statute and regulation for this opportunity is Section 1006 of the American Rescue Plan Act of 2021 (hereafter referred to as the Act) (Pub. L 117-2), as amended by Section 22007 of the Inflation Reduction Act of 2022 (Pub. L 117-169)). Section 1006(b) of the Act, as amended, provides resources for grants to improve land access, including heirs' property, highly fractionated land, and related land ownership and land access issues, for underserved farmers, ranchers, and forest landowners.

**Loan Types:**

1. A "direct loan" is a disbursement of funds by the recipient to a participant (Beneficiary) under a contract that requires the repayment of such funds with or without interest.

2. Revolving Loan Fund (RLF): A recipient that establishes an RLF makes direct loans to Beneficiaries with ILA Program funds.  The proceeds from loan repayments flow back to the fund and become available to lend again to other beneficiaries.
    i.  RLF Income means interest earned on outstanding loan principals and RLF accounts holding RLF funds, all fees and charges received by the RLF, and other income generated from RLF operations.
    ii. An RLF recipient may use RLF Income only to capitalize the RLF for financing activities and to cover eligible and reasonable costs necessary to administer the RLF. RLF Income excludes repayments of principal.
    iii. A recipient may use revolved funds to make loans to additional Beneficiaries in accordance with this policy without obtaining prior FSA concurrence.

**Loan Uses:**

Loans can be utilized for land acquisition down payments, pay real estate taxes, lease or rental assistance, leverage or implement conservation practices, purchase livestock, improve soil quality, purchase on-farm infrastructure, or provide cost share for supplies, equipment, and maintenance. Purchases must be agricultural only, based on the IRS Agricultural Form 1040 Schedule F (Attachment A).  Please contact your Grant Management Specialist to discuss any uses not identified above.

**Loan Policy Guidance:**

- Recipients shall create their own lending policy.
- All policies must adhere to the standards as outlined in this FSA Lending Policy.
- Recipient policies will be reviewed by FSA Staff for approval, prior to lending program implementation.  FSA will not review individual loan applications.
  **Policies should include how recipient intends to ensure interest rates are fair and are not burdensome to Beneficiaries.

- USDA Non-Discrimination Policy – When developing and reviewing loan applications, recipients must adhere to USDA's Non-Discrimination Policy below:

  "In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident."

- Loan Documentation – Application forms used by the recipient must include the following information:
    - Name and address of the beneficiary;
    - Loan purpose;
    - Interest rate and term;
    - Location, nature, and scope of the project being financed;
    - Uses and sources of funds;
    - Nature and lien priority of the collateral;
    - Proof there is no conflict of interest between recipient and beneficiary; (FSA requires a checked box on the application and a signature, or by other means as agreed to by the agency); and
    - Proof of citizenship in accordance with 7 CFR 764.101(c). (Attachment B)

**Post Award Requirements**

1. Applicability.
Recipients receiving grants under this program shall be governed by this policy, 2 CFR Part 200 or successor regulation, the grant award agreement, the approved project narrative, recipient loan policy, and any other conditions which FSA may impose in making the grant. Whenever this policy imposes a requirement on loans made from the "ILA revolving loan fund," such requirement shall apply to all loans made by a recipient to a Beneficiary from the recipient's ILA revolving loan fund during the grant period of performance. Whenever this policy imposes a requirement on loans made by recipients from "FSA ILA grant funds," without specific reference to the ILA revolving loan fund, such requirement shall apply only to loans made by a recipient using FSA ILA grant funds and will not apply to loans made from revolved funds.

2. Grant Disbursement
FSA will disburse grant funds to the recipient in accordance with 2 CFR Part 200 or successor regulation, as applicable, its grant award agreement, and the terms and provisions of this policy. Any funds disbursed in advance will be supported by financial need substantiated in writing by the recipient. Form SF-270 must be completed by the recipient and submitted to FSA no more often than monthly to request an advance of funds.

Specifically, FSA will disburse the grant funds in advance if the following requirements are met:

    (a) The recipient has established written procedures that will minimize the time elapsing between the transfer of funds from FSA and their disbursement to beneficiaries;

    (b) The management system of the recipient meets the requirements of 2 CFR Part 200 or successor regulation, as applicable;

    (c) The requests for cash advances made by the recipient are limited to the minimum amounts needed and timed to be in accordance with the actual immediate cash needs of the beneficiary to carry out the project.

    (d) Before the initial lending of FSA ILA grant funds to a beneficiary, the recipient must obtain written FSA approval of all forms to be used for relending purposes, including application forms, loan agreements, promissory notes, and security instruments.

3. Maintenance of ILA Revolving Loan Fund.

The recipient must maintain the ILA grant in compliance with its FSA grant award agreement, and the terms and provisions of this policy. All ILA grant funds to be used for revolving loan purposes, received by a recipient, must be deposited in an ILA revolving loan fund. The ILA revolving loan fund can only be used for receiving advances from FSA, receiving cash from fees assessed from activities of the ILA revolving loan fund, interest earned, disbursing beneficiary loans, and collecting beneficiary loan repayments. Interest earned, cash obtained from fees assessed from activities of the ILA revolving loan fund, etc. must remain part of the ILA revolving loan fund though these monies may be used to pay administrative expenses as provided below. All FSA ILA loan activity must be managed through the ILA revolving loan fund.  The recipient may transfer additional assets into the ILA revolving loan fund to cover any shortage at any time.  The recipient must maintain adequate documentation of any additional assets that are transferred into the account.

Recipients may use an operating account, general fund, or Automated Clearing House (ACH) account to initially collect payments from beneficiaries, as long as those payments are transferred to the ILA revolving loan fund within ten working days of receipt or by the end of the Federal fiscal quarter, whichever occurs first. All moneys deposited to the ILA revolving loan fund bank account or accounts must be money of the ILA revolving loan fund. The receivables created by making loans to beneficiaries, the recipient's security interest in collateral pledged by beneficiaries, collections on the receivables, interest, fees, and any other income or assets derived from the operation of the ILA revolving loan fund are considered a part of the ILA revolving loan fund.

    (a) The recipient can use the portion of the ILA revolving loan fund that consists of FSA ILA grant funds only for making loans in accordance with this policy. The recipient may use the portion of the ILA revolving loan fund that consists of revolved funds for debt service reserve (a cash reserve that ensures the borrowers have enough to cover debt service payments in the event of cash flow disruptions), and reasonable administrative costs, in accordance with this section, or for making additional beneficiary loans, provided, however, that the recipient cannot use proceeds received from the collection of principal repayment by a beneficiary for administrative

expenses. The amount removed by the recipient from the ILA revolving loan fund for administrative costs in any year must be reasonable, and must not exceed the actual cost of operating the ILA revolving loan fund, including loan servicing and providing technical assistance.

(b) If FSA determines that the recipient has substantial amounts of FSA ILA grant funds available for lending that is not being regularly loaned out to beneficiaries, FSA may require, at its discretion, that those funds be returned to FSA .

(c) The recipient must deposit all reserves and other cash of the ILA revolving loan fund in accounts in depository financial institutions. Such accounts must be fully covered by Federal deposit insurance or fully collateralized with other securities in accordance with normal banking practices and all applicable State laws. The account must be interest-bearing if feasible and any interest earned thereon remains a part of the ILA revolving loan fund. The recipient cannot use funds for any certificates of deposit over a 30-day duration or for investments in securities. All instruments associated with the revolving loan fund must be liquid and not impose fees associated with the withdrawal or movement of cash.

(d) ILA revolving loan funds are intended to provide an ongoing source of funding to strengthen land access with additional opportunities to focus on capital access and market access for use in agriculture.  Any FSA ILA grant funds that are obligated by the recipient within the five years of the grant award date can continue to be revolved.

4.  Agency oversight.
(a) FSA will monitor each recipient based on progress reports submitted by the recipient, audit findings, disbursement transactions, visitations, and other contact with the recipient, as necessary.

(b) In the event the recipient's financial condition deteriorates, such that it cannot operate any portion of the loan portfolio, the recipient takes action detrimental to prudent fund operation, or the recipient fails to take action required of a prudent lender, execute documents and/or undertake any reasonable acts and manage their loan portfolio, FSA may request, to protect the agency's interest, to transfer the ILA revolving loan fund to FSA or to a third party designated/approved by FSA.

5.  Notification.
(a) The recipient must notify FSA and obtain prior written approval from FSA before making any significant changes in approved forms, security policy, or the ILA revolving loan fund policy The FSA Grant Management Specialist may approve changes in forms, security policy, or the ILA revolving loan fund policy at any time upon a written request from the recipient and determination by FSA that the change will not violate any requirements of FSA. The recipient must comply with the approvals by FSA, during the grants period of performance.

6.  Responsibilities
(a) Recipient.  The recipient shall remain in compliance with all applicable laws, regulations, Executive Orders, and other generally applicable requirements for the duration of the Agreement, including 2 CFR parts 200, 400, 415, 416, 417, 418, 421, and 422.  The most commonly-referenced provisions are identified below.

(1) Closeout. The recipient must comply with the closeout requirements in 2 CFR § 200.344 – The revolving loan fund will be allowed to continue into perpetuity.

Funds that are held by a Federally Recognized Tribe or an economic entity of the Tribe tribal organization will have the federal interest released at the end of the grant period.  The FSA Grant Management Specialist will continue to monitor the Recipient's ILA Lending Program to ensure funds are loaned as outlined in the project narrative.

(2) Post-Closeout Adjustments and Continuing Responsibilities.  The recipient must continue to comply with the requirements in 2 CFR § 200.345 even after the Period of Performance for this Agreement has ended.

(3) Audits.  The Recipient must comply with the provisions in 2 CFR Part 200, Subpart F.

7.  Monitoring and Enforcement.  FSA will monitor the project to ensure that recipients compliance with the terms of the award.  If FSA determines that a recipient is not in compliance, the Agency will enforce the terms of this Agreement using the provisions of 2 CFR § 200.339-343.

Attachment A

**Part II  Farm Expenses—Cash and Accrual Method.** Do not include personal or living expenses. See instructions.

| | | | | | |
|---|---|---|---|---|---|
| 10 | Car and truck expenses (see instructions). Also attach **Form 4562** | 10 | 23 | Pension and profit-sharing plans . . | 23 |
| 11 | Chemicals . . . . . . . . | 11 | 24 | Rent or lease (see instructions): | |
| 12 | Conservation expenses (see instructions) | 12 | a | Vehicles, machinery, equipment . . | 24a |
| 13 | Custom hire (machine work) . . . | 13 | b | Other (land, animals, etc.) . . . . | 24b |
| 14 | Depreciation and section 179 expense (see instructions) . . . . . . | 14 | 25 | Repairs and maintenance . . . . | 25 |
| 15 | Employee benefit programs other than on line 23 . . . . . . . . | 15 | 26 | Seeds and plants . . . . . . | 26 |
| | | | 27 | Storage and warehousing . . . | 27 |
| 16 | Feed . . . . . . . . . | 16 | 28 | Supplies . . . . . . . . . | 28 |
| 17 | Fertilizers and lime . . . . . | 17 | 29 | Taxes . . . . . . . . . | 29 |
| 18 | Freight and trucking . . . . . | 18 | 30 | Utilities . . . . . . . . . | 30 |
| 19 | Gasoline, fuel, and oil . . . . . | 19 | 31 | Veterinary, breeding, and medicine . | 31 |
| 20 | Insurance (other than health) . . | 20 | 32 | Other expenses (specify): | |
| 21 | Interest (see instructions): | | a | | 32a |
| a | Mortgage (paid to banks, etc.) . . | 21a | b | | 32b |
| b | Other . . . . . . . . . | 21b | c | | 32c |
| 22 | Labor hired (less employment credits) | 22 | d | | 32d |
| | | | e | | 32e |
| | | | f | | 32f |

Attachment B

For direct loan programs, 7 CFR 764.101(c) states:

> Citizenship. The applicant and anyone who will sign the promissory note must be a citizen of the United States, United States non-citizen national, or a qualified alien under applicable Federal immigration laws.

# Land Policy

**Increasing Land, Market and Capital Access Program Description**

*Legislative Authority*

The authorizing statute and regulation for this opportunity is Section 1006 of the American Rescue Plan Act of 2021 (hereafter referred to as the Act) (Pub. L 117-2), as amended by Section 22007 of the Inflation Reduction Act of 2022 (Pub. L 117-169)). Section 1006(b) of the Act, as amended, provides resources for grants to improve land access, including heirs' property, highly fractionated land, and related land ownership and land access issues, for underserved farmers, ranchers, and forest landowners.

Real Property

A.  Title.  Subject to the requirements and conditions set forth in this section, title to real property acquired or improved under a Federal award will vest upon acquisition to the recipient.  FSA staff must be granted access to the real property and capital assets to be purchased and/or purchased with ILA Program funds as long as the recipient reports to FSA on the real property and capital assets.

B.  Use
   a.  Real property as defined in 2 CFR 200.1

   b.  Capital assets as defined in 2 CFR 200.1

C.  Pre-closing Actions

   Due Diligence for Acquisition.  The acquisition of land requires certain activities to ensure the appropriate use of Federal funds and that landowners are justly compensated. An acquisition typically requires the following tasks, in the approximate order set forth below. However, FSA for good cause may determine that there is a need to deviate from this order. (e.g. where a Phase I programmatic environmental assessment under Item 3 below may be warranted before the expenditures of any other expenses, such as a preliminary title search under Item 1).

1.  Title Search and Title Insurance
   a.  The title of the interest acquired must be free of encumbrances inconsistent with the purposes of the Increasing Land, Capital, Market Access Program (ILA) Program. Title insurance may be secured for the full value of the encumbered property but is not an alternative to an acceptable title. Title issues can be a major cause of problems in the acquisition of properties. As early as practicable, a title search should be done to help determine the issues that must be addressed for a successful acquisition. A title search may uncover such common issues as the existence of mortgages, liens, contracts, court actions, reserved rights, utility or road easements, and other recorded legal considerations. A title search is generally performed by a title insurance company, an attorney, or a title abstractor.

b. For conservation easement projects, a mortgaged tract can only be accepted into the ILA Program if the mortgage holder subordinates the mortgage interest to the conservation easement. This is to avoid the potential situation of a bank dissolving a conservation easement if the landowner defaults on the loan.

c. The information provided in a title report may not always provide an accurate assessment of the title. Thus, title insurance is a protection that can be purchased to cover errors in the title report. When ILA funds are used in acquiring lands or interests in lands, the ILA Program requires assurance of a title free of any encumbrances that may be inconsistent with the ILA purposes. This requirement can be met via a written opinion from an attorney, or by purchasing title insurance for the full value of the property that names the interest holder as the beneficiary. Title insurance protects the holder from any loss sustained because of defects in the title, other than those specifically excluded in the policy. Title insurance does not guarantee acceptable title.

2. Legal Description/Survey
   a. A legal description of the estate, whether it is a fee title or a conservation easement, is an essential element of the transaction. Acceptable legal descriptions should be derived by field survey, metes and bounds, or measurement methods that meet State standards, whereby a plat of the estate is recorded, or by reference to another recorded document developed by one of these methods. In every case, acreage must be stated to the accuracy required by State standards to assure that the estate appraised is the estate purchased by the ILA recipient. For conservation easements, a survey should be obtained if the easement only covers a portion of the tract, unless the easement area can be easily identified by natural features.

   b. The ILA recipient should consider obtaining a survey especially when there are known boundary line disputes, or when there are concerns about the reliability or accuracy of the survey—for example, if the survey is very old. All known boundary disputes must be resolved before the drafting of the final legal description. The legal description fails if it does not clearly define what the Grantor (seller) is conveying to the Grantee (buyer).

   c. Surveys can provide reliable information to develop maps for management plans, trails, or other important resources that need to be spatially displayed.

3. Environmental Review

   ILA project grants are subject to the National Environmental Policy Act (NEPA) (NEPA; Public Law 91-190; 42 USC §4321) and will comply with Farm Service Agency (FSA) NEPA implementing procedures as described in 7 CFR Part 799, as well as the Council on Environmental Quality's NEPA procedures at 40 CFR 1500-1508.

USDA's FSA must conduct environmental reviews in accordance with Notice AO-1863 1-EQ Environmental Quality Programs and 2 EQ Environmental Risk Management, prior to the official land purchase.

4.  Minerals Determination -Surface and Subsurface Mineral Exploration and Extraction

Mining or extraction of soil, sand, gravel, oil, natural gas, fuel, coal, or any other mineral substance owned or later acquired by Grantor using any surface mining, subsurface mining, or dredging method is prohibited on the Protected Property (property that will have the easement on it) as of the date of the conservation easement project.

Any mineral leases or other conveyances of minerals entered into or renewed after the date the Conservation Easement is executed must be subordinate to the terms of the Conservation Easement and must incorporate by reference the Conservation Easement.

If prior to the time the Conservation Easement is executed a third party owns or leases the oil, natural gas, or any other mineral rights associated with the Protected Property, and their interests have not been subordinated to this Conservation Easement, the Grantor must require, to the greatest extent possible, that any oil, natural gas, and mineral exploration and extraction is conducted by such third party in accordance with applicable State law using off-site methods that do not impact the surface of the Protected Property and do not harm the Conservation Values described by the Conservation Easement.

5.  Water Rights
Especially in the West, where water is crucial to running stock or irrigating pastures, it is not unusual to find that a property has a third-party interest in the form of a right to water. This right may be to use water on the property, for example, use of watering holes or tanks for cattle owned by someone other than the landowner. Or there could also be a right to use water coming off the property by some conveyance, such as a ditch or pipeline. In some States where water was necessary for mining, these interests may have been recorded many generations ago. Some landowners may not have knowledge of these older recorded interests.

In general, recorded third-party interest rights are listed in the Exceptions Section of the Preliminary Title Report as a right of someone, other than the landowner, to utilize water coming from a source other than that person's own property. For example:

"Any rights of (name of third party) in conjunction with the right to take water pursuant to a License Agreement recorded (some date), as instrumented No XXX-XXXXXX-XX in (some county) Records."

The recipient must determine if another's right to take water or have access to water on the subject property is compatible with the conservation values being purchased through ILA. Some of these agreements allow the holder of the water right to make improvements to the source and/or the conveyance of the water. This could mean new

road construction, development to the spring or lake, or removal of vegetation along the conveyance (ditch or pipeline), any of which may not be compatible.

6. Document Preparation and Legal Advice
    a. It is recommended that the ILA recipients use an attorney and conservation experts to develop and review acquisition documentation. The complexities of legal considerations and the diversity of landowner interests require expertise in the development of conservation documentation.
    b. The ILA grant funds can be used to pay for legal assistance for ILA acquisitions. All ILA deeds must include the provisions in the FSA-2569, Warranty Deed (Attachment A), to ensure the ILA tracts are protected in perpetuity.

7. Amicable Agreement Acknowledgment
The entity acquiring the land or interest in land is required to notify the landowner in writing, prior to closing, of two things:
    a. The value of the property interest to be conveyed to the State or Federal Government as determined by an approved appraisal, and
    b. That the sale of the property or interests in property is strictly voluntary and that eminent domain will not be used if negotiations do not result in an amicable agreement. The landowner shall sign this notification. (See Attachment B – Amicable Agreement Acknowledgment Letter for an example.)

8. Fee Simple Purchase Deed Language

Recipients must submit an FSA-2569, Warranty Deed., to the Land.Access@usda.gov mailbox.

9. Insurance coverage

In accordance with 2 CFR 200.310, the recipient must, at a minimum, provide the equivalent insurance coverage for real property acquired or improved with Federal funds as provided to property owned by the recipient.

10. Appraisal and Appraisal Review

Appraisals of real property or capital assets must be conducted by an independent appraiser (for example, certified real property appraiser and certified by a responsible official of the awardee).

    a. The appraisals will be obtained by the recipient and a copy of the appraisal must be submitted to Land.Access@usda.gov for review.
    b. The ILA Program funds can be used to pay for the appraisals.

11. Submission of Pre-closing documents

Recipient must submit a copy of the following pre-closing documents prior to closing to Land.Access@usda.gov:

   a. Title Search and Title Insurance
   b. Legal Description/Survey
   c. Mineral Determination
   d. Draft Closing Documents
   e. Appraisals
   f. Insurance coverage
   g. Copies of any leases, covenants, or other restrictions on the use of the property.
   h. Amicable Agreement acknowledgment or documentation that the landowner has been notified of the appraised value and understands that ILA is a voluntary program.
   i. Landowner inspection consent agreement
   j. Sales agreement.
   k. Documentation of water rights (if applicable)

12. Escrow
   a. Recipients will be required to have an escrow account for closing transactions involving the purchase of real property or capital assets.
   b. The ILA Program funds must be deposited into an escrow account by the closing agent (e.g., title company or closing attorney).

      Recipients must receive approval from FSA prior to scheduling the closing for land purchases.

D. Closing Requirements

Mandatory Documents
After closing, the recipient will provide FSA with the documents detailed below if not previously provided.  The recipient and FSA will be required to maintain the following documents in accordance with 2 CFR Part 200, Subpart D (Non- Federal entities must retain records related to federal awards for three years. Records must be retained for three years from the date of submitting the final expenditure report):

1. Copy of recorded acquired interest in land (whether conservation easement or fee deed, including any conservation easement amendment(s)) with signatures, and book and page stamp from recording.
2. Copy of Settlement/Closing Statement, including signatures, and proof of payment, such as a copy of a check or electronic funds transfer.
3. Final title insurance policy or letter from the recipient assuring title.
4. Minerals determination (if mineral rights are severed).

5. Appraisal Review Report indicating appraisal conformance to Uniform Appraisal Standards for Federal Land Acquisitions (Yellow Book) or Certification of appraiser and non-Federal review appraiser.
6. Amicable Agreement acknowledgment or documentation that the landowner has been notified of the appraised value and understands that ILA is a voluntary program.
7. Landowner inspection consent agreement.
8. Sales agreement.
9. Notification of county or local government (if required – Some county or local governments require notification of some projects that are occurring in their area).
10. Completed Federal Notice of Interest form (Attachment C)
11. Documentation of water rights (if applicable)

E. Reporting on Real Property or Capital Assets

Requirements for recipients reporting on real property or capital assets.

1. For all financial assistance actions where real property or capital assets are acquired under the Federal award, the recipient must submit documentation, ~~and~~ reports on the status of the real property. This will include closing documents and other documents as may be determined by FSA land acquisition policy and guidance.
2. If the interest in the land will be held for less than 15 years, reports must be submitted annually. If the interest in the land will be held for 15 years or more, then the recipient must submit the first report within one year of the period of performance end date of the award and then, at a minimum, every two years thereafter.
3. The reports must be submitted to Land.Access@usda.gov.
4. Recipients must use the OMB-approved governmentwide data elements for collection of real property reporting information, as of October 29, 2019, the Real Property Status Report Standard Form (SF) 429–A, General Reporting, to report status of land or interests in land under Federal financial assistance awards, and applicable attachments along with proof that real estate taxes are current.
5. Reports must include, at a minimum, sufficient information to demonstrate that all conditions imposed on the land use are being met and a signed certification to that fact by the recipient of the financial assistance award.
6. Grant recipients are subject to periodic site visits, financial document reviews, desk reviews, progress report reviews, and any other engagement that may be necessary for program oversight, conducted by the FSA staff to verify that property acquired under the ILA Program has not been sold or converted to unauthorized uses or any use inconsistent with the purpose of the ILA Program.

F. Disposition on Real Property or Capital Assets

Disposition. When real property or capital assets are no longer needed for the originally authorized purpose, the recipient must obtain disposition instructions from the FSA or pass-through entity. The instructions must provide for one of the following alternatives:

1. Retain title after compensating the FSA. The amount paid to the FSA will be computed by applying the FSA percentage of participation in the cost of the original purchase (and costs of any improvements) to the fair market value of the property. However, in those situations where the recipient is disposing of real property acquired or improved with a federal award and acquiring replacement real property under the same Federal award, the net proceeds from the disposition may be used as an offset to the cost of the replacement property.

2. Sell the property and compensate the FSA. The amount due to the FSA will be calculated by applying the FSA percentage of participation in the cost of the original purchase (and cost of any improvements) to the proceeds of the sale after deduction of any actual and reasonable selling and fixing-up expenses. If the Federal award has not been closed out, the net proceeds from sale may be offset against the original cost of the property. When the recipient is directed to sell property, sales procedures must be followed that provide for competition to the extent practicable and result in the highest possible return.

3. Transfer title to the FSA or to a third party designated/approved by the FSA. The recipient is entitled to be paid an amount calculated by applying the recipient percentage of participation in the purchase of the real property (and cost of any improvements) to the current fair market value of the property.

   Except as otherwise provided by Federal statutes or by the FSA, real property will be used for the originally authorized purpose as long as needed for that purpose (as decided by the recipient or FSA), during which time the recipient must not dispose of or encumber its title or other interests.

G. Transfer of Real Property or Capital Assets to Federally Recognized Tribe

   In accordance with Executive Order 13175, Consultation and Coordination with Indian Tribal Governments, Sections 3b, FSA maintains that since the Federally Recognized Tribe either as a recipient, subrecipient, or beneficiary are managing the agreement on behalf of their citizens then FSA can release their federal interest directly to the Federally Recognized Tribe or economic entity of the Tribe.  Economic entities of a tribe may be asked to document that they are a subdivision of the tribe in order to have federal interest removed.  This aligns with tribal sovereignty, federal trust responsibility and our responsibilities as federal employees for consultation and coordination with Tribes.

ATTACHMENT A

Form Approved - OMB No. 0560-0233
*(See Page 2 for Privacy Act and Public Burden Statements)*

**FSA-2569**                           **U.S. DEPARTMENT OF AGRICULTURE**                           Position 5
(08-14-08)                                   Farm Service Agency

## WARRANTY DEED

THIS INDENTURE, made on the *(a)* _____ day of _____ , 20 _____ , by and between *(b)* _____ **(GRANTOR)** of the County of *(c)* _____ , in the State of *(d)* _____ , whose mailing address is *(e)* _____ and United States of America, acting through the Farm Service Agency, whose mailing address is *(f)* _____ **(GRANTEE)**:

    WITNESSETH, That the GRANTOR, in consideration of the sum of *(g)* _____ , and other valuable consideration to them by the said GRANTEE, the receipt of which is hereby acknowledged does by these presents, Grant, Bargain and Sell, Convey and Confirm, unto the GRANTEE and its assigns, the following described Lots, Tracts or Parcels of land, lying, being and situated in the County of *(h)* _____ , and State of *(i)* _____ , to wit:

    TO HAVE AND TO HOLD the premises aforesaid, with all and singular the rights, privileges, appurtenances and immunities thereto belonging or in anywise appertaining unto the GRANTEE, and unto its heirs and assigns, FOREVER, the GRANTOR hereby covenanting that GRANTOR is lawfully seized of an indefeasible estate in fee in the premises herein conveyed; that GRANTOR has good right to convey the same; that the said premises are free and clear of any encumbrance done or suffered by GRANTOR or those under whom GRANTOR claim and that GRANTOR will WARRANT and DEFEND the title to the said premises unto the GRANTEE, and unto its heirs and assigns, FOREVER, against the lawful claims and demands of all persons whomsoever.

    IN WITNESS WHEREOF, the GRANTOR has hereunto set his hand the day and year first above written.

_____
*(j)* Type Name

_____
*(k)* Type Name

## ACKNOWLEDGEMENT

**TE:**   *The following statement are made in accordance with the Privacy Act of 1974 (5 USC 552a). The information requested is necessary for FSA to determine eligibility for financial assistance, service your loan, and conduct statistical analyses. Supplied information may be furnished to other Department of Agriculture agencies, the Department of the Treasury, the Department of Justice or other law enforcement agencies, the Department of Defense, the Department of Housing and Urban Development, the Department of Labor, the United States Postal Service, or other Federal, State, or local agencies as required or permitted by law. In addition, information may be referred to interested parties under the Freedom of Information Act (FOIA), to financial consultants, advisors, lending institutions, packagers, agents, and private or commercial credit sources, to collection or servicing contractors, to credit reporting agencies, to private attorneys under contract with FSA or the Department of Justice, to business firms in the trade area that buy chattel or crops or sell them for commission, to Members of Congress or Congressional staff members, or to courts or adjudicative bodies. Disclosure of the information requested is voluntary. However, failure to disclose certain items of information requested, including your Social Security Number or Federal Tax Identification Number, may result in a delay in the processing of this form or its rejection.*

*According to the Paperwork Reduction Act of 1995, an agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0560-0233. The time required to complete this information collection is estimated to average 15 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. **RETURN THIS COMPLETED FORM TO YOUR LOCAL FSA OFFICE**.*

*In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.*

*Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.*

*To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at http://www.ascr.usda.gov/complaint_filing_cust.html and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture Office of the Assistant Secretary for Civil Rights 1400 Independence Avenue, SW Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3) email: program.intake@usda.gov.  USDA is an equal opportunity provider, employer, and lender.*

**FSA-2569** (08-14-08) Page 2

**ATTACHMENT B**

Amicable Agreement Acknowledgment Letter Example

The acknowledgment example below may be used. This example would be sent on official agency letterhead and signed by the seller.

RE: [ILA Project Name] Amicable Agreement Acknowledgment for [Tract name]

To Whom It May Concern:

The appraisal of the proposed acquisition on the [Tract name] that is part of the [Project Name] Increasing Land, Capital, and Market Access (ILA) was completed by [List appraiser name/company] and was reviewed and determined to meet the Uniform Appraisal Standard for Federal Land Acquisition by [List review appraiser name/company]. In conjunction with the proposed acquisition by [List entity acquiring the property] on [Enter number of acres of acquisition] acres owned by [List Landowner's name], and in accordance with the following notifications are acknowledged:

• The market value of the [fee acquisition of the property or acquisition of a conservation easement on the property] has been determined to be [enter appraised value] by an appraisal prepared and completed for [List entity acquiring the property] by [List appraiser name/company] and has been reviewed to be in compliance with the Uniform Appraisal Standards for Federal Land Acquisitions.

• [List landowner's name] has agreed to sell the [property or conservation easement] to [List entity acquiring the property or conservation easement] for [enter amount that property or conservation easement will be sold for] including a Forest Legacy Program payment of [$XXX,XXX].
• The sale of this [property or conservation easement] is strictly voluntary and eminent domain will not be used if negotiations don't result in an amicable agreement.

Acknowledged by:
_____
[Landowner Name (IN CAPS)] Date [Enter date]
If a nonprofit organization is the landowner,
Insert the authorized signatory's
[Name (IN CAPS)]_____
[Title]_ _____
[Organization Name]_____

**ATTACHMENT C**

**NOTICE OF FEDERAL INTEREST**

**UNITED STATES DEPARTMENT OF AGRICULTURE**
**(USDA)**

**Increasing Land Access**

This notice pertains to the federal interest in property acquired through the use of grant money awarded by the USDA's Increasing Land, Capital, and Market Access Program ("the Grant program").

On  (insert date) , the Farm Service Agency (FSA), an agency in the United States Department of Agriculture (Agency), awarded grant No. _____ ("the Grant") in the amount of $_____ to (insert name of recipient)_____. The Grant was awarded under the Increasing Land Access Program (Section 1006 of the American Rescue Plan Act of 2021 (Pub. L 117-2), as amended by Section 22007 of the Inflation Reduction Act of 2022 (Pub. L 117-XX)), (hereafter referred to as the Act), and in accordance with the provisions of the related Notice of Funding Opportunity dated August 24, 2022. and the Act provides funds for (describe purpose of grant, e.g. construction of a building, or other permanent fixtures) which is located on the land described in Attachment A herein ("Grant Property").

The Grant Program include conditions on use of the Grant Property and provides for a continuing, perpetual federal interest in the Grant Property that is real property (including fixtures). Specifically, the Grant Property may not be:

(1) used for any purpose inconsistent with applicable statutes and regulations governing the Grant under which the Grant Property was acquired; such regulations include but are not limited to 2 CFR 200, 2 CFR 400, 2 CFR 417, and
2 CFR 200.311.

(2) mortgaged or otherwise used as collateral without the written permission of the FSA.

(3) sold or transferred to another party, or otherwise disposed of, without the written permission of the FSA; or

(4) any other proposed change in usage, ownership, or use of the Grant Property for third- party collateral.

The conditions and requirements described herein cannot be subordinated, diminished, nullified or voided through encumbrance of the property, a transfer of ownership or other violation of requirements related to the Grant.

Inquiries regarding FSA's interest in the Grant Property should be directed to:

Administrator
Farm Service Agency
1400 Independence Avenue
Washington, DC 20250-0506

This Notice of Federal Interest is acknowledged and agreed to by the undersigned Grantee on behalf of the Grantee and its successors in interest. All references to the Agency will include its successors in interest.

**Public Burden Statement (Paperwork Reduction Act)**: An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0503- 0028. The time required to complete this information collection is estimated to average 2 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.

Grantee:

Signature: _____   Typed Name: _____   Title: _____

Date: _____

(EXAMPLE OF NOTARIZED AFFIRMATION. THIS SHOULD BE CONFORMED AS NEEDED TO THE SITUATION OR STATE LAW.)

STATE OF_____ COUNTY OF _____ On this ____ day of _____ , 20__, before me, the undersigned, a Notary Public for the County of _____, (State), personally appeared before me and is known to be the person who executed this instrument on behalf of said Grantee and acknowledged to me that he/she executed the same as their free act and deed in either their individual or other capacity described above.

Witness my hand and official seal.
Notary Public in and for the County of _____, State of_____.(INSERT LEGAL DESCRIPTION OF PROPERTY INCLUDING THE CITY/TOWN/COUNTY AND STATE OF PROPERTY)

# Exhibit B



**Farm Service Agency**

U.S. DEPARTMENT OF AGRICULTURE

U.S. Department of Agriculture
Farm Service Agency
Office of the Administrator
1400 Independence Ave., S.W.
Washington, DC, 20250-0506

March 23, 2026

Four Bands Community Fund
Attn: Lakota Vogel
412 South Main Street
Eagle Butte, SD 57625

Dear Recipient,

This letter provides notice that the Farm Service Agency (FSA) is terminating your federal award, *Increasing Land and Capital Access for the Mountain Plains Region's Tribal Areas* (FSA24GRA0011582) in accordance with the terms and conditions of your award and applicable regulations (including 2 C.F.R. 200.340(a)(4)). The United States Department of Agriculture (USDA) has determined that awards under this program involved discriminatory preferences based on Diversity, Equity, and Inclusion (DEI) and wasteful spending that did little to further lawful agricultural land purchases. Accordingly, as discussed below, USDA has determined your award no longer effectuates the program goals or agency priorities. Termination of your award is effective Thursday, March 26, 2026.

The Secretary's Memorandum 1078-004, *"Directive on Departmental Grant and Cooperative Agreement Priorities"* (March 2025), instructed USDA agencies and staff offices to review existing awards to ensure they reflect the Department's priorities of unity, equality, meritocracy, and color-blindness. Accordingly, USDA conducted a thorough review of the Increasing Land, Capital, and Market Access Program ("ILA" or "the program"). That review revealed that ILA awards, including yours, do not align with the Department's goals and priorities, for the following reasons:

1. *Awards Discriminate Based on Immutable Characteristics.*
   Your award was made pursuant to a program rife with DEI preferences that discriminated based on immutable characteristics.  USDA programs must be consistent with principles of equal protection and should never pick winners in the land market based on immutable characteristics like race or sex. When Congress amended the program authority through Section 22007 of the Inflation Reduction Act (IRA), it removed any reference to "socially disadvantaged" (*i.e.*, distinctions based on race, ethnicity, or sex) and focused the program's eligibility for "underserved farmers, ranchers, and forest landowners including veterans, limited resource producers, beginning farmers and ranchers, and farmers, ranchers, and forest landowners living in high poverty areas." Yet despite this de-authorization, the vast majority of projects across the ILA program violated equal protection principles by selecting beneficiaries based on race, ethnicity, sexual orientation, or

**Farm Service Agency**
*USDA is an equal opportunity provider, employer, and lender.*

sex. Eligible groups referenced in the statute should never have been de-prioritized for awards in favor of groups that Congress specifically removed. This award violates the principles laid out in Secretary's Memorandum 1078-021, "*Establishment of USDA General Terms and Conditions for Grants, Cooperative Agreements, and Similar Arrangements,*" (December 2025) (which supersedes Secretary's Memorandum 1078-004); Secretary's Memorandum 1078-001, "*Prioritizing Unity, Equality, Meritocracy, and Color-Blind Policies, in the United States Department of Agriculture,*" (Feb. 2025); USDA's final rule, "*Removal of Unconstitutional Preferences Based on Race and Sex in Response to Court Ruling,*" 90 Fed. Reg. 30555 (July 10, 2025); and FSA's notice, "*Agricultural Disaster Assistance Programs,*" 90 Fed. Reg. 44623 (Sep. 16, 2025). It also violates at least two executive orders, including Executive Order 14148, *"Initial Recissions of Harmful Executive Orders and Actions,"* and Executive Order 14173, *"Ending Illegal Discrimination and Restoring Merit-Based Opportunity."*

2. *Awards Do Not Align with Congressional Intent.*
   Most of the funding for ILA came from Section 1006(b) of the American Rescue Plan Act (ARPA), as amended by Section 22007 of the IRA, which sought "to provide grants and loans ... to improve land access (including heirs' property and fractionated land issues)." Yet most of the awards did little to improve land access. With high overhead costs and excessive spending on outreach and technical assistance, existing awards do not do enough to help producers.

3. *ILA Award Structure Unacceptably Exposed Taxpayers to Fraud, Waste, and Abuse.*
   The program's open "innovative" framework and minimal guardrails resulted in awards improperly exposing taxpayers to unacceptable risks of fraud, waste and abuse. The program's awards enabled spending inconsistent with sound public policy or market logic. Instances of excessive or frivolous expenditures — such as purchasing gazebos, massages, a camper/RV, and oversized office supply budgets (in one case, over $130,000) — instead of land are an affront to taxpayers. The absence of robust oversight mechanisms further amplifies the risk of fraud and abuse.

These issues are endemic across the ILA program; they have biased the application and selection processes and fail to safeguard taxpayer funds in the administration of the program. It is necessary to fully realign the program to ensure consistency with statutory requirements, equal protection principles, and prudent fiscal management.

As stated in the project narrative supporting the award, $6,603,750.00 of the $8,490,667.21 award will be allocated to lending capital, and $733,750.00 toward equity

bundles to low-income agriculture producers in the tribal areas of the Mountain Plains. The program's absence of oversight mechanisms and lack of internal controls present significant risks in the large-scale distribution of federal dollars. The program, in its current form, creates significant vulnerabilities in the responsible stewardship of taxpayer dollars. USDA must ensure that federal funds are being used in alignment with Congressional intent, and are supported by adequate justification to prevent the waste, fraud, and abuse of federal funds.

We acknowledge that Four Bands Community Fund has undertaken efforts in connection to this project. We also acknowledge that the project includes partnership with the Mountain Plains Regional Native CDFI Coalition, Native American Agriculture Fund (NAAF), and Intertribal Agriculture Council (IAC) in furtherance of the project's aim to support tribal producers start, expand, or sustain a profitable agricultural operation. However, the public has a significant interest in ensuring that the ILA program, as a whole, accomplishes its statutory purpose to improve land access and that the selection of beneficiaries does not discriminate based on immutable characteristics. The public also has a significant interest in ensuring the effective and efficient use of federal funds. As such, following careful consideration of your award – including any potential reliance interests, intended outcomes described, as well as consideration of alternatives to termination – USDA has determined the best use of resources and advancing USDA's goals and priorities requires a full termination to realign the program to be consistent with its statutorily mandated purpose and the policies and priorities of the Department.

Your award is terminated pursuant to 2 C.F.R. § 200.340(a)(4) and Section XXII of your Notice of Grant and Agreement Award, effective Thursday, March 26, 2026. You may be reimbursed for costs incurred up to the effective date of termination that are determined to be consistent with 2 C.F.R. § 200.343. Any applicable payment requests must be submitted no later than 120 calendar days after the date of this notice. Any open balance remaining 120 days after the date of this notice will be unavailable for payment.

Any applicable final reports must be submitted to FPAC.BC.GAD@usda.gov no later than 120 calendar days after the date of this notice. If you do not submit all reports in accordance with the terms and conditions of the Federal award within one (1) year of the effective termination date, FSA must proceed to close out the award with the information available. In these circumstances, in accordance with 2 C.F.R. § 200.344, FSA must report your material failure to comply with the terms and conditions of the award in SAM.gov using the Contractor Performance Assessment Reporting System (CPARS). Failure to submit timely and accurate final reports may affect your future funding.

Federal regulation requires recipients to retain all Federal award records consistent with 2 C.F.R. § 200.334. Termination of the agreement does not affect a Federal agency's or a pass through entity's right to disallow costs and recover funds based on a later audit or other review. In accordance with 2 C.F.R. § 200.345, termination does not affect a recipient's obligation to return any funds due because of later refunds, corrections, or other transactions, including final indirect cost rate adjustments.

You may appeal this determination to the National Appeals Division (NAD) by filing a written request no later than 30 calendar days after you receive this notice according to the NAD appeal procedures found at 7 CFR Part 11. If you appeal to NAD, you have the right to a hearing that you or your representative may attend. Once a hearing with NAD begins, you waive any rights you might have to reconsideration, appeal to FSA, and mediation. You can find information for how to file an appeal with a NAD on its website at https://nad.usda.gov/. If you do not timely exercise one of the preceding options, this shall be the final administrative determination with respect to this matter according to the regulations at 7 CFR Part 780 and 7 CFR Part 11.

If you have questions, contact your FSA Program Contact at land.access@usda.gov.

Sincerely,

STEVEN PETERSON
Digitally signed by STEVEN PETERSON
Date: 2026.03.23 10:08:59 -04'00'

Steven Peterson
Associate Administrator, Farm Service Agency

# Exhibit C



**FOUR BANDS**
COMMUNITY FUND

April 21, 2026

Lakota Vogel
Executive Director
Four Bands Community Fund, Inc.
412 South Main Street
Eagle Butte, SD 57625
605-964-3687
lakota@fourbands.org

National Appeals Division
Western Regional Office
13922 Denver West Parkway
Suite 100-NAD
Lakewood, CO 80401-3102

*Via e-filing*

**Subject:**  Appeal of Grant Termination
USDA Increasing Land, Capital, and Market Access ("ILA" or "LCM") Program
Increasing Land and Capital Access for the Mountain Plains Region's Tribal Area
Award Number FSA24GRA0011582

Dear National Appeals Division:

Four Bands Community Fund, Inc., ("Four Bands") hereby formally appeals the United States Department of Agriculture ("USDA"), Farm Service Agency's ("FSA's"), March 23, 2026 decision to terminate Four Bands' grant award titled Increasing Land and Capital Access for the Mountain Plains Region's Tribal Areas, Award Number FSA24GRA0011582.

This grant was awarded pursuant to the Increasing Land, Capital, and Market Access (Increasing Land Access) Program ("ILA" or "LCM"), which was designed to improve access to land, capital, and markets for underserved farmers and ranchers. Priority was given to proposals that provided "specializ[ed] project design" to address challenges with land access and "innovative ways to connect available land to underserved producers who have challenges in accessing land."[1]

---

[1] Fiscal Year 2022 Increasing Land, Capital, and Market Access Program National Funding Opportunity, at 26.

The Place to Grow

📍 412 S. Main Street
Box 932
Eagle Butte, SD 57625

📞 (605) 964-3687
🌐 fourbands.org

FSA awarded the grant to Four Bands to "serve tribal areas" across North Dakota, South Dakota, Montana, and Wyoming—an "area that represents 20 Indian reservations."[2] These reservations and nearby lands are "some of the nation's most economically distressed," rural, and remote areas.[3] The ILA grant was intended to address several structural barriers to accessing land and capital that are unique to these tribal areas.[4] It also would have established a revolving loan fund as a long-term, self-sustaining solution to these barriers.

Four Bands designed our project to address these specific needs. Recognizing the great need in the tribal areas of the Mountain Plains region, USDA selected Four Bands as one of the first potential ILA grantees. In July 2023, USDA issued a press release highlighting Four Bands as an example of a potential awardee.[5] As a result of USDA's media announcements, Four Bands immediately began receiving inquiries from potential beneficiaries within the Mountain Plains Region who believed this was their first opportunity to access land for themselves.

Four Bands diligently worked toward implementing the project. But USDA approvals were delayed as USDA staff waited for guidance from leadership. On March 23, 2026, Four Bands abruptly received a termination letter. The letter broadly states that USDA has "determined that awards under [the ILA] program involved discriminatory preferences based on Diversity, Equity, and Inclusion (DEI) and wasteful spending that did little to further lawful agricultural land purchases." The termination further alleges that "ILA awards, including [Four Bands'] do not align with the Department's goals and priorities" because they discriminate based on immutable characteristics; do not align with Congressional intent; and expose taxpayers to fraud, waste, and abuse.

The termination letter reflects decisions to both (1) effectively cancel the ILA program and (2) terminate Four Bands' specific award. Both decisions are unlawful and should be reversed.

## I.     The termination letter argues that USDA has changed its policy positions for reasons not specific to Four Bands' award.

The termination letter indicates that USDA has made a program-wide determination that ILA awards "do not align" with agency priorities and has acted to terminate nearly all awards under the program. This decision is one of general applicability regarding the ILA program as a whole, not based on the specific facts of Four Bands' award.

This program-wide termination:

- Is contrary to law, including express congressional intent set forth in legislative authorizations for the ILA program;

---

[2] Project Narrative, at 1. The Project Narrative is appended to the end of this appeal letter.
[3] *Id.*
[4] *Id.*
[5] U.S. Dep't of Agric., Farm Service Agency, *News Release: Biden-Harris Administration Announces Intended Investment of Approximately $300 Million in 50 Projects Increasing Land, Capital, and Market Access for Underserved Producers* (July 5, 2023).

2

- Is arbitrary and capricious, including because it relied on improper factors, failed to consider important aspects of the problem, is contrary to evidence, is insufficiently reasoned, is implausible, reverses prior agency policy without adequate explanation, and/or fails to properly consider reliance interests; and

- Unlawfully applies new policy determinations retroactively.

Four Bands recognizes that, if the decision to terminate the ILA program in its entirety is the basis for terminating our individual award, NAD may determine that this termination is non-appealable as a matter of general applicability. If NAD determines that these claims are not appealable, Four Bands respectfully requests a prompt **determination of non-appealability**, in which case Four Bands may pursue these claims in district court.

In the alternative, if NAD determines that this termination is appealable to NAD, Four Bands requests a hearing before NAD. Arguments regarding Four Bands' individual award termination are briefly summarized below. Four Bands reserves the right to supplement these arguments.

## II.    Four Bands' project aligns with underlying programmatic and statutory requirements.

The termination letter broadly claims that the ILA program does not align with congressional intent. First, the letter argues that the Inflation Reduction Act ("IRA") "de-authoriz[ed]" funding for socially disadvantaged groups.[6] Second, the letter implies that providing technical assistance does not further congressional intent to improve land access.

Neither characterization is accurate. To the contrary, the stated reasons for the termination are directly at odds with the statutory purposes of the ILA program, which expressly prioritizes support for underserved producers, including through funding for *both* land access and technical assistance.

### A.    Congress did not de-authorize funding to socially disadvantaged farmers and ranchers.

As part of the American Rescue Plan Act, Congress established the ILA program to address historical and ongoing barriers faced by "socially disadvantaged" farmers and ranchers.[7] The term "socially disadvantaged" is defined in statute as individuals who "have been subjected to racial or ethnic prejudice because of their identity as members of a group without regard to their individual qualities."[8]

The IRA broadened the ILA program to serve "underserved farmers, ranchers, or forest landowners."[9] But the IRA did not in any way *prohibit* the use of funds for "socially disadvantaged" farmers. And the IRA expressly provided additional financial assistance to

---

[6] Termination Letter, at 1 (March 23, 2026).

[7] American Rescue Plan Act of 2021, Pub. L. No. 117-2, § 1006, 135 Stat. 4, 13.

[8] 7 U.S.C. § 2279(a)(5)-(6).

[9] Inflation Reduction Act of 2022, Pub. L. 117-169, § 22007, 136 Stat. 2021–22.

anyone determined to have experienced discrimination in USDA programs prior to January 1, 2021.[10]

In any event, it cannot be disputed that the farmers and ranchers that would benefit from Four Bands' award are underserved. Over a third of residents in the tribal areas of the Mountain Plains region are unbanked or underbanked. For example, the Pine Ridge Reservation has only one depository institution. From 2012 to 2017, both acres of agricultural land and the number of agricultural operations decreased in the tribal areas of the Mountain Plains Region. Agricultural operations have struggled to achieve positive revenue streams, with an increasingly small subset of producers able to achieve a profit while others operate at a loss. As explained in Four Bands' grant application, these disparities in Four Bands' service area are rooted in patterns of land ownership and complications in land status that began with the formation of the reservations over 150 years ago.

Further, although the termination letter claims the ILA program violates equal-protection principles, neither the terms nor the implementation of our award excludes any potential beneficiary based on race or any other classification.[11] Four Bands' award is only limited by geography. There is nothing in the grant application or award that precludes non-Native beneficiaries. And in practice, Four Bands does provide assistance to qualifying non-Native beneficiaries.

### B.  Congress expressly funded both technical assistance and initiatives to improve land access, and Four Bands' award would accomplish both.

The termination letter further claims that Congress "sought 'to provide grants and loans . . . to improve land access'" but "most of the awards" spent excessive money on "high overhead costs and excessive spending on outreach and technical assistance."[12]

First, Four Bands would be required to spend a relatively small portion of the award on overhead or outreach. Four Bands was a well-established institution prior to receiving this award. For this reason, Four Bands began receiving inquiries from potential beneficiaries as a result of USDA's own press release announcing its preliminary decision to award a grant to Four Bands. Because Four Bands had already engaged in extensive relationship-building and built robust programs in the region, Four Bands was poised to begin deployment of grant funds upon receiving the required agency approvals.

Second, Congress expressly directed that funding be used, in part, to provide technical assistance. In the first subsection of the IRA, Congress directed USDA to fund:

> outreach, mediation, *financial training, capacity building training, cooperative development and agricultural credit training and support, and other technical assistance* on issues concerning food, agriculture, agricultural credit,

---

[10] See *id.* § 22007, § 1006(b), (e), 136 Stat. 2022–23.

[11] The assertion that the program violates equal-protection principles is also incorrect.

[12] Termination Letter, at 2.

4

agricultural extension, rural development, or nutrition to underserved farmers, ranchers, or forest landowners . . . .[13]

USDA's subsequent Notice of Funding Opportunity solicited proposals that would "respond to land, capital, and market access needs of the target audience *while concurrently providing wraparound technical assistance* to ensure that program participants have the information, training, and customized support they require."[14] The Notice recognized that underserved farmers often lack access to technical assistance, which is a key component of ensuring land, market, and capital access overall.[15]

Even so, Four Bands' award focused heavily on land access. The grant would provide over $6.6 million for land purchases.[16] By combining technical assistance with land purchases, Four Bands has historically been able to facilitate increased profitability, access to a variety of financial products, and improvement in agricultural business planning—ensuring *continued* access to land, capital, and markets.[17] This sound practice aligns with express congressional intent. It also sets a trajectory for financial independence, ultimately decreasing the need for future assistance.

In summary, Four Bands' project was designed to fulfill the mandates and priorities outlined by Congress and USDA. USDA reviewed, approved, and funded Four Bands' project based on those statutory and programmatic criteria, which are reflected in Four Bands' executed agreement. And Four Bands has taken steps to implement our program in accordance with the approved scope of work and applicable program rules.

Rather than considering the specifics of Four Bands' award, the termination letter mischaracterizes the criteria governing the ILA program. It also effectively penalizes Four Bands for designing a project based on those criteria. Accordingly, the termination violates the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) and (C).

### III.    The termination letter incorrectly characterizes Four Bands' award as a race-based initiative and does not consider the nature of the barriers the award was designed to address.

The termination letter states that USDA prioritizes "color-blindness," that USDA "should never pick winners . . . based on immutable characteristics like race," and that "the vast majority of projects across the ILA program violated equal protection principles by selecting beneficiaries

---

[13] IRA § 22007, § 1006(a), 136 Stat. 2022.

[14] Notice of Funding Opportunity, at 2 (emphasis added).

[15] *Id.* at 6-7. The Notice recognized: "One method to support and *increase access to land* is to provide wrap around technical assistance and support services such as business development, tax training, legal services for resolution of land title issues, etc. which are essential to effectively provide meaningful and sustained access to land, capital, and markets." *Id.* at 13 (emphasis added).

[16] Project Narrative, at 5.

[17] *Id.* at 11.

5

based on race, ethnicity, sexual orientation, or sex."[18] The assertions that the program violates equal-protection principles are unsupported and incorrect.

Further, the termination letter does not articulate any specific reason that the grant awarded to Four Bands, or Four Bands' implementation of the award, would violate equal protection. Rather, the letter makes broad, unsupported statements about USDA's ILA program in a general sense. This lack of a specific, reasoned basis alone is a basis to reverse the termination.

There are factors unique to Four Bands' grant that USDA did not consider whatsoever. Our grant was intended to address barriers to agriculture in "tribal areas."[19] There are specific barriers to accessing land and capital due to the *legal status* of these lands.[20] And the vast majority of producers accessing our services are members of federally recognized tribes. It is well established that this is a political, not race-based, status.[21] Consistent with this principle, USDA expressly recognized in May 2025 that "[t]he Department's unique government-to-government relationship with . . . American Indian Tribal citizens . . . are legally distinct from policy-based Diversity, Equity, and Inclusion programs such as those covered by [recent] executive orders."[22]

Four Bands' grant application demonstrates why these legal distinctions are important. Our service area includes twenty Indian reservations[23] and one-third of the trust lands in the United States.[24] These lands are subject to unique barriers to land acquisition and development, including agricultural development, that arise from specific federal policies related to Indian lands.[25] The federal government has recognized that promoting self-sufficiency in Indian country is an important component of federal Indian policy today—and part of the federal trust responsibility.[26] Four Bands' project was specifically designed to address the challenges associated with farming on reservation lands, including the large amount of land held in trust by the federal government.[27]

As discussed above, Four Bands' project, and Four Bands' lending in general, is not exclusive to Native Americans. In issuing Four Bands' award, however, USDA recognized that there are unique complications in Four Bands' service area that this award would address. These considerations are based on political classifications and legal frameworks. Yet, the

---

[18] Termination Letter, at 1-2.

[19] Project Narrative, at 1.

[20] *Id.* at 3.

[21] *Morton v. Mancari*, 417 U.S. 535, 555 (1974).

[22] USDA Office of the Secretary, *Clarifying the Application of Certain Executive Orders to Federally Recognized Indian Tribes, American Indian Tribal Citizens, and the Native Hawai'ian Community,* Secretary's Memorandum 1078-010 (May 5, 2025).

[23] Project Narrative, at 1.

[24] *Id.* at 3-4.

[25] *Id.*

[26] *See, e.g., Morton,* 417 U.S. at 541-42 (discussing the use of Indian preferences to further self-determination as an aspect of the federal trust responsibility).

[27] Project Narrative, at 3.

termination letter's misplaced discussion of equal-protection principles gives no consideration to the political and legal status of tribal producers or tribal lands.

### IV.    The termination is arbitrary, capricious, procedurally deficient, and unsupported by substantial evidence.

The termination is arbitrary and capricious, without observance of required procedures, and unsupported by substantial evidence in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (D) and (E). USDA previously *encouraged* and approved projects like Four Bands' through its funding announcements and award process. The agency now penalizes Four Bands for implementing USDA's articulated priorities without providing any reasoned explanation. Nor does the agency set forth any allegations that Four Bands has failed to comply with the terms or conditions of the award.

Indeed, the termination letter fails to conduct any individualized assessment of Four Bands' project. The termination letter instead relies on generalized concerns about the ILA program as a whole. The letter is devoid of any mention, let alone discussion, of Four Bands' specific activities, expenditures, compliance, or outcomes. The sole statement regarding Four Bands' execution of our program is a mention of Four Bands' "partnership with the Mountain Plains Regional Native CDFI Coalition, Native American Agriculture Fund (NAAF), and Intertribal Agriculture Council (IAC)." The letter contains no mention of the steps that Four Bands had taken to implement the program. And it does not explain whatsoever how our project would violate program requirements or statutory authority.

Overall, the termination decision is arbitrary and unsupported because it:

- **Fails to analyze Four Bands' specific project.** The letter does not mention any specifics about Four Bands' project other than a reference to Four Bands' partnerships. The letter does not explain the relevance of these partnerships to the termination decision. And the letter says nothing about Four Bands' execution of the program or program beneficiaries. The letter does not consider whether, or how, activities undertaken pursuant to Four Bands' award would give rise to any of the concerns stated in the letter.

- **Relies on generalized claims** without applying them to Four Bands' award. For example, the letter:

  o Asserts the ILA program involves impermissible "preferences" or discrimination, but it fails to identify any specific activity within Four Bands' project that would violate applicable law, regulation, or program requirements.

  o Makes general assertions about waste, inefficiency, and overspending in the ILA program, without explaining how Four Bands' project would violate laws or program requirements. The letter describes "[i]nstances of excessive or frivolous expenditures - such as purchasing gazebos, massages, a camper/RV, and oversized office supply budgets (in one case, over $130,000)." These allegations relate to unspecified programs that are entirely unknown to Four

7

Bands. Four Bands has not made any such expenditures using our ILA grant funding.

- ○ Makes general statements that ILA awardees were not able to achieve land access. To the contrary, Four Bands has a track record of facilitating land access and had designed specific, detailed measures to expand land access in the project area using the awarded grant funds. For over a year prior to award termination, Four Bands sought approvals from USDA, only to be told that USDA staff was awaiting guidance from leadership. Accordingly, Four Bands' inability to provide assistance for land access under the program was entirely due to the agency's own delays.

- **Mischaracterizes Four Bands' project without evidence** and fails to explain how Four Bands' specific project is unlawfully discriminatory. As explained above, the termination letter entirely fails to consider non-race-based barriers to land access that would be addressed by Four Bands' award. Nor has USDA considered that the award was not restricted to specific groups.

- **Attempts to apply new terms and policies retroactively,** including Secretary's Memorandum 1078-021, "Establishment of USDA General Terms and Conditions for Grants, Cooperative Agreements, and Similar Arrangements" (December 2025). Four Bands' award is not governed by these updated general terms and conditions, and no formal amendment was executed to apply those terms to our award. Additionally, the letter fails to set forth sound reasons for the new policy.

- **Fails to explain why alternatives to termination were not feasible.** Although the termination letter states that alternatives were considered, it provides no reasoned explanation for why modification or corrective action was not pursued. The decision to terminate Four Bands' award in its entirety is overly broad and unsupported.

- **Fails to meaningfully consider reliance interests**. The letter acknowledges reliance interests but does not explain what specific reliance interests were considered, how those interests were evaluated, or why termination was nonetheless appropriate.

Even if USDA is reconsidering broader priorities, it must still apply governing law and contractual requirements to Four Bands' award. The termination letter does not do so.

## V.    Equitable relief is warranted.

Equitable relief is warranted under 7 U.S.C. § 7996, 7 U.S.C. § 6998(d), and 7 C.F.R. § 11.9(e). The termination of Four Bands' award is not based on any allegations or findings that Four Bands failed to comply with program requirements. Rather, it reflects a subsequent shift in agency interpretation or priorities applied after the award was made and work toward implementation had begun.

8

Four Bands relied in good faith on USDA's approval and executed agreement. Accordingly, the award termination would impact Four Bands—and producers in the tribal areas of the Mountain Plains Region—in multiple ways, including the following.

- **Reliance on the award has affected the amount and diversity of other funds in Four Bands' current and future portfolio.** Because Four Bands believed it was receiving this substantial federal award and incurring corresponding responsibilities associated with the award, Four Bands declined to pursue other funding opportunities that we would have been likely to receive. Thus, the termination would affect, for years to come, both (1) the amount of money that Four Bands would have been able to access and (2) Four Bands' ability to diversify our portfolio.

- **Reputational damage** potentially affecting future funding opportunities. Four Bands' reputation with both constituents and funders is crucial to Four Bands' viability and ongoing ability to implement successful programs. When funders learned of the award termination, Four Bands began receiving inquiries as to its ongoing financial viability. The sudden loss of promised funds also makes potential future investors nervous. Thus, the termination negatively impacts Four Bands' relationship with existing investors/funders and our ability to attract new investors/funders in the future.

- **Numerous beneficiaries who would have accessed land for the first time have given up.** When USDA advertised its preliminary decision to fund Four Bands' program, Four Bands immediately began receiving inquiries from multiple constituents. These producers, or would-be producers, had never dreamed that they could access land themselves, but the advertisement of the program made them believe for the first time that it was possible. Now that they have heard the program is being terminated, many believe land access is no longer possible and are giving up on their pursuit.

- **Loss of capital through the revolving loan fund.** Through termination of the grant, the agency has damaged Four Bands in the amount of the grant dedicated to the revolving loan fund by removing Four Bands' opportunity to secure a stable form of institutional capital for revolving lending consistent with the grant purposes.

- **Loss of revenue through the collection of interest and fees.** Had Four Bands' award not been terminated, Four Bands would have realized interest and fees associated with lending through the revolving loan fund that we could have used toward eligible expenses. The agency's termination of the grant has damaged Four Bands by removing any access to these revenues that we expected to fund future programs.

Accordingly, equitable relief is necessary to prevent Four Bands from being penalized for circumstances beyond our control.

## VI.    Conclusion and relief requested.

To remedy this unlawful grant termination, Four Bands respectfully requests an evidentiary hearing and the following relief from NAD:

1.  Reinstatement of Four Bands' grant award in full, including an extension of time to allow completion of all deliverables delayed as a result of the agency's misactions;

2.  In the alternative, modifications or corrective action rather than termination, including an extension of time to allow completion of all deliverables under the modified or corrected agreement; and

3.  Equitable relief as appropriate.

Please confirm receipt of this appeal letter. Thank you for your time and consideration.

Sincerely,

Lakota Vogel
Executive Director
Four Bands Community Fund

# Exhibit D



**UNITED STATES DEPARTMENT OF AGRICULTURE**
**OFFICE OF THE SECRETARY**
**NATIONAL APPEALS DIVISION**

April 29, 2026

**XXXXX**
**XXXXX**
**XXXXX**
**XXXXX**

RE:    <u>NAD Case No. 2026W000311</u>

Dear **XXXXX**:

This letter responds to the appeal you filed with the National Appeals Division (NAD) challenging a decision issued by the Farm Service Agency (FSA) on March 23, 2026, to terminate your federal grant, (*Increasing Land and Capital Access for the* **XXXXX**), under the Increasing Land, Capital, and Market Access (ILA) program. Although FSA's adverse decision includes appeal rights, NAD ultimately determines whether a matter is appealable to our division.

In its decision, FSA noted that "the United States Department of Agriculture (USDA) has determined that the awards under this program involved discriminatory preferences based on Diversity, Equity and Inclusion (DEI) and wasteful spending that did little to further lawful agricultural land purchases." FSA further explained that the ILA awards, including yours, did not align with USDA's goals and priorities because: (i) ILA awards discriminated based on immutable characteristics; (ii) ILA awards did not align with congressional intent; and (iii) the ILA award structure unacceptably exposed taxpayers to fraud, waste, and abuse. FSA noted that USDA should not pick winners based on immutable characteristics, most of the awards did little to improve land access, and the program enabled spending inconsistent with sound public policy or market logic.

In your appeal request, you disagree with FSA's decision and believe such decision cancelling the program and terminating your specific project is unlawful and should be reversed. Among other arguments, you contend the decision is contrary to Congressional authorization, is arbitrary and capricious, and unlawfully applies new policy interpretations to existing agreements.

NAD's implementing regulations codified at 7 C.F.R. Part 11, provide the relevant authority for determining whether an agency's decision is appealable to NAD. Pursuant to 7 C.F.R. § 11.6(a)(2), the NAD Director "shall determine whether the decision is adverse to the individual participant and thus appealable or is a matter of general applicability and thus not subject to appeal …." There are two components to making an appealability determination. First, the decision must be adverse to the program participant. Second, the decision must be based on an individual application of the program rather than a generalized application. Thus, program participants may not seek NAD review of agency regulations or statutory provisions that establish basic program requirements or eligibility criteria. *See* 7 C.F.R. § 11.3(b) (clarifying that the NAD appeals process may not be used to seek review of statutes or USDA regulations issued under federal law). On the other hand, program participants may seek review of decisions that are based on an individual application of an agency's regulations, policies, or specified criteria.

In this case, the first prong of the appealability determination is met because FSA's decision is adverse to you. NAD's regulations codified at 7 C.F.R. § 11.3(a)(1) make clear that the term "adverse decision" is intended to include administrative decisions made by an agency denying participation in, or receipt of benefits under, certain agency programs. Thus, FSA's decision terminating your grant is adverse to you.

However, the second prong of the appealability determination--whether the matter is one of general applicability--supports the conclusion that this matter is not subject to a NAD appeal. FSA's decision is not based on the individual application of specific program criteria. Instead, your grant termination is based on the general policy priorities of USDA and its decision to cancel the ILA program. The Secretary of Agriculture has determined that this program, and awards made thereunder, no longer support USDA priorities.

Therefore, in accordance with 7 C.F.R. § 11.6(a)(2), I have made the following final determination:

**FSA's March 23, 2026, decision terminating your ILA grant is not appealable because it concerns matters of general applicability.**

Accordingly, I decline to accept your request for an appeal of FSA's decision.

Sincerely,

/S/


Jennifer K.M. Nicholson
Acting Director