# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| URBAN SUSTAINABILITY DIRECTORS NETWORK, *et al.*, | |
| Plaintiffs, | Civil Action No. 25-1775 (BAH) |
| v. | Judge Beryl A. Howell |
| UNITED STATES DEPARTMENT OF AGRICULTURE, *et al.*, | |
| Defendants. | |

## MEMORANDUM OPINION

Plaintiffs, four nonprofit organizations involved in agriculture and ecology-related projects, were granted a preliminary injunction in August 2025 on their challenge, under the Administrative Procedure Act ("APA), 5 U.S.C. §§ 551 *et seq.*, to the termination of five grants awarded by the United States Department of Agriculture ("USDA") and several component agencies (collectively, "defendants"), though such relief was denied as to plaintiffs' broader challenge to "defendants' alleged broader 'policy, pattern, and practice of unlawfully terminating' *en masse* 'hundreds of grants' due to changes in agency priorities driven by certain executive orders, notwithstanding the grants' fulfillment of the purposes set out in authorizing statutes and appropriations acts." *Urb. Sustainability Dirs. Network v. U.S. Dep't of Agric.*, No. 25-cv-1775 (BAH), 2025 WL 2374528, at *1 (D.D.C. Aug. 14, 2025) (quoting First Am. Compl. ("FAC") ¶¶ 1-3, 11-31, 46-96, ECF No. 10). Since the enjoining of termination of plaintiffs' own grants, defendants have produced, with two supplementations, an administrative record that plaintiffs now contend is insufficient to describe the alleged agency-wide policy that resulted in the allegedly improper terminations of hundreds of federal grants beyond those awarded to plaintiffs. *See* Pls.'

Mot. to Suppl. Admin R. ("Pls.' Mot. to Suppl."), Att. 1, Pls.' Mem. in Supp. of Mot. to Suppl. Admin. R. ("Pls.' Mem.") at 3, ECF No. 55-1.

For their part, defendants maintain that "the terminations were effectuated based on an individualized review" and that "the record reveals that grants were not terminated *en masse*," so no undisclosed agency-wide policy resulting in automatic termination of funding exists for which further supplementation of the administrative record is warranted. Defs.' Mem. in Opp'n to Pls.' Mot. to Suppl. Admin. R. ("Defs.' Opp'n") at 16, ECF No. 56. Defendants' position rests on the premise of "trust us" as to what the record may show, despite the evidence marshalled by plaintiffs to the contrary. As plaintiffs point out, the record compiled so far by defendants ignores the fact that plaintiffs challenge both the terminations of their own grants as well as defendants' adopted policy and, by limiting the record to only the former challenge, defendants "seek to unilaterally nullify the [policy-based] claims by refusing to produce a record that covers them." Pls.' Reply in Supp. of Mot. to Supp. Administrative R. ("Pls.' Reply") at 3-4, ECF No. 57. To the extent defendants' effort to limit the administrative record is designed to defeat claims simply by declining to produce records that may help establish the veracity of the underlying factual allegations, this strategy will not be condoned by this Court.

Additionally, when defendants, throughout their briefing, emphasize that "[e]ach day the preliminary injunction remains in place is a day that Defendants are forced to fund grants inconsistent with their policies," Defs.' Opp'n at 22, they appear to lose sight of the fact that whether those grants are consistent with the current policies of the executive branch is only one of the concerns in assessing the legality of the grant terminations since such terminations must also comport with the law. After all, as members of the Executive Branch, defendants are obliged to "take Care that the Laws be faithfully executed," U.S. CONST. art II, § 3, cl. 4, and, accordingly,

their discretion to award and terminate grants is circumscribed by statute, including the APA and legislative instructions authorizing grant-making as set out by Congress, the entity in which the power to legislate and appropriate funds is vested, *see id.* art I, § 9, cl. 7.  The prior memorandum opinion in this case already reminded that "[d]efendants flout Congress's mandates . . . when they terminate grants for the very reason that the grants further the aims Congress explicitly instructed defendants to pursue."  *Urb. Sustainability*, 2025 WL 2374528, at *33.  In short, defendants lack boundless executive branch authority to terminate grants authorized by and implementing statutory purposes set out by Congress.

For the reasons explained below, plaintiffs' motion to supplement the administrative record is granted in part and denied in part, while their motion for sanctions at this juncture is denied.

## I.    BACKGROUND

The factual background and procedural history relevant to the pending motion are described below.

### A.    Factual Background

This lawsuit was initiated by "five nonprofit organizations, Urban Sustainability Directors Network ('USDN'), Oakville Bluegrass Cooperative ('OBC'), Agroecology Commons ('AC'), the Providence Farm Collective Corp. ('PFC'), and the Institute for Agriculture and Trade Policy ('IATP')," all of which "received federal awards, under various statutorily authorized federal programs, from the USDA or its components that were unexpectedly terminated during from March through July of 2025, after the Trump administration announced changes in policy priorities."  *Urb. Sustainability*, 2025 WL 2374528, at *2.  "[T]hese programs and the federal awards supporting them cover a broad range of issues that create jobs and support community, agricultural, and rural development," and "[t]he programs range from supporting local urban

forestry, to addressing food insecurity, to incentivizing the adoption of more environmentally friendly agricultural practices." FAC ¶ 47.

"The parties agree that these terminations were the outgrowth of at least two executive orders issued by President Trump shortly after he took office for his second term," *Urb. Sustainability*, 2025 WL 2374528, at *4, namely: (1) Executive Order 14151, "Ending Radical and Wasteful Government DEI Programs and Preferencing," which instructed the Director of the Office of Management and Budget ("OMB"), "assisted by the Attorney General and the Director of the Office of Personnel Management," to "coordinate the termination of all discriminatory programs, including illegal DEI and 'diversity, equity, inclusion, and accessibility' (DEIA) mandates, policies, programs, preferences, and activities in the Federal Government, under whatever name they appear," 90 Fed. Reg. 8339, 8339 (Jan. 20, 2025); *see Urb. Sustainability*, 2025 WL 2374528, at *4; and (2) Executive Order 14222, "Implementing the President's 'Department of Government Efficiency' Cost Efficiency Initiative," which instructed agency heads, "in consultation with the agency's DOGE Team Lead," to "review all existing covered contracts and grants and, where appropriate and consistent with applicable law, terminate or modify (including through renegotiation) such covered contracts and grants to reduce overall Federal spending or reallocate spending to promote efficiency and advance the policies of my Administration," 90 Fed. Reg. 11,095, 11,095-96 (Feb. 26, 2025); *see Urb. Sustainability*, 2025 WL 2374528, at *4.[1]

---

[1] "Plaintiffs also point to two other executive orders as driving the termination decisions made here: Executive Order 14173, 'Ending Illegal Discrimination and Restoring Merit-Based Opportunity,' 90 Fed. Reg. 8,633, 8,634 (Jan. 31, 2025), which instructs agency heads to 'excise references to DEI and DEIA principles . . . from Federal acquisition, contracting, grants, and financial assistance procedures,' and Executive Order 14154, 'Unleashing American Energy,' 90 Fed. Reg. 8,353, 8,353-54, 8,357 (Jan. 29, 2025), which instructed agencies to 'immediately pause the disbursement of funds appropriated through the Inflation Reduction Act of 2022' and review grants for 'consistency with the' new policy of prioritizing domestic energy production." *Urb. Sustainability*, 2025 WL 2374528, at *4 n.2 (citing Pls.' Mot. for Prelim. Inj., Att. 1, Pls.' Statement of P. & A. in Supp. of Their Mot. for Prelim. Inj. at 13, ECF No. 14-1).

In accordance with these directives, the Secretary of Agriculture released a press statement in mid-February 2025 about thousands of grants being subject to review, and then the next month touting in a press release that she had cut "wasteful spending" and saved "American taxpayers millions." *Id.* at *5 (quoting Press Release No. 0023.25, *Secretary Rollins Takes Bold Action to Stop Wasteful Spending and Optimize USDA to Better Serve American Agriculture*, USDA (Feb. 14, 2025), https://perma.cc/Z5Y5-ZD64, and Press Release No. 0049.25, *Secretary Brooke Rollins Takes Bold Action in First 30 Days at USDA*, USDA (Mar. 13, 2025), https://perma.cc/4FBR-AHXY).  To effectuate the grant terminations, the Secretary released guidance in two memoranda issued on March 13, 2025.  *Id.*  The first, "Directive on Conservation and Natural Resources Priorities," directed that "all USDA agencies and staff offices that issue awards must conduct an internal review of all active awards" to ensure "that the Department does not fund programs or organizations that promote or take part in climate change or environmental justice initiatives that are either contrary to law or to the Department's policy objectives" and "that all awards are free from fraud, abuse, and duplication" by terminating such grants "in whole or in part or otherwise modified to minimize the scope of the Department's obligations."  USDA Secretary's Memorandum 1078-003 (Mar. 13, 2025), https://perma.cc/CE9Y-LCFH; *see Urb. Sustainability*, 2025 WL 2374528, at *5.

The second memoranda released that day, "Directive on Departmental Grant and Cooperative Agreement Priorities," defined as a priority "ensuring that the Department's grants, cooperative agreements, and other similar arrangements, including mutual interest agreements . . ., do not support programs or organizations that promote or take part in diversity, equity, and inclusion ('DEI') initiatives or any other initiatives that discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic" and stated that grants inconsistent

5

with this priority "shall, to the extent permitted by applicable law, be terminated, in whole or in part, or otherwise modified in accordance with any applicable regulations and notice and procedural requirements in the relevant award, agreement, or other instrument."  USDA Secretary's Memorandum 1078-004 (Mar. 13, 2025), https://perma.cc/36P6-E7M9; *see Urb. Sustainability*, 2025 WL 2374528, at *5.  Plaintiffs' received letters indicating that their grants had been terminated "before and in the months following the issuance of the Secretary's March 13, 2025, memoranda."  *Urb. Sustainability*, 2025 WL 2374528, at *5.

### B.    Procedural Background

Plaintiffs pursued administrative appeals of their grant terminations, but "anticipating that no relief would be forthcoming from the agency," "USDN, OBC, and AC filed a complaint before this Court on June 5, 2025, and after being joined by PFC and IATP, filed the operative first amended complaint on June 24, 2025."  *Id.* at *9.  They allege that "[i]n an apparent effort to effectuate the President's sweeping Executive Orders in as quick a manner as possible regardless of the legality of their conduct, Defendants adopted the policy, pattern, and practice at issue here, terminating awarded grants without individualized review but rather based on vague allegations that the projects were not aligned with the President's newly stated goals of eliminating funding for DEI and climate initiatives—without any effort to determine whether the projects could be brought into line."  FAC ¶ 132.  Consequently, plaintiffs sought both vacatur of the termination of their own awards and relief enjoining defendants "from giving effect to or maintaining award terminations of . . . all other[ awards] enacted pursuant to Defendants' policy, pattern, and practice."  FAC pg. 61 (Requests for Relief).

Two days later, on June 26, 2025, plaintiffs sought a preliminary injunction, *see* Pls.' Mot. for Prelim. Inj., ECF No. 14, challenging "a widespread policy and practice of unlawfully terminating hundreds of grants issued to nonprofit organizations, farmers, ranchers, universities,

cities, and states," through "minimally edited, boilerplate form letters," Pls.' Statement of P. & A. in Supp. of Their Mot. for a Prelim. Inj. at 1-2, ECF No. 14-1. Simultaneously, plaintiffs sought "an order from this Court allowing them to conduct limited expedited discovery," reasoning that "Defendants have not publicly divulged the processes by which they arrived at mass, formulaic terminations of grant awards across multiple programs and subagencies using the same alleged justification," so "[u]nlike rulemakings and administrative adjudications, there is no published administrative record of Defendants' mass terminations, and any ad hoc administrative record offered by Defendants will shed little, if any, light on the scope." Pls.' Mot. for Expedited Disc. & Statement of P. & A. in Supp. ("Pls.' Mot. for Expedited Disc.") at 1-2, ECF No. 15. Plaintiffs expressed concern that "this case will not contain a typical administrative record about how and why Defendants terminated grant awards *en masse*. . . . because it appears Defendants' unlawful policy, pattern, and practice was guided by forces outside USDA, including DOGE." *Id.* at 4-5. Thus, they requested information concerning the process behind creating the policy of terminating grants as well as a list of those grant recipients whose termination notices contained similar language to those of plaintiffs. *Id.* at 5-6.[2] At the hearing held on August 6, 2025, regarding the then-pending motions for preliminary injunctive relief and expedited discovery, the Court expressed that "it just seems premature in an APA case to be seeking an expedited discovery at

---

[2]    Specifically, plaintiffs sought to pose two interrogatories to defendants: "(1) a description of the process by which Defendants identified and decided to terminate or did terminate Plaintiffs' Grants and any other grants for failing to effectuate or otherwise align with USDA's current priorities—the stated rationale for the terminations— including the creation of the newly articulated priorities, the conclusion that alleged noncompliance with the priorities was an appropriate basis for termination, the search for and identification of grants for potential termination on that basis, the assessment of the identified grants for compliance with the new priorities, and any other analyses of whether and when to terminate all identified grants; and (2) a list of all grant recipients who received termination notices containing language similar or equivalent to the termination letters received by Plaintiffs, and the grants impacted by those terminations." *Id.* at 5. They also sought two requests for production: "(1) all documents regarding the creation, development, and execution of Defendants' policy, practice, or process of terminating grants on the basis that they no longer effectuate agency priorities, including the decision to issue the termination notices received by Plaintiffs, and (2) all records Defendants rely on in answering the two interrogatories." *Id.* at 6.

this point" before the compilation and production of an administrative record.  Hr'g Tr. (Aug. 6, 2025) at 64:13-14, ECF No. 36.  In the face of this concern, defendants assured the Court that the "administrative record would go into the reasoning behind the termination of plaintiffs' grants" and that "if [plaintiffs] think the administrative record is incomplete, they can file a motion to supplement it at that time."  *Id.* at 66:24-67:3.

About one week later, the Court "preliminarily set aside and vacated under the APA" the terminations of plaintiffs' six individual grants but otherwise denied plaintiffs' preliminary injunction relief as to "the alleged policy ["of perfunctory, unreasoned terminations"] . . . due to the difficulties of identifying on the current record the specific grant terminations that are part of the *en masse* implementation of that policy."  *Urb. Sustainability*, 2025 WL 2374528, at *27, *39. Plaintiffs' motion for expedited discovery was denied because "until that [administrative] record is produced, plaintiffs cannot demonstrate 'a strong showing of bad faith' or that the 'record is so bare as to frustrate judicial review' to support their need for further discovery" and because "defendants gave assurance at the motions hearing that the administrative record would include what plaintiffs have requested in their discovery motion, as well as materials reflecting 'the process' defendants took when evaluating the grants at issue."  *Id.* at *40 (quoting *Cmty. for Creative Non-Violence v. Lujan*, 908 F.2d 992, 997-98 (D.C. Cir. 1990)).  This decision took pains to "clarify for defendants that plaintiffs are challenging the implementation of an alleged policy, derived from the Secretary's March 13, 2025 memoranda, and resulting in defendants' actions to terminate, from about March to July 2025, possibly hundreds of grant awards that were fulfilling the objectives of the grant and statutory authorizations under which the grants were awarded and were in compliance with the terms or conditions of the awards, but terminations were nonetheless abruptly made due to a change in agency priorities for which no reasoned explanation was

communicated to grant recipients, who also were not offered technical assistance or an opportunity to address any alleged problems prior to termination" and that "[t]his is indeed a reviewable agency action and thus should be conducive to the production of a fulsome administrative record." *Id.* at *40 n.19.

Defendants filed an answer to the complaint on August 29, 2025, *see* Answer, ECF No. 35, and provided notice of the contents of the administrative record on September 17, 2025, *see* Certification of Admin. R., ECF No. 37. In response to plaintiffs' concerns about "perceived deficiencies" in the administrative record, Joint Resp. to O.S.C. & Status Rep. at 2, ECF No. 38, defendants "determined that many of these items can be added," *id.*, and were thus directed "to produce the supplemental administrative record within three weeks (21 days) of the conclusion of" the then-occurring "government shutdown," Minute Order (Oct. 2, 2025).[3] Funding for the federal government was restored on November 12, 2025, and, accordingly, the supplemental administrative record was due by December 4, 2025.[4]

On December 16, 2025, defendants moved for an extension of time *nunc pro tunc* to supplement the administrative record, explaining that "[d]ue to the lapse in appropriations, limited staffing, and some confusion about the types of records that would be required to satisfy Plaintiffs' concerns, the Department of Agriculture was unable to produce a supplemental administrative record by the Court-ordered deadline" and, further, that defendants "had misinterpreted the order and did not understand it to be the type of order that would require a motion in order to extend." Defs.' Mot. for Extension of Time, Nunc Pro Tunc, to Suppl. the Admin. R. at 2, ECF No. 43.

---

[3]    A lapse in federal appropriations between October 1 and November 12, 2025, resulted in the staying of filing and discovery deadlines imposed against the United States and its federal agencies in civil cases. *See* D.D.C. Standing Order No. 25-55 (JEB) (Oct. 1, 2025); D.D.C. Standing Order No. 25-59 (JEB) (Nov. 13, 2025).

[4]    On December 5, 2025, plaintiff OBC voluntarily moved to dismiss its claims, *see* Pl.'s Consent Mot. to Voluntarily Dismiss Claims of Oakville Bluegrass Cooperative, ECF No. 42, and OBC was terminated from the action, *see* Minute Order (Dec. 5, 2025).

Plaintiffs opposed this extension, emphasizing that a December 4, 2025, email from defendants to plaintiffs indicated that defendants "understood they had a deadline to supplement" and "[a]t the parties' December 9, 2025, meet and confer, Defendants never mentioned that they misunderstood that December 4, 2025, was their deadline to supplement the Administrative Record"; that the lapse in appropriations did not explain why defendants' initial production, which occurred before the lapse, was deficient; that the administrative record "did not certify that it contained all (or even any) documents relevant to Defendants' agency-wide policy alleged by Plaintiffs, other than those relevant to Plaintiffs' terminations"; and that the administrative record did not include "a USDA policy document that both proved the existence of other documents and itself should have been in the Administrative Record." Pls.' Opp'n to Defs.' Mot. to Extend & Request for Sanctions at 3-5 ("Pls.' Mot. for Sanctions"), ECF No. 44; *see* Pls.' Reply in Supp. of Mot. for Sanctions ("Pls.' Reply in Supp. of Sanctions"), Ex. D, Letter from Holly Bainbridge, FarmSTAND Att'y, to Assistant U.S. Att'y (Nov. 13, 2025), ECF No. 48-5 (containing the USDA policy flow chart). Plaintiffs further requested "an adverse inference that Defendants terminated all DEI- and climate-related grants based solely on the presence of DEI- and climate-related search terms in grant documents." Pls.' Mot. for Sanctions at 9. The same afternoon that the motions for an extension of time and for sanctions became ripe, defendants were directed to produce the supplemental administrative record by December 22, 2025, the parties were directed to file jointly a status report by January 26, 2026, and judgment was reserved on plaintiffs' motion for sanctions. Minute Order (Dec. 18, 2025). The day after entry of this order, defendants supplemented the administrative record, on December 19, 2025, and, again, on January 25, 2026. *See* Certifications of Admin. R., ECF Nos. 51, 53.

10

In the January 26, 2026, joint status report, plaintiffs expressed continued dissatisfaction with the supplementation of the administrative record as "[n]either supplement produces the documents that the Court instructed and Defendants represented to Plaintiffs and the Court they would," Joint Status Report at 1, ECF No. 54, and therefore anticipated filing "a motion for sanctions or supplementation of the administrative record," *id.* Defendants denied any "basis for sanctions" and further stated that "[t]he court never ordered or otherwise 'instructed' Defendants to include a particular document in the administrative record." *Id.* at 3. After highlighting that "[t]o demonstrate that sanctions are merited, plaintiffs must first raise reasonable, non-speculative grounds to establish that the present administrative record is underinclusive" only after which "can the extent, if any, of defendants' misconduct be ascertained," this Court entered a scheduling order for briefing on plaintiffs' motion to compel supplementation of the administrative record. Scheduling Order (Jan. 29, 2026). Plaintiffs' motions for supplementation and for sanctions in the form of adverse inferences are now ripe.[5]

On April 2, 2026, plaintiffs notified the Court that "in late-March 2026 Defendants terminated 49 of the 50 'Increasing Land, Capital, and Market Access Program' ('ILCMAP') grants," that "Defendants have admitted that these ILCMAP terminations are part of the same policy over which Plaintiffs are litigating" because "termination letters sent to ILCMAP awardees

---

[5]    To facilitate resolution of this motion, defendants were directed to produce excerpts of the portions of administrative record that defendants identified as corresponding to pages concerning the alleged agency-wide policy at issue, *see* Minute Order (May 19, 2026); Defs.' Certification of Admin. R., Index, ECF No. 37-1 (identifying pages 1-40 as corresponding to "Regulations, Memoranda, and E-mails"); Defs.' Certification of Suppl. Admin. R., Index, ECF No. 51-1 (identifying pages 347-58 as corresponding to "Regulations, Memoranda, and E-mails"); Defs.' Certification of Suppl. Admin. R., Index, ECF No. 53-1 (identifying pages 593-97 as corresponding to "Regulations, Memoranda, and E-mails"); Defs.' Opp'n at 12 (identifying pages 395, 399-400 as "non-privileged documents demonstrating involvement by the Department's DOGE team in these termination decisions"), and defendants have filed those excerpts, *see* Defs.' Not. of Filing Admin. R. Excerpts ("AR"), ECF No. 60. No joint appendix with the cited contents of the AR has been filed by the parties and thus the only contents of the AR presented to the Court for purposes of resolving the pending motions are those portions submitted by defendants at the Court's direction and plaintiffs in their motion, *see* Pls.' Mot., Exs. A, B, E, ECF Nos. 55-3, 55-4, 55-7 (containing Bates numbered documents from the AR).

state that the terminations were undertaken pursuant to the policy to effectuate Secretary Rollins'

March 13, 2025, anti-DEI memorandum," and that the "termination letters state that the Secretary

has issued a newer memorandum, in December 2025, regarding the agency's anti-DEI policy that

supports these terminations, Memorandum 1078-021, 'Establishment of USDA General Terms

and Conditions for Grants, Cooperative Agreements, and Similar Arrangements.'"  Pls.' Not. of

Factual Dev. Related to Gaps in the Admin. R. ("Pls.' Not. of Factual Dev.") at 1-2, ECF No. 58.[6]

## C.    Pending Appeal

The two pending motions for supplementation of the administrative record and for

sanctions in this case are under consideration at a time while an appeal is pending of the

preliminary injunction order.  Specifically, on October 10, 2025, defendants filed an appeal of the

preliminary injunction order, *see* Defs.' Not. of Appeal, ECF No. 39, which appeal has been held

in abeyance, at plaintiffs' request with no objection from defendants, pending decisions in *Vera*

*Institute of Justice v. U.S. Department of Justice*, No. 25-5248 (D.C. Cir. argued Oct. 14, 2025),

and *Climate United Fund v. Citibank, N.A.*, No. 25-5122 (D.C. Cir. reh'g en banc granted Dec. 17,

2025), *see* Clerk's Order, *U.S. Dep't of Agric. v. Urb. Sustainability Dirs. Network*, No. 25-5370

(D.C. Cir. Dec. 5, 2025).  Plaintiffs apparently persuaded the D.C. Circuit that "[t]he central

question of many of these cases is whether the district court has jurisdiction over disputes involving

APA and *ultra vires* claims related to the termination of federal grants" and that "[t]hough

Plaintiffs do not now know whether the ultimate decisions in those matters will be dispositive of

this case, each appeal raises jurisdictional, statutory, and *ultra vires* issues that are certain to bear

on—if not determine—the arguments here."  Pls.-Appellees' Mot. to Hold Appeal in Abeyance

---

[6]    On May 26, 2026, plaintiffs filed a Motion for Leave to File Amended Complaint, ECF No. 62, and a second Preliminary Injunction, ECF No. 63, and briefing is underway on both of those motions, which are thus not yet ripe for consideration here.

Pending Outcome of Related Cases at 5-6 ("Pls.-Appellees' Mot."), *U.S. Dep't of Agric. v. Urb. Sustainability Dirs. Network*, No. 25-5370 (D.C. Cir. Nov. 17, 2025).

Given the pendency of the appeal—now for over seven months—the parties were directed to "jointly submit their positions on whether this Court may exercise jurisdiction to resolve the pending motions." Minute Order (May 4, 2026). The parties agree that this Court may exercise jurisdiction over the dispute. *See* Joint Status Report ("May 15, 2026, JSR") at 1, ECF No. 59 (Plaintiffs' Statement: "This Court has jurisdiction to resolve the pending motions, including ordering supplementation and issuing sanctions . . . ."); *id.* at 13-14 (Defendants' Statement: "Defendants do not dispute that the pending appeal of the preliminary injunction does not deprive this Court of jurisdiction to resolve" plaintiffs' pending motions "and thus are not addressing Plaintiffs' jurisdictional arguments above on that specific question.").[7] At the same time, however, defendants ask that these proceedings be stayed "until the D.C. Circuit rules on *Vera Institute of Justice v. U.S. Department of Justice*, No. 25-5248, and *Climate United Fund v. Citibank, N.A.*, No. 25-5122." *Id.* at 14.[8]

---

[7]     Though "[t]he filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal," *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982) (per curiam), the parties correctly agree the pending appeal poses no jurisdictional bar to consideration of plaintiffs' pending motions, s*ee* May 15, 2026, JSR at 1, 13-14, since an "interlocutory appeal . . . did not divest the district court of jurisdiction." *Garner v. United States*, No. 25-5335, 2026 WL 69397, at *2 (D.C. Cir. Jan. 8, 2026) (per curiam) (citing *Ex Parte Nat'l Enameling & Stamping Co.*, 201 U.S. 156, 161-62 (1906)).

[8]     Defendants request a stay due to the hardship of continuing this litigation and requiring defendants' compliance with additional orders in this case, when the D.C. Circuit may alter the jurisdictional landscape for claims, such as the instant ones, challenging grant terminations by "address[ing] the Tucker Act issues *en banc*." May 15, 2026, JSR at 14-15. In evaluating a stay request, "the district court, in 'the exercise of judgment,' [must] 'weigh competing interests and maintain an even balance,' between the court's interests in judicial economy and any possible hardship to the parties." *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 732-33 (D.C. Cir. 2012) (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 254-55 (1936)). "The proponent of a stay bears the burden of establishing its need," *Clinton v. Jones*, 520 U.S. 681, 708 (1997), and "must make out a clear case of hardship or inequity in being required to go forward," *Landis*, 299 U.S. at 255. Defendants' stay request is denied since the hardship identified of a possible adverse ruling to plaintiffs on interlocutory appeal is a risk inherent in a common-law legal system where a court of review may change or clarify precedent and is an insufficient basis upon which an indefinite stay of the proceedings for enforcement of an order may be grounded. *See Lee v. Great Am. Life Ins. Co.*, No. 20-cv-1133 (SPG), 2024 WL

Plaintiffs' motions to supplement the administrative record and for sanctions are both ripe for resolution.

## II.    LEGAL STANDARD

"[I]n reviewing agency action, a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record." *Dep't of Com. v. New York*, 588 U.S. 752, 780 (2019); *see Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."). "If a court is to review an agency's action fairly, it should have before it neither more nor less information than did the agency when it made its decision" because "[t]o review less than the full administrative record might allow a party to withhold evidence unfavorable to its case." *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984). Therefore, "reliance on extra-record evidence 'is the exception, not the

---

2209775, at *3 (C.D. Cal. Feb. 16, 2024) ("If courts stayed litigation every time there was the possibility that new, persuasive authority might arise to clarify issues, the judiciary would grind to a halt.").

This is particularly true here, given the oddity in defendants' litigation strategy. Plaintiffs' strategy is straightforward: since grant of their requested preliminary injunction, as defendants' note, "[p]laintiffs have received their funding during the entire life of this case" and thus "have not hesitated to delay proceedings when they believe delays are to their benefit," Defs.' Opp'n at 22, including avoiding perceived uncertainty in the D.C. Circuit by successfully seeking to have the appeal held in abeyance, *see* May 15, 2026, JSR at 17 (Defendants' Statement: "As Plaintiffs likely recognized when they sought a stay of briefing on the preliminary injunction in the D.C. Circuit, the status quo is a favorable posture for them. From Plaintiff's vantage point, the outcome of further proceedings in this Court, the D.C. Circuit, or the Court of Federal Claims will, at best, continue to preserve the status quo, and, at worst, allow the Government to terminate Plaintiffs' grants as originally planned."). In contrast, defendants' strategy is less coherent. Though complaining that "[e]ach day the preliminary injunction remains in place is a day that Defendants are forced to fund grants inconsistent with their policies," Defs.' Opp'n at 22, defendants, as plaintiffs highlighted to the D.C. Circuit, took "fifty-seven days after the decision" to appeal the preliminary injunction, "waiting until almost the deadline to file their notice of appeal," Pls.-Appellees' Mot. at 4, 8, and posed no objection to holding the appeal in abeyance. Meanwhile, before this Court, defendants have protracted litigation, when they, concededly, "produced the administrative record piecemeal and not as quickly as Plaintiffs wanted," Defs.' Opp'n at 21, and now seek to stall litigation entirely by arguing "that the Court should stay further proceedings in this case until the D.C. Circuit rules on *Vera Institute of Justice v. U.S. Department of Justice*, No. 25-5248, and *Climate United Fund v. Citibank, N.A.*, No. 25-5122," May 15, 2026, JSR at 14; *id.* at 11 (Plaintiffs' Statement: "Defendants sat on their hands and only now invoke the need for a stay to dodge the resolution of Plaintiffs' motions."). No stay of proceedings is warranted and defendants' request for the same is denied.

14

rule.'"  *Am. Petroleum Inst. v. SEC*, 714 F.3d 1329, 1334 (D.C. Cir. 2013) (quoting *Theodore Roosevelt Conservation P'Ship v. Salazar*, 616 F.3d 497, 514 (D.C. Cir. 2010)).

The D.C. Circuit has explained that courts "do not allow parties to supplement the record 'unless they can demonstrate unusual circumstances justifying a departure from this general rule.'" *City of Dania Beach v. Fed. Aviation Admin*, 628 F.3d 581, 590 (D.C. Cir. 2010) (quoting *Tex. Rural Legal Aid, Inc. v. Legal Servs. Corp.*, 940 F.2d 685, 698 (D.C. Cir. 1991)).  The record may be supplemented in three circumstances: "(1) if the agency 'deliberately or negligently excluded documents that may have been adverse to its decision,' (2) if background information was needed 'to determine whether the agency considered all the relevant factors,' or (3) if the 'agency failed to explain administrative action so as to frustrate judicial review.'" *Id.* (quoting *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008)).  Consequently, "if a party makes a significant showing—variously described as a strong, substantial, or prima facie showing—that it will find material in the agency's possession indicative of bad faith or an incomplete record, it should be granted limited discovery." *Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 663 F.3d 476, 487-88 (D.C. Cir. 2011) (citation omitted).

## III.  DISCUSSION

Plaintiffs' requests for supplementation of the record and for discovery are considered first, and granted in part, followed by plaintiffs' request for sanctions, which is denied as premature.

### A.  Plaintiffs Are Entitled to Discovery

Plaintiffs' motion to supplement the administrative record renews some arguments presented in plaintiffs' earlier motion for expedited discovery filed simultaneously with their preliminary injunction motion.  *See* Pls.' Mot. for Expedited Discovery.  In their earlier motion, *see id.* at 8, plaintiffs relied on *Hispanic Affairs Project v. Acosta*, 901 F.3d 378 (D.C. Cir. 2018), in which the D.C. Circuit explained that, when the administrative record is insufficient to

determine whether a policy exists, a "district court is free to exercise its discretion to permit further discovery 'to ascertain the contours of the precise policy at issue,'" *id.* at 388 (quoting *Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925, 928 (D.C. Cir. 2008)).  The plaintiff bears the burden on motions to supplement because courts "must presume an agency acts in good faith," *Friedman v. Fed. Aviation Admin*, 841 F.3d 537, 541 n.1 (D.C. Cir. 2016) (quoting *Comcast Corp. v. FCC*, 526 F.3d 763, 769 n.2 (D.C. Cir. 2008)), and thus "do not allow parties to supplement the record 'unless they can demonstrate unusual circumstances justifying a departure from this general rule,'" *Dania Beach*, 628 F.3d at 590 (quoting *Tex. Rural Legal Aid*, 940 F.2d at 698); *see Charleston Area Med. Ctr. v. Burwell*, 216 F. Supp. 3d 18, 23 (D.D.C. 2016) (JEB) ("In other words, 'a plaintiff must put forth concrete evidence' and 'identify reasonable, non-speculative grounds for its belief that documents were considered by the agency and not included in the record.'" (quoting *Marcum v. Salazar*, 751 F. Supp. 2d 78, 78 (D.D.C. 2010) (RCL))); *see also Fund for Animals v. Williams*, 391 F. Supp. 2d 191, 197 (D.D.C. 2005) (RMU) ("Although an agency may not unilaterally determine what constitutes the administrative record, the agency enjoys a presumption that it properly designated the administrative record absent clear evidence to the contrary.").

At the preliminary injunction stage in this litigation, plaintiffs' discovery request was denied as premature because, in determining whether the administrative record was "so bare as to frustrate judicial review," "the administrative record must have already been produced and thus the need for further discovery apparent," *Urb. Sustainability*, 2025 WL 2374528, at *41, and, of course, defendants had no opportunity for filing such a record only two days after plaintiffs' filing of the First Amended Complaint with a preliminary injunction motion.  Moreover, the Court credited defendants' "assurance at the motions hearing that the administrative record would include what plaintiffs have requested in their discovery motion, as well as materials reflecting

16

'the process' defendants took when evaluating the grants at issue," in the absence of evidence to the contrary. *Id.* at *40 (citing Hr'g Tr. at 66:12-19, 71:11-21 (The Court: "[I]n my view the things that the plaintiffs are asking for in their discovery requests are items and information that will be in the administrative record when that is compiled . . . if I find on the jurisdictional issue, that I can exercise subject matter jurisdiction here. Do you share that understanding?" Defendants' Counsel: "I do, Your Honor.")). Now, with the administrative record having been filed and supplemented twice, review of the categories of documents identified by plaintiffs as missing from the administrative record reveals that supplementation and/or discovery is needed to ascertain the contours of the agency-wide policy and how the termination decisions were made.

Plaintiffs seek four categories of documents for which they argue they "have reasonable, non-speculative grounds to believe were considered in relation to Defendants' policy to terminate DEI and climate-related awards[.]" Pls.' Mem. at 15. Each category is addressed *seriatim*.

First, plaintiffs request "documents reflecting the directions USDA received to implement the Administration's anti-DEI and climate-related policies." Pls.' Mem. at 17; *id.* at 15 ("documents considered by USDA in adopting and adjusting its policy implementing the Administration's anti-DEI and climate priorities"). For instance, the administrative record contains an email from February 21, 2025, stating that the "OCFO [Office of the Chief Financial Officer] has been asked to issue a data call to identify certain climate-related awards for termination," Defs.' Not. of Filing AR Excerpts ("Defs.' Not."), Att. 1 ("First AR Excerpts"), AR 35, ECF No. 60-1, but the record is devoid of reference to who issued or the substance of that directive. Three days later, on February 24, 2025, an email relays sixteen "additional topic areas and search terms for this data call that leadership has requested be transmitted to USDA agencies and staff offices," *id.* at AR 33, but who this leadership is or how they communicated these

17

additional search terms and the precise search terms are all missing.  Plaintiffs also cite to an email exchange with defense counsel, who reported that "USDA was the decisionmaker to terminate the grants but did rely on OMB guidance."  Pls.' Reply in Supp. of Sanctions, Decl. of FarmSTAND Att'y, Holly Bainbridge ¶ 9, ECF No. 48-1.  Defendants argue that they have "produced all records that it considered in implementing its memoranda concerning climate change and DEI," Defs' Opp'n at 8, that "[d]ecisions to terminate each grant were made by the Department of Agriculture, not an entity outside the Department," *id.* at 11, and that "any non-privileged documents demonstrating involvement by the Department's DOGE team in these termination decisions is reflected in the administrative record," *id.* at 12.  Consequently, defendants maintain that the only relevant records are the March 13, 2025, memoranda, the Executive Orders, a memorandum dated February 6, 2025, by USDA's general counsel, and five email chains comprising fewer than thirty pages.  *Id.* at 8-9.  Defendants emphasize that "[t]he record demonstrates that the search terms were used only to identify awards for scrutiny, not to mark awards for automatic termination."  *Id.* at 10.

Critically, a review of the material shows that the administrative record is devoid of instructions for how the policy was to be implemented, including the specific process for identifying search terms and conducting searches, and then how precisely grants flagged by search terms were subsequently sorted for termination.  At the hearing, defendants argued that "[t]his case would be much cleaner if plaintiffs were simply just challenging their own grant terminations, and we could very easily produce administrative record from that."  Hr'g Tr. at 69:24-70:2.  While defendants might wish that this were the scope of the case, such wishful thinking ignores the actual claims asserted and at issue in this case.  Count 3 of the First Amended Complaint alleges that "Defendants' policy, pattern, and practice of issuing form letters terminating awards pursuant to 2

18

C.F.R. § 200.340(a)(4) is not in accordance with law," and Count 4 alleges that "Defendants' policy, pattern, and practice of issuing the termination letters to hundreds of federal awardees—including Plaintiffs—is arbitrary and capricious." FAC ¶¶ 197, 205. No matter how vigorously defendants deny the alleged policy implementation claims, they must produce in the administrative record documentation surrounding the implementation of defendants' policy directives to enable assessment of plaintiffs' challenge to the legality of agency actions in terminating grants. After all, the D.C. Circuit has held that "in order to allow for meaningful judicial review, the agency must produce an administrative record that delineates the path by which it reached its decision." *Occidental Petroleum Corp. v. SEC*, 873 F.2d 325, 338 (D.C. Cir. 1989). If part of the decision-making contributing to develop the agency-wide policies at issue either occurred outside the agency or were shaped by instruction from outside of the agency, and relevant records are in the control of defendants, then those documents must be produced in the administrative record. *See Competitive Enter. Inst. v. Off. of Sci. & Tech. Pol'y*, 827 F.3d 145, 149 (D.C. Cir. 2016) (holding in the FOIA context that "[i]f the agency head controls what would otherwise be an agency record, then it is still an agency record and still must be searched or produced"); *see also Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 65 (D.D.C. 2002) ("[T]he Government must furnish 'the 'whole' administrative record,' which includes 'all documents and materials directly or indirectly considered by agency decision-makers and including evidence contrary to the agency's position.'" (alterations accepted) (quoting *Thompson v. Dep't of Lab.*, 885 F.2d 551, 555 (9th Cir. 1989))).

Second, plaintiffs request "any instructions given on how to complete the spreadsheets for grants with DEI and climate-related search terms." Pls.' Mem. at 18; *id.* at 15 ("instructions provided to staff on how to fill in the spreadsheets designed to catalogue grants considered for

termination."). While the administrative record contains spreadsheets for DEI-related awards, *see* First AR Excerpts at AR 23-30, and for the climate-related awards, *see id.* at AR 38-40, these spreadsheets are blank and, consequently, reveal little to nothing about the process of developing or implementing policy directives. Plaintiffs point to two sets of questions on each spreadsheet suggestive of standardized instructions absent from the record. The spreadsheets for both DEI-related awards and for climate-related awards ask "What is the recommended course of action (full termination, partial termination, other)? Provide any additional information that supplements an evaluation on this award." *Id.* at AR 27, 40. Plaintiffs contend that completing this question "operated under some standards (reasoned or not), or no standards existed at all, which would be arbitrary and capricious." Pls.' Reply at 8. Additionally, both sets of spreadsheets inquire about applicable statutory requirements, with the DEI-related award spreadsheet asking, "Does the statutory authority for the award require the DEIA activity or preference?," First AR Excerpts at AR 26, and the climate-related award spreadsheet asking, "Is this activity required by statute?," *id.* at AR 39. Plaintiffs demand that "if they truly cannot locate instructions, Defendants should produce the completed spreadsheets, which may demonstrate whether Plaintiffs' terminations were merely error or if the agency was operating under some flawed understanding what the statutes allowed." Pls.' Reply at 9.

Plaintiffs next point to a January 31, 2025, email sent by USDA's Office of the Chief Financial Officer to a group of eighty-one individuals, all of whom appear to have USDA email addresses, summarizing an "optional check-in call regarding this data call earlier this afternoon," stating that "[w]e reviewed the data call spreadsheet to ensure that staff understood the intent of the 'green' columns" and reminded employees that "[i]f you encounter any difficulty using these columns to communicate the specific circumstances of an award, please be in touch directly."

Defs.' Not., Att. 2 ("Second AR Excerpts"), AR 351, ECF No. 60-2; *see* Pls.' Mem. at 18-19.[9] Noting the verbal nature of the calls, defendants explain that while "it is possible that staff took personal notes during this call, those notes were not included because they were not in front of the agency decisionmakers when they decided to terminate the grants." Defs.' Opp'n at 11. Plaintiffs refute this argument, stating that the "notes would memorialize what the agency considered in its policy of terminating grants," Pls.' Reply at 9, and question, rightly, how "a call to communicate the 'intent' of a major policy did not generate preparatory documents and personal summaries," Pls.' Mem. at 19. This Court agrees with plaintiffs. The administrative record must be supplemented to include any preparatory documents relating to the spreadsheets, personal notes memorializing calls discussing the spreadsheets, and the spreadsheets, without redaction and reflecting all data entered.

Third, plaintiffs request "records showing what termination decisions were made by agency leadership and what criteria they used," which "is most obviously communicated in non-deliberate form through the universe of termination letters." Pls.' Mem. at 19-20; *id.* at 15 ("standards by which leadership determined whether to terminate awards and documentation of the resulting decisions and reasoning, including all termination letters and any form letters not already produced"). Only two form letters are included in the administrative record, one relating to DEI and the other to climate. Indeed, at the hearing, plaintiffs expressed that they "are fearful that [defendants] would limit any administrative record to these particular plaintiffs," so "what you would get is the letter and maybe some notes, but not the broader question of how they came to these form letters in itself." Hr'g Tr. at 61:20-25. As the Court indicated, "if they don't produce that as part of the AR at the outset, then you could make a motion to supplement the AR." *Id.* at

---

[9] This email was not included in the AR until more than three months after the initial production, which contained the blank spreadsheets. *See* Certification of Suppl. Admin. R., ECF No. 51.

62:4-6. The Court certainly contemplated "[a] more fulsome administrative record, including termination letters for other grants and information revealing defendants' decision-making and implementation process, may enable plaintiffs to substantiate the policy as alleged." *Urb. Sustainability*, 2025 WL 2374528, at *28. Instead of producing the termination letters for other terminated grants, however, defendants mischaracterize *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), as authority not to produce those termination letters, stating that *CASA* "forecloses the possibility that Plaintiffs would be able to litigate the termination of grants other than their own." Defs.' Opp'n at 14-15. This reasoning is plainly wrong as *CASA* concerned an issue "of remedy: whether, under the Judiciary Act of 1789, federal courts have equitable authority to issue universal injunctions," 606 U.S. at 839, and as plaintiffs point out, the issue presented by the motion to supplement is the production of documents "to assess the existence of the policy and whether it violated the APA—not to define the remedy's scope," Pls.' Reply at 12. *CASA* is simply inapposite here.

Defendants proffer one further argument why the termination letters for other grants should not be produced: "the record reveals that grants were not terminated *en masse* without an individualized review," so any "determinations on grants whose recipients are not parties to this case [are] irrelevant to Plaintiffs' claims and not necessary for the administrative record." Defs.' Opp'n at 16. To support this argument, defendants state that "[t]he DEI data call identified a total of 2,695 awards individually and another 2,012 in groups, but the Department only terminated 312 awards from these data calls" and that "the Department identified 864 awards in the climate change data call but only terminated thirty of those awards." *Id.* at 13. In response, plaintiffs point to other evidence, like the fact that "in late-March 2026 Defendants terminated 49 of the 50 'Increasing Land, Capital, and Market Access Program' [] grants" and that the single remaining

22

grant was not terminated "[d]ue to this Court's preliminary injunction."  Pls.' Not. of Factual Dev. at 1.  Defendants' argument is misplaced and amounts to defying their obligation to produce a fulsome administrative record because they believe their own argument that grant termination decisions were made on an individual-grant-by-grant basis, rather than *en masse* based on a keyword search that was arbitrary and capricious in implementation, as plaintiffs claim.  The weighing of evidence occurs when considering the merits of a claim and happens once both sides are fairly able to present arguments based on a factual administrative record that is complete.  As plaintiffs correctly summarize, "[t]his is another instance in which they put the cart before the horse: that is a factual determination that cannot be made until a complete record, including all termination letters, is produced."  Pls.' Reply at 12-13.  Defendants must produce the termination letters for the other grants because such letters are relevant to delineating the contours of the agency-wide policy that plaintiffs allege and challenge.

Fourth, plaintiffs highlight the absence of records relating to the terminations of their own grants.  *See* Pls.' Mem. at 21-23; *id.* at 15 ("documents showing the decisionmaking on Plaintiffs' awards.");  Pls.' Reply at 13-15.  Plaintiffs highlight the absence of two sets of documents about two of their grant terminations from the administrative record.  *See* Pls.' Mem. at 22-23.[10]  First, plaintiffs note that "USDN's appeal of its termination and the agency's response were not included in the record."  Pls.' Mem. at 22.  Defendants denied that "an appeal from USDN of its termination

---

[10]    Plaintiffs originally also identified a missing email attachment—a document titled "DEI Grant Termination Letter"—that should have been produced alongside two emails.  Pls.' Mem. at 22.  Despite originally proffering that "[n]o termination letters were attached to those e-mails," Pls.' Mot., Ex. D., Letter from Assistant U.S. Att'y to Holly Bainbridge at 5 (Jan. 22, 2026), ECF No. 55-6, defendants later clarified that the "letter is in the administrative record at AR 594," Defs.' Opp'n at 16.  Plaintiffs express frustration that "there is no way Plaintiffs could have known that a document produced a hundred pages later in a separate production was the attachment referenced at AR 0594—and Defendants waited until motion practice to clarify that.  This jumbled production embodies Defendants' failure to produce a comprehensible record—in which there are many instances of email attachments being omitted—and their failure to communicate honestly about its contents."  Pls.' Reply at 14 (footnote omitted).  With the additional guidance provided in this Memorandum Opinion, thorough and complete production of the administrative record is expected from defendants.

[could be] part of the administrative record for the termination decision itself, as it necessarily could not have been before the agency at the time it made its decision," but regardless, they stated that the "Forest Service has searched relevant systems and inquired with appropriate staff, and there is no record that USDN filed an appeal."  Pls.' Mot., Ex. D, Letter from Assistant U.S. Att'y to Holly Bainbridge at 5 (Jan. 22, 2026), ECF No. 55-6.  Notwithstanding defendants' representation as to the nonexistence of these records, plaintiffs were able to present them as exhibits to plaintiffs' memorandum, without dispute as to the authenticity of those exhibits by defendants, who also now agree the documents "should be part of the administrative record."  Defs.' Opp'n at 16.  Rather than complain, as defendants did, that "[h]ad Plaintiffs shown these records to Defendants prior to filing their motion, Defendants would have addressed the issue, thus eliminating the need for Plaintiffs to raise it with the Court," *id.*, defendants should be offering assurances as to why this Court should have any confidence that the administrative record is complete.  *See* Pls.' Reply at 13 (noting that defendants provided "no explanation as to why the Court should trust a search that missed such basic documents as sufficient for everything else.").  In any event, contrary to defendants' complaint, plaintiffs did, in fact, inform defendants of the missing appeal information on September 24, 2025, when they provided a list of "documents [that] were omitted," including "Appeal letters for all Plaintiffs other than IATP, and any response from or communications with USDA in response for all Plaintiffs."  Pls.' Reply in Supp. of Sanctions, Ex. B, E-Mail from Holly Bainbridge, FarmSTAND Att'y, to Assistant U.S. Att'y at 2 (Sept. 24, 2025, at 3:39 P.M.), ECF No. 48-3.

Next, plaintiffs focus on "significant new gaps regarding documents connected to Agroecology Commons's Community Food grant," which "shows Defendants identified 'gender/sexuality-related' awards for termination, particularly those that include 'gender

ideology,' which resulted in this termination," yet the administrative record sheds little light on what occurred. Pls.' Mem. at 22. Defendants respond that the cited document merely memorialized "a verbal request for information about 'gender/sexuality-related' awards" made by "the Chief of Staff for the Department's Research, Education and Economics mission area." Defs.' Opp'n at 17. Strangely, defendants then point to the March 13, 2025, memoranda as providing the reasoning for the termination and that the "Agroecology award was terminated as part of the Department's efforts to end DEI-focused awards," *id.*, even though, as the prior memorandum opinion summarized, "AC's Grant #1, which created a cooperative incubator program, was terminated on March 7, 2025, before the Secretary's issuance of the March 13, 2025, memoranda," *Urb. Sustainability*, 2025 WL 2374528, at *6. In short, defendants' assertion that the grant was terminated based on the DEI-policy articulated by the Secretary's memorandum is inconsistent with the time-frame and thus unavailing.

Defendants must supplement the administrative record with all documents related to the termination of plaintiffs' grants. Though defendants certified that "[t]he administrative record now includes all records that Defendants considered in terminating Plaintiffs' grants," Defs.' Opp'n at 16, they made a similar representation with their initial production, *see* Certification of Admin. R., ECF No. 37 (certifying that "the attached documents constitute the non-privileged documents that were considered in connection with the Department's termination of Plaintiffs' Federal financial assistance awards"), and since then have managed to locate more than 370 additional pages that had been missing, *see* Certifications of Admin. R., ECF Nos. 51, 53. Indeed, the added pages more than doubled the volume of materials on the individual termination decisions that were initially included.[11]

---

[11]    Defendants repeatedly argue that they are entitled to the presumption of regularity, stating that "the Department 'enjoys a presumption that it properly designated the administrative record absent clear evidence to the

In addition to supplementing the administrative record, plaintiffs propose two methods "to prove the sufficiency of [defendants'] renewed search." Pls.' Reply at 4. First, plaintiffs request that defendants be ordered to produce a privilege log because, "to the extent Defendants are claiming privilege over all but two DOGE-related documents otherwise belonging in the record, . . . Defendants should be required to produce a privilege log given their misconduct throughout this process calling into question Defendants' reliability in making such assertions." Pls.' Reply at 4, 7 n.2. Indeed, defendants allude to the existence of documents not in the administrative record "demonstrating involvement by the Department's DOGE team in these termination decisions," Defs.' Opp'n at 12, and further stating that they are "withholding some records under the attorney-client and deliberative process privileges" because "such records 'are not part of the administrative record to begin with, so they do not need to be logged as withheld from the administrative record,'" *id.* at 7-8 (quoting *Oceana, Inc. v. Ross*, 920 F.3d 855, 865 (D.C. Cir. 2019)). The very case that defendants quote, however, goes on to say that while "[t]he federal rules do not require parties to provide logs of all documents that were not produced because they were deemed immaterial or irrelevant" and are frequently not needed in administrative procedure cases, an exception exists "where a 'substantial showing' was made that the record was incomplete" that "would justify further action or inquiry by the District Court." *Oceana, Inc.*, 920 F.3d at 865 (quoting *Nat. Res. Def. Council, Inc. v. Train*, 519 F.2d 287, 291 (D.C. Cir. 1975)). The Ninth Circuit, in applying *Oceana, Inc.*, determined that "whether materials are in fact

---

contrary.'" Defs.' Opp'n at 5 (quoting *Fund for Animals*, 391 F. Supp. 2d at 197); *id.* at 3 (quoting the same); *id.* at 19-20 ("Without evidence to the contrary, we must presume an agency acts in good faith." (quoting *Friedman*, 841 F.3d at 541 n.1)); *see also* Defs.' Reply in Supp. of Mot. to Extend Nunc Pro Tunc & in Opp'n to Pl.'s Request for Sanctions at 4, ECF No. 46 ("[A]bsent clear evidence, an agency is entitled to a strong presumption of regularity that it properly designated the administrative record." (alteration in original) (quoting *Am. Petroleum Tankers Parent, LLC v. United States*, 952 F. Supp. 2d 252, 260-61 (D.D.C. 2013) (CKK))). The evidence of omissions and accompanying irregular, piecemeal production of the administrative record in this matter has more than rebutted any such presumption.

deliberative is subject to judicial review, and in appropriate circumstances district courts may order a privilege log to aid in that analysis" and that "we agree with the D.C. Circuit that 'a showing of bad faith or improper behavior' might justify production of a privilege log to allow the district to determine whether excluded documents are actually deliberative." *Blue Mountains Biodiversity Proj. v. Jeffries*, 99 F.4th 438, 445 (9th Cir. 2024) (quoting *Oceana, Inc.*, 920 F.3d at 865). Given the substantial showing here that the presented administrative record is underinclusive and incomplete, and the production so far in this matter has been irregular—or "piecemeal," Defs.' Opp'n at 21, as defendants themselves describe the process—plaintiffs' request for a privilege log is well-justified and will be granted.

Second, plaintiffs request that defendants be ordered to "sit for a deposition regarding their policy and resulting record search and production." Pls.' Reply at 4. To be sure, in cases where the administrative record is inadequate on its face and the government denies the existence of a challenged policy, *see Molina v. U.S. Dep't of Homeland Sec.*, No. 25-cv-3417 (BAH), 2026 WL 1256234, at *7 (D.D.C. May 7, 2026) (ordering depositions where "the administrative record produced by defendants[] total[ed] eleven pages" and defendant agencies denied challenged policy existed), discovery in the form of depositions may be the only or best option to clarify the record about the agency's actions. Here, in contrast, defendants do not deny the existence of a policy to terminate certain USDA grants but dispute how that policy was implemented, *i.e.*, *en masse* grant terminations, as plaintiffs contend, or after individual review, as defendants contend. In addition, though the administrative record produced so far is underinclusive and incomplete, other discovery mechanisms originally requested by plaintiffs may be more efficiently used than depositions of individual agency officials to identify materials that should be included in the administrative record. Indeed, plaintiffs are notably silent about the number of depositions, which agency

personnel would be noticed for a deposition or even which level of defendants' personnel would be targeted for deposition(s). *See generally* Pls.' Mem. at 23 n.7; Pls.' Reply at 4, 10-11, 20.

Instead of depositions, defendants will be required to respond to the interrogatories and requests for production proposed by plaintiffs in their Motion for Expedited Discovery, providing through interrogatories "(1) a description of the process by which Defendants identified and decided to terminate or did terminate Plaintiffs' Grants and any other grants for failing to effectuate or otherwise align with USDA's current priorities—the stated rationale for the terminations—including the creation of the newly articulated priorities, the conclusion that alleged noncompliance with the priorities was an appropriate basis for termination, the search for and identification of grants for potential termination on that basis, the assessment of the identified grants for compliance with the new priorities, and any other analyses of whether and when to terminate all identified grants; and (2) a list of all grant recipients who received termination notices containing language similar or equivalent to the termination letters received by Plaintiffs, and the grants impacted by those terminations." Pls.' Mot. for Expedited Disc. at 5. Additionally, defendants will be required to produce "(1) all documents regarding the creation, development, and execution of Defendants' policy, practice, or process of terminating grants on the basis that they no longer effectuate agency priorities, including the decision to issue the termination notices received by Plaintiffs, and (2) all records Defendants rely on in answering the two interrogatories." *Id.* at 6. These were the documents expected to be included in the administrative record at the outset.

**B.    Plaintiffs Have Not Established Bad Faith Requisite for an Adverse Inference**

Plaintiffs do not limit their sought after remedy at supplementation of the administrative record but rather urge that "[a]lthough [they] have shown the standard for supplementation is met, the sanction of adverse inferences is warranted and the most appropriate remedy," seeking an order

28

for the adverse inferences that "(1) Defendants terminated DEI and climate-related grants based solely on the presence of DEI and climate-related search terms in grant documents, and (2) Plaintiffs' termination letters and the template letters at AR 0594 and 0596 are representative of and reflect the extent of Defendants' reasoning for all such terminations."  Pls.' Mem. at 24. Such adverse inferences would be tantamount to an instruction that defendants' actions in terminating the grants were arbitrary and capricious and make dispositive briefing on that claim in Counts 3 and 4 of the First Amended Complaint easily resolved in plaintiffs' favor.  *See* Defs.' Opp'n at 17 ("Plaintiffs' desire for an adverse inference appears to be a ploy to win their case on a technicality rather than on the merits.").  For this reason, the D.C. Circuit has cautioned that "[b]ecause the missing evidence instruction deals not with evidence but with its absence, 'there is the danger that the instruction permitting an adverse inference may add a fictitious weight to one side or another of the case.'"  *Huthnance v. District of Columbia*, 722 F.3d 371, 379 (D.C. Cir. 2013) (quoting *Burgess v. United States*, 440 F.2d 226, 234 (D.C. Cir. 1970) (opinion of Fahy, J.)).

"A district court may order sanctions, including a default judgment, for misconduct either pursuant to Rule 37(b)(2) of the Federal Rules of Civil Procedure, which authorizes a court to assess a sanction for violation of a discovery order, or pursuant to the court's inherent power to 'protect [its] integrity and prevent abuses of the judicial process.'"  *Webb v. District of Columbia*, 146 F.3d 964, 971 (D.C. Cir. 1998) (insertion in original) (quoting *Shepherd v. Am. Broad. Co.*, 62 F.3d 1469, 1474 (D.C. Cir. 1995)); *see also Parsi v. Daioleslam*, 778 F.3d 116, 130 (D.C. Cir. 2015) ("In addition to sanctions contemplated by the Federal Rules of Civil Procedure, courts have an inherent power at common law to 'protect their institutional integrity and to guard against abuses of the judicial process with contempt citations, fines, awards of attorneys' fees, and such

29

other orders and sanctions as they find necessary, including even dismissals and default judgments.'" (quoting *Shephard*, 62 F.3d at 1474, and citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991))); FED. R. CIV. P. 37(b)(2)(A)(i) ("If a party or a party's officer, director, or managing agent . . . fails to obey an order to provide or permit discovery . . . the court where the action is pending may issue further just orders. They may include the following: directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims . . . .").

The adverse inference rule "provides that when a party has relevant evidence within his control which he fails to produce, that failure gives rise to an inference that the evidence is unfavorable to him." *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. NLRB*, 459 F.2d 1329, 1336 (D.C. Cir. 1972). The D.C. Circuit has explained that this rule is motivated by "[t]he idea [] that 'all other things being equal, a party will of his own volition introduce the strongest evidence available to prove his case,'" but "does not go so far" as to suggest that "*any* failure to introduce ostensibly relevant evidence warrants an adverse interest." *Huthanance*, 722 F.3d at 378 (emphasis in original) (quoting *Int'l Union*, 459 F.2d at 1336). Indeed, the D.C. Circuit has "proscribed the inference when its premises do not obtain, such as when there are innocuous explanations for the party's failure to introduce the evidence." *Id.*

Plaintiffs base their request for adverse inference sanctions on four alleged violations by defendants of their discovery obligations: that defendants' initial administrative record contained numerous shortcomings; that when defendants were ordered to supplement the administrative record "within three weeks of the end of the government shutdown," they "not only failed to complete the record, but failed to produce a single additional document by that deadline"; that they later "produced a supplement that addressed essentially none of the record deficiencies"; and that

30

finally their "second supplement—provided the evening before the parties' joint scheduling proposal was due and without explanation—again made little movement towards a complete record." Pls.' Mem. at 25-26. In short, "Defendants have already had four bites at the apple and have shown that a fifth will make no difference." *Id.* at 27.

Defendants argue that "drawing an adverse inference would violate bedrock administrative law principles" and thus is not appropriate in an APA case. Defs.' Opp'n at 17-18. Indeed, plaintiffs acknowledge that "[s]anctions in administrative records cases may be historically uncommon," Pls.' Reply at 19, citing only two non-binding, out-of-circuit district court decisions where sanctions were considered in an APA case, both of which are readily distinguishable from the instant case, *id.* (citing *New York v. U.S. Dep't of Com.*, 461 F. Supp. 3d 80 (S.D.N.Y. 2020), and *Goose Creek Physical Med., LLC v. Becerra*, No. 22-cv-3932, 2024 WL 3653639 (D.S.C. Aug. 5, 2024)). In *New York v. U.S. Department of Commerce*, the district court did not impose, nor even appeared to consider, the sanction of an adverse inference, but rather awarded attorneys' fees. 461 F. Supp. 3d at 94. In *Goose Creek Physical Medicine*, the court explained that the "dispute ha[d] dragged on for over a decade" and "the failure to preserve the target universe inclusive of the [relevant] files is likely run-of-the-mill government negligence," so the court held "two facts as established"—"that the target universe existed and that the Secretary failed to preserve it"—but clarified that this "sanction is not an adverse inference" because "holding the two requested facts as established . . . does not require the court to additionally hold that the target universe contained information adverse to the Secretary," 2024 WL 3653639, at *10, *11 & n.17.

While plaintiffs repeatedly use the term "bad faith," none of the conduct that plaintiffs ascribe to defendants, either individually or collectively, at this point rises to bad faith. *See* Pls.' Reply at 13-15. Defendants certainly misapprehended the scope of their responsibilities to produce

documents for the administrative record, erroneously believing that they only had to produce "all non-privileged documents that decisionmakers considered in terminating Plaintiffs' grant agreements." Defs.' Opp'n at 1. Such breadth limited to agency action against specific plaintiffs is appropriate for the administrative record in many APA cases but does not suffice where, as here, plaintiffs bring a broader challenge to implementation of a policy, which adversely affected plaintiffs too. *See supra* Part III.A. Whether defendants' initial misapprehension in compiling the administrative record was sufficiently intentional to rise to the level of bad faith is yet to be seen now that they have additional judicial instructions. Additionally, "innocuous explanations," *Huthanance*, 722 F.3d at 378, explain defendants' failure to abide by the December 4, 2025, deadline: confusion and excusable neglect resulting from restarting after the longest lapse in appropriations to federal agencies in the history of the country. Nothing, however, justifies the "piecemeal" and haphazard manner in which the administrative record has been produced so far. Defs.' Opp'n at 21.

Upon issuance of this memorandum opinion and going forward, defendants will not be able to rely on any misapprehension of their production obligations, and the administrative record is expected to be fully supplemented. Plaintiffs' motion for sanctions at this juncture is denied but may be renewed should defendants continue to fall short of their production obligations.[12]

## IV.    CONCLUSION

For the reasons explained, plaintiffs' motion to supplement the administrative record is granted in part, denied in part, and limited discovery will commence. Defendants will accordingly also produce a privilege log as well as the interrogatories and requests for production as specified

---

[12]    For similar reasons, plaintiffs' request for an award of attorneys' fees is also denied. *See* Pls.' Mem. at 28-29; Pls.' Reply at 20-21. The D.C. Circuit has held that bad faith is required for a district court to use its inherent sanctions power to "awards of attorneys' fees," "the district court must find clear and convincing evidence of the predicate misconduct," *Parsi*, 778 F.3d at 131, and that standard is not met here.

in this Memorandum Opinion.  At this juncture, plaintiffs have not established the bad faith requisite to be entitled to an adverse inference, so their motion for sanctions and attorneys' fees is denied.  Defendants' request for a stay is denied, and instead parties are ordered to propose promptly a schedule for the limited discovery ordered herein and for further supplementation of the administrative record.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  May 29, 2026

_____
**BERYL A. HOWELL**
United States District Judge