**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

URBAN SUSTAINABILITY DIRECTORS NETWORK, *et al.*,

*Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF AGRICULTURE, *et al.*,

*Defendants*.

Case No. 1:25-cv-01775-BAH

**JOINT STATUS REPORT**

The parties respectfully submit this report pursuant to the Court's June 8, 2026, Minute Order, directing the parties to discuss "terminations that may be excluded entirely from discovery" and to create "a detailed proposal for rolling production of materials to supplement the administrative record," with productions "completed by September 2, 2026."

**Plaintiffs' Position**

***Plaintiffs' Proposed Schedule***

The following is meant to supplement, not supplant, the deadlines established by the Court's June 8, 2026, Minute Order. It reflects both Plaintiffs' independent proposals and, where indicated, agreements reached between the parties. Unfortunately, Defendants were first able to meet and confer at noon on June 11, and therefore the parties were not able to fully discuss or reach resolution on several matters. However, Plaintiffs have modified several of their proposals to reflect the burdens and concerns Defendants described.

- **By agreement between the parties, Defendants will produce rolling productions of their responses to Plaintiffs' First Interrogatory and Plaintiffs' First and Second Requests for Production**. *See* Order 2, Dkt. No. 71. Defendants have represented that they intend to move

chronologically through the terminations and therefore they will be able to provide rolling narratives and supporting documents regarding the terminations and process employed at the completion of each reasonably defined temporal set of terminations. These narratives and productions will reflect Defendants' view of the full set of responsive documents for that period and update the claimed process to the extent it varied over time. This will allow Plaintiffs to determine gaps in those productions and understand Defendants' view on the documents produced. Moreover, Defendants have represented that this will provide Plaintiffs significantly earlier responses than Defendants would be able to provide otherwise, i.e., Defendants will not be waiting until late July to start these rolling productions.

- **By agreement between the parties, by June 18, 2026 Defendants will produce their response to Plaintiffs Second Interrogatory.** *See* Order 2, Dkt. No. 71.

- **By agreement between the parties, the parties will meet bi-weekly to discuss disputes and potentials for streamlining production based on produced materials**, with decision makers attending those meet and confers.

- **By agreement between the parties, Defendants will produce privilege logs of documents withheld from any production at the time of production**. This appears consistent with the June 8, 2026, Minute Order, will facilitate Plaintiffs' review, and is necessary to ensure Defendants do not backload privilege disputes, which would delay resolution of this matter.

- **Plaintiffs' Proposal, by June 18, 2026, Defendants should produce all templates used to craft the grant termination letters that were sent out**. *See* Mem. Op. 21, 22, Dkt. No. 72. The Court set June 18, 2026, as the deadline for producing the termination letters themselves, Minute Order, June 8, 2026, and producing the templates along with those termination letters will facilitate Plaintiffs' review of the letters. Plaintiffs will be able to determine what, if any, variation from the templates was allowed. Defendants' suggestion below that they cannot identify templates they created for the terminations until three weeks after they collect the termination letters is nonsensical. The letters were based on templates, thus the two go hand and hand and will exist in similar repositories.

- **Plaintiffs' Proposal, by June 30, 2026, Defendants should make a significant production of materials demonstrating directions or guidance given to "leadership" on whether to terminate grants.** *See* Mem. Op. 21, 28, Dkt. No. 72. For the sake of clarity, this should include documents like the USDA Office of the Secretary decision memoranda that the record establishes exist regarding certain groups of DEI-related terminations, as well as all similar documents. Br. Mot. Suppl. 19–20, Dkt. No. 55-1; *see also id.* at 9. The June 8, 2026, Minute Order provides for Defendants to produce on this same date a privilege log of materials Defendants have already withheld from the administrative record, so that the parties can work to resolve any privilege disputes before the close of production. Defendants have claimed that the guidance given to leadership is likely to be privileged. *See* Br. Mot. Suppl. 20, Dkt. No. 55-1. Thus, it appears the Court already ordered Defendants to search for, and produce or log,

some of this material by this deadline.[1] Early production of this material also helps ensure the parties can resolve privilege disputes before the close of production. In contrast, Defendants' suggestion that they will *first* produce *some* of these documents by *July 31*, is inconsistent with the Court's order. Nonetheless, because at the parties' meet and confer Defendants indicated that there are other, more difficult-to-locate instructions, Plaintiffs have broken up this request, providing for the final, complete production of this material at a later date.

- **Plaintiffs' Proposal, by July 10, 2026, Defendants should produce all materials demonstrating directions or guidance given to USDA staff about how to populate and use the spreadsheets that identified grants for termination.** The June 8, 2026, Minute Order requires Defendants to produce "preparatory documents for calls related to the spreadsheets" by June 30 and notes memorializing those calls by July 10. This additional request ensures that if there were other records describing how to employ the spreadsheets, such as the email inquiries that the record indicates exist, Mot. Suppl. 8, 19, Dkt. No. 55-1, those are produced at the same time, which will facilitate Plaintiffs' review of all the related materials. Defendants' suggestion that Plaintiffs wait three more weeks for this material will only serve to delay Plaintiffs' full understanding of the spreadsheets and thus resolution of this matter. Defendants' claim of burden is also contrary to the record, as the record shows Defendants worked to consolidate all communications regarding the spreadsheets to particular individuals and emails. *Id.*

- **Plaintiffs' Proposal, by July 10, 2026, Defendants should also produce all directions received on how to implement the anti-DEI and anti-climate Executive Orders,** including materials showing the origin of the search terms Defendants employed to identify grants for termination, whether or not those materials originated from USDA. *See* Mem. Op. 18-19, Dkt. No. 72. The Court has already set this as the deadline for Defendants to produce materials explaining how the spreadsheets of grants that hit the search terms were to be populated. Producing materials regarding the creation and purpose of the search terms at the same time should facilitate review of those documents. In contrast, Defendants do not even provide for the production of this material, risking that they hold this material until the end of their production, which will hamper Plaintiffs' understanding and the resolution of both any resulting production disputes and the matter as a whole.

- **Plaintiffs' Proposal, by July 17, 2026, Defendants should produce the remaining materials demonstrating directions or guidance given to "leadership" on whether to terminate grants.** During the parties' meet and confer Defendants suggested that certain leadership directives are easier to gather than others. Thus, this deadline reflects Plaintiffs' effort to offer a compromise. The intervening weeks will also allow the parties to meet and confer regarding any streamlining the initial production allowed for, potentially further reducing the burden of this production.

[1] Plaintiffs maintain that final guidance or instructions provided to leadership, like that described above, does not fall under the deliberative process privilege. *See* Br. Mot. Suppl. 20, Dkt. No. 55-1 (cases cited).

- **<u>Plaintiffs' Proposal</u>, by July 17, 2026, Defendants should produce all additional directions regarding the search for and termination of grants because they furthered "gender ideology" or similar terms.** *See id.* at 24–25. The record indicates that there were special searches for gender- and sexuality-related grants, but Defendants have stated that these searches were connected to their anti-DEI activities. *Id.* Therefore, it follows that Defendants should produce any additional materials speaking to gender-related searches after, but in close proximity to, the materials Defendants will produce regarding the DEI-searches. This will also help Plaintiffs' review of the other search-term related documents. Again, Defendants' failure to even provide a deadline for this production risks them holding this material until the end, confounding Plaintiffs' review.

- **<u>Plaintiffs' Proposal</u>, by July 31, 2026, Defendants should produce all missing materials related to Plaintiffs' grants.** Mem. Op. 25, Dkt. No. 72.

- **<u>Plaintiffs' Proposal</u>, by September 2, 2026,** Defendants must have produced all documents and narrative responses ordered by the Court, as well as all documents the parties' meet and confers identified as missing or wrongly withheld on a claim of privilege.

***Plaintiffs' Discussion of Documents That Can Be Excluded from Production***

In providing the above schedule Plaintiffs do not intend to waive their right to any responsive document, but Plaintiffs note that they have clarified for Defendants that Defendants' most recent statements to the Court on the scope of their production are based on an overly broad interpretation of the issues in dispute. Defendants portrayed this case as concerning "any" grant terminations and that they are required to produce information regarding the creation and implementation of all the "Secretary's Memorandums that required the evaluation and termination of awards." JSR 5,7, Dkt. No. 74. That is an exaggeration.

As Plaintiffs have described throughout, they contend there was an unlawful policy to terminate what have been characterized as DEI- and climate-related grants. *See* Mem. Op. 4–6 & n.1, Dkt. No. 72. The record reveals that Defendants employed additional terminology to describe the grants they sought to extinguish—sometimes that language was used in the termination letters provided to grantees, although it may not have been, and Defendants may have merely used this language internally to describe the targets of the anti-DEI and anti-climate change policies.

Without endeavoring to provide a complete list, it appears Defendants included within their effort to identify and terminate DEI- and climate-related grants, grants they claimed dealt with "equity," "DEIA," "gender ideology," "gender-sexuality," "social vulnerability," "socially disadvantaged" groups, "underserved" groups, "underrepresented" groups, "discrimination," "environmental justice," "urban planning," "sustainable construction," "green infrastructure," "carbon pricing," "market mechanics," "renewable energy," "resilience," "biodiversity," "low carbon mobility," "environmental" activities, "sustainable finance," and "green banking." Defendants' productions must include responsive documents to the extent they discussed or involved terminating grants because the grants furthered any of these concepts or any related concepts.

Nonetheless, as Plaintiffs clarified for Defendants, to the extent a grant was terminated exclusively for reasons wholly distinct from the search terms and concepts identified above and other related terms and concepts that Defendants employed, Defendants do not need to search for or produce documents regarding how Defendants identified and decided to terminate those grants. However, Plaintiffs note that, as the "Land Access Program Plaintiffs'"[2] terminations reveal, Defendants sometimes use claims of fraud and abuse alongside of, and to justify, their anti-DEI objectives. Documents demonstrating how Defendants identified and decided to terminate grants with multiple rationales, where one was DEI- or climate-related, should be included in Defendants' productions. Indeed, as Plaintiffs allege with respect to the Land Access Program Plaintiffs' terminations, Defendants' anti-DEI objectives were the primary motivators, with claims of fraud and abuse merely being window-dressing, as the Secretary's own memoranda imply. *See*, *e.g.*, Mem. Op. 5, Dkt. No. 72.

[2] A term Plaintiffs define in their proposed Second Amended Complaint, Dkt. No. 62-1, and second motion for a preliminary injunction, Dkt. No. 63-1.

After Plaintiffs provided the above clarification, and further demonstrating the parties can reach agreement if Defendants are willing to engage, the parties agreed that the following types of terminations could be "excluded entirely from discovery": Terminations of "foreign assistance awards," terminations for "noncompliance," terminations "by mutual agreement," "recipient-requested terminations," and "partial terminations." Yet, these termination categories are excluded only to the extent that the terminations were not based on or brought about in whole or in part by the anti-DEI and climate-related directives as described above.

Defendants' suggestion below that they should also be able to exclude "terminations where the agreement was subsequently permanently reinstated (i.e., not just due to a preliminary injunction) and has continued, either in the same or modified form," is inappropriate. The fact that recipients later received funding is not indicative of whether the initial termination was the result of a policy. For instance, while some Partnerships for Climate-Smart Commodities ("PCSC") grantees (like Oakville Bluegrass Cooperative) received modified awards after their initial termination, the record indicates those terminations were the result of Defendants' anti-climate policy. While Defendants nominally based Oakville's initial termination on the fact that an insufficient amount of the funds "go to producers." *Urb. Sustainability Directors Network v. United States Dep't of Agric.*, No. CV 25-1775 (BAH), 2025 WL 2374528, at *6 (D.D.C. Aug. 14, 2025), Defendants' records reveal that they examined grants for whether they "d[id] not directly benefit farmers" to attack climate-related work. AR0033. Moreover, contrary to Defendants' argument below this issue is not unrelated to Plaintiffs' claims because Oakville was dismissed from the case. Defendants continue to bury their heads in the sand regarding the policy and practice issue in this matter. Plaintiffs' grants were terminated due to a policy that impacted

them and others (as almost all policies will). Seeing how the policy impacted others is indicative of that policy, not extraneous to the issues in this case.

***Plaintiffs' Response Regarding the Need for a Confidentiality Agreement***

Today, for the first time, Defendants claim they require a confidentiality agreement to protect deliberative process privileged information in the spreadsheets. The Court should dismiss that for the delay tactic it is. This will require the parties to negotiate a confidentiality agreement and then work through disputes over Defendants' designations and the need to file designated material on a public docket (both as exhibits and in briefs). Moreover, the notion that Defendants have the right to protect such material merely by asserting that it is deliberative is wrong. Defendants bear the burden to establish material is truly deliberative. *Trea Senior Citizens League v. U.S. Dep't of State*, 923 F. Supp. 2d 55, 67 (D.D.C. 2013) (Howell, J.). Defendants' notion that they are entitled to burden and delay this case based on their *ipse dixit* should be rejected.[3]

Lest there be any doubt that Defendants' request for a confidentiality agreement is a play for delay, until their June 11 draft Status Report, Defendants never mentioned the need for such an agreement to protect deliberative process. Rather, last week Defendants raised, for the first time, concerns that their production would contain Personally Identifiable Information ("PII") or Confidential Business Information ("CBI"). In response, Plaintiffs informed Defendants that Plaintiffs did not understand how such information would be caught up in the productions. Nonetheless, Plaintiffs stated to the extent that Defendants could identify the types of PII or CBI that would be produced, Plaintiffs could likely work with Defendants to agree to exclude that

[3] Defendants claim below that Plaintiffs publishing on the web government documents Defendants produced (i) without any confidentiality designation and (ii) that have since been placed on a public court docket justifies a confidentiality agreement is dumbfounding. The notion that informing the public about public information is a negative and should hamstring future disclosures is an afront to the First Amendment and common law rights of Plaintiffs, their counsel, and court observers.

information from production. This would prevent the need to negotiate a confidentiality agreement and the resulting delay, as well as the delays such agreements are likely to generate. Only when Defendants' ploy regarding PII and CBI failed to produce the delay they had hoped for did they switch to talking about deliberative process.

* * *

In light of the above, Plaintiffs believe they have significantly narrowed Defendants' purported burdens and provided a logical (and where possible, compromise) path for rolling productions that will facilitate resolving the production disputes in the time allotted, and this case as quickly as possible. Plaintiffs request the Court enter the above deadlines to supplement the deadlines in the Court's June 8, 2026, Minute Order.

**Defendants' Position**

In setting a schedule, Defendants respectfully ask that the Court be mindful of the discrepancies in the parties' respective abilities to dedicate the time needed to this case. Plaintiffs have six attorneys from three different organizations representing them whereas Defendants have the undersigned government counsel and an agency counsel at the Department of Agriculture. Although this case may be Plaintiffs' Counsels' principal focus, this is one of over 100 open cases on government counsel's docket. In addition to those cases, government counsel supervises a team of attorneys.

Moreover, Plaintiffs are seeking information that implicates many components of the Department of Agriculture and the Department will require sufficient time to search for responsive documents and review them for privilege.

Defendants propose the schedule as listed below. In proposing this schedule, Defendants do not waive any objections to the scope of discovery. Moreover, should parties engage in any significant dispute over the scope of production or any withholdings, it may seek to extend any of these deadlines while the parties attempt to resolve their disputes informally or litigate those disputes.

1. **By June 18, 2026, Defendants will provide all termination notices and completed spreadsheets. Defendants will also produce its response to the Plaintiffs' Second Interrogatory.**

The Court has ordered that the Department of Agriculture ("USDA" or "the Department") produce the spreadsheets "without redaction and reflecting all data entered." However, as evident by the template already produced (*see* AR 0023-0030), the spreadsheet includes material that is deliberative in nature. Defendants will request that Plaintiffs enter into a stipulated protective order over the spreadsheet. If necessary, Defendants will move for a confidentiality protective order over Plaintiffs' objection. Plaintiffs have already demonstrated a practice of publicly disclosing records provided to them in this proceeding.[4] Notably, deliberative material is not supposed to be part of the record in an APA case, *Oceana, Inc. v. Ross*, 920 F.3d 855, 865 (D.C. Cir. 2019), but Defendants are producing it because the Court has ordered them to do so. To address Plaintiffs' concerns regarding delay, Defendants are willing to produce the spreadsheets with an agreement from Plaintiffs that they will treat the spreadsheets as confidential until the Court rules on any motion for a protective order. Moreover, because the Second Interrogatory overlaps with production of the termination notices, Defendants plan to produce those together.

[4] Deep Dive: Trump's Ten Search Terms to Cancel American Farmers https://farmstand.org/case/deep-dive-trumps-ten-search-terms-to-cancel-american-farmers/ (last visited, June 11, 2026).

2. **By June 30, 2026, Defendants will produce all preparatory documents for calls relating to the spreadsheets and a partial privilege log for documents withheld from the administrative record produced to date.**

3. **By July 6, 2026, Defendants will produce all templates used to craft the grant termination letters that were sent to recipients**.

Defendants propose this deadline because USDA must review all of the termination letters to see whether they were based off a template and, if so, to gather those templates from the requisite agencies and staff offices. USDA requires additional time after gathering and producing the termination letters themselves to conduct that analysis and gather and produce the templates from the agencies and staff offices. USDA already produced some of the template letters at issue (*see* AR 0594-0597), as those were associated with Plaintiffs' awards. However, now that the court has clarified the scope of production to include a significantly broader set of terminations, Defendants must collect additional templates from throughout the Department.

4. **By July 10, 2026, Defendants will produce personal notes memorializing calls discussing the spreadsheet.**

USDA will endeavor to identify who participated in any such calls and have those participants search for such records.

5. **By July 17, 2026, Defendants will produce all missing materials related to Plaintiffs' grants.**

USDA continues to believe the starting point for this litigation should be the Plaintiffs' own grants, not claims being litigated on behalf of non-Plaintiffs and thus Defendants propose producing these materials earlier in the discovery period.

6. **By July 31, 2026, Defendants will produce all materials demonstrating directions or guidance given to USDA staff about how to populate and use the spreadsheets that identified grants for termination.**

USDA continues to believe that potentially hundreds of employees throughout the department contributed to efforts to complete the spreadsheets. In addition to producing "preparatory documents for calls related to the spreadsheets" by June 30 and notes memorializing

those calls by July 10, USDA must also identify any instructions provided by the agencies to staff as the spreadsheets were distributed for completion, as well as any advice that may have been provided by senior officials, OCFO, counsel, and colleagues during the effort to complete them. Those processes spanned weeks, and, in many cases, were collateral duties for employees otherwise engaged in routine grantmaking and grant management activity. As a result, identifying instructions that were provided, which would reflect the individualized review undertaken and potentially capture instructions for the thousands of awards entered on the spreadsheet that were never terminated, is a time-consuming endeavor that Defendants continue to believe would take at least six months to produce. However, Defendants acknowledge the Court's order to complete all document production by September 2, 2026, and are prioritizing this effort.

7. **By July 31, 2026, Defendants will produce materials demonstrating directions or guidance given to leadership on grant terminations or otherwise related to the search for or termination of grant awards.**

This category includes any relevant Executive Order or Secretary's Memorandum, guidance associated with execution of any such Executive Order or Memorandum, and materials showing the origin of the search terms Defendants employed to identify grants for evaluation, to the extent such documents are related to terminations encompassed in this discovery process. Although Defendants will endeavor to produce as many documents as possible by this deadline, Defendants again reiterate that terminations occurred over the course of many months using a variety of different procedures. For example, as already documented, one of Plaintiffs' awards was identified as a result of a verbal request for information made by a senior policy official. Only by conducting a complete evaluation and reconstruction of each individual termination can USDA identify all relevant directions or guidance. Based on its evaluation of termination letters, USDA will aim to prioritize and produce by this date documents that account for as many terminations as possible, but additional relevant documents may be identified as Defendant completes Plaintiffs'

First Interrogatory and First and Second Requests for Production, as described below, and will be produced as soon as possible.

**8. On a rolling basis to be completed by August 31, 2026, Defendants will provide responses to Plaintiffs' First Interrogatory and complete Plaintiffs' First and Second Requests for Production.**

As Defendants have repeatedly asserted, there is no single agency-wide policy or process resulting in automatic termination of funding. Rather, terminations have occurred over a significant period of time through various processes for identifying and reviewing agreements, assessing the agreements, and proposing and approving termination as the appropriate course of action. The only way for Defendants to identify these processes for each award is to conduct record searches, communicate with record-holders and agency staff, review those records, and recreate the termination process that led to each termination. In addition, collecting these documents will allow Defendants to meet its obligation to produce all documents regarding the "execution" of Defendants' terminations, as required by the First Request for Production. Defendants described the scope of this undertaking in the July 5, 2026, Joint Status Report (Doc. 74). That process will take a significant amount of time and will require Defendants to collect and review virtually every document Plaintiffs otherwise request in discovery. Defendants continue to believe this process will require at least six months but acknowledge the Court's order to complete production by September 2, 2026.

USDA acknowledges that some identification and review processes yielded recommendations and terminations of multiple awards. USDA will endeavor to provide intermediate productions of responses to Plaintiffs' First Interrogatory and Plaintiffs' First and Second Requests for Production to the extent possible to ensure that a "thorough and complete", not "jumbled," production occurs. Mem. Op. 23, fn. 10. As noted above, this production and interrogatory response will occur on a rolling basis and Defendants hope that based on their bi-

weekly calls with Plaintiffs they can reach an agreement to further narrow the scope of this request. Defendants understand Plaintiff's predicament that they cannot agree to further narrowing until they have seen some of the documents.

9. **Throughout this timeline, Defendants agree to produce privilege logs of documents withheld from any production at the time of production**.

* * *

In addition to the list of agreed-upon types of terminations that could be "excluded entirely from discovery," USDA proposed and Plaintiffs rejected "terminations where the agreement was subsequently permanently reinstated (i.e., not just due to a preliminary injunction) and has continued, either in the same or modified form." USDA maintains that the recipients continue to receive funding and to perform under the terms of any modification, which would have been mutually agreed upon between the parties. Plaintiffs rejected this request because it "appears to describe the PCSC grants," and assert that Defendants' termination and reformulation of that program relates to climate change policies.[5] The only Plaintiff that had a Partnerships for Climate-Smart Commodities ("PCSC") award (Oakville Bluegrass Cooperative) has withdrawn from this case, and none of the Plaintiffs assert that they have a PCSC or Advancing Markets for Producers award (which replaced the PCSC program). Plaintiffs appear to continue to seek some form of relief for entities that have assented to new agreements, are performing under those new agreements, and specifically requested to withdraw from this case. USDA believes that this category threatens disruption to existing awardees and requests that the court also exclude from

[5] Defendants note that, in fact, existing agreements were evaluated based on three Farmer First policy priorities (https://www.usda.gov/about-usda/news/press-releases/2025/04/14/usda-cancels-biden-era-climate-slush-fund-reprioritizes-existing-funding-farmers) which related to whether funding in fact went to producers.

discovery terminations where the agreement was subsequently permanently reinstated and has continued, either in the same or modified form.

Additionally, Defendants disagree that Plaintiffs have been clear about the scope of grant terminations that they believe are relevant to this case. For example, Plaintiffs' interrogatories and requests for production, as written seek information all grants that were terminated "for failing to effectuate or otherwise align with USDA's current priorities." Mem. Op. at 7 n.2 (ECF No. 72). Plaintiffs also describe their policy claim as challenging "a widespread policy and practice of unlawfully terminating hundreds of grants issued to nonprofit organizations, farmers, ranchers, universities cities, and states," through "minimally edited, boilerplate form letters." Mem. Opp. at 7. Plaintiffs did not limit the claims to grants concerning climate change, DEI, or gender ideology. Defendants, however, appreciate Plaintiffs' agreement to narrow the scope to these matters.

Dated this 11th day of June, 2026.

Respectfully submitted,

/s/ David S. Muraskin
David S. Muraskin
DC Bar No. 1012451
Hannah Wolf
TX Bar No. 24137413 (Pro Hac Vice)
FarmSTAND
712 H Street NE, Suite 2534
Washington, DC 20002
(202) 595-8816
david@farmstand.org
hannah@farmstand.org

Carrie Apfel (DC Bar No. 974342)
Earthjustice
1001 G Street, NW, Suite 1000
Washington, DC 20001
(202) 667-4500
capfel@earthjustice.org

JEANINE FERRIS PIRRO
United States Attorney

*/s/ John J. Bardo*
John J. Bardo, DC Bar #1655534
Assistant United States Attorney
601 D Street, NW
Washington, DC 20530
(202) 252-2539

*Counsel for Defendants*

Scott W. Carlson (pro hac vice)
Benjamin E. Apple (pro hac vice)
Farmers Justice Center
6 Fifth Street West
Suite 650
St. Paul, MN 55102
(651) 204-1664
scott.carlson@farmersjustice.org
ben.apple@farmersjustice.org

*Counsel for Plaintiffs*