UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

URBAN SUSTAINABILITY DIRECTORS
NETWORK, et. al.,

      Plaintiffs,

      v.

BROOKE ROLLINS, Secretary of
Agriculture, et al.,

      Defendants.

Civil Action No. 25-1775 (BAH)

**DEFENDANTS' COMBINED MEMORANDUM IN OPPOSITION TO PLAINTIFFS'
MOTIONS FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT AND FOR A
<u>PRELIMINARY INJUNCTION</u>**

**TABLE OF CONTENTS**

Table of Contents ............................................................................................................... i

Background ...........................................................................................................................1

    I.     Procedural Background ..........................................................................................1

    II.    Legal Background. ..................................................................................................2

    III.   Factual Background ................................................................................................4

Legal Standards ....................................................................................................................5

    I.     Motion for A Preliminary Injunction. ...................................................................5

    II.    Motion for Leave to Amend ..................................................................................6

Argument ..............................................................................................................................7

    I.     The Prospective Plaintiffs Are Not Entitled to Extraordinary Relief When They Are Not Properly Before the Court as Parties to the Case. ...................................7

    II.    The Prospective Plaintiffs Are Unlikely To Succeed on the Merits of Their Preliminary Injunction. ........................................................................................8

            A.    The Court of Federal Claims Has Exclusive Jurisdiction over the prospective plaintiffs claims. ......................................................................9

            B.    The Tucker Act Impliedly Precludes Relief. ...........................................14

            C.    Decisions on Which Grants to Fund are Committed to Agency Discretion by Law. ......................................................................................18

            D.    The Grant Terminations are not Contrary to Law. ...................................20

            E.    The Termination Decisions were not Arbitrary and Capricious. ..............22

            F.    Plaintiffs Failed to Demonstrate that They Will Suffer Irreparable Harm Absent Preliminary Relief. ......................................................................29

            G.    The Balance of Equities Weighs Against Granting Plaintiffs Relief. .......33

            H.    Any Preliminary Injunction Should be Stayed. .......................................34

            I.     The Court Should Order that Plaintiffs Post a Bond as a Condition of Preliminary Relief. ................................................................................34

    III.   Plaintiffs' Amended Complaint Would Not Survive a Motion to Dismiss. ..........34

A.      Plaintiffs' Policy or Practice Claim is not a Valid Claim Under the APA. ...............................................................................................................35

B.      Plaintiffs' Untra Vires and Separation of Powers Claims are Futile.........41

C.      The Court Has Already Rejected Many of The Claims Plaintiffs Put Forth in Their Amended Complaint. ...............................................................43

D.      Allowing Amendment at this Stage Would Unduly Prejudice Defendants. ...............................................................................................................44

Conclusion ...............................................................................................................................45

Defendants, the Secretary of Agriculture and other officials and agencies in the Department of Agriculture sued in their official capacities, respectfully submit this combined memorandum in opposition to Plaintiffs' Motion for Leave to File a Second Amended Complaint (ECF No. 62) and Motion for Preliminary Injunction (ECF No. 63).

## BACKGROUND

### I.    Procedural Background

Plaintiffs Urban Sustainability Directors Network, Agroecology Commons, Providence Farm Collective, and the Institute for Agriculture and Trade Policy (collectively "Plaintiffs") brought this lawsuit challenging the Department of Agriculture's decision to terminate their grant awards. *See generally* Am. Compl. (ECF No. 10).    Plaintiffs' complaint included claims for "Violation of Due Process Clause," Am. Comp. ¶¶ 174-90; claims under the Administrative Procedure Act ("APA") for agency action "not in accordance with the law," *id*. ¶¶ 191-201, 209-24, and "arbitrary and capricious and an abuse of discretion," *id*. ¶¶ 202-08; and violation of the separation of powers and ultra vires. *Id.* ¶¶ 225-38.

Plaintiffs moved for a preliminary injunction (ECF No. 14), which Defendants opposed (ECF No. 22).  On August 14, 2025 the Court granted Plaintiffs' motion in part and ordered Defendants to restore the named Plaintiffs' grant agreements.  Order at 2 (ECF No. 29).  On May 26, 2026, nearly one year after Plaintiffs filed this lawsuit, Plaintiffs moved for leave to file an amended complaint to add twenty four additional plaintiffs whose grants under the Increasing Land Capital and Market Access Program ("ILA Program") were terminated in or around March 2026. Mot to Amend (ECF No. 62).  That same day, Plaintiffs moved for a preliminary injunction on behalf of those prospective plaintiffs.  2d. Mot. for Prelim. Inj. (ECF No. 63).  The Proposed Second Amended Complaint includes the same claims as the Amended Complaint, including those

that the Court previously determined Plaintiffs were unlikely to succeed.  Prop. 2d. Am. Compl. Redline (ECF No. 62-2).

## II.    <u>Legal Background.</u>

Upon taking office on January 20, 2025, President Donald Trump issued a series of executive orders seeking to align the government's grant programs with his agenda.  In the *Ending Radical and Wasteful Government DEI Programs and Preferencing* EO, Exec. Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025), the President declared that "illegal and immoral discrimination programs" were implemented under the name "diversity, equity, and inclusion ("DEI")." § 1. The President further declared that "Americans deserve a government committed to serving every person with equal dignity and respect, and to expending precious taxpayer resources only on making America great." *Id.*  Relevant here, the President then directed agencies to "terminate, to the maximum extent allowed by law . . . 'equity-related' grants or contracts." *Id.* at § 2(i).

Shortly after taking office, Secretary of Agriculture Brooke Rollins issued a Memorandum directing that Department staff ensure that the Department's grants "do not support programs or organizations that promote or take part in diversity, equity, and inclusion initiatives or any other initiatives that discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic."  Secretary's Memo. 1078-004 (Mar. 13, 2025), AR 016.  The Secretary directed that any awards inconsistent with this memo be terminated, in whole or in part, or otherwise modified in accordance with any applicable regulations and notice and procedural requirements in the relevant award.  *Id.*

Then, in accordance with the preliminary injunction entered in *Strickland v. United States Dep't of Agric.,* 736 F. Supp. 3d 469 (N.D. Tex. 2024), the Department published a Final Rule in the Federal Register announcing a change in its approach to the discretionary use of race- and sex-based preferences to align with constitutional principles and the administration's policy objectives.

90 Fed. Reg. 30555, 30556-57 (Jul. 10, 2025). That Final Rule also amended the Department's regulations that implemented discretionary policy choices associated with several programs[1] and generally announced that "USDA will no longer apply race- or sex-based criteria in its decision-making processes, ensuring that its programs are administered in a manner that upholds the principles of meritocracy, fairness, and equal opportunity for all participants." *Id.* at 30557.

The Office of Management and Budget ("OMB") has promulgated a set of regulations addressing the termination of federal grants and cooperative agreements. *See* 2 C.F.R. pt. 200. Those regulations provide, *inter alia*, that a "Federal award may be terminated in part or its entirety . . . [b]y the Federal agency . . . pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). The regulations further provide that the federal agency "must provide written notice of termination," which should include the reason for termination and the effective date. *Id.* § 200.341(a).

The Secretary has since taken additional steps to ensure that the Department does not fund projects that discriminate based on protected characteristics. On December 31, 2025, the Secretary issued a memorandum to establish uniform terms and conditions for grants, cooperative agreements, and similar arrangements. Secretary's Memo. 1078-021 (Dec. 31, 2025). The Memorandum reiterated that no Department awards "may fund or otherwise support diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that discriminate on the basis of immutable characteristics."

---

[1] The ILA Program was not included in the Final Rule as there are no implementing regulations for the program published in the Code of Federal Regulations. However, the rationale supporting the Final Rule applies to the decision to terminate grants in the ILA Program where the implementation of such preferences is discretionary under the statute.

The prospective plaintiffs seek a preliminary injunction reversing the Department's decision to terminate their grants under the ILA Program.  Although originally authorized by the American Rescue Plan Act of 2021, Pub. L. 117-2 (Mar. 11, 2021), Sec. 1006(b)(2), the provision was subsequently amended by the Inflation Reduction Act, Pub. L. 117-169 (Aug. 16, 2022).  The provision, as amended by the Inflation Reduction Act ("IRA"), appropriated $250 million (which remains available through September 30, 2031) "to provide grants and loans to eligible entities, as determined by the Secretary, to improve land access (including heirs' property and fractionated land issues) for underserved farmers, ranchers, and forest landowners, including veterans, limited resource producers, beginning farmers and ranchers, and farmers, ranchers, and forest landowners living in high poverty areas."  IRA § 22007, amending ARPA § 1006(b).  The Inflation Reduction Act removed all mention of "socially disadvantaged" from the statute, including in the subsection authorizing the ILA program.

The grants that are already part of this lawsuit, with the exception of one of the two Agroecology grants, originated from programs other than the ILA Program.  For descriptions of those other programs and the current Plaintiffs grant awards, Defendants respectfully refer the Court to their opposition to the existing Plaintiffs' motion for preliminary injunction.  *See* Defs.' Opp'n, ECF No. 22 at 5-13.

### III.    Factual Background[2]

Consistent with the policy and regulatory changes discussed above, in or around March 2026, each of the twenty-four prospective plaintiff received a letter stating that their ILA Program grants were being terminated.  *See e.g.,* Black Oregon Land Trust Letter (ECF No. 63-3 at 68).

---

[2]    For a factual background regarding the existing Plaintiffs, Defendants respectfully refer the Court to their opposition to those Plaintiffs 'motion for a preliminary injunction.  See ECF No. 22 at 9-13.

The letters stated that the awards did not align with the Department's goals and priorities because they discriminated based on immutable characteristics, and were inconsistent with Congressional intent to improve land access for under resourced farmers regardless of those farmers' immutable characteristics. *Id*. at 68-69. The letters included an assessment of the recipient's reliance interests in the award. *Id*. at 70. The letters noted that the problems were endemic across the ILA Program and "have biased the application and selection processes," thus necessitating action to "fully realign the program to ensure consistency with statutory requirements, equal protection principles, and prudent fiscal management." *Id*. at 69. Each letter included an explanation specific to the corresponding grant agreement explaining why the Department reached the conclusion that the grants were intended to benefit individuals based on their immutable characteristics. *Id*. at 69-70. The letters advised recipients of their option to appeal the termination to the Department's National Appeals Division ("NAD"). *Id.* Each of the prospective plaintiffs exercised this option, but NAD determined that the prospective plaintiffs' grant terminations were not appealable because their appeal concerned "a matter of general applicability." *See e.g.*, NAD Letter (ECF No. 65-3 at 60-61). The prospective plaintiffs then sought leave to join this lawsuit (ECF No. 62), and moved for a preliminary injunction (ECF No. 63).

**LEGAL STANDARDS**

## I.      Motion for A Preliminary Injunction.

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008). A party seeking preliminary relief must make a "clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." *League of Women Voters v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (*quoting Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 505 (D.C. Cir. 2016)). The last

two factors merge when the government is the opposing party. *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 10 (D.C. Cir. 2019); *accord Pub. Citizen Health Rsch. Grp. v. Acosta*, 363 F. Supp. 3d 1, 20 (D.D.C. 2018). "[P]laintiffs bear the burden of persuasion on all four preliminary injunction factors in order to secure such an 'extraordinary remedy.'" *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014).

Before the Supreme Court's decision in *Winter*, courts weighed these factors on a "sliding scale," allowing "an unusually strong showing on one of the factors" to overcome a weaker showing on another. *Damus v. Nielsen*, Civ. A. No. 18-0578 (JEB), 2018 WL 3232515, at *4 (D.D.C. July 2, 2018) (quoting Davis v. Pension Ben. Guar. Corp., 571 F.3d 1288, 1291–92 (D.C. Cir. 2009)). The Supreme Court subsequently reaffirmed its disagreement with the sliding scale approach holding that "a plaintiff seeking a preliminary injunction must make a clear showing that 'he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024) (quoting *Winter*, 555 U. S. at 20). And where, as here, a party "seeks a mandatory injunction—to change the status quo through action rather than merely to preserve the status quo—typically the moving party must meet a higher standard than in the ordinary case: the movant must show 'clearly' that [it] is entitled to relief or that extreme or very serious damage will result." *Farris v. Rice*, 453 F. Supp. 2d 76, 78 (D.D.C. 2006).

## II.   Motion for Leave to Amend

Federal Rule of Civil Procedure ("Rule") 15(a) allows a plaintiff to amend his complaint once as a matter of course within twenty-one days after serving it, or within twenty-one days of service of a responsive pleading or a Rule 12 motion to dismiss, for a more definite statement, or

to strike.  Fed. R. Civ. P. 15(a)(1).  Under any other circumstances, any further amendment is permitted "only with the opposing party's written consent or the court's leave."  Fed. R. Civ. P. 15(a)(2).  Given the procedural posture of this case, Plaintiffs can only amend their complaint with the "court's leave."  *Id.*

The Court "should freely give leave when justice so requires."  *Id*.  But "leave to amend should be denied when amendment would be futile," *Sai v. Dep't of Homeland Sec.*, 149 F. Supp. 3d 99, 126 (D.D.C. 2015), including, most notably, when "the proposed claim would not survive a motion to dismiss," *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1099 (D.C. Cir. 1996).  Thus, if the proposed amended complaint does not contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted), leave to amend should be denied.  In making this assessment, the Court applies the same rules applicable to its consideration of a motion to dismiss.  The Court must, accordingly, "accept all the well-pleaded factual allegations of the" proposed amended "complaint as true and draw all reasonable inferences from those allegations in the plaintiff's favor," but it need not "assume the truth of legal conclusions." *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015).

## ARGUMENT

**I.**     **The Prospective Plaintiffs Are Not Entitled to Extraordinary Relief When They Are Not Properly Before the Court as Parties to the Case.**

As an initial matter, the Court should not consider the prospective plaintiffs' motion for a preliminary injunction because those plaintiffs are not parties to the case.  The prospective plaintiffs sought leave of Court to be added to this lawsuit as part of Plaintiffs' motion for leave to file an amended complaint almost a year after the original complaint was filed, but the Court has not granted them leave.  To obtain preliminary relief the prospective plaintiffs must first become

actual plaintiffs, and the prospective plaintiffs can only become actual plaintiffs if and when the Court grants such relief. This approach is consistent with *Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 121 (D.D.C. 2017). In that case, the Court first granted Plaintiffs leave to add their new claims "such that the [new claims] are properly before it." *Id*. But here, as explained in Part III below, the Court should not grant the motion for leave to file a second amended complaint because not only would amendment be futile, but it will alsounfairly prejudice Defendants.

More broadly, requiring the prospective plaintiffs to first prevail on their motion for leave to file an amended complaint is consistent with the well-established principle that a court "cannot grant preliminary relief on claims not pleaded in the complaint." *Steele v. United States*, Civ. A. No. 14-1523 (RCL), 2020 WL 7123100, at *7 (D.D.C. Dec. 4, 2020) *(quoting Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.,* 810 F.3d 631, 633 (9th Cir. 2015)). The prospective plaintiffs' claims are not in the operative complaint, *see* Am. Compl., ECF No. 10, and therefore the Court "must deny [Plaintiff's] preliminary injunction motion because it cannot grant preliminary relief on claims not pleaded in the complaint." *Id.*; *N.Y. Times Co. v. Def. Health Agency*, Civ. A. No. 21-0566 (BAH), 2021 WL 1614817, at *4 n.6 (D.D.C. Apr. 25, 2021).

Accordingly, the motion for preliminary injunction should be denied for the threshold reasons that the prospective plaintiffs are not parties to the case.

## II.     The Prospective Plaintiffs Are Unlikely To Succeed on the Merits of Their Preliminary Injunction.

The prospective plaintiffs seek restoration of their grants on the theory that the terminations were contrary to law, and arbitrary and capricious in violation of the APA, 5 U.S.C. § 706(2)(A). 2d. Mot. for Prelim. Inj. at 17, 19 (ECF No. 36). But before the Court can entertain these arguments, Plaintiffs must first establish that the Court has jurisdiction over these claims. Yet, the

- 8 -

prospective plaintiffs have not established jurisdiction. Even if the Court finds that it has jurisdiction, the prospective plaintiffs are still unlikely to succeed on the merits because decisions on what grants to fund are committed to agency discretion, the Department explained its change in position, the Department's decision is consistent with the text of the statute, and the decision was not arbitrary and capricious nor inconsistent with evidence before the Department.

### A. The Court of Federal Claims Has Exclusive Jurisdiction over the prospective plaintiffs claims.

To sue a federal agency or its officials, the prospective plaintiffs must identify an express waiver of sovereign immunity and show that their claims fall within the waiver's scope. *See Cooper*, 566 U.S. at 290. In the proposed Second Amended Complaint, Plaintiffs necessarily rely on the APA's waiver of sovereign immunity. *See* proposed 2d Am. Compl. ¶¶ 9, 12, 216-230. Yet APA review is unavailable where there is an adequate remedy in another court, or if another statute impliedly precludes relief. Both are true here. Thus, the APA and Tucker Act prevent Plaintiffs from circumventing the Court of Federal Claims.

Congress expressly limited APA review to situations where "there is no other adequate remedy in a court." 5 U.S.C. § 704. This adequate remedy bar is jurisdictional. *Christopher Vill.*, 360 F.3d at 1327; *Consol. Edison Co. of N.Y., Inc. v. Dep't of Energy*, 247 F.3d 1378, 1383- 84 (Fed. Cir. 2001); *Delano Farms Co. v. Cal. Table Grape Comm'n*, 655 F.3d 1337, 1344 (Fed. Cir. 2011). The key question is "can the Court of Federal Claims provide an adequate remedy under the Tucker Act for the alleged wrong?" *Suburban Mortg. Assocs.*, 480 F.3d at 1125.

Here, the answer is "yes." The Federal Circuit has long held that "[t]he availability of an action for money damages under the Tucker Act or Little Tucker Act is presumptively an 'adequate remedy' for § 704 purposes." *Telecare Corp. v. Leavitt*, 409 F.3d 1345, 1349 (Fed. Cir. 2005). As a result, if a litigant can "sue the government for money damages in the Court of Federal

Claims," it has "an 'adequate remedy' that precludes an APA waiver of sovereign immunity in other courts." *Christopher Vill.*, 360 F.3d at 1327 (quoting *Consol. Edison*, 247 F.3d at 1384). Put another way, "when the plaintiff's claims, regardless of the form in which the complaint is drafted, are understood to be seeking a monetary reward from the Government," then the only question is whether the litigant can seek money in the Court of Federal Claims. *Suburban Mortg. Assocs.*, 480 F.3d at 1126.

Thus, to determine whether there is an adequate remedy here involves three questions. First, is there a contract between the United States and Plaintiffs? Second, is that contract enforceable for money damages in the Court of Federal Claims? Third, does Plaintiffs' complaint, regardless of how it is framed, ultimately seek a monetary reward from the Government? If the answer to all three questions is yes, then the adequate remedy bar precludes reliance on the APA's waiver of sovereign immunity, as it does here.

1.  The grant agreements are contracts with the United States.

Plaintiffs' grant agreements are contracts for purposes of the Court of Federal Claims. "[F]ederal grant agreements a[re] contracts when the standard conditions for a contract are satisfied, including that the federal entity agrees to be bound." *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1338 (Fed. Cir. 2021). The Federal Circuit has a four-part test for such a contract: "(1) mutuality of intent to contract; (2) offer and acceptance; (3) consideration; and (4) a government representative having actual authority to bind the United States." *Id*. at 1339. All are met here.

First, the "the language of the agreement[s] . . . speaks in terms of binding obligations." *Id.* These are explicit contracts awarding definite sums of money in exchange for services described in the application. *See e.g.,* World Farmers Notice of Grant Agreement (ECF No. 63-4 at 8), Statement of Work (ECF No. 63-4 at 10). Similarly, regulations may provide additional

evidence that the contracting agency has expressed an intent to be bound. *See Columbus Reg'l Hosp.*, 990 F.3d at 1339. Here, for example, the detailed regulations governing this program, promulgated by OMB, make clear that grant-making agencies intend to be bound by their agreements. *See* 2 C.F.R. part 200; *see also id.* § 200.340 (providing detailed procedures for termination when terms and conditions are violated, further evincing an intent to be bound).

Second, the awards were offers from the Department. *See Columbus Reg'l Hosp.*, 990 F.3d at 1339. They "evinced [the agency's] willingness to enter into a bargain and justified [the recipient's] understanding that its assent would consummate the bargain." *See id*. And "[a]cceptance was effected when the parties' authorized agents signed the agreement." *See id*. at 1339-40.

Finally, Defendants agree that actual authority is satisfied here, which is sufficient to establish that element. *See id.* Plaintiffs' grant agreements are therefore contracts. They "set the terms of and receive commitments from recipients" of federal grant programs. *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021); *see also McGee v. Mathis*, 71 U.S. (4 Wall.) 143, 155 (1866) ("It is not doubted that the grant by the United States to the State upon conditions, and the acceptance of the grant by the State, constituted a contract."). That places them within the scope of the Court of Federal Claims.

2. The contracts are enforceable with money damages.

Next, the Court must consider whether the contracts are enforceable with money damages. "Normally contracts do not contain provisions specifying the basis for the award of damages in case of breach." *San Juan City Coll. v. United States*, 391 F.3d 1357, 1361 (Fed. Cir. 2004). But "in the area of government contracts, as with private agreements, there is a presumption in the civil context that a damages remedy will be available upon the breach of an agreement." *Sanders v. United States*, 252 F.3d 1329, 1334 (Fed. Cir. 2001). That Plaintiffs' contracts are "government

- 11 -

financial grants does not warrant a different standard." *San Juan City Coll.*, 391 F.3d at 1361. As a result, "the presumption [is] that damages are available upon the breach" of these grant agreements. *Boaz Hous. Auth.*, 994 F.3d at 1365. This is true even if the statutory scheme authorizing the grants does not expressly contemplate money damages in a subsequent suit. "[C]ontracts impose obligations on parties, for which damages are the default remedy upon breach" regardless of the statutory or regulatory terms underlying the program. *Id.* at 1367.

There are three narrow exceptions to this presumption, all inapplicable. First, "contracts that expressly disavow money damages" are excepted from the presumption. *Id.* at 1365. No such express disavowal is present here. Second, "agreements that are entirely concerned with the conduct of parties in a criminal case" are not enforceable with money damages. *Id.* There is no suggestion that these grant agreements are anything of the sort. That leaves the final category, situations "where a special government cost-sharing agreement" is the contract to be enforced. *Rocky Mountain Helium, LLC v. United States*, 841 F.3d 1320, 1327 (Fed. Cir. 2016). Government grant agreements, pursuant to a statutory program, do not fall within this category. *See Boaz Hous. Auth.*, 994 F.3d at 1366. If the Court of Federal Claims ultimately finds that the Government wrongfully terminated the contract, Plaintiffs will be entitled to money damages for the alleged breach.

3. Plaintiffs' claims ultimately seek monetary reward specified in the contracts.

Plaintiffs' claims are fundamentally based on the premise that Defendants should have kept paying funds pursuant to the grant agreements. *See, e.g.,* Compl. ¶ 59 ("these awards, USDA agrees to provide funding up to a specified dollar amount over a specified period of time for work that advances U.S. policy interests as detailed in the agency's notices of funding opportunity or equivalent award-related documentation").

- 12 -

Regardless of how they are styled, the claims "in essence . . . seek[] to obtain the financial benefit of a prior contract-based obligation that allegedly has not been honored by the Government." *Suburban Mortg. Assocs.*, 480 F.3d at 1126. Because "a money judgment will give . . . plaintiff[s] essentially the remedy [they] seek[,]" this case does not belong in district court. *See id.*

Even if Plaintiffs alleged that statutory obligations required continued contract payments, rather than using the term "breach of contract," the Court of Deral Claims would provide an adequate remedy. In *Boaz Housing Authority*, 994 F.3d at 1362-63, for example, plaintiffs sought to recover funds that the Department of Housing and Urban Development ("HUD") refused to pay to public housing authorities as part of a mandatory federal grant subsidy program. Although Congress required the subsidies by statute, HUD effectuated its grants through contracts with the recipients. *Id.* at 1366-67. Those contracts laid out various terms and conditions recipients were required to follow in exchange for HUD's continued payments. Because legislation mandated the subsidies, HUD argued that the plaintiffs' claims really stemmed from the "statutorily mandated subsidy program" rather than any contract enforceable with monetary damages. *Id.* at 1368.

The Federal Circuit rejected HUD's view. It held that the "contracts impose obligations on [the] parties, for which damages are the default remedy upon breach" notwithstanding the background statutory requirement. *Id.* at 1367. Nor did it matter that "contractual provisions [were] required by or incorporate governing regulations." *Id.* "If [a federal agency] chooses to employ contracts to set the terms of and receive commitments from recipients with respect to [federal] subsidies," the United States is generally "subject to suit in the Claims Court for damages relating to an alleged breach." *Id.* at 1368. In sum, even when a statute mandates the grant

- 13 -

program, or federal regulations support the contractual relationship, the existence of a contract places the dispute squarely in the jurisdiction of the Court of Federal Claims. *See id.*

### B. The Tucker Act Impliedly Precludes Relief.

Likewise, the "APA's waiver of sovereign immunity does not apply 'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.'" *California*, 604 U.S. at 651 (quoting 5 U.S.C. § 702). This exception "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012). The Supreme Court's recent decisions affirmatively resolve this question.

In *Department of Education v. California*, 604 U.S. at 650, the district court had "enjoin[ed] the Government from terminating various education-related grants" and "require[d] the Government to pay out past-due grant obligations and to continue paying [grant] obligations as they accrue." But the district court likely lacked jurisdiction because the APA's waiver of sovereign immunity "does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered." *Id*. at 651 (*quoting Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). Instead, such suits must be brought in the Court of Federal Claims, in which Congress vested "jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.* (quoting 28 U.S.C. § 1491(a)(1)).

That ruling reflects basic jurisdictional principles. Given the federal government's sovereign immunity, federal courts generally lack jurisdiction over "suits against the United States absent Congress's express consent." *United States v. Miller*, 604 U.S. 518, 527 (2025). The APA's waiver does not reach situations where another statute impliedly precludes relief. *See* 5 U.S.C. § 702. The Tucker Act provides that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express

- 14 -

or implied contract with the United States." 28 U.S.C. § 1491(a)(1). And in *California*, those principles established that the respondents' claim was just a disguised breach-of-contract claim that belonged in the Court of Federal Claims. *California* "squarely control[s]" this materially identical case. *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025).

*American Public Health Association v. National Institutes of Health ("NIH")*, 145 F.4th 39, 43-44, 47 (1st Cir. 2025), confirms these basic tenets. There, the plaintiffs brought APA claims alleging that the government's terminations of their diversity, equity, and inclusion-related research grants were arbitrary and capricious, and the district court vacated the terminations on those grounds. The First Circuit denied the government's request for a stay, concluding that the district court "likely had jurisdiction to enter the orders . . .to set aside an agency's actions as arbitrary and capricious," and reasoning that "the fact that the 21 orders may result in the disbursement of funds did not divest the court of its jurisdiction." *Id*. at 52 (citation modified).

In an ruling issued on August 21, 2025, seven days after this Court granted the current Plaintiffs' motion for a preliminary injunction, the Supreme Court disagreed with the First Circuit. The Supreme Court stayed the district court's judgment "vacating the Government's termination of various research-related grants." *Nat'l Insts. of Health ("NIH") v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2659 (U.S. 2025). The Court held that the APA's "limited waiver of sovereign immunity does not provide the District Court with jurisdiction to adjudicate claims based on the research-related grants." *Id.* (citation modified). So claims reliant on a grant agreement are impliedly precluded. Moreover, a district court is not just barred from asserting jurisdiction over a claim based on a grant agreement. If the relief sought is "relief designed to enforce any obligation to pay money pursuant to those grants" then that too is barred. *Id.* (internal quotation marks omitted) (quoting *California*, 604 U.S. at 651). Notwithstanding various "objection[s]" that have

- 15 -

been raised to adjudication of these claims in the Court of Federal claims, such arguments "to sending the grant-termination claims to the [Court of Federal Claims]" are "already addressed" by *California* and have been conclusively rejected. *NIH,* 145 S. Ct. at 2662 n.1 (Barrett, J., concurring).

The Fourth Circuit has already heeded the Supreme Court's instructions regarding APA jurisdiction of grant terminations in a case almost identical to this case. *See Sustainability Inst. v. Trump*, 165 F.4th 817, 826-27 (4th Cir. 2026). Like the Plaintiffs in this case, the plaintiffs there challenged the Government's decision to "suspend[] or terminate[] environmental and agricultural grants it had previously awarded to several nonprofit organizations and local governments." *Id*. at 821. Importantly, the *Sustainability Institute* plaintiffs sought the same relief that Plaintiffs seek here, an order to "'hold unlawful and set aside any actions taken . . . to freeze or terminate [their] federal grants'"; '[p]reliminarily and permanently enjoin Defendants from continuing to freeze or terminating [their] grants or effectuating any termination'; and '[p]rohibit Defendants from otherwise impeding, blocking, cancelling, or terminating Plaintiffs' access to their funds.'" *Id*. at 823. Many of these grants were, like Plaintiffs' grants, funded through the Inflation Reduction Act. *Id*. at 821. The Fourth Circuit found that the district court had incorrectly awarded the plaintiffs the relief that they sought because "[t]here is no meaningful difference between the district court's order here and the district court's order in *California*." *Id.* at 826 (*citing Department of Education v. California* 604 U.S. at 651). Even though the plaintiffs brought claims under the APA and framed their claims as stemming from the Constitution and various statutes, the Court determined "alleged statutory and constitutional violations do not alter the essentially contractual nature of Plaintiffs' APA claims before us on appeal. 'The core of [P]laintiffs' suit alleges that the

Government unlawfully terminated their grants.'" *Sustainability Inst*., 165 F.4th at 826 (quoting *NIH*, 145 S. Ct. 2665 (Kavanaugh, J., concurring)).

Plaintiffs attempt to get past the jurisdictional bar by arguing that because they appealed the decisions to terminate their grants to the Department's National Appeals Division ("NAD"), that makes their claims reviewable under 7 U.S.C. § 6999. Pls.' Mot. for Prelim. Inj. at 15. Plaintiffs are mistaken. Before NAD can consider an appeal, the NAD must determine whether the decision is appealable. 7 U.S.C. § 6992(d). Decisions that are "a matter of general applicability" are "not subject to appeal." *Id*. In this case, NAD determined that Plaintiffs' grant terminations were not appealable because their appeal concerned "a matter of general applicability." NAD Letter (ECF No. 65-3 at 60-61). Specifically, NAD determined that the denial was "not based on specific program criteria" but instead "based on general policy priorities of [the Department] and its decision to cancel the [increasing land access] program." *Id*. Accordingly, the NAD director "decline[ed] to accept [Plaintiff's] request for an appeal." *Id*. at 61. The judicial review provision that Plaintiffs cite states that "a final determination of the Division shall be reviewable and enforceable by any United States district court of competent jurisdiction." 7 U.S.C. § 6999. But this provision does not apply because NAD determined that the grant terminations were not appealable in the first place, NAD Letter (ECF No. 65-3 at 60-61), and thus there is no "final determination" to review. 7 U.S.C. § 6999. Notably, the cases that Plaintiffs cite are all cases where NAD had determined the decision was appealable and issued a substantive decision on the merits. *Deaf Smith County Grain Processors, Inc. v. Glickm*an, 162 F.3d 1206, 1209 (D.C. Cir. 1998); *Enter. Nat'l Bank v. Johanns*, 539 F. Supp. 2d 343, 344 (D.D.C. 2008)

Moreover, to the extent that the district court has any jurisdiction to review the NAD decisions, that jurisdiction would be limited to reviewing whether the NAD correctly decided that the grant terminations are appealable.  The statute vests a district court with jurisdiction to review "a final determination of the Division."  7 U.S.C. § 6999.  But here, the only "final determination" is that the grant terminations were not appealable because the appeal concerned "a matter of general applicability."  NAD Letter (ECF No. 65-3 at 60-61).  Plaintiffs are not asking the Court to decide whether the NAD was correct in deciding that the grant terminations were not appealable, they are asking the Court to reinstate the grant agreements, which goes beyond what NAD considered.  *See generally*, Prop. 2d. Am. Compl.   Because NAD never made it past the initial step of determining that the terminations were not appealable under 7 U.S.C. § 6992(d), that is the only determination that a district court would have jurisdiction to review.  To hold otherwise would impliedly repeal all jurisdictional statutes applicable to the Department, because any plaintiff could bring any claim before NAD, receive an adverse determination of appealability, and subsequently seek relief on the underlying merits in the District Court under 7 U.S.C. § 6999.  Accordingly, because NAD determined that the grant terminations are "not appealable," 7 U.S.C. § 6999 does not vest the Court with jurisdiction.

In sum, Congress limited the relief available for contractual claims against the Federal Government to money judgments.  Plaintiffs cannot circumvent that choice through artful pleading.  Because the Tucker Act provides an adequate remedy in the COFC, it precludes relief under the APA.

### C. Decisions on Which Grants to Fund are Committed to Agency Discretion by Law.

APA review also is unavailable here because the action that Plaintiffs challenge is "committed to agency discretion by law."  5 U.S.C. § 701(a)(2).  Plaintiffs do not cite authority

that limits the Department's inherent discretion to make independent decisions about the amount of appropriations to expend during a given time period, whether to award or maintain particular grants, and the number of grants to award or maintain over a particular time frame.  Courts have explained that agency action is "committed to agency discretion by law" when a "statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion," rendering "meaningful judicial review . . . impossible."  *Steenholdt v. FAA*, 314 F.3d 633, 638 (D.C. Cir. 2003) (*quoting Heckler v. Chaney*, 470 U.S. 821, 830 (1985)).  This is true "even where Congress has not affirmatively precluded review."  *Heckler,* 470 U.S. at 830. Hallmarks of a decision committed to agency discretion include a statute that puts the onus on the agency, not the courts, to apply a standard, and general criteria that make it difficult for courts to meaningfully second-guess an agency determination.  *See id*.; *see also Webster v. Doe*, 486 U.S. 592, 600 (1988).

The statute authorizing the Department to issue the ILA grants is one such statute.  The statute simply directed the Secretary "to provide grants and loans to eligible entities, . . . to improve land access (including heirs' property and fractionated land issues) for underserved farmers, ranchers, and forest landowners, including veterans, limited resource producers, beginning farmers and ranchers, and farmers, ranchers, and forest landowners living in high poverty areas."  Inflation Reduction Act § 22007(b).  The statute does not direct the Department to enter into particular grants, or fund particular grants, or a certain number of grants within a given time frame.  *See Vt. Yankee Nuclear Power Corp. v. Natural Re. Def. Fund*, 435 U.S. 519, 545 (1978) (explaining that a court may not "dictat[e] to the agency the methods, procedures, and time dimension" to make an agency decision); *see also Sealed v. Sealed*, 332 F.3d 51, 56 (2d Cir. 2003) (distinguishing between a statute that "channels official discretion by mandating a defined administrative outcome" and a

statute that "merely authorizes particular actions"). Because the statute's authorization to fund grants encompasses broadly drawn topics and guidelines that would not provide a meaningful rubric for court review, the Department's decision on which grants to fund is committed to agency discretion by law.

### D. The Grant Terminations are not Contrary to Law.

The terminations are not contrary to law because Congress did not intend for the ILA grants to be used to fund projects that give preferences to individuals based on their immutable characteristics. The Inflation Reduction Act appropriated $250 million "to provide grants and loans to eligible entities, as determined by the Secretary, to improve land access . . . for underserved farmers, ranchers, and forest landowners, including veterans, limited resource producers, beginning farmers and ranchers, and farmers, ranchers, and forest landowners living in high poverty areas." IRA § 22007(b). By its plain text, the provision funds initiatives based on farmers' financial status and does not mention race, sex, or sexual orientation. Section 22007(b) allows the Department to continue to fund initiatives that that assist "underserved" and "limited resource" producers without funding awards that discriminate based on immutable characteristics. See e.g., World Farmers Inc. Letter (ECF No. 63-4 at 62).

Section 22007(b) of the Inflation Reduction Act amended Section 1006 of the American Rescue Plan Act ("ARPA"). Pub. L. 117-2, 135 Stat 13 (Mar. 11, 2021). And to be sure, Section 1006 of the American Rescue Plan Act originally appropriated $1 billion to support "socially disadvantaged farmers, ranchers, forest landowners, and operators and groups," of which only a portion was to be used "to improve land access." ARPA § 1006(a), (b)(2). A "socially disadvantaged farmer or rancher" is farmer or rancher who is a member of a socially disadvantaged group," 7 U.S.C. § 2279(a)(5), and a "socially disadvantaged group" is "a group whose members have been subjected to racial or ethnic prejudice because of their identity as members of a group

without regard to their individual qualities." *Id.* § 2279(a)(5).  But operation of ARPA § 1005, which authorized benefits for "socially disadvantaged farmers or ranchers," immediately faced injunctions prohibiting its implementation in multiple district courts for violating equal protection principles of the Constitution.  *See e.g., Miller v. Vilsack*, Civ. A. No. 21-0595, 2021 U.S. Dist. LEXIS 264778, at *23-24, 35-36 (N.D. Tex. Jul. 1, 2021) (preliminarily enjoining the Secretary from "discriminating  on account of race or ethnicity in administering section 1005 of the American Rescue Plan Act" which provided debt relief to "socially disadvantaged farmers" because "Plaintiffs are likely to succeed on the merits of their claim that the Government's use of race-and ethnicity-based preferences in the administration of the loan-forgiveness program violates equal protection under the Constitution.");  *Wynn v. Vilsack*, 545 F. Supp. 3d 1271, 1288 (M.D. Fla. 2021) (same); *Holman v. Vilsack*, Civ. A. No. 21-1085, 2021 U.S. Dist. LEXIS 127334, at *25-26 (W.D. Tenn. Jul. 8, 2021).  It was on this background, recognizing the potential constitutional infirmities of the "socially disadvantaged" designation, that Congress repealed ARPA § 1005 (IRA § 22008) and significantly revised § 1006 (IRA § 22007) with enactment of the Inflation Reduction Act on August 16, 2022.

Unlike Section 1006 American Rescue Plan, the Section 22007(b) of the Inflation Reduction Act does not purport to assist "socially disadvantaged farmers," and does not even contain the term "socially disadvantaged farmers."  Thus, unlike its predecessor statute, Section 22007(b) of the Inflation Reduction Act supports "underserved" and "limited resource" farmers regardless of whether those farmers qualify as "socially disadvantaged farmers."  If Congress intended for the funds appropriated under Section 22007(b) of the Inflation Reduction Act to fund grants for programs that assisted farmers not based on their financial status but based on their race or other protected class, then Congress would not have amended the statute to omit the term

"socially disadvantaged farmers and ranchers." *See Van Buren v. United States*, 593 U.S. 374, 393 (2021) ("When Congress amends legislation, courts must presume it intends the change to have real and substantial effect."). By removing the term, "socially-disadvantaged" and replacing it with criteria primarily based on income rather than race, gender, or other immutable characteristics, Congress would have prevented the ILA Program from being enjoined as unconstitutional.

Furthermore, it is inapposite that the statute otherwise contemplated race-based distinctions, such as the creation of equity commissions in the revised Sec. 1006(c) to "address racial equity issues within the Department of Agriculture and the programs of the Department of Agriculture." That requirement did not seek to provide prospective public benefits based solely on race, ethnicity, gender, or sexual orientation, but rather to address internal administration of the Department. In addition, the requirement to "provide financial assistance … to farmers, ranchers, or forest landowners determined to have experienced discrimination prior to January 1, 2021, in Department of Agriculture farm lending programs," Sec. 1006(e), was a wholly separate program (the Discrimination Financial Assistance program) whose purpose was to remediate discrete prior instances of discrimination in Department programs. That bore no relation to the newly created ILA program and the risk identified by at least three district courts of violating equal protection principles in providing prospective benefits based solely on race or ethnicity.

Thus, the Department's decision to terminate the prospective plaintiffs' grants because the grants discriminate on the basis of immutable characteristics, World Farmers Inc. Letter (ECF No. 63-4 at 62), was not contrary to law.

### E. The Termination Decisions were not Arbitrary and Capricious.

The prospective plaintiffs next argue the termination decisions were arbitrary and capricious. Pls.' Mot. for Prelim. Inj. at 19. In evaluating agency actions under the arbitrary and

capricious standard courts must consider 'whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *United Steel Int'l Union v. Pension Ben. Guar. Corp.,* 839 F. Supp. 2d 232, 245 (D.D.C. 2012), *aff'd*, 707 F.3d 319 (D.C. Cir. 2013) (*quoting, Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989) (internal quotations and citation omitted); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971); *DIRECTV, Inc. v. FCC*, 110 F.3d 816, 826 (D.C. Cir. 1997)).   To qualify as arbitrary and capricious, an agency typically must have "relied on factors which Congress has not intended it to consider," "entirely failed to consider an important aspect of the problem," "offered an explanation for its decision that runs counter to the evidence before the agency," or be "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Virginia v. Johnson*, 609 F. Supp. 2d 1, 6-7 (D.D.C. 2009) (quoting *State,* 463 U.S. at 43 (internal quotation marks omitted)).

### 1. Defendants Justified their Change in Position.

The prospective plaintiffs first argue Defendants failed to justify their change in position. Pls.' Mot. for Prelim. Inj. at 20.  Not so.  As just explained, the change in position was in part based on Congress's decision to amend the statute creating the ILA program to remove the term "socially disadvantaged."  Beyond that, on July 10, 2025, the Department published a final rule where it determined that it would "no longer employ the race- and sex-based 'socially disadvantaged' designation to provide increased benefits based on race and sex" in awarding discretionary grants.  90 Fed. Reg. 30555 (Jul. 10, 2025).

The Department explained its reasoning for this decision.  On June 7, 2024, a district court had preliminarily enjoined the Department from applying race-based criteria in various assistance programs finding that the practice violated the Constitution's equal protection clause.  *Strickland v. Dep't of Agric.*, 736 F. Supp. 3d 469, 483 (N.D. Tex. 2024); 90 Fed. Reg at 30556.  The

- 23 -

Department found that this ruling was part of "an emerging judicial scrutiny of remedial race-based classifications, particularly considering Supreme Court precedent clarifying constitutional limits on affirmative action."  90 Fed. Reg. at 30556; *see also, Strickland*, 736 F. Supp. 3d at 480 (*citing Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll*, 600 U.S. 181, 206 (2023); *Parents Involved in Community Schools v. Seattle School Dist. No. 1*, 551 U.S. 701 (2007)).  Accordingly, the Department determined that "moving forward" it would "no longer apply race- or sex-based criteria in its decision-making processes, ensuring that its programs are administered in a manner that upholds the principles of meritocracy, fairness, and equal opportunity for all participants."  90 Fed. Reg at 30557.

Two months after the Department issued the final rule, the Department issued a notice that the Farm Service Agency, the agency which administers the ILA program, would "no longer employ the race and sex-based 'socially disadvantaged' designation to provide increased benefits based on race and sex" in several additional programs.  90 Fed. Reg. 44623 (Sept. 16, 2025).  The Department cited the *Strickland* decision, the July 10, 2025, final rule, and Executive Orders 14148 and 14173 as the basis for its decision.  *Id.* at 44624.  In reaching those decisions, the Department acknowledged that it "faced a long history of litigation stemming from allegations of discrimination in the administration of its farm loan and benefit programs" but "over the past several decades," "has undertaken substantial efforts to address past problems, culminating in comprehensive settlements, institutional reforms, and compensatory frameworks."  *Id*.; *see also* 90 Fed. Reg. at 30555-56 (detailing past efforts to remedy historic race and sex discrimination in Department programs).  With these efforts, the Department determined that it had sufficiently addressed past discrimination and thus could no longer justify race- or sex based remedies.  90 Fed. Reg. 44624.

The termination letters that Plaintiffs received cited the July 10, 2025 final rule and the September 16, 2025 notice as reasons for the termination. *See e.g.,* World Farmers Inc. Letter (ECF No. 63-4 at 62). Accordingly, the Department has adequately explained its change in position regarding the Land Access grants.

2.  The Termination Letters Were Supported by Evidence Before the Department.

The Department explained its reasoning for the grant terminations in the termination letters. The Department determined that the grants did "not align with the Department's goals and priorities." *See e.g.*, World Farmers Inc. Termination Letter (ECF No. 63-4 at 62). Specifically, the awards did not "reflect the Department's priorities of unity, equality, meritocracy, and color-blindness." *Id.* The grants benefited people based on their membership in a protected class, even though Congress had amended the statute creating the program to benefit "underserved farmers" regardless of race, sex, national origin, or sexual orientation. *Id.* Those issues biased the application and selection processes, necessitating a full program realignment. *Id.*

Contrary to the prospective plaintiffs' characterizations, Pls.' Mot. for Prelim. Inj. at 25-26, each termination letter explains specifically why the given grant award was inconsistent with Congressional intent and the Department's decision not to fund grants that favor certain beneficiaries because of their membership in a protected class. Several examples are worth highlighting here. First, the Department terminated World Farmer's grant because the award included financial support to farmers "classified as socially disadvantaged based on the individual's race or ethnicity," and included a stipend that was only available to "farmers of color." World Farmers Letter (ECF No. 63-4 at 64). Second, the Department terminated Our Space's award because the award was limited to assisting "specialty crop farmers of the Black Diaspora." Our Space Letter (ECF No. 65-6 at 109). Third, the San Diego Food System Alliance's grant was terminated because the award was limited to benefiting "underserved BIPOC food producers and

other marginalized grower communities," and various benefits from the project, were only available to certain producers based on their race or ethnicity.  San Diego Food System Alliance Letter (ECF No. 63-7 at 76-77).  Agrarian Land Trust's grant was terminated because beneficiaries were limited to "Black, Indigenous, People of Color (BIPOC) farmers."  Agrarian Land Trust Letter (ECF No. 64-3 at 95).  Fifth, Cultivate Kansas City's grant was terminated because the grant continued its focus on "socially disadvantaged farmers" even though Congress had amended the statute to remove references to "socially disadvantaged farmers."  Cultivate Kansas City Letter (ECF No. 63-6 at 65-66).  Indeed, Plaintiffs have posted each of the twenty-four termination letters to the docket and each letter contains a specific explanation for how the grant gives preferences to certain individuals based on their membership in a protected class and is thus inconsistent with Congressional intent and the Secretary's decision not to award grants based on immutable characteristics.

Even if the termination letters are not a "model of analytic precision," *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1404 (D.C. Cir. 1995), the basis for the action is "set forth with [enough] clarity as to be understandable." *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947), and contains "a rational connection between the facts found and the choice made." *Frizelle v. Slater*, 111 F.3d 172, 176 (D.C. Cir. 1997).  Given the facts found, Defendants reasonably determined that the grants should be terminated because of the DEI criteria in the grants, and Defendants' decision was "support[ed]" by the "record evidence." *Fla. Gas Transmission Co*. v. *FERC*, 604 F.3d 636, 645 (D.C. Cir. 2010).

Plaintiffs cite some instances where they believe the Department misinterpreted the goals of the awards and argue that the Department's decisions were contrary to evidence.  Pls.' Mot. for Prelim. Inj. at 26.  But these awards did, in fact, contain criteria favoring beneficiaries based on

- 26 -

immutable characteristics.  In its award justification, the Iowa Valley Resource Conservation and Development sought to address "the systemic barriers to entering the agricultural sector for Black, Indigenous, and other people of color (BIPOC)."  *See* ECF No. 64-5 at 14.  The organization specifically expressed a need for a "a younger, more diverse pool of farmers to begin learning the trade."  *Id*.  The Sustainable Iowa Land Trust grant targeted its assistance toward "the three Iowa cities with the largest populations of BIPOC, Latinx, immigrant, refugee, and other underrepresented individuals," Sustainable Iowa Project Narrative (ECF No. 64-6 at 15), demonstrating that the primary motivation behind the program was to provide assistance based on race and national origin rather than socioeconomic status.  Sustainable Iowa Letter (ECF No. 64-6 at 106) (noting that beneficiaries are "primarily" "Black farmers in Waterloo," "immigrant and Black farmers in Cedar Rapids" and "refugee farmers in Des Moines.").  The Heru Urban Farming grant is similar.  The proposal notes that of the 106,715 agriculture producers in Missouri, only 2,036 are racial or ethnic minorities, ECF No. 65-3 at 9, but that "the demographics and characteristics of the St. Louis Urban Farmers Collective leadership, partners, and key stakeholders originate from and are reflective and representative of the population of the geographical area, and include 75% Black/African American, 5% Hispanic/Latinx, 5% Asian, 8% Multi-Racial, and 12% Other Races/White."  *Id*. at 8.  This language demonstrates that the primary goal behind the Heru Urban Farming grant is to assist individuals based on their immutable characteristics.  Heru Urban Farming Letter (ECF No. 65-3 at 49) (concluding, based on the project narrative, that "beneficiaries of the award are expected to be entirely Black, Indigenous, and other Persons of Color (BIPOC) producers.").  Finally, Plaintiffs admit that eligibility for assistance from the NDN Collective grant is conditioned on membership in an American Indian tribe but argue tribal membership is a political, not a racial or ethnic status.  Pls.' Mot. for Prelim. Inj. at 27.  But it goes

without saying that one must have American Indian ancestry to be a member of an American Indian tribe. NDN Collective Letter (ECF No. 64-4 at 52-53). Regardless, Defendants acknowledge that tribes possess a unique government-to-government and political relationship with the United States that are legally distinct from policy-based DEI programs. Secretary's Memorandum 1078-010 (https://www.usda.gov/directives/sm-1078-010, May 5, 2025). Defendants noted other program-wide infirmities (such as the risk of fraud, waste, and abuse) and the bias to the application and selection processes. NDN Collective Letter (ECF No. 64-4 at 52-53).

In reviewing the Department's termination decisions, the Court's role is not to "ask whether record evidence could support the petitioner's view of the issue, but whether it supports the [agency's] ultimate decision." *Fla. Gas Transmission Co.*, 604 F.3d at 645. Indeed, "[i]t would defy that standard of review [under *State Farm*] to invalidate [an agency's] decision simply because there are alternate methods by which to calculate [], even if those alternatives might ultimately produce a more accurate" result. *Baystate Franklin Med. Ctr. v. Azar*, 950 F.3d 84, 89 (D.C. Cir. 2020). The agency's decision is presumed to be valid, and a court must not substitute its judgment for that of the agency. *Havens,* 146 F. Supp. 3d at 214 (citing *Citizens to Preserve Overton Park*, 401 U.S., 415; *State Farm*, 463 U.S. at 43).

Finally, the prospective plaintiffs argue that Defendants failed to consider their reliance interests when the Department decided to terminate their grants. Pls.' Mot. for Prelim. Inj. at 29. For an agency to change its course to an extent that the change undermines "serious reliance interests," the agency need only acknowledge and address those interests and explain why it nonetheless changes its policy. *FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009). As explained in part E.1 above, the Department explained its change in position. The termination

- 28 -

letters acknowledge the reliance interests, but the Department determined that the reliance interest is outweighed by the "public interest ensuring that the increasing land program, as a whole, accomplishes its statutory purpose to improve land access and that the selection of beneficiaries does not discriminate based on immutable characteristics." *See e.g.,* Heru Urban Farming Letter (ECF No. 65-3 at 48).  This explanation is sufficient under Supreme Court precedent.  *Fox Television Stations*, 556 U.S. at 515.

### F. Plaintiffs Failed to Demonstrate that They Will Suffer Irreparable Harm Absent Preliminary Relief.

The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.  The moving party must demonstrate an injury that is "'both certain and great'" and "of such imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm."  *Id*. (emphasis in original) (*quoting Chaplaincy of Full Gospel Churches*, 454 F.3d at 298).  The injury must "be beyond remediation," meaning that where, as here, the "possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1234 (D.C. Cir. 2024) (citation modified). Plaintiffs have the burden to put forth sufficient evidence to satisfy this high standard.  "The movant cannot simply make 'broad conclusory statements' about the existence of harm.  Rather, [the movant] must 'submit[ ] . . . competent evidence into the record . . . that would permit the Court to assess whether [the movant], in fact, faces irreparable harm[.]'" *Aviles-Wynkoop v. Neal*, 978 F. Supp. 2d 15, 21 (D.D.C. 2013) (*quoting Cornish v. Dudas*, 540 F. Supp. 2d 61, 65 (D.D.C. 2008)).  In short, "irreparable harm requires not only a concrete, particularized harm, but a harm that is sufficiently serious and irremediable so as to warrant the extraordinary relief of a court's intervention in a case before factual and legal development." *Santos,* 2025 WL 1823471, at \*6.

This case is about funding. Pls.' Mot. for Prelim. Inj. at 30. The prospective plaintiffs' irreparable harm arguments largely focus on interim harms they will experience based on a lack of funding such as staff layoffs, shutting down or suspending certain programs, or drawing upon other sources of funding. *Id*. But these harms are entirely economic. "Mere injuries, however substantial, in terms of money, time and energy necessarily expended . . . are not enough." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (*quoting Wis. Gas Co.*, 758 F.2d at 674). Rather, it is black-letter law that economic harm is generally not irreparable because compensation after the lawsuit generally ensures full relief. *Wis. Gas Co.*, 758 F.2d at 674 (describing that principle as "well-settled"). The only exceptions are "where the loss threatens the very existence of the movant's business," *id*., or "where the claimed economic loss is unrecoverable." *Safari Club Int'l v. Jewell*, 47 F. Supp. 3d 29, 36 (D.D.C. 2014) (citation omitted).

The first exception is a narrow one—it encompasses only cases where the plaintiffs demonstrate "extreme hardship to the business*." Gulf Oil Corp. v. Dep't of Energy*, 514 F. Supp. 1019, 1025 (D.D.C. 1981). Plaintiffs may be forced to make difficult choices in critical areas of their operations without incurring irreparable harm sufficient to warrant injunctive relief. *Cf. Boivin v. U.S. Airways, Inc.*, 297 F. Supp. 2d 110, 118–19 (D.D.C. 2003) ("[T]he forced sale of a house . . . do[es] not rise to the level of 'irreparable' harm necessary to warrant the extraordinary remedy of a preliminary injunction."). And Plaintiffs must document any claim that an alleged harm is a threat to the business's very existence with specific details. *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 51–52 (D.D.C. 2011) (plaintiff needed to "offer a projection of anticipated future losses, tie that to an accounting of the company's current assets, [and] explain with . . . specificity how he arrived at the conclusion that he would be forced out of business in eighteen months" to show irreparable harm on this theory).

A few of the prospective plaintiffs claim that absent reinstatement of their funding they may have to shutter their operations entirely. Pls.' Mot. for Prelim. Inj. at 31. But even these prospective plaintiffs offer no meaningful explanation for why, if funding were restored after an outcome favorable to them in this action, they would not be able to reopen. Because the prospective plaintiffs have not offered "proof" that they will cease to exist and that their losses will be unrecoverable if the grant terminations are not preliminary enjoined, they have not demonstrated that they will suffer irreparable harm absent a preliminary injunction. *Wis. Gas Co.*, 758 F.2d at 674.

Nor do Plaintiffs claimed reputational injuries show irreparable harm. "The loss of business opportunities, market share, and customer goodwill are typically considered to be economic harms"—and thus recoverable. *Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.*, 840 F. Supp. 2d 327, 335 (D.D.C. 2012). Further, the alleged harm must "directly result from the action which the movant seeks to enjoin." *Wis. Gas Co.*, 758 F.2d at 674. Thus, when a harm is "based on independent market variables such as how [a company's] customers and/or retailer consumers might react," that harm does not flow directly from the challenged action. *Am. Meat Inst. v. USDA*, 968 F. Supp. 2d 38, 81 (D.D.C. 2013), *aff'd*, 746 F.3d 1065 (D.C. Cir. 2014); *see Safari Club Int'l v. Jewell*, 47 F. Supp. 3d 29, 37 (D.D.C. 2014), *appeal dismissed*, 2014 WL 5838221 (D.C. Cir. Nov. 7, 2014).

Plaintiffs also claim the grant terminations "will cause immediate and irreparable harm to the livelihoods of the communities that were intended to benefit from the land access program." Pls.' Mot. for Prelim. Inj. at 33. But these are not harms that Plaintiffs will experience themselves. "[H]arm that might befall unnamed third parties does not satisfy the irreparable harm requirement in the context of emergency injunctive relief, which must instead be connected specifically to the

parties before the Court." *New Mexico v. Musk.* 769 F. Supp. 3d 1, 7 (D.D.C. 2025) (*quoting Church v. Biden*, 573 F. Supp. 3d 118, 146 (D.D.C. 2021)); *see also Kansas v. United States*, 124 F.4th 529, 534 (8th Cir. 2024) ("The irreparable-harm analysis focuses on the moving party, not the nonmoving party or some third party.") (citation omitted).  For example, in *New Mexico*, 769 F. Supp. 3d at 6, although the Court noted that "[t]erminating thousands of federal employees may cause extreme harm to the individual employees, and potentially the institution writ large," the Court held that it could not consider alleged harm to parties not before the Court on a request for emergency injunctive relief.  *See id.*  Likewise, in this case, Plaintiffs' allegations concerning possible harm to third parties cannot support emergency relief.

The Court should also view the prospective plaintiffs' claims of irreparable harm with skepticism because most of the prospective plaintiffs grants were terminated on March 23, 2026 but the prospective plaintiffs waited more than two months to seek preliminary injunctive relief. Mot for PI (ECF No. 63). On that basis alone, Plaintiffs' motion for preliminary injunction should denied.  *Dallas Safari Club v. Bernhardt*, 453 F. Supp. 3d 391, 403 (D.D.C. 2020) ("an unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm.").  Notably, the D.C. Circuit has held that a delay of just forty-four days in moving for injunctive relief "was 'inexcusable,' and 'bolstered' the 'conclusion that an injunction should not issue,' particularly where"—as here—the movant "had knowledge of the pending nature of the alleged irreparable harm."  *Id.* (quoting *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975)); *see also Open Top Sightseeing*, 48 F. Supp. 3d at 90 (holding that delay of thirty-six days before filing for preliminary injunctive relief was "dilatory action" that failed to clear the high bar needed to show entitlement to relief).  Plaintiffs' decision

to wait two months or more before seeking extraordinary relief in this Court thus further weighs against issuing a preliminary injunction in this case.

Finally, because recovery against the government on improperly terminated contracts is available in appropriate actions in the Court of Federal Claims, this is not an instance in which sovereign immunity leaves government funds unrecoverable. In *Department of Education v. California*, 604 U.S. at 652, the Supreme Court held it was appropriate to stay a temporary restraining order enjoining the government from terminating various education-related grants, reasoning that "if [the grantees] ultimately prevail, they can recover any wrongfully withheld funds through suit in an appropriate forum." The same rationale applies to this case. Accordingly, Plaintiffs failure to establish that they will suffer irreparable harm absent preliminary relief warrants denying their motion for preliminary injunction.

### G. The Balance of Equities Weighs Against Granting Plaintiffs Relief.

The third and fourth requirements for issuance of a preliminary injunction—the balance of harms and whether the requested injunction will disserve the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). These factors tilt decisively against granting a preliminary injunction here. *See Kim v. FINRA*, 698 F. Supp. 3d 147, 172 (D.D.C. 2023) ("[A] court can deny preliminary injunctive relief solely on the balance of equities and public interest factors even in cases, like this, involving constitutional claims."), appeal dismissed, No. 23-7136, 2025 WL 313965 (D.C. Cir. Jan. 27, 2025).

Granting a preliminary injunction would disrupt the Department's efforts to ensure that it is funding grants consistent with Congressional mandates, the Equal Protection Clause and the Secretary's priorities. The public has an interest in permitting the Department to take decisive action when it comes to setting its policy priorities. Entering any sort of preliminary relief would displace and frustrate the Executive's decision about how to best address those issues. *Heckler*,

470 U.S. at 831–32. Moreover, the government will likely be unable to recover the grant funds once they are disbursed because Plaintiff has not "promised to return withdrawn funds should its grant termination be reinstated." *California*, 604 U.S. at 652. As discussed above, Plaintiffs will not suffer irreparable harm from the denial of their request for preliminary relief because they have not shown that their harm could not otherwise be remediated later.

### H. Any Preliminary Injunction Should be Stayed.

To the extent the Court issues any injunctive relief, Defendants respectfully request that such relief be stayed pending the disposition of any appeal that is authorized by the Solicitor General, or, at a minimum, administratively stayed for a period of seven days to allow the United States to seek an emergency, expedited stay from the Court of Appeals if an appeal is authorized.

### I. The Court Should Order that Plaintiffs Post a Bond as a Condition of Preliminary Relief.

Defendants also respectfully request that any injunctive relief be accompanied by a bond. "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The D.C. Circuit recently clarified that "injunction bonds are generally required." *NTEU v. Trump*, No. 25-5157, 2025 WL 1441563, at *3 n.4 (D.C. Cir. May 16, 2025), *reh'g en banc denied* (July 16, 2025). A bond is appropriate here given that the requested preliminary relief would potentially require the Executive to spend money and resources that may not be recouped once distributed and employed.

### III. Plaintiffs' Amended Complaint Would Not Survive a Motion to Dismiss.

The Court should also deny Plaintiffs' motion for leave to file a second amended complaint to add the twenty-four prospective plaintiffs to the lawsuit because granting such leave would be

- 34 -

futile.  *See* Mot. to Amend (ECF No. 61).  As explained above, Plaintiffs' APA claims stemming from the termination of their own grants will not succeed.  Plaintiffs' remaining claims are also futile.  First, Plaintiffs' APA claim arising from an alleged unlawful policy of terminating grants *en masse* will not succeed because the claim does not challenge a discrete final agency action.  Second, the Court already determined that Plaintiffs are unlikely to succeed on their constitutional and ultra vires claims and thus the Court should not permit Plaintiffs to press forward with these claims in a second amended complaint.  Finally, Plaintiffs' motion for leave should be denied because adding twenty-four additional Plaintiffs more than a year after this lawsuit was filed, and where there is an open question as to whether the Court even has jurisdiction to entertain Plaintiffs' claims, will unduly prejudice Defendants.

### A.  Plaintiffs' Policy or Practice Claim is not a Valid Claim Under the APA.

The APA authorizes courts to review only 'final agency action[s].'" *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218, 1235 (D.C. Cir. 2026) (quoting 5 U.S.C. § 704) (alteration in original). "To be final and thus reviewable, an agency action must (1) mark the 'consummation' of the agency's decisionmaking process" and (2) determine 'rights or obligations,' or produce 'legal consequences.'" *Id.* (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)).  "Each prong of *Bennett* must be satisfied independently for agency action to be final." Id. (citation omitted).  The agency action in question must also be "circumscribed" and "discrete." *Norton v. Southern Utah Wilderness Alliance* ("*SUWA*"), 542 U.S. 55, 62, 64 (2004).  Plaintiffs cannot, for example, "seek wholesale improvement of" an agency "program by court decree," they instead "must direct [their] attack against some particular 'agency action' that causes [them] harm."  *Id*. at 64 (*quoting Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990)).

Plaintiffs' policy claim does not challenge an identifiable "discrete" action.  Far from presenting a "narrow question to resolve," *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir.

2006), Plaintiffs' purport to bring a challenge to Defendants' alleged "policy mandating grant terminations *en masse*" because the grants to not align with current Department priorities. Prop. 2d Am. Compl. ¶¶ 1, 6, 223, 254 (ECF No. 62-1). Plaintiffs allege "the policy relied on search terms to identify grants for termination without consideration for what those search terms hit and whether the grant could be modified in light of the search term hits," "the policy failed to properly consider whether the terminations were consistent with statutory mandates," and "the policy purported to provide for individualized review, but that individualized review never occurred." Prop. 2d. Am. Compl. ¶ 254. The APA was not intended to allow a plaintiff to allege a pattern of agency conduct in individual transactions or occurrences, label that conduct as a "policy," and challenge it as a final agency action under the APA.

The Department's process of reviewing grant agreements to determine whether they were consistent with the current administration's priorities, and if not, determine if the grant agreements could be modified to make them consistent with the current priorities or terminate them  is "no more an identifiable agency action—much less a final agency action—than a weapons procurement program of the Department of Defense or a drug interdiction program of the Drug Enforcement Administration." *Bark v. Forest Serv.*, 37 F. Supp. 3d 41, 50–51 (D.D.C. 2014) (quoting *Nat'l Wildlife Fed'n*, 497 U.S. at 890). Like those types of programs, the Department's alleged Policy encompasses the choices that the Department has made as to each individual grantee. Plaintiffs cannot "attach[] a policy label" to such varied practices to circumvent the APA's restrictions on judicial review. *Id*. at 50. "All governmental programs are the aggregation of individual decisions," and the APA "ensures that it is the individual decisions that are assessed as agency action[.]" *City of New York v. Dep't of Def.*, 913 F.3d 423, 433 (4th Cir. 2019). Plaintiffs admit that their policy claim is based on a conglomerate of individual grant terminations.

Prop. 2d. Am. Compl. ¶ 254.  In that sense, the alleged Policy as pleaded involves "a number of different types of administrative action," just like the land management plan that the Supreme Court said was too broad to be a discrete agency action in *National Wildlife Federation*. 497 U.S. at 877.  Plaintiffs cannot obtain such "wholesale improvement" through "court decree" of how the Department evaluates its existing grant agreements.  *SUWA*, 542 U.S. at 64.  Instead, Plaintiffs must identify what, exactly, the agency did that they are seeking to challenge.

The D.C. Circuit's recent decision in *Nat'l Treasury Emps. Union v. Vought*, 149 F.4th 762 (D.C. Cir. 2025*), reh'g en banc granted*, U.S. App. LEXIS 33453 (D.C. Cir. Dec. 17, 2025), echoes *Nat'l Wildlife Fed'n*.  In that case the plaintiffs sought to challenge "actions to suspend or terminate [the Consumer Financial Protection Bureau's ("CBPB")] statutorily mandated activities— including by issuing stop-work instructions, cancelling contracts, declining and returning funding, firing employees, and terminating the lease for its headquarters" as a final agency action reviewable under the APA.  *Id.* at 773.  But the D.C. Circuit disagreed that this was a viable APA claim finding that, "rather than seeking to challenge any of these discrete decisions that may have caused them harm, the plaintiffs seek to dress up these 'many individual actions' as a single decision in order to challenge all of them at once, which is exactly what *National Wildlife* prevents." *Id*. at 784 (quoting *Nat'l Wildlife Fed'n*, 497 U.S. at 890).  *"National Wildlife* held that an APA challenge may not bundle together discrete actions in order to challenge them all together." *Nat'l Treasury Emps. Union,* 149 F.4th at 785 (*citing Nat'l Wildlife Fed'n*, 497 U.S. at 893).  But this is precisely what Plaintiffs attempt to do here: they challenge an alleged policy of terminating grant agreements *en masse*.  Prop. 2d Am. Compl. ¶ 223.

Plaintiffs attempt to transform the pleading standard for an APA claim into something more akin to a constitutional tort claim under 42 U.S.C. 1983 against a municipality, also known as a

*Monell* claim.  To set forth a *Monell* claim, a plaintiff must adequately allege "that a policy or custom of the [municipality] caused the constitutional violation."  *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003); (*citing, Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)).  A Plaintiff can state a *Monell* claim "by alleging facts that the municipality 'explicitly adopted the policy that was the moving force of the constitutional violation,' 'knowingly ignore[d] a practice that was consistent enough to constitute custom,' or failed to 'respond[] to a need . . . in such a manner as to show deliberate indifference to the risk that not addressing the need will result in constitutional violations."  *Toure v. District of Columbia*, Civ. A. No. 24-2843 (JMC), 2026 U.S. Dist. LEXIS 60687, at *12 (D.D.C. Mar. 23, 2026) (quoting *Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004)).  In other words, the policy need not be a formally adopted written policy.

An APA claim is different: to bring a claim under the APA, a plaintiff must allege that he or she was aggrieved by a "final agency action."  5 U.S.C. § 704.  An agency action is "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13); *see also Id.* § 701(b)(2).  Plaintiffs' challenge to a purported policy of terminating grants *en masse* without individualized review fits none of these categories. Prop. 2d Am. Compl. ¶¶ 1, 6, 223, 254 (ECF No. 62-1).  A challenged agency action must be discrete and specific. *City of New York*, 913 F.3d at 432 (addressing claim to compel agency action).  The statutory definition of "action" only includes "circumscribed, discrete agency actions."  *SUWA*, 542 U.S. at 62 (describing 5 U.S.C. § 551(13) and explaining that section's reference to an "equivalent ... thereof" "must also be discrete (or it would not be equivalent)" (alteration in original) (quotation marks omitted)).  The discreteness requirement has repeatedly been applied by the Supreme Court and various circuit courts to reject attempts to make federal

courts agents of wholesale agency reform.  *Nat'l Wildlife Fed'n*, 497 U.S. at 890-91 ("land withdrawal review program" "d[id] not refer to a single [agency] order or regulation, or even to a completed universe of particular [agency] orders and regulations," and so was insufficiently "specific" for APA review); *SUWA*, 542 U.S. at 64 ("The limitation to discrete agency action precludes the kind of broad programmatic attack we rejected in [National Wildlife Federation]" in a Section 706(2) action."); *Fund for Animals, Inc. v. Bureau of Land Mgmt.*, 460 F.3d 13, 21 (D.C. Cir. 2006) (explaining that "only specific actions implementing [an agency's] plans," not the plans themselves, "are subject to judicial scrutiny"); *City of New York*, 913 F.3d at 433 (declining to "supervise an agency's compliance with" its "broad statutory mandate" (quotation marks omitted)).

If Congress intended to expand the waiver of sovereign immunity in the APA to allow a plaintiff to challenge a collection or agency actions by labeling them as a "policy," then Congress would not have limited challenges to tangible actions "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13). Instead, Congress would have, at a minimum, included the terms "policy" or "practice."  But the statute contains no such language. And is well established, the APA is a limited waiver of sovereign immunity, *Med. Imaging & Tech. All. v. Libr. of Cong.*, 103 F.4th 830. 836 (D.C. Cir. 2024), and declining to enlarge the scope of agency activity reviewable under the APA is consistent with the longstanding principle that waivers of sovereign immunity should not be enlarged beyond what the language in the statute requires.  *Library of Congress v. Shaw*, 478 U.S. 310, 318 (1986) ("We must construe waivers strictly in favor of the sovereign, and not enlarge the waiver beyond what the language requires.").

Plaintiffs allege that "Each termination of Plaintiffs' grants is a final agency action." Prop. 2d. Am. Compl. ¶ 224. Plaintiffs are correct that an individual termination is indeed final agency actions but programmatic changes are not. *See Nat'l Treasury, Emps. Union*, 149 F.4th at 784 (CFPB's "discrete actions to lay off workers and cancel contracts . . . would have been reviewable in the [Merit Systems Protection Board] or the Court of Federal Claims."). If the Court finds, despite the Tucker Act, that it has jurisdiction over Plaintiffs' claims stemming from their grant terminations, Plaintiffs can challenge terminations of their own grants, but they cannot challenge the terminations as a group as part of an alleged policy. *See Nat'l Wildlife Fed'n*, 497 U.S. at 894.

Additionally, the policy claim would not survive the Tucker Act jurisdictional issues because Plaintiffs' policy claim is merely a way to challenge individual grant terminations as a group. The gravamen of the claim would still be that the "Government unlawfully terminated Plaintiffs grants'" and such claims must be brought in the Court of Federal Claims. *Sustainability Inst.*, 165 F.4th at 826 (quoting NIH, 145 S. Ct. 2665 (Kavanaugh, J., concurring)). Plaintiffs will no doubt point to Justice Barrett's concurrence in *NIH*, 145 S. Ct. 2658 (2025) where Justice Barrett stated that the Supreme Court's holdings in cases like *Department of Education v. California* do not speak to district courts' ability to "declare[] unlawful and vacat[e]" agency "guidance" that results in the terminations. *NIH,* 145 S. Ct. at 2261 ("That the agency guidance discusses internal policies related to grants does not transform a challenge to that guidance into a claim 'founded . . . upon' contract that only the [Court of Federal Claims] can hear. 28 U.S.C. § 1491(a)(1) [the Tucker Act]'). But Plaintiffs are not challenging guidance; they are challenging an alleged policy of terminating grants *en masse* without individualized assessments, which is still, at bottom, a challenge to a breach of a grant agreement. Prop. 2d Am. Compl. ¶¶ 1, 6, 223, 254.

Accordingly, Plaintiffs' policy claim is futile, and the Court should not permit Plaintiffs to continue litigating it in their amended complaint.

### B. Plaintiffs' Untra Vires and Separation of Powers Claims are Futile.

Urban Sustainability, Agroecology, and the prospective plaintiffs bring claims for violation of separation of powers and ultra vires. Prop. 2d. Am. Compl. ¶¶ 273-86. The Appropriations Clause provides that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. In other words, the Clause requires that "the payment of money from the Treasury must be authorized by a statute." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990). At the same time, it is the President's duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

Urban Sustainability claims that terminating the grant violated the Cooperative Forestry Assistance Act. Prop. 2d Am. Compl. 273-81. But as explained previously, Opp'n to PI at 24-25 (ECF No. 22), nothing in the statute requires the Department to fund Urban Forestry's grant specifically. 16 U.S.C. § 2105(c) ("The Secretary is authorized to provide financial, technical, and related assistance."). To be sure, the $28 million grant awarded to Urban Sustainability was made from appropriations under the Inflation Reduction Act. Urban Sustainability Grant (ECF No. 14-2 at 20). But the appropriation simply provided $1.5 billion "to provide multiyear, programmatic, competitive grants" for the "Urban and Community Forestry Assistance program established under . . . of the Cooperative Forestry Assistance . . . for tree planting and related activities." IRA § 23003(a)(2). Congress made these funds available to the Department through September 30, 2031. *Id.* at § 23004(1). Nothing in the Inflation Reduction Act requires the Department to fund any one particular grant at any one particular time.

The same logic applies for Agroecology and the prospective plaintiffs whose grants were funded under 22007(b). The Inflation Reduction Act appropriated $250 million "to provide grants

- 41 -

and loans to eligible entities, as determined by the Secretary, to improve land access . . . for underserved farmers, ranchers, and forest landowners, including veterans, limited resource producers, beginning farmers and ranchers, and farmers, ranchers, and forest landowners living in high poverty areas." IRA § 22007(b). This statute also does not require the Secretary to fund any particular grant. Section 22007(b) funds initiatives based on farmers' financial status and does not mention race, sex, or sexual orientation. Section 22007(b) allows the Department to continue to find initiatives that that assist "underserved" and "limited resource" producers without funding initiatives "that unlawfully discriminate on the basis of immutable characteristics.

The limited cases involving successful Appropriations Clause challenges have involved attempts to spend funds not appropriated by Congress, *see Off. of Pers. Mgmt.*, 496 U.S. at 432, or a refusal to spend appropriated funds where the relevant statutes required that the funds be spent, *see Train v. City of NewYork*, 420 U.S. 35, 42–45 (1975). Neither of those circumstances exists here. The Department has not attempted to spend any funds not appropriated to it, and the Department can re-obligate the funds toward projects consistent with its current priorities.

Finally, Urban Sustainability, Agroecology, and the prospective Plaintiffs' attempt to repackage their contract claims as an *ultra vires* claim, but this claim likewise fails. Ultra vires review is "a doctrine of last resort," *Schroer v. Billington*, 525 F. Supp. 2d 58, 65 (D.D.C. 2007), and the equivalent of "a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009). A plaintiff may seek *ultra vires* review only when "(i) the statutory preclusion of review is implied rather than express, (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts 'in excess of its delegated powers and contrary to a specific prohibition in the' statute that is 'clear and mandatory.'" *Id. (quoting Leedom v. Kyne,* 358 U.S. 184, 188 (1958); *MCorp*

*Fin., Inc.*, 502 U.S. at 44; *McBryde v. Comm. to Review Circuit Council Conduct & Disability Orders of the Judicial Conference of the U.S.,* 264 F.3d 52, 63-64 (D.C. Cir. 2001); *Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Serv. Impasses Panel*, 437 F.3d 1256, 1263-64 (D.C. Cir. 2006)).

Here, as discussed above, the Tucker Act provides remedies for the Plaintiffs to challenge the termination of their grant agreements. This precludes this Court from providing supplemental remedies for the termination, including through *ultra vires* review. And for the reasons discussed above, Plaintiffs' ultra vires claim also fails on the third prong of the test, because Defendants have not violated any "clear and mandatory" statutory command. Finally, allegations of constitutional error do not establish ultra vires action. *See Eagle Tr. Fund v. USPS*, 365 F. Supp. 3d 57, 68 n.6 (D.D.C. 2019). Neither do claims that "simply involve a dispute over statutory interpretation." *Dart v. United States,* 848 F.2d 217, 231 (D.C. Cir. 1988). Rather, an officer may be said to act ultra vires "only when he acts 'without any authority whatever.'" *Penhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101-02 n.11 (1984).

### C. The Court Has Already Rejected Many of The Claims Plaintiffs Put Forth in Their Amended Complaint.

Plaintiffs proposed second amended complaint contains claims for violations of due process, Prop. 2d. Am. Compl. ¶¶ 198-215, and an additional APA claim alleging that the terminations were executed contrary to uniform OMB guidance. *Id*. ¶¶ 216-30. In opposing the current Plaintiffs' motion for preliminary injunction, Defendants explained why these claims were unlikely to succeed on the merits. Defs.' Opp'n to Prelim. Inj. 26-33 (ECF No. 22). The Court agreed with Defendants that these claims were unlikely to succeed. Mem. Op. at 48 (ECF No. 30) (constitutional due process claims); *id.* at 63 (terminations are contrary to the regulations in the OMB Uniform Guidance adopted by USDA). Accordingly, for the same reasons that Defendants

explained in their prior briefing on the current Plaintiffs' motion for preliminary injunction, and the Court explained in ruling on the preliminary injunction, the Court should not permit Plaintiffs amended complaint to include claims that the grant terminations violated due process or were inconsistent with OMB guidance because those claims are futile.

**D. Allowing Amendment at this Stage Would Unduly Prejudice Defendants.**

Finally, in deciding whether to permit an amended complaint, the Court must consider whether the proposed amendment will cause undue prejudice to the opposing party. *See Foman v. Davis*, 371 U.S. 178, 182 (1962). Here, granting Plaintiffs' motion will unduly prejudice Defendants. Plaintiffs first filed this lawsuit more than a year ago and since then, Defendants have produced an administrative record (ECF Nos. 37, 51, 53) the parties briefed the scope of the administrative record, Mem. Op. (ECF No. 72) and the Court has already ordered a demanding discovery schedule. Min. Order, Jun. 12, 2026. Twenty-four additional entities now seek to become parties to the case, which no doubt expands the scope of the case. The Court has ordered Defendants to "supplement the administrative record with all documents related to the termination of [the existing] plaintiffs' grants." Mem. Op. at 25 (ECF No. 72). Granting Plaintiffs' motion for leave to amend the complaint will increase the number of plaintiffs for whom Defendants need to add documents to the administrative record from four to twenty-eight, a sixfold increase.

Moreover, since the Court issued the first motion for preliminary injunction, appellate decisions have called into question the Court's jurisdiction over grant terminations. As explained in Part II.A above, district courts—like this one—likely lack jurisdiction to hear claims stemming from grant terminations, and the Fourth Circuit has already reached this conclusion in a case involving similar grants. *See Sustainability Inst.*, 165 F.4th at 826. Additionally, the D.C. Circuit will soon issue a ruling in a case that addresses the same issue. *Climate United Fund v. Citibank, N.A.*, No. 25-5122 (D.C. Cir.). The *en banc* panel in *Climate United* heard oral argument on

February 24, 2026 and ordered supplemental briefing, which concluded on March 26, 2026. The only remaining step in the process is for the *en banc* panel to issue a ruling.

Finally, denying the prospective plaintiffs leave to join this case will cause them no prejudice. As the prospective plaintiffs themselves admit, rather than join a lawsuit that has already undergone extensive motions practice for over a year, they can file a separate lawsuit. Pls.' Mot. for Leave at 5 (ECF No. 62),

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' motion for leave to file a second amended complaint (ECF No. 62) and the prospective plaintiffs' motion for a preliminary injunction (ECF No. 63).

Dated: June 16, 2026                           Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney


By:          */s/ John J. Bardo*
     JOHN J. BARDO, D.C. Bar #1655534
     Assistant United States Attorney
     601 D Street, NW
     Washington, DC 20530
     (202) 870-6770

*Attorneys for the United States of America*

- 45 -