**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| URBAN SUSTAINABILITY DIRECTORS NETWORK, *et al.*, | |
| Plaintiffs, | Civil Action No. 25-1775 (BAH) |
| v. | Judge Beryl A. Howell |
| UNITED STATES DEPARTMENT OF AGRICULTURE, *et al.*, | |
| Defendants. | |

**<u>MEMORANDUM OPINION</u>**

In August 2025, "[f]ive nonprofit organizations involved in agriculture and ecology-related projects" were granted a preliminary injunction against the United States Department of Agriculture ("USDA") and several component agencies (collectively, defendants), under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.*, enjoining "the termination of six grants awarded to plaintiffs," though requested relief as to a broader swathe of terminated grants was denied at the preliminary stage to the extent based on "defendants' alleged broader 'policy, pattern, and practice of unlawfully terminating' *en masse* 'hundreds of grants' due to changes in agency priorities driven by certain executive orders, notwithstanding the grants' fulfillment of the purposes set out in authorizing statutes and appropriations acts." *Urb. Sustainability Dirs. Network v. U.S. Dep't of Agric.* (*Urb. Sustainability I*), No. 25-cv-1775 (BAH), 2025 WL 2374528, at *1 (D.D.C. Aug. 14, 2025) (quoting First Am. Compl. ("FAC") ¶¶ 1-3, 11-31, 46-96, ECF No. 10).[1] Now, twenty-four new organizations, each of which received a termination letter for a grant under

---

[1]    Since then, one of the original plaintiff nonprofit organizations holding one of the grants has voluntarily dismissed its claims. *See Urb. Sustainability Dirs. Network v. U.S. Dep't of Agric.* (*Urb. Sustainability II*), No. 25-cv-1775 (BAH), 2026 WL 1500832, at *4 n.4 (D.D.C. May 29, 2026).

the Increasing Land, Capital, and Market Access Program (collectively, the "Land Access Program Plaintiffs"), seek to join the suit, *see* Pls.' Mot. for Leave to File Am. Compl. ("Pl.'s Mot. to Amend"), ECF No. 62, and simultaneously move for a preliminary injunction, *see* Land Access Program Pls.' Mot. for a Prelim. Inj. ("Pls.' Mot. for Prelim. Inj."), ECF No. 63.  For the reasons explained below, plaintiffs' motion for leave to amend their complaint and Land Access Program Plaintiffs' motion for a preliminary injunction are granted.

## I.    BACKGROUND

The factual background and procedural history in this matter have been detailed in two previous decisions, *see Urb. Sustainability Dirs. Network v. U.S. Dep't of Agric.* (*Urb. Sustainability II*), No. 25-cv-1775 (BAH), 2026 WL 1500832, at *2-7 (D.D.C. May 29, 2026); *Urb. Sustainability I*, 2025 WL 2374528, at *2-10, and thus described below is more limited information relevant to the two pending motions.

### A.    Factual Background

"This lawsuit was initiated by 'five nonprofit organizations, Urban Sustainability Directors Network ('USDN'), Oakville Bluegrass Cooperative ('OBC'), Agroecology Commons ('AC'), the Providence Farm Collective Corp. ('PFC'), and the Institute for Agriculture and Trade Policy ('IATP'),' all of which 'received federal awards, under various statutorily authorized federal programs, from the USDA or its components that were unexpectedly terminated during from March through July of 2025, after the Trump administration announced changes in policy priorities.'" *Urb. Sustainability II*, 2026 WL 1500832, at *2 (quoting *Urb. Sustainability I*, 2025 WL 2374528, at *2).  "[T]hese programs and the federal awards supporting them cover a broad range of issues that create jobs and support community, agricultural, and rural development," and "[t]he programs range from supporting local urban forestry, to addressing food insecurity, to

incentivizing the adoption of more environmentally friendly agricultural practices." *Id.* (alterations in original) (quoting FAC ¶ 47).

The parties agree that at least two executive orders issued by President Trump shortly after he took office for his second term led to the terminations, *see id.*, namely: (1) Executive Order 14151, "Ending Radical and Wasteful Government DEI Programs and Preferencing," which instructed the Director of the Office of Management and Budget ("OMB"), "assisted by the Attorney General and the Director of the Office of Personnel Management," to "coordinate the termination of all discriminatory programs, including illegal DEI and 'diversity, equity, inclusion, and accessibility' (DEIA) mandates, policies, programs, preferences, and activities in the Federal Government, under whatever name they appear," 90 Fed. Reg. 8339, 8339 (Jan. 20, 2025); *see Urb. Sustainability II*, 2026 WL 1500832, at *2; *Urb. Sustainability I*, 2025 WL 2374528, at *4; and (2) Executive Order 14222, "Implementing the President's 'Department of Government Efficiency' Cost Efficiency Initiative," which instructed agency heads, "in consultation with the agency's DOGE Team Lead," to "review all existing covered contracts and grants and, where appropriate and consistent with applicable law, terminate or modify (including through renegotiation) such covered contracts and grants to reduce overall Federal spending or reallocate spending to promote efficiency and advance the policies of my Administration," 90 Fed. Reg. 11,095, 11,095-96 (Feb. 26, 2025); *see Urb. Sustainability II*, 2026 WL 1500832, at *2; *Urb. Sustainability I*, 2025 WL 2374528, at *4.[2]

---

[2]     "Plaintiffs also point to two other executive orders as driving the termination decisions made here: Executive Order 14173, 'Ending Illegal Discrimination and Restoring Merit-Based Opportunity,' 90 Fed. Reg. 8,633, 8,634 (Jan. 31, 2025), which instructs agency heads to 'excise references to DEI and DEIA principles . . . from Federal acquisition, contracting, grants, and financial assistance procedures,' and Executive Order 14154, 'Unleashing American Energy,' 90 Fed. Reg. 8,353, 8,353-54, 8,357 (Jan. 29, 2025), which instructed agencies to 'immediately pause the disbursement of funds appropriated through the Inflation Reduction Act of 2022' and review grants for 'consistency with the' new policy of prioritizing domestic energy production." *Urb. Sustainability II*, 2026 WL 1500832, at *2 n.1 (quoting *Urb. Sustainability I*, 2025 WL 2374528, at *4 n.2).

To facilitate these executive orders, the Secretary released guidance in two memoranda issued on March 13, 2025.  The first, "Directive on Conservation and Natural Resources Priorities," directed that "all USDA agencies and staff offices that issue awards must conduct an internal review of all active awards" to ensure "that the Department does not fund programs or organizations that promote or take part in climate change or environmental justice initiatives that are either contrary to law or to the Department's policy objectives" and "that all awards are free from fraud, abuse, and duplication" by terminating such grants "in whole or in part or otherwise modified to minimize the scope of the Department's obligations."  USDA Secretary's Memorandum 1078-003 (Mar. 13, 2025), https://perma.cc/CE9Y-LCFH; *see Urb. Sustainability II*, 2026 WL 1500832, at *3; *Urb. Sustainability I*, 2025 WL 2374528, at *5.  The second, "Directive on Departmental Grant and Cooperative Agreement Priorities," defined as a priority "ensuring that the Department's grants, cooperative agreements, and other similar arrangements, including mutual interest agreements . . ., do not support programs or organizations that promote or take part in diversity, equity, and inclusion ('DEI') initiatives or any other initiatives that discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic" and stated that grants inconsistent with this priority "shall, to the extent permitted by applicable law, be terminated, in whole or in part, or otherwise modified in accordance with any applicable regulations and notice and procedural requirements in the relevant award, agreement, or other instrument."  USDA Secretary's Memorandum 1078-004 (Mar. 13, 2025), https://perma.cc/36P6-E7M9; *see Urb. Sustainability II*, 2026 WL 1500832, at *3; *Urb. Sustainability I*, 2025 WL 2374528, at *5.  The five original plaintiffs in this suit received letters indicating that their grants had been terminated "before and in the months following the issuance of the Secretary's March 13, 2025, memoranda."  *Urb. Sustainability I*, 2025 WL 2374528, at *5.

On around March 23, 2026, holders for 49 of the 50 grants issued under the Increasing Land, Capital, and Market Access Program ("ILCMAP") received termination notices for those grants. *See* Pls.' Mot. to Amend, Att. 1, Second Am. Compl. ("Proposed Am. Compl.") ¶ 174, ECF No. 62-1. This program, as amended by the Inflation Reduction Act, Pub. L. No. 117-169, 136 Stat. 1818 (2022), was designed to benefit "underserved farmers, ranchers, or forest landowners, including veterans, limited resource producers, beginning farmers and ranchers, and farmers, ranchers, and forest landowners living in high poverty areas" by, among other things, "provid[ing] outreach, mediation, financial training, capacity building training, cooperative development and agricultural credit training and support, and other technical assistance on issues concerning food, agriculture, agricultural credit, agricultural extension, rural development, or nutrition," "provid[ing] grants and loans to eligible entities, as determined by the Secretary, to improve land access (including heirs' property and fractionated land issues)," "fund[ing] the activities of one or more equity commissions that will address racial equity issues within the Department of Agriculture and the programs of the Department of Agriculture," "support[ing] and supplement[ing] agricultural research, education, and extension, as well as scholarships and programs that provide internships and pathways to agricultural sector or Federal employment," and "provid[ing] financial assistance, including the cost of any financial assistance, to farmers, ranchers, or forest landowners determined to have experienced discrimination prior to January 1, 2021." *Id.*, 136 Stat. at 2022-23.

The termination letters sent to ILCMAP grant holders are "nearly identical" and "contain boilerplate language for all but one to two paragraphs in the four-page letters." Proposed Am. Compl. ¶¶ 177, 179. The opening paragraph of each letter contains the statement that "[t]he United States Department of Agriculture (USDA) has determined that awards under this program involved

discriminatory preferences based on Diversity, Equity, and Inclusion (DEI) and wasteful spending that did little to further agricultural land purchases.  Accordingly, as discussed below, USDA has determined your award no longer effectuates the program goals or agency priorities." *Id.* ¶ 183. Additionally, the letters cite the Secretary's March 13, 2025, memorandum "Directive on Departmental Grant and Cooperative Agreement Priorities" and contains general concerns about the program, including that the "program [is] rife with DEI preferences that discriminated based on immutable characteristics," "did little to improve land access," and has "unacceptable risks of fraud, waste and abuse." *Id.* ¶¶ 180, 184.  The letters concluded with the statement "following careful consideration of your award—including any potential reliance interests, intended outcomes described, as well as consideration of alternatives to termination—USDA has determined the best use of resources and advancing USDA's goals and priorities requires a full termination to realign the program to be consistent with its statutorily mandated purpose and the policies and priorities of the Department." *Id.* ¶ 193.  These letters were sent to every ILCMAP grant holder save AC, whose ILCMAP grant at issue in this lawsuit was protected from termination by this Court's injunction issued eight months earlier, on August 14, 2025. *See id.* ¶ 174.

The "termination letters informed grantees they could appeal their termination to the National Appeals Division," but when the Land Access Program Plaintiffs individually appealed, the National Appeals Division issued identical determinations that "FSA's March 23, 2026, decision terminating your ILA grant is not appealable because it concerns matters of general applicability" and that the "termination is based on the general policy priorities of USDA and its

decision to cancel the [Land Access Program] program." *Id.* ¶¶ 196-97 (alteration in original and emphasis removed).[3]

### B.    Procedural Background

The original "[p]laintiffs pursued administrative appeals of their grant terminations, but 'anticipating that no relief would be forthcoming from the agency,' 'USDN, OBC, and AC filed a complaint before this Court on June 5, 2025, and after being joined by PFC and IATP, filed the operative first amended complaint on June 24, 2025.'" *Urb. Sustainability II*, 2026 WL 1500832, at *3 (quoting *Urb. Sustainability I*, 2025 WL 2374528, at *9). "They allege that '[i]n an apparent effort to effectuate the President's sweeping Executive Orders in as quick a manner as possible regardless of the legality of their conduct, Defendants adopted the policy, pattern, and practice at issue here, terminating awarded grants without individualized review but rather based on vague allegations that the projects were not aligned with the President's newly stated goals of eliminating funding for DEI and climate initiatives—without any effort to determine whether the projects could be brought into line.'" *Id.* (alteration in original) (quoting FAC ¶ 132). "Consequently, plaintiffs sought both vacatur of the termination of their own awards and relief enjoining defendants 'from giving effect to or maintaining award terminations of . . . all other [awards] enacted pursuant to Defendants' policy, pattern, and practice.'" *Id.* (alterations in original) (quoting FAC pg. 61 (Requests for Relief)).

Two days later, on June 26, 2025, plaintiffs sought a preliminary injunction, *see* Pls.' Mot. for Prelim. Inj., ECF No. 14, challenging "a widespread policy and practice of unlawfully terminating hundreds of grants issued to nonprofit organizations, farmers, ranchers, universities,

---

[3]    THRIVE Santa Ana, Inc., one of the Land Access Plaintiffs, has "not yet received a final determination" on its appeal, but plaintiffs credibly reason that "there is no reason to suspect it will receive anything different from what the other Land Access Program Plaintiffs received." *Id.* ¶ 197 n.20.

cities, and states," through "minimally edited, boilerplate form letters," Pls.' Statement of P. & A. in Supp. of Their Mot. for a Prelim. Inj. at 1-2, ECF No. 14-1.  Defendants have throughout this litigation denied plaintiffs' allegation of *en masse* grant terminations and this Court's subject matter jurisdiction to review their claims.  *See* Defs.' Combined Mem. in Opp'n to Pls.' Mots. for Leave to File a Second Amend. Compl. & for a Prelim. Inj. ("Defs.' Opp'n") at 8-18, ECF No. 76; Joint Status Report at 4, ECF No. 74 (Defendants' Position: "In submitting this discovery plan, Defendants are not waiving or otherwise prejudicing their arguments regarding Tucker Act jurisdiction or the scope of relief available to Plaintiff . . . ."); Defs.' Combined Mem. in Opp'n to Pls.' Mot. for a Prelim. Inj. & for Expedited Disc. at 11-16, ECF No. 22.  A hearing was held on the requested preliminary injunction on August 6, 2025, *see* Hr'g Tr. (Aug. 6, 2025), ECF No. 36, within twenty-two days of briefing being completed, as extended due to defense counsel's availability, *see* Defs.' Mot. to Reschedule the Hr'g on Pls.' Mot. for Prelim. Inj. & Disc., ECF No. 25, and eight days later, the Court "preliminarily set aside and vacated under the APA" the terminations of plaintiffs' six individual grants but otherwise denied plaintiffs' preliminary injunction relief as to "the alleged policy [of "perfunctory, unreasoned terminations"] . . . due to the difficulties of identifying on the current record the specific grant terminations that are part of the *en masse* implementation of that policy," *Urb. Sustainability I*, 2025 WL 2374528, at *27, *39. Plaintiffs demonstrated a likelihood that defendants' terminations, in particular, of AC's ILCMAP grant and USDN's grant were contrary to law, *see id.* *31 ("Plaintiffs USDN and AC . . . have demonstrated a likelihood of success on the merits of their claim that defendants violated the APA by acting contrary to statute in terminating their grants for the reasons stated in USDN's termination letter and the press release announcing termination of AC's second grant."); *see id.* *32 ("Likewise, the announced termination of AC's Grant #2 based on the agency's new

8

opposition to what it deems to be 'DEI' is at odds with the Land Access Program's statutory purpose in aiding socially disadvantaged and underserved farmers."), and that the terminations of every grant save AC's ILCMAP were arbitrary and capricious, *see id.* at *34 ("At the outset, plaintiffs cannot demonstrate a likelihood of success with respect to this claim for AC's Grant #2 given that the termination has not yet officially occurred . . . . The five other of plaintiffs' grant terminations clearly lacked sufficient explanation.").

Following a protracted dispute between the parties over defendants' obligations to produce documents in the administrative record, defendants were ordered, on May 29, 2026, to "supplement the administrative record," "produce a privilege log," and answer specified "interrogatories and requests for production," *Urb. Sustainability II*, 2026 WL 1500832, at *14, but this was followed by continued dispute between the parties on a schedule for defendants' compliance with that order, *see* Joint Status Report, ECF No. 74.  Those disputes were resolved and a schedule entered, on June 12, 2026, requiring production of documents to be completed by September 2, 2026, with additional deadlines for producing, *inter alia*, "all templates used to craft the termination letters sent to terminate the grants at issue," "directions or guidance to leadership about whether to terminate the grants at issue," "directions or guidance given to USDA staff about how to populate and use the spreadsheets that identified the grants at issue for termination," and "the origin of the search terms defendants employed to terminate the grants at issue."  Minute Order (June 12, 2026).[4]

---

[4]    Defendants moved to modify the June 12, 2026, deadline to begin rolling productions of their responses to plaintiffs' first interrogatory, noting the "significant additional resources" defendants have employed to meet the production schedule, including that "[t]he Department's Office of General Counsel is reassigning a Senior Executive Service employee to help lead discovery efforts, as well as at least two additional attorneys in addition to existing staff"; that "[t]he Department has activated five eDiscovery contractor employees to assist with coordinating this effort, including onboarding a new contractor employee"; and that "[t]he Department is also working on awarding a contract to facilitate document review."  Defs.' Mot. for Extension of Time to Begin Resp. to Pls.' First Interrog. at 2, ECF No. 77.  With plaintiffs' consent, *see* Pls.' Resp. to Defs.' Mot. for Extension of Time to Begin Resp. to Pls.' First Interrog. at 1, ECF No. 78, defendants' motion was granted, *see* Minute Order (June 22, 2026).

Meanwhile, on May 26, 2026, plaintiffs moved to amend the complaint to add twenty-four plaintiffs, each of which had an ILCMAP grant that was were terminated, explaining that "[i]n light of USDA's cancellation of 49 Land Access Program grants using boilerplate letters and pursuant to the same policy challenged in this case, Plaintiffs seek leave to amend their complaint to include these additional terminations."  Pls.' Mot. to Amend at 2.  Simultaneously, the Land Access Program Plaintiffs filed a motion for a preliminary injunction, seeking "an order that enjoins Defendants' terminations of these Plaintiffs' grants and restores the status quo ante."  Pls.' Mot. for Prelim. Inj. at 1.  The parties submitted competing proposals for a briefing schedule, *see* Joint Status Report, ECF No. 70, and the Court set a schedule, *see* Minute Order (May 29, 2026), resulting in both pending motions becoming ripe for resolution on June 23, 2026, *see* Defs.' Opp'n; Pls.' Combined Reply in Supp. of Their Mots. for Leave to File a Second Am. Compl. & for a Prelim. Inj. ("Pls.' Reply"), ECF No. 79.

## II.    APPLICABLE LEGAL STANDARDS

Set out below are the separate legal standards applicable to plaintiffs' motion for leave to amend and the Land Access Program plaintiffs' motion for a preliminary injunction.

### A.    Motion for Leave to Amend

"Leave to amend a complaint under Rule 15(a) 'shall be freely given when justice so requires.'"  *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996) (quoting FED. R. CIV. P. 15(a)).  "If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits."  *Foman v. Davis*, 371 U.S. 178, 182 (1962).  Thus, "a district court should grant leave to amend a complaint '[i]n the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of

10

amendment, etc.'"  *Atchinson v. District of Columbia*, 73 F.3d 418, 425-26 (D.C. Cir. 1996) (quoting *Foman*, 371 U.S. at 182).  The D.C. Circuit has recognized that "the grant of leave to amend a complaint might often occasion some degree of delay and additional expense, but leave still should be 'freely given' unless prejudice or delay is 'undue.'"  *Barkley v. U.S. Marshals Serv. ex rel. Hylton*, 766 F.3d 25, 39 (D.C. Cir. 2014) (quoting *Foman*, 371 U.S. at 182).  The party opposing the amendment bears the burden to show why leave should not be granted.  *See Gudavich v. District of Columbia*, 22 F. App'x. 17, 18 (D.C. Cir. 2001) (per curiam) (affirming order granting leave to amend because non-movant "failed to show prejudice from the district court's action in allowing the [movant's] motion to amend").

### B.      Motion for Preliminary Injunction

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).  A plaintiff seeking a preliminary injunction "must satisfy a four-factor test before a court may grant such relief."  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  The plaintiff must "establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter*, 555 U.S. at 20.  "The balance of the equities weighs the harm to [plaintiffs] if there is no injunction against the harm to [defendants] if there is," and, when the government opposes the preliminary injunction, "the [government]'s harm and the public interest are one and the same, because the government's interest *is* the public interest," so the third and

fourth factors merge.  *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (emphasis in original).[5]

Additionally, "[t]he 'merits' on which plaintiff must show a likelihood of success encompass not only substantive theories but also establishment of jurisdiction." *Elec. Priv. Info. Ctr. v. U.S. Dep't of Com.*, 928 F.3d 95, 104 (D.C. Cir. 2019) (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015)).  The party seeking a preliminary injunction "carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (quoting 11A WRIGHT & MILLER'S FEDERAL PRACTICE AND PROCEDURE § 2948 (2d ed.1995)).

## III.   DISCUSSION

Plaintiffs' motion for leave to amend the complaint is considered first, and granted, followed by the Land Access Program Plaintiffs' motion for a preliminary injunction, which motion is also granted.

### A.   Plaintiffs Are Entitled to Amend the Complaint

The proposed second amended complaint principally differs from the operative complaint through the addition to the existing causes of action of the twenty-four Land Access Program

---

[5]     Defendants cite the "'sliding scale' approach" to evaluating the four injunction factors.  Defs.' Opp'n at 6. The D.C. Circuit has "[i]n the past . . . applied a 'sliding scale' approach under which 'a strong showing on one factor could make up for a weaker showing on another,'" *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022) (quoting *Sherley*, 644 F.3d at 392), but now regularly acknowledges that "[t]his approach is arguably in tension with intervening Supreme Court decisions stating without qualification that 'a party seeking a preliminary injunction must demonstrate, among other things, a likelihood of success on the merits,'" *id.* (quoting *Munaf v. Geren*, 553 U.S. 674, 690 (2008)); *see also Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1235-1236 (D.C. Cir 2025) ("It is questionable that the sliding scale approach remains good law after 2008, when the Supreme Court decided *Winter v. Natural Resources Defense Council, Inc.*[,] [which] can be read to require movants to establish *each* preliminary injunction factor independently.  But we have (somehow) gone seventeen years without needing to say if *Winter* really meant what it can be read to have said." (emphasis in original; internal citations omitted)); *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018) ("[T]his court has not yet decided whether *Winter v. National Resources Defense Council* is properly read to suggest a 'sliding scale' approach to weighing the four factors be abandoned . . . ." (internal citation omitted)).  In accordance with *Winter*, plaintiffs' satisfaction of each factor is considered here.  *See Media Matters for Am. v. Paxton*, 138 F.4th 563, 584 (D.C. Cir. 2025) (without referencing "sliding scale" approach, holding "that the District Court did not err in granting the preliminary injunction because Appellees have met each element of the test enunciated in *Winter* . . . .").

Plaintiffs, with accompanying factual allegations in support, and the trifurcation of the original single APA cause of action for arbitrary and capricious agency action into three causes of action: one encompassing the original plaintiffs, a second encompassing the Land Access Program Plaintiffs, and a third encompassing all plaintiffs. Defendants oppose leave to amend on two grounds—that the proposed second amended complaint's claims are futile and that "adding twenty-four additional Plaintiffs more than a year after this lawsuit was filed . . . will unduly prejudice Defendants." Defs.' Opp'n at 35. Neither ground is availing.

First, defendants cannot and do not adequately explain why amending the complaint is futile in a circumstance where denying leave serves neither judicial economy, because all of the substantive causes of action in the proposed amended complaint already exist in the operative complaint, nor conserves the resources of the parties, because, as defendants acknowledge, Land Access Program Plaintiffs "can file a separate lawsuit," *id.* at 45, to which defendants would still have to respond. Indeed, as plaintiffs observe, "[t]he facts and circumstances on which Defendants fixate in their opposition to amendment are for all intents and purposes identical to the facts and circumstances in the live claims that have reached discovery. In the Second Amended Complaint, the Land Access Program Plaintiffs join the existing Plaintiffs on seven of the nine causes of action, simply adding new terminations that fit the contours of the pleaded claims." Pls.' Reply at 3.

Notwithstanding plaintiffs' common sense view of the proposed amended complaint, defendants press their view that adding the Land Access Program Plaintiffs "would be futile," arguing that the "APA claim arising from an alleged unlawful policy of terminating grants *en masse* will not succeed because the claim does not challenge a discrete final agency actions," that "Plaintiffs are unlikely to succeed on their constitutional and ultra vires claims," and that claims

stating that "the grant terminations violated due process or were inconsistent with OMB guidance" are also "unlikely to succeed." Defs.' Opp'n at 34-35, 43-44. Such focus on the merits of the underlying claims might have purchase if plaintiffs were attempting to revive claims that had previously been dismissed or were attempting to circumvent a pending motion to dismiss because "courts are not obliged to indulge litigants indefinitely, especially when their amendments constitute futile gestures." *Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 792 n.21 (D.C. Cir. 1983). That is not the situation at hand, however, where plaintiffs are alleging new factual allegations and adding identically injured parties to bolster existing claims, and thus denying leave to amend does not conserve resources for either this Court or defendants. Plaintiffs do not bring any new substantive cause of action, *see* Pls.' Reply at 3 ("Plaintiffs allege only a single additional cause of action for the Land Access Program Plaintiffs—that their particular terminations were arbitrary, capricious, and an abuse of discretion."); rather, the proposed amended complaint adds entities whose grants were terminated pursuant to implementation of the same alleged policy and practice challenged in the original complaint. As such, "[t]he lawfulness of Land Access Program grant terminations is thus already before this Court, and the Amended Complaint at issue builds on those claims, raising similar allegations arising out of the subsequent termination of 24 additional Land Access Program grants, challenging both the individual terminations as well as the policy pursuant to which Defendants terminated the grants." Pls.' Mot. to Amend at 4.

Defendants also suggest futility due to new appellate decisions, stating that "since the Court issued the first motion for preliminary injunction, appellate decisions have called into question the Court's jurisdiction over grant terminations," and "the D.C. Circuit will soon issue a ruling in a case that addresses the same issue." Defs.' Opp'n at 44 (citing *Climate United Fund v. Citibank, N.A.*, No. 25-5122 (D.C. Cir.)). This argument was found unpersuasive, when this Court explained

that "a possible adverse ruling to plaintiffs . . . is a risk inherent in a common-law legal system where a court of review may change or clarify precedent," *Urb. Sustainability II*, 2026 WL 1500832, at *6 n.8, such risk poses no jurisdictional bar, *see id.* at *6 n.7 ("[T]he parties correctly agree the pending appeal poses no jurisdictional bar to consideration of plaintiffs' pending motions . . . ."), and, though defendants have appropriately vigorously asserted jurisdictional defenses, those defenses have been rejected in this case, *Urb. Sustainability I*, 2025 WL 2374528, at *11 ("Contrary to defendants' argument, this Court has subject matter jurisdiction over all of plaintiffs' claims because they do not fall within the scope of the Tucker Act conferring exclusive jurisdiction to the Court of Federal Claims."). In short, this argument is no more persuasive now.

In sum, defendants have not established the futility of the proposed amendment to the complaint.

Second, defendants claim that granting leave to amend would create undue prejudice, emphasizing the "demanding discovery schedule" already in place and arguing that "[g]ranting Plaintiffs' motion for leave to amend the complaint will increase the number of plaintiffs for whom Defendants need to add documents to the administrative records from four to twenty-eight, a sixfold increase." Defs.' Opp'n at 44 (citing Minute Order (June 12, 2026)). To be sure, the addition of twenty-four plaintiffs will trigger additional production demands for completion of the administrative record, and should such production require additional time, defendants are entitled to detail the reasons and make any necessary request for deadline extensions. Although the grants of the twenty-four new proposed plaintiffs were formally terminated starting in March 2026—with termination letters akin to those sent to the original plaintiffs—many report that their grant funding was frozen in the same period as the original plaintiffs, in the period from January to June 2025, seemingly subject to the same alleged policy and practice applied to the original plaintiffs. *See,*

*e.g.*, Pls.' Mot. for Prelim. Inj., Decl. of Black Or. Land Trust's Exec. Dir., Qiddist Ashe ("Ashe Decl.") ¶ 8, ECF No. 63-3 ("In January 2025, a freeze was placed on the grant account.  Then, beginning around April 2025, our primary USDA contact became unavailable and ultimately left the agency.  Communication during this period was inconsistent, and it was not until later in the summer that we received confirmation that invoicing activities could resume."); *id.*, Decl. of Agraria Ctr. for Regenerative Prac.'s President of the Bd. of Dirs., Jessica D'Ambrosio ("D'Ambrosio Decl.") ¶ 8, ECF No. 63-5 ("Since the start of 2025, USDA has been slow to responding [sic] to inquiries and approving reimbursements."); *id.*, Decl. of Grow Food dba Viva Farms's Chief Exec. Officer, Michael Frazier ("Frazier Decl.") ¶ 9, ECF No. 64-1 ("In January 2025, we sought clarification on certain issues raised in our Beneficiary Microgrant Policies from our Grant Management Specialist[,]" who "advised that he could not interact with us until receiving guidance from new USDA leadership.  For five months, we continued finalizing our Beneficiary Microgrant Policies while awaiting guidance."); *id.*, Decl. of Urb. Oasis Project Inc.'s Exec. Dir., Arthur Friedrich ("Friedrich Decl.") ¶¶ 7-8, ECF No. 64-2 ("[W]ork halted again on or around January 20, 2025, when FSA ceased all reimbursements to and communications with Urban Oasis.  After six months' delay, FSA made outstanding reimbursement payments in June 2025, and our work recommenced."); *id.*, Decl. of Iowa Valley Res. Conservation & Dev.'s Exec. Dir., Jason Grimm ("Grimm Decl.") ¶ 8, ECF No. 64-5 ("In January 2025, with no explanation, USDA and FSA froze our grant, and we were no longer able to obtain reimbursement for any of our expenses related to our project."); *id.*, Decl. of Sustainable Iowa Land Trust's Exec. Dir., Breanna Horsey ("Horsey Decl.") ¶ 8, ECF No. 64-6 ("Starting in January 2025, many questions we sent about the program, staffing, and expenses were ignored for months."); *id.*, Decl. of Afr. All. of R.I.'s Exec. Dir., Julius Kolawole ("Kolawole Decl.") ¶ 7, ECF No. 65-1 ("However, work was

16

stopped when USDA paused reimbursement of grantees in 2025."); *id.*, Decl. of 2020 Farmers Coop.'s Exec. Dir., Sharon Mallory ("Mallory Decl.") ¶ 8, ECF No. 65-4 ("Since the start of 2025, USDA has been slow to responding to inquiries and approving reimbursements.  The lingering threat of termination—now come to fruition—has also made us cautious in planning further investments."); *id.*, Ne. Organic Farming Ass'n of N.J.'s Land Access Coordinator, Nagisa Manabe ("Manabe Decl.") ¶ 9, ECF No. 65-5 ("And at the time of termination, NOFA-NJ was making significant progress with increasing land access, which would have been more extensive had USDA and FSA not frozen our grant last year."); *id.*, Decl. of OurSpace World, Inc.'s President & Chair of the Bd. of Trustees, Yohance Maqubela ("Maqubela Decl.") ¶ 9, ECF No. 65-6 ("But neither USDA nor FSA examined our progress with increasing land access, which was well underway and would have been more extensive had USDA and FSA not frozen, delayed, and then terminated our grant."); *id.*, Decl. of Ctr. for Heirs' Prop. Pres.'s Chief Exec. Officer, Jennie L. Stephens ("Stephens Decl.") ¶ 8, ECF No. 67-2 ("Notably, these outcomes were achieved despite USDA hampering our ability to accomplish the project's stated goals, including through a funding freeze that occurred in the first five months of 2025.  While the freeze was in place, CHP was unable to reimburse a substantial amount of expenses associated with the program, hindering CHP and its sub-awardees from meeting their deliverables.").

Other than the possible necessity of additional time for complete production of the administrative record, however, defendants never explain how such production would constitute "prejudice," let alone how any prejudice could not be remediated through such a deadline extension or would be otherwise "undue."  Indeed, the D.C. Circuit has observed that "the grant of leave to amend a complaint might often occasion some degree of delay and additional expense,

but nonetheless leave should be 'freely given' unless prejudice or delay is 'undue.'" *Barkley*, 766 F.3d at 39 (quoting *Foman*, 271 U.S. at 182).

In any event, defendants overstate the perceived increased burden posed by adding plaintiffs to the compilation and production of the administrative record, given that the new plaintiffs assert the same alleged pattern and practice by defendants in the same grant program already at issue.  For example, defendants' existing discovery obligations, such as producing "all templates used to craft the termination letters sent to terminate the grants at issue," "directions or guidance to leadership about whether to terminate the grants at issue," "directions or guidance given to USDA staff about how to populate and use the spreadsheets that identified the grants at issue for termination," and "the origin of the search terms defendants employed to terminate the grants at issue," Minute Order (June 12, 2026), will almost certainly already include materials relevant to the new plaintiffs.  Additionally, as plaintiffs note, "because Defendants do not truly contest the Land Access Program Plaintiffs' ability to bring their stand-alone cause of action, Defendants will have to make that production whether it is part of this case or another."  Pls.' Reply at 7.  Consequently, defendants have not established that permitting the complaint to be amended would create undue prejudice.

Accordingly, plaintiffs' motion to amend the complaint is granted.

**B.      Land Access Program Plaintiffs Are Entitled to a Preliminary Injunction**

Land Access Program Plaintiffs challenge the termination of their grants as arbitrary and capricious as well as contrary to law, the latter of which claim already serves as the basis for the preliminary enjoining of the termination of AC's ILCMAP grant and USDN's grant, *see Urb. Sustainability I*, 2025 WL 2374528, at \*32-33, and the former of which was the basis for the preliminary enjoining of the termination of five of the grants held by the original plaintiffs, *id.* at

*34-36.  Consequently, analysis principally follows the same reasoning already employed to the same claims predicated on closely related factual allegations.  *Id.* at *32-33.

The first *Winter* factor considered is likelihood of success on the merits which necessarily includes the "threshold" issue of establishing that this Court has subject-matter jurisdiction over Land Access Program Plaintiffs' claims.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998).  Defendants again contest this Court's jurisdiction, contending that "the Court of Federal Claims has exclusive jurisdiction over the prospective plaintiffs' claims," that "the Tucker Act impliedly precludes relief," and that "decisions on which grants to fund are committed to agency discretion by law."  Defs.' Opp'n at 9-20 (capitalization standardized and emphasis removed).  These arguments fell short the last time, and for the same reasons already discussed at length, *see Urb. Sustainability I*, 2025 WL 2374528, at *11-25, the Court again concludes that "[t]he grants at issue here would not be considered contracts and therefore would not be subject to the Court of Federal Claims' jurisdiction," *id.* at *14.

Defendants point to the fact that "seven days after this Court granted the current Plaintiffs' motion for a preliminary injunction," Defs.' Opp'n at 15, the Supreme Court issued an emergency-docket stay order, without oral argument or fulsome merits briefing, in *National Institutes of Health v. American Public Health Association*, 145 S. Ct. 2658 (2025) (mem.), finding that "[t]he Administrative Procedure Act's 'limited waiver of [sovereign] immunity' does not provide the District Court with jurisdiction to adjudicate claims 'based on' the research-related grants or to order relief designed to enforce any 'obligation to pay money' pursuant to those grants," *id.* (second alteration in original) (quoting *Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025) (per curiam)).  Nowhere in that stay order, however, did the Supreme Court consider whether the grants at issue amounted to "contracts" within the meaning of and subject to the Tucker Act.  Likewise,

neither the district court nor appellate court opinions leading to this Supreme Court stay order addressed the issue of whether these grants were contracts within the meaning of and subject to the Tucker Act. *See Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, 145 F.4th 39 (1st Cir. 2025); *Massachusetts v. Kennedy*, 783 F. Supp. 3d 487 (D. Mass. 2025). Consequently, this case is simply not persuasive for defendants.

Land Access Program Plaintiffs are likely to succeed on their claim that the grant terminations were contrary to law.[6] This Court has previously recounted that "[t]he Land Access Program originated with section 1006 of the American Rescue Plan Act, entitled 'USDA Assistance and Support for Socially Disadvantaged Farmers, Ranchers, Forest Land Owners and Operators, and Groups,' which appropriated funds for supporting the designated people or groups. The 2022 IRA [Inflation Reduction Act] amended that section and appropriated additional funds for programs to benefit 'underserved farmers, ranchers, or forest landowners, including veterans, limited resource producers, beginning farmers and ranchers, and farmers, ranchers, and forest landowners living in high poverty areas' and to 'provide financial assistance . . . to farmers, ranchers, or forest landowners determined to have experienced discrimination prior to January 1, 2021, in Department of Agriculture farm lending programs.'" *Urb. Sustainability I*, 2025 WL 2374528, at \*32 (quoting American Rescue Plan Act, Pub. L. No. 117-2, 135 Stat. 4, 13-14; Inflation Reduction Act, sec. 22007, § 1006(b), (e), 136 Stat. at 2022-23). As a result, the statute "employs the term 'socially disadvantaged' multiple times and defines this term as meaning people who 'have been subjected to racial or ethnic prejudice because of their identity as members of a

---

[6]    As Land Access Program Plaintiffs' contrary to law argument prevails—the same argument that has previously succeeded for AC's ILCMAP grant, *see Urb. Sustainability I*, 2025 WL 2374528, at \*32-33—their alternative argument that the decisions to terminate the grants were arbitrary and capricious need not be considered, *see* Pls.' Mot. for Prelim. Inj., Pls.' Statement of P. & A. in Supp. of Their Mot. for a Prelim. Inj. at 14-25, ECF No. 63-1.

group without regard to their individual qualities.'" *Id.* (quoting 7 U.S.C. § 2279(a)(5)-(6)). Nevertheless, defendants still "attempt to recast the statute as one that contemplated aid to growers based purely on financial status," a position previously determined to have been "not credible." *Id.* at *33; *see* Defs.' Opp'n at 20 ("By its plain text, the provision funds initiatives based on farmers' financial status and does not mention race, sex, or sexual orientation."). While defendants might have policy disagreements with a statute that considers an applicant's "race or other protected class," Defs.' Opp'n at 21, they "flout Congress's mandates . . . when they terminate grants for the very reason that the grants further the aims Congress explicitly instructed defendants to pursue," *Urb. Sustainability I*, 2025 WL 2374528, at *33.

As to the second *Winter* factor, Land Access Program Plaintiffs have also demonstrated a likelihood of irreparable harm in the absence of the requested relief. To make this showing, a movant must establish that the alleged injury is "'both certain and great,' 'actual and not theoretical,' 'beyond remediation,' and 'of such *imminence* that there is a clear and present need for equitable relief." *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (emphasis in original) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)). Such a showing requires "proof indicating that the harm is certain to occur in the near future." *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam). "Reputational injury can also suffice to establish irreparable harm." *S. Educ. Found. v. U.S. Dep't of Educ.*, 784 F. Supp. 3d 50, 72 (D.D.C. 2025) (PLF) (citing *Patriot, Inc. v. U.S. Dep't of Hous. & Urb. Dev.*, 963 F. Supp. 1, 5 (D.D.C. 1997) (finding plaintiffs' business "reputation will be damaged by [agency]'s characterization of them . . . as 'enticing' senior citizens into meetings, and 'pressuring' them to obtain reverse mortgages 'under the guise of sound estate planning'")).

21

Here, Land Access Program Plaintiffs allege that "[a]cross the board," they "will have to stop their projects or drastically reduce the scope of work funded by their terminated grants" and "have had to divert significant resources away from their organizations' core missions to comply with grant close out requirements while simultaneously attempting to find alternative funding sources." Pls.' Mot. for Prelim. Inj., Pls.' Statement of P. & A. in Supp. of Their Mot. for a Prelim. Inj. ("Pls.' Mem.") at 26, ECF No. 63-1. Such articulated harms to core operations and mission qualify as irreparable harm. *See, e.g.*, *Nat'l Council of Nonprofits v. OMB*, 763 F. Supp. 3d 36, 56-57 (D.D.C. 2025) (LLA) (finding irreparable harm where plaintiff organizations would have to shutter programs, causing "existential injuries"); *E. Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1094, 1116 (N.D. Cal. 2018) ("Organizations 'have established a likelihood of irreparable harm' based on their showing of serious 'ongoing harms to their organizational missions,' including diversion of resources and the non-speculative loss of substantial funding from other sources." (quoting *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013))).

These allegations are supported by twenty-four sworn affidavits detailing the harm to the operations and mission of the new proposed plaintiffs. *See* Ashe Decl. ¶ 14 ("We have had to stop all work developing the statewide network of underserved farmers, and do not have the resources needed to complete the data collection work. We will have to reduce staff hours and reallocate our organization's resources to continue to pay the salaries of employees who were hired specifically to work on this project."); Pls.' Mot. for Prelim. Inj., Decl. of World Farmers's Exec. Dir., Amie Avila ("Avila Decl.") ¶ 13, ECF No. 63-4 ("World Farmers also has been forced to make significant staffing and budgetary adjustments due to the grant termination, as well as redirect stay time away from our planned program development and enhancement of this and other critical projects to address the termination. We had to lay off our Marketing Design Coordinator,

and we are evaluating whether we will have to do additional layoffs. We also had to institute a hiring freeze, except for certain temporary positions."); D'Ambrosio Decl. ¶ 23 ("The Agraria Center is currently engaged in cost-cutting activities to further offset the loss of the grant. It is presently having difficulty meeting contractor obligations (including those it entered into to carry out the project) and without emergency funding or delaying other activities it may not be able to continue all its non-grant-related activities."); Frazier Decl. ¶ 18 ("Due to the termination of our federal award, we have been forced to redirect our resources and staff time away from our mission and other critical projects to address the termination and comply with award close out procedures."); Friedrich Decl. ¶ 14 ("[W]e have had to cease payments to and reduce the workload of all Advisory Board members (who functioned as the administrators and were primarily local farmers), and to cancel our contracts with two sub-awardees, disrupting their project plans and planned income and financial stability. . . . [W]e cannot launch the larger, planned apprenticeship program and have stopped the process of hiring eighteen apprentice-workers and eight farmer-mentors."); Grimm Decl. ¶ 13 ("We had to end the Two-Year New Century Farm Fellowship Program, laying off the two fellows we had already brought on, and eliminating the opportunity for the additional fellows we had planned to have go through the program."); Horsey Decl. ¶ 21 ("The grant terminations also impacts the long-term viability of SILT and the sub-awardee organizations. The grant supported the salaries of several staff members, leaving those positions partially unfunded going forward."); Kolawole Decl. ¶ 12 ("As a result of the grant termination, we have not been able to provide training and technical assistance to underserved farmers and could not advance our grant application program. AARI has been unable to fund this work without the certainty of reimbursements, and hiring for program support has been put on hold."); Stephens Decl. ¶ 18 ("Pursuant to the project, at the time of termination CHP and its sub-awardees were in

23

the midst of assisting 42 families in clearing title to their land, leaving those families with an interruption in the services, and CHP and its sub-awardees with unfunded professional and ethical obligations to provide assistance."); Pls.' Mot. for Prelim Inj., Decl. of Cultivate Kan. City's Exec. Dir., Brien Darby ("Darby Decl.") ¶ 14, ECF No. 63-6 ("We have not yet been able to identify any funding source that could make up for this large of a loss, and if we are not able to raise future funds, we will have to reduce staffing levels as early as January 2027."); *id.*, Decl. of S.D. Food Sys. All.'s Co-Exec. Dir., Sona Desai ("Desai Decl.") ¶ 14, ECF No. 63-7 ("The loss of funding is placing significant financial strain on our organization and project partners and has reduced our ability to stay operational at the same scale and level of impact originally planned. Some operational reductions have already occurred, while additional impacts may become more significant over the next 6-18 months if replacement funding is not secured."); *id.*, Decl. of Workin Rootz's Exec. Dir. & Lead Farmer, Candius Elliott ("Elliott Decl.") ¶ 14, ECF No. 63-8 ("We had planned to complete our projects around the funding we were awarded, and now we are stuck unable to complete tasks we were in the middle of. We are unsure if we will be able to hire part-time farm apprentices as planned."); *id.*, Decl. of Agrarian Land Trust's Commons Manager, Nathan Michael Galaviz ("Galaviz Decl.") ¶ 25, ECF No. 64-3 ("Because of the termination, Agrarian Trust has already had to reduce staff capacity, including laying off four staff members[, which] layoffs directly reduced Agrarian Trust's ability to coordinate land acquisitions, manage partner obligations, prepare and submit reporting materials, compile diligence documents, communicate with farmer groups and landowners, support local and regional Agrarian Commons entities, and carry out the land tenure and stewardship work approved under the award."); *id.*, Decl. of NDN Collective, Inc.'s President, Wizipan Little Elk Garriott ("Garriott Decl.") ¶ 15, ECF No. 64-4 ("The funding delay will likely also create challenges in meeting organizational financial

24

obligations, including staffing, operational expenses, and program-related costs."); *id.*, Decl. of Rural Advancement Found. Int'l–USA, Kavita Koppa ("Koppa Decl.") ¶ 13, ECF No. 65-2 ("We had planned to hire two full-time staff members in January 2025 to support implementation of our work under the ILA grant.  We already prepared and posted the job descriptions for both of these roles and had begun the interviewing process.  RAFI-USA did not fill these roles."); *id.*, Decl. of Heru Urb. Farming's Exec. Dir., Tyrean Markee Lewis Sr. ("Lewis Decl.") ¶ 13, ECF No. 65-3 ("Heru Urban Farming also has been forced to make significant staffing and budgetary adjustments due to the grant termination, as well as redirect staff time away from our mission and other critical projects to address the termination.  We had to lay off some staff, and we have had to divert staff attention to closing out the grant and seeking out alternative funding sources."); Mallory Decl. ¶ 21 ("Prior to the termination, 2020 Farmers Cooperative had entered into agreements with certain groups that we will also not be able to fulfill due to the termination.  Not only does this mean that those initial payments are inefficient, but I know those groups were counting on those funds and may not be able to remain in business if 2020 Farmers Cooperative cannot meet its commitments."); Manabe Decl. ¶ 11 ("We have had to stop all our work on five active land access projects that we have been working on with farmers.  We also have had to stop delivering equipment and providing equipment training to farmers, providing technical assistance to farmers, and helping farmers identify and assess potential farm sites.  In addition, we may have to reduce the income of or lay off three to four of our employees, and our staff have been experiencing emotional distress due to the uncertainty of our financial future."); Maqubela Decl. ¶ 12 ("In addition to needing to lay off the project manager for this project and halt our hiring process for previously planned fellow positions, we are no longer able to hire additional staff that we had planned for, most of our existing staff have been converted from employees to independent

25

contractors, some of our staff have voluntarily reduced their hours or pay, and we had to cancel our organizational health insurance contract."); Pls.' Mot. for Prelim. Inj., Decl. of King Cnty., Wash.'s Env't Programs Managing Supervisor, Richard Peter Martin ("Martin Decl.") ¶ 19, ECF No. 66-1 ("If sufficient replacement funding cannot be found by the end of 2026—which King County is diverting resources to look for—King County will have to cancel six different contracts that enabled the County to implement the grant, including County contracts with one college (Highline College), one local Community Development Financial Institution (Business Impact Northwest), and four community-based organizations (collectively, the County's 'Contractors')," resulting in layoffs of "staff both within King County and at some of our Contractors . . ., and our Farmland Access program would be significantly scaled back, starting January 1, 2027."); *id.*, Decl. of Holistic Organic Prac. Educ. for Small Farm Sustainability's Exec. Dir., Diana Garcia Padilla ("Padilla Decl.") ¶¶ 11-14, ECF No. 66-2 ("We have lost the opportunity to expand across Texas, as we had originally planned, and made promises to purchase land, signed contracts, ordered appraisals, interviewed staff, and purchased supplies for eight additional sites. . . . HOPE may not be able to stay operational beyond September 2026, when our one other very small grant ends."); *id.*, Decl. of Kan. Black Farmers Ass'n's Chief Exec. Officer/President, JohnElla Holmes Reece ("Reece Decl.") ¶ 12, ECF No. 66-3 ("We have had to cancel our marketing service contract with a partner that was actively working to secure and develop commercial opportunities and contracts for KBFA farmers with other organizations[,]" which "has significantly disrupted our efforts to expand market access and create sustainable sales opportunities for farmers in our programs."); *id.*, Decl. of THRIVE Santa Ana, Luis Sarmiento ("Sarmiento Decl.") ¶ 11, ECF No. 67-1 ("With the termination of the grant, THRIVE will not be able to pay a percentage of staff salaries and will have to eventually lay off some current staff.  Subawardees will also be forced to

26

further reduce staff time" and "THRIVE will not be able to pay several contractors that we planned to work with throughout the grant period."); *id.*, Decl. of Four Bands Cmty. Funds, Inc.'s Exec. Dir., Lakota Vogel ("Vogel Decl.") ¶ 17, ECF No. 67-3 ("Four Bands will also have to restructure staffing and staff responsibilities in significant ways to address the lack of funding promised by the ILA grant agreement.  Finding replacement funding may take years, if it's possible to do so at all.  Every day that Four Bands cannot make up the funds, the farmers who do not receive said funds are suffering.").

Defendants attempt to sidestep these attested harms, arguing that "when a harm is 'based on independent market variables such as how [a company's] customers and/or retailer consumers might react,' that harm does not flow directly from the challenge action."  Defs.' Opp'n at 31 (quoting *Am. Meat Inst. v. USDA*, 968 F. Supp. 2d 38, 81 (D.D.C. 2013)).  Here, the harms of staff layoffs, reducing or shuttering programs, diverting resources, etc., to the proposed plaintiffs directly arises from the grant terminations, but their harm is more than merely economic.  These plaintiffs further describe the reputational harm resulting from the terminated grants, explaining that "[w]ithout the promised funding, the Land Access Program Plaintiffs will be unable to deliver on promises made to the communities they serve, causing harm to their reputations as reliable partners."  Pls.' Mem. at 27-28; *see* Ashe Decl. ¶ 15 ("BOLT's reputation as a reliable source of funding and services to community members has also been harmed by FSA's termination of this grant.  Without the ILA grant money, we do not know how we will repay the loan for the 45-acre incubator farm purchase, which jeopardizes our ability to provide land access to our farmers in our network.  We will also not be able to deliver the $300,000 in micro grants to local farmers on the edge of viability to support their labor and infrastructure."); Avila Decl.¶ 14 ("The termination forced us to cancel these contracts, and I worry that this will harm our prospects for future

relationships with these partners.  We also built new relationships with farmers who were very excited about the land access opportunities that our project would provide.  Those farmers are incredibly disappointed that the project will not move forward, and it is my understanding that they think the failure lies fully with World Farmers, as they have not been following USDA's grant terminations."); D'Ambrosio Decl. ¶ 24 ("The project drew on relationships the staff and organization had spent years building with farmers and other organizations.  Because the organization cannot now fulfill its commitments, both staff and the organization believe that it will be harder to be a trusted partner in the future."); Darby Decl. ¶ 13 ("Cultivate KC's reputation as a reliable source of funding and services to community members has also been harmed by FSA's termination of this grant.  Without the ILA grant money, Kansas City, MO has had to fund the Food System Coordinator position out of its operational budget rather than using grant funding as originally planned."); Desai Decl. ¶ 18 ("We are concerned that the grant termination may cause SDFSA to lose trust with community members, because we will be unable to fully deliver on planned programs, funding opportunities, and land access initiatives that had been publicly discussed and developed in collaboration with those community members.  Some producers and partners may feel disappointed or uncertain after investing time and energy into opportunities that were ultimately unable to move forward as planned due to the grant cancellation, and we are worried that they may be less likely to trust us again in the future."); Elliott Decl. ¶ 16 ("Workin Rootz's reputation has also been harmed by the grant termination.  We have an entire community in Detroit that has been counting on us to deliver what we said we would: the CSA, farm stands, and technical assistance and mini-grants to farmers. . . . When we aren't able to deliver as planned because we no longer have access to the grant funding we were relying upon, it damages the trust of farmers and other community members in our organizations."); Frazier Decl. ¶ 19 ("FSA's

28

termination of our grants has also harmed Viva Farms' reputation as a reliable source of funding and services to community members."); Friedrich Decl. ¶ 15 ("FSA's termination of our grant has also harmed Urban Oasis's reputation as a reliable source of funding and services to community members.  And I fear that the project setbacks caused by FSA's delays and grant termination will impact our ability to raise funding from other sources."); Galaviz Decl. ¶ 27 ("The approved project depended on that trust because it required farmers and partners to work with Agrarian Trust on land acquisition, governance, lease development, stewardship planning, USDA/FSA program access, and long-term landholding structures.  When FSA terminated the award after approving the project and without first giving Agrarian Trust an opportunity to clarify or address any concern, it weakened partner confidence in Agrarian Trust's ability to fulfill commitments that were made in reliance on the federal award."); Garriott Decl. ¶ 14 ("The loss of funding and resulting delays or elimination of Project elements is severely harming NDN Collective's reputation as a reliable source of funding and services to indigenous community members."); Grimm Decl. ¶ 14 ("IVRCD's reputation as a reliable source of employment, funding, and services for community members has also been harmed by FSA's termination of this grant.  When we ended the Two-Year New Century Farm Fellowship Program, we had to lay off our two fellows. . . . [and] a full-time farm manager . . . . [and] end our contracts with our two sub-awardees and tell workshop instructors that we could not hire them.  I worry that beginning farmers will be reluctant to apply to or participate in our programs because of the uncertainty around our funding."); Horsey Decl. ¶ 19 ("We will not be able to complete the educational models or resource list, will not be able to distribute mini-grants, and many other aspects of our project work have been delayed.  Because we had indicated to program participants and the public that we would be able to complete this work, in reliance on the grant, I am concerned that this termination will negatively affect

landowners', farmers', and employees' trust in our ability to follow through with commitments, which will dissuade these groups from engaging with SILT in the future."); Kolawole Decl. ¶ 14 ("Because of the grant termination, beginning farmers are now much more skeptical of working with or relying on organizations connected to USDA funding.  For organizations like AARI who have collaborated with USDA, it can diminish AARI's reputation in the community when important projects are unfulfilled."); Koppa Decl. ¶ 16 ("Due to FSA's termination of this grant, RAFI-USA is losing trust with farmers and subaward partners that have taken years of dedicated effort to establish through outreach, collaboration, and consistent support.  The disruption has not only jeopardized ongoing projects but weakened trust in our organization's ability to fulfil its commitments, eroding the foundation of trust we have so carefully built over the years."); Lewis Decl. ¶ 14 ("The termination will also harm the broader community, and thus our reputation.  The community depends on us to provide produce, workshops, and employment, and the termination undermines this work."); Mallory Decl. ¶ 22 ("Put another way, the grant termination has undone 2020 Farmers Cooperative's long-term work in building trusting relationships, which led us to apply for the grant, and we must now find new ways to get back to where we were reputationally."); Manabe Decl. ¶ 12 ("NOFA-NJ's reputation as a reliable source of funding and services to community members has also been harmed by FSA's termination of this grant. . . . Because of the unexpected termination of the grant, we will not be able to honor the commitments we have made to both community members and partners."); Maqubela Decl. ¶¶ 12-13 ("In addition, once our incubator farm sites exhaust their funding, they will have to reduce staff hours or even terminate staff.  The termination will also harm the community OurSpace serves.  The lack of government support for small-scale produce farmers who feed the community has far-reaching negative impacts on health and wellbeing, including increasing food insecurity."); Martin Decl. ¶ 23

30

("Without the grant or replacement funding, King County will be unable to provide the same support to the land and farmers it had intended, which in turn harms the County's reputation with those farmers, as well as the community groups on which those farmers rely (including some of the Contractors).  In the long term, this will undermine the County's effort to expand farmland access and support the next generation of farmers, which will reduce agricultural production and community benefits."); Padilla Decl. ¶ 12 ("HOPE's reputation as a reliable source of funding and services to community members has also been harmed by FSA's termination of this grant.  Without the ILA grant money, we have had to cancel land use contracts and service agreements with several partners, which may undermine our organizational reputation in relation to our commitments and contractual agreements."); Reece Decl. ¶ 13 ("Families, youth, and entire rural and urban communities will be affected through the loss of educational programming, workforce development opportunities, mentorship, and agricultural training initiatives connected to the grant.  KBFA's partnerships with universities, community organizations, and technical assistance providers were designed to create long-term infrastructure for underserved producers, and the termination undermines years of planning, relationship-building, and community trust."); Sarmiento Decl. ¶ 12 ("THRIVE and subawardees had publicly announced when we were awarded our ILA grant and outlined for our community how the funding would be spent on programming and to increase land, capital, and market access for farmers.  We have had to continuously go back to our community and let them know that funding has been delayed and now terminated.  Community members were counting on THRlVE to purchase and provide land and programming for the 2026 growing season.  The termination of the grant has negatively impacted community members financially as well as eroded their trust in THRIVE and subawardees as well as in USDA and FSA."); Stephens Decl. ¶ 20 ("Moreover, both staff and the participating organizations rely

31

on their deep relationships with the served communities to successfully conduct outreach and deliver services. As individuals and organizations, their inability to fulfill their commitments due to the grant termination will undermine the trust the staff and organizations have built and thereby hinder their ability to work with these communities going forward."); Vogel Decl. ¶ 18 ("On tribal lands, reputation and trust are everything; they are the primary driver of client participation, partner collaboration, and capital deployment. Communities are tightly connected, and information travels quickly, so reputational harm is both rapid and durable. . . . This massive loss of expected ILA grant funding will reverberate throughout our community. The reputational damage to Four Bands is immediate and also growing and becoming more persistent with every passing day.").

Compounding this reputational harm is the premise of defendants' action in terminating the grants "based on the accusations that their programming was discriminatory and fiscally irresponsible." Pls.' Mem. at 28; *see, e.g.*, Mallory Decl., Ex. B, Termination Letter from Steven Peterson, Assoc. Admin., Farm Serv. Agency, to 2020 Farmers Coop., Inc. (Mar. 23, 2026), ECF No. 65-4 ("The United States Department of Agriculture (USDA) has determined that awards under this program involved discriminatory preferences based on Diversity, Equity, and Inclusion (DEI) and wasteful spending that did little to further lawful agricultural land purchases."); Mallory Decl. ¶ 23 ("2020 Farmers Cooperative's reputation has also been harmed by the USDA's suggestion we were part of a program in which there was fraud, waste, and abuse. I am concerned that this will hamper our ability to obtain other funding and partner with other organizations. I am also concerned the constituents we serve will be less likely to trust us to support them in the future. The termination letter's statements may also lead participants to be reluctant to participate in other federal programming opportunities fearing rash, baseless accusations."); D'Ambrosio Decl., Ex. B, Termination Letter from Steven Peterson, Assoc. Admin., Farm Serv. Agency, to the Agraria

32

Ctr. (Mar. 23, 2026), ECF No. 63-5 ("The United States Department of Agriculture (USDA) has determined that awards under this program involved discriminatory preferences based on Diversity, Equity, and Inclusion (DEI) and wasteful spending that did little to further lawful agricultural land purchases."); D'Ambrosio Decl. ¶ 25 ("The specific allegations in the termination letter of discrimination, waste, fraud, and abuse have enhanced the above harms. Staff have been whipsawed by the government, which previously approved this grant. They also worry about whether these allegations will follow them in future work, harming their ability to partner or raise funds."). These extensive declarations from the Land Access Program Plaintiffs leave little doubt as to their irreparable harm resulting from the grant terminations.

The remaining *Winter* factors—the balance of the equities and the public interest—merge where, as here, the government is the opposing party. *Pursuing Am.'s Greatness*, 831 F.3d at 511. These merged factors likewise favor the Land Access Program Plaintiffs. As explained above, these plaintiffs have established a likelihood that defendants acted contrary to law, and "[t]here is generally no public interest in the perpetuation of unlawful agency action," but "[b]y contrast, 'there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operation.'" *Urb. Sustainability I*, 2025 WL 2374528, at *38 (internal quotation marks removed) (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)).

Defendants' principle argument in support of the merged factors favoring defendants is that "[t]he public has an interest in permitting the Department to take decisive action when it comes to setting its policy priorities" and that "a preliminary injunction would disrupt the Department's efforts to ensure that it is funding grants consistent with Congressional mandates, the Equal Protection Clause and the Secretary's priorities." Defs.' Opp'n at 33. As was true when these

merged factors were under consideration in the previous preliminary injunction, "plaintiffs and the public face significant injury from defendants' actions, which are likely violative of the APA, and defendants' relative delay in fulfilling their agency priorities pales in comparison." *Urb. Sustainability I*, 2025 WL 2374528, at *38. Indeed, each of the grants had been determined to fulfill congressional mandates, which is the reason that these projects had been selected in the first place, *see, e.g.*, Mallory Decl., Ex. A, Notice of Grant and Agreement Award Number FSA24GRA0011585 (Nov. 5, 2024) (showing, under heading "Authority," "Section 1006 of the American Rescue Plan Act of 2021 (Pub. L 117-2), as amended"). Despite defendants' denial that the terminations were decided *en masse* and without individualized review, *see* Defs.' Opp'n at 25 ("[E]ach termination letter explains specifically why the given grant award was inconsistent with Congressional intent . . . ."), the process employed resulting in the termination decision appears suspect given the elimination of 49 of the 50 grant holders almost simultaneously as well as, for instance, assertions of waste, fraud, and abuse in the termination letters that have not been substantiated against any specific organization or pressed in any filings in this matter, *see, e.g.*, Friedrich Decl. ¶ 13 ("The termination letter states that ILA awards were used for frivolous expenses, such as 'gazebos, massages, a camper/RV.' Urban Oasis did not make any such purchases, and USDA and FSA do not claim that we did. . . . All expenses incurred under the program were approved by USDA.").

Land Access Program Plaintiffs have thus carried their burden of persuasion on all four of the *Winter* factors and, consequently, have demonstrated entitlement to a preliminary injunction.

### C.    Defendants' Request For a Stay

Having determined that Land Access Program Plaintiffs are entitled to a preliminary injunction, two requests posed by defendants are considered. First, defendants request, in a single

sentence, without citation to any authority or further reasoning, that any grant of preliminary injunctive relief "be stayed pending the disposition of any appeal that is authorized by the Solicitor General, or, at a minimum, administratively stayed for a period of seven days to allow the United States to seek an emergency, expedited stay from the Court of Appeals if an appeal is authorized." Defs.' Opp'n at 34.  To start, such request may be denied because "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are deemed waived." *Johnson v. Panetta*, 953 F. Supp. 2d 244, 250 (D.D.C. 2013) (BJR).  Regardless, "[a] stay is not a matter of right."  *Nken v. Holder*, 556 U.S. 418, 433 (2009) (quoting *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672 (1926)).  "It is instead 'an exercise of judicial discretion,' and '[t]he propriety of its issue is dependent upon the circumstances of the particular case."  *Id.* (alteration in original).  Stays pending appeal "are granted only in extraordinary circumstances."  *Graves v. Barnes*, 405 U.S. 1201, 1203 (1972) (Powell, J., in Chambers).  In deciding whether to grant a stay pending appeal, a court must consider "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."  *Nken*, 556 U.S. at 434 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

The foregoing analysis has already demonstrated that Land Access Program Plaintiffs have established a likelihood of success on the merits and that the balance of equities and public interest favor them.  Land Access Program Plaintiffs argue that staying the preliminary injunction "would be counterintuitive to the very purpose of the preliminary relief sought," namely restoring millions of dollars in interrupted funding.  Pls.' Reply at 25.  Defendants make no argument regarding irreparable injury, but, as a general matter, disbursing funds as required by a congressional statute

cannot constitute an irreparable injury because executive agencies "may not decline to follow a statutory mandate or prohibition simply because of policy objections." *In re Aiken County*, 725 F.3d 255, 259 (D.C. Cir. 2013). Accordingly, the *Nken* factors do not favor a stay.

Second, defendants request that plaintiffs post a bond as a condition of preliminary relief pursuant to Federal Rule of Civil Procedure 65(c). *See* Defs.' Opp'n at 34; Fed. R. Civ. P. 65(c) ("The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."). Land Access Program Plaintiffs respond that "[a]s one court explained, '[i]n a case where the Government is alleged to have unlawfully withheld [large sums] of previously committed funds to countless recipients, it would defy logic—and contravene the very basis of this opinion'" to impose a bond. Pls.' Mem. at 30 (first alteration added) (quoting *Nat'l Council of Nonprofits v. OMB*, 775 F. Supp. 3d 100, 130 (D.D.C. 2025) (LLA)). Federal Rule of Civil Procedure 65(c) provides "broad discretion in the district court to determine the appropriate amount of an injunction bond." *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999). Accordingly, to avoid exacerbating Land Access Program Plaintiffs' financial straits, a nominal bond of $5.00 will be imposed.

## IV.    CONCLUSION AND ORDER

For the foregoing reasons, plaintiffs have established entitlement to amend the complaint, and Land Access Program Plaintiffs have demonstrated that the terminations of their individual grants were likely contrary to statute, that they will suffer irreparable harm in the absence of relief, and that the balance of equities and public interest favor preliminary injunctive relief. Thus, these

grant terminations are preliminarily vacated, and defendants are enjoined from giving them any effect.  An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  June 30, 2026

_____
**BERYL A. HOWELL**
United States District Judge