# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| URBAN SUSTAINABILITY DIRECTORS NETWORK, 500 Westover Dr., #14973 Sanford, NC 27330, | Case No. 1:25-cv-1775-BAH |
| AGROECOLOGY COMMONS, 836 Marin Rd. El Sobrante, CA 94803-1322, | **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| PROVIDENCE FARM COLLECTIVE CORP., 5701 Burton Rd. Orchard Park, NY 14127-3246, | |
| INSTITUTE FOR AGRICULTURE AND TRADE POLICY, 1700 2nd St., NE #200 Minneapolis, MN  55413-1139, | |
| 2020 FARMERS COOPERATIVE, INC. 715 Wilborn Ave. South Boston, VA 24592, | |
| AFRICAN ALLIANCE OF RHODE ISLAND 807 Broad St., Room 121 Providence, RI 02907, | |
| AGRARIAN LAND TRUST P.O. Box 357 South Royalton, VT 05068, | |
| ARTHUR MORGAN INSTITUTE DBA THE AGRARIA CENTER P.O. Box 243 Yellow Springs, OH 45387, | |
| BLACK OREGON LAND TRUST 39058 E Knieriem Rd. Corbett, OR 97019, | |

CENTER FOR HEIRS' PROPERTY
PRESERVATION
8570 Rivers Ave., STE 170
North Charleston, SC 29406,

CULTIVATE KANSAS CITY
4049 Pennsylvania Ave., STE 206 Kansas
City, MO 64111,

FOUR BANDS COMMUNITY FUND, INC.
412 South Main St.
Eagle Butte, SD 57625,

GROW FOOD DBA VIVA FARMS
16470 State Route 20
Mount Vernon, WA 98273,

HERU URBAN FARMING
3853 Lindell Blvd. #608
St. Louis, MO 63108,

H.O.P.E. FOR SMALL FARM
SUSTAINABILITY
19833 Morris Rd.
Harlingen, TX 78552,

IOWA VALLEY RC&D
920 48th Ave.
Amana, IA 52203,

KANSAS BLACK FAMERS
ASSOCIATION
200 Washington Ave.
Bogue, KS 67625,

KING COUNTY, WASHINGTON
201 S Jackson St., STE 5600
Seattle, WA 98104,

NDN COLLECTIVE, INC.
408 Knollwood Dr.
Rapid City, SD 57701,

NORTHEAST ORGANIC FARMING
ASSOCIATION OF NEW JERSEY
386 Rock Rd. East
Lambertville, NJ 08530,

OURSPACE WORLD, INC.
12530 Fairwood Pkwy, STE 102 #514
Bowie, MD 20720,

RURAL ADVANCEMENT FOUNDATION
INTERNATIONAL--USA
P.O. Box 640
Pittsboro, NC 27312,

SAN DIEGO FOOD SYSTEM ALLIANCE
P.O. Box 3185
San Diego, CA 92163,

SUSTAINABLE IOWA LAND TRUST
P.O. Box 306
West Branch, IA 52358,

THRIVE SANTA ANA, INC.
1901 W Walnut St.
Santa Ana, CA 92703,

URBAN OASIS PROJECT, INC
6870 SW 45th Ln., Apt. 7
Miami, FL 33155,

WORKIN ROOTZ
2918 Tyler St. Detroit, MI 48238, and

WORLD FARMERS, INC.
769 Main St. P.O. Box 112
Lancaster, MA 01523

  *Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF
AGRICULTURE,
1400 Independence Ave., S.W.
Washington, DC 20250,

BROOKE ROLLINS, in her official capacity
as Secretary of the United States Department
of Agriculture,
1400 Independence Ave., S.W.
Washington, DC 20250,

DEPARTMENT OF GOVERNMENT
EFFICIENCY,
736 Jackson Place, N.W.
Washington, DC 20503,

AMY GLEASON, in her official capacity as
Acting Administrator of the Department of
Government Efficiency,
736 Jackson Place, N.W.
Washington, DC 20503,

UNITED STATES FOREST SERVICE,
1400 Independence Ave., S.W.
Washington, DC 20250,

TOM SCHULTZ, in his official capacity as
Forest Service Chief,
1400 Independence Ave., S.W.
Washington, DC 20250,

NATIONAL INSTITUTE OF FOOD AND
AGRICULTURE,
1400 Independence Ave., S.W.
Washington, DC 20250,

JAYE L. HAMBY, in his official capacity as
Director of National Institute of Food and
Agriculture,
1400 Independence Ave., S.W.
Washington, DC 20250,

FARM SERVICE AGENCY,
1400 Independence Ave., S.W.
Washington, DC 20250,

WILLIAM BEAM, in his official capacity as
Administrator of the Farm Service Agency,
1400 Independence Ave., S.W.
Washington, DC 20250,

AGRICULTURAL MARKETING
SERVICE,
1400 Independence Ave., S.W.
Washington, DC 20250, and

ERIN MORRIS, in her official capacity as
Administrator of Agricultural Marketing
Service,
1400 Independence Ave., S.W.
Washington, DC 20250

　　　*Defendants*.

## **INTRODUCTION**

1.      This action seeks to stop the U.S. Department of Agriculture's ("USDA") policy mandating the termination of hundreds of grants issued to nonprofit organizations, farmers, ranchers, universities, cities, and states. Defendants' policy has undercut efforts to strengthen rural and agricultural communities, address food security in low-income communities, support beginning farmers, empower urban communities to address climate and heat risks, and support the production and marketing of climate-smart commodities. Defendants' primary basis for these mass terminations and the justification binding these terminations together under this policy is that the grant awards allegedly no longer effectuate new USDA priorities—namely the Trump Administration's priority to attack anything it can portray as related to diversity, equity, inclusion ("DEI") or climate change, regardless of the purpose of the awards or limits on agency authority.

2.      Plaintiffs are organizations that received USDA grant awards under a variety of programs, including, for example, the U.S. Forest Service's ("USFS") Urban and Community Forestry Assistance Program ("Forest Program"), the National Institute of Food and Agriculture's ("NIFA") Community Food Projects Competitive Grants Program ("Food Program"), the Farm Service Agency's ("FSA") Increasing Land, Capital, and Market Access Program ("Land Access Program"), NIFA's Beginning Farmer and Rancher Development Program ("Development Program"), and the Agricultural Marketing Service's ("AMS") Regional Food System Partnerships Program ("Partnership Program"). Plaintiffs devoted extensive time and resources to developing their grant proposals, and then, once awarded, acted in reliance on these grants by hiring employees, providing and promising new or expanded programs to community members and sub-awardees, entering into contracts with local small

businesses, expending their own resources to invest in the projects' long-term success, and foregoing other funding opportunities that they reasonably believed they would no longer need.

3.    Following the Trump Administration's Executive Orders requiring that federal agencies rescind grant awards related to DEI, climate change, and/or environmental justice, in February 2025, Defendants began implementing an agency policy of unlawfully terminating federal grant awards.

4.    Defendants justified these widespread award terminations—which Plaintiffs and others received through minimally edited form letters with little to no discussion of individual grants or valid individualized determinations—by alleging that the awards "no longer effectuate" USDA's new "agency priorities."

5.    In fact, with respect to the most recent round of terminations, Defendants' own internal appeals division concluded that the terminations "[are] not based on the individual application of specific program criteria," but that "[i]nstead, [the] grant termination[s are] based on the general policy priorities of USDA," and that the individual awards "no longer support USDA priorities."

6.    Defendants' policy mandating the termination of Plaintiffs' and hundreds of other USDA awards in this manner violates Plaintiffs' constitutionally protected right to due process, as well as USDA's own regulations. It also runs afoul of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. And, for certain awards, USDA's policy violates the U.S. Constitution's Separation of Powers provision and is *ultra vires* because these terminations exceed executive authority and usurp legislative authority.

7.    Plaintiffs and many other nonprofit organizations, farmers, ranchers, universities, cities, states, and the communities they serve have been and continue to be harmed by USDA's

unlawful policy requiring the termination of grant awards in this manner. USDA's actions threaten Plaintiffs' and others' livelihoods, jobs, and communities. Plaintiffs are faced with layoffs, abandoning projects and investments, reputational harm in the community for failing to deliver promised programs, and drastic reductions in their organizations' operations, or in some cases, having to shutter their organizations entirely.

8.      Plaintiffs seek relief, including declaratory and injunctive relief, (1) to vacate and set aside Defendants' unlawful policy requiring the termination of awards without the requisite authority to do so, without a reasoned explanation, and, for select award programs, contrary to congressional mandates, (2) to undo the unlawful terminations that Defendants have already issued, and (3) to prevent any future terminations resulting from these unlawful actions.

## JURISDICTION AND VENUE

9.      This action arises under the APA, 5 U.S.C. § 701, *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*

10.      For the Land Access Program Plaintiffs (defined below) who have each had the opportunity to proceed through USDA's National Appeals Division ("NAD"), this action also arises under 7 U.S.C. § 6999. Each[1] received a final determination from NAD that, pursuant to statute, may be enforced by any United States district court of competent jurisdiction in accordance with chapter 7 of Title 5. *See also* 7 C.F.R. § 11.13(a) (2025).

---

[1] All the Land Access Program Plaintiffs received a final determination from NAD except for THRIVE. THRIVE received authorization from NAD to file its NAD appeal later than the other Land Access Program Plaintiffs, and its NAD appeal is still pending. However, THRIVE received the same formulaic termination letter from USDA and FSA as all other Land Access Program Plaintiffs, so there is no reason to believe its NAD determination will be materially different than those received by all the Land Access Program Plaintiffs.

3

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

12.     The Court has authority to enter a declaratory judgment and to provide temporary, preliminary, and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure; the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202; the All Writs Act, 28 U.S.C. § 1651; and the Court's inherent equitable powers. The APA further authorizes the Court to grant temporary and permanent relief from agency action. 5 U.S.C. §§ 705–706. The statute governing the NAD process provides for the remedies available under the APA. 7 U.S.C. § 6999.

13.     Venue properly vests in this Court pursuant to 28 U.S.C. § 1391(e).

**PARTIES**

14.     Plaintiff Urban Sustainability Directors Network ("USDN") is a nonprofit organization that supports local government sustainability directors in the United States and Canada to accelerate adoption of sustainability practices, with over 330 member municipalities across the region. In 2023, USDN applied for and was awarded a five-year, $28 million award from USFS under the Forest Program to strengthen the field of urban forestry, increase equitable access to urban tree canopy in disadvantaged communities, broaden community engagement in urban forest planning, and expand best management and maintenance practices to improve resilience to climate change and extreme heat.  On April 2, 2025, USDN received a letter from USDA and USFS terminating its award.

15.     Plaintiff Agroecology Commons ("AC") is a California-based nonprofit organization that cultivates knowledge sharing, community action, and global solidarity for agroecological land stewardship, collective healing, and justice within the food movement. In 2023, AC applied for and was awarded a three-year, $397,914 grant award from NIFA through

4

the Food Program to develop a collaborative model to advance nutrient-dense food sovereignty and community self-reliance through urban agroecological land stewardship, expanding market channels, and increasing the distribution of fresh local food in low-access communities in the San Francisco Bay Area. In 2024, FSA awarded AC a separate grant for $2,512,000 through the Land Access Program for a project to develop and implement innovative solutions that catalyze equitable access to land, capital, and market opportunities for Queer, Trans, Black, Indigenous, and Multi-Racial farmers in the Bay Area, where land access is particularly challenging. On March 7, 2025, AC received a letter from USDA and NIFA terminating its Food Program award. Throughout early 2025, USDA froze AC's Land Access Program grant funds. Then, on June 17, 2025, USDA posted a press release titled, "Secretary Rollins Takes Bold Action to Put American Farmers First, Cuts Millions in Woke DEI Funding."[2] The press release states that USDA "will terminate" a $2,500,000 grant for "[e]xpanding equitable access to land, capital, and market opportunities for underserved producers in the Bay Area."[3] On information and belief, this is in reference to AC's Land Access Program grant, though to date, AC has not received a termination notice.

16.     Plaintiff Providence Farm Collective Corp. ("PFC") is a nonprofit organization based in Western New York. Its mission is to cultivate farmer-led and community-rooted agriculture and food systems in order to actualize the rights of under-resourced peoples. In 2023, PFC applied for and was awarded a three-year, $749,998 grant through NIFA's Development Program for a project titled "Empowering Refugee, Immigrant, and Black Beginning Farmers

---

[2] USDA, *Secretary Rollins Takes Bold Action to Put American Farmers First, Cuts Millions in Woke DEI Funding* (June 17, 2025), https://www.usda.gov/about-usda/news/press-releases/2025/06/17/secretary-rollins-takes-bold-action-put-american-farmers-first-cuts-millions-woke-dei-funding [https://perma.cc/F3X8-F9EU].
[3] *Id.*

5

through Personalized, Culturally Adapted Training and Education at PFC" designed to empower refugee, immigrant, and Black beginning farmers with needed resources, knowledge, skills, and opportunities to enter and continuously improve their successes in farming. On April 25, 2025, NIFA terminated PFC's grant award via letter.

17.    Plaintiff Institute for Agriculture and Trade Policy ("IATP") is a nonprofit organization based in Minneapolis, Minnesota, whose mission is to work locally and globally at the intersection of policy and practice to ensure fair and sustainable food, farm, and trade systems. IATP advocates around barriers to success for farmers or community institutions. In 2023, IATP applied for a grant through AMS's Partnership Program to support a network of Minnesota farm and food systems organizations that prioritize practices that nourish people and planet. On October 30, 2023, AMS approved IATP's application for $111,694 over two years. Then on April 21, 2025, after months of performance on the grant, IATP received a letter from AMS terminating its Partnership Program award.

18.    Plaintiff 2020 Farmers Cooperative is a 501(c)(3) nonprofit organization headquartered in South Boston, Virgina. Its mission is to create and operate a marketing cooperative that promotes fair and equitable agricultural opportunities for small scale farmers nationwide. In November 2023, Farmers Cooperative received a Land Access Program grant to help farmers secure land and equipment through microgrants and low interest loans, constructing and running Farmer Academies, and offering technical assistance. The award totaled $13,310,200. On March 23, 2026, 2020, Farmers Cooperative received a letter from USDA and FSA terminating its grant.

19.    Plaintiff African Alliance of Rhode Island ("AARI") is a 501(c)(3) nonprofit organization headquartered in Providence, Rhode Island. Its mission is to bridge the gaps in

6

culturally relevant health and food access for African immigrants and refugees. In November 2023, FSA approved AARI for a Land Access Program grant designed to aid underserved farmers with downpayment assistance to purchase land in Connecticut, Massachusetts, and Rhode Island. The project would also provide technical assistance to underserved farmers for business development and land acquisition. The award totaled $8,499,429.00. On March 23, 2026, AARI received a letter from USDA and FSA terminating its grant.

20.     Plaintiff Agrarian Trust is a 501(c)(3) nonprofit organization incorporated in California in 2016. Agrarian Trust is dedicated to farmland conservation and secure land tenure through its Agrarian Commons initiative, a community-led approach to land ownership and stewardship.  In June 2024, FSA approved Agrarian Trust for a Land Access Program grant for farmland acquisition and land transfer work, among other things. The award totaled $12,966,593.00. On March 23, 2026, Agrarian Trust received a letter from USDA and FSA terminating its grant.

21.     Plaintiff the Arthur Morgan Institute for Community Solutions, which does business as the Agraria Center for Regenerative Practice ("Agraria Center"), is a 501(c)(3) nonprofit organization headquartered in Yellow Springs, Ohio. Its mission is to cultivate community resilience by modeling regenerative practices that restore ecosystem health, heal our relationship with the land, and grow just and equitable food systems. In November 2023, FSA approved Agraria Center for a Land Access Program grant to provide microgrants and microloans to enable farmer development through land access, as well as educational and technical programing to increase farm growth and sales. The grant award totaled $2,289,253.35. On March 23, 2026, Agraria Center received a letter from USDA and FSA terminating its grant.

7

22.     Plaintiff Black Oregon Land Trust ("BOLT") is a 501(c)(3) nonprofit organization headquartered in Corbett, Oregon. Its mission is to ensure Black communities in Oregon have secure, permanent access to land for farming, housing, and cultural preservation, fostering generational wealth and ecological stewardship. In 2023 FSA approved BOLT for a Land Access Program grant involving: (1) purchasing agricultural land for an incubator model, (2) fully financing an existing 10-acre education site, (3) building a statewide network of underserved farmers to collect data for USDA's evaluation and metric purposes, (4) creating a small grant program for subgrantees to purchase farm equipment, (5) improving access for underserved farmers to USDA and related services, and (6) increasing market access for producers on the edge of viability. The award totaled $2,500,000, which was later amended to $2,497,911.00. On March 23, 2026, BOLT received a letter from USDA and FSA terminating its grant.

23.     Plaintiff the Center for Heirs' Property Preservation ("CHP") is a 501(c)(3) nonprofit organization headquartered in North Charleston, South Carolina. CHP empowers families and small-acreage landowners to protect what matters most—the roof over their heads and the land under their feet—for generations to come. Working in deep relationship with landowners and partners, CHP provides legal support, financial education, and helps families grow working landscapes that sustain generational wealth. In 2023, FSA approved CHP for a Land Access Program grant to enable CHP and trusted partners to engage in outreach, education, and technical assistance regarding estate planning, clearing title, and obtaining USDA farm support. The award totaled $8,500,000. On March 23, 2026, CHP received a letter from USDA and FSA terminating its grant.

24.    Plaintiff Cultivate Kansas City ("Cultivate KC") is a 501(c)(3) nonprofit organization headquartered in Kansas City, Missouri.  Cultivate KC's mission is to grow food, farms, and community in support of an equitable, sustainable, and healthy local food system for all. Cultivate KC primarily works with urban farmers and local food systems throughout the Kansas City metro area.  In  2023, FSA approved Cultivate KC for a Land Access Program grant for their proposed project, Filling the Gaps in Access to Land and Capital for Kansas City-Area Urban Farmers, which included, among other things, (1) creating a shared infrastructure farm to support graduates from their incubator program who were struggling with land access, (2) developing a land linking platform to connect land holders and land seekers, and (3) creating a city-level position to address food systems challenges related to farmer land access.  The award totaled $2,498,565. On March 23, 2026, Cultivate KC received a termination letter from USDA and FSA.

25.    Plaintiff Four Bands Community Fund, Inc. ("Four Bands") is a 501(c)(3) nonprofit organization headquartered in in Eagle Butte, South Dakota. It is a non-profit loan fund that promotes economic revitalization and community development through increased access to affordable capital in low-income communities. In 2023, Four Bands received a Land Access Program grant for a project entitled "Increasing Land and Capital Access for the Mountain Plains Region's Tribal Areas." The objective of the grant project is to assist underserved, low-income agricultural producers in overcoming systemic barriers to accessing land and capital in the tribal areas of the Mountain Plains Region, which includes twenty Indian reservations. The total award was $8,490,67.21. On March 23, 2026, Four Bands received a letter from USDA and FSA terminating its grant.

9

26.     Plaintiff Grow Food dba Viva Farms ("Viva Farms") is a 501(c)(3) nonprofit organization headquartered in Mount Vernon, Washington. Viva Farms' mission is to empower aspiring and limited-resource farmers by providing bilingual (Spanish-English) training in holistic organic farming practices, as well as access to land, infrastructure, equipment, marketing, capital, and community. In 2023, Viva Farms received a Land Access Program grant for a project entitled "From Surviving to Thriving: Capitalizing a new generation of farmers to address their core land and market access needs and catalyze long-term viability." The objective of the grant project is to help historically underserved farmers access secure, long-term land tenure by providing capital via downpayment assistance grants, low-interest loans, and recoverable grants. The total award was $2,499,997. On March 23, 2026, Viva Farms received a letter from USDA and FSA terminating its grant.

27.     Plaintiff Heru Urban Farming is a 501(c)(3) nonprofit organization headquartered in St. Louis, Missouri. Heru Urban Farming's mission is to bring healthy, sustainable produce to those who need it the most, providing local food options to help create food sovereignty for St. Louis communities and local retailers. In 2023, Heru Urban Farming received from FSA a Land Access Program grant for its project, the St. Louis Urban Farmers Collective, aimed to mobilize, empower, and sustain the energy, assets, and resources of a diverse, skilled collective of urban farmers and producers to address core barriers in locally sourced production due to lack of access to technical assistance, economies of scale, training in agricultural best practices, and relevant, effective outreach and marketing. The award totaled $2,500,000. On March 23, 2026, Heru Urban Farming received a letter from USDA and FSA terminating its grant.

28.     Plaintiff H.O.P.E. for Small Farm Sustainability ("HOPE") is a 501(c)(3) nonprofit organization headquartered in Harlingen, Texas. HOPE's mission is to develop organic

10

farmers, increase the number of businesses engaging in organic farming, and expand entrepreneurial opportunities for communities in South Texas. HOPE provides training and education to small-scale farmers and individuals interested in growing, preparing, and selling their own organic food and have supported farming businesses to become sustainable for the long-term. In 2023, HOPE received from FSA a Land Access Program grant to provide access to farmland, shared equipment, and marketing resources to any small, beginning, aspiring, or expanding farmers (individually or in cooperative groups), to expand HOPE's peer-to-peer beginning-farmer training curriculum, and to replicate HOPE's programming and services across Texas by establishing new satellite sites beyond where they already operated. The award totaled $7,481,172. On March 23, 2026, HOPE received a letter from USDA and FSA terminating its grant.

29.    Plaintiff Iowa Valley RC&D ("IVRCD") is a 501(c)(3) nonprofit organization headquartered in Amana, Iowa. Founded in 1998, IVRCD's mission is to inspire transformative change and lead in the development of farmers and food value chains toward a more collaborative, equitable, and resilient food system across Iowa's communities. In 2023, IVRCD received from FSA a Land Access Program grant for The New Century Farm: Creating a Viable Route to Land, Markets and Capital for Beginning and Underserved Farmers in Eastern IA at the Johnson County Historic Poor Farm, that included, among other things, (1) establishing a Two-Year New Century Farm Fellowship Program for 15 beginning farmers; (2) hosting 10 Come to the Table networking events for 30 beginning farmers; and (3) expanding the Johnson County Historic Poor Farm Land Access Program to 12 acres and the Feed Iowa First Equitable Land Access Program to 11 acres. The award totaled $2,499,024. On March 24, 2026, IVRCD received a letter from USDA and FSA terminating its grant.

11

30.     Plaintiff Kansas Black Farmers Association ("KBFA") is a 501(c)(3) nonprofit organization headquartered in Bogue, Kansas. KBFA's mission is to preserve and advance the legacy of Black farming and rural communities by empowering farmers, ranchers, youth, and families through education, land stewardship, economic opportunity, food and nutrition access, and agricultural innovation. In 2024, KBFA received from FSA a Land Access Program grant. Their project, Reclaiming the Heritage of Farming for the Underserved: A Regional Agricultural Partnership to Access Land, Capital, Markets, and Education, was a multi-state and multi-partner technical assistance and capital access program to increase land access for beginning farmers and underserved farmers on the edge of viability. Their award totaled $8,490,389.78.  On March 23, 2026, KBFA received a letter from USDA and FSA terminating its grant.

31.     Plaintiff King County, Washington is a political subdivision of the State of Washington. In 2023, King County's Water and Land Resource Division, which sits within Department of Natural Resources and Parks, received a Land Access Program grant to expand and strengthen King County's pre-existing FarmLand Access Program, with activities designed to serve historically underserved farmers, including limited resource producers, beginning farmers, and farmers living in high poverty areas, who often face significant barriers to accessing land, capital, and support services. The award totaled $2,499,984. On March 23, 2026, King County received a letter from USDA and FSA terminating its grant.

32.     Plaintiff NDN Collective, Inc. ("NDN Collective") is a 501(c)(3) nonprofit organization headquartered in Rapid City, South Dakota. NDN Collective's mission is to build the collective power of Indigenous Peoples, communities, and Nations to exercise our inherent right to self-determination, while fostering a world that is built on a foundation of justice and

12

equity for all people and Mother Earth. In 2023, NDN Collective received a Land Access Program grant to fund its Pine Creek Ranch Land and Water Conservation Project. This project involves the restoration of and debt paydown on the historic Pine Creek Ranch Land, located in central Nevada, and ultimate return of that land to the Shoshone and Paiute tribal communities for their long-term use and benefit. NDN Collective acquired the Ranch in or around early 2022. At that time, the Ranch was in a state of disrepair after 30 years of neglect. By restoring the Ranch and returning it in good working order and free of debt to the Shoshone and Paiute tribal communities, the Project addresses and mediates the longstanding barriers for these tribal communities' access to land, capital, and markets in their traditional lands in Nevada. The award totaled $2,500,000. On March 23, 2026, NDN Collective received a letter from USDA and FSA terminating its grant.

33.    Plaintiff Northeast Organic Farming Association of New Jersey ("NOFA-NJ") is a 501(c)(3) nonprofit organization headquartered in Lambertville, New Jersey. NOFA-NJ's mission is to support organic food and agriculture in New Jersey through education, technical assistance, and policy action. In 2023, NOFA-NJ received a Land Access Program grant for their project, NJ Wildlife Management Area Land Access with Organic Farming Practices, which included (i) creating a land access demonstration pilot to transition conventional agricultural production on state wildlife management areas to organic practices; (ii) conducting outreach to find and vet eligible producers; (iii) supporting producers to achieve land access and successfully grow, process, and sell by offering education, certification, technical assistance, leased equipment, and capital and market access; and (iv) building a community of New Jersey grain growers to share resources and further develop capital and market access. The award totaled

13

$2,476,310. On March 23, 2026, NOFA-NJ received a letter from USDA and FSA terminating its grant.

34.     Plaintiff OurSpace World, Inc. ("OurSpace") is a 501(c)(3) nonprofit organization headquartered in Bowie, Maryland. Its mission is to cooperatively educate, organize, and support squads of land stewards and Earth healers. In 2023, FSA awarded OurSpace a Land Access Program grant for the project Creating a Mid-Atlantic Land-Access-to-Market Pipeline (LAMP) Program for Small-Scale Specialty Crop Farmers of the Black Diaspora. The project aimed to (i) increase access to farm-to-institution markets through contracts with entities such as schools, hospitals, and detention facilities to keep farm businesses viable; (ii) increase access to land by providing free growing space at incubator farms; (iii) increase access to capital by providing access to start-up grants and loans that could be used to purchase land or engage in long-term leases, or to purchase equipment or establish basic critical farm infrastructure; and (iv) develop and disseminate a blueprint to replicate the LAMP model in other regions. The award totaled $8,498,393. On March 23, 2026, OurSpace received a letter from USDA and FSA terminating its grant.

35.     Plaintiff RAFI-USA is a North Carolina-based 501(c)(3) nonprofit organization dedicated to supporting family farmers, rural communities, and food systems across the country. RAFI-USA focuses on key issues such as fair farm policy, disaster relief for farmers, land access and farmer-led food systems through grant programs, technical assistance, and advocacy efforts. RAFI-USA also engages in research and coalition-building to challenge unfair agricultural policies and corporate practices that threaten independent farmers, advocating for transparent and just supply chains, preserving seed sovereignty, and ensuring that farmers have a voice in shaping agricultural policies. In May 2024, FSA awarded RAFI-USA a cooperative agreement

14

through the Land Access Program for $8,499,695 to implement the Gaining New Ground project, which improves land access and land security for underserved farmers in North Carolina, Florida, U.S. Virgin Islands, and Puerto Rico who are especially vulnerable to climate change impacts. On March 23, 2026, RAFI-USA received a letter from USDA and FSA terminating its grant.

36.    Plaintiff San Diego Food System Alliance ("SDFSA") is a 501(c)(3) nonprofit organization headquartered in San Diego, California. SDFSA's mission is to create a just and resilient food system in San Diego County. In 2023, SDFSA received a Land Access Program grant for its project, the Local Food Economy Lab Land Access Initiative, which was designed to establish viable and equitable pathways to land access and connect producers with the capital and markets they need to thrive as farmers in San Diego County. The award totaled $2,499,494.64, which was later amended to $2,499,434.64. On March 23, 2026, SDFSA received a letter from USDA and FSA terminating its grant.

37.    Plaintiff Sustainable Iowa Land Trust ("SILT") is a 501(c)(3) organization headquartered in West Branch, Iowa. Its mission is to secure, preserve and steward threatened farmland, ensuring that future generations of farmers have access to Iowa land to produce healthy food in the most sustainable ways possible. FSA approved SILT for a Land Access Program grant for its project "Decolonizing Iowa's Land Wealth: Financing Affordable Food Farms for the Next Generation of Farmers," which aimed to help farmers overcome two major challenges to building and sustaining their farms: navigating public and private financial assistance programs and tackling the increasingly high cost of land in Iowa. That award totaled $1,810,949.99. On March 23, 2026, SILT received a letter from USDA and FSA terminating its grant.

15

38.     Plaintiff THRIVE Santa Ana, Inc. ("THRIVE") is a 501(c)(3) nonprofit organization headquartered in Santa Ana, California. THRIVE's mission is to elevate residents' voices in planning, neighborhood design, and governance decisions while fostering community wealth and healthy neighborhoods, empowering residents to take an active role in building a sustainable, inclusive future through land stewardship and cultivating multi-generational leadership. In 2023, THRIVE received a Land Access Program grant for its project, the Walnut and Diary Micro-Farm, a pilot for community stewardship of land and economic development intended to increase access to land, capital, and markets for farmers in Santa Ana and Orange County. The award totaled. $3,576,638 for this project. On April 2, 2026, THRIVE received a letter from USDA and FSA terminating its grant.

39.     Plaintiff Urban Oasis Project Inc ("Urban Oasis") is a 501(c)(3) nonprofit organization headquartered in Miami, Florida. Urban Oasis's mission is to make fresh, local foods affordable and accessible for all. In 2023, Urban Oasis received a Land Access Program grant, entitled "Moving Farmers from Surviving to Thriving in Miami-Dade County," for a land access and training project that would enable Urban Oasis to buy five to ten acres of farmland and construct an agricultural center to provide long-term land lease opportunities, shared infrastructure, and business and agricultural training. The award totaled $2,499,036. On March 23, 2026, Urban Oasis received a letter from USDA and FSA terminating its grant.

40.     Plaintiff Workin Rootz is a nonprofit organization based in Detroit, Michigan, and it is focused on fighting against food apartheid in the Nolan community of Detroit. In 2023, FSA approved Workin Rootz for a Land Access Program grant to create a partnership that would coordinate a multi-farm community supported agriculture box, support individual on-site farm stands, support infrastructure investment and expansion of Detroit farms, and train youth in

16

farming through apprenticeship programs. The grant would also support technical assistance programs for farmers and a grower mini-grant program. The award totaled $1,339,403. On March 23, 2026, Workin Rootz received a letter from USDA and FSA terminating the grant.

41.    Plaintiff World Farmers is a 501(c)(3) organization headquartered in Lancaster, Massachusetts. World Farmers' mission is to support small-scale farmers in agricultural production and successful marketing practices, and to connect culturally relevant produce to viable markets. World Farmers provides mentoring, training, and hands-on assistance when working with each farmer to build the capacity needed to operate individual farming enterprises. In 2023, World Farmers received a Land Access Program grant for its project, Creating a Pathway to Land Ownership for Immigrants, Refugees, and Underserved Farmers in Massachusetts, Maine, New York, and Florida, aimed to increase farmland access and ownership for underserved farmers, transition open land into viable farmland, and preserve farmland in perpetuity, while enhancing immigrant and refugee farmers' business viability and utilization of USDA programs and services. The award totaled $8,181,515. On March 23, 2026, World Farmers received a letter from USDA and FSA terminating its grant.

42.    Defendant U.S. Department of Agriculture is an agency within the meaning of the APA, 5 U.S.C. § 701. USDA operates under the supervision and direction of the Secretary of USDA.

43.    Defendant Brooke Rollins is the Secretary of USDA and is sued in her official capacity only.[4]

---

[4] References herein to "USDA" include both the U.S. Department of Agriculture and Secretary Rollins. The same is true for each agency and subagency: mention of the subagency acronym refers both to the subagency itself and the subagency official.

44.    Defendant Department of Government Efficiency ("DOGE") is an agency within the meaning of the APA, 5 U.S.C. § 701. DOGE operates under the supervision and direction of its Administrator.

45.    Defendant Amy Gleason is the Acting Administrator of DOGE and is sued in her official capacity only.

46.    Defendant U.S. Forest Service is a subagency of USDA and an agency within the meaning of the APA, 5 U.S.C. § 701. USFS operates under the supervision and direction of the Forest Service Chief.

47.    Defendant Tom Schultz is the Forest Service Chief and is sued in his official capacity only.

48.    Defendant National Institute of Food and Agriculture is a subagency of USDA and an agency within the meaning of the APA, 5 U.S.C. § 701. NIFA operates under the supervision and direction of its Director.

49.    Defendant Jaye L. Hamby is Director of NIFA and is sued in his official capacity only.

50.    Defendant Farm Service Agency is a subagency of USDA and an agency within the meaning of the APA, 5 U.S.C. § 701. FSA operates under the supervision and direction of its Administrator.

51.    Defendant William Beam is Administrator of FSA and is sued in his official capacity only.

52.    Defendant Agricultural Marketing Service is a subagency of USDA and an agency within the meaning of APA, 5 U.S.C. § 701. AMS operates under the supervision and direction of its Administrator.

53.    Defendant Erin Morris is Administrator of AMS and is sued in her official capacity only.

## FACTUAL BACKGROUND

### I.    USDA Awards

54.    USDA is responsible for overseeing congressionally funded programs related to agriculture, and for distributing funds Congress has appropriated through federal awards, including grants and cooperative agreements.

55.    As described below, these programs and the federal awards supporting them cover a broad range of issues that create jobs and support community, agricultural, and rural development, often pursuant to mandates from Congress. The programs range from supporting local urban forestry, to addressing food insecurity, to incentivizing the adoption of more environmentally friendly agricultural practices.

56.    Before awarding funding, federal agencies, including USDA, are required to give public notice of the funding opportunity that includes the goals and priorities of the program; publicly solicit applications; conduct a "merit review process"; and only select "recipients most likely to be successful in delivering results based on the program objectives." 2 C.F.R. §§ 200.204–200.205.

57.    To ensure that taxpayer money is well spent, federal awards involve lengthy and complex application procedures and reporting and auditing requirements. *See*, *e.g.*, *id.* §§ 200.205–200.213 (application process), 200.328–200.330 (performance, financial monitoring, and reporting requirements for federal award recipients), 200.500–200.521 (financial auditing requirements for federal award recipients).

19

58.     Recipients of these awards are selected by USDA through this competitive process and once selected, enter into binding terms with USDA in the form of a grant or cooperative agreement.

59.     By these awards, USDA agrees to provide funding up to a specified dollar amount over a specified period of time for work that advances U.S. policy interests as detailed in the agency's notices of funding opportunity or equivalent award-related documentation.

60.     In exchange, awardees agree to use the federal funds to complete their agency-approved projects on an agency-approved timeline, in a manner that advances objectives for the programs defined by Congress and/or the awarding agency at the time of the award. Awardees also agree to comply with lengthy terms and conditions incorporated into their award agreements. The terms are dictated by pre-existing USDA rules and regulations and are virtually identical across funding recipients within a given program.

61.     USDA does not receive consideration in the form of direct tangible benefits from the awardees' performance of these awards.

62.     The following are just some examples of USDA grant programs.

**A.  Urban and Community Forestry Assistance Program**

63.     In 2022, Congress passed and President Biden signed into law the Inflation Reduction Act, Pub. L. No. 117-169, 136 Stat. 1818 (2022) ("IRA").

64.     In Subtitle D, Section 23003(a)(2) of the IRA, Congress appropriated $1.5 billion to USDA, to remain available until September 30, 2031, "to provide multiyear, programmatic, competitive grants to a State agency, a local governmental entity, an agency or governmental entity of the District of Columbia, an agency or governmental entity of an insular area . . . an Indian Tribe, or a nonprofit organization through the Urban and Community Forestry Assistance

20

program established under section 9(c) of the Cooperative Forestry Assistance Act of 1978 (16 U.S.C. 2105(c)) for tree planting and related activities."

65.    These funds are administered through the USFS, an agency within USDA.

66.    In creating the Forest Program, Congress found, among other things, that "tree plantings and ground covers such as low growing dense perennial turfgrass sod in urban areas and communities can aid in reducing carbon dioxide emissions, mitigating the heat island effect, and reducing energy consumption, thus contributing to efforts to reduce global warming trends." 16 U.S.C. § 2105(a)(5).

67.    Thus, the statutory purposes of the Forest Program include "implement[ing] [] tree planting program[s] to complement urban and community tree maintenance and open space programs and to reduce carbon dioxide emissions, conserve energy, and improve air quality in addition to providing other environmental benefits." *Id.* § 2105(b)(5).

68.    On April 12, 2023, USFS issued a Notice of Funding Opportunity ("NOFO") to initiate the process of distributing these IRA funds to qualified applicants through a competitive process. The notice's section on "Legislative Authority and Funding Priorities" reiterates that the funds must be used for projects in furtherance of the priorities listed in IRA Section 23003(a)(2). It further provides that the program prioritizes projects "working to support disadvantaged communities experiencing low tree canopy and environmental justice," as well as "locally led conservation and park projects in communities that disproportionately lack access to nature and its benefits."[5]

---

[5] U.S. Dep't of Ag. Forest Serv., USDA-FS-2023-UCF-IRA-01, *USDA Forest Service Urban & Community Forestry Inflation Reduction Act Notice of Funding Opportunity* (Apr. 12, 2023), https://www.fs.usda.gov/sites/default/files/UCF-IRA-NOFO-04122023.pdf [https://perma.cc/F48W-783Z].

21

69.     Following the application process, USFS announced more than $1 billion in awards to 385 community-based organizations, local and state governments, and other entities in all 50 states. The agency also allocated $250 million in funding directly to state and territory forestry agencies to administer awards.[6] The projects awarded under the program were all dedicated to tree planting and maintenance, workforce development, wood utilization, extreme heat mitigation, restoration and resilience strategies, and community planning.

70.     USDN received one such award, Award of Cooperative Agreement 24-CA-11132544-016, in the amount of $28 million for its project titled, "Accelerating Urban Forestry as Equity Centered Climate Action and Sustainable Community Development." The award agreement was fully executed on December 11, 2023, and the performance period began that same day and continues until November 30, 2028.

71.     Consistent with the NOFO and USDA's stated objectives for the Forest Program, as well as Congress's statutory mandates, USDN's project is a five-year program designed to strengthen the field of urban forestry, increase equitable access to urban tree canopy in disadvantaged communities, broaden community engagement in urban forest planning, and expand best management practices to improve resilience to climate change and extreme heat. Through this program, USDN supports communities with pass-through funding to municipalities and community organizations, and by providing technical assistance. The award also provides funding for USDN's administrative operations.

---

[6] USDA, *Urban and Community Forestry Grants Factsheet* (2023), https://www.fs.usda.gov/sites/default/files/urban-communit-forestry-2023-factsheet.pdf [https://perma.cc/2VG4-QBUL]; *Urban Forests*, USDA, https://www.fs.usda.gov/managing-land/urban-forests [https://perma.cc/E8H6-9QYS] (last visited May 7, 2025).

### B. Community Food Projects Competitive Grants Program

72.    In 2022, USDA subagency NIFA announced a funding opportunity for the Food Program, authorized by Public Law 104-107, which amended the Food Stamp Act of 1977 (7 U.S.C. § 2011) and added a section, "Assistance for Community Food Projects" (7 U.S.C. § 2034). Awards issued through this program are intended to help eligible nonprofits, tribal organizations, and food-program service providers in need of a one-time grant for projects that promote self-sufficiency and food security in low-income communities.

73.    In the Request for Applications ("RFA"), the purpose and priorities of the program are based on Congress's mandate for the program, set out in 7 U.S.C. § 2034, to assist private nonprofit entities establish and carry out community food projects, defined as community based projects that are designed "to meet the food needs of low-income individuals through food distribution, community outreach to assist in participation in Federally assisted nutrition programs, or improving access to food as part of a comprehensive service"; "to increase the self-reliance of communities in providing for the food needs of the communities"; and "to promote comprehensive responses to local food access, farm, and nutrition issues"; or "to meet specific State, local, or neighborhood food and agricultural needs, including needs relating to" equipment, long-term planning, and "the creation of innovative marketing activities that mutually benefit agricultural producers and low-income consumers."[7]

74.    The RFA encouraged applications for communities in Opportunity Zones, low-income communities defined by population census tracts,[8] because "[t]he [Food Program] is

---

[7] USDA, *Request for Applications Community Food Projects Competitive Grant Program* 39 (2022), available at https://perma.cc/TM36-QWH8 (on file with Plaintiffs' counsel).
[8] *Opportunity Zones*, U.S. Dep't of Hous. & Urb. Dev., https://www.hud.gov/opportunity-zones (last visited June 2, 2025) [https://perma.cc/F3XS-5R5W].

intended to bring together stakeholders from distinct parts of the food system and to foster understanding of national food security trends and how they might improve local food systems."[9]

75.    The RFA states that these priorities directly align with USDA's 2022–2026 Strategic Plan's[10] Goal 4: Make Safe, Nutritious Food Available to All Americans, and Objective 4.1; Increase Food Security Through Assistance and Access to Nutritious and Affordable Food.

76.    AC received an award through the Food Program for its project, "Growing Cooperative Networks for Community Food Sovereignty, Nutrition, and Agroecological Land Stewardship." The total amount of the award was $397,914, with a period of performance of July 15, 2023, to July 14, 2026. The award agreement was fully executed on January 29, 2024.

77.    AC's project involves a collaborative model to advance nutrient-dense food sovereignty and community self-reliance through urban agroecological land stewardship, expanding market channels, and increasing the distribution of fresh local food in low-access communities in the San Francisco Bay Area, specifically in Alameda, Contra Costa, and Fresno counties. Much of their work takes place within designated Opportunity Zones.

78.    The project centers relationship-building and cooperation through values-aligned market collaboration, farm apprenticeships, land access, soil assessments, and a food sovereignty tool lending library. The apprenticeships support new local farmers and build mentoring capacity for experienced farmers to pass on their knowledge to the next generation. The project also supports two cooperative markets and a network of urban farm partners.

---

[9] USDA, *Request for Applications Community Food Projects Competitive Grant Program* 6 (2022), available at https://perma.cc/TM36-QWH8 (on file with Plaintiffs' counsel).
[10] USDA, *Strategic Plan Fiscal Years 2022-2026* (2022), https://www.usda.gov/sites/default/files/documents/usda-fy-2022-2026-strategic-plan.pdf [https://perma.cc/5DZG-YV65].

24

79.     AC's project proposal documents are incorporated into the award agreement and identify the project goals and intended outcomes. This includes supporting low-income women, queer, and Black, Indigenous, and people of color urban farmers and consumers, who, due to systemic barriers, are often underrepresented and overburdened within agriculture and often lack access to nutritious food. The intended outcomes of the project are identified as developing a network of values-aligned cooperative markets, providing access to cooperative farm tools and value-added processing equipment, providing agroecological education through on-farm partnerships, providing land access to beginning farmers through AC's Cooperative Incubator Farm, and training for farmers on urban soil assessments.

## C. Increasing Land, Capital, and Market Access Program

80.     Section 1006 of the American Rescue Plan Act of 2021 appropriated over $1 billion to the Secretary of Agriculture for fiscal year 2021 and directed that the Secretary "shall" use those funds on various agricultural programs that benefit "socially disadvantaged farmers, ranchers, or forest landowners, or other members of socially disadvantaged groups." Pub. L. No. 117-2, 135 Stat. 4, 13–14 (2021).

81.     In Section 22007 of the IRA, Congress amended Section 1006 of the American Rescue Plan Act and appropriated an additional $2.9 billion to the Secretary of Agriculture to fund various agricultural programs to benefit "underserved farmers, ranchers, or forest landowners," certain educational institutions that serve underserved communities, and "farmers, ranchers, or forest landowners determined to have experienced discrimination prior to January 1, 2021, in Department of Agriculture farm lending programs . . . ." IRA § 22007, 136 Stat. at 2022–23.

25

82.     The IRA directs that these funds be used "to provide outreach, mediation, financial training, capacity building training, cooperative development and agricultural credit training and support, and other technical assistance on issues concerning food, agriculture, agricultural credit, agricultural extension, rural development, or nutrition;" "to provide grants and loans to . . . improve land access (including heirs' property and fractionated land issues);" to "address racial equity issues within the Department of Agriculture and the programs of the Department of Agriculture;" "to support and supplement agricultural research, education, and extension, as well as scholarships and programs that provide internships and pathways to agricultural sector or Federal employment;" and "to provide financial assistance, including the cost of any financial assistance." *Id.*

83.     USDA, through its FSA, used these IRA funds to create the Land Access Program and issued a NOFO for grant funding through the program. The NOFO states that the purpose of the funding, based on the statutory mandates, is to "address[] the needs of underserved producers through outreach, education, engagement, and technical assistance to increase land, credit, and market access."

84.     USDA awarded a total of 50 grants through the Land Access Program to nonprofit organizations, governments, and Tribes across the country.

85.     AC received one such award for $2,512,000 for its project, "Catalyzing Equitable Access to Land, Capital, and Market Opportunities through an Agroecologically Stewarded Land Commons, Diversified Technical Support Program, and Resource Sharing Cooperative in the Bay Area." The award agreement was fully executed on March 21, 2024, and the performance period began that same day and continues until November 30, 2028.

26

86.     AC's project proposal documents are incorporated into the award agreement and identify the project goals and intended outcomes. AC's proposal explains how queer, transgender, Black, Indigenous, and multiracial farmers have been historically underserved due to corporate consolidation of agriculture, legacies of unjust land distribution, systemic racism, and limited access to resources. To support these socially disadvantaged groups, AC's project includes the purchase of land for its cooperative farming model in which it leases its farm land to beginning farmers, development of partnerships with restaurants, farmers' markets, and grocery cooperatives to support small-scale farmers' access to reliable markets, technical assistance to its farmer network, development of a data management and sharing plan, expansion of its online learning platform for farmers, and expanded farmer participation in land equity policy education.

87.     All other Plaintiffs who received awards pursuant to the Land Access Program (collectively, "Land Access Program Plaintiffs") fully executed agreements for those awards. Each Land Access Program Plaintiff's individual project proposal was incorporated into the award agreement, and each identifies the project goals and intended outcomes. Consistent with the statutory mandate that funded the program, each project aims to increase land access for underserved populations identified in the NOFO and statute. Project goals include providing land access, training, equipment, and markets, as well as building partnerships for program participants.

88.     USDA reviewed and approved project narratives and budgets for each of these projects when it awarded the grants.

**D.  Beginning Farmer and Rancher Development Program**

89.     The Development Program was first authorized and funded by Congress through the Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, 122 Stat. 1651 (2008),

commonly known as the 2008 Farm Bill. Most recently, through the Agriculture Improvement

Act of 2018, Pub. L. No. 115-334, 132 Stat. 4490 (2018), commonly known as the 2018 Farm

Bill, Congress reauthorized the program and provided ongoing mandatory funds to support

education, mentoring, and technical assistance initiatives for beginning farmers and ranchers.

The 2018 Farm Bill was signed into law by President Trump.

90.    In 2023, NIFA issued an RFA for the Development Program, pursuant to 7 U.S.C.

§ 2279(d). According to the RFA, the "primary goal of [the Development Program], under

assistance listing number 10.311, is to help beginning farmers and ranchers in the United States

and its territories enter and/or improve their successes in farming, ranching, and management of

nonindustrial private forest lands, through support for projects that provide education, mentoring,

and technical assistance to give beginning farmers and ranchers the knowledge, skills, and tools

needed to make informed decisions for their operations and enhance their sustainability."

91.    The RFA lists a number of "priorities" for the Development Program, including

"economic revitalization, particularly in socially disadvantaged communities."

92.    It also explains that it has a "targeted set aside for projects that address the needs

of two subsets of beginning farmers and ranchers," under which "[a]t least five percent of the

program funds available for standard [Development Program] projects will be allocated to

address the needs of limited resource beginning farmers and ranchers; socially disadvantaged

beginning farmers or ranchers; and/or farm workers (including immigrants) desiring to become

beginning farmers or ranchers." The RFA relies on Congress's definition of socially

disadvantaged farmer or rancher: "a farmer or rancher who is a member of a socially

disadvantaged group (i.e., a group whose members have been subjected to racial, ethnic, or

28

gender prejudice because of their identity as members of a group without regard to their individual qualities) (7 U.S.C. 2003(e))."

93.      The RFA states that the Development Program "is aligned with . . . USDA Strategic Plan FY 2022-2026"[11] and the Plan's Strategic Goals 1 to 5.

94.      PFC received an award through the Development Program for its project, "Empowering Refugee, Immigrant, and Black Beginning Farmers through Personalized, Culturally Adapted Training and Education at PFC." The award was for $749,998, with a period of performance from September 15, 2023, to September 14, 2026.

95.      The grant agreement incorporates by reference PFC's project proposal documents. The proposal discusses the specific objectives and strategies that PFC is using to meet the goals and priorities of the Development Program. The long-term goal of PFC's project is to empower refugee, immigrant, and Black beginning farmers with needed resources, knowledge, skills, and opportunities to enter and continuously improve their successes in farming by refining PFC's beginning farmer training initiatives. The resources provided to such farmers include access to land, personalized education and technical assistance, farming equipment and supplies, and marketing opportunities.

## E.  Regional Food Systems Partnership Program

96.      The Partnership Program was first established in the 2018 Farm Bill, Agriculture Improvement Act of 2018, Pub. L. No. 115-334, 132 Stat. 4490 (2018), as part of the Local Agriculture Market Program. Administered by AMS, the Partnership Program provides competitive grant funding to support multi-stakeholder partnerships, focusing on building and strengthening the viability and resilience of the local or regional food economy.

---

[11] *See id.*

97.     On February 14, 2023, AMS published an RFA for the Partnership Program. The RFA expressly encouraged "applications from partnerships that engage with smaller farms and ranches, new and beginning farmers and ranchers, underserved producers, veteran producers, and/or underserved communities," and provided that "[f]or grants intended to serve these entities, applicants should engage and involve those beneficiaries when developing projects and applications." And it notes that "AMS will prioritize applications that: . . . Cover an area that includes distressed low-income rural or urban communities with areas of persistent poverty that provide significant opportunities for high impact investment."

98.     In October 2023, IATP's application for a grant under the Partnership Program was approved for a period of two years for $111,694, and it required IATP to match 25% of that amount through private funds. The awarded project aimed to support the MinnieAg Network, a network of Minnesota farm and food systems organizations that prioritize practices to nourish people and the planet. The project deliverables included the creation of a visual directory for the network, as well as the development of educational resources on Minnesota agricultural policy that IATP intended to publish and make available in multiple languages. The goal was to help build understanding and capacity for civic engagement by Network members.

## F.  Regulations Applicable to Termination of Awards

99.     The Office of Management and Budget's ("OMB") Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards ("Uniform Guidance"), 2 C.F.R. Part 200, provides rules and requirements for federal agencies' management of grant awards.

30

100.    USDA has formally adopted the Uniform Guidance as its "policies and procedures for uniform administrative requirements, cost principles, and audit requirements for Federal awards." 2 C.F.R. § 400.1.

101.    Certain USDA subagencies have also independently adopted the Uniform Guidance. *See*, *e.g.*, 7 C.F.R. § 3400.8 (NIFA).

102.    Accordingly, the Uniform Guidance applies to USDA's management of Plaintiffs' awards, as well as all other awards issued by USDA.

103.    The Uniform Guidance provides several procedural safeguards that protect the interests of grant recipients from ambiguous, vague, or shifting requirements, including limiting the bases for termination. *See* 2 C.F.R. §§ 200.211, 200.340–343, 200.472.

104.    Two versions of the Uniform Guidance are relevant to Plaintiffs' claims: the 2020 version, which became effective November 12, 2020, except for amendments to §§ 200.216 and 200.340, which became effective on August 13, 2020, 85 Fed. Reg. 49,506 (Aug. 13, 2020) ("2020 Uniform Guidance"); and the 2024 version of the Uniform Guidance, which became effective on October 1, 2024, 89 Fed. Reg. 30,046 (Apr. 22, 2024) ("2024 Uniform Guidance"); *see* 89 Fed. Reg. 68,321 (Aug. 26, 2024) (USDA adopting October 1, 2024 effective date for 2024 Uniform Guidance).

105.    Both versions of the Uniform Guidance include a provision laying out the circumstances in which an award may be terminated. *See* 2 C.F.R. § 200.340. While the structure of 2 C.F.R. § 200.340 differs between the two, both require that agencies "clearly and unambiguously" identify termination provisions in an award's terms and conditions, and limit termination based on an award's no longer serving agency priorities to circumstances in which

31

the agency has specific evidence that the particular award no longer serves the priorities it was originally intended to further.

106.    Section 200.340(a)(2) of the 2020 Uniform Guidance provides that a federal award may be terminated "[b]y the Federal awarding agency or pass-through entity, to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

107.    The 2020 Uniform Guidance § 200.211(c)(v) relatedly requires that "Federal awarding agencies must make recipients aware, in a clear and unambiguous manner, of the termination provisions in § 200.340, including the applicable termination provisions in the Federal awarding agency's regulations or in each Federal award."

108.    The preamble to the final rule for the 2020 Uniform Guidance restates this requirement: "Federal awarding agencies must clearly and unambiguously articulate the conditions under which a Federal award may be terminated in their applicable regulations and in the terms and conditions of Federal awards." 85 Fed. Reg. at 49,507; *see* 2 C.F.R. § 200.340(b) (2021).

109.    The stated intent of the 2020 Uniform Guidance is for "Federal awarding agencies" to "prioritize ongoing support to Federal awards that meet program goals." 85 Fed. Reg. at 49,507. OMB provided examples of circumstances in which an agency's termination pursuant to 2 C.F.R. § 200.340(a)(2) (2021) would be appropriate: "if additional evidence reveals that a specific award objective is ineffective at achieving program goals" or if "additional evidence . . . cause[s] the Federal awarding agency to significantly question the feasibility of the intended objective of the award." *Id.* at 49,508–09.

110. The preamble to the final rule also emphasized that the provision allowing for unilateral termination by the agency in § 200.340(a)(2) (2021) is "linked to performance goals of the program (§ 200.301)." 85 Fed. Reg. at 49507. The referenced provision states that "program goals and objectives should be derived from program planning and design (see § 200.202)," and "[t]he Federal agency should clearly communicate the specific program goals and objectives in the Federal award." 2 C.F.R. § 200.301 (2021).

111. In 2024, OMB updated the Uniform Guidance, adjusting the language in § 200.340, while maintaining the essential requirements of the prior version.

112. The 2024 Uniform Guidance modified the language that was in the 2020 Uniform Guidance § 200.340(a)(2), and moved it to § 200.340(a)(4). It now provides that a federal award may be terminated "[b]y the Federal agency or pass-through entity pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4) (2025).

113. The 2024 Uniform Guidance also revised section 200.340 to reiterate the requirement that agencies "must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award." 2 C.F.R. § 200.340(b) (2025); see 2 C.F.R. § 200.211(c)(v) (2025) ("Federal agencies must inform recipients of the termination provisions in § 200.340, including the applicable termination provisions in the Federal agency's regulations or terms and conditions of the Federal award.").

114. In the preamble to the 2024 Uniform Guidance, OMB explained that the federal award "may include a term and condition allowing termination by the Federal agency . . . if an award no longer effectuates the program goals or agency priorities," but makes clear that

termination is authorized only "[p]rovided that the language is included in the terms and condition of the award." 89 Fed. Reg. at 30,089.

115. Thus, under either version of the Uniform Guidance, for an agency to terminate an award on the basis that it no longer effectuates the program goals or agency priorities, the agency must "clearly and unambiguously" specify in the award that this ground—no longer effectuating program goals or agency priorities—is a basis for termination.

116. Moreover, an agency may only terminate an award on the basis that it no longer effectuates the program goals or agency priorities if those program goals and agency priorities are determined and "clearly and unambiguously" identified in the terms and conditions at the time of the award. USDA had to identify what those policies and priorities were at the time of the award and only the award's failure to effectuate those identified policies and priorities can be a basis for termination—assuming USDA reserved its right to terminate because the award failed to effectuate the policies and priorities.

117. Additionally, the Uniform Guidance allows for termination of an award that no longer effectuates program goals or agency priorities only if specific evidence shows the particular award no longer serves the intended program goals and agency priorities as determined at the time of the award and reflected in the award documents. *See also* 2 C.F.R. §§ 200.202–204 (2025); 2 C.F.R. §§ 200.202–204 (2021) (requiring goals to be identified at the outset of the award). To terminate on this basis, USDA needs evidence not of its changed position, but that the awardee's project was failing to achieve the objectives the award originally set out to achieve.

118. Further still, an agency may suspend or terminate a grant award in part or in its entirety *only after* the agency "determines that noncompliance cannot be remedied by imposing

34

specific conditions," such as "[r]equiring additional project monitoring," requiring the recipient to obtain technical or management assistance, or "[e]stablishing additional prior approvals." 2 C.F.R. §§ 200.339, 200.208(c) (2025); 2 C.F.R. §§ 200.339, 200.208(c) (2021). Termination is therefore limited to circumstances in which USDA took additional steps in an effort to achieve compliance and failed.

119.    Certain subagencies also have additional processes that must precede grant termination. For instance, NIFA's regulations provide that "NIFA generally will suspend (rather than immediately terminate) an award to allow the awardee an opportunity to take appropriate corrective action before NIFA makes a termination decision." 7 C.F.R. § 3430.60.

120.    Likewise, AMS's General Terms and Conditions for Grants states that "AMS may terminate an award in whole or in part per 2 CFR §200.340. AMS generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective actions before terminating a grant agreement."[12]

## II.    Defendants' Termination of Federal Awards

121.    In the first days of the new federal administration, President Trump issued a series of executive orders broadly seeking to end all efforts, including federal awards, related to "equity"—such as any initiatives relating to DEI or Diversity, Equity, Inclusion, and Accessibility ("DEIA").

---

[12] AMS, *Agricultural Marketing Service (AMS) Grants Division General Terms and Conditions*, at § 16.5 (Jan. 2024), https://www.ams.usda.gov/sites/default/files/media/FY2024_AMSGeneralTermsandConditions.pdf [https://perma.cc/WRE5-YUAL].

35

122.    On January 20, 2025, President Trump issued Executive Order No. 14151 "Ending Radical and Wasteful Government DEI Programs and Preferencing." 90 Fed. Reg. 8,339 (Jan. 29, 2025) ("First DEI EO").

123.    The First DEI EO instructs the Director of OMB, Director of Office of Personnel Management, and Attorney General to "coordinate the termination of all discriminatory programs, including illegal DEI and 'diversity, equity, inclusion, and accessibility' (DEIA) mandates, policies, programs, preferences, and activities in the Federal Government, under whatever name they appear." *Id.* at 8,339. It also requires each federal agency head to "terminate, to the maximum extent allowed by law, all . . . 'equity-related' grants or contracts" within 60 days. *Id.*

124.    On January 21, 2025, President Trump issued Executive Order No. 14173 "Ending Illegal Discrimination and Restoring Merit-Based Opportunity," 90 Fed. Reg. 8,633 (Jan. 31, 2025) ("Second DEI EO," together with the First DEI EO, "the DEI EOs").

125.    The Second DEI EO requires the Director of OMB, with the assistance of the Attorney General, to "[e]xcise references to DEI and DEIA principles, under whatever name they may appear, from Federal acquisition, contracting, grants, and financial assistance procedures" and to "[t]erminate all 'diversity,' 'equity,' 'equitable decision-making,' 'equitable deployment of financial and technical assistance,' 'advancing equity,' and like mandates, requirements, programs, or activities, as appropriate." *Id.* at 8,634. It also instructs federal agencies to include in every contract or grant award terms requiring contractual counterparties or grant recipients "to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." *Id.*

36

126.    The DEI EOs do not define key terms, including "equity-related," "programs promoting DEI," "illegal DEI," and "DEIA principles." In fact, in a hearing before the District Court for the Northern District of Illinois on March 25, 2025, the U.S. Department of Justice refused to provide the court with the Trump Administration's definition of "illegal and immoral discrimination" in the context of the Executive Orders.[13]

127.    On January 20, 2025, President Trump issued an Executive Order No. 14154 "Unleashing American Energy," 90 Fed. Reg. 8353 (Jan. 29, 2025) ("Energy EO").

128.    Section 2 of the Energy EO detailed several purported "polic[ies] of the United States," including "to ensure that no Federal funding be employed in a manner contrary to the principles outlined in this section, unless required by law." *Id.* at 8,353–54.

129.    Section 7 of the Energy EO, titled "Terminating the Green New Deal," directed all agencies to "immediately pause the disbursement of funds appropriated through the Inflation Reduction Act of 2022 (Public Law 117-169) or the Infrastructure Investment and Jobs Act (Public Law 117-58)" and to "review their processes, policies, and programs for issuing grants, loans, contracts, or any other financial disbursements of such appropriated funds for consistency with the law and the policy outlined in section 2 of this order." 90 Fed. Reg. at 8,357.

130.    The Energy EO required that within 90 days of its issuance, all agency heads submit a report detailing their review and recommendations to "enhance their alignment with the policy set forth in section 2." *Id.* The Energy EO directed that "[n]o funds" blocked under the Order "shall be disbursed" unless the Director of OMB and Assistant to the President for

---

[13] Chris Strohm, *Judge Presses DOJ Attorney to Define "Illegal" DEI Programming*, Bloomberg Law (May 15, 2025), https://news.bloomberglaw.com/litigation/judge-presses-doj-attorney-to-define-illegal-dei-programming.

Economic Policy determine that such payments "are consistent with any review recommendations they have chosen to adopt." *Id.*

131.    Then, on March 3, 2025, President Trump issued Executive Order 14222, "Implementing the President's 'Department of Government Efficiency' Cost Efficiency Initiative," 90 Fed. Reg. 11,095 (Mar. 3, 2025) ("DOGE EO").

132.    The DOGE EO instructs agencies, "in consultation with the agency's DOGE Team Lead," to "review all existing covered contracts and grants" and to "terminate or modify" those contracts and grants to "advance the policies of [the Trump] Administration." 90 Fed. Reg. at 11,095–96.

### A.  Defendants' Termination Policy in Response to the Executive Orders

133.    Shortly after the Executive Orders were issued, on February 14, 2025, Secretary of Agriculture Brooke Rollins announced she "welcome[d]" DOGE's spending cuts, and that DOGE would have "full access" to USDA as Rollins reviewed "thousands of . . . grants" over the first weeks of her tenure to ensure compliance with the Executive Orders, "per the President's directives."[14] On March 13, 2025, USDA announced that Rollins had "worked with [DOGE] to streamline USDA operations by cutting wasteful spending and saving American taxpayers millions."[15]

134.    In an apparent effort to effectuate the President's sweeping Executive Orders in as quick a manner as possible regardless of the legality of their conduct, Defendants adopted the

---

[14] USDA, *Secretary Rollins Takes Bold Action to Stop Wasteful Spending and Optimize USDA to Better Serve American Agriculture* (Feb. 14, 2025), https://www.usda.gov/about-usda/news/press-releases/2025/02/14/secretary-rollins-takes-bold-action-stop-wasteful-spending-and-optimize-usda-better-serve-american [https://perma.cc/6YHF-8VGG].
[15] USDA, *Secretary Brooke Rollins Takes Bold Action in First 30 Days at USDA* (Mar. 13, 2025), https://www.usda.gov/about-usda/news/press-releases/2025/03/13/secretary-brooke-rollins-takes-bold-action-first-30-days-usda [https://perma.cc/9ZXY-ASA3].

policy at issue here, mandating the termination of awarded grants without individualized review but rather based on vague allegations that the projects were not aligned with the President's newly stated goals of eliminating funding for DEI and climate initiatives—without any effort to determine whether the projects could be brought into line.

135.    On information and belief, to identify DEI-related grants for review and termination, Defendants used a variety of search terms, including "Equity," "Environmental Justice," "DEI," "DEIA," "Diversity," "Inclusion," "Underrepresented producers," "Underserved communities," "Socially disadvantaged producers," and "Socially vulnerable."

136.    On information and belief, to identify climate-related grants for termination, Defendants instructed staff to identify any active awards that "include, fund, or otherwise support climate-related activities which do not demonstrably directly or indirectly benefit farmers, ranchers, or producers," specifically grants that fund "Climate consulting services"; "Climate modeling, tracking, or other technology platforms or solutions"; "The authoring of a report not anticipated to benefit farmers, ranchers, or producers"; "Climate-friendly facilities/construction"; and "Any other kinds of analysis, evaluation, or reporting," as well as sixteen "additional topic areas and search terms." Defendants later provided their staff additional topic areas and specific search terms to employ.

137.    On information and belief, USDA staff were instructed to fill out one of several spreadsheets with information regarding each grantee identified through the searches. For grants that included the DEI search terms, the spreadsheet asked staff to "evaluate" a grant for termination based on (i) whether a statute required DEI- or climate related activities, and (ii) whether the DEI- or climate related portions of the grant could be severed from the remaining portions. Despite these questions, the agency terminated grants where a statute required DEI- or

39

climate-related activities (as those terms are commonly understood), and on information and belief, its practice was to terminate grants in their entirety. The spreadsheet called on staff to make a recommendation regarding termination based on the first two questions. Therefore, to the extent the spreadsheets were actually utilized, they establish that the search terms were dispositive as to whether a grant was terminated.

138.    On information and belief, "leadership" were nominally required to approve any terminations, but to the extent it occurred, that review was not substantive.

139.    On March 13, 2025, Secretary Rollins issued memoranda—Secretary's Memoranda 1078-003 and 1078-004—that appear intended to codify and approve USDA's policy requiring the identification and termination of DEI- or climate-related grants based on search terms and without sufficient individualized review. The Memoranda state that it is the policy of the Department to "not fund programs or organizations that promote or take part in climate change or environmental justice initiatives" or "DEI."

140.    On information and belief, USDA continues to follow the policy codified in Memoranda 1078-003 and 1078-004 when terminating grants.

141.    USDA relied on Memorandum 1078-004 in the most recent LAND ACCESS PROGRAM terminations issued in March 2026.

**B.  Defendants' Initial Application of the Termination Policy**

142.    As of May 16, 2025, a DOGE website listed nearly 600 USDA awards that had been terminated, which, based on the timing and the other facts alleged herein, all appear to have been terminated by the same policy that impacted Plaintiffs.[16] Indeed, Defendants' terminations of Plaintiffs' awards, other than the terminated Land Access Program Plaintiffs' awards (which

---

[16] Dep't of Gov't Efficiency, https://doge.gov (last visited June 2, 2025).

40

were terminated after May 16, 2025), are included on the DOGE website list of terminated grants.

143.    On information and belief, the USDA terminations listed on the DOGE website were carried out using form letters.

144.    On information and belief, Plaintiffs USDN, AC, PFC, and IATP received termination letters that were based on these form letters.

145.    Indeed, the USDN Termination includes highlighted fill-ins for the name of the subagency that issued its award to be filled in.

146.    Moreover, on information and belief, Defendants sent most or all the termination letters via email as attached PDF files. On information and belief, the file names for the PDFs sent to some recipients included the phrase "Full Termination Letter Template."

147.    Plaintiffs USDN's, AC's, PFC's, and IATP's termination letters reveal that their terminations and those relying on the same form letter shared key characteristics.

148.    As justification for all these terminations, Defendants cited 2 C.F.R. § 200.340(a)(4).

149.    None of the terminations Defendants issued under this policy complied with the requirements of the Uniform Guidance. Nor have Defendants published any evidence or records of an administrative decision-making process prior to any of these individual terminations by which they identified their obligations under the Uniform Guidance, attempted to comply with such obligations, or considered the individual circumstances of any given grantee and the grantee's efforts to fulfill the objectives of their grant and the program under which it was awarded.

41

150.    Under this policy, the individual award terminations:

    a.    Were based on termination grounds that were not clearly and unambiguously allowed for under the awards;

    b.    Were based on a claimed failure to effectuate agency priorities, when those agency priorities were not specified in the awards;

    c.    Were based on the Trump Administration's new priorities that did not exist at the time of the awards;

    d.    Lacked any evidence that the awards failed to effectuate the priorities determined at the time of the awards;

    e.    Lacked any reasoned explanation for the terminations;

    f.    Did not allege any noncompliance by the recipients with the terms or conditions of their awards;

    g.    Did not describe any specific aspect of the awards that was found to be objectionable, let alone unlawful;

    h.    Did not provide any advance notice to awardees;

    i.    Did not offer technical assistance or even an opportunity to address any alleged problems prior to termination;

    j.    Were based on the use of search terms;

    k.    Failed to consider all aspects of the specific grants being terminated;

    l.    Were not based on reasoned decision making and offered insufficiently substantiated explanations;

    m.    Provided explanations that are contrary to the facts;

    n.    Relied on unexplained shifts in policies;

42

o.  Failed to properly consider reliance interests;

p.  Did not explain how the awards no longer effectuate USDA's priorities as determined at the time of the award, which is the proper standard by which to judge the awards; and

q.  Failed to consider whether the programs could be modified rather than terminated.

**i.  Defendants' Termination of USDN's Forestry Program Grant**

151.  For example, on April 2, 2025, USDN received a letter from USDA and USFS terminating its award for its project, "Accelerating Urban Forestry as Equity Centered Climate Action and Sustainable Community Development."

152.  The USDN Termination states USDA's new policy is to "establish a return to American principles and realign its focus towards its original objectives of maximizing and promoting American agriculture; ensuring a safe, nutritious, and secure food supply; enhancing rural prosperity; and managing our National Forests." USDA, it continues, must "conserve[]" resources and "focus[] upon its original objectives, as well as its obligations under the Constitution and laws of the United States." Thus, according to the termination letter, USDA's new priorities include "ensuring that its grants, cooperative agreements, and other similar arrangements do not support programs that promote or take part in climate change or environmental justice initiatives."

153.  The USDN Termination went on to state that the award "provides funding for programs that promote or take part in climate change or environmental justice initiatives; that conflict with the Department's policies and priorities; that are not free from fraud, abuse, or duplication; or that otherwise fail to serve the best interests of the United States."

43

154.    The USDN Termination ultimately asserts that USDA and USFS terminated USDN's award because the award is "inconsistent with, and no longer effectuates, Department priorities." The letter cites 2 C.F.R. § 200.340(a)(4) in support of this assertion.

155.    The USDN Termination also broadly claims that the termination is made pursuant to 2 C.F.R. §§ 200.339–343, which are the Uniform Guidance rules governing remedies for noncompliance; termination; notification of termination requirements, opportunities to object, hearings, and appeals; and effect of suspension and termination.

156.    Under this policy of unlawfully terminating grants, the USDN Termination:

a.    Was based on termination grounds that were not clearly and unambiguously allowed for under USDN's award;

b.    Was based on a claimed failure to effectuate agency priorities, when those agency priorities were not specified in USDN's award;

c.    Was based on the Trump Administration's new priorities that did not exist at the time of USDN's award;

d.    Lacked any evidence that the award failed to effectuate the priorities determined at the time of the award;

e.    Lacked any reasoned explanation for the termination;

f.    Did not allege any noncompliance by USDN with the terms or conditions of its award;

g.    Did not describe any specific aspect of the award that was found to be objectionable, let alone unlawful;

h.    Did not provide any advance notice to USDN;

44

i.   Did not offer technical assistance or even an opportunity to address any alleged problems prior to termination;

j.   Was based on the use of search terms;

k.   Failed to consider all aspects of the specific grants being terminated;

l.   Was not based on reasoned decision making and offered insufficiently substantiated explanations;

m.   Provided explanations that are contrary to the facts;

n.   Relied on unexplained shifts in policies;

o.   Failed to properly consider reliance interests;

p.   Did not explain how the awards no longer effectuate USDA's priorities as determined at the time of the award, which is the proper standard by which to judge the awards; and

q.   Failed to consider whether the programs could be modified rather than terminated..

157.   On May 1, 2025, USDN submitted an appeal letter to USFS pursuant to the optional process included in the DISPUTES provision of its award. Prior to filing this action, USDN had not yet heard back from the agency. It would have been futile for USDN to wait for USFS's response because the termination was made as part of an agency-wide policy pursuant to the Executive Orders to eliminate funding with any alleged connection to climate and environmental justice initiatives.

### ii. Defendants' Termination of AC's Food Program Grant

158.    On March 7, 2025, NIFA sent a letter to AC, terminating the award for its project, "Growing Cooperative Networks for Community Food Sovereignty, Nutrition, and Agroecological Land Stewardship."

159.    The AC Termination states the award is terminated "as of the date of this notice, in accordance with 2 CFR § 200.340(a)(4) and the terms and conditions of the award." The only stated justification is that the award "no longer effectuates USDA priorities, which are to maximize and promote American agriculture; ensure a safe, nutritious, and secure food supply; enhance rural prosperity; and protect our National Forests."

160.    Around the same time of the AC Termination, Secretary Rollins took to her official Instagram to provide what she called a "DOGE update," explaining, "@usdagov was funding a $397K grant in the San Francisco Bay to educate queer, trans, and BIPOC urban farmers and consumers about food justice and values-aligned markets…🤦‍♀️This grant has been CANCELLED."[17] She continued, "By stopping this wasteful spending here at USDA, we are ending identity policy and we are refocusing our agency on American farming, ranching, and forestry."

161.    USDA and NIFA never provided AC any formal notice that its grant was terminated for any of the reasons implicated by Secretary Rollins in her post.

162.    Under this policy of unlawfully terminating grants, this AC Termination:

      a.    Was based on termination grounds that were not clearly and unambiguously allowed for under AC's award;

---

[17] USDA, *supra* note 2.

46

b.  Was based on a claimed failure to effectuate agency priorities, when those agency priorities were not specified in AC's award;

c.  Was based on the Trump Administration's new priorities, which did not exist at the time of AC's award;

d.  Lacked any evidence that the award failed to effectuate the priorities determined at the time of the award;

e.  Lacked any reasoned explanation for the termination;

f.  Did not allege any noncompliance by AC with the terms or conditions of its award;

g.  Did not describe any specific aspect of the award that was found to be objectionable, let alone unlawful;

h.  Did not provide any advance notice to AC;

i.  Did not offer technical assistance or even an opportunity to address any alleged problems prior to termination;

j.  Was based on the use of search terms;

k.  Failed to consider all aspects of the specific grants being terminated;

l.  Was not based on reasoned decision making and offered insufficiently substantiated explanations;

m.  Provided explanations that are contrary to the facts;

n.  Relied on unexplained shifts in policies;

o.  Failed to properly consider reliance interests;

47

    p.  Did not explain how the awards no longer effectuate USDA's priorities as determined at the time of the award, which is the proper standard by which to judge the awards; and

    q.  Failed to consider whether the programs could be modified rather than terminated.

163.    On May 6, 2025, AC submitted an appeal letter to NIFA pursuant to 7 C.F.R. § 3430.62. The appeal was submitted out of an abundance of caution, but was not a necessary step for AC because it applies only where NIFA has terminated based on "failure of the awardee to carry out its approved project in accordance with the applicable law and the terms and conditions of award or for failure of the awardee otherwise to comply with any law," which NIFA has not stated as its basis for termination. 7 C.F.R. § 3430.62(a). Prior to filing this action, AC had yet to receive a response from NIFA. It would have been futile for AC to wait for NIFA's response because the termination was made as part of an agency-wide policy pursuant to the Executive Orders to eliminate funding with any alleged connection to DEI, climate, or environmental justice initiatives.

### iii.  Defendants' Termination of PFC's Development Program Grant

164.    On April 25, 2025, NIFA sent a letter to PFC, terminating the award for its project, "Empowering Refugee, Immigrant, and Black Beginning Farmers through Personalized, Culturally Adapted Training and Education at PFC."

165.    The PFC Termination alleges that PFC's award "provides funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights laws; that conflict with the Department's

48

policies and priorities; that are not free from fraud, abuse, or duplication; or that otherwise fail to serve the best interests of the United States. The award is therefore inconsistent with, and no longer effectuates, Department priorities. See 2 C.F.R. § 200.340(a)(4)." The PFC Termination does not point to any factual bases supporting its allegations.

166.    Under Defendants' policy of unlawfully terminating grants, the PFC Termination:

     a.  Was based on termination grounds that were not clearly and unambiguously allowed for by PFC's award;

     b.  Was based on a claimed failure to effectuate agency priorities, when those agency priorities were not specified in PFC's award;

     c.  Was based on the Trump Administration's new priorities, which did not exist at the time of PFC's award;

     d.  Lacked any evidence that the award failed to effectuate the priorities determined at the time of the award;

     e.  Lacked any reasoned explanation for the termination;

     f.  Did not allege any noncompliance by PFC with the terms or conditions of its award;

     g.  Did not describe any specific aspect of the award that was found to be objectionable, let alone unlawful;

     h.  Did not provide any advance notice to PFC;

     i.  Did not offer technical assistance or even an opportunity to address any alleged problems prior to termination;

     j.  Was based on the use of search terms;

     k.  Failed to consider all aspects of the specific grants being terminated;

49

l.   Was not based on reasoned decision making and offered insufficiently substantiated explanations;

m.  Provided explanations that are contrary to the facts;

n.   Relied on unexplained shifts in policies;

o.   Failed to properly consider reliance interests;

p.   Did not explain how the awards no longer effectuate USDA's priorities as determined at the time of the award, which is the proper standard by which to judge the awards; and

q.   Failed to consider whether the programs could be modified rather than terminated.

167.   On May 15, 2025, PFC filed an informal appeal with NIFA. Prior to filing this action, NIFA had not provided a response to the appeal. It would have been futile for PFC to wait for NIFA's response because the termination was made as part of an agency-wide policy pursuant to the Executive Orders to eliminate funding with any alleged connection to DEI, climate, or environmental justice initiatives.

**iv.  Defendants' Termination of IATP's Partnership Program Grant**

168.   Similarly, on April 21, 2025, IATP received a notice from AMS terminating its Partnership Program grant.

169.   The IATP Termination includes a laundry list of potential accusations about the funded award and ultimately justifies the termination by concluding that the "award is therefore inconsistent with, and no longer effectuates, Department priorities," relying on 2 C.F.R. § 200.340(a)(4).

170.   The IATP Termination notes that the termination is immediately effective.

171.   Under the policy of unlawfully terminating grants, the IATP Termination:

   a.   Was based on termination grounds that were not clearly and unambiguous allowed for by IATP's award;

   b.   Was based on a claimed failure to effectuate agency priorities, when those agency priorities were not specified in IATP's award;

   c.   Was based on the Trump Administration's new priorities that did not exist at the time of IATP's award;

   d.   Lacked any evidence that the award failed to effectuate the priorities determined at the time of the award;

   e.   Lacked any reasoned explanation for the termination;

   f.   Did not allege any noncompliance by IATP with the terms or conditions of its award;

   g.   Did not describe any specific aspect of the award that was found to be objectionable, let alone unlawful;

   h.   Did not provide any advance notice to IATP;

   i.   Did not offer technical assistance or even an opportunity to address any alleged problems prior to termination;

   j.   Was based on the use of search terms;

   k.   Failed to consider all aspects of the specific grants being terminated;

   l.   Was not based on reasoned decision making and offered insufficiently substantiated explanations;

   m.   Provided explanations that are contrary to the facts;

   n.   Relied on unexplained shifts in policies;

51

o.  Failed to properly consider reliance interests;

p.  Did not explain how the awards no longer effectuate USDA's priorities as determined at the time of the award, which is the proper standard by which to judge the awards; and

q.  Failed to consider whether the programs could be modified rather than terminated.

172.  On May 21, 2025, IATP filed an appeal to AMS explaining why the termination should be reconsidered, as provided in the IATP Termination. The termination letter stated that IATP would receive a final decision within 15 business days of receipt of the appeal. Prior to filing this action, IATP had not received any communication from AMS in response to its appeal.

173.  On information and belief, Defendants continue to terminate awards pursuant to this policy, with the Land Access Program Plaintiffs (discussed below) the latest victims of Defendants' actions. Plaintiffs, as well as others with awards similarly terminated by USDA, have been and continue to be injured by Defendants' abrupt unlawful termination of their awards. Plaintiffs are no longer able to execute their important projects, carry out their missions, plan for the future, pay their employees, contractors, or sub-awardees, and serve communities in need. The harm to Plaintiffs' work only grows as time continues, with more potential layoffs and reductions in operations on the horizon absent this grant funding.

**C.  Defendants' Subsequent Efforts to Terminate the Land Access Program.**

174.  On or around March 23, 2026, FSA sent termination letters purportedly cancelling 49 of the 50 awarded Land Access Program grants. AC is the only Land Access Program grantee who did not receive such a termination letter.

52

175.    Prior to this action, AC's Land Access Program grant had been frozen starting in January 2025. On June 17, 2025, USDA issued a press release stating that it "will terminate more than 145 Diversity, Equity, and Inclusion (DEI) focused awards, totaling a maximum savings of $148.6 million."[18] The announcement states that among the terminated grants is one for "[e]xpanding equitable access to land, capital, and market opportunities for underserved producers in the Bay Area: $2,500,000."[19] On information and belief, this is in reference to AC's Land Access Program grant. AC, however, has not yet received formal notice of the termination of this award. This appears to be the result of the preliminary injunction entered in this action, which occurred between the announcement of the termination and USDA's issuing an actual termination notice.

176.    But for that preliminary injunction, on information and belief, AC's Land Access Program grant would have been terminated pursuant to the policy at issue here no later than the when the remaining Land Access Program awardees received notice of the termination.

177.    The Land Access Program Plaintiffs (defined above as all those with Land Access Program grants except AC) each received nearly identical termination letters.

178.    Those termination letters each state that the termination is "in accordance with the terms and conditions of [the] award and applicable regulations," including 2 C.F.R. § 200.340(a)(4) (2024).

179.    Those termination letters contain boilerplate language for all but one to two paragraphs in the four-page letters.

---

[18] USDA, *supra* note 2.
[19] *Id.*

53

180.    None of those letters explains the approximately nine-month delay between Defendants' initial efforts to terminate the Land Access Program starting with AC and the issuance of these termination letters. However, each termination letter references the "Secretary's Memorandum 1078-004, '*Directive on Departmental Grant and Cooperative Agreement Priorities*' (March 2025)," which "instructed USDA agencies and staff offices to review existing rewards to ensure they reflect the Department's priorities of unity, equality, meritocracy, and color-blindness."

181.    These Land Access Program termination letters share key common features.

182.    Indeed, the repetitive language and fact that USDA addressed at least some of the letters to "Recipient" rather than any individual name or organization indicate that the letters were produced using form documents.

183.    On information and belief, every one of their letters states in its opening paragraph that "[t]he United States Department of Agriculture (USDA) has determined that awards under this program involved discriminatory preferences based on Diversity, Equity, and Inclusion (DEI) and wasteful spending that did little to further agricultural land purchases. Accordingly, as discussed below, USDA has determined your award no longer effectuates the program goals or agency priorities."

184.    Consistent with the broad, non-individualized nature of that initial termination rationale, on information and belief, the next three sections of the letter list newly declared concerns with the Land Access Program in general, without relating them to the specific grant being terminated. Section 1 asserts, without any supporting information, "Your award was made pursuant to a program rife with DEI preferences that discriminated based on immutable characteristics." On information and belief, section 2 states "most of the awards did little to

54

improve land access," without any supporting information or attempt to link that concern back to the terminated grantee's individual award. On information and belief, section 3 claims the program contained "unacceptable risks of fraud, waste and abuse" and provides three examples of such spending, but does not state whether any of those examples relates to the individual terminated grantee or how any expenditure was problematic given that each specific expense had to be approved by the agency.

185.   On information and belief, Defendants relied on the foregoing generalized assertions to justify "fully realign[ing] the program," and as a result, issued the terminations without any individualized analysis or reasons.

186.   On information and belief, the next paragraph attempts to link the termination to the specific award, in many cases taking some language from the grant application and asserting that it reveals the "project's intention to allocate program resources to specific producers based on these characteristics underscores the fundamental inconsistency with equal protection principles and USDA policy and priorities." Yet nothing in these letters indicates that USDA reviewed the awarded project in its entirety (or at all) to determine if it was accurately interpreting the excerpted language, whether the project truly reflected a violation of USDA's new position on funding, or whether the funded project could be modified to meet the agency's new position.

187.   Indeed, on information and belief, in Agraria Center's termination letter, after providing generic recitations of complaints about Land Access Program, Defendants rely on factually false statements regarding the grant and organization. The letter claims the funded project was "limit[ed]" to serving people "based on race and ethnicity," but in making this claim, Defendants quote a sentence from the grant application that explains that under the grant, the

55

organization "work[s] with emerging and existing BIPOC *and other underserved farmers*."
(emphasis added).

188.    Likewise, on information and belief, Urban Oasis's termination letter quotes its
project narrative's focus on serving "underserved farmers" to imply a race-based approach, but
neglects to acknowledge that the narrative defines "underserved farmers" as "any producer
earning less than the area's median wage (under $54,000 or $26/hr) and/or producers that
identify as people of color, women, or LGBTQ that have experienced barriers to land, capital,
and/or markets." And the narrative goes on to explain that the defining characteristic of the
targeted underserved farmers is the small size of their operations and their inability to afford
access to farmland, thus substantiating the barriers to land, capital, and/or markets that the grant
program was designed to mitigate.

189.    The lack of meaningful individualized review performed before issuing these
terminations is further highlighted by the inclusion of the same formulaic language in
termination letters for organizations serving tribes and tribal citizens or otherwise assisting
producers on tribal lands. For example, the termination letters for Plaintiffs Four Bands
Community Fund and NDN Collective assert that "the vast majority of projects across" the
program "violated equal protection principles by selecting beneficiaries based on race, ethnicity,
sexual orientation, or sex," and rely on the same Secretary memoranda as all the other
terminations—those objecting to DEI. However, such an approach fails to acknowledge tribal
status is not a race-based classification. That is the holding of longstanding case law, as well as
the current administration's own positions regarding the application of DEI principles to tribes
and tribal members.

56

190.    Tribes are sovereign nations, and membership in a federally recognized tribe is a political classification, not a racial one. In this manner, terminating grants for organizations serving tribes and tribal citizens or otherwise assisting producers on tribal lands on the basis that it is DEI directly contravene USDA's long recognized "unique government-to-government and political relationship with, federally recognized Indian Tribes [and] American Indian Tribal citizens," as stated in Secretary's Memorandum 1078-0010 entitled "Clarifying the Application of Certain Executive Orders to Federally Recognized Indian Tribes, American Indian Tribal Citizens and Alaska Natives, and the Native Hawai'ian Community."

191.    Indeed, Memorandum 1078-0010 specifically clarifies that the government's relationship with American Indian Tribal members, such as those served by Four Bands' and NDN's grants, is "legally distinct from policy-based Diversity, Equity, and Inclusion programs such as those covered by" both of the DEI EOs. Memorandum 1078-0010 expressly states that "these Executive Orders did not eliminate, rescind, hinder, impair, or otherwise affect activities, services, or programs that implement the legal and political relationship carried out by the Department of Agriculture arising by Treaty or statute with respect to federally recognized Indian Tribes, American Indian Tribal citizens" and others. Here, Congress has directed USDA to provide funding to tribes or to "national tribal organization[s] that ha[ve] demonstrated experience in providing agriculture education or other agriculturally related services to socially disadvantaged farmers and ranchers in a region." 7 U.S.C. 2279(c)(1)(F).

192.    On information and belief, each Land Access Program Plaintiff's termination letter also claims—without support—that USDA considered the "reliance interests" of the grantees and others before terminating the grant. The closest the letters get to this is listing other organizations referenced in the grant materials and inserting that into the template.

57

193.    On information and belief, each termination letter then concludes by stating that "following careful consideration of your award—including any potential reliance interests, intended outcomes described, as well as consideration of alternatives to termination—USDA has determined the best use of resources and advancing USDA's goals and priorities requires a full termination to realign the program to be consistent with its statutorily mandated purpose and the policies and priorities of the Department." Again, the letters did not provide any support beyond these bald assertions. On information and belief, the letters' conclusion further states that the agency was acting on the public's interests that the Land Access Program "improve land access," that the grants do "not discriminate," and that the grants represent "the effective and efficient use of federal funds," but USDA failed to provide any indication that the grants were to the contrary, and did not explain why the agency changed its position in thinking the grants were inconsistent with these interests.

194.    In light of the above and the termination letters' dependance on 2 C.F.R. § 200.340(a)(4) (2024), consistent with the policy under which these grants were terminated, these latest terminations share characteristics with the prior terminations including that they:

   a.  Were based on termination grounds that were not clearly and unambiguously allowed for by Land Access Program Plaintiffs' awards;

   b.  Were based on a claimed failure to effectuate agency priorities, when those agency priorities were not specified in the Land Access Program awards;

   c.  Were based on the Trump Administration's new priorities, which did not exist at the time of the Land Access Program awards;

58

d.  Lacked any evidence that the awards failed to effectuate the priorities determined at the time of the awards;

e.  Lacked any reasoned explanation for the terminations;

f.  Did not allege any noncompliance by the Land Access Program Plaintiffs with the terms or conditions of their awards;

g.  Did not demonstrate how the awards were found to be objectionable, let alone unlawful;

h.  Did not provide any advance notice to the Land Access Program Plaintiffs;

i.  Did not offer technical assistance or even an opportunity to address any alleged problems prior to termination;

j.  Were based on the use of search terms;

k.  Failed to consider all aspects of the specific grants being terminated;

l.  Were not based on reasoned decision making and offered insufficiently substantiated explanations;

m.  Provided explanations that are contrary to the facts;

n.  Relied on unexplained shifts in policies;

o.  Failed to properly consider reliance interests;

p.  Did not explain how the awards no longer effectuate USDA's priorities as determined at the time of the award, which is the proper standard by which to judge the awards; and

q.  Failed to consider whether the programs could be modified rather than terminated.

195.    Each of the termination letters required terminated grantees to submit final reports within 120 calendar days after the termination letter, whether or not those final reports could be completed given the early termination of the grants.

196.    Each of the termination letters informed grantees they could appeal their termination to the National Appeals Division, according to the Division's procedures at 7 C.F.R. Part 11 by filing a written request no later than 30 calendar days after receiving the termination letter.

197.    The Land Access Program Plaintiffs each individually filed an appeal of their Land Access Program grant terminations to the National Appeals Division consistent with the Division-listed procedures and in the time allowed. In response to each grantee's appeal,[20] on or around April 29, 2026, the National Appeals Division issued identical "final determination[s]," that "FSA's March 23, 2026, decision terminating your ILA grant is not appealable because it concerns matters of general applicability." NAD determined that "FSA's decision is not based on the individual application of specific program criteria," but that "[i]nstead, [the] grant termination is *based on the general policy priorities of USDA and its decision to cancel the [Land Access Program] program*," that "[t]he Secretary of Agriculture has determined that this program, and awards made thereunder, no longer support USDA priorities" (emphasis added). Therefore, NAD determined it could not act on the terminations.

---

[20] As noted above, *see supra* note 1, THRIVE has not yet received a final determination from NAD. However, given its termination letter is nearly identical to the others, there is no reason to suspect it will receive anything different from what the other Land Access Program Plaintiffs received.

60

**FIRST CAUSE OF ACTION**
**Violation of Due Process Clause**
**By All Plaintiffs Against All Defendants**

198.    The allegations made in all preceding paragraphs are realleged and incorporated by reference herein.

199.    The Fifth Amendment to the United States Constitution guarantees that no person shall be deprived of life, liberty, or property without due process of law.

200.    Plaintiffs have a constitutionally protected interest in the USDA funding they applied for, were awarded, and relied on. Plaintiffs have expended significant resources to set up their programs and projects in reliance on their grant awards. Plaintiffs' interests in their awards are established and governed by the acceptance of their application by USDA. *See, e.g., Cnty. of Santa Clara v. Trump*, 275 F. Supp. 3d 1196, 1218 (N.D. Cal. 2017), *aff'd in part, vacated in part, remanded sub nom, City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018).

201.    Because Defendants have adopted procedural protections for awardees through their own regulations, Plaintiffs also have a constitutionally protected right to scrupulous compliance with the regulations.

202.    Thus, Plaintiffs were entitled to reasonable notice and due process before Defendants summarily terminated their grant funding.

203.    Plaintiffs did not receive prior notice before Defendants summarily terminated their awards and ceased disbursing funds owed. Nor were Plaintiffs provided a hearing or other opportunity to challenge the termination of their grants before the terminations.

204.    The terminations deprived Plaintiffs of their interests in their funding without the procedural due process rights to which they are constitutionally entitled. Plaintiffs have had their

61

operations disrupted as a result, including reduction in services provided, staff layoffs, and damage to relationships with community beneficiaries, with ongoing risks to their very existence.

205.    Thus, Defendants' termination of awards in the manner described herein violates the Fifth Amendment Due Process Clause.

206.    Plaintiffs are entitled to have these unlawful actions set aside.

**SECOND CAUSE OF ACTION**
**Violation of Due Process Clause – Void for Vagueness**
**By All Plaintiffs Against All Defendants**

207.    The allegations made in all preceding paragraphs are realleged and incorporated by reference herein.

208.    The Fifth Amendment to the United States Constitution guarantees that no person shall be deprived of life, liberty, or property without due process of law. A fundamental aspect of due process is that government-imposed obligations must be stated with sufficient clarity to provide fair notice and prevent arbitrary enforcement. Government regulatory enforcement is void for vagueness if it (1) does not provide a person of ordinary intelligence fair notice of what is prohibited or (2) risks arbitrary application. *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972); *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012); *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674 (D.C. Cir. 2016); *Timpinaro v. SEC*, 2 F.3d 453, 460 (D.C. Cir. 1993).

209.    Open-ended regulatory terminology that allows for "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings" violates due process. *United States v. Williams*, 553 U.S. 285, 306 (2008); *Coates v. City of Cincinnati*, 402 U.S. 611, 611–14 (1971); *Smith v. Goguen*, 415 U.S. 566, 573–77 (1974).

210.    Plaintiffs have a constitutionally protected interest in the award funding they applied for, were awarded, and relied on. Plaintiffs also have a constitutionally protected interest in Defendants' scrupulous compliance with their own regulations.

211.    Defendants' application of 2 C.F.R. § 200.340(a)(4) to Plaintiffs is unconstitutionally vague and constitutes an arbitrary exercise of authority.

212.    Moreover, the form termination letters are also unconstitutionally vague because they are based on priorities that were never previously identified for awardees.

213.    To the extent the terminations mention new priorities, these new priorities are not included in the award documents, nor are they meaningfully defined.

214.    As a result, Defendants' termination of awards in the manner described herein is unconstitutionally vague, thereby violating the Fifth Amendment Due Process Clause.

215.    Plaintiffs are entitled to have these unlawful actions set aside.

**THIRD CAUSE OF ACTION**
**Violation of 7 U.S.C. § 6999 and Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**Agency Actions Not in Accordance with Law (Uniform Guidance, 2 C.F.R. § 400.1)**
**By All Plaintiffs Against All Defendants**

216.    The allegations made in all preceding paragraphs are realleged and incorporated by reference herein.

217.    For the Land Access Program Plaintiffs, following final review by NAD, agency actions subject to NAD's review can be considered and set aside "in accordance with Chapter 7 of Title 5," which is the Administrative Procedure Act. 7 U.S.C. § 6999.

218.    All the Land Access Program Plaintiffs' terminations at issue here have been subject to final review by NAD.

219.    Defendants are "agencies" under the APA, 5 U.S.C. § 551(1).

220.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law." 5 U.S.C. § 706(2)(A).

221.    The APA's reference to "law" in the phrase "not in accordance with law," "means, of course, any law, and not merely those laws that the agency itself is charged with administering." *FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003) (emphasis in original).

222.    When a federal agency has promulgated "[r]egulations with the force and effect of law," those regulations "supplement the bare bones" of federal statutes. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 265, 268 (1954). "[A]n agency is bound by its own regulations," and therefore "if an agency action fails to comply with its regulations, that action may be set aside as arbitrary and capricious." *Erie Boulevard Hydropower, LP v. FERC*, 878 F.3d 258, 269 (D.C. Cir. 2017) (citation modified). In particular, "agencies may not violate their own rules and regulations to the prejudice of others." *Battle v. F.A.A.*, 393 F.3d 1330, 1336 (D.C. Cir. 2005).

223.    Defendants' policy mandating termination of Plaintiffs' and others' awards relying in whole or in part on 2 C.F.R. § 200.340(a)(4) in the manner described above is a final agency action. The policy has resulted in mass termination of awards that has led to the immediate cessation of project support and funding, including that to which Plaintiffs are entitled, and marks the culmination of USDA's decision making.

224.    Each termination of Plaintiffs' grants is a final agency action.

225.    Defendants' termination of Plaintiffs' individual awards relying in whole or in part on 2 C.F.R. § 200.340(a)(4), and their policy mandating termination of awards relying in

64

whole or in part on 2 C.F.R. § 200.340(a)(4), are final agency actions not in accordance with law for several reasons, including:

    a.  Reliance on a provision, 2 C.F.R. § 200.340(a)(4), that does not apply to USDA awards issued before October 1, 2024;

    b.  Failure to clearly and unambiguously list the grounds for termination in the conditions of the award, as opposed to merely cross-referencing the relevant Code of Federal Regulations provision;

    c.  Terminating based on new USDA priorities, rather than any program goals or agency priorities as determined at the time of the award that are included in the award itself (if any);

    d.  Failure to identify or rely on any specific new evidence about the particular award that demonstrates the award no longer effectuates the priorities it was initially intended to serve; and

    e.  Failure to inform awardees prior to termination of any noncompliance with the award's requirements and offer technical assistance or an opportunity to address any issue, as contemplated by 2 C.F.R. §§ 200.339, 200.208(c).

226.    Additionally, those subagencies that have adopted more specific procedural protections have likewise failed to comply with those requirements. For instance, NIFA's regulations provide that the agency will "allow the awardee an opportunity to take appropriate corrective action before NIFA makes a termination decision." 7 C.F.R. § 3430.60. AMS's General Terms and Conditions governing their grants provides the same.[21] NIFA failed to do so

---

[21] AMS, *supra* note 12.

when it issued the AC and PFC Terminations, and AMS failed to do so when it issued the IATP Termination. On information and belief, this is also the case for other award terminations by NIFA and AMS.

227.    For each of these reasons, each termination of Plaintiffs' and others' grants substantively and procedurally violates its own governing regulations. *See* 2 C.F.R. §§ 200.340, 400.1.

228.    For each of these reasons, USDA's policy mandating the termination of awards based on its new priorities without procedural safeguards also substantively and procedurally violates its own governing regulations. *See id.*

229.    Plaintiffs and additional awardees terminated pursuant to USDA's policy have suffered and will continue to suffer irreparable harm if these actions are not declared unlawful, and Plaintiffs have no adequate remedy in law.

230.    Plaintiffs are entitled to have Defendants' actions set aside because they are in violation of law.

**FOURTH CAUSE OF ACTION**
**Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**Agency Action that is Arbitrary and Capricious and an Abuse of Discretion**
**By Plaintiffs USDN, AC, PFC, and IATP Against All Defendants**

231.    The allegations made in all preceding paragraphs are realleged and incorporated by reference herein.

232.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

233.    An agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of

66

the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Moreover, when an agency changes its policy, if the "new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests," the agency's failure to consider such factors "would be arbitrary and capricious." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). The "reasoned explanation requirement . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).

234.    Defendants' terminations of grants for hundreds of federal awardees—including Plaintiffs USDN, AC, PFC, and IATP—are arbitrary and capricious for each of the following reasons:

      a. In the form termination letters, Defendants did not provide a reasonable explanation for the award terminations, but instead broadly asserted that the award "no longer effectuates agency priorities," without explaining why that is the case, and did not explain how the awards are allegedly inconsistent with its new priorities;

      b. Where funding has been issued to recipients pursuant to statutory mandates, Defendants did not explain how their new priorities can be reconciled with those statutory mandates;

c.  Defendants did not explain how Plaintiffs' awards no longer effectuate USDA's priorities as determined at the time of the award, which is the proper standard by which to judge the awards;

d.  Defendants did not explain in any of their termination letters what additional specific evidence shows that terminated awards are ineffective at achieving or no longer serve USDA's priorities as determined at the time of the award;

e.  Defendants failed to consider the Plaintiffs' and other awardees' reliance interests;

f.  Defendants failed to consider that many of the terminated awards are, in fact, consistent with USDA's new priorities;

g.  Defendants' termination letters failed to provide a reasoned explanation for its change in policy from its previous priorities;

h.  Defendants' terminations are based on the use of search terms;

i.  Defendants' failed to consider all aspects of the specific grants being terminated;

j.  Defendants' terminations were not based on reasoned decision making and offered insufficiently substantiated explanations; and

k.  Failed to consider whether the programs could be modified rather than terminated..

235.  Defendants' unlawful action has caused and will continue to cause irreparable harm absent a declaration that this conduct is unlawful and injunctive relief setting Defendants' actions aside, and Plaintiffs have no adequate remedy in law.

236.    Plaintiffs are entitled to have Defendants' actions set aside because they are in violation of law.

**FIFTH CAUSE OF ACTION**
**Violation of 7 U.S.C. § 6999 and Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**Agency Action that is Arbitrary and Capricious and an Abuse of Discretion**
**By Land Access Program Plaintiffs Against All Defendants**

237.    The allegations made in all preceding paragraphs are realleged and incorporated by reference herein.

238.    Following review by NAD, agency actions subject to NAD's review can be considered and set aside "in accordance with Chapter 7 of Title 5," which is the Administrative Procedure Act. 7 U.S.C. § 6999.

239.    Defendants terminated each of the Land Access Program Plaintiffs' grants and each of those terminations was subject to review by NAD.

240.    All Land Access Program Plaintiffs exhausted their administrative remedies when they obtained a final determination from NAD. NAD denied all appeals.[22]

241.    This action is a timely judicial challenge following NAD review.

242.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

243.    An agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of

---

[22] *See supra* note 1.

69

agency expertise." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. Moreover, when an agency changes its policy, if the "new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests," the agency's failure to consider such factors "would be arbitrary and capricious." *FCC*, 556 U.S. at 515. The "reasoned explanation requirement . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Com.*, 588 U.S. at 785.

244.    Each of Defendants' terminations of the Land Access Program Plaintiff's grants is arbitrary and capricious and contrary to law for the following reasons:

a.   The terminations failed to consider all aspects of the specific grants being terminated;

b.   The terminations were not based on reasoned decision making and offered insufficiently substantiated explanations;

c.   The terminations provided explanations that are contrary to the facts;

d.   The terminations relied on unexplained shifts in policies, including Defendants' shift in policy regarding how the funds should be used as well as Defendants' shift in policy that Plaintiffs' grants could be lawfully funded and would achieve the program's aims;

e.   The terminations failed to properly consider reliance interests;

f.   Defendants did not explain how the awards no longer effectuate USDA's priorities as determined at the time of the award, which is the proper standard by which to judge the awards;

70

g.  Defendants failed to consider that many of the terminated awards are, in fact, consistent with USDA's new priorities of "maximizing and promoting American agriculture" and "ensuring a safe, nutritious, and secure food supply; enhancing rural prosperity" or putting "Farmers First";

h.  Defendants did not consider whether the programs could be modified rather than terminated; and

i.  Are based on the use of search terms.

245.   USDA and FSA's termination of Land Access Program grants to organizations serving tribes or tribal citizens, including Plaintiffs Four Bands Community Fund and NDN Collective, is particularly arbitrary and capricious because a stated basis for termination directly contravenes USDA policy and fails to consider the distinct legal and political considerations that apply to those grants.

246.   Tribes are sovereign nations, and membership in a federally recognized tribe is a political classification, not a racial one. USDA policy clearly sets forth that federally recognized Indian Tribes and American Indian Tribal citizens have unique government-to-government and political relationships with the agency. As USDA itself has acknowledged, that relationship is legally distinct from policy-based Diversity, Equity, and Inclusion programs such as those covered by both of the DEI EOs.

247.   USDA and FSA's termination of the grants to Four Bands Community Fund and NDN Collective ignores the unique status of tribes, tribal citizens, and tribal lands, as well as USDA's policy that the DEI EOs did not eliminate, rescind, hinder, impair, or otherwise affect activities, services, or programs that implement the legal and political relationship carried out by

71

USDA arising by statute with respect to federally recognized Indian Tribes and American Indian Tribal citizens.

248.    Further, Congress has directed USDA to provide funding to tribes or national tribal organizations that have demonstrated experience in providing agriculture education of other agriculturally related services to socially disadvantaged farmers and ranchers in a region, such as the Land Access Program grants awarded to Four Band and NDN Collective.

249.    Defendants' unlawful action has caused and will continue to cause irreparable harm absent a declaration that this conduct is unlawful and injunctive relief setting Defendants' actions aside, and Plaintiffs have no adequate remedy in law.

250.    Plaintiffs are entitled to have Defendants' actions set aside because they are in violation of law.

**SIXTH CAUSE OF ACTION**
**Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**Agency Action that is Arbitrary and Capricious and an Abuse of Discretion**
**By All Plaintiffs Against All Defendants**

251.    The allegations made in all preceding paragraphs are realleged and incorporated by reference herein.

252.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

253.    An agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. Moreover, when an agency

72

changes its policy, if the "new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests," the agency's failure to consider such factors "would be arbitrary and capricious." *FCC*, 556 U.S. at 515. The "reasoned explanation requirement . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Com.*, 588 U.S. at 785.

254.    Defendants' policy mandating grant terminations *en masse*—including Plaintiffs' grants—as described above is arbitrary and capricious for each of the following reasons:

      a.   The policy relied on search terms to identify grants for termination without consideration for why those search terms hit and whether the grant could be modified in light of the search term hits;

      b.   The policy failed to properly consider whether the terminations were consistent with statutory mandates;

      c.   The policy purported to provide for individualized review, but that individualized review never occurred;

      d.   The policy did not take into account grantees' reliance interests;

      e.   The policy did not take into account the shift in policy and how that would impact grantees;

      f.   The policy relied on a provision, 2 C.F.R. § 200.340(a)(4), that does not apply to USDA awards issued before October 1, 2024;

      g.   The policy terminated grants based on new USDA priorities, rather than any program goals or agency priorities as determined at the time of the award that are included in the award itself (if any);

h.  The policy failed to inform awardees prior to termination of any noncompliance with the award's requirements and offer technical assistance or an opportunity to address any issue, as contemplated by 2 C.F.R. §§ 200.339, 200.208(c); and

i.  The policy had other arbitrary aspects that will be revealed through discovery.

255.  Defendants' unlawful action has caused and will continue to cause irreparable harm absent a declaration that this conduct is unlawful and injunctive relief setting Defendants' actions aside, and Plaintiffs have no adequate remedy in law.

256.  Plaintiffs are entitled to have Defendants' actions set aside because they are in violation of law.

**SEVENTH CAUSE OF ACTION**
**Violation of 7 U.S.C. § 6999 and Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**Agency Action Not in Accordance with Law (Cooperative Forestry Assistance Act of 1978 and Inflation Reduction Act of 2022)**
**By USDN Against USDA and USFS; By AC and Additional Land Access Program Plaintiffs Against USDA and FSA**

257.  The allegations made in all preceding paragraphs are realleged and incorporated by reference herein.

258.  USDA, USFS, and FSA's policy resulting in the termination of Forest Program and Land Access Program awards and their termination of USDN's, AC's, and Land Access Program Plaintiffs' individual awards are also not in accordance with law and thus violates the APA because the stated bases for terminations directly contravene Congress's statutory mandates for funding those programs.

74

259.    Congress intended awards under the Forest Program to implement tree planting programs that contribute to reducing global warming trends by reducing carbon dioxide emissions, mitigating the heat island effect, and reducing energy consumption. 16 U.S.C. § 2105.

260.    USDA and USFS are required to carry out this program as statutorily mandated and to distribute the funds that Congress appropriated for the program.

261.    Consistent with these statutory duties, USDA and USFS obligated these funds to specific entities following a rigorous, regulated, and competitive grantmaking process.

262.    USDA and USFS's stated justification for the termination of Forest Program awards—including USDN's—was that the awards "no longer effectuate agency priorities" because they relate to climate or environmental justice.

263.    USDA and USFS's new priority of defunding awards based on climate and environmental justice, however, is at odds with Congress's mandates that USDA fund the Forest Program, and that those funds go towards programs that address climate and other environmental harms.

264.    Accordingly, USDA and USFS's policy pursuant to which it terminated Forest Program awards—and its termination of USDN's individual award—on the basis that the funds relate to climate or environmental justice are not in accordance with the statutory requirements for the program and thus violates the APA.

265.    Congress intended awards under the Land Access Program to benefit socially disadvantaged and underserved farmers. Pub. L. No. 117-2, 135 Stat. 4, 13–14; IRA § 22007.

266.    USDA and FSA are required to carry out this program as statutorily mandated and to distribute the funds that Congress appropriated for the program.

75

267.    Consistent with these statutory duties, USDA and FSA obligated these funds to specific entities following a rigorous, regulated, and competitive grantmaking process.

268.    USDA and FSA have terminated 49 out of 50 Land Access Program awards—and have stated it will terminate AC's award should the preliminary injunction in this case be lifted—pursuant to the policy described herein. USDA's press announcement says as much, describing an award that matches AC's Land Access Program award and stating that it will be terminated because it is "DEI focused." And USDA's nearly identical termination letters to the 49 terminated Land Access Program grantees say the same.

269.    USDA and FSA's policy requiring terminations based on DEI—and its individual termination of Land Access Program Plaintiffs' and AC's grants—are at odds with Congress's mandate that USDA funds for Land Access Program go towards programs that address socially disadvantaged and underserved farmers.

270.    Accordingly, USDA and FSA's policy requiring termination of Land Access Program awards—and their individual termination of Land Access Program Plaintiffs' awards—on the basis that they relate to DEI are not in accordance with the statutory requirements for the program and thus violates the APA.

271.    USDA, USFS, and FSA's unlawful actions have caused and will continue to cause irreparable harm absent a declaration that this conduct is unlawful and injunctive relief setting these actions aside, and USDN, AC, and Land Access Program Plaintiffs have no adequate remedy in law.

272.    USDN, AC, and Land Access Program Plaintiffs are entitled to have USDA, USFS, and FSA's actions set aside because they are a violation of law.

76

**EIGHTH CAUSE OF ACTION**
**Violation of Separation of Powers**
**By USDN Against USDA and USFS; By AC and Land Access Program Plaintiffs Against USDA and FSA**

273.    The allegations made in all preceding paragraphs are realleged and incorporated by reference herein.

274.    Article I, Section 1 of the United States Constitution states that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." U.S. Const. Art. I, § 1. "The Framers viewed the legislative power as a special threat to individual liberty, so they divided that power to ensure that 'differences of opinion' and the 'jarrings of parties' would 'promote deliberation and circumspection' and 'check excesses in the majority.'" *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 223 (2020) (quoting Federalist No. 70, at 475 (A. Hamilton)). Attempts by the Executive Branch to exercise legislative power are an affront to the carefully constructed balance created by the Framers.

275.    The Constitution vests the right to appropriate funds exclusively with Congress. The Executive Branch has no discretion to withhold funds validly appropriated by Congress. U.S. Const. Art. I, § 9, cl. 7; *see also Train v. City of New York*, 420 U.S. 35, 45–47 (1975).

276.    "[W]henever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge." *Collins v. Yellen*, 594 U.S. 220, 245 (2021).

277.    Congress enacted the Forest Program and appropriated $1.5 billion in funding for that program to serve the enumerated purposes described above.

278.    USDA and USFS's policy of terminating awards issued pursuant to IRA funding for the Forest Program—including USDN's—violates the separation of powers because the basis for terminating such awards directly contravenes their statutory mandates.

77

279.    As explained above, Congress required that the funding for the Land Access Program go towards socially disadvantaged and underserved farmers.

280.    USDA and FSA's policy of terminating awards for the Land Access Program—including AC's and Land Access Program Plaintiffs' awards—based on new priorities against DEI violates the separation of powers because the basis for terminating such awards directly contravenes their statutory mandates.

281.    USDN, AC, and Land Access Program Plaintiffs are entitled to have these actions set aside because they are a violation of law.

## NINTH CAUSE OF ACTION
### *Ultra Vires* Action (In the alternative)
### By USDN Against USDA and USFS; By AC and Land Access Program Plaintiffs Against USDA and FSA

282.    The allegations made in all preceding paragraphs are realleged and incorporated by reference herein.

283.    USDA, USFS, and FSA are acting *ultra vires* in seeking to terminate Forest Program and Land Access Program awards. *See Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689–91 (1949); *Dugan v. Rank*, 372 U.S. 609, 621–22 (1963).

284.    USDA and USFS have no statutory authority to terminate awards for reasons wholly inconsistent with the IRA and Cooperative Forestry Assistance Act of 1978.

285.    USDA and FSA have no statutory authority to terminate awards for reasons wholly inconsistent with the IRA and American Rescue Plan Act of 2021.

286.    Accordingly, USDA and USFS's termination of Forest Program awards, including USDN's award, and USDA and FSA's termination of Land Access Program awards, including AC's and Land Access Program Plaintiffs' awards, are unlawful *ultra vires* actions.

78

USDN, AC, and Land Access Program Plaintiffs are entitled to have these unlawful actions set aside.

## REQUESTS FOR RELIEF

Wherefore, Plaintiffs respectfully request that this Court:

1.      Issue a declaration that Defendants' terminations of awards and all others pursuant to the policy described herein are unlawful;

2.      Vacate and set aside the terminations of Plaintiffs' awards and all other awards terminated pursuant to Defendants' policy as described herein;

3.      Order Defendants to return things to the status quo ante in relation to Plaintiffs' awards and all other awards terminated pursuant to Defendants' policy described herein;

4.      Preliminarily and permanently enjoin Defendants from giving effect to or maintaining award terminations of Plaintiffs' awards and all others enacted pursuant to Defendants' policy described herein;

5.      Preliminarily and permanently enjoin Defendants from unlawfully re-terminating the awards reinstated pursuant to the Court's order;

6.      Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

7.      Grant any and all other such relief as the Court may deem appropriate.

Dated this 26 day of May, 2026.

Respectfully submitted,

/s/ Carrie Apfel

Carrie Apfel
DC Bar No. 974342
Earthjustice
1001 G Street, NW, Suite 1000
Washington, DC  20001
(202) 667-4500
capfel@earthjustice.org

Hannah Wolf
TX Bar No. 24137413 (*Pro Hac Vice Pending)*
FarmSTAND
712 H Street NE, Suite 2534
Washington, DC 20002
202-595-8816
hannah@farmstand.org

Benjamin E. Apple
NC Bar No. 52009 (*Pro Hac Vice*)
Farmers Justice Center
6 Fifth Street West, Suite 650
St. Paul, MN 55102
(651) 204-7203
ben.apple@farmersjustice.org

*Counsel for Plaintiffs*

David S. Muraskin
DC Bar No. 1012451
FarmSTAND
712 H Street NE, Suite 2534
Washington, DC 20002
202-595-8816
david@farmstand.org

Scott W. Carlson
MN Bar No. 0338400 (*Pro Hac Vice*)
Farmers Justice Center
6 Fifth Street West, Suite 650
St. Paul, MN 55102
(651) 204-1664
scott.carlson@farmersjustice.org

80