**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| URBAN SUSTAINABILITY DIRECTORS NETWORK, et al.,<br><br>    *Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF AGRICULTURE, et al.,<br><br>    *Defendants*. | Case No. 1:25-cv-01775-BAH |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO VACATE AND POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SANCTIONS AND ADDITIONAL DISCOVERY**

Two months ago, this Court stated that "Plaintiffs' motion for sanctions at this juncture is denied but may be renewed should defendants continue to fall short of their production obligations." *USDN v. USDA*, No. CV 25-1775 (BAH), 2026 WL 1500832, at *14 (D.D.C. May 29, 2026). Defendants have more than continued to fall short. They have missed numerous production deadlines, failed to timely seek extensions of those deadlines, and in one instance did not even request a necessary extension. Now Defendants state they will not work to meet their obligations but rather ask Plaintiffs and the Court to overlook the lost time and establish a new schedule that is more convenient for Defendants. Defendants do all this while appealing this Court's preliminary orders and seeking a stay of the recent preliminary injunction. Thus, Defendants are delaying final judgment before this Court, while simultaneously working to eliminate the protections in place, which would expose Plaintiffs to irreparable harms. This Court has provided Defendants more opportunities than Plaintiffs can count. It should not provide another.

This Court should deny Defendants' motion to vacate and reset the production deadlines, and instead impose evidentiary sanctions that will enable the parties to proceed directly to summary judgment. This Court set the current production schedule so that Defendants would produce the necessary record to address the existence or lack thereof of an "alleged agency-wide policy that resulted in the allegedly improper terminations of hundreds of federal grants" merely because the grants contained language associated with "DEI" or climate protections. *Id.* at *1. Because Defendants have continued to dodge their production obligations, the Court should impose adverse inferences that reflect Defendants' choices. It should establish that, in light of Defendants' withholdings: (i) USDA had a policy to terminate DEI- and climate-related grants solely based on the presence of DEI- or climate-related terms in the grant materials, which resulted in the termination of the grants identified in response to Plaintiffs' Second Interrogatory[1]; and (ii) to the extent Defendants seek to rebut the presence or effect of that policy in individual instances, Defendants possess no other evidence than what is in the grants' termination letters, one of only two complete sets of documents Defendants have produced to date. *See* Muraskin Decl. ¶ 5.

Should the Court reject that sanction, it still should not simply grant Defendants' request to give them yet more time to meet their obligations. Defendants have flouted this Court's orders and imposed numerous burdens on Plaintiffs. The Court should impose monetary sanctions for missed deadlines to incentivize future compliance. It should also order quick depositions of the relevant decision makers to help offset the effects of the delayed discovery.

---

[1] Plaintiffs' Second Interrogatory was meant to identify all grants that were terminated based on form letters equivalent to those received by Plaintiffs, whose grants were terminated because they were DEI- or climate-related. That is, to identify all grants that could have been subject to the alleged policy. *See USDN*, 2026 WL 1500832, at *12. Defendants' response to this interrogatory is essentially complete—Defendants have provided one response and subsequently identified six additional grants to add to that response, although they have yet to do so or provide a certification as to the response's completeness. Muraskin Decl. ¶ 4.

No matter which of the above courses of action this Court chooses, it should also require Defendants to pay the attorneys' fees for preparing this motion. Those fees are mandatory under Rule 37(b)(2)(C), absent showings Defendants cannot make.

## I.        Background.

Due to the repeated motions practice over Defendants' delayed productions, this Court is very familiar with Defendants' history of missed deadlines. *E.g.*, Resp. MET & Cross-Mot. for Sanctions, ECF No. 44; Reply ISO Sanctions, ECF No. 48; MPA ISO Suppl., ECF No. 55-1; Reply ISO Suppl., ECF No. 57; Resp. MET, ECF No. 87; Resp. MET, ECF No. 91; Notice, ECF No. 98. Plaintiffs do not repeat all those facts but highlight the key occurrences.

Defendants' initial efforts to produce an administrative record "ignore[d] the fact that plaintiffs challenge both the terminations of their own grants as well as defendants' adopted policy" regarding DEI- and climate-related terminations "and, by limiting the record to only the former challenge, defendants s[ought] to unilaterally nullify the policy-based claims by refusing to produce a record that covers them." *USDN*, 2026 WL 1500832, at *1 (cleaned up). Defendants failed to produce documents responsive to the policy claim despite this Court's initial preliminary injunction decision taking "pains to clarify for defendants that plaintiffs are challenging the implementation of an alleged policy." *Id.* at *4 (cleaned up).

Plaintiffs identified these deficiencies as far back as September 2025 and Defendants represented at that time that they could cure "many of these" gaps. JSR, ECF No. 38. Defendants, however, missed the December 2025 deadline to supplement the administrative record. *USDN*, 2026 WL 1500832, at *4. They justified their violation of that order by stating to the Court they "misinterpreted" this deadline, although Defendants indicated no such misunderstanding in correspondence and oral exchanges with Plaintiffs. *Id.*

Over another month passed without Defendants completing the administrative record. *Id.* at *5. At that point, Defendants explained they actually had no intention of compiling a record on their policy because they now claimed, in contravention of the initial preliminary injunction decision, "the court never ordered" the specific productions Plaintiffs sought. *Id.* (cleaned up).

All the while, Defendants continued to enforce the alleged policy. Defendants terminated "49 of the 50 'Increasing Land, Capital, and Market Access Program' ("ILCMAP") grants," the only exception being the grant already covered by this Court's first preliminary injunction. *Id.* The ILCMAP termination letters stated the terminations "were undertaken pursuant to the policy to effectuate" Defendants' "anti-DEI" objectives. *Id.*

The Court then ordered "supplementation and[] discovery . . . to ascertain the contours of the agency-wide policy and how the termination decisions were made." *Id.* at *8. The Court explained that in addition to traditional supplementation, formal discovery—in the form of two requests for production, two interrogatories, and privilege logs—was necessary given "the presented administrative record is underinclusive and incomplete, and the production so far in this matter has been irregular." *Id.* at *11. Defendants had withheld "documents expected to be included in the administrative record at the outset," so the Court and Plaintiffs could no longer rely on Defendants compiling an appropriate administrative record. *Id.* at *12.

Although the Court made clear that Defendants had been on notice of their production obligations since the August 2025 preliminary injunction decision, Defendants then demanded another six months to complete the record. JSR at 5, ECF No. 74. The Court rejected Defendants' position and ordered the parties to meet and confer on "rolling production of materials to supplement the administrative record to be completed by September 2, 2026." Min. Order, June 8,

2026. The Court entered an order implementing the parties' subsequent agreements and imposing other deadlines. Min. Order June 12, 2026.

Since then, not a single deadline has passed where Defendants have fulfilled their production obligations. For instance, Defendants were required to provide their first rolling response to Plaintiffs' First Interrogatory by June 18, *id.*, yet they have not produced a single response to that interrogatory, *see* Mot. to Vacate at 1, ECF No. 99.

In total, between June 18, 2026 (the first deadline in the Court's latest discovery scheduling order) to present, Defendants have sought to move the deadlines six times. METs, ECF Nos. 77, 82, 86, 90, 95; Mot to Vacate, ECF No. 99. Even after granted extensions, Defendants stand in violation of multiple Court orders. The first four of Defendants' extension requests were granted *nunc pro tunc*. Min. Order, June 22, 2026; Min. Order, July 1, 2026; Min. Order, July 14, 2026. The fifth was denied. Because it was filed the same day as several deadlines, Defendants were immediately in violation of their obligation to produce multiple types of documents. MET at 1, ECF No. 95; Min. Order, July 20, 2026. Defendants remain in violation of those deadlines, and their only plan related to the production of those documents is to adjust the schedule. Mot. to Vacate, ECF No. 99. Moreover, although Defendants nominally produced two privilege logs, the July 7 log did not contain the information ordered by the Court or required by Federal Rule of Civil Procedure 26. Min. Order, July 14, 2026. This Court ordered Defendants to bring that log into compliance by July 20. Defendants failed to do so. They have still not produced that log and failed to seek an extension of the deadline from this Court. It fell on Plaintiffs to inform the Court of that missed deadline. Notice, ECF No. 98.

Further still, every one of Defendants' motions to extend the discovery deadlines violated this Court's Standing Order. That order requires extension motions be filed four days before the

deadline a party is seeking to move. Standing Order, ECF No. 4 ¶ 8(b); *see also see also* Min. Order, July 20, 2026 (denying motion to extend in part because of their failure to comply with ¶ 8(b)); Mot. to Vacate at 2, ECF No. 99 (Defendants acknowledging their request to adjust the production deadlines have been made either after "the deadlines have passed" or "on the same day" as the deadline).

Finally, Defendants have sought these extensions in such a way as to disrupt Plaintiffs' plans and prevent the parties from reaching compromises. They have only informed Plaintiffs they would miss the deadline at the last moment, frequently well after normal business hours the day of the deadline. *E.g.*, Resp. at 3–4, ECF No. 87. Likewise, despite being admonished by the Court that the parties must "confer" prior to such requests, Defendants have waited to schedule those discussions until after they have missed the deadlines requiring extensions. *E.g.*, Min. Order, July 20, 2026.

## II.    Standard for Sanctions.

Federal Rule of Civil Procedure 37 provides that if a party "fails to obey an order to provide or permit discovery," courts "may issue further just orders," including "directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action" and "treating as contempt of court the failure to obey." Fed. R. Civ. P. 37(b)(2)(A); *see also SEC v. China Infrastructure Inv. Corp.*, 189 F. Supp. 3d 118, 127 n.6 (D.D.C. 2016) (Howell, J.) (identifying similar authority under Federal Rule of Civil Procedure 16, where, as here, a party also failed to comply with "the Court's requirements and deadlines"). In addition, "the court ***must*** order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or

other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C) (emphasis added).

A sanction under Rule 37(b)(2)(A) is within the district court's "broad discretion" so long as it is shown to be "just." *Wilson v. On the Rise Enters., LLC*, No. CV 16-2241 (BAH), 2019 WL 399821, at *3 (D.D.C. Jan. 30, 2019) (Howell, J.). Reversing the burdens, the award of fees under Rule 37(b)(2)(C) is "ordinarily" required, unless the opposition establishes they are not appropriate. Fed. R. Civ. P. 37, 1970 Advisory Committee Notes.

The failure to produce the required administrative record is not technically a violation of a discovery order, but "[s]everal courts, including a court of appeals, have held that a prior court order to produce or complete an administrative record can be the basis for Rule 37 sanctions." *Goose Creek Physical Med., LLC v. Becerra*, No. 2:22-cv-03932, 2024 WL 3653639, at *8 (D.S.C. Aug. 5, 2024) (citing *Diaz-Fonseca v. Puerto Rico*, 451 F.3d 13, 26 (1st Cir. 2006); *New York v. U.S. Dep't of Com.*, 461 F. Supp. 3d 80, 94 (S.D.N.Y. 2020); *Nat'l Urb. League v. Ross*, No. 20-cv-05799, 2020 WL 5548117, at *5 (N.D. Cal. Sept. 15, 2020)). Even were that not the case, the D.C. Circuit has made clear that "[w]hen rules alone do not provide courts with sufficient authority to protect their integrity and prevent abuses of the judicial process, the inherent power fills the gap." *Shepherd v. Am. Broad. Cos., Inc.*, 62 F.3d 1469, 1474 (D.C. Cir. 1995).

In this case, this Court has explained it will not order an adverse inference "when there are innocuous explanations for the party's failure to introduce the evidence." *USDN*, 2026 WL 1500832, at *13. Relevant innocuous explanations would be "confusion and excusable neglect." *Id.* at *14. The failure to produce material absent such explanations, however, establishes "bad faith" that can justify both adverse inferences and the Court's "inherent sanctions power" to impose monetary awards—a narrower authority than that under Rule 37(b)(2)(C). *Id.* at 14 & n.12.

### III.    An adverse inference is now warranted.

There is no innocuous explanation for Defendants' failures to meet their recent deadlines. Thus, adverse inferences are appropriate. And given the case's history and risks to Plaintiffs from further delay, they are necessary.

This Court explained that, following its May 2026 order to supplement and provide discovery, Defendants "will not be able to rely on any misapprehension of their production obligations." *Id.* at \*14. The future failure to produce material would constitute "bad faith." *Id.*; *see also UAW v. NLRB,* 459 F.2d 1329, 1338 (D.C. Cir. 1972) ("if such evidence is not introduced" following a clear order to do so, "it may be inferred that the evidence is unfavorable to the party suppressing it.").

Defendants have not claimed any misunderstanding, nor could they. Their motions to adjust the deadlines do not profess any confusion as to their production obligations, nor their obligation to comply with this Court's Standing Order when moving for extensions. *e.g.*, Mot. to Vacate, ECF No. 99; *see also* Min. Order, August 18, 2025 (first admonishing Defendants to follow Standing Order ¶ 8(b)). In defense of their failures to meet and confer, the most Defendants have offered is they "got distracted," Resp. Min. Order, ECF No. 97, even though this Court repeatedly directed that such conversations occur on a regular basis, Min. Order, June 12, 2026; Min. Order, July 14, 2026. And Defendants have not attempted to explain why they failed to alert the Court as to a missed deadline. *See* Notice, ECF No. 98.

Instead, Defendants focus on their lack of staffing and maintain that this amounts to an innocuous explanation for the delays. But the Court has already held their staffing is "inexplicable and dilatory." Min. Order, July 20, 2026. Indeed, Defendants' lack of staff is particularly difficult to justify given it was patently obvious Defendants would need to prepare for litigation. Defendants

made the decision to pursue mass-terminations of grants in a manner that has never before been attempted by a previous administration. And, having terminated some grants in 2025 that prompted the first round of this litigation, Defendants followed up with the termination of 49 out of 50 Land Access Program grants. All apparently without having added any additional litigation support.

Defendants' efforts to explain their staffing only confirms its dilatory nature, while raising additional concerns. Approximately three weeks after this Court's May 2026 order to supplement and provide discovery—and around three months after terminating the Land Access Program Plaintiffs' grants—Defendants stated they were still "martialing" staff resources to produce the required materials, including "reassigning a Senior Executive Service employee to help lead discovery efforts," adding "at least two additional attorneys . . . to existing staff" and "activat[ing] five eDiscovery contractor employees to assist." MET at 2, ECF No. 77. Yet approximately a week and a half later, Defendants stated that "despite the additional resources they have brought to this case"—what would constitute ten individuals working on the matter when their earlier listed additions are added to the two attorneys already on the matter—they could not meet any of the existing deadlines. MET at 1, ECF No. 82.

The next week, Defendants changed course. They indicated they could not meet the deadlines because the additional staff had not actually been in place. They could not produce documents because the "principal staff" was unavailable and Defendants had only then "completed the onboarding of additional eDiscovery contractor resources" and "add[ing] additional staff . . . to facilitate catching up." MET at 2, ECF No. 86.

Defendants' most recent filing starts by claiming the earlier promised staffing resources were *never* actually in place: "[m]any of the resources . . . promised did not come through." Mot. at 2, ECF No. 99. Their effort to explain themselves only adds confusion. While Defendants

reasonably state certain "senior attorneys" were unavailable for "medical emergencies," they also state other assigned staff "have put in notice that they will be leaving the Department imminently." *Id.* In other words, while blaming the absence of staffing—despite Defendants' earlier promises—Defendants continue that there was staff that should have been working on productions for weeks, even if they will soon be leaving USDA, and thus there is no reason for the missed deadlines. Moreover, Defendants' explanation does not detail what happened to the contractors meant to move this case forward. Regardless, Defendants acknowledge they are only now "exploring" any "redundancy" that could account for such eventualities. *Id.* at 3.

At bottom, it is clear that more than a year into this case and months after being ordered to produce materials, Defendants have not staffed this case appropriately. And the excuses Defendants offer are so head-scratching the Court and Plaintiffs can reasonably question if they are being told the complete story. Defendants' staffing rationale for their delays is far from innocuous.

It is particularly appropriate to consider Defendants' conduct as bad faith warranting an adverse inference given that, at the same time Defendants delay production, they are seeking to stay the preliminary relief awarded to the Land Access Program Plaintiffs and to overturn the earlier preliminary injunctions. If the second preliminary injunction is stayed or either is overturned and the terminations are reinstated, Plaintiffs will be irreparably harmed. They "will have to stop their projects or drastically reduce the scope of work funded by their terminated grants," and they will have "to divert significant resources away from their organizations' core missions to comply with grant close out requirements while simultaneously attempting to find alternative funding sources." *USDN v. USDA*, 2026 WL 1877821, at *10 (D.D.C. June 30, 2026)

(discussing Land Access Program Plaintiffs). Moreover, they will suffer reputational harm by being "unable to deliver on promises made to the communities they serve." *Id.* at *11.

This is not the mere consequence of our judicial system at work, but a product of Defendants' gamesmanship. Even if Defendants succeed in the Court of Appeals there are other bases for Plaintiffs' relief. *See id.* at *9 n.6. Defendants' foot-dragging will have meant Plaintiffs could not reach final judgment on those issues in time to offset any adverse decision from the Court of Appeals.

Further, Defendants' motion to vacate confirms they do not take their production obligations seriously. They characterize their missed deadlines as the equivalent of an extension for "professional courtesy" Defendants recently provided Plaintiffs in responding to Defendants' motion to dismiss. Mot. to Vacate at 5, ECF No. 99. Yet, Defendants' record above exists despite Plaintiffs twice agreeing to extend the discovery deadlines to avoid disputes. Resp. MET, ECF No. 78; MET, ECF No. 82. In addition, Plaintiffs' seeking a timely motion to extend the deadline to respond to Defendants' repetitious motion to dismiss, MET, ECF No. 94, has no equivalence to Defendants' conduct.[2]

Defendants previously argued that courts cannot impose adverse inferences in an APA case, as the established remedy for an incomplete administrative record is an order to supplement, not sanctions. Resp. at 18, ECF No. 56. Particularly in light of intervening events, that argument fails for three reasons. *First*, Defendants have not only failed to timely produce a complete administrative record, but failed to comply with the ordered discovery, for which the remedy is

---

[2] Defendants imply that Plaintiffs sought and Defendants consented to an extension of time to respond to the "motion to stay" in the D.C. Circuit, on which getting a ruling "as soon as possible is in Defendants' best interest." Mot. to Vacate at 5, ECF No. 99. That is false. Plaintiffs responded to that motion without an extension. Instead, Plaintiffs sought an extension to address Defendants' unnecessary motion to dismiss filed the same day as the motion to stay.

sanctions, including adverse inferences. *See* Fed. R. Civ. P. 37(b)(2)(A). Indeed, this Court has characterized "adverse evidentiary rulings" as one of the "lesser sanctions" available under Rule 37. *China Infrastructure Inv. Corp.*, 189 F. Supp. 3d at 128. *Second*, Defendants have already been ordered to supplement the administrative record and failed to abide by that order, thereby requiring the Court to look for other remedies. *Third*, and leaving aside that the other facts distinguish this case from run-of-the-mill APA actions, courts have held Rule 37 sanctions are available where the government fails to produce an appropriate administrative record. *Goose Creek Physical Med.*, 2024 WL 3653639, at *8. This Court previously noted that while the court in *Goose Creek* stated it was imposing evidentiary sanctions on defendants in an administrative action, its factual finding did not amount to an "adverse inference" because the judicially imposed fact was not necessarily adverse to the government. *See id.* at *11 n.17. Nonetheless, the *Goose Creek* court explained that, except for failing to produce one piece of information, the government had "otherwise complied with the court's orders." *Id.* at *10. Thus, it designed its sanction to be "proportional" to the conduct. *Id.* at *11. Further, the evidentiary sanction amounted to the factual predicate for the plaintiffs' "due process" claim, with the court merely left to determine if the existence of the judicially found fact established the claim. *Id.* at *11 n.17. Plaintiffs here merely ask for the factual predicate to the existence of Defendants' policy, while allowing Defendants to work to rebut that inference regarding any individual termination through relying on the termination letters, the single complete record Defendants have produced. In a more extreme case, Plaintiffs ask for less.

Defendants have also claimed Plaintiffs' adverse inference is not warranted because it is "not [an] accurate statement[]." Resp. at 17, ECF No. 56. However, the premise of an adverse inference is that neither Plaintiffs nor the Court should be required to take Defendants' word for a fact. Yet, as this Court has explained, "Defendants' position rests on the premise of 'trust us' as to

12

what the record may show, despite the evidence marshalled by plaintiffs to the contrary." *USDN*, 2026 WL 1500832, at *1. In the normal course, "'all other things being equal, a party will of his own volition introduce the strongest evidence available to prove his case." *Id.* at *13. In response to Plaintiffs' allegation that Defendants terminated DEI- and climate-related grants merely because they contained buzz words, Defendants have insisted "the terminations were effectuated based on an individualized review." *Id.* at *1. Nearly a year later, and in the face of countless orders, Defendants have failed to make that showing, at most producing the form termination letters. *E.g.*, *USDN*, 2025 WL 2374528, at *34 (explaining Plaintiffs showed Defendants used form letters). Thus, it is reasonable to presume that were Defendants able to make their case, they would have done so. *See UAW*, 459 F.2d at 1338; *Nunnally v. District of Columbia.*, 243 F. Supp. 3d 55, 73 (D.D.C. 2017) ("An adverse inference is fundamentally remedial rather than punitive and can be imposed whenever a preponderance of the evidence establishes that a party's misconduct has tainted the evidentiary resolution of the issue." (cleaned up)). Further, consistent with the logic underlying adverse inferences, Plaintiffs' proposed adverse inferences allow Defendants to rebut the application of the policy based on the termination letters Defendants have produced.

Were that not enough, what records Defendants have produced indicate Defendants terminated grants because of the presence of DEI- or climate-related terms. This Court already concluded that the evidence provided in support of Plaintiffs' motion to supplement was consistent with Plaintiffs'—not Defendants'—characterization of the facts. *USDN*, 2026 WL 1500832, at *1. The limited universe Defendants subsequently produced is more of the same. It identifies that the same day USDA began its "data call" of grants, *i.e.*, identifying grants through search terms, the Natural Resources Conservation Service ordered all 19 grants identified through that data call "will need to be terminated right away." Muraskin Decl., Ex. A (USDA002978–79). The next month,

13

USDA directed its Office of Chief Financial Officer "to identify $100M" in grants to cancel, which, as the person in charge of approving those cancelations highlighted resulted in the cancelation of a grant identified based on a single sentence: "The proposal aims to enhance diversity, equity and accessibility (DEIA) within integrated pest management (IPM)." Muraskin Decl., Ex. B (USDA002344–46). Defendants' sole focus was effectuating terminations of grants that contained DEI- or climate-related language.

In sum, in full awareness of their obligations, Defendants have violated this Court's orders to supplement the administrative record and produce discovery. They have done so in bad faith: their explanations are internally inconsistent and, even if assumed to be true, do not justify their actions. The Rules of Civil Procedure provide for evidentiary sanctions for these discovery violations, and case law supports similar sanctions for Defendants' failure to supplement the administrative record. Such a sanction is particularly appropriate here where Defendants are dragging their feet on producing the record for final relief, while simultaneously working in the D.C. Circuit to undo the preliminary relief Plaintiffs obtained and thereby cause irreparable harm to Plaintiffs. Thus, consistent with the record, the Court should impose an adverse inference that Defendants had a policy to terminate DEI- and climate-related grants solely because their materials contained disapproved DEI- or climate-related language and this policy resulted in the termination of the grants identified in Plaintiffs' Second Interrogatory. If Defendants wish to work to rebut the effect of that policy on individual terminations, they can do so based on the termination letters they produced, one of the only complete universes of documents provided in this case. *See* Muraskin

14

Decl. ¶ 5.[3] This will resolve the outstanding factual dispute and enable the case to proceed to summary judgment, shielding Plaintiffs and the Court from Defendants' further gamesmanship.[4]

## IV.     Alternatively, the Court should impose monetary sanctions and order depositions.

Should the Court believe evidentiary sanctions are not yet warranted, it still should not grant Defendants' request to reset the schedule without also imposing monetary sanctions for the current and any future missed deadlines. As the history above establishes, Defendants are unrepentant violators of this Court's schedule and rules. Thus, Defendants require incentives to ensure future compliance. *See* Fed. R. Civ. P. 37(b)(2)(A)(vii) (stating Defendants' conduct can amount to contempt). In determining the appropriate amount, courts look to the sanctioned party's resources and what will move them. S*ee Perkinson v. Houlihan's/D.C., Inc.*, 107 F.R.D. 286, 287–88 (D.D.C. 1985) (ordering a sanction of a multi-million dollar businesses of $5,000 per day for failing to produce a witness, the present-day value of which would be more than $15,000 per day). Here, as the federal government has the most resources of any potential party and the Executive has worked feverishly to return those resources to its control, that sanction will need to be substantial.

In addition, were the Court to entertain Defendants' request to reset the deadlines, it should order a single deposition of each decision maker responsible for the DEI- and climate-related grant terminations identified in response to Plaintiffs' Second Interrogatory, to take place over the first two weeks of the restart of discovery. The parties designed their originally proposed discovery schedule, particularly the rolling production of Defendants' response to Plaintiffs' First

---

[3] The only other complete set of documents appears to be the *completed* spreadsheets of grants, although Plaintiffs have identified missing *interim* spreadsheets in Defendants' productions to date.

[4] Plaintiffs note that they may need to submit materials related to their grants as part of summary judgment briefing, similar to what they provided at the preliminary injunction stage.

15

Interrogatory, to enable Plaintiffs to understand Defendants' termination process and thereby work with Defendants to narrow further discovery. JSR at 1–2, ECF No. 75. Defendants' delays, leading them to not produce a single response to Plaintiffs' First Interrogatory, have kept that from occurring. Plaintiffs previously explained a Rule 30(b)(6) deposition could stand in for these functions of the First Interrogatory. Resp. at 1, 5, ECF No. 87. However, given Defendants' challenges in discovery, Plaintiffs are reasonably concerned Defendants will delay or ineffectually prepare a representative deponent. Therefore, Plaintiffs now seek depositions of the class of people who have personal knowledge of how Defendants executed the relevant terminations. Early depositions of those individuals will assist Plaintiffs in preparing their case, understanding what is produced, and working with Defendants to streamline discovery. Thus, they serve as an appropriate response to the state of discovery. *See* R*obert F. Kennedy Hum. Rts. v. Dep't of Homeland Sec.*, No. 25-01270 (D.D.C. July 11, 2025), Dkt. No. 49 (ordering deposition in an APA case).

## V.     Attorneys' fees are also warranted.

Regardless of whether this Court imposes evidentiary or monetary sanctions, this Court should award Plaintiffs their attorneys' fees for preparing this motion. Rule 37(b)(2)(C) provides for that remedy for missed discovery deadlines unless Defendants establish their conduct was justified. In light of the history above, there is no way Defendants can make that showing.

Further, Plaintiffs will agree to use the Fitzpatrick Matrix, which provides a Department of Justice approved fee schedule for "complex civil cases in District of Columbia federal courts handled by the Civil Division of the United States Attorney's Office for the District of Columbia,"

16

*i.e.*, this matter.[5] That ensures their rates will be reasonable and the amount requested will not be unjust.

Thus, the Court should order that, within five business days of this Court's granting Plaintiffs' motion, Plaintiffs should provide Defendants Plaintiffs' hours spent on this motion and relevant years of experience and Defendants must compensate Plaintiffs' counsel consistent with the Fitzpatrick Matrix.

### VI. Conclusion.

It is time this Court holds Defendants responsible for their lack of compliance. Thus, the Court should deny Defendants' request that it simply reset the production deadlines. It should instead order evidentiary sanctions regarding the missing documents, allowing the parties to move immediately to summary judgment briefing and limit any future risk of delay to Plaintiffs. Even if the Court is inclined to reset the deadlines, it should not do so without imposing monetary sanctions for the past and any future missed deadlines to incentivize future compliance, and it should order depositions to help offset the lost discovery. In addition, the Court should order Defendants to pay Plaintiffs' attorneys' fees associated with this motion.

DATED: July 28, 2026

Respectfully submitted,

<table>
<tr><td>/s/ David S. Muraskin<br>David S. Muraskin<br>DC Bar No. 1012451<br>Holly Bainbridge<br>CA Bar No. 323201 (<em>Pro Hac Vice</em>)<br>Hannah Wolf<br>TX Bar. No. 24137413 (<em>Pro Hac Vice</em>)<br>FarmSTAND<br>712 H Street NE, Suite 2534</td><td>Scott W. Carlson<br>MN Bar No. 338400 (<em>Pro Hac Vice</em>)<br>Benjamin E. Apple<br>NC Bar No. 52009 (<em>Pro Hac Vice</em>)<br>Farmers Justice Center<br>6 Fifth Street West, Suite 650<br>St. Paul, MN 55102<br>(651) 204-1664<br>scott.carlson@farmersjustice.org</td></tr>
</table>

---

[5] U.S. Attorney's Office for District of Columbia, Civil Division, *Fitzpatrick Matrix*, Dep't Justice, https://www.justice.gov/usao-dc/media/1449156/dl?inline.

Washington, DC 20002
(202) 595-8816
david@farmstand.org
holly@farmstand.org
hannah@farmstand.org

Carrie Apfel
DC Bar No. 974342
Earthjustice
1001 G Street, NW, Suite 1000
Washington, DC 20001
(202) 667-4500
capfel@earthjustice.org

ben.apple@farmersjustice.org

*Counsel for all Plaintiffs*

Ben Grillot
D.C. Bar. No. 982114
SOUTHERN ENVIRONMENTAL
LAW CENTER
500 New Jersey Ave. NW, Suite 600
Washington, DC, 20001
Telephone: (202) 828-8382
bgrillot@selc.org

*Counsel for Plaintiffs Agrarian Trust and RAFI-
USA*