**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| URBAN SUSTAINABILITY DIRECTORS NETWORK, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF AGRICULTURE, *et al.*,<br><br>Defendants. | Civil Action No. 25-1775 (BAH)<br><br>Judge Beryl A. Howell |

**MEMORANDUM OPINION**

Plaintiffs, twenty-seven nonprofit organizations involved in agriculture and ecology-related projects and King County, Washington, were granted preliminary injunctive relief in August 2025 and June 2026, on their challenge, under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, to the termination of their individual grants awarded by the United States Department of Agriculture ("USDA") and several component agencies (collectively, "defendants"), though such relief was denied as to plaintiffs' broader challenge to "defendants' alleged broader 'policy, pattern, and practice of unlawfully terminating' *en masse* 'hundreds of grants' due to changes in agency priorities driven by certain executive orders, notwithstanding the grants' fulfillment of the purposes set out in authorizing statutes and appropriations acts." *Urb. Sustainability Dirs. Network v. U.S. Dep't of Agric.* (*USDN I*), No. 25-cv-1775 (BAH), 2025 WL 2374528, at *1 (D.D.C. Aug. 14, 2025) (quoting First Am. Compl. ("FAC") ¶¶ 1-3, 11-31, 46-96, ECF No. 10). Nearly a year after the original preliminary injunction was entered, defendants filed a partial motion to dismiss the Second Amended Complaint, pursuant to Federal Rule of Civil Procedure 12(b)(1) and (6). *See* Defs.' Mot. to Dismiss Pls.' Second Am. Compl. in Part & Mem. in Supp. Thereof ("Defs.' Mot."), ECF No. 93; Second Am. Compl. ("SAC"), ECF No. 83.

Since the original preliminary injunction was awarded in August 2025, production of a complete administrative record has been halting, necessitating judicial intervention in May 2026, *see Urb. Sustainability Dirs. Network v. U.S. Dep't of Agric.* (*USDN II*), No. 25-cv-1775 (BAH), 2026 WL 1500832 (D.D.C. May 29, 2026), to clarify defendants' obligation to supplement the administrative record and comply with plaintiffs' discovery requests, given defendants' blanket denial of the alleged policy and practice claim. A scheduling order was entered to control the timing of this record supplementation and discovery as to the claims in this case, but even after grant of defendants' requests for four extensions of time to accommodate the filing of the Second Amended Complaint adding additional plaintiffs, defendants have failed to comply with the amended deadlines set out in the court-ordered schedules. *See* Min. Orders (dated June 22, July 1, and July 14, 2026, granting defendants' first four motions for extensions). Most recently, defendants moved to vacate the scheduling order altogether, with no timeline proffered to complete supplementation of the administrative record ("AR") and comply with discovery requests, *see* Defs.' Mot. to Vacate Disc. Scheduling Order ("Defs.' Mot. to Vacate"), ECF No. 99; *see also* Joint Status Rep. at 8, ECF No. 114 (defendants stating: "Defendants cannot currently provide the date certain that they can complete production of the AR and responses to Plaintiffs' discovery requests."), to which plaintiffs have responded by cross-moving for sanctions and additional discovery, *see* Pls.' Mot. for Sanctions & Additional Disc. ("Pls.' Mot."), ECF No. 101.

For the reasons explained below, defendants' motion to dismiss is granted in part and denied in part, and defendants' motion to vacate the scheduling order, leaving no scheduling order in place, and plaintiffs' motion for sanctions are both denied at this juncture.

# I. BACKGROUND

The factual background and procedural history in this matter have been described in detail in three previous decisions, *see Urb. Sustainability Dirs. Network v. U.S. Dep't of Agric.* (*USDN III*), No. 25-cv-1775 (BAH), 2026 WL 1877821, at *1-4 (D.D.C. June 30, 2026); *USDN II*, 2026 WL 1500832, at *2-7; *USDN I*, 2025 WL 2374528, at *2-10, and thus the combined procedural and factual background described below is limited to information relevant to the three pending motions.

## A. Defendants Terminate Thousands of USDA Grants in March 2025

"This lawsuit was initiated by 'five nonprofit organizations, Urban Sustainability Directors Network ("USDN"), Oakville Bluegrass Cooperative ("OBC"), Agroecology Commons ("AC"), the Providence Farm Collective Corp. ("PFC"), and the Institute for Agriculture and Trade Policy ("IATP"),' all of which 'received federal awards, under various statutorily authorized federal programs, from the USDA or its components that were unexpectedly terminated'" between March and July 2025, after the current administration announced changes in policy priorities. *USDN II*, 2026 WL 1500832, at *2 (quoting *USDN I*, 2025 WL 2374528, at *2).[1] "'These programs and the federal awards supporting them cover a broad range of issues that create jobs and support community, agricultural, and rural development,' and 'the programs range from supporting local urban forestry, to addressing food insecurity, to incentivizing the adoption of more environmentally friendly agricultural practices.'" *Id.* (citation modified) (quoting FAC ¶ 47).

"The parties agree that these terminations were the outgrowth of at least two executive orders issued by President Trump shortly after he took office for his second term," *USDN I*, 2025

[1] AC has two terminated grants at issue: (1) a Community Food Projects Competitive grant approved by USDA's National Institute of Food and Agriculture; and (2) a Land Access Program grant approved by USDA's Farm Service Agency. *USDN I*, 2025 WL 2374528, at *3.

WL 2374528, at *4, namely: (1) Executive Order 14151, "Ending Radical and Wasteful Government DEI Programs and Preferencing," which instructed the Director of the Office of Management and Budget ("OMB"), "assisted by the Attorney General and the Director of the Office of Personnel Management," to "coordinate the termination of all discriminatory programs, including illegal DEI and 'diversity, equity, inclusion, and accessibility' (DEIA) mandates, policies, programs, preferences, and activities in the Federal Government, under whatever name they appear," 90 Fed. Reg. 8339, 8339 (Jan. 20, 2025); *see USDN III*, 2026 WL 1877821, at *2; *USDN II*, 2026 WL 1500832, at *2; *USDN I*, 2025 WL 2374528, at *4; and (2) Executive Order 14222, "Implementing the President's 'Department of Government Efficiency' Cost Efficiency Initiative," which instructed agency heads, "in consultation with the agency's DOGE Team Lead," to "review all existing covered contracts and grants and, where appropriate and consistent with applicable law, terminate or modify (including through renegotiation) such covered contracts and grants to reduce overall Federal spending or reallocate spending to promote efficiency and advance the policies of my Administration," 90 Fed. Reg. 11095, 11095-96 (Feb. 26, 2025); *see USDN III*, 2026 WL 1877821, at *2; *USDN II*, 2026 WL 1500832, at *2; *USDN I*, 2025 WL 2374528, at *4.[2]

"To facilitate these executive orders, the [USDA] Secretary released guidance in two memoranda issued on March 13, 2025." *USDN III*, 2026 WL 1877821, at *2. The first memorandum, "Directive on Conservation and Natural Resources Priorities," directed that "all USDA agencies and staff offices that issue awards must conduct an internal review of all active

[2] Plaintiffs also point to two other executive orders as driving the grant termination decisions at issue: "Executive Order 14173, 'Ending Illegal Discrimination and Restoring Merit-Based Opportunity,' 90 Fed. Reg. 8,633, 8,634 (Jan. 31, 2025), which instructs agency heads to 'excise references to DEI and DEIA principles . . . from Federal acquisition, contracting, grants, and financial assistance procedures,' and Executive Order 14154, 'Unleashing American Energy,' 90 Fed. Reg. 8,353, 8,353-54, 8,357 (Jan. 29, 2025), which instructed agencies to 'immediately pause the disbursement of funds appropriated through the Inflation Reduction Act of 2022' and review grants for 'consistency with the' new policy of prioritizing domestic energy production," *USDN II*, 2026 WL 1500832, at *2 n.1 (quoting *USDN I*, 2025 WL 2374528, at *4 n.2).

awards" to ensure "that the Department does not fund programs or organizations that promote or take part in climate change or environmental justice initiatives that are either contrary to law or to the Department's policy objectives" and "that all awards are free from fraud, abuse, and duplication" by terminating such grants "in whole or in part or otherwise modified to minimize the scope of the Department's obligations." USDA Secretary's Memorandum 1078-003 (Mar. 13, 2025), https://perma.cc/CE9Y-LCFH; *see USDN III*, 2026 WL 1877821, at *2; *USDN II*, 2026 WL 1500832, at *3; *USDN I*, 2025 WL 2374528, at *5.

The second memorandum released that day, "Directive on Departmental Grant and Cooperative Agreement Priorities," defined as a priority "ensuring that the Department's grants, cooperative agreements, and other similar arrangements, including mutual interest agreements . . ., do not support programs or organizations that promote or take part in diversity, equity, and inclusion ('DEI') initiatives or any other initiatives that discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic" and stated that grants inconsistent with this priority "shall, to the extent permitted by applicable law, be terminated, in whole or in part, or otherwise modified in accordance with any applicable regulations and notice and procedural requirements in the relevant award, agreement, or other instrument." USDA Secretary's Memorandum 1078-004 (Mar. 13, 2025), https://perma.cc/36P6-E7M9; *see USDN III*, 2026 WL 1877821, at *2; *USDN II*, 2026 WL 1500832, at *3; *USDN I*, 2025 WL 2374528, at *5. The five original plaintiffs received letters terminating their grants "before and in the months following the issuance of the Secretary's March 13, 2025, memoranda." *USDN I*, 2025 WL 2374528, at *5.

### B. Five Plaintiffs Are Granted Preliminary Injunctive Relief in August 2025

"The original plaintiffs pursued administrative appeals of their grant terminations, but anticipating that no relief would be forthcoming from the agency, USDN, OBC, and AC filed a

complaint before this Court on June 5, 2025, and after being joined by PFC and IATP, filed the . . . first amended complaint on June 24, 2025." *USDN III*, 2026 WL 1877821, at *3 (citation modified) (quoting *USDN II*, 2026 WL 1500832, at *3). They alleged that "[i]n an apparent effort to effectuate the President's sweeping Executive Orders in as quick a manner as possible regardless of the legality of their conduct, Defendants adopted the policy, pattern, and practice at issue here, terminating awarded grants without individualized review but rather based on vague allegations that the projects were not aligned with the President's newly stated goals of eliminating funding for DEI and climate initiatives—without any effort to determine whether the projects could be brought into line." *USDN II*, 2026 WL 1500832, at *3 (alteration in original) (quoting FAC ¶ 132). "Consequently, plaintiffs sought both vacatur of the termination of their own awards and relief enjoining defendants 'from giving effect to or maintaining award terminations of . . . all other[ awards] enacted pursuant to Defendants' policy, pattern, and practice.'" *Id.* (alteration and ellipsis in original) (quoting FAC at 61 (Requests for Relief)).

"Two days later, on June 26, 2025, plaintiffs sought a preliminary injunction challenging 'a widespread policy and practice of unlawfully terminating hundreds of grants issued to nonprofit organizations, farmers, ranchers, universities, cities, and states,' through 'minimally edited, boilerplate form letters.'" *USDN III*, 2026 WL 1877821, at *4 (citing Pls.' Mot. for Prelim. Inj. ("Pls.' PI Mot."), ECF No. 14, and quoting Pls.' Statement of P. & A. in Supp. of Their Mot. for a Prelim. Inj. ("Pls.' PI Mem.") at 1-2, ECF No. 14-1). "Simultaneously, plaintiffs sought 'an order from this Court allowing them to conduct limited expedited discovery,' reasoning that 'Defendants have not publicly divulged the processes by which they arrived at mass, formulaic terminations of grant awards across multiple programs and subagencies using the same alleged justification,' so '[u]nlike rulemakings and administrative adjudications, there is no published

administrative record of Defendants' mass terminations, and any ad hoc administrative record offered by Defendants will shed little, if any, light on the scope.'" *USDN II*, 2026 WL 1500832, at *2 (alteration in original) (quoting Pls.' Mot. for Expedited Disc. & Statement of P. & A. in Supp. at 1-2, ECF No. 15). Importantly, at the preliminary injunction hearing held on August 6, 2025, defendants assured the Court that the "administrative record would go into the reasoning behind the termination of plaintiffs' grants" and that "if [plaintiffs] think the administrative record is incomplete, they can file a motion to supplement it at that time." Hr'g Tr. (Aug. 6, 2025) at 66:24-67:3, ECF No. 36.

The preliminary injunction order issued about one week later "preliminarily set aside and vacated under the APA" the terminations of plaintiffs' six individual grants but otherwise denied plaintiffs' preliminary injunction relief as to the alleged policy of "perfunctory, unreasoned terminations" due to "the difficulties of identifying on the current record the specific grant terminations that are part of the *en masse* implementation of that policy." *USDN I*, 2025 WL 2374528, at *27, *39. Plaintiffs "demonstrated a likelihood of success in showing that all five of their already terminated grants were terminated arbitrarily and capriciously." *Id.* at *34. Explaining that "[a]n agency action is considered 'arbitrary and capricious' if the agency has 'relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise,'" *id.* (quoting *Motor Vehicles Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)), the Court went on to observe that "[t]his requirement for a 'reasoned explanation' means that when an agency is changing its policy, the agency must demonstrate recognition of that change and provide 'good reasons for the new policy,'

and those reasons must be especially strong where the 'prior policy has engendered serious reliance interests' or where the 'new policy rests upon factual findings that contradict those which underlay its prior policy,'" *id.* (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009)). Applying these legal standards to the circumstances described in terminating plaintiffs' grants, the Court determined that the "grant terminations clearly lacked sufficient explanation" because "[t]he termination letters offered only vague and conclusory reasoning with no consideration of reliance interests, dispelling any assumption that the agency conducted an individualized review" and, even though the grant letters expressed that "the grant is not consistent with agency priorities, no letter explains *why* the particular grant is not consistent with the cited priorities and *why* the change in priorities justifies terminating an awarded grant on which plaintiffs have substantially relied." *Id.* (emphasis in original).

As further support for preliminary injunctive relief, the Court found plaintiffs' claim that the grant terminations violated the APA as contrary to law had a likelihood of success, but at the same time rejected their arguments that the terminations violated their rights under the Due Process Clause. Specifically, USDN and AC were found to "have demonstrated a likelihood of success on the merits of their claim that defendants violated the APA by acting contrary to statute in terminating their grants." *Id.* at *31. As the D.C. Circuit observed, "an agency does not have the authority to 'decline to follow a statutory mandate or prohibition simply because of policy objections.'" *Id.* (quoting *In re Aiken County*, 725 F.3d 255, 259 (D.C. Cir. 2013)). With respect to USDN's grant issued under the Urban and Community Forestry Assistance Program and AC's grant issued under the Increasing Land, Capital, and Market Access Program ("ILCMAP" or "Land Access Program"), the Court found that plaintiffs had shown a likelihood of success on their claims these two grants were "[t]erminated for addressing the[] very issues Congress intended for

such programs to address." *Id.* at *32. In contrast, however, plaintiffs' two Due Process Clause claims were determined not to be an adequate basis for a preliminary injunction because "plaintiffs likely have no constitutionally protected property interest in their grant funding and thus have no likelihood of success on their constitutional due process claim." *Id.* at *22.

Finally, plaintiffs' motion for expedited discovery was denied because "until that [administrative] record is produced, plaintiffs cannot demonstrate 'a strong showing of bad faith' or that the 'record is so bare as to frustrate judicial review' to support their need for further discovery" and because "defendants gave assurance at the motions hearing that the administrative record would include what plaintiffs have requested in their discovery motion, as well as materials reflecting 'the process' defendants took when evaluating the grants at issue." *Id.* at *40 (quoting *Cmty. for Creative Non-Violence v. Lujan*, 908 F.2d 992, 997-98 (D.C. Cir. 1990)).

Defendants then answered the amended complaint on August 29, 2025. *See* Answer, ECF No. 35. On December 5, 2025, plaintiff OBC voluntarily moved to dismiss its claims, *see* Pl.'s Consent Mot. to Voluntarily Dismiss Claims of Oakville Bluegrass Cooperative, ECF No. 42, and OBC was terminated from the action, *see* Min. Order (Dec. 5, 2025).

### C. Land Access Program Plaintiffs Granted Preliminary Injunctive Relief in June 2026

On April 2, 2026, the original plaintiffs notified the Court that "in late-March 2026 Defendants terminated 49 of the 50 'Increasing Land, Capital, and Market Access Program' ('ILCMAP') grants" and that "Defendants have admitted that these ILCMAP terminations are part of the same policy over which Plaintiffs are litigating" because "termination letters sent to ILCMAP awardees state that the terminations were undertaken pursuant to the policy to effectuate Secretary Rollins' March 13, 2025, anti-DEI memorandum." Pls.' Not. of Factual Dev. Related to Gaps in the AR at 1, ECF No. 58.

Almost two months later, on May 26, 2026, the original plaintiffs moved for leave to file a second amended complaint to add twenty-four plaintiffs (the "Land Access Program Plaintiffs"), each of which had an ILCMAP grant terminated in March 2026, explaining that "[i]n light of USDA's cancellation of 49 Land Access Program grants using boilerplate letters and pursuant to the same policy challenged in this case, Plaintiffs seek leave to amend their complaint" a second time "to include these additional terminations." Pls.' Mot. for Leave to File Am. Compl. at 2, ECF No. 62; *see also USDN III*, 2026 WL 1877821, at *4. "Simultaneously, the Land Access Program Plaintiffs filed a motion for a preliminary injunction, seeking 'an order that enjoins Defendants' terminations of these Plaintiffs' grants and restores the status quo ante.'" *USDN III*, 2026 WL 1877821, at *4 (quoting Land Access Program Pls.' Mot. for a Prelim. Inj. at 1, ECF No. 63). On June 30, 2026, over defendants' objections, leave to amend the complaint was granted, and preliminary injunctive relief was issued to the Land Access Program Plaintiffs enjoining the terminations based on an "analysis principally follow[ing] the same reasoning already employed to the same claims" in the prior preliminary injunction decision. *Id.* at *8 (citing *USDN I*, 2025 WL 2374528, at *32-33).

The Second Amended Complaint provides additional context as to the circumstances of the USDA grant terminations. *See* SAC. The termination letters sent to ILCMAP grant holders are "nearly identical" and "contain boilerplate language for all but one to two paragraphs in the four-page letters." *Id.* ¶¶ 177, 179. The opening paragraph of each letter contains the statement that "[t]he United States Department of Agriculture (USDA) has determined that awards under this program involved discriminatory preferences based on Diversity, Equity, and Inclusion (DEI) and wasteful spending that did little to further agricultural land purchases. Accordingly, as discussed below, USDA has determined your award no longer effectuates the program goals or

agency priorities." *Id.* ¶ 183. Each letter cites the Secretary's March 13, 2025, memorandum, "Directive on Departmental Grant and Cooperative Agreement Priorities," and contains general concerns about the program, including that the "program [is] rife with DEI preferences that discriminated based on immutable characteristics," "did little to improve land access," and has "unacceptable risks of fraud, waste and abuse." *Id.* ¶¶ 180, 184. The letters concluded that "following careful consideration of your award—including any potential reliance interests, intended outcomes described, as well as consideration of alternatives to termination—USDA has determined the best use of resources and advancing USDA's goals and priorities requires a full termination to realign the program to be consistent with its statutorily mandated purpose and the policies and priorities of the Department." *Id.* ¶ 193. These letters were sent to every ILCMAP grant holder save AC, whose ILCMAP grant at issue in this lawsuit was subject to, and protected from termination by, the first preliminary injunctive order issued in this case eight months earlier, on August 14, 2025. *See id.* ¶ 174; *see also id.* ¶ 176 ("But for that preliminary injunction, on information and belief, AC's Land Access Program grant would have been terminated pursuant to the policy at issue here no later than . . . when the remaining Land Access Program awardees received notice of the termination.").

The now operative Second Amended Complaint asserts nine causes of action, claiming that the grant terminations (1) violated plaintiffs' Due Process rights under the Fifth Amendment to the U.S. Constitution by failing to provide reasonable notice and an opportunity to be heard prior to their grant terminations (Count I), and by doing so in an unconstitutionally vague manner (Count II); (2) violated the APA by engaging in agency action that was not in accordance with law, including agency regulations (Count III), and, was arbitrary and capricious by failing to explain the reasons for terminating USDN's, AC's, PFC's and IATP's grants (Count IV) as well as Land

Access Program Plaintiffs' grants (Count V); (3) violated the APA by engaging in arbitrary and capricious agency action under a policy mandating grant terminations *en masse*, including plaintiffs' grant terminations (Count VI); (4) violated the APA by terminating USDN's, AC's and Land Access Program Plaintiffs' grants not in accordance with law "because the stated bases for terminations directly contravene Congress's statutory mandates for funding those programs," *id.* ¶ 258, citing the Cooperative Forestry Assistance Act of 1978 and the Inflation Reduction Act of 2022 (Count VII); (5) violated constitutional separation of powers principles (Count VIII); and (6) were *ultra vires* (Count IX), *see* SAC ¶¶ 198-286.

**D. Defendants' Noncompliance with the Scheduling Order**

Almost immediately after issuance of the original preliminary injunction in August 2025, disputes over the scope of the administrative record arose. Defendants provided notice, on September 17, 2025, of the certified contents of the administrative record, Defs.' Certification of AR, ECF No. 37 (consisting of 346 pages, 305 pages of which were documents submitted or received by plaintiffs for their awarded and terminated grants), but, "[i]n response to plaintiffs' concerns about 'perceived deficiencies' in the administrative record, defendants 'determined that many of these items can be added,' and were thus directed 'to produce the supplemental administrative record within three weeks (21 days) of the conclusion of' the then-occurring 'government shutdown,'" *USDN II*, 2026 WL 1500832, at *4 (citations omitted).[3] When the government shutdown ended on November 12, 2025, the supplemental administrative record was due by December 4, 2025, but, belatedly, almost two weeks later, defendants moved for an extension of time *nunc pro tunc*, due to "limited staffing, and some confusion about the types of

[3] "A lapse in federal appropriations between October 1 and November 12, 2025, resulted in the staying of filing and discovery deadlines imposed against the United States and its federal agencies in civil cases." *USDN II*, 2026 WL 1500832, at *4 n.3 (citing D.D.C. Standing Order No. 25-55 (JEB) (Oct. 1, 2025), and D.D.C. Standing Order No. 25-59 (JEB) (Nov. 13, 2025)).

records that would be required to satisfy Plaintiffs' concerns . . . ." *Id.* Plaintiffs opposed this motion, noting, *inter alia*, that "the administrative record 'did not certify that it contained all (or even any) documents relevant to Defendants' agency-wide policy alleged by Plaintiffs, other than those relevant to Plaintiffs' terminations,'" *id.* (citation omitted), and requesting sanctions in the form of "'an adverse inference that Defendants terminated all DEI- and climate-related grants based solely on the presence of DEI- and climate-related search terms in grant documents,'" *id.* (citation omitted). Over plaintiffs' objection, defendants were granted an extension to supplement the AR by December 22, 2025, and "judgment was reserved on plaintiffs' motion for sanctions." *Id.*

Defendants then supplemented the AR twice, on December 19, 2025, and January 25, 2026. *See* Defs.' Certifications of AR, ECF Nos. 51, 53 (consisting of AR pages 347 to 739). Plaintiffs, still dissatisfied, moved to supplement the record, *see* Pls.' Mot. to Suppl. AR, ECF No. 55, which, alongside plaintiffs' renewed motion for sanctions, was resolved in a decision issued on May 29, 2026, *see USDN II*, 2026 WL 1500832, at *1. As that decision recounted, "the Court credited defendants' 'assurance at the [preliminary injunction] motions hearing that the administrative record would include what plaintiffs have requested in their discovery motion, as well as materials reflecting "the process" defendants took when evaluating the grants at issue,' in the absence of evidence to the contrary." *Id.* at *8 (quoting *USDN I*, 2025 WL 2374528, at *40); *see also* Hr'g Tr. at 66:12-19, 71:11-21 (The Court: "[I]n my view the things that the plaintiffs are asking for in their discovery requests are items and information that will be in the administrative record when that is compiled . . . if I find on the jurisdictional issue, that I can exercise subject matter jurisdiction here. Do you share that understanding?" Defendants' Counsel: "I do, Your Honor."). Further, "with the administrative record having been filed and supplemented twice, review of the

categories of documents identified by plaintiffs as missing from the administrative record reveal[ed] that supplementation and/or discovery [wa]s needed to ascertain the contours of the agency-wide policy and how the termination decisions were made." *USDN II*, 2026 WL 1500832, at *8. Although plaintiffs' request for depositions was denied at that time, defendants were required to respond to two sets of interrogatories and requests for production. *See id.* at *12. Additionally, as no showing of bad faith had been made, "[p]laintiffs' motion for sanctions at this juncture [wa]s denied but may be renewed should defendants continue to fall short of their production obligations." *Id.* at *14. Parties were ordered to propose jointly a schedule for the limited discovery ordered, *see id.,* and subsequently proposed competing schedules, *see* Joint Status Rep. at 2-5, ECF No. 74 (plaintiffs proposing discovery completion within two weeks, by June 19, 2026, and defendants proposing an extended rolling discovery schedule for completion in six months, *i.e.*, by November 2026). Pertinent to the plaintiffs' proposed discovery of defendants' alleged policy of *en masse* grant terminations, defendants revealed that 948 USDA grants had been terminated since January 20, 2025, *see id.* at 5 n.4, which was more than triple the "312 awards known when the order was issued," Min. Order (June 8, 2026). Parties were thus ordered to confer on prioritization of discovery "as to the existence, or not, of the challenged policy at issue," and to provide a "proposal for rolling production of materials to supplement the administrative record to be completed by September 2, 2026." *Id.* (emphasis removed). In response, defendants reiterated that "this process will require at least six months." Joint Status Rep. at 12, ECF No. 75. A Scheduling Order was issued on June 12, 2026, with nine interim deadlines set to ensure measurable progress in meeting the September 2, 2026, discovery completion date. Min. Order (June 12, 2026).

Less than a week later, on June 18, 2026, defendants sought an extension in the deadline for the first interim production, which extension was granted, *nunc pro tunc*, with plaintiffs' consent, *see* Min. Order (June 22, 2026), followed by three more extension requests, on June 30, July 6, and July 10, *see* Defs.' Unopposed Mot. to Extend June 30 Disc. Deadline, ECF No. 82; Defs.' Mot. to Extend the Disc. Schedule, ECF No. 86; Defs.' Mot. to Extend the Disc. Schedule, ECF No. 90, which requests were also granted, Min. Orders (July 1 and 14, 2026), though the Court observed that defendants "so far appear to have made only minimal progress with production and have prepared a privilege log that appears to be deficient" and cautioned that "[t]he scheduling order was designed to promote efficiency and minimize burden" on the parties, "and defendants' failure to confer in an effort to facilitate timely discovery and production will be considered if any further request for an extension of a court-ordered discovery deadline is presented to the Court," Min. Order (July 14, 2026). Defendants' fifth request for an extension, on July 17, 2026, was denied, citing defendants' failure to confer with plaintiffs prior to filing, and explaining that defendants' excuse of inadequate staffing in their serial requests for extensions no longer sufficed. Min. Order (July 20, 2026).

Over a year after the initiation of this lawsuit, defendants filed, on July 14, 2026, the pending partial motion to dismiss the Second Amended Complaint, *see* Defs.' Mot., which became ripe on August 25, 2026, *see* Defs.' Reply in Further Supp. of Their Partial Mot. to Dismiss ("Defs.' Reply"), ECF No. 110. During briefing on that motion, defendants also filed, on July 24, 2026, their pending motion to vacate the Scheduling Order, *see* Defs.' Mot. to Vacate, to which plaintiffs responded with a cross-motion for sanctions, *see* Pls.' Mot.; *see* Pls.' Reply in Supp. of Their Cross-Mot. for Sanctions & Additional Disc. ("Pls.' Reply"), ECF No. 109. In the parties' most recent update in response to the Court's queries on the current status of discovery and the

AR, which was last supplemented in January 2026, *see* Min. Order (Sept. 29, 2026), defendants describe the now "considerable resources dedicated to this case," including "four (4) attorneys from [the USDA Office of General Counsel ("OGC")] permanently assigned to this case" and "two (2) additional OGC attorneys in the Washington, DC office [who] are currently being onboarded"; "three (3) personnel from USDA's eDiscovery Program assisting with this case, including USDA's Director of Information Affairs"; and "four (4) reviewers from Deloitte [contracted] to review records for responsive information." Joint Status Rep. at 2, ECF No. 114. Defendants also describe their process of a first-level responsiveness review, followed by a second-level privilege review, and reported that "[f]rom August 27, 2026, and up through September 21, 2026, Defendants have reviewed approximately 26,804 documents at the first level and made a production of 21 documents to Plaintiffs on September 22, 2026," and that "[f]rom September 22, 2026, through September 28, 2026, Defendants have reviewed approximately 8,975 documents at the first level." *Id.* at 3. Additionally, defendants have produced 1,517 documents, though only 21 of those documents were produced after July 7, 2026. *Id.* at 5-6.

## II. APPLICABLE LEGAL STANDARDS

Set out below are the separate legal standards applicable to defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) and (6), and plaintiffs' motion for sanctions pursuant to Rules 16 and 37 and the Court's inherent powers.

### A. Motion to Dismiss

To survive a motion to dismiss for "lack of subject-matter jurisdiction," under Federal Rule of Civil Procedure 12(b)(1), "[t]he plaintiff bears the burden of invoking the court's subject matter jurisdiction." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). When considering jurisdictional questions, the court accepts as true all uncontroverted material factual allegations contained in the complaint and "construe[s] the

complaint liberally, granting plaintiff[s] the benefit of all inferences that can be derived from the facts alleged." *Hemp Indus. Ass'n v. DEA*, 36 F.4th 278, 281 (D.C. Cir. 2022) (second alteration in original) (quoting *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011)). Additionally, "where necessary, the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (quoting *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992)).

Federal Rule of Civil Procedure 12(b)(6) permits dismissal for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the plaintiff pleads factual content that is more than "'merely consistent with' a defendant's liability" and "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556-57). "Factual allegations, although assumed to be true, must still 'be enough to raise a right to relief above the speculative level.'" *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (per curiam) (quoting *Twombly*, 550 U.S. at 555). Courts "do not assume the truth of legal conclusions, nor do [courts] 'accept inferences that are unsupported by the facts set out in the complaint.'" *Arpaio*, 797 F.3d at 19 (citing *Iqbal*, 556 U.S. at 678, and quoting *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007)). In determining whether a complaint fails to state a claim, a court may consider only the facts alleged in the complaint and "any documents either attached to or incorporated in the complaint and

matters of which the court may take judicial notice." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1249 (D.C. Cir. 2020) (citation modified).

**B. Motion for Sanctions**

Under Federal Rule of Civil Procedure 37(b)(2)(A), "[i]f a party . . . fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders." FED. R. CIV. P. 37(b)(2)(A). The sanctions expressly authorized for such a violation include: "(i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims; (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence; . . . (vi) rendering a default judgment against the disobedient party; or (vii) treating as contempt of court the failure to obey." FED R. CIV. P. 37(b)(2)(A)(i)–(vii). Additionally, "[i]nstead of or in addition to the orders above, the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." FED R. CIV. P. 37(b)(2)(C).

"District courts have 'considerable discretion' in managing discovery and possess broad discretion to impose sanctions for discovery violations under Rule 37." *Parsi v. Daioleslam*, 778 F.3d 116, 125 (D.C. Cir. 2015) (quoting *United States v. Philip Morris Inc.*, 347 F.3d 951, 955 (D.C. Cir. 2003)). "The central requirement of Rule 37 is that 'any sanction must be just.'" *Bonds v. District of Columbia*, 93 F.3d 801, 808 (D.C. Cir. 1996) (quoting *Ins. Corp. v. Compagnie des Bauxites de Guinée*, 456 U.S. 694, 707 (1982)). "In addition to sanctions contemplated by the Federal Rules of Civil Procedure, courts have an inherent power at common law to 'protect their institutional integrity and to guard against abuses of the judicial process with contempt citations,

fines, awards of attorneys' fees, and such other orders and sanctions as they find necessary, including even dismissals and default judgments.'" *Parsi*, 778 F.3d at 130 (quoting *Shepherd v. Am. Broad. Co.*, 62 F.3d 1469, 1472 (D.C. Cir. 1995), and citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991)).

## III. DISCUSSION

Defendants' partial motion to dismiss is considered first and is granted in part and denied in part, followed by consideration of defendants' motion to vacate the scheduling order and plaintiffs' request for sanctions, both of which are denied. At the outset, for clarification of what is not at issue, defendants' pending motion for partial dismissal does not challenge the following four APA claims: that the terminations of plaintiffs' individual grants violated the APA because this agency action was not in accordance with law (Count III) and was arbitrary and capricious by failing to explain the reasons for terminating the grants (Counts IV and V, as to four original plaintiffs and Land Access Plaintiffs, respectively), and that USDN has plausibly alleged that USDA and its component, the U.S. Forestry Service, violated the APA by terminating USDN's grant under the Land Access Program not in accordance with the law (part of Count VII).

### A. Defendants Are Entitled to Partial Dismissal of Some of Plaintiffs' Claims

Defendants seek dismissal, in whole or part, of six claims asserted in Counts I, II, VI, VII, VIII, and IX of the Second Amended Complaint, and the claims of three original plaintiffs, contending that: (1) AC, PFC and IATP's claims should be dismissed as moot, Defs.' Mot. at 5-9; (2) Counts I and II, "which allege violations of the Fifth Amendment, should be dismissed," *id.* at 18; (3) Count VI, "which alleges Defendants have an unlawful policy or practice of terminating grants without individualized assessment should be dismissed because it is not a proper APA claim," *id.* at 9; (4) Count VII, "which alleges that the grant terminations were contrary to law . . . should be dismissed" for the Land Access Program plaintiffs, *id.* at 14; and (5) Counts VIII and

IX, the separation of powers and *ultra vires* claims, should be dismissed, *see id.* at 21-22. These claims are addressed *seriatim*.

### 1. *Jurisdiction Can Properly Be Exercised over PFC's and IATP's Claims for Declaratory Relief*

Defendants challenge the exercise of subject-matter jurisdiction over claims arising out of the termination of IATP's and PFC's Land Access Program grants and AC's Community Food Projects Competitive grant, contending that because the "period of performance for IATP's grant ended on September 29, 2025," and "both [PFC] and [AC] have fully spent their grant awards," their claims are moot. Defs.' Mot. at 5. While part of the relief claimed by these three plaintiffs is indeed moot, the claims of at least IATP and PFC support other relief that is not moot and thus dismissal is warranted only as to AC's claims related to its Community Food Projects Competitive grant.

The doctrine of mootness "focuses on whether events subsequent to the filing of the complaint have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." *N. Am. Butterfly Ass'n*, 977 F.3d at 1258 (internal quotation marks omitted) (quoting *Hardaway v. D.C. Hous. Auth.*, 843 F.3d 973, 978 (D.C. Cir. 2016)). "Mootness is a jurisdictional question because the Court 'is not empowered to decide moot questions or abstract propositions,'" a limitation that "derives from the requirement of Article III of the Constitution under which the exercise of judicial power depends upon the existence of a case or controversy." *North Carolina v. Rice*, 404 U.S. 244, 246 (1971) (per curiam) (first quoting *United States v. Alaska S.S. Co.*, 253 U.S. 113, 116 (1920); then quoting *Liner v. Jafco, Inc.*, 375 U.S. 301, 306 n.3 (1964)). A lawsuit becomes moot "only when it is impossible for a court to grant 'any effectual relief whatever' to the prevailing party," so "[a]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is

not moot." *Zukerman v. U.S. Postal Serv.*, 961 F.3d 431, 442 (D.C. Cir. 2020) (first quoting *Knox v. Serv. Emps. Int'l Union*, 567 U.S. 298, 307 (2012); then quoting *Chafin v. Chafin*, 568 U.S. 165, 172 (2013)). Additionally, "[t]o prevail on its [Federal] Rule [of Civil Procedure] 12(b)(1) motion to dismiss for lack of jurisdiction . . . the party urging mootness, bears the 'heavy burden' of establishing that the case is moot." *Id.* at 441 (quoting *Honeywell Int'l, Inc. v. Nuclear Regul. Comm'n*, 628 F.3d 568, 576 (D.C. Cir. 2010)).

Plaintiffs do not contest that the three grants of the organizations targeted for dismissal "are now fully spent or closed out" but argue instead that the claims are not moot for two reasons: first, each of the three plaintiffs "continue[s] to seek declaratory relief to remedy the reputational harm caused by Defendants' false allegations in the termination letters," and, second, "[a]ll three Plaintiffs can pursue the policy claim on the additional basis that invalidating Defendants' illegal policy will provide them future relief." Pls.' Opp'n to Defs.' Mot. to Dismiss Pls.' Second Am. Compl. in Part ("Pls.' Opp'n") at 8-9, ECF No. 105. The first reason is sufficient to establish that the claims of at least IATP and PFC are not moot, but the second reason does not withstand scrutiny under binding precedent.

As to their first argument, recall that the termination letters for IATP and PFC accuse these two organizations of taking part in "initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights laws . . . [and]; that are not free from fraud, abuse, or duplication." FAC, Ex. D, PFC Termination Letter at 1, ECF No. 10-6; *id.*, Ex. E, IATP Termination Letter at 1, ECF No. 10-7; *see also* SAC ¶¶ 165 (quoting from PFC termination letter), 169 (describing the IATP termination letter as "a laundry list of potential accusations").

In contrast to IATP and PFC's termination letters, which expressly accuse these two organizations of somehow engaging in or facilitating unlawful conduct, the termination letter for AC's Community Food Projects Competitive Grant states only that the grant "no longer effectuates USDA priorities, which are to maximize and promote American agriculture; ensure a safe, nutritious, and secure food supply; enhance rural prosperity; and protect our National Forests." FAC, Ex. C, AC Termination Letter at 1, ECF No. 10-5. In this way, AC's termination letter contains no accusation that this organization's receipt and use of the grant reflected unlawful discrimination or perpetuated waste fraud and abuse, and thus AC's claim to reputational harm stands on a much weaker basis. A grant termination due only to USDA's new priorities suggests nothing negative, let alone nefarious or unlawful, about AC or its conduct or operations in connection with the terminated grant, and the record here provides no other basis or argument for reputational harm to AC.

Plaintiffs contend that they "have a valid and continuing legal interest in remedying this reputational harm that extends beyond the life of their grant," emphasizing that "[d]efendants have never retracted or rescinded these termination letters, so the harm remains." Pls.' Opp'n at 9. To remedy this reputational harm, plaintiffs believe that declaratory relief is necessary, as called for in their first request for relief in the form of "a declaration that Defendants' terminations of awards and all others pursuant to the policy described herein are unlawful." SAC, Requests for Relief ¶ 1.

Defendants discount these three plaintiffs' claims of reputational harm, describing them as "newly invented to avoid dismissal." Defs.' Reply at 5. Yet, nothing is "new" about the reputational harm plaintiffs claim to suffer from USDA's termination letters. Indeed, plaintiffs refer to concerns over reputational harms in the First Amended Complaint, *see* FAC ¶ 6, in briefing in support of preliminary injunctive relief, *see* Pls.' PI Mem. at 3, 40-41, and the first preliminary

injunction decision examined the language in PFC and IATP's grant termination letters and determined that "[t]he vague accusation that plaintiffs engaged in fraud and abuse is not only completely unsupported by any evidence or reasoning but also doubly damaging to the reputations of these nonprofit organizations," *USDN I*, 2025 WL 2374528, at *34.

As support for discounting any reputational harm stemming from the reasons given for the grant terminations as a basis for maintaining a live controversy here, defendants rely on *Foretich v. United States*, 351 F.3d 1198 (D.C. Cir. 2003), for the proposition that "where harm to reputation arises as a byproduct of government action, the reputational injury, without more, will not satisfy Article III standing when that government action itself no longer presents an ongoing controversy." Defs.' Reply at 3 (quoting *Foretich*, 351 F.3d at 1212-13). This case is not helpful to defendants and instead only confirms that plaintiffs' claimed reputational harm may still be remedied through declaratory relief in this case. The *Foretich* plaintiff was involved in a protracted child custody dispute with his former wife and the notoriety created by that dispute reached Congress, where supporters of his former wife "attempted to broker a deal with him" in a House subcommittee hearing by attempting to make him "give up his parental rights and voluntarily seek vacatur of . . . [child] visitation orders." *Foretich*, 351 F.3d at 1208. When the plaintiff declined to do so, Congress passed an Act that "undisputedly prohibit[ed] the Superior Court from awarding or enforcing custody or visitation rights to [the plaintiff]," *id.*, and this publicity caused damage to plaintiff's professional reputation such that his "business suffered a 30% decline following adoption of the Act," *id.* at 1209. While plaintiff was challenging the constitutionality of that Act, his daughter turned eighteen years old, and thus the D.C. Circuit determined that his "claim is moot insofar as it challenges the Act's negation of his visitation rights." *Id.* at 1209. Pertinent here, the Circuit further determined, however, that notwithstanding the mootness of part of his requested

relief, his "reputational injuries are sufficiently concrete and amenable to redress by a declaratory judgment in his favor as to satisfy the requirements of Article III standing," *id.* at 1210, at least insofar as they "derive[] directly from government action," *id.* at 1214, rather than constituting a "byproduct of government action" that "itself no longer presents an ongoing controversy," *id.* at 1212-13. The same reasoning holds true in this case, where even though the grants have been fully funded, the reputational injuries, at least those of PFC and IATP, are sufficiently amenable to redress to provide Article III standing since, unlike AC, those two organizations were told their grants were terminated due to USDA's view that their receipt and use of the grant awards amounted to unlawful conduct, and thus those injuries stem directly from government action. *See id.* at 1213 (holding that the alleged injury stemming from "a congressional determination that [the plaintiff was] a child abuser and a danger to his own daughter" remained amenable to redress).

Plaintiffs' second argument is that "invalidating Defendants' illegal policy will provide them future relief" because AC and PFC "have routinely been awarded such grants in the past, and will be applying for yet more USDA grants in the future" while "IATP has received USDA grants in the past and may apply for future USDA grants as well." Pls.' Opp'n at 9. In other words, plaintiffs argue that nothing prevents defendants from "terminat[ing] Plaintiffs' future USDA grants on the same or similar bases pursuant to their illegal policy." *Id.* at 11. Plaintiffs lack standing to seek such prospective relief because the Second Amended Complaint is focused solely on the terminated grants, with absolutely no allegations about potential future grants or that they have in fact applied for, let alone received, future USDA grants, to provide sufficient factual allegations about being subjected to any concrete threat of future application of the same alleged unlawful policy. Those plaintiffs whose grant funding remains protected by the preliminary injunctive relief certainly face such a concrete threat from the alleged unlawful policy, absent relief

in this case, but these three plaintiffs whose grant funding has ended stand in a different posture. Indeed, the Supreme Court has determined that "[a]bsent a sufficient likelihood that [a plaintiff] will again be wronged in a similar way, [that plaintiff] is no more entitled to an injunction than any other citizen," and "a federal court may not entertain a claim by any or all citizens who no more than assert that certain practices . . . are unconstitutional." *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1993). Plaintiffs AC, PFC and IATP have not established that they will *likely* be harmed by the same policy again, so this argument fails.

Accordingly, PFC and IATP, who were both accused of discriminatory and unlawful conduct, may continue to pursue declaratory relief associated with their grant terminations to remedy their reputational harm from defendants' actions, but they may not continue to challenge the defendants' alleged policy, even if their grant terminations were allegedly part of the effectuation of that policy. *See Lyons*, 461 U.S. at 111. Additionally, any claim by AC arising out of its Community Food Project Competitive grant, the termination of which did not involve allegations of discrimination or waste, fraud and abuse, is moot and AC's participation in this action will be limited to claims concerning its Land Access Program grant. *See supra* n.1.

**2. *Plaintiffs' Due Process Claims (Counts I and II) Must Be Dismissed***

In Counts I and II, plaintiffs claim defendants violated the Due Process Clause, first, by failing to provide reasonable notice and an opportunity to be heard before terminating the plaintiffs' grants, *see* SAC ¶¶ 198-206 (Count I), and, second, for terminating the grants using an "application of 2 C.F.R. § 200.340(a)(4)" that "is unconstitutionally vague and constitutes an arbitrary exercise of authority" by issuing "form termination letters [that] are also unconstitutionally vague because they are based on priorities that were never previously identified for awardees," *id.* ¶¶ 211-12 (Count II). Defendants contend that these clams are "legally deficient because Plaintiffs had no protected property interest in continued grant funding" and "[w]ithout a

'cognizable liberty or property interest,' a plaintiff cannot state a procedural due process claim against the government." Defs.' Mot. at 18-19 (quoting *Hettinga*, 677 F.3d at 480).

As noted before in this case, "[t]he first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'liberty' or 'property'" and that "[o]nly after finding the deprivation of a protected interest do we look to see if the government's actions comport with due process." *USDN I*, 2025 WL 2374528, at *22 (citation modified) (quoting *NB ex rel. Peacock v. District of Columbia*, 794 F.3d 31, 41 (D.C. Cir. 2015)). Indeed, "[w]hile the D.C. Circuit has recognized property interests in 'certain government benefits' to which one has 'a legitimate claim of entitlement,' courts have generally rejected, aside from certain employment contexts, that parties have a constitutionally protected property interest in other anticipated payments from the federal government." *Id.* (quoting *NB ex rel. Peacock*, 794 F.3d at 41, and citing *New Vision Photography Program, Inc. v. District of Columbia*, 54 F. Supp. 3d 12, 29 (D.D.C. 2014) (JEB) (collecting cases and explaining that the "Supreme Court 'has never held that government contracts for goods and services create property interests protected by due process'" (quoting 2 Richard J. Pierce Jr., *Administrative Law Treatise* 764 (5th ed. 2010))).

Plaintiffs do not dispute this summary of applicable jurisprudence but instead emphasize that "the D.C. Circuit is in the process of deciding when and how a party can plead Due Process claims for grant terminations." Pls.' Opp'n at 18 (citing *Vera Inst. of Just. v. U.S. Dep't of Just.*, 805 F. Supp. 3d 12 (D.D.C. 2025) (APM), *argued*, No. 25-5248 (D.C. Cir. Oct. 14, 2025)).[4] Based on this view of the legal issue raised in an appeal of another case, plaintiffs contend that "there is

[4] Appellants raise four principal questions on appeal: (1) "[w]hether the district court erred in concluding that the Tucker Act deprived it of jurisdiction over APA claims"; (2) "[w]hether Plaintiffs are likely to prevail on their APA claims"; (3) "[w]hether Plaintiffs have stated a viable due process claim and are likely to prevail on that claim"; and (4) whether a preliminary injunction should be entered. Appellants' Opening Br. at 4, *Vera Inst. for Just. v. U.S. Dep't of Just.*, No. 25-5248 (D.C. Cir. argued Oct. 14, 2025)). Most of the ink spilled in the opening brief—more than thirty-six pages' worth—is over the jurisdictional issue and viability of the APA claim, *see id.* at 16-53, with comparative short shrift given to the Due Process arguments, *see id.* at 53-57.

no reason the Court should dismiss the Due Process claims only for them to potentially be revived later" and because "[p]laintiffs have not sought any documents based on this claim, [] premature dismissal would only burden the Court and parties, without any benefit." *Id.* In other words, plaintiffs invite this Court to forbear in applying current binding precedent on the off chance that the D.C. Circuit may provide a basis to sustain the viability of due process claims in the grant termination context. *See* Defs.' Reply at 13 ("Moreover, the prospect that binding precedent may change later 'is a risk inherent in a common-law legal system' and 'is an insufficient basis upon which an indefinite stay of the proceedings for enforcement of an order may be grounded.'" (quoting *USDN II*, 2026 WL 1500832, at *6 n.8)). This invitation to duck binding precedent is rejected. Judicial economy is not a sufficient basis to deny a motion to dismiss where the legal theory is not recognized because "[a]bsent a viable cause of action, a court must dismiss for failure to state a claim." *Superior Fibre Prods., Inc. v. U.S. Dep't of the Treasury*, 156 F. Supp. 3d 54, 60 (D.D.C. 2016) (ESH) (citing *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 188 (D.C. Cir. 2006) ("Whether these are claims 'upon which relief can be granted' depends in part on whether there is a cause of action that permits Trudeau to invoke the power of the court to redress the violations of law that he claims the FTC has committed.")).

Accordingly, dismissal of both Due Process claims in Counts I and II of the Second Amended Complaint is appropriate.

#### 3. *Plaintiffs Have Plausibly Challenged Defendants' Mass Termination Policy as Arbitrary and Capricious (Count VI)*

Defendants seek dismissal of Count VI of the Second Amended Complaint alleging that "[d]efendants' policy mandating grant terminations *en masse*—including Plaintiffs' grants— . . . is arbitrary and capricious." SAC ¶ 254. As support, defendants renew arguments that their policy of *en masse* terminations is not a final agency action, *see* Defs.' Mot. at 14, but these previously

rejected arguments, *see USDN I*, 2025 WL 2374528, at *26-28; *USDN III*, 2026 WL 1877821, at *6, are no more persuasive now.

This Court previously reasoned as to the original plaintiffs that "[w]hile litigants cannot successfully challenge the whole of agencies' activities by seeking, for instance, general improvement across the board, plaintiffs can challenge specific policies or rules implemented by the agency." *USDN I*, 2025 WL 2374528, at *27 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 n.2 (1990) ("[If] there is in fact some specific order . . . applying some particular measure across the board to all . . . terminations," and that order is final, "it can of course be challenged under the APA by a person adversely affected—and the entire '. . . program,' insofar as the content of that particular action is concerned, would thereby be affected.")). Here, plaintiffs "allege that the agency adopted a global policy of terminating *en masse*, without individualized consideration or reasoned review, all grants 'it can portray as related to . . . DEI or climate change,'" and executed the mass terminations by offering a conclusory justification that the grants "'no longer effectuate new USDA priorities,'" with this policy "embodied in the Secretary's March 13 memoranda and demonstrated by the agency 'sending termination letters with the same type of language.'" *Id.* (citations omitted). These allegations, the Court reasoned, plausibly showed that "the policy is sufficiently discrete to be challenged under the APA, and plaintiffs can accordingly request that it be vacated and enjoined on a prospective basis across the board." *Id.* (citations omitted).

The same reasoning holds true for the Land Access Program Plaintiffs, all of whom received virtually identical termination letters "[o]n or around March 23, 2026," consisting of "boilerplate language" that references the Secretary's March 2025 Memorandum, makes the accusation, without citation to any evidence, that USDA "has determined that awards under this

program involved discriminatory preferences based on Diversity, Equity, and Inclusion (DEI) and wasteful spending that did little to further agricultural land purchases." SAC ¶¶ 174, 179-80, 183. Indeed, here, too, "[d]efendants' alleged policy and practice of allegedly perfunctory, unreasoned terminations is sufficiently final for plaintiffs to obtain relief." *USDN I*, 2025 WL 2374528, at *27.

Defendants fault plaintiffs for not having "identified 'some specific order or regulation, applying some particular measure across the board to all individual [] terminations' that they are challenging," Defs.' Reply at 7 (alteration in original) (quoting *Lujan*, 497 U.S. at 890 n.2), but the search for the clear contours of defendants' policy is the precise reason that plaintiffs have been permitted discovery. The absence of such evidence as a specific order or regulation is an insufficient basis to dismiss this claim when plaintiffs have already established the plausible existence of a policy to effectuate *en masse* terminations without individualized consideration. Those extensive allegations include that: (1) "to identify DEI-related grants for review and termination, Defendants used a variety of search terms, including 'Equity,' 'Environmental Justice,' 'DEI,' 'DEIA,' 'Diversity,' 'Inclusion,' 'Underrepresented producers,' 'Underserved communities,' 'Socially disadvantaged producers,' and 'Socially vulnerable,'"; (2) "to identify climate-related grants for termination, Defendants instructed staff to identify any active awards that 'include, fund, or otherwise support climate-related activities which do not demonstrably directly or indirectly benefit farmers, rangers, or producers,' specifically grants that fund 'Climate consulting services'; 'Climate modeling, tracking, or other technology platforms or solutions'; 'The authoring of a report not anticipated to benefit farmers, ranchers, or producers'; 'Climate-friendly facilities/construction'; and 'And other kinds of analysis, evaluation, or reporting,' as well as sixteen 'additional topic areas and search terms'"; and (3) "Defendants later provided their staff

additional topic areas and search terms to employ." SAC ¶¶ 135-36. Further, plaintiffs allege that "USDA staff were instructed to fill out one of several spreadsheets with information regarding each grantee identified through the searches," but that "to the extent the spreadsheets were actually utilized, they establish that the search terms were dispositive as to whether a grant was terminated." *Id.* ¶ 137. Later, "'leadership' were nominally required to approve any terminations, but to the extent it occurred, that review was not substantive." *Id.* ¶ 138.

Plaintiffs add that the USDA Secretary's March 13, 2025 memoranda "appear intended to codify and approve USDA's policy requiring the identification and termination of DEI- or climate-related grants based on search terms and without sufficient individualized review" because "[t]he Memoranda state that it is the policy of the Department to 'not fund programs or organizations that promote or take part in climate change or environmental justice initiatives' or 'DEI.'" *Id.* ¶ 139. Contending that "USDA continues to follow the policy codified in [the memoranda] when terminating grants," plaintiffs allege that "USDA relied on [a memorandum] in the most recent Land Access Program terminations issued in March 2026." *Id.* ¶ 140-41 (capitalization standardized). The original terminations were carried out through "letters that were based on [] form letters," *id.* ¶ 144, and "[o]n or around March 23, 2026, FSA sent termination letters purportedly cancelling 49 out of the 50 awarded Land Access Program grants," *id.* ¶ 174, through "nearly identical termination letters," *id.* ¶ 177. Plaintiffs allege that but for the original preliminary injunction, all of the Land Access Program grants "would have been terminated pursuant to the policy at issue." *Id.* ¶ 176.

Such allegations are more than enough to establish the plausibility of the existence of a policy of terminating grants *en masse* without individualized consideration and based on a keyword search for certain disfavored words and little other reasoned consideration. Such

perfunctory process would not pass muster under the APA, as defendants' counsel has conceded. *See* Hr'g Tr. at 71:11-72:10 (The Court: "If [a word search] were the process, would you say that that process was not individualized and was arbitrary and capricious?" Defense counsel: "I don't think they could go in and see the words 'climate change' and press a delete button that perfunctorily . . . To me, Your Honor, it doesn't seem that that's appropriate. . . . There would need to be a much more thorough review than just a 'control' find search."). Defendants' motion to dismiss Count VI therefore fails.

#### 4. *Land Access Program Plaintiffs Have Plausibly Alleged that the Grant Terminations Were Contrary to Law in Count VII*

Count VII claims that defendants' "policy requiring terminations based on DEI—and its individual termination of Land Access Program Plaintiffs' and AC's grants—are at odds with Congress's mandate that USDA funds for Land Access Program go towards programs that address socially disadvantaged and underserved farmers" and, as such, this policy is "not in accordance with the statutory requirements for the program and thus violates the APA." SAC ¶¶ 269-70. Defendants' challenge to this claim has been rejected twice before. *See USDN III*, 2026 WL 1877821, at *9; *USDN I*, 2025 WL 2374528, at *32-33. Nevertheless, defendants reassert that, due to an amendment made by the Inflation Reduction Act, the statutory authorization for the current version of the Land Access Program is not intended "to be used to fund projects that give preference to individuals based on their race, sex, sexual orientation, or other immutable characteristics," and therefore termination of these grants, which defendants say "were designed to condition eligibility . . . based on a farmer's race or other immutable characteristics," was not contrary to law. Defs.' Mem. at 14-15. As plaintiffs correctly observe, "[t]his third bite at the apple fares no better." Pl.'s Opp'n at 14.

As has now twice been recounted, "[t]he Land Access Program originated with section 1006 of the American Rescue Plan Act, entitled 'USDA Assistance and Support for Socially Disadvantaged Farmers, Ranchers, Forest Land Owners and Operators, and Groups,' which appropriated funds for supporting the designated people or groups." *USDN I*, 2025 WL 2374528, at *32 (quoting American Rescue Plan Act ("ARPA"), Pub. L. No. 117-2, § 1006, 135 Stat. 4, 13-14 (2021)). The statute defines "[t]he term 'socially disadvantaged farmer, rancher, or forest landowner' [to] mean[] a farmer, rancher, or owner or operator of nonindustrial private forest land who is a member of a socially disadvantaged group," and, in turn, "socially disadvantaged group" is given the definition provided in 7 U.S.C. § 2279(a). ARPA, § 1006(c), 135 Stat. at 14. Under 7 U.S.C. § 2279(a), "[t]he term 'socially disadvantaged group' means a group whose members have been subjected to racial or ethnic prejudice because of their identity as members of a group without regard to their individual qualities." 7 U.S.C. § 2279(a)(6).

ARPA § 1006 provided further direction on how specific percents of the appropriated funds were to be used, including for the following five programmatic purposes: (1) "to provide outreach…and other technical assistance on issues concerning food…or nutrition to socially disadvantaged farmers, ranchers, or forest landowners, or other members of socially disadvantaged groups," ARPA § 1006(b)(1); (2) "to provide grants and loans to improve land access for socially disadvantaged farmers, ranchers, or forest landowners, including issues related to heirs' property . . .," *id.* § 1006(b)(2); (3) "to fund the activities of one or more equity commissions that will address racial equity issues within the Department of Agriculture and its programs," *id.* § 1006(b)(3); (4) "to support and supplement agricultural research, education . . . as well as scholarships and programs that provide internships and pathways to federal employment by," funding such programs at institutions eligible for funding under 7 U.S.C. § 321, *et seq.* (known as

the Second Morrill Act), including Tuskegee University, 1994 institutions under 7 U.S.C. § 301 note, Alaska Native, Native Hawaiian and Hispanic-serving institutions under 7 U.S.C. §§ 3156, 3241, and "insular area institutions of higher education located in the territories of the United States" under 7 U.S.C. § 3361, *id.* § 1006(b)(4); and (5) "to provide financial assistance to socially disadvantaged farmers, ranchers, or forest landowners that are former farm loan borrowers that suffered related adverse actions or past discrimination or bias in [USDA] programs," *id.* § 1006(b)(5).

This program was expanded the next year in the Inflation Reduction Act of 2022 ("IRA") Sec. 22007, Pub. L. No. 117-169, 136 Stat. 1818. From a total appropriated amount of $1,010,000,000 for fiscal year 2021, *see* ARPA § 1006(a), the appropriated amount for fiscal year 2022, and "to remain available until September 30, 2031," was almost three times that amount for a total of $2,859,000,000 in the IRA § 22007, which amended ARPA § 1006 to appropriate these additional funds for five programs that correlate directly with the same five programs set out in ARPA § 1006. Rather than using the defined terms, "socially disadvantaged farmer, rancher, or forest landowner" and "socially disadvantaged group," *see* ARPA § 1006 (c)(2) and (3) (referring to 7 U.S.C. § 2279(a)), to describe the eligible recipients of grant funding and intended beneficiaries under the programs, however, the IRA's amended § 1006 eliminates the definition section and uses the undefined term "underserved farmers, ranchers, and forest landowners." IRA § 22007 (amending ARPA § 1006).

Each agreement between the Land Access Program Plaintiffs and USDA states that "[t]he authorizing statute for this agreement is Section 1006 of the American Rescue Plan Act . . . as amended by Section 22007 of the Inflation Reduction Act of 2022," specifying that "Section 1006(b)(1) and (b)(2) of the American Rescue Plan Act authorizes assistance and support to

farmers, ranchers, and forest landowners and operators; and focuses on addressing the needs of underserved producers through outreach, education, engagement, and technical assistance to increase land, credit, and market access." *E.g.*, Land Access Program Pls.' Mot. for a Prelim. Inj., Decl. of Black Or. Land Trust's Exec. Dir., Qiddist Ashe, Ex. A, Att. 2, Agreement Number: FSA24GRA0011612, at 1, ECF No. 63-3. Though the record is silent as to which subsection of Section 1006 AC's Land Access Program grant was awarded, presumably this too was awarded under IRA's amended § 1006(b)(1) and (b)(2). *See* Pls.' PI Mot., Decl. of Leah Atwood, Dir. of Partnerships for AC, ECF No. 14-4.

Other than the use of the new undefined "underserved" term, nearly identical language is used to describe the programs funded in IRA's amended § 1006. For example, IRA's amended § 1006 describes the purpose of the first program, titled "TECHNICAL AND OTHER ASSISTANCE," using identical language as in the original text in ARPA § 1006, "to provide outreach…and other technical assistance on issues concerning food . . . or nutrition to," and then substitutes for the term "socially disadvantaged" the text "underserved farmers, ranchers, or forest landowners, including veterans, limited resource producers, beginning farmers and ranchers, and farmers, ranchers, and forest landowners living in high poverty areas." IRA § 1006(a), 136 Stat. at 2022. Likewise, IRA's amended § 1006 describes the purpose of the second program, titled "LAND LOSS ASSISTANCE," using closely similar language to the original text in ARPA § 1006, "to provide grants and loans . . . to improve land access (including heirs' property and fractionated land issues) for underserved farmers, ranchers, or forest landowners, including veterans, limited resource producers, beginning farmers and ranchers, and farmers, ranchers, and forest landowners living in high poverty areas." IRA § 1006(b), 136 Stat. at 2022. Next, IRA's amended § 1006, in a third subsection, titled "EQUITY COMMISSIONS," describes the purpose

of these commissions using identical language as in the original text in ARPA § 1006, "to fund the activities of one or more equity commissions that will address racial equity issues within the Department of Agriculture and the programs of the Department of Agriculture." IRA § 1006(c), 136 Stat. at 2022. The fourth subsection of IRA's amended § 1006, titled "RESEARCH, EDUCATION, AND EXTENSION," uses similar, though broader, purpose language than in ARPA § 1006, "to support and supplement agricultural research, education . . . as well as scholarships and programs that provide internships and pathways to agricultural sector or Federal employment for" certain specified institutions, including those enumerated in the original text. IRA § 1006(d), 136 Stat. at 2022. Finally, the fifth subsection of IRA's amended § 1006, titled "DISCRIMINATION FINANCIAL ASSISTANCE," directs funds "for a program to provide financial assistance, including the cost of any financial assistance, to farmers, ranchers, or forest landowners determined to have experienced discrimination prior to January 1, 2021, in Department of Agriculture farm lending programs . . .," IRA § 1006(e), 136 Stat. at 2022-23, which is similar to the original text in ARPA §1006 describing the beneficiaries of this financial assistance as "socially disadvantaged . . . former farm loan borrowers that suffered related adverse actions or past discrimination or bias in [USDA] programs," ARPA § 1006(b)(5).

In short, the IRA's amended § 1006 uses identical or similar language for the purposes of the appropriated funding and describes beneficiaries and eligible grant recipients for the programs funded under this section as "underserved," rather than the defined terms "socially disadvantaged farmer, rancher, or forest landowner," or "socially disadvantaged group." Though the term "underserved" is undefined, the USDA generally defines "underserved applicants" "as a group whose members have been subjected to racial, ethnic, or gender prejudice because of their identity as members of the group without regard to their individual qualities." Press Release, FSA, *USDA*

*Offers Targeted Farm Loan Funding for Underserved Groups and Beginning Farmers* (June 2, 2020), https://perma.cc/7JWT-F3NA ("For farm loan program purposes, targeted underserved groups are women, African Americans, American Indians and Alaskan Natives, Hispanics and Asians and Pacific Islanders."); *see also* Pls.' Opp'n at 15 n.5 (quoting a March 6, 2024, USDA press release, now removed from USDA's website and thus inaccessible, applying the same definition that "USDA defines underserved applicants as a group whose members have been subjected to racial, ethnic, or gender prejudice because of their identity as members of the group without regard to their individual qualities.").

Indeed, at the time of the IRA's passage and even today, the term "underserved" is used "routinely" in USDA regulations. Pls.' Opp'n at 15 n. 5 (citing, e.g., 7 C.F.R. § 610.22(c) (2025) ("[H]istorically underserved groups and individuals; i.e., minorities, women, persons with disabilities, *socially and economically disadvantaged groups*, and beginning farmers and ranchers") (emphasis supplied); 7 C.F.R. § 9.302 (2025) ("Underserved farmer or rancher means a beginning farmer or rancher, limited resource farmer or rancher, *socially disadvantaged farmer or rancher*, or veteran farmer or rancher") (emphasis supplied); 7 C.F.R. § 5001.3 (2025) (defining "underserved communities" to include "unserved or underserved populations, *including minorities or protected* groups, persistent poverty areas, or areas where Rural Development projects have not been awarded in the past five years") (emphasis supplied)). The use of the phrase "socially disadvantaged" in these regulations defining "underserved" harkens to the statutory definition of "socially disadvantaged groups," in 7 U.S.C. § 2279(a)(6) (defining the term to mean "a group whose members have been subjected to racial or ethnic prejudice because of their identity as members of a group without regard to their individual qualities."), which was expressly referenced in ARPA's § 1006 (c)(3).

Against this backdrop of the original ARPA § 1006 amended statutory authorization for the grants at issue and regulatory use of the term "underserved" used in the current version of § 1006, twice now, "[d]efendants' attempt to recast the statute as one that contemplated aid to growers based purely on financial status," is an effort that has been determined to be "not credible." *USDN I*, 2025 WL 2374528, at *33; *see USDN III*, 2026 WL 1877821, at *9. In their opposition to the original preliminary injunction, defendants argued in two sentences that "Section 22007(b) [meaning § 1006(b)] funds initiatives based on farmers' financial status and does not mention race, sex, or sexual orientation" and that "Section 22007(b) [meaning § 1006(b)] allows the Department to continue to find initiatives that assist 'underserved' and 'limited resource' producers without funding initiatives 'that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic.'" Defs.' Combined Mem. in Opp'n to Pls.' Mot. for a Prelim. Inj. & for Expedited Disc. at 31, ECF No. 22 (citation omitted). Defendants expanded on this argument in opposing the second preliminary injunction motion, pointing out that "[u]nlike Section 1006 American Rescue Plan, the Section 22007(b) of the Inflation Reduction Act does not purport to assist 'socially disadvantaged farmers,' and does not even contain the term 'socially disadvantaged farmers,'" and arguing that had "Congress intended for the funds appropriated under Section 22007(b) [meaning § 1006(b)] of the Inflation Reduction Act to fund grants for programs that assisted farmers not based on their financial status but based on their race or other protected class, then Congress would not have amended the statute to omit the term 'socially disadvantaged farmers and ranchers.'" Defs.' Combined Mem. in Opp'n to Pls.' Mots. for Leave to File a Second Am. Compl. & for a Prelim. Inj. at 21-22, ECF No. 76. Defendants renew this argument contending that their "position that Congress did not intend for farmers to qualify for assistance under the ILA Program based on their race or other immutable characteristics is based

on a plain text reading of the amendments that Congress made to the program as part of the Inflation Reduction Act." Defs.' Mot. at 16. As plaintiffs point out, however, "Defendants cite no legislative history to support this argument," Pls.' Opp'n at 17, and "it is more likely that Congress chose 'underserved' to broaden the class of eligible farmers using a variety of markers of social and governmental bias, including race and gender, and consistent with the current regulatory and statutory uses of that term," *id.*

Indeed, the fundamental flaw in defendants' position is that even if Congress intended in the IRA's amended § 1006 to replace the prior criteria with new criteria for grant eligibility, *see* Defs.' Mot. at 17—and momentarily disregarding the common-sense understanding that "underserved" may apply more broadly than "socially disadvantaged"—plaintiffs have still established that defendants acted contrary to law. Simply applying a keyword search for certain disfavored words—"including 'Equity,' 'Environmental Justice,' 'DEI,' 'DEIA,' 'Diversity,' 'Inclusion,' 'Underrepresented producers,' 'Underserved communities,' 'Socially disadvantaged producers,' and 'Socially vulnerable,'" which search terms were allegedly dispositive as to whether a grant was terminated, *see* SAC ¶ 135, will likely sweep up grants benefiting financially disadvantaged and thereby "underserved" farmers, rancher, or forest landowners. For instance, applying the search term "Socially disadvantaged producers," *id.*, will almost certainly result in targeting for termination grants designed to benefit "farmers, ranchers, and forest landowners living in high poverty areas," IRA § 1006(b), but the process allegedly employed by defendants to terminate grants would encompass these grants too. In any event, the overall context of the statute, which includes the creation of equity commissioners and funding directly aimed at farmers who themselves directly experienced discrimination from USDA, confirms the reality of a strong

overlap between those "underserved" and those who have been socially disadvantaged through historic discrimination.

While defendants may now have policy disagreements with the IRA's amended § 1006 and may vigorously object to the appearance of the words like "DEI, "DEIA," "Diversity," and "Inclusion," they run afoul of the law when they predicate termination of grants on the existence of those words and not consideration of the statutory objective.

### 5. *Plaintiffs' Separation of Powers Claim (Count VIII) Withstands Dismissal But Not the Ultra Vires Claim (Count IX)*

Defendants seek dismissal of the last two Counts VIII and IX in the Second Amended Complaint. In Count VIII, USDN, AC, and the Land Access Program Plaintiffs raise a separation of powers claim, contending that because "[t]he Constitution vests the right to appropriate funds exclusively with Congress," defendants' policy terminating their grants "violates the separation of powers because the basis for terminating such awards directly contravenes their statutory mandates." SAC ¶¶ 275, 278, 280. Count IX asserts an *ultra vires* claim that defendants "have no statutory authority to terminate awards for reasons wholly inconsistent with" the relevant statutes." *Id.* ¶¶ 284-85.

As to the separation of powers claim, defendants contend dismissal is appropriate because "[t]he limited cases involving successful Appropriations Clause challenges have involved attempts to spend funds not appropriated by Congress or a refusal to spend appropriated funds where the relevant statutes required that the funds be spent" and that "[n]either of those circumstances exists here." Defs.' Opp'n at 21 (citing *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 432 (1990), and *Train v. City of New York*, 420 U.S. 35, 42-45 (1975)). Plaintiffs, in turn, cite a more recent case by another judge on the Court recently affirmed by the *en banc* D.C. Circuit, Pls.' Opp'n at 20 (citing *Climate United Fund v. Citibank, N.A.*, 778 F. Supp. 3d 90, 116 (D.D.C. 2025) (TSC), *aff'd*

*per curiam*, No. 25-5122, 2026 WL 2235002, at *1 (D.C. Cir. Aug. 4, 2026) (en banc)). That case concerned the Environmental Protection Agency's decision to "suspend[] all eight grants comprising the entire NCIF [National Clean Investment Fund] and CCIA [Clean Communities Investment Accelerator Fund] programs," both of which programs were designed to help "finance clean technology projects nationwide" and had been created by Congress in the IRA. *Climate United Fund*, 778 F. Supp. 3d at 99, 116. The grantees sued and were found to have a likelihood of success on the merits of a claim for a "violation of the separation of powers" because "'Congress speaks through the laws it enacts' and here, EPA has terminated programs established through lawfully enacted congressional appropriations without any basis in statutory authority." *Id.* at 115 (quoting *In re Aiken County*, 725 F.3d at 260). Thus, "EPA cannot shut down these programs completely and it cannot 'decline to spend previously appropriated funds.'" *Id.* (quoting *In re Aiken County*, 725 F.3d at 260). In other words, "EPA lacks the authority to effectively unilaterally dismantle a program that Congress established." *Id.* at 116.

Plaintiffs allege similar facts capable of supporting the inference that defendants are "unilaterally dismantl[ing] a program that Congress established." *Id.* The Second Amended Complaint alleges that "[o]n or around March 23, 2026, FSA sent termination letters purportedly cancelling 49 of the 50 awarded Land Access Program grants." SAC ¶ 174. AC is identified as "the only Land Access Program grantee who did not receive such a termination letter," *id.*, for the highly plausible reason that "[b]ut for that preliminary injunction, on information and belief, AC's Land Access Program grant would have been terminated pursuant to the policy at issue here no later than [] when the remaining Land Access Program awardees received notice of the termination," *id.* ¶ 176. Each of the Land Access Program Plaintiffs "received nearly identical termination letters," *id.* ¶ 177, and each administrative appeal was met with a response by USDA's

National Appeals Division stating that "FSA's March 23, 2026, division terminating your ILA grant is not appealable because it concerns matters of general applicability" and that "[the] grant termination is based on the general policy priorities of USDA and its decision to cancel the [Land Access Program] program," *id.* ¶ 197 (citation modified).

Against these factual allegations, defendants nonetheless insist that they "are not refusing to spend appropriated funds" but "only seek to spend the funds consistent with the program authorizing statutes and the Department's current priorities." Defs.' Reply at 14. This boils down to a factual dispute that may not be resolved at the motion to dismiss stage when plaintiffs' factual allegations must be taken as true and the inferences to be drawn must be in plaintiffs' favor. Thus, under the reasoning recently affirmed by the *en banc* D.C. Circuit, plaintiffs have adequately alleged that defendants sought to terminate the entire congressional program and thus have plausibly pleaded a separation of powers violation by terminating (or trying to terminate) all grants awarded under a congressionally authorized and appropriated program.

Plaintiffs also bring an *ultra vires* claim, alleging that "USDA and USFS's termination of Forest Program awards, including USDN's award, and USDA and FSA's termination of Land Access Program awards, including AC's and Land Access Program Plaintiffs' awards, are unlawful *ultra vires* actions," SAC ¶ 286, because these agencies "have no statutory authority to terminate awards for reasons wholly inconsistent with the IRA" and other applicable statutes, *id.* ¶ 284-85. The D.C. Circuit has determined that an *ultra vires* challenge, which "permits, in certain limited circumstances, judicial review of agency action for alleged statutory violations even when a statute precludes review," applies only where "(i) the statutory preclusion of review is implied rather than express; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in

the statute that is clear and mandatory." *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 721-22 (D.C. Cir. 2022) (quoting *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 509 (D.C. Cir. 2019)); *see also Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009).

The D.C. Circuit has explained that such a "demanding standard is necessary because *ultra vires* review seeks the intervention of an equity court where Congress has not authorized statutory judicial review, on the assumption that Congress has not 'barred judicial comparison of agency action with plain statutory commands.'" *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 765 (D.C. Cir. 2022). To succeed, then, "*ultra vires* claimants must demonstrate that the agency has plainly and openly crossed a congressionally drawn line in the sand." *Id.* Thus, the D.C. Circuit has "explained that if the plaintiff's claims would have failed under the APA, then those same claims necessarily 'could not succeed under' *ultra vires* review, which has an even 'narrow[er] scope.'" *Id.* (alteration in original) (quoting *Trudeau*, 456 F.3d at 190).

In light of this precedent, "there is no risk that the 'premature' dismissal of an ultra vires claim will prejudice a plaintiff who also brings an APA claim" because "*ultra vires* review inherently 'represents a more difficult course . . . than would review under the APA.'" *Lewis v. U.S. Parole Comm'n*, 743 F. Supp. 3d 181, 201 (D.D.C. 2024) (RCL) (quoting *Trudeau*, 456 F.3d at 190). Thus, "prudential considerations favor interpreting the *ultra vires* pleading standard to foreclose the mutual survivability of a statutory claim and an *ultra vires* claim, even at the motion to dismiss stage." *Id.*; *see also Jafarzadeh v. Duke*, 270 F. Supp. 3d 296, 311 (D.D.C. 2017) (JDB) ("[B]ecause plaintiffs are able to assert the same claim through the APA, they cannot obtain relief under the Mandamus Act or through the Court's inherent power to review ultra vires agency actions.").

Thus, as plaintiffs continue to assert viable APA claims, their *ultra vires* claim will be dismissed without prejudice. *See Lewis*, 743 F. Supp. 3d at 201 ("[I]f a plaintiff advances both a well-pleaded APA claim and a duplicative *ultra vires* claim, the *ultra vires* claim must be dismissed upon a motion by the defendants for failure to state a claim.").[5] Accordingly, the separation of powers claim (Count VIII) survives defendants' motion to dismiss but not plaintiffs' *ultra vires* claim (Count IX).

**B. Imposition of Sanctions Is Not Appropriate**

Defendants also move to vacate the scheduling order entered June 12, 2026, *see* Defs.' Mot. to Vacate, and in response plaintiffs have moved for sanctions or, alternatively, additional discovery in the form of "a single deposition of each individual responsible for terminating the DEI- and climate-related grants," Pl.'s Mot. at 2, which, defendants clarify would amount to "thirty-three different individuals [who] signed the termination letters," Defs.' Combined Mem. in Opp'n to Pls.' Mot. for Sanctions & Reply in Further Supp. of Their Mot. to Vacate the Scheduling Order ("Defs.' Opp'n") at 10, ECF No. 107. Though defendants' diligence in complying with their obligations to complete the AR and comply with limited discovery requests is disappointing and will not be rewarded with their requested elimination of all deadlines, each motion is denied for the reasons explained below.

Defendants currently have nine outstanding deadlines for discovery, but rather than confer with plaintiffs and propose new realistic dates for completion of discovery, they filed their motion

---

5 In an effort to sustain the ultra vires claim, plaintiffs contend that "if in this matter DOGE or another outside party directed USDA's terminations under the Defendants' mass termination policy, then such terminations could be *ultra vires*," Pls.' Opp'n at 19, but this fails since no factual allegations necessary to support this argument are presented in the Second Amended Complaint or Count IX, which make no reference to DOGE or such outside decision-makers of the grant terminations. *See* SAC ¶¶ 282-86; *see also* Defs.' Reply at 13 ("Even if this could be a basis for an ultra vires claim, Plaintiffs have not plausibly alleged in the Complaint that the decisions to terminate grants came from outside of the Department."). In short, this argument does not help plaintiffs demonstrate that their operative complaint plausibly advances an *ultra vires* claim.

to vacate the scheduling order "on July 24, 2026, after four of the deadlines ha[d] passed and on the same day as three of the deadlines" came due. Defs.' Mot. to Vacate at 2. They contend that "the schedule has not been efficient or minimally burdensome giving their resource constraints" and "competing priorities," noting that "[d]efendants do not benefit from discovery lasting longer than necessary," *id.* at 3, 4, while "Plaintiffs continue to litigate this case as if it is in an emergency posture even though Plaintiffs [sic] grants are funded under the Court's preliminary injunctions," *id.* at 4. Outlining the reasons for excusable neglect to explain why they have fallen so far behind the deadlines set in the scheduling order, defendants explain that "senior attorneys assigned to this case faced medical emergencies that unexpectedly interfered with their ability to assist with this case for significant periods of time" and that "[o]ther attorneys assigned to this case have put in notice that they will be leaving the Department imminently." *Id.* at 2. Further, because they "fell behind on earlier productions, it necessarily made it impossible to fully meet future deadlines." *Id.* at 4. These explanations are taken at face value, also mindful of the fact that the number of plaintiffs increased sixfold with the filing, on June 30, 2026, of the Second Amended Complaint, and that defendants' anticipated six-month completion date for discovery and supplementation of the AR was proposed before the expansion of the claims to include the Land Access Program Plaintiffs. Moreover, defendants have, though belatedly, now seemingly put into place the personnel necessary to complete discovery. *See* Joint Status Rep. at 2, ECF No. 114 (stating that "[i]n addition to the senior OGC [USDA Office of General Counsel] managers over seeing this case," there are "four (4) attorneys from OGC permanently assigned to this case" and "two (2) additional OGC attorneys in the Washington, DC office [who] are currently being onboarded"; "three (3) personnel from USDA's eDiscovery Program assisting with this case, including USDA's

Director of Information Affairs"; and "four (4) reviewers from Deloitte [contracted] to review records for responsive information").

Nevertheless, defendants propose no suggested deadlines nor provide any timeframe by which future production obligations will be satisfied. *See id.* Indeed, on September 30, 2026, when asked to provide a "date certain by which defendants plan to complete production of: (a) the AR; and (b) responses to plaintiffs' discovery requests," defendants stated that they "cannot currently provide the date certain that they can complete production of the AR and responses to Plaintiffs' discovery requests," but also represented that the June 5, 2026, representation that discovery might be completed by November 5, 2026, was no longer viable after "[d]efendants greatly expanded the scope of the search for responsive information on July 7, 2026," and "twenty-four additional plaintiffs whose grants under the ILCMAP" were added to this action. Joint Status Rep. at 8-9, ECF No. 114. Granting defendants' motion to vacate would leave discovery in this case in an unacceptable liminal state with no deadlines, and that requires denial of defendants' motion.

Plaintiffs once again have moved for sanctions contending that defendants' failure to comply with the Scheduling Order deadlines—and multiple amended deadlines—"for discovery and to produce a complete administrative record has tainted the evidence, lacks innocuous explanations, constitutes bad faith, has the potential to unduly prejudice Plaintiffs, unduly burdens the Court, and reflects Defendants will not bring themselves into line." Pls.' Mot. at 1. For these reasons, plaintiffs request that the discovery effort be put aside and instead the Court obviate the need for further discovery by imposing the sanction of adverse inferences "that: (i) USDA had a policy to terminate DEI- and climate related grants solely based on the presence of DEI- or climate-related terms in the grant material, which resulted in the termination of the grants identified in

response to Plaintiffs' Second Interrogatory; and (ii) to the extent Defendants seek to rebut the presence or effect of that policy in individual instances, Defendants possess no other evidence than what is in the grants' termination letters, one of only two complete set of documents Defendants have produced to date." *Id.* For their part, defendants could avoid further discovery by accepting these findings in the form of adverse inferences and continuing this litigation with those findings in place, but they strongly oppose any such findings being made. According to defendants, "[t]he adverse inference Plaintiffs seek is inconsistent with the facts of the case" and defendants argue that plaintiffs "can compare the spreadsheets against the list of the awards that were terminated and see for themselves that not all awards that contained a particular search term were terminated," and use this to support an inference that individualized review must have occurred. Defs.' Opp'n at 7-8. Perhaps sensing the weakness of this position—particularly, the glaring omission of any context for this argument with information, for example, whether only a miniscule 2% or an overwhelming 99% of the awards with a keyword hit were terminated—defendants promise that they "have additional records forthcoming if given the opportunity to put this case back on track." *Id.* at 8. As plaintiffs observe, "one presumes that if that smoking gun existed Defendants would have produced and cited it at any time in the last year." Pls.' Reply at 4 n.1.

In any event, as was true the previous time plaintiffs' motion for sanctions was considered "[s]uch adverse inferences would be tantamount to an instruction that defendants' actions in terminating the grants were arbitrary and capricious and make dispositive briefing . . . easily resolved in plaintiffs' favor." *USDN II*, 2026 WL 1500832, at *12. The D.C. Circuit has warned that "[b]ecause the missing evidence instruction deals not with evidence but with its absence, 'there is the danger that the instruction permitting an adverse inference may add a fictitious weight to one side or another of the case.'" *Huthnance v. District of Columbia*, 722 F.3d 371, 379 (D.C. Cir.

2013) (quoting *Burgess v. United States*, 440 F.2d 226, 234 (D.C. Cir. 1970) (opinion of Fahy, J.)); *see USDN II*, 2026 WL 1500832, at *12 (quoting same).

Plaintiffs primarily base their request for adverse inferences on the argument that defendants' excuse about a "lack of staffing" is "particularly difficult to justify given it was patently obvious Defendants would need to prepare for litigation." Pls.' Mot., Att. 1, Pls.' Resp. to Defs.' Mot. to Vacate & P. & A. in Supp. of Pls.' Cross-Mot. for Sanctions & Additional Disc. ("Pls.' Mem.") at 8, ECF No. 101-1. They further state that "Defendants' efforts to explain their staffing only confirms its dilatory nature, while raising additional concerns." *Id.* at 9. By September 30, 2026, however, defendants' staffing appears to have been resolved as defendants described the now "considerable resources dedicated to this case," including "four (4) attorneys from OGC [USDA Office of General Counsel] permanently assigned to this case" and "two (2) additional OGC attorneys in the Washington, DC office [who] are currently being onboarded"; "three (3) personnel from USDA's eDiscovery Program assisting with this case, including USDA's Director of Information Affairs"; and "four (4) reviewers from Deloitte [contracted] to review records for responsive information." Joint Status Rep. at 2, ECF No. 114.[6]

Given the evolving circumstances surrounding the administrative record and requirements for limited discovery, plaintiffs have not established the bad faith requisite for adverse inferences. Less than two weeks after *USDN II* clarified defendants' discovery obligations and directed the parties to propose a schedule controlling discovery, defendants revealed that "the number of defendants' terminated grant awards ha[d] tripled from 312 awards known when the order was

[6] Plaintiffs also attempt to establish "bad faith warranting an adverse inference" through defendants' efforts in the D.C. Circuit "to stay the preliminary relief awarded to the Land Access Program Plaintiffs and to overturn the earlier preliminary injunctions." Pls.' Mem. at 10. To whatever degree defendants' continued efforts to litigate this case in the D.C. Circuit might represent bad faith, any possible prejudice to plaintiffs is now moot as defendants' motion for a stay was denied on September 29, 2026. *See Urb. Sustainability v. U.S. Dep't of Agric.*, No. 26-5264 (D.C. Cir. Sep. 29, 2026) (per curiam order).

issued to 948 awards at present." Min. Order (June 8, 2026) (citations omitted). Then, less than three weeks after the June 12, 2026 scheduling order was imposed, the Second Amended Complaint was filed adding the twenty-four Land Access Program Plaintiffs to the case. At the time, defendants opposed granting leave to amend "emphasizing the 'demanding discovery schedule' already in place and arguing that '[g]ranting Plaintiffs' motion for leave to amend the complaint will increase the number of plaintiffs for whom Defendants need to add documents to the administrative records from four to twenty-eight, a sixfold increase.'" *USDN III*, 2026 WL 1877821, at *7 (citation omitted). That "the addition of twenty-four plaintiffs will trigger additional production demands for completion of the administrative record" was acknowledged, and defendants were assured that "should such production require additional time, defendants are entitled to detail the reasons and make any necessary request for deadline extensions." *Id.* Given the larger discovery burden than anticipated when the Scheduling Order was originally entered, and defendants' efforts, though belated, to add sufficient staffing to this case such that between August 27 and September 28, 2026, they were able to process 35,779 documents at the "first level of review," *see* Joint Status Rep. at 3, ECF No. 114, plaintiffs have not shown that defendants' attempts to comply with the scheduling order were so deficient as to amount to bad faith. Therefore, plaintiffs' request for adverse inferences is denied.[7]

In the alternative, plaintiffs request "depositions of the class of people who have personal knowledge of how Defendants executed the relevant terminations." Pls.' Mem. at 16. As was true in *USDN II*, "plaintiffs are notably silent about the number of depositions, which agency personnel

---

[7] Plaintiffs once again requests monetary sanctions, *see* Pls.' Mem. at 15; Pls.' Reply at 6, but because they have not made a showing of bad faith, this request is denied, *see Parsi*, 778 F.3d at 131 ("[A] finding of bad faith is required for an award of attorney's fees under the court's inherent power. . . . '[T]he district court must find clear and convincing evidence of the predicate misconduct.'" (quoting *Shepherd*, 62 F.3d at 1478)); *see also USDN II*, 2026 WL 1500832, at *14 n.12 (denying plaintiffs' previous request for attorneys' fees for the same reason).

would be noticed for a deposition or even which level of defendants' personnel would be targeted for deposition(s)." 2026 WL 1500832, at *12; *see* Pls.' Mem. at 15-16; Pls.' Reply at 6. Thus, this request, too, is denied. While depositions may in fact be helpful and at this point warranted in this case, the Court will not order any number of such depositions in a vacuum, but only based on the documentary production, conferral among the parties and as properly justified to complete discovery. The parties will be directed to confer and propose an updated schedule for completion of discovery, which may include a reasonable, limited number of depositions, and any necessary supplementation of the AR.

## IV. CONCLUSION

For the reasons explained, defendants' motion to dismiss is granted in part and denied in part. Specifically, defendants' motion to dismiss is granted as to Counts I, II and IX in the Second Amended Complaint, to the claims asserted by Agroecology Commons arising out of the termination of its Community Food Competitive Grant, to Institute for Agriculture and Trade Policy and Providence Farm Collective's claims in Count VI of the Second Amended Complaint, and otherwise denied. In addition, defendants' motion to vacate the schedule for completion of discovery and supplementation of the administrative record, and plaintiffs' motion for sanctions are both denied. Instead, the parties are ordered to confer and propose shortly a modified schedule for completion of the outstanding discovery and supplementation of the administrative record.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date: October 6, 2026

**BERYL A. HOWELL**
United States District Judge